1   KATHLEEN MAYLIN (SBN  (SBN 155371)
    CARA CHING-SENAHA (SBN  298467)
2   JACKSON LEWIS LLP
    199 Fremont Street, 10th Floor
3   San Francisco, California  94105
    Telephone:  (415) 394-9400
4   Facsimile:  (415) 394-9401

5   Attorneys for Defendants
    NATIONAL RAILROAD PASSENGER
6   CORPORATION dba AMTRAK and JOE DEELY

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  JOHN EARL CAMPBELL,                    Case No. C05-05434 MJJ

12            Plaintiff,                   **DEFENDANT NATIONAL
                                           RAILROAD PASSENGER
13       v.                                CORPORATION'S NOTICE OF
                                           MOTION AND MOTION FOR
14  NATIONAL RAILROAD PASSENGER            SUMMARY JUDGMENT, OR IN THE
    CORPORATION dba AMTRAK, JOE DEELY,     ALTERNATIVE, SUMMARY
15  and DOES 1-15, inclusive,              ADJUDICATION; MEMORANDUM
                                           OF POINTS AND AUTHORITIES**
16            Defendants.
                                           [Declarations and Evidence in Support of
17                                         Motion concurrently filed]

18                                         Date:        May 8, 2007
                                           Time:        9:30 a.m.
19                                         Courtroom:   11
                                           Floor:       19
20                                         Judge:       The Hon. Martin J. Jenkins

21                                         Complaint Filed:     12/30/05
                                           FAC Filed:           2/23/06
22                                         Trial Date:          7/23/07

23                                         **[Fed.R.Civ.Proc. 56]**

24

25

26

27

28

**Table of Contents**

Page

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, SUMMARY ADJUDICATION MEMORANDUM OF POINTS AND AUTHORITIES ........................................................................... 1

I.    INTRODUCTION .......................................................................................... 1

II.   STATEMENT OF FACTS ............................................................................. 3

    A.    About Amtrak ....................................................................................... 3

        1.    Amtrak's Commitment to Safety ............................................... 3

        2.    Amtrak's Commitment to Equal Employment Opportunity ........ 4

        3.    Amtrak's Disciplinary Process for Conductors ......................... 5

    B.    Amtrak Hires Campbell as an Assistant Conductor in 1998 ................... 6

    C.    Amtrak Promotes Campbell Twice Between 1998 and 2000 ................... 6

    D.    Campbell is Reprimanded and Suspended for a Series of Safety Violations in 2000 and 2002 .............................................................. 7

    E.    Campbell is Terminated after His Third Serious Safety Violation .......... 8

    F.    Campbell Applies Repeatedly for the Engineer Position While Being Disciplined for Safety Violations ........................................................... 9

        1.    Recruiting for the Locomotive Engineer Trainee Position ......... 10

        2.    Campbell Was Not Promoted in 2001 ....................................... 10

        3.    Campbell Did Not Apply for an Engineering Position in 2002 ... 11

        4.    Campbell Excluded Himself From Consideration in November 2003 ........................................................................................ 11

        5.    Campbell's Extensive Discipline Record Excluded Him from Promotion Consideration in June 2004 ..................................... 12

    G.    Campbell's EEOC and DFEH Filings ................................................... 12

III.  LEGAL ARGUMENT ................................................................................... 13

    H.    Summary Judgment is Proper In This Case because there are No Genuine Issues of Disputed Material Facts ........................................................... 13

    I.    Campbell's Claim for Race Discrimination in Violation of 42 U.S.C. § 1981 is Without Merit ......................................................................... 14

i

1.    Amtrak Had Legitimate Reasons for Denying Campbell the Engineer Position, Initially Because of His Failure to Meet the Minimum Job Qualifications and Later Because of His History of Safety Violations...................................................................... 15

2.    Amtrak Had Legitimate Reasons for Terminating Campbell's Employment Because of Excessive Safety Violations .............................. 16

J.    Campbell's Claim for Retaliation in Violation of 42 U.S.C. § 1981 is Barred as Matter of Law ...................................................................... 17

K.    Campbell's Retaliation Claim Under FEHA Fails as a Matter of Law ................. 17

1.    Campbell's FEHA Retaliation/Discrimination Claim based on Failure to Promote is Time-Barred ............................................................ 17

2.    Campbell Cannot State a Prima Facie Case of Retaliation under the FEHA for his Second Charge Because he has No Evidence of Causation and Temporal Proximity Between Campbell's Complaint to the EEOC and His Termination Is Insufficient as a Matter of Law ............................................................................... 17

3.    Even If Campbell Could State a Prima Facie Case of Retaliation, He Cannot Rebut Amtrak's Legitimate, Non-Retaliatory Reasons for Terminating His Employment .............................................................. 19

L.    Campbell's Wrongful Termination Claim Also Fails As A Matter Of Law Because It Is Premised On His Claims For Discrimination And Retaliation Which Are Without Merit............................................................................... 19

M.    Campbell's Emotional Distress Claims Are Without Merit .................................. 20

1.    Campbell's Intentional Infliction of Emotional Distress ("IIED") Claim is Barred Because Personnel Decisions Are Not Sufficiently Extreme or Outrageous As a Matter of Law .............................................. 20

2.    Campbell's Negligent Infliction of Emotional Distress Claim ("NIED") Is Barred Because the Act of Termination or Failure to Hire Campbell Cannot be Characterized as Negligence ............................ 21

3.    Campbell's Intentional and Negligent Infliction of Emotional Distress Claims Are Preempted by Federal Law ......................................... 21

N.    CAMPBELL'S CLAIM FOR PUNITIVE DAMAGES IS BARRED.................. 22

IV.    CONCLUSION.............................................................................................. 23

ii

DEF. NRPC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MPA    Case No. C05-05434 MJJ

# Table of Authorities

Page

<u>FEDERAL CASES</u>

Anheuser-Busch, Inc. v. Natural Beverage Distributors
   69 F.3d 337, 343 (9th Cir. 1995) ........................................................................ 13

Beanland v. Chicago, Rock Island and Pacific Railroad Co.
   480 F.2d 109, 113 (8th Cir. 1973) ....................................................................... 22

Brooks v. City of San Mateo
   229 F.3d 917 (9th Cir. 2000) .......................................................................... 17,19

Buscemi v. McDonnell Douglas Corp.
   736 F.2d 1348 (9th Cir. 1984) ............................................................................ 20

Celotex Corp. v. Catrett
   477 U.S. 317, 324 (1986)..................................................................................... 13

Clark Co. School Dist. v. Breeden
   532 U.S. 268 (2001)............................................................................................ 18

Coleman v. Quaker Oats Co.
   232 F.3d 1271, 1282 (9th Cir. 2000) .................................................................. 19

Consolidated Rail Corp. v. Gottshall Consolidated Rail Corp.
   512 U.S. 532 (1994)............................................................................................ 21

Costa v. Desert Palace, Inc.
   299 F.3d 838, 864 (9th Cir. 2002) (en banc), cert. Granted, 123 S.Ct. 816, 154
   L.Ed.2d 756 (2003)............................................................................................. 22

Edwards v. U.S. Fid. & Guar. Co.
   848 F.Supp. 1460, 1466 (N.D. Cal. 1994)........................................................... 21

Filipovic v. K & R Express Sys., Inc.
   176 F.3d 390, 399 (7th Cir. 1999) ...................................................................... 18

Fuentes v. Perskie
   32 F.3d 759, 765 (3d Cir. 1994) ......................................................................... 15

Godwin v. Hunt Wesson, Inc.
   150 F.3d 1217, 1221-22 (9th Cir. 1998) ............................................................. 14

Higgins v. Metro-North Railroad Co.
   143 F.Supp.2d 353, 361 (S.D.N.Y. 2001) ........................................................... 21

Hudson v. IBM
   620 F.2d 351, 354 (2d Cir. 1980), cert. denied, 449 U.S. 1066 (1980) .................. 14

Jamison v. Encarnacion
   281 U.S. 635 (1949)............................................................................................ 21

Jones v. R.R. Donnelly & Sons, Co.
   124 S.Ct. 1836, 1845 (2004)........................................................................................9

Kolstad v. American Dental Assoc.
   527 U.S. 526, 545 (1999)......................................................................................22,23

Passantino v. Johnson & Johnson Consumer Products
   212 F.3d 493 (9th Cir. 2000) .....................................................................................22

Persons v. United Postal Service, Inc.
   502 F.Supp.1176, 1777 (N.D. Ga. 1980) ..................................................................17

Reed v. Cracker Barrel Old Country Store
   171 F. Supp. 2d 741, 749 (M.D. Tenn. 2001)...........................................................22

Slaughter v. Atlantic Coast Line Railroad
   302 F.2d 912 (D.C. Cir. 1962)...................................................................................21

Stewart v. Rutgers
   The State University, 120 F.3d 426 (3d Cir. 1996) ...................................................15

Teague v. National Railroad Passenger Corp.
   708 F.Supp. 1344 (D. Mass. 1989).............................................................................22

Texas Dept. of Comm. Affairs v. Burdine
   450 U.S. 248, 254-255 (1981) ...................................................................................14

Villiarimo v. Aloha Island Air
   281 F.3d 1054, 1065 (9th Cir. 2002) .........................................................................18

Wallis v. J.R. Simplot Co.
   26 F.3d 885, 889-90 (9th Cir. 1994) ..........................................................................14

Williams v. Edward Apffels Coffee Co.
   792 F.2d 1482, 1484 (9th Cir. 1986) .........................................................................14

STATE CASES

Alcorn v. Anbro Engineering, Inc.
   2 Cal.3d 493, 499 (1970) ...........................................................................................20

Cole v. Fair Fire Protection Dist.
   43 Cal.3d 148, 155 (1987) .........................................................................................20

Gonzales v. Metpath, Inc.
   214 Cal.App.3d 422 (1989) ........................................................................................14

Guz v. Bechtel National, Inc.
   4 Cal.4th 317, 354-355 (2000)...................................................................................14

Hersant v. Dept. of Social Services,
   57 Cal.App.4th 997, 1005 (1997) .........................................................................15, 19

Martin v. Lockheed Missiles & Space Co.
   29 Cal.App.4th 1718, 1733 ........................................................................................14

iv

DEF. NRPC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MPA   Case No. C05-05434 MJJ

Morgan v. Regents of Univ. of Calif.
    88 Cal. App. 4th 52, 69 (2000) ........................................................................ 20

Semore v. Pool
    217 Cal.App.3d 1087, 1105 (1990) .................................................................. 21

Sequoia Insurance v. Superior Court
    13 Cal.App.4th 1472, 1475 (1993) ................................................................... 20

Trerice v. Blue Cross of California
    209 Cal.App.3d 878, 883 (1989) ...................................................................... 20

Turner v. Anheuser-Busch, Inc.
    7 Cal.4th 1238, 1256-57 (1997) ....................................................................... 19

Yanowitz v. L'Oreal USA, Inc.
    36 Cal.4th 1028, 1042 (2005) ........................................................................... 17

FEDERAL STATUTES

42 U.S.C. § 1981 ...................................................................................................... 17

45 U.S.C. § 51 .......................................................................................................... 21

STATE STATUTES

Cal. Lab. Code § 1102.5. ......................................................................................... 19

FEDERAL RULES

Fed.R.Civ.Proc. 56 ..................................................................................................... 1

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT, OR ALTERNATIVELY, SUMMARY ADJUDICATION

TO PLAINTIFF AND HIS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on May 8, 2007, at 9:30 a.m. in Courtroom 11 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, Defendant NATIONAL PASSENGER RAILROAD CORPORATION dba AMTRAK will move this Court for an order granting summary judgment in favor of Defendant and against Plaintiff JOHN CAMPBELL as to Campbell's First Amended Complaint in its entirety, or alternatively, summary adjudication as to each claim for relief and on the claim for punitive damages.

Amtrak brings this motion on the following grounds:

1.      Campbell's first claim for relief for race discrimination in violation of 42 U.S.C. section § 1981 fails as a matter of law because Campbell cannot establish a prima facie case of race discrimination.  Even if he could, Amtrak had legitimate, non-discriminatory reasons for its decision not to promote Campbell and to thereafter terminate his employment—which Campbell cannot show by "specific, substantial evidence" was a pretext for racially motivated discrimination.

2.      Campbell's second claim for relief for retaliation under 42 U.S.C. § 1981 is barred as a matter of law because there is no viable claim for retaliation under the statute.  Additionally, the claim fails as a matter of law because Campbell cannot establish a prima facie case of retaliation.  Even if he could, Amtrak had legitimate, non-retaliatory reasons for its decision to not promote Campbell and to thereafter terminate his employment – which Campbell cannot show by "specific, substantial evidence" was pretext for a retaliatory motive.

3.      Campbell's third claim for relief for retaliation in violation of California's Fair Employment and Housing Act (FEHA) is time-barred as a matter of law for Campbell's failure to timely file an administrative charge and for Campbell's failure to adequately exhaust his administrative remedies.  Additionally, the claim is barred as a matter of law because Campbell cannot establish a causal link between any protected activity during his employment and any adverse action sufficient as a matter of law to sustain a claim for retaliation under the FEHA.

1   4.    Campbell's fourth claim for relief for wrongful termination in violation of public

2   policy claim is barred as a matter of law because Campbell cannot establish a violation of a public

3   policy.

4   5.    Campbell's fifth and sixth claims for intentional and negligent infliction of

5   emotional distress, respectively, are barred because personnel decisions are not sufficiently

6   extreme or outrageous as a matter of law and because the claims are preempted by federal law.

7   6.    If the Court does not grant summary judgment on all claims, Campbell's claim for

8   punitive damages must fail as a matter of law because Campbell cannot establish that Amtrak

9   acted with the requisite intent or disregard of Campbell's rights.

10   This motion is made pursuant to Federal Rules of Civil Procedure, Rule 56, and is based

11   on the grounds that no genuine fact issues exist in any of Campbell's claims and that Amtrak is

12   entitled to prevail on Campbell's First Amended Complaint or the issues set forth above as a

13   matter of law.

14   This motion is based on this Notice and Memorandum of Points and Authorities and

15   concurrently filed Declarations and Evidence in Support of Motion for Summary Judgment or

16   Summary Adjudication, the Declarations of Steve Shelton, Joseph Deely, Sue Venturelli, Paul

17   Ho, Gregg Baxter, Larry Follis, Randy Erlewine, and Cara Ching-Senaha, together with such oral

18   and documentary evidence as may be permitted.    The Parties through their counsel are in the

19   process of meeting and conferring on submission of a joint separate statement, in accordance with

20   the Hon. Martin J. Jenkins' Standing Order.  A joint separate statement will be filed on or before

21   the tenth court day preceding the hearing on Defendant's motion.

22                                 Respectfully Submitted,

23   Date:  April 3, 2007                 JACKSON LEWIS LLP

24

25                                 By: _Cara Ching's_____
                                           KATHLEEN MAYLIN
26                                         CARA CHING-SENAHA
                                           Attorneys for Defendants
27                                         NATIONAL RAILROAD PASSENGER
                                           CORPORATION dba AMTRAK and JOE
28                                         DEELY

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION

Working on a railroad crew is an inherently dangerous line of work.  Every year we hear of too many injuries and deaths of employees, passengers, and the public from railroad accidents around the world.  Some of these accidents are just that – unavoidable accidents.  However, many injuries and deaths result from the poor practices of a railroad company that has inadequate safety measures.  Occasionally and unfortunately, however, some injuries and deaths may result from the poor safety practices of an individual employee of a railroad company that has the highest safety standards.  It is that railroad company's obligation and responsibility to have policies and practices in place to identify and remove that safety-challenged employee from service before a serious accident occurs.   Amtrak is just such a company and Plaintiff John Campbell is that employee who accurately was referred to as an "accident waiting to happen."

Defendant National Passenger Railroad Corporation dba Amtrak hired John Campbell as an Assistant Conductor on September 30, 1998.   During Campbell's first two years of employment, he was promoted twice - first to Assistant Yard Conductor and then to Yard Conductor.   During the next few years of Campbell's employment, he committed a series of serious safety and operating rules violations for which he was repeatedly disciplined.  During the same period of time he was being disciplined for various rules infractions, Campbell applied several times, and was logically rejected, for promotion to Amtrak's Locomotive Engineer Trainee - a position with even greater safety responsibilities.

Despite his earlier promotions when his performance was acceptable, and his series of safety violations thereafter, Campbell alleges Amtrak's failure to promote him to the position of Engineer trainee was motivated by racial bias.  Campbell alleges he applied for and was denied the position several times while other employees Campbell believed to be less qualified, or who Campbell believed had less seniority, were selected for the position.  Campbell, however, was not eligible for promotion to the Engineer trainee position the first two times he allegedly applied because he had not worked the requisite one-year period pursuant to Amtrak's policy.  Thereafter, his applications were rejected either because of his record of safety violations or because

1   Campbell did not properly apply for the position.

2       Amtrak finally discharged Campbell for his third serious rules infraction, consistent with

3   Amtrak's progressive discipline guidelines. Every instance of Campbell's rules violation was for

4   his failure to follow basic but critical operating rules relating to passenger or employee safety.

5   Campbell's repeated violations of Amtrak's safety rules, not his race, disqualified him for

6   promotion to the position of Engineer trainee and eventually lead to his termination from

7   employment on September 17, 2004. It is of important note that the Public Law Board, the

8   highest and final level of appeal available to Campbell's union to challenge Amtrak's decision to

9   terminate his employment (which is chaired by a neutral, non-railroad affiliated member),

10  determined the decision was just and upheld it.

11      Campbell alleges six claims for relief: (1) race discrimination in violation of 42 U.S.C. §

12  1981; (2) retaliation in violation of 42 U.S.C. § 1981; (3) retaliation in violation of the Fair

13  Employment and Housing Act (FEHA); (4) wrongful termination in violation of public policy; (5)

14  intentional infliction of emotional distress; and (6) negligent infliction of emotional distress.

15  Amtrak asks the court to summarily adjudicate all of the claims in Campbell's First Amended

16  Complaint in its favor because each fails to state a triable issue of fact as a matter of law.

17      Campbell's first claim, for race discrimination under 42 U.S.C. § 1981 cannot stand

18  because many of the allegations fall outside of the applicable statute of limitations, and those that

19  do not are not supported by admissible evidence. Specifically, Campbell has no competent

20  evidence to rebut Defendant's legitimate reasons for rejecting his applications for the Engineer

21  position or for later terminating his employment due to repeated and serious safety violations.

22  Moreover, Campbell has no competent evidence that Amtrak treated non African-American

23  employees who committed the same type and number of safety violations any differently than

24  Campbell. Campbell believes he was more qualified than those selected by Amtrak for the

25  Engineer trainee position, but he has only his inadmissible speculation and the inadmissible

26  speculation of several of his co-workers to rely on.

27      Campbell's second and third claims for retaliation under 42 U.S.C. § 1981 and the FEHA

28  also are without merit as retaliation is not a viable claim under 42 U.S.C. § 1981 and the FEHA

1  claim for retaliation is barred as untimely or because he failed to exhaust the administrative

2  process, and Campbell also cannot prove the necessary causal link between his prior filing of an

3  EEOC charge some eight months before his termination and his termination. Moreover, Amtrak

4  had legitimate, non-retaliatory reasons to terminate Campbell's employment – namely, his history

5  of safety violations.

6       Campbell's claims for intentional and negligent infliction of emotional distress are barred

7  because they are preempted by FEHA, because personnel decisions are not sufficiently extreme

8  or outrageous as a matter of law, and because Campbell has no other evidence of conduct by

9  Amtrak that was sufficiently extreme or outrageous to cause him emotional distress.

10      In sum, Campbell cannot establish a triable issue by competent evidence on any of his

11 claims. Therefore, Amtrak respectfully requests this Court to grant this motion in its entirety.

12 **II.    STATEMENT OF FACTS**

13      **A.    About Amtrak**

14      The name Amtrak is the blending of the words "American" and "Track." The railroad's

15 official name is the National Railroad Passenger Corporation. Amtrak officially began service on

16 May 1, 1971. Monthly ridership in 1971 was just slightly over one million. In fiscal year 2005,

17 Amtrak served more than 25 million passengers. Today, Amtrak serves more than 500 stations in

18 45 states. Amtrak operates over more than 22,000 route miles. Amtrak trains operate every

19 minute of the entire year. Each day, approximately 61,000 passengers travel on Amtrak.

20           1.    Amtrak's Commitment to Safety

21      Working in and around trains is dangerous. Passengers and employees have been severely

22 injured or killed as a result of safety rules not being followed. As a result, Amtrak has listed the

23 achievement of safety excellence as one of its Key Corporate Goals in its Standards of Excellence

24 distributed to all employees, in that "[t]he safety of our passengers, our employees, the public,

25 and our operating environment is our highest priority." (Venturelli Dec., ¶ 4, Ex. C.) To that

26 end, Amtrak requires its employees to familiarize themselves with the Company's standards of

27 excellence and to understand what is expected of them:

28           •   "You should understand that failure to follow the standards of excellence outlined

1   in this booklet—as well as the rules specific to your particular job—will result in

2   appropriate corrective or disciplinary action up to and including dismissal."

3   • "Amtrak's highest priority is the safety and well being of our employees and

4   customers. Your help is essential to achieving that goal. You can begin by being

5   sure that you understand and comply with all safety requirements related to your

6   position. In many instances, it may be just a matter of using plain common sense."

7   • "Familiarize yourself with and obey safety guidelines pertinent to your department

8   or craft. They contain wisdom gained from the experience of others who have

9   come before you."

10  • "Working safely is required of all employees, regardless of position."

11  (Venturelli Dec. ¶ 4, Ex. C.)

12      Specific to Conductors, Engineers, and other crew employees, Amtrak's safety and

13  operating rules are provided in extensive materials and instructions, including: the General Code

14  of Operating Rules; Service Standards for Train Service Employees; AMT-3, Amtrak's Air Brake

15  and Train Handling Rules and Instructions; and, AMT- 5, Amtrak's Safety Instruction for

16  Transportation Employees. All Amtrak conductors and engineers are charged with knowing and

17  following the rules as a condition of employment.    (Shelton Dec., ¶ 8.)    Plaintiff was no

18  exception. (Plaintiff Deposition, attached to Ching-Senaha Dec. as Exhibit A (hereafter "Pl.

19  Depo."), 41:23—42:11, 153:24—154:16 and Pl. Depo. Ex. 8, 11, 12.)

20              2.    Amtrak's Commitment to Equal Employment Opportunity

21      Amtrak has well-articulated and well-disseminated policies and practices to protect

22  employees from unlawful harassment, discrimination or retaliation. Since the 1970s, Amtrak has

23  maintained and disseminated to employees a handbook describing its formal internal procedure

24  for reporting and responding to EEO Complaints. (Venturelli Dec., ¶ 5, Ex. D.)   When Mr.

25  Campbell was hired, Amtrak's 1994 handbook titled "EEO Internal Complaint Procedures

26  Handbook" was made available to all employees. The handbook explains how an employee can

27  file an EEO complaint and has separate sections explaining the purpose of the internal complaint

28  procedure; who may file an internal complaint; where to file; when to file; and how the internal

complaint procedure worked.    It also discusses Amtrak's commitment to addressing any

complaints.  It encourages employees to file as soon as possible, and no longer than a year after

an event had occurred.  It explains that the EEO representative will investigate the allegation and

corrective action will be taken as necessary.  (Venturelli Dec., ¶ 5.)

Amtrak also has maintained an Affirmative Action/Equal Employment Opportunity policy

as part of its corporate procedures since the Company's inception in 1971.  It states the purpose of

that section of the Procedures Manual is to "establish a policy and employment environment

which ensures fair and equitable treatment of all applicants and employees."  It also discusses

Amtrak's managers' and supervisors' responsibilities to ensure that all personnel actions and

employment decisions are administered without regard to race.  It discusses the internal complaint

resolution process and how Amtrak has put this in place as part of its good faith attempt to

comply with Title VII.  (Venturelli Dec., ¶ 7, Ex. E.)  In sum, the following policy statement

regarding discrimination in its Standards of Excellence encapsulates Amtrak's commitment to

diversity and equal opportunity:

> Amtrak will continue to be a leader in providing equal opportunity for employees in a work environment free of discrimination and harassment.  As a matter of policy, we manage this company and administer our programs without regard to race, color, religion, sex, national origin, age, disability, sexual orientation or veteran's status and in conformance with all applicable federal, state and local laws.
>
> Therefore, we will not tolerate discrimination or harassment of any kind by our employees toward our customers or coworkers, including but not limited to racial, ethnic, religious or sexual slurs, whether written or spoken.

(Venturelli Dec. ¶ 4, Ex. C.)

    3.    Amtrak's Disciplinary Process for Conductors

Amtrak employs conductors pursuant to a collective bargaining agreement with the United

Transportation Union.[1]  That agreement provides that a conductor will not be disciplined without

---

[1] Engineers and conductors are in different crafts, belong to different unions, and hold no bid or seniority rights to the other's positions. (Shelton Dec., ¶ 9; Venturelli Decl., ¶ 9; Pl. Depo., 202:11--203:10)

1   the benefit of a hearing, and includes a right of appeal. (Shelton Dec., ¶ 3.) After being charged

2   with a disciplinary violation, a formal investigatory hearing is convened in which the employee,

3   the employee's union representative, and a company representative (referred to as the Charging

4   Officer) attend the hearing and present evidence to a Hearing Officer. The Hearing Officer is a

5   full-time management employee. At the hearing, the employee has the ability to call any witness

6   desired. The hearing is recorded and transcribed. The decision of the Hearing Officer may be

7   appealed to the Labor Relations officer, and that decision may be appealed to the Public Law

8   Board where the claim is finally decided by a panel of three: an Organization Member (union), a

9   Carrier Member (company), and a Neutral Member (non-railroad affiliated) who is the Chairman

10  of the Board.[2] (Shelton Dec., ¶ 5.) Amtrak's Progressive Discipline Procedures are guidelines for

11  dealing with offenses by employees. Under the guidelines, a third formal discipline is grounds

12  for dismissal. Further, suspension of ten days is considered a very serious penalty and dismissal

13  is the likely result of any future infraction after an employee receives a ten (or more) days'

14  suspension. (Shelton Dec., ¶ 7.)

15          **B.     Amtrak Hires Campbell as an Assistant Conductor in 1998**

16          Amtrak hired Campbell as an Assistant Conductor at its Oakland, California crew base on

17  September 25, 1998. (Pl. Depo., 61:7-18,  83:20-25 and Pl. Depo. Exs. 2, 7.) Campbell's only

18  other railroad experience  was a job he held at Southern Pacific as a Track Laborer. (Pl. Depo.,

19  36:21—37:20) Campbell had no other railroad experience before he applied to Amtrak to be an

20  Assistant Conductor. He had no experience as an Engineer anywhere. As an Assistant Conductor

21  at Amtrak, Campbell was responsible for taking passenger tickets, assisting passengers on and off

22  the train, and insuring the safe movement and operation of the trains. (Pl. Depo., 41:16-21.)

23          **C.     Amtrak Promotes Campbell Twice Between 1998 and 2000**

24          In 1999, Amtrak promoted Campbell to the Assistant Yard Conductor position.  (Pl.

25  Depo., 47:12-20.) Campbell's position as Assistant Yard Conductor gave him increased authority

26  ─────────────────────
    [2] Also part of the disciplinary process is the waiver option, which is a plea bargain negotiated
27  between the union and management, where the employee admits guilt to a rule or rules violation
    and waives his right to a hearing in exchange for a negotiated specified discipline. (Shelton
28  Dec., ¶ 6.)

DEF. NRPC'S  NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MPA          Case No. C05-05434 MJJ

1    and increased responsibility. (Pl. Depo., 97:4-20.) In the latter part of 2000, about a year after

2    his promotion to Assistant Yard Conductor, Campbell applied for and received a promotion to

3    Yard Conductor. (Pl. Depo., 48:21-49:3.) A Yard Conductor is primarily responsible for

4    switching equipment for train make up to stage trains for departure and arrival. Adherence to

5    safety and operation rules and policies is a critical job function given the high frequency that a

6    Yard Conductor switches equipment. (Shelton Dec., ¶ 4.)

7        **D.    Campbell is Reprimanded and Suspended for a Series of Safety Violations in**
         **2000 and 2002**
8

9        Over the course of several years, Campbell engaged in several acts of serious misconduct.

10   In early 2000, Campbell was charged with seven violations of the Amtrak General Code of

11   Operating Rules, Safety Rules, and AMT-3 Rule. The charges stemmed from damage caused by

12   Campbell on March 24, 2000 when trucks (railroad cars) were moved improperly in the yard, a

13   boxcar derailed, equipment was damaged, and Campbell failed to report the incident. (Pl. Depo.,

14   113:10—115:4, 116:14—118:4, 122:2—123:6 and Pl. Depo. Exh. 13) The recommended

15   discipline for the misconduct was termination. Campbell, however, acknowledged his

16   misconduct and waived his right to a formal investigation. (Id.) As a result of his admitted

17   misconduct, Campbell was issued a formal letter of reprimand. (Pl. Depo., 119:13-15.)

18       In January 2002, Campbell was charged with four serious rules infractions relating to a

19   boxcar derailment on January 10, 2002. (Baxter Dec, ¶ 2; Pl. Depo., 118:22—119:1 and Pl.

20   Depo. Exh. 27.) Campbell was charged with moving a train at an unsafe speed (Charge 1), failing

21   to work safely and to avoid damage to equipment (Charge 2), failing to verify cars were properly

22   secured before coupling or moving cars (Charge 3), and failing to control train movement while

23   moving cars into a spur track (Charge 4). (Baxter Dec., ¶ 2, Ex. A.; Pl. Depo., 118:19—120:3,

24   123:12--124:1 and Pl. Depo. Exh. 14.) Campbell's rules violations resulted in a derailment.

25   (Shelton Dec., ¶ 11; Pl. Depo., 118:19—119:1.) Amtrak conducted a formal investigation

26   hearing on March 15, 2002, which included a transcribed hearing. Based in large part on

27   Campbell's own admissions, he was assessed a 20 day suspension, with 10 days held in abeyance.

28

1 (Baxter Dec., ¶ 3, Ex. B; Pl. Depo., 120:4—121:7, 123:12—124:1 and Pl. Depo. Ex. 14.)

2 Campbell's bargaining representative appealed the suspension up both tiers of the appeal process

3 to the Public Law Board. On August 12, 2004, the Board upheld the suspension. (Baxter Dec., ¶

4 5; Pl. Depo., 120:24—125:7, 141:21—142:8, 155:17-24, 229:14-22  and Pl. Depo. Ex. 25

5 (excerpt – pages D09554-D09556), 30.)

6        **E.    Campbell is Terminated after His Third Serious Safety Violation**

7        Campbell continued to prove himself unable to safely perform his job despite having been

8 issued the previous formal letter of reprimand and then later being assessed a 20-day suspension.

9 The final incident leading to Campbell's termination took place on July 24, 2004 when Campbell

10 improperly disabled the brakes on a locomotive, which subsequently began rolling away on its

11 own volition after a hard coupling. The yard foreman had to run along the moving locomotive to

12 engage the brakes. (Shelton Dec., ¶ 10.) The incident resulted in Campbell being charged with

13 five rules violations of the General Code of Operating Rules, Service Standards for Train Service

14 Employees, and AMT-3, Amtrak Air Brake and Train Handling Rules and Instructions. (Shelton

15 Dec., ¶¶ 8 and 10, Ex. C; Pl. Depo., 139:19—142:11 and Pl. Depo. Exh. 19.)

16        As part of Amtrak's investigative process[3], a formal hearing was conducted on September

17 9, 2004, at which testimony was taken and exhibits submitted. (Pl. Depo., 140:24—141:7.)

18 Campbell had the ability to call any witness he wanted and submit any documentation in his

19 defense. (Shelton Decl., ¶ 5.) On September 17, 2004, hearing officer Patrick Gallagher issued a

20 Decision to Campbell which stated in pertinent part that it was "evident on the record by the

21 testimony of the Corporation's witnesses and your own testimony that you clearly violated the

22 rules and instructions regarding the movement and coupling of cars and engines." (Shelton Dec.,

23 ¶ 11, Ex. D; Pl. Depo., 154:17—155:4 and Pl. Depo. Exh. 19.) Campbell was found guilty of

24 four charges and, as a result, Steve Shelton, Amtrak's District Superintendent in the Pacific

25 Division, concluded and recommended that in light of the current violations and Campbell's prior

26

27 [3] The investigative process includes on-site discussions with witnesses – the same process that
Plaintiff described as "fair" in his deposition  (Erlewine Decl., Exh. A (which is Plaintiff's

28 deposition taken *Hardeman v. Amtrak*, at 21:6-17)  Plaintiff also testified that Amtrak was more
interested in finding out the truth, than in using him as a fall guy. (Id., also  21:6--23:10.)

8

discipline record, the just and necessary action was to terminate Campbell's employment. (Shelton Dec., ¶¶ 1 and 11.)[4]

On September 28, 2004, the union appealed Campbell's termination to Amtrak's Director of Labor Relations. On November 9, 2004, the Director denied the appeal, and noted that "Claimant's approach to operating rule compliance is the proverbial 'accident waiting to happen'" and continued that Amtrak "should not be required to retain Claimant until there is a serious incident where injuries, damage or delays occur because of Claimant's misguided decision to short cut operating rules." (Shelton Dec., ¶ 12, Ex. E; Pl. Depo., 155:17-24 and Pl. Depo. Exh. 21.)

The union appealed the Director of Labor Relations' decision to the Public Law Board on November 10, 2004. The Board dismissed the claim (denied the appeal) on February 24, 2006. The Board agreed with Amtrak's judgment that Campbell "has been afforded sufficient opportunity to correct his behavior to comply with the Carrier's operating rules and failed to do so." (Shelton Dec., ¶ 3, Ex. F.)

F.    **Campbell Applies Repeatedly for the Engineer Position While Being Disciplined for Safety Violations**[5]

Despite the pattern of unsafe conduct outlined above, which resulted in a letter of reprimand, suspension, and then termination, Campbell takes issue with the fact that he was not promoted into an Engineer position.

---

[4] Shelton is ultimately responsible for supervising all engineers, conductors, station personnel, and on board service employees in the District, including assessing discipline up to and including termination. (Shelton Dec., ¶ 2.) Joe Deely, Amtrak's General Superintendent of the Pacific Division, supervises Steve Shelton (and two other District Superintendents, a Manager of Business Operations, and an Administrator) and routinely reviews and approves terminations. However, Deely does not recall discussing Campbell with Shelton and, indeed, does not then know who he was. Nonetheless, Deely believes that based on his normal and routine practice and in light of Campbell's safety record, he would have approved the termination. (Deely Dec., ¶¶ 2,3,4 and 6.)

[5] Campbell filed his original Complaint on December 30, 2005. The statute of limitations under 42 U.S.C. § 1981 is four years. *See, e.g. Jones v. R.R. Donnelly & Sons, Co.*, 124 S.Ct. 1836, 1845 (2004); 2004 U.S. LEXIS 3236 at *20. Therefore, the limitations period extends only back to December 30, 2001. Campbell alleges he submitted several applications for the Engineer position prior to December 2001 (two in 1999). However, even if those applications were actionable, Campbell conceded he was not eligible for the position when he applied either time because he had not yet completed a mandatory one-year service requirement to qualify for the promotion. (Venturelli Dec, ¶ 8; Pl. Depo, 53:22—54:8, 54:23—55:10, 187:17-21.)

9

1          1.    Recruiting for the Locomotive Engineer Trainee Position

2          The Locomotive Engineer position is the most safety-sensitive position for Amtrak

3    recruits. As the Locomotive Engineer requisition profile states: Engineers are responsible for the

4    safe operation of diesel electric locomotives, complying with train orders, bulletin orders,

5    wayside signals, railroad regulations, railroad operating rules, special instructions, and federal,

6    state, and local regulations to transport passengers and equipment safely and efficiently. It is their

7    responsibility to safeguard life and property under stressful situations. As a result, an applicant's

8    prior safety record is closely considered and it is our practice not to interview applicants for an

9    Engineer Trainee position who have a history of discipline for rules violations. (Ho Dec., ¶ 3.)

10         Applicants for promotion to the Locomotive Engineer Trainee position from the

11   Conductor position cannot take advantage of any bid or seniority rights. In other words, seniority

12   is not considered. (Pl. Depo., 202:11—203:10; Venturelli Decl., ¶ 9.) Applicants to the Locomotive

13   Engineer Trainee position are evaluated on the basis of the applicant's interview score, safety

14   record, discipline record, job experience, and managers' recommendations. (Venturelli Dec., ¶

15   9.) The interview panel piece of the recruitment for any Engineer position is just one piece of a

16   larger decision-making process. Because the interview panel is limited to a set series of

17   questions, often the information gleaned from an interview fails to provide the decision-maker

18   with a complete account of a candidate's qualifications. Because safety is critical when

19   considering candidates for an Engineer position, Amtrak focuses heavily on prior discipline and

20   the demonstrated ability to follow operating and safety guidelines. (Ho Dec., ¶ 12.)

21         2.    Campbell Was Not Promoted in 2001

22         Campbell alleges that in 2001 he applied for an Engineer position and was not promoted,

23   despite allegedly being more qualified than Caucasian employees who were promoted. (FAC, ¶¶

24   8, 9.) Amtrak records reflect that on August 14, 2001, Campbell applied for an Engineer position

25   out of Amtrak's San Jose, California facility. (Ho Dec., ¶ 8.) Campbell was interviewed on

26   October 12, 2001, and received a 3/5 interview score. (Ho Dec., ¶ 10, Ex. H.) On January 25,

27   2002, Campbell was issued a letter advising him that he had not been selected for the position.

28   (Ho Dec., ¶ 11, Ex. I.)

1    There were five offers given for Engineer trainee positions in 2001. Three candidates

2    received a score of 2 on the interview, with 1 being the highest possible score. Two other

3    candidates given offers received a score of 3, the same score as Campbell. No candidate with an

4    interview score lower than Campbell was offered an Engineer position. (Ho Dec., ¶ 12.) Unlike

5    the two individuals with an interview score of 3 that were offered an Engineer position, Campbell

6    already had a documented history of discipline. He had a formal letter of reprimand in his file

7    resulting from a boxcar derailment and damage caused to a train on March 24, 2000. (Pl. Depo.,

8    113:10-22, 114:20—115:4, 117:8—118:4, 116:14-16 and Pl. Depo. Exh. 13.) In addition, the

9    rules violations that ultimately resulted in Campbell's 20-day suspension occurred on January 10,

10   2002, just two weeks before the letter notifying Campbell that he would not be selected for

11   promotion. (Ho Decl., ¶ 11 and Ex. I.) An employee with serious rules violations and discipline

12   will not be considered for an Engineer position. (Venturelli Dec., ¶ 12; *see also* Pl. Depo. Exh.

13   31 ("Must have satisfactory prior work record."). Pl. Depo., 291:9—292:1.)

14          3.    Campbell Did Not Apply for an Engineering Position in 2002

15   Campbell alleges that he again applied for an Engineer position in 2002. (FAC, ¶ 9.)

16   Campbell further alleges that he received a call canceling his interview and that Amtrak failed to

17   reschedule his interview as promised. (FAC, ¶9.) Amtrak records reflect one posting for

18   Engineer positions in Oakland in 2002, on October 16, 2002. (Venturelli Dec., ¶ 14.) There is no

19   record in Amtrak's computer system that tracks employees' promotional applications indicating

20   that Campbell applied for an Engineer position in 2002. (Venturelli Dec., ¶¶ 11-13.) As to the

21   October 16, 2002 posting, Campbell would not have been considered for the position as it was for

22   a Locomotive Engineer (Re-entry) position, that was open only to a currently qualified Class I

23   Engineer, which Campbell was not. (Venturelli Dec., ¶ 14.)

24          4.    Campbell Excluded Himself From Consideration in November 2003

25   Campbell applied for another Engineer trainee position in November 2003. (Ho Dec., ¶

26   5.) As reflected on the posting, Amtrak was only considering internal applicants for the position.

27   (Ho Dec., ¶ 4; Pl. Depo., 190:5—192:2 and Pl. Depo. Exh. 23.) Campbell submitted a resume

28   listing his current employment as County of Alameda, In-Home Care Giver. (Ho Dec., ¶ 5, Ex.

B; Pl. Depo., 137:1-25 and Pl. Depo. Exh. 17.) Campbell sent the "application," such as it was, via facsimile to Amtrak's HR recruiting officer in Los Angeles. (Id.; Ho Dec., ¶¶4-6.) Since Campbell's resume indicated he was an external candidate for a position that was open solely to internal candidates, he was excluded from consideration as a candidate at the first cut due to his own misrepresentation. (Ho Dec., ¶ 6.)

5.     Campbell's Extensive Discipline Record Excluded Him from Promotion Consideration in June 2004

In May 2004, personnel issues forced Amtrak to schedule a series of interviews for several Engineer positions without first conducting a review of past discipline. (Venturelli Depo., Attached to Ching-Senaha Decl., Ex. B ("Venturelli Depo."); 38:6-40:2.) Campbell applied for the Oakland positions on May 17, 2004 and was subsequently interviewed by Sue Venturelli, Larry Follis, and union representative Chad Skinner. (Venturelli Dec., ¶ 14; Follis Dec., ¶ 2.) Campbell likely would not have received an interview had his extensive disciplinary history been reviewed before his interview was scheduled. (Venturelli Dec. ¶ 12.) Although Campbell's interview score did not eliminate him from contention, his prior disciplinary record caused the Department Manager (Assistant Superintendent) to preclude him from further consideration. Campbell was not offered the position because of his prior safety and rules violations and discipline record. (Venturelli Dec., ¶ 14; Follis Dec., ¶ 4.) [6]

**G.     Campbell's EEOC and DFEH Filings**

Campbell filed a Charge of Discrimination with the EEOC and DFEH against Amtrak on February 9, 2004 alleging race discrimination for not being called to interview for the Engineer position that posted in November 2003. Campbell received his right-to-sue notice from the DFEH on the same day (February 9, 2004) and from the EEOC on October 15, 2004. (Pl. Dep. 65:18-66:10 and Pl. Depo. Ex. 3 and 4.)

---

[6]  In response to the May 2004 posting, there were four candidates who were recommended to the Department as qualified for hire for the Oakland positions. These individuals were: Brice Carroll, George Solimine, John Hansen, and Patrick Duncan (alternate). Solimine also applied for the San Jose posting. None of these individuals had a record of prior safety or rules violations or discipline. Therefore, Carroll, Hanson, and Duncan were chosen to undergo Engineer Training for Oakland, and Solimine was chosen for San Jose. (Venturelli Dec. ¶ 16, Exs. F and G.)

DEF. NRPC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MPA          Case No. C05-05434 MJJ

1    Campbell later filed a Complaint of Discrimination with the DFEH on August 17, 2005

2    alleging that his September 17, 2004 termination was a result of race discrimination and

3    retaliation by Amtrak for his previous complaint to the EEOC in February 2004. Campbell was

4    issued a right-to-sue notice by the DFEH on August 29, 2005. (Pl. Depo., 75:13-76:20, Pl. Depo.

5    Ex. 5 and 6.) Campbell filed the instant civil action on December 30, 2005.

6    Neither Shelton nor Deely had any information that Campbell had filed a prior DFEH or

7    EEOC charge at the time of Campbell's termination. (Shelton Dec., ¶ 15; Deely Dec., ¶ 5.)

8    Campbell has no reason to think that any manager or supervisor had any knowledge of his filing

9    the prior EEOC/DFEH charge in February 2004. (Pl. Depo., 215:21-216:3; 217:18-219:10.)

10   **III.    LEGAL ARGUMENT**

11   **H.    Summary Judgment is Proper In This Case because there are No Genuine**
**Issues of Disputed Material Facts**
12

13   Summary judgment is appropriate where no genuine issues of material fact exist and the

14   moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(b); *Celotex Corp. v.*

15   *Catrett*, 477 U.S. 317, 324 (1986). The moving party bears the initial burden of identifying those

16   facts which it believes demonstrate the absence of a genuine issue of material fact, but the burden

17   is on the party opposing a motion for summary judgment to designate "specific facts showing that

18   there is a genuine issue for trial." *Id.*  To sustain his burden of proof, Campbell must adduce

19   relevant, admissible evidentiary matter setting forth specific facts based upon personal

20   knowledge. Fed. R. Civ. P. 56(e).

21   The existence of an alleged factual dispute does not defeat summary judgment; there must

22   be a genuine issue of material fact. *See id. at* 322-323 (1986).    A material fact is one which

23   might affect the outcome of the case under governing law. *Anheuser-Busch, Inc. v. Natural*

24   *Beverage Distributors*, 69 F.3d 337, 343 (9th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.,*

25   *477 U.S. 242, 248* (1986)). To preclude summary judgment, the dispute about a material fact

26   must also be "genuine," such that a reasonable jury could find in favor of Campbell. *Id.* Where,

27   as here, Campbell cannot meet this burden, Defendant's summary judgment motion must be

28   granted.

I.    **Campbell's Claim for Race Discrimination in Violation of 42 U.S.C. § 1981 is Without Merit**

Courts utilize the McDonnell Douglas analysis to evaluate disparate treatment cases under Section 1981. *See, e.g., Williams v. Edward Apffels Coffee Co.*, 792 F.2d 1482, 1484 (9th Cir. 1986); *Hudson v. IBM*, 620 F.2d 351, 354 (2d Cir. 1980), cert. denied, 449 U.S. 1066 (1980) (applying the order and allocation of proof established in *McDonnell Douglas* to employment discrimination claim brought under Section 1981).

To establish his prima facie case of intentional discrimination, Campbell must satisfy his initial prima facie burden that:   (1) he is a member of a protected class; (2) he was qualified for the position sought or was performing competently in the position held; (3) he suffered an adverse employment action, such as denial of an available job or termination; and (4) some other circumstance that suggests discriminatory motive.   *McDonnell Douglas Corp.*, 411 U.S. at 802; *Guz v. Bechtel National, Inc.*, 4 Cal.4th 317, 354-355 (2000).   If Campbell satisfies his prima facie burden, Amtrak is obligated to articulate a legitimate, non-discriminatory rationale for the challenged employment action. *Texas Dept. of Comm. Affairs v. Burdine*, 450 U.S. 248, 254-255 (1981); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889-90 (9th Cir. 1994). Once Amtrak makes its minimal showing, the ultimate burden then returns to Campbell.

To withstand summary judgment, Campbell must present direct evidence of discriminatory intent or "specific, substantial" indirect evidence that the employer's proffered nondiscriminatory reasons are unworthy of credence. *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221-22 (9th Cir. 1998); *Martin v. Lockheed Missiles & Space Co*, 29 Cal.App.4th 1718, 1733 and 1735 (1994) (plaintiff's opinion she was better qualified than retained individual was not probative of discrimination); *see also Gonzales v. Metpath, Inc.*, 214 Cal.App.3d 422 (1989).

> [i]t is not enough for the employee simply to raise triable issues of fact concerning whether the employer's reasons for taking the adverse action were sound. What the employee has brought is not an action for general unfairness but for discrimination .... As several federal courts have stated: "The [employee] cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the [employee] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or

14

contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence,' [citation], and hence infer 'that the employer did not act for the [the asserted] non-discriminatory reasons.' [Citations.]" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994); *Stewart v. Rutgers, The State University*, 120 F.3d 426 (3d Cir. 1996).

Hersant v. Dept. of Social Services, 57 Cal.App.4th 997, 1005 (1997).

1.    Amtrak Had Legitimate Reasons for Denying Campbell the Engineer Position, Initially Because of His Failure to Meet the Minimum Job Qualifications and Later Because of His History of Safety Violations

Campbell can offer no evidence to show that Amtrak's reasons for denying his applications for the position of Engineer were based on any discriminatory intent.[7] Campbell bases his discrimination claim on pure conjecture and speculation regarding the seniority and qualifications of other candidates who received promotions to the Engineer position and regarding the level of discipline other employee received for the same or similar safety violations committed by Campbell.[8] Speculation and conjecture cannot withstand summary judgment.

Amtrak's decision to deny Campbell promotion to the position of Engineer was based on legitimate, non-discriminatory reasons.[9] The first time within the limitations period that

[7] Campbell's claim is logically tortured – he is claiming he was not discriminated against on the basis of his race when he was promoted to Assistant Yard Conductor and then again promoted to Yard Conductor, but he was discriminated against on the basis of race when he was not promoted to Engineer.

[8] Interestingly, Plaintiff alleges in the First Amended Complaint that Amtrak selected Caucasian individuals who had less seniority than he for Engineer. (Plaintiff made the same allegation in a declaration he filed in another case, stating that someone with less seniority had been selected. *See* Declaration of John Campbell In Opposition to Defendant's Motion for Summary Judgment, at.2:5-6, 3:6-8 and 3:21-23, filed in *Hardeman v. Amtrak* (attached to Erelewin Decl. as Exh. B).) However, Plaintiff admitted in his deposition that seniority is irrelevant to whether an individual is hired or promoted to Engineer. He also admitted that he had no greater right to the Engineer position just because he may have worked longer for Amtrak. (Pl. Depo., 202:11—203:10; Venturelli Decl., ¶ 9.)

[9] Campbell's first two applications in 1998 and 1999 are time-barred. Section 1981 has a four-year statute of limitations. Accordingly, Campbell may not raise any adverse employment action prior to December 30, 2001, given his civil action was filed on December 30, 2005. Even if the applications prior to that date were not barred, Campbell admits he was not qualified for the promotions during that time because Amtrak has a blanket policy rule of not considering applications for the Engineer position from employees with less than one year of service with the Company. Amtrak advised Campbell about its one-year policy when he was first hired. Campbell rebuts this by alleging the one-year policy was discriminatorily applied to him based on his race. Campbell bases this allegation on his belief that Amtrak promoted three employees who had less than one year of service to Engineer. Campbell admits that he assumes these individuals worked for Amtrak for less than one year before their promotions only because he had personally worked with and trained each of them for less than one year. Instead, two of

15

Campbell applied, in 2001, he admittedly submitted a stale resume that stated he was an external candidate, and as a result he was disqualified since the position was for internal candidates only. The second time he applied, in 2004, he was disqualified because the Engineer position is the most safety-sensitive position Amtrak recruits for and thus Campbell was disqualified due to his history of repeated and serious operating and safety rules violations.

2.    Amtrak Had Legitimate Reasons for Terminating Campbell's Employment Because of Excessive Safety Violations

Amtrak terminated Campbell's employment consistent with its progressive discipline guidelines after he had three serious rules violations.  The final straw was broken when Campbell was charged with cutting the brakes on a locomotive and failing to properly secure it prior to coupling it with other cars in July 2004.  Cutting out the brakes is strictly prohibited and egregiously violates Amtrak's written rules and procedures.  Campbell was charged with five violations of portions of Amtrak's Service Standards for Train Service Employees, Amtrak's General Code of Operating Rules, and Amtrak Air Brake and Train Handling Rules and Instructions.  Given the seriousness of the charges and the District Superintendent's review of Campbell's prior safety record which showed he had two prior disciplinary actions in his file based on either admitted or adjudicated violations (and the last one resulted in a twenty-day suspension of ten actual days and ten held in abeyance), the Superintendent concluded that the appropriate and just discipline was termination.    Campbell appealed the charge up two tiers to the Public Law Board where an impartial hearing officer determined Campbell had committed the offenses as charged.

The foregoing evidence satisfies Amtrak's burden that the decision to terminate Campbell's employment was based on legitimate, non-discriminatory business reasons. Campbell cannot rebut Defendant's evidence with substantial, competent evidence and therefore Defendant is entitled to summary adjudication of this claim

///

///

the three employees to whom Campbell refers worked at Amtrak for more than one year prior to their promotion to Engineer. The third employee, whom Campbell claims received more favorable treatment because he was not subjected to the one-year policy, is himself African-American, but he nevertheless never worked as an Engineer. (Venturelli Dec., ¶ 10.)

16

J.      **Campbell's Claim for Retaliation in Violation of 42 U.S.C. § 1981 is Barred as Matter of Law**

Unlike Title VII, Section 1981 does not include a provision prohibiting retaliation for engaging in protected acts.  Courts considering the issue have concluded there is no private right of action for retaliation under Section 1981.  In *Walton v. Rockwell International, No.* CV 77-8875-FW, 1980 U.S. Dist. LEXIS 14389 (C.D. Cal.), 24 Fair Empl. Prac. Cas. (BNA) 9555, a plaintiff brought a retaliatory discharge claim under Section 1981.  *Id.*  The *Walton* court dismissed plaintiff's Section 1981 claim, holding "the question of a retaliatory layoff as mentioned hereinabove cannot [be based on] a suit under Title 42, U.S.C. § 1981." *Id.*; *see also Persons v. United Postal Service, Inc.*, 502 F.Supp.1176, 1777 (N.D. Ga. 1980) (retaliation is not an independent cause of action under Section 1981).  Accordingly, Campbell's retaliation claim under Section 1981 is barred as a matter of law.

K.      **Campbell's Retaliation Claim Under FEHA Fails as a Matter of Law**

1.      **Campbell's FEHA Retaliation/Discrimination Claim based on Failure to Promote is Time-Barred**

Campbell filed a Charge of Discrimination with the EEOC and DFEH against Amtrak on February 9, 2004 alleging race discrimination for not being called to interview for the Engineer position that posted in November 2003.  Campbell received his right-to-sue notice from the DFEH on the same day (February 9, 2004) and from the EEOC on October 15, 2004.  Therefore, since the one-year period for Campbell to file a civil action under the FEHA ran on February 9, 2005, yet he did not file his civil action until December 30, 2005, any FEHA claim based on that filing is time-barred.

2.      **Campbell Cannot State a Prima Facie Case of Retaliation under the FEHA for his Second Charge Because he has No Evidence of Causation  and Temporal Proximity Between Campbell's Complaint to the EEOC and His Termination Is Insufficient as a Matter of Law**

To state a prima facie case of retaliation, Campbell must show he engaged in protected activity, he was subjected to an adverse employment action, and a causal link exists between the protected activity and adverse action.  *See Yanowitz v. L'Oreal USA, Inc.,* 36 Cal.4th 1028, 1042 (2005); *Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000) (Plaintiff must demonstrate a

1    causal relationship between protected complaints and an adverse employment action).

2        Here, Campbell has no competent evidence that any decision-maker insofar as his

3    termination had any knowledge that Plaintiff had previously filed a charge of discrimination with

4    the EEOC and DFEH eight months before the termination.    Indeed, Campbell admitted he has no

5    information that any manager or supervisor knew that information.    The decision-maker, Steve

6    Shelton, and his supervisor, Joe Deely (the General Superintendent), both have declared they had

7    no knowledge of Campbell previously filing an administrative charge.    As a result, no causal

8    nexus exists between Campbell's filing a DFEH or EEOC charge eight months before his

9    termination and the termination.

10        The cases that accept "mere temporal proximity" between an employer's knowledge of a

11    protected activity and an adverse action as sufficient evidence of causality to establish a *prima*

12    *facie* case uniformly hold that the temporal proximity must be "very close." *Clark Co. School*

13    *Dist. v. Breeden*, 532 U.S. 268 (2001). "[I]n order to support an inference of retaliatory motive,

14    the termination must have occurred 'fairly soon after the employee's protected expression.'"

15    *Villiarimo v. Aloha Island Air*, 281 F.3d 1054, 1065 (9th Cir. 2002) (quoting *Paluck v. Gooding*

16    *Rubber Co.*, 221 F.3d 1003, 1009-10 (7th Cir. 2000).)    On the other hand, "[a] substantial time

17    lapse between the protected activity and the adverse employment action 'is counter-evidence of

18    any causal connection.'" *Filipovic v. K & R Express Sys., Inc.*, 176 F.3d 390, 399 (7th Cir. 1999)

19    (holding that a four-month delay between the protected activity and the Campbell's termination

20    precluded plaintiff from establishing a causal nexus).

21        In this case, Campbell filed the EEOC complaint alleging race discrimination and

22    retaliation in February 2004.    Campbell's employment was not terminated until September 2004,

23    eight months later.    This substantial time lapse "is counter-evidence of any causal connection"

24    between Campbell's filing of the EEOC complaint and his termination.    *Id.*    Furthermore, this

25    eight-month lag is longer than the four-month delay that precluded the plaintiff in *Filipovic* from

26    establishing a causal nexus between his protected activity and his termination.    *Id.*    Thus,

27    Campbell cannot establish a causal nexus between his termination and his participation in a

28    protected activity in order to maintain his retaliation claim.

1    Even if there were a temporal nexus, a specified period of time cannot be mechanically

2    applied to draw an inference of retaliation; a proffered temporal connection between the protected

3    activity and retaliatory treatment must be considered in the context of its factual setting. *Cozalter*

4    *v. City of Salem* F.3d 968, 977-8 (9th Cir. 2003). The *Cozalter* court explained that summary

5    judgment is appropriate, even if there is a temporal connection, if the facts clearly demonstrate

6    there is no retaliation. *Id.* at 977-8.    As explained below, Amtrak had legitimate, non-

7    discriminatory, and non-retaliatory reasons to terminate Plaintiff's employment.

8
                    3.    Even If Campbell Could State a Prima Facie Case of Retaliation, He
                          Cannot  Rebut  Amtrak's  Legitimate,  Non-Retaliatory  Reasons  for
9                         Terminating His Employment

10    Even if Campbell could establish a prima facie case, Amtrak need only articulate a

11    legitimate, non-retaliatory reason for the adverse employment decision. *Brooks, supra*, at 917.

12    Thereafter, Campbell has the ultimate burden of proving Amtrak's rationale is pretextual.

13    Evidence of pretext must be "specific [and] substantial." *Coleman v. Quaker Oats Co.*, 232 F.3d

14    1271, 1282 (9th Cir. 2000); *Hersant v. Dept of Social Srvs.*, 57 Cal.App.4th 997, 1004-05 (1997).

15    (plaintiff must rebut employer's reasons with substantial evidence, not by speculation and

16    conjecture).

17    As discussed above, Campbell cannot rebut Defendant's legitimate reasons for

18    terminating his employment because of excessive and serious safety violations with specific and

19    substantial evidence that the reasons are pretextual for a retaliatory motive. Therefore, even if

20    Campbell could establish a prima facie case for retaliation in violation of the FEHA—which he

21    cannot—his retaliation claim still fails as a matter of law.

22
      **L.    Campbell's Wrongful Termination Claim Also Fails As A Matter Of Law
             Because It Is Premised On His Claims For Discrimination And Retaliation**
23           **Which Are Without Merit.**

24    To succeed on his wrongful termination claim, Campbell must prove a violation of public

25    policy. *See Turner v. Anheuser-Busch, Inc.*, 7 Cal.4th 1238, 1256-57 (1997).    Campbell bases

26    his public policy claim on his statutory claims of race discrimination and retaliation, as well as

27    California Labor Code Section 1102.5. (FAC, ¶¶ 30 – 34). As such, to the extent Campbell's

28    discrimination and retaliation claims fail, so must his public policy cause of action. *See Sequoia*

1    *Insurance v. Superior Court*, 13 Cal.App.4th 1472, 1475 (1993) (wrongful termination claim

2    cannot proceed in the absence of a viable public policy claim).

3        As established above, Campbell's Section 1981 discrimination claim and retaliation claim

4    under FEHA fail as a matter of law. Campbell's Section 1102.5 claim also fails as a matter of

5    law, as retaliation claims under Section 1102.5 are analyzed under the FEHA analytical

6    framework. *See Morgan v. Regents of Univ. of Calif.*, 88 Cal. App. 4th 52, 69 (2000) (prima

7    facie case for Section 1102.5 retaliation comprised of (1) protected activity; (2) adverse

8    employment action; and (3) causal link).

9        **M.    Campbell's Emotional Distress Claims Are Without Merit**

10            1.    Campbell's Intentional Infliction of Emotional Distress ("IIED") Claim is
                  Barred Because Personnel Decisions Are Not Sufficiently Extreme or
11                Outrageous As a Matter of Law

12       To establish an IIED claim, Campbell must show that (1) Defendant engaged in extreme

13   and outrageous conduct; (2) Defendant had the intention to cause or recklessly disregarded the

14   probability of causing emotional distress; (3) severe emotional suffering; and (4) actual and

15   proximate cause of the emotional distress. *See Cole v. Fair Fire Protection Dist.*, 43 Cal.3d 148,

16   155 (1987). More specifically, Campbell must prove that Defendant's actions were "so extreme

17   and outrageous as to go beyond all possible bounds of decency, and to be regarded as atrocious,

18   and utterly intolerable in a civilized community." *Alcorn v. Anbro Engineering, Inc.*, 2 Cal.3d

19   493, 499 (1970).

20       Employment terminations do not constitute "outrageous" conduct as a matter of law. *See*

21   *e.g., Buscemi v. McDonnell Douglas Corp.*, 736 F.2d 1348 (9th Cir. 1984) (in applying California

22   law, the Court held plaintiff's allegation that he was terminated in a "callous and insensitive

23   manner" without cause and for pretextual reasons, was insufficient to establish IIED); *Trerice v.*

24   *Blue Cross of California*, 209 Cal.App.3d 878, 883 (1989) (retracting a severance package and

25   forcing an employee to work in a menial job until she was terminated insufficient as a matter of

26   law). Therefore, the fact that Campbell's employment was terminated, or that he was not selected

27

28

DEF. NRPC'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT,
OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MPA    Case No. C05-05434 MJJ

1    for an Engineer position, cannot support an IIED claim against Amtrak as a matter of law.[10]

2        2.    Campbell's Negligent Infliction of Emotional Distress Claim ("NIED") Is
            Barred Because the Act of Termination or Failure to Hire Campbell Cannot
3            be Characterized as Negligence

4    Employment terminations and failures to hire are inherently intentional acts. As such,

5    they cannot possibly support NIED claims. *Semore v. Pool,* 217 Cal.App.3d 1087, 1105 (1990)

6    ("It is clear…that there was no duty not to discharge plaintiffs and that any actions by the

7    employer were intentional, not negligent."); *Edwards v. U.S. Fid. & Guar. Co.,* 848 F.Supp.

8    1460, 1466 (N.D. Cal. 1994) (applying California law) ("where the conduct is intentional, it

9    cannot be used as the basis for a negligent infliction of emotional distress claim.").

10   Consequently, Amtrak is entitled to judgment as a matter of law on Campbell's NIED claim.

11        3.    Campbell's Intentional and Negligent Infliction of Emotional Distress
            Claims Are Preempted by Federal Law
12
13   Campbell's claims for emotional distress are preempted by the Federal Employers'

14   Liability Act (the "Act" or "FELA"), codified at 45 U.S.C. § 51. The Act provides: "Every

15   common carrier by railroad while engaging in [interstate] commerce…shall be liable in damages

16   to any person suffering injury while he is employed by such carrier in such commerce. For such

17   injury…resulting in whole or in part from the negligence of any of the officers, agents, or

18   employees of such carrier….." 45 U.S.C. § 51.    Campbell has not alleged any facts to place him

19   outside the scope of FELA for purpose of his negligent infliction of emotional distress claim.

20   Accordingly, Campbell's claim for negligent infliction of emotional distress is preempted by

21   FELA. *Consolidated Rail Corp. v. Gottshall Consolidated Rail Corp.,* 512 U.S. 532 (1994).

22   FELA has also been extended to intentional torts. *Jamison v. Encarnacion,* 281 U.S. 635

23   (1949); *Slaughter v. Atlantic Coast Line Railroad,* 302 F.2d 912 (D.C. Cir. 1962). Emphasizing

24   only intentional infliction of emotional distress claims, the "majority of courts…have held there

25   can be no recovery under FELA for intentional infliction of emotional distress, absent physical

26   contact or threat of physical contact." *Higgins v. Metro-North Railroad Co.,* 143 F.Supp.2d 353,

27   361 (S.D.N.Y. 2001); *see also Teague v. National Railroad Passenger Corp.,* 708 F.Supp. 1344

28   ---
[10] Plaintiff admits he was never subjected to racial slurs or offensive race-based comments during his
employment.  (Pl. Depo., 34:24—35:9.)

21

1  (D. Mass. 1989) (holding that FELA preempts state law claims for intentional infliction of

2  emotional distress). In this case, Campbell is alleging intentional infliction of emotional distress

3  arising from allegations of wrongful termination and failure to promote. Wrongful discharge is

4  not cognizable under FELA. *Beanland v. Chicago, Rock Island and Pacific Railroad Co.*, 480

5  F.2d 109, 113 (8th Cir. 1973). For these reasons, Campbell's negligent and intentional infliction

6  of emotional distress claims must be dismissed.

7  ### N.    CAMPBELL'S CLAIM FOR PUNITIVE DAMAGES IS BARRED

8  The United States Supreme Court has held "in the punitive damages context, an employer

9  may not be vicariously liable for the discriminatory employment decisions of managerial agents

10  where these decisions are contrary to the employer's 'good faith efforts to comply with Title

11  VII'." *Kolstad v. American Dental Assoc.*, 527 U.S. 526, 545 (1999) (quoting *Kolstad v. ADA*,

12  139 F.3d 958, 974 (D.C. Cir. 1998) (Tatel, J. dissenting)). An employer may "escape punitive

13  damages if it can show that the challenged actions were not taken by senior managers and or

14  contrary to the employer's good faith implementation of an effective anti-discrimination policy."

15  *See Costa v. Desert Palace, Inc.*, 299 F.3d 838, 864 (9th Cir. 2002) (en banc), cert. Granted, 123

16  S.Ct. 816, 154 L.Ed.2d 756 (2003)); *see also Passantino v. Johnson & Johnson Consumer*

17  *Products*, 212 F.3d 493 (9th Cir. 2000).

18  "'[I]n some cases, the existence of a written policy instituted in good faith has operated as

19  a total bar to employer liability for punitive damages.'" *Kolstad, supra*, 527 U.S. at 544 (quoting

20  *Harris v. L.&L. Wings, Inc.*, 132 F.3d 978, 983, 984 (4th Cir. 1997)). One court has approved a

21  jury instruction consisting of the following three elements: (1) the promulgation of an explicit

22  policy against harassment in the work place; (2) the communication of the policy to the

23  employees and; (3) the creation of a reasonable avenue for the Campbell to make a complaint to

24  higher management. *Reed v. Cracker Barrel Old Country Store*, 171 F. Supp. 2d 741, 749 (M.D.

25  Tenn. 2001).

26  Amtrak has much more than a mere policy against discrimination. Since 1971, Amtrak

27  has developed and disseminated detailed policies and procedures for reporting and remedying

28  claims for discrimination and retaliation. At, or shortly following, the start of Campbell's

1   employment, he received Amtrak's employee handbook, which included Amtrak's policy

2   prohibiting racial discrimination. (Pl. Depo., 84:15—85:14 and Pl. Depo. Ex. 8.) Additionally,

3   Amtrak holds managers responsible for ensuring their actions are reflective of Amtrak's EEO

4   policies. Each Amtrak supervisor is individually responsible for supporting and implementing

5   Amtrak's equal employment and affirmative action goals on a day to day basis. (Venturelli Dec.

6   ¶ 7.) As such, any action taken by a supervisor or manager contrary to Amtrak's policies cannot

7   impute vicarious liability to Amtrak because the acts are contrary to its good faith efforts to

8   comply with Title VII. *Kolstad, supra,* 527 U.S. at 545 ("[A]n employer may not be vicariously

9   liable for the discriminatory employment decisions of managerial agents where these decisions

10  are contrary to the employer's 'good faith efforts to comply with Title VII'".)

11      Because Amtrak has acted in good faith to comply with Title VII and all state, local and

12  federal anti-discrimination laws, the Company is entitled to summary adjudication on Campbell's

13  prayer for punitive damages.

14  **IV.    CONCLUSION**

15      Based on the foregoing, Amtrak respectfully requests that the Court grant its motion for

16  summary judgment in its entirety. Alternatively, to the extent the Court finds any triable issue of

17  material fact, Amtrak requests summary adjudication of each claim

18

19                              Respectfully submitted,

20                              JACKSON LEWIS LLP

21

22  Dated: April 3, 2007         By: _Cara Chang-E_____

23                              Kathleen Maylin
                                Cara Ching-Senaha
24                              Attorneys for Defendants
                                NATIONAL RAILROAD PASSENGER
25                              CORPORATION dba AMTRAK and JOE
                                DEELY
26

27

28