KATHLEEN MAYLIN (SBN: 155371)
CARA CHING-SENAHA (SBN: 209467)
JACKSON LEWIS LLP
199 Fremont Street, 10th Floor
San Francisco, California 94105
Telephone: (415) 394-9400
Facsimile: (415) 394-9401

Attorneys for Defendant
NATIONAL RAILROAD PASSENGER
CORPORATION dba AMTRAK and JOE DEELY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN EARL CAMPBELL<br><br>    Plaintiff,<br><br>v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION dba AMTRAK, JOE DEELY and DOES 1-10 inclusive,<br>    Defendants. | Case No. C05-05434 MJJ<br><br>**DECLARATION OF R. SCOTT ERLEWINE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**<br><br>DATE:    May 8, 2007<br>TIME:    9:30 a.m.<br>DEPT:    11 |

R. Scott Erlewine declares:

1.  I am a principal with Phillips, Erlewine & Given LLP. I served as counsel of record for defendant NATIONAL RAILROAD PASSENGER CORPORATION dba AMTRAK in a lawsuit filed in this court by C. Faheem Hardeman, styled C. Faheem Hardeman v. Amtrak/Caltrain Railroad, Case No. C 04-3360 SI ("Hardeman Action").

2.  On or about May 11, 2006, I took the deposition of Mr. John Campbell in the Hardeman Action. Attached hereto as Exhibit A is a true and correct copy of the transcript of said deposition (without exhibits).

3.  On or about June 23, 2006, I filed on behalf of Amtrak a motion for summary judgment in the Hardeman Action. On or about July 7, 2006, Mr. Hardeman's counsel filed a

1

1  declaration executed by Mr. John Campbell in opposition to that motion for summary judgment.
2  Attached hereto as Exhibit B is a true and correct copy of said declaration.
3      Executed this 3rd day of April, 2007 in San Francisco, California. I declare under penalty
4  of perjury under the laws of California and the United States of America that the foregoing is true
5  and correct.

R. Scott Erlewine

2

Decl. of R. Scott Erlewine in Support of Defendant's Mot. Sum. Judg. (Case No. C05-05434 MJJ)

# EXHIBIT A

PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
OK-HEE SHIM, ESQ. (STATE BAR NO. 240998)
PRICE AND ASSOCIATES
A Professional Law Corporation
The Latham Square Building
1611 Telegraph Avenue, Suite 1450
Oakland, CA 94612
Telephone: (510) 452-0292
Facsimile: (510) 452-5625

Attorneys for Plaintiff
C. FAHEEM R. HARDEMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| C. FAHEEM R. HARDEMAN,<br><br>　　　　Plaintiff,<br><br>v.<br><br>AMTRAK/CALTRAIN RAILROAD,<br><br>　　　　Defendant. | NO. C04-3360 SI<br><br>**DECLARATION OF JOHN CAMPBELL IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>DATE:　　July 28, 2006<br>TIME:　　9:00 a.m.<br>DEPT:　　10, 19th Floor<br><br>HON. SUSAN ILLSTON |

　　　　I, JOHN CAMPBELL, declare that:

　　　　1.　　I was employed by Amtrak for six years as a Conductor in its Oakland Yard and other locations in the Bay Area. Prior to working for Amtrak, I worked for Southern Pacific Railroad for a period of eight years as a machine operator. While working for Southern Pacific Railroad, I maintained and prepared railroad right of ways and operated track machines. I am an African-American man. I make this Declaration on personal knowledge in opposition to Defendant Amtrak's Motion for Summary Judgment.

2.  In June 1999, I applied for an Engineer position with Amtrak for the first time. My application was rejected on the grounds that I was not eligible to apply based on the length of my employment with Amtrak.

3.  In 2000 and 2001, I was interviewed for the Engineer position but other applicants with less seniority than I were selected.

4.  In 2002, my scheduled engine service interview was cancelled.

5.  On February 24, 2003, I was involved in a derailment in South San Francisco. I was working as the Conductor with Engineer Mike Cecconi, and Assistant Conductor Charles Breda. Assistant Conductor Breda lined the wrong switch, causing a derailment. He was pulled out of service. My supervisor at the time, Jim Gunther, conducted the on-site investigation. Mr. Gunther was already on site because he was a roving supervisor. Mr. Gunther was standing next to me when the derailment occurred. I felt some responsibility for the incident, however, because Mr. Breda was new and I felt like I should check his work. Mr. Gunther said that I was "too valuable" to the project and stated that he did not want the incident to be placed in my file because he did not want me to be disciplined. Mr. Gunther made it clear that he intervened because he could not afford to lose me and said "Don't mention it," when I thanked him.

6.  On April 1, 2003, I was a part of a crew that experienced a derailment at Redwood City. Ms. Debrice Gallo was the Assistant Conductor, I was the Conductor and Martin Jaeger was the engineer. Although we ran over the switch and there was a derailment, no one was disciplined because it was found to have been caused by a defective switch (company ill-manufactured). Every time the train went over the switch, the switch would pop up. A week later,

1139P207MSJ

-2-
DECLARATION OF JOHN CAMPBELL (C04-3360 SI)

the same thing occurred. Mark Jaeger is Caucasian.

7. In November 2003, I applied for the Engineer position for the fifth time. Interviews were held in December 2003, but I was not scheduled for an interview at all. I was qualified for the position. On or about January 8, 2004, I learned that two lesser qualified Caucasian applicants with less seniority were selected for the position.

8. On January 28, 2004, I filed a Charge of Discrimination with the California Department of Fair Employment & Housing (DFEH) and the United States Equal Employment Opportunity Commission (EEOC) challenging my non-selection for the Engineer position and asserting that Defendant Amtrak discriminated against African-Americans on the basis of race in promoting applicants to the Engineer position.

9. In or about June 2004, while my Charge of Discrimination was pending, I applied for the Engineer position for the sixth time. There were a total of seven (7) positions available in Oakland and Sacramento. I was interviewed on July 7, 2004. Defendant Amtrak uses a scoring system in which applicants are assigned a numerical value based upon their answers to the interviewer's questions. I am informed and believe that my overall score was among the highest scores of the approximately thirty (30) applicants interviewed over a three-day period. In August 2004, however, several lesser qualified Caucasian applicants with less seniority were selected for the positions. I was not promoted or given any reason for my non-selection.

10. On or about August 6, 2004, while my Charge of Discrimination was pending, I was accused of violating Defendant Amtrak's Operating Rules and faced formal disciplinary charges arising out of an incident which allegedly occurred on July 24, 2004. I was falsely accused

1  of failing to properly secure the brakes on a locomotive inside the Oakland Yard prior to coupling it.

2  An internal hearing was held on September 9, 2004, and Defendant Amtrak's Hearing Officer

3  sustained four (4) of

4  the five (5) charges Defendant Amtrak brought against me.

5       11.   On September 17, 2004, Defendant Amtrak terminated my employment,

6  ostensibly for the rules violations. I am informed and believe that a violation of these work rules,

7  even

8  if true, does not usually result in termination of employment.

9       I declare under penalty of perjury under the laws of the State of California and the

10 United States that the foregoing is true and correct. If called as a witness, I could and would testify

11 competently

12 to the matters stated herein.

13      Executed this 7th day of July, 2006, at Oakland, California.

                                /s/
                                _____
                                JOHN CAMPBELL, Declarant

1139P207MSJ

-4-
DECLARATION OF JOHN CAMPBELL (C04-3360 SI)

# EXHIBIT B

Case 4:05-cv-05434-CW    Document 53    Filed 04/03/2007    Page 9 of 15

JOHN E. CAMPBELL - 5/11/06
BSA                    HARDEMAN vs. AMTRAK/CALTRAIN RAILROAD                    XMAX(1/1)

## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF CALIFORNIA
                 SAN FRANCISCO DIVISION
                        ---oOo---

C. FAHEEM R. HARDEMAN,
           Plaintiff,         No. C 04-3360 SI
   vs.
AMTRAK/CALTRAIN RAILROAD,
           Defendants.
_____/

           Deposition of
           JOHN E. CAMPBELL
           Thursday, May 11, 2006







REPORTED BY: MARY DUTRA, CSR #9251

              NOGARA REPORTING SERVICE
              130 Battery Street, Suite 580
              San Francisco, California 94111
                    (415) 398-1889
```

## Page 2

```
                    I N D E X

                                        Page Number
EXAMINATION BY MR. ERLEWINE                  4
                    ---oOo---




                    E X H I B I T S
Defendants'
  1   Hand-drawn diagram by Mr. Campbell    10
                    ---oOo---
```

## Page 3

BE IT REMEMBERED that, pursuant to Notice of Taking Deposition and Subpoena Duces Tecum and on Thursday, the 11th day of May, 2006, commencing at the hour of 1:04 o'clock p.m. thereof, at the Law Offices of PHILLIPS, ERLEWINE & GIVEN LLP, One Embarcadero Center, Suite 2350, San Francisco, California, before me, MARY DUTRA, a Certified Shorthand Reporter in and for the State of California, personally appeared

JOHN E. CAMPBELL,

called as a witness by the Defendants, having been by me first duly sworn, was examined and testified as hereinafter set forth.

---oOo---

APPEARANCES OF COUNSEL

For the Plaintiff and the Witness
PRICE & ASSOCIATES
1611 Telegraph Avenue
Suite 1450
Oakland, California 94612
(510) 452-0292
By: PAMELA Y. PRICE, Attorney at Law

For the Defendants
PHILLIPS, ERLEWINE & GIVEN LLP
One Embarcadero Center
Suite 2350
San Francisco, California 94111
(415) 398-0900
By: R. SCOTT ERLEWINE, Attorney at Law
---oOo---

## Page 4

EXAMINATION BY MR. ERLEWINE

MR. ERLEWINE: Q. Please state your name.

A. John Earl Campbell.

Q. And what is your present residence address?

A. 2210 109th Avenue, Oakland, California 94603.

Q. And your current telephone number?

A. (510) 632-4260.

Q. Have you had your deposition taken before?

A. Yes.

Q. On how many occasions?

A. Just once.

Q. When was that?

A. 1990, I'm guessing.

Q. What was that in connection with?

A. I had an on-the-job injury with the Southern Pacific Railroad.

Q. Let me go over the ground rules for today's deposition.

First of all, are you represented by counsel today?

A. Yes, I am.

Q. And that's Ms. Price?

A. Yes.

Q. And when did you retain Ms. Price as your

Case 4:05-cv-05434-CW  Document 53  Filed 04/03/2007  Page 10 of 15

BSA  JOHN E. CAMPBELL - 5/11/06
HARDEMAN vs. AMTRAK/CALTRAIN RAILROAD  XMAX(2/2)

## Page 5

(1) counsel?
(2) A. Approximately six months ago.
(3) Q. Have you had any discussions with her
(4) regarding the Hardeman case?
(5) A. No.
(6) Q. You've been sworn to give testimony under
(7) penalty of perjury today. Do you understand that?
(8) A. I do.
(9) Q. And you understand that that requires that
(10) you tell the truth?
(11) A. Yes.
(12) Q. And the court reporter will be taking down
(13) what's said in today's proceeding, transcribing it
(14) into a booklet form known as a deposition transcript.
(15) You'll have an opportunity to review the transcript
(16) and make any changes or corrections you deem
(17) appropriate. I do caution that if you do make any
(18) changes or corrections, any counsel will be entitled
(19) to comment upon those in order, for example, to try
(20) and discredit your testimony.
(21)    Do you understand that?
(22) A. Yes, I do.
(23) Q. So it's very important for today's
(24) proceeding that you give your best testimony.
(25)    Is that acceptable?

## Page 6

(1) A. Yes.
(2) Q. If at any time any question I ask is unclear
(3) to you, you don't understand it or you have any
(4) question about it, please let me know and I'll do my
(5) best to rephrase it.
(6)    Okay?
(7) A. Okay.
(8) Q. And to the extent that you do answer a
(9) question, I will assume that you understood it.
(10)    Okay?
(11) A. Okay.
(12) Q. You're doing a good job so far. The court
(13) reporter cannot take down nonverbal answers, so you'll
(14) have to answer audibly.
(15) A. Okay.
(16) Q. Even though we're in an attorney's office,
(17) the force of your testimony today is as if it were
(18) given in front of a judge and jury in open court.
(19)    Do you understand that?
(20) A. I understand.
(21) Q. We're not asking you to speculate today;
(22) we're only looking for your recollection. If an
(23) answer would require that you speculate, please tell
(24) me.
(25) A. Okay.

## Page 7

(1) Q. We are entitled to your best recollection
(2) today and a reasonable estimate to the extent you can
(3) give one. Okay?
(4) A. Okay.
(5) Q. Do you have any questions before we begin?
(6) A. No.
(7) Q. How long were you employed with Amtrak?
(8) A. Eight years.
(9) Q. Okay. And what was your separation date
(10) from the company?
(11) A. September 17, 2004.
(12) Q. And I understand you have a lawsuit pending
(13) against Amtrak?
(14) A. Correct.
(15) Q. And are you being represented by Ms. Price
(16) in that lawsuit?
(17) A. Yes.
(18) Q. Are you a high school graduate?
(19) A. Yes.
(20) Q. A college graduate?
(21) A. No.
(22) Q. Okay. Did you take any college?
(23) A. No.
(24) Q. You've been identified in supplemental
(25) disclosures by Ms. Price in this case, the subject

## Page 8

(1) matter being a January 2003 derailment involving
(2) Charles Breeda and Mike Cecconi.
(3)    Do you know what that refers to?
(4) A. Yes. We all three worked together and we
(5) had a small derailment in South San Francisco yard.
(6) Q. Okay. The reason that you're here today is
(7) to find out what information you have on that subject.
(8) A. Okay.
(9) Q. Okay. Now, do you recall the date that the
(10) incident occurred?
(11) A. No, I don't.
(12) Q. Okay. Was it during the day or during the
(13) evening?
(14) A. It was during the evening.
(15) Q. Okay. And where did the incident occur?
(16) A. Milepost 9.1 in South San Francisco yard.
(17) Q. Who was the crew at the time of the
(18) incident?
(19) A. Myself, I was the conductor; Charles Breeda
(20) was my assistant conductor; and Mike Cecconi was the
(21) engineer.
(22) Q. What did the train consist of at the time of
(23) the incident?
(24) A. Two locomotives and about 2,000 feet of
(25) cars.

Page 9

(1) Q. Approximately how many cars would that
(2) consist of?
(3) A. 2,000 feet? Oh, 25.
(4) Q. Where were the locomotives at the time?
(5) A. On the south end of the train.
(6) Q. So am I correct that there were two
(7) locomotives on the south end of the train and then
(8) there were approximately 25 cars?
(9) A. Correct.
(10) Q. And how do you recall the incident
(11) occurring?
(12) A. I instructed Mr. Breeda to line the train
(13) out onto the main line, and I was about 100 yards
(14) away. And when the train started to move, the second
(15) locomotive derailed.
(16) Q. You know what would I think probably be most
(17) helpful today is would it be possible for you to -- if
(18) you could do a small drawing and show me where you
(19) were, where all the crew was, where the train was,
(20) where the tracks were, and we can go from there.
(21) A. I'm not a good drawer, but I will try.
(22)       MR. ERLEWINE: Madam Court Reporter, if you
(23) would be kind enough -- well, let's go ahead. I've
(24) handed the witness a pen and a blank piece of paper,
(25) and he is going to do his best to diagram the

Page 10

(1) incident.
(2)       THE WITNESS: (Complies.)
(3)       MR. ERLEWINE: Let me, Madam Reporter, have
(4) you mark this Exhibit 1.
(5)       (Discussion off the record.)
(6)       MR. ERLEWINE: Let's mark this Exhibit 40.
(7)       (Defendants' Exhibit No. 40 marked for
(8)       identification.)
(9)       MR. ERLEWINE: Q. Mr. Campbell, we've now
(10) had marked as Exhibit 40 the diagram you had begun
(11) drawing here. And you've drawn two parallel lines
(12) here.
(13)      Can you tell me what the first line is?
(14) A. The first line is the southbound main-line
(15) track.
(16) Q. And then the second parallel line is what?
(17) A. That's the yard track.
(18) Q. How many yard tracks were there?
(19) A. Let's see -- three yard tracks on the
(20) southbound side, three yard tracks on the northbound
(21) side.
(22) Q. And did the yard track -- you've drawn a
(23) yard track on Exhibit 40. Which yard track have you
(24) drawn?
(25) A. I think it's 02. They call it 02, 04, and

Page 11

(1) 06 on the southbound.
(2) Q. Okay. Was this track 02?
(3) A. This is 02, yes (indicating).
(4) Q. Okay. Would you be kind enough on that to
(5) note the track number -- yard track number?
(6) A. Okay. (Complies.)
(7) Q. And you've drawn on there "Yard Track 02";
(8) is that correct?
(9) A. Right.
(10) Q. And at the time of the incident, where were
(11) you located?
(12) A. I'm up here close to the station platform,
(13) South San Francisco's CalTrans station platform.
(14) Q. And you've written the term "Myself" there?
(15) A. Mm-hmm.
(16) Q. And that was your location?
(17) A. Mm-hmm.
(18) Q. And where was Mr. Breeda at the time of the
(19) incident?
(20) A. Right at the switch. At the point of
(21) derailment, that's the switch that goes from 02 to the
(22) main line.
(23) Q. And you've drawn an arrow from Mr. Breeda's
(24) name to where he was located?
(25) A. Correct.

Page 12

(1) Q. And am I correct that Mr. Cecconi was on the
(2) train at the time?
(3) A. Yes. He's -- he was the engineer.
(4) Q. And where on the movement in question --
(5) that is, that led up to the derailment? Where had the
(6) train come from?
(7) A. The 02 track.
(8) Q. Okay.
(9) A. It was parked north of the 02 switch.
(10) Q. "It was parked"?
(11) A. Yes. We was waiting for a southbound
(12) commuter train to clear.
(13) Q. Okay. Up to the point where -- how long had
(14) it been parked there in the 02 track?
(15) A. About five minutes, because we had been
(16) switching all night. So no more than five minutes.
(17) Q. Okay. And when it was parked at the
(18) 02 track, where were you located?
(19) A. I was still here (indicating), looking at my
(20) switch list at the station platform. And I think I
(21) was probably talking to the supervisor Jim Gunther.
(22) Q. And how far away were you from the train at
(23) that point?
(24) A. A good guesstimate, 100 yards.
(25) Q. Okay. And where was Mr. Breeda located at

Page 13

(1) the time when the train was parked on the 02 track?
(2) A. Right at the switch that goes from 02 to
(3) main line (indicating).
(4) Q. All right. And did someone get clearance to
(5) move the train?
(6) A. Yes; I did.
(7) Q. Who did you get the permission from?
(8) A. A San Jose dispatcher.
(9) Q. And what was the movement that you received
(10) permission for?
(11) A. He gave me authority to enter main line and
(12) occupy main-line track, the southbound main line.
(13) Q. And what was the route going to be used in
(14) order to get you from the parked position on the 02
(15) line to the main-line track?
(16) A. It was go from 02 through the crossover to
(17) the main line. These are switches right here
(18) (indicating). So we was going to make a southbound
(19) movement through the crossovers.
(20) Q. Let me make sure I understand. I'm going to
(21) ask you to do this, please: Would you please draw a
(22) number "1" with a circle around it for the first
(23) switch that you'd need to go through to get onto the
(24) main line from the yard track?
(25) A. Okay.

Page 14

(1) Q. And then draw a number "2" with a circle
(2) around it to show where you would enter the main line.
(3) A. (Complies.)
(4) Q. And can you also draw a number "3," please,
(5) that shows where the cars were located and the two
(6) engines.
(7) A. (Complies.)
(8) Q. Thank you. So you got permission from SCO
(9) to proceed onto the main line?
(10) A. Correct.
(11) Q. Okay. And what did you do next after you
(12) got permission to proceed onto the main line?
(13) A. Via radio I instructed Mr. Breeda to line
(14) the switches so the train can come out onto the main.
(15) Q. Okay. What did that require him to do?
(16) A. To line switch No. 1 and switch No. 2.
(17) Q. Physically what did he have to do to line
(18) No. 1?
(19) A. He had to unlock the switch and throw it.
(20) It was a ground-throw switch. And then he had to walk
(21) up to switch No. 2 and do the same thing -- unlock it
(22) and throw it.
(23) Q. They were both hand switches?
(24) A. They were both hand switches, they were both
(25) locked.

Page 15

(1) Q. Okay. And do you recall specifically what
(2) you told Mr. Breeda in that conversation?
(3) A. Yeah. I told him, "Line us out to the main,
(4) crossover to crossover."
(5) Q. Any other conversation at that point?
(6) A. He acknowledged that he understood.
(7) Q. Okay. And did you observe Mr. Breeda
(8) whether he followed those instructions?
(9) A. It was night and it was dark, and I did not.
(10) I just assumed he'd followed me because we had worked
(11) together for months. So I assumed he knew what he was
(12) doing.
(13) Q. Okay. So the short answer is you did not
(14) see him; correct?
(15) A. No, I didn't. I'm sorry.
(16) Q. What did you observe next? And by
(17) "observe," what occurred next after you had this
(18) conversation with Mr. Breeda?
(19) A. Okay. After about five minutes, he radioed
(20) me back that he had lined both switches.
(21) Q. That would be both switch No. 1 and No. 2 on
(22) your drawing here?
(23) A. Correct.
(24) Q. And what occurred next?
(25) A. I instructed Mr. Cecconi to come ahead,

Page 16

(1) which means move the train. And within 30 seconds
(2) after the move started, the second locomotive
(3) derailed.
(4) Q. Okay. And did anything occur between
(5) that -- in that 30-second time frame that you were
(6) aware of?
(7) A. No. Just the train started moving.
(8) Q. Okay. So where did the derailment occur?
(9) A. Right here at switch No. 1 (indicating).
(10) Q. Okay. And so it's your recollection that
(11) once you gave Mr. Cecconi the go-ahead to proceed,
(12) that he put the train in the forward -- he went
(13) forward with the train?
(14) A. Mm-hmm.
(15) Q. And went over the switch at No. 1?
(16) A. Mm-hmm.
(17) Q. And is that what caused the derailment?
(18) A. Yes.
(19) Q. All right. Between the time that
(20) Mr. Cecconi started the train movement from the parked
(21) position on 02 through the time of the derailment,
(22) were there any radio transmissions?
(23) A. I had told Mike that we had the clearance.
(24) He also heard on his radio, but on the railroad you
(25) repeat everything so everybody understands. So I told

Page 17

(1) him we had clearance to enter the main line, and he
(2) acknowledged that, you know, he understood.
(3)    Q. Okay. Did that conversation occur before he
(4) started moving the train?
(5)    A. Oh, yes, definitely.
(6)    Q. Okay. And my follow-up question is that
(7) between the time that he started moving the train up
(8) through the time of the derailment, you said it was 30
(9) seconds, approximately?
(10)   A. Approximately.
(11)   Q. Was there any stoppage of the train that you
(12) were aware of before the derailment?
(13)   A. Not before the derailment, no.
(14)   Q. Okay. And how did you find out there was a
(15) derailment?
(16)   A. Mike started screaming and cussing on the
(17) radio. Because I was far away, I didn't see it. He
(18) just hollered, "We're on the" blanking "ground." I
(19) said, "What?" He said, "We're on the ground," which
(20) means we have derailed.
(21)   Q. And did you understand that he had derailed
(22) as he was taking the train forward?
(23)   A. Yes.
(24)   Q. What did you do when you found out there was
(25) a derailment?

Page 18

(1)    A. I walked back to the two locomotives to
(2) inspect the damage.
(3)    Q. And what did you observe?
(4)    A. The second set of trucks on the second
(5) locomotive was on the ground.
(6)    Q. And did you have a discussion with
(7) Mr. Breeda as to what happened?
(8)    A. Yes. I asked him what happened.
(9)    Q. What did he say?
(10)   A. He said he followed my instructions, he
(11) lined the switches, and after that they derailed.
(12)   Q. Did he indicate to you that he had done
(13) anything wrong?
(14)   A. He thought he hadn't done anything wrong.
(15)   Q. He thought he had lined the switches
(16) correctly?
(17)   A. Correctly, yes.
(18)   Q. And were you able to observe the -- did you
(19) investigate?
(20)   A. Yes, I did.
(21)   Q. And what did you find?
(22)   A. That he had lined the wrong switch.
(23)   Q. What did you do to investigate?
(24)   A. I asked him exactly what he did. I told him
(25) to walk me through the steps, and he did. And he

Page 19

(1) showed me which did he line. And then I say, "Oops.
(2) Wrong switch."
(3)    Q. Did you talk to Mr. Cecconi about what
(4) happened?
(5)    A. Yes. We was -- all three of us conferred
(6) with each other. I can't tell you exactly what was
(7) said.
(8)    Q. And do you recall what Mr. Cecconi said?
(9)    A. Well, he was upset for about five, ten
(10) minutes.
(11)   Q. About what?
(12)   A. The derailment.
(13)   Q. Did he say who he felt was responsible for
(14) it?
(15)   A. At that point, no.
(16)   Q. Okay. Did you indicate to anybody who you
(17) felt was responsible for the derailment?
(18)   A. I talked to Mr. Breeda and I told him, "I
(19) think you made a mistake."
(20)   Q. Did you tell Mr. Cecconi you felt he had
(21) made a mistake?
(22)   A. Not at that time, no.
(23)   Q. Did you at any time speak with Mr. Cecconi
(24) and indicate that you felt Mr. Cecconi had
(25) responsibility?

Page 20

(1)    A. No.
(2)    Q. Do you believe Mr. Cecconi had any
(3) responsibility for the derailment?
(4)    A. No.
(5)    Q. Do you believe that Mr. Breeda had
(6) responsibility for the derailment?
(7)    A. Yes.
(8)    Q. Was there an investigation done?
(9)    A. On-site investigation, yes.
(10)   Q. And who conducted the on-site investigation?
(11)   A. My supervisor at the time, Jim Gunther.
(12)   Q. And what investigation did Mr. Gunther
(13) perform?
(14)   A. Basically the same one as I did. He had
(15) Charles walk him through the moves and Charles showed
(16) him exactly what he did. And he came to the same
(17) conclusion that I did, that it was Charles Breeda's
(18) fault.
(19)   Q. And not Mr. Cecconi's?
(20)   A. I didn't hear him say it was Mr. Cecconi's
(21) fault.
(22)   Q. Did Mr. Gunther come out that evening?
(23)   A. He was already on site. He was like a
(24) roving supervisor. In fact, he was standing next to
(25) me when it happened.

Case 4:05-cv-05434-CW  Document 53  Filed 04/03/2007  Page 14 of 15

JOHN E. CAMPBELL - 5/11/06

BSA HARDEMAN vs. AMTRAK/CALTRAIN RAILROAD XMAX(6/6)

## Page 21

(1) Q. Okay. Were you aware of any follow-up
(2) investigation that occurred with respect to the
(3) incident?
(4) A. They took lots of pictures and they had an
(5) investigation, but they didn't call me, you know.
(6) Q. Did you feel the investigation they
(7) conducted into the incident was a fair investigation?
(8) MS. PRICE: Objection; lacks foundation;
(9) calls for speculation.
(10) MR. ERLEWINE: Q. As far as you know.
(11) MS. PRICE: Same objection.
(12) THE WITNESS: Do I answer?
(13) MS. PRICE: If you have an opinion about the
(14) investigation, you can offer it.
(15) THE WITNESS: It was pretty fair, I guess.
(16) I tried to take blame for it, too, but they wouldn't
(17) let me.
(18) MR. ERLEWINE: Q. Why did you try and take
(19) blame for it?
(20) A. He was new, and I told Mr. Gunther maybe I
(21) should have walked down there and double-checked the
(22) guy's work.
(23) Q. You were entitled to rely upon your
(24) instructions to the AC; correct?
(25) A. Correct.

## Page 22

(1) MS. PRICE: Objection; lacks foundation;
(2) it's also vague.
(3) MR. ERLEWINE: Those are all my questions.
(4) Thank you.
(5) (Brief recess.)
(6) MR. ERLEWINE: I do have a couple other
(7) things. I just have a follow-up question.
(8) Q. When you told Mr. Gunther that — when you
(9) tried to take blame, you talked to Mr. Gunther and
(10) said maybe you should have walked down and checked the
(11) work, what did he say?
(12) A. He told me that if I did that, it was going
(13) to go on my record. And he said he didn't want to get
(14) me charged because I was too valuable to the project.
(15) He said, "You're not going to fall on the sword. He's
(16) been out here a year. He should know better."
(17) And that was it.
(18) Q. And did you talk to anybody else at Amtrak
(19) as to whether you could be accepting responsibility?
(20) A. No. Just Mr. Gunther. He told me, "Don't
(21) mention it," because he couldn't afford to lose me,
(22) you know, so....
(23) Q. Did Mr. Gunther indicate to you that he felt
(24) you were responsible somehow for the incident?
(25) A. He said no. I told him what happened, and

## Page 23

(1) he said, "Charles been out there a year, he should
(2) know." He said, "Don't try to fall on the sword"
(3) because, like he said, he wasn't going to lose me.
(4) And Charles admitted it was his fault. He said, I
(5) understood what John said, talking about me —
(6) MS. PRICE: He's asking you about
(7) Mr. Gunther.
(8) THE WITNESS: Mr. Gunther basically told me
(9) it wasn't my fault and don't try to be a martyr or
(10) take blame for it.
(11) MR. ERLEWINE: Those are all my questions.
(12) (Whereupon, the deposition concluded at
(13) 1:31 o'clock p.m.)
(14)
(15)
_____
JOHN E. CAMPBELL

## Page 24

(1) STATE OF CALIFORNIA    )
                         )
(2) COUNTY OF SAN FRANCISCO )
(3)   I, MARY DUTRA, a Certified Shorthand Reporter of
(4) the State of California, duly authorized to administer
(5) oaths pursuant to Section 2025 of the California Code
(6) of Civil Procedure, do hereby certify that
(7)          JOHN E. CAMPBELL,
(8) the witness in the foregoing deposition, was by me
(9) duly sworn to testify the truth, the whole truth and
(10) nothing but the truth in the within-entitled cause;
(11) that said testimony of said witness was reported by
(12) me, a disinterested person, and was thereafter
(13) transcribed under my direction into computer-aided
(14) transcription and is a true and correct transcription
(15) of said proceedings.
(16)   I further certify that I am not of counsel or
(17) attorney for either or any of the parties in the
(18) foregoing deposition and caption named, nor in any way
(19) interested in the outcome of the cause named in said
(20) caption.
(21)   Dated the 26th day of May, 2006.
(22)
(23)
         _____
         MARY DUTRA
(24)     CSR No. 9251 (California)
(25)

Case 4:05-cv-05434-CW   Document 53   Filed 04/03/2007   Page 15 of 15

JOHN E. CAMPBELL - 5/11/06
BSA                HARDEMAN vs. AMTRAK/CALTRAIN RAILROAD                    XMAX(7/7)

Page 25

(1) Mr. John E. Campbell
    c/o Pamela Y. Price, Esq.
(2) Price & Associates
    1611 Telegraph Ave., Ste. 1450
(3) Oakland, CA 94612
(4) Date: May 26, 2006
    Re: C. Faheem R. Hardeman v. Amtrak/Caltrain Railroad
(5) Deposition Date: Thursday, May 11, 2006
(6) Dear Mr. Campbell,
(7) Please be advised that the original transcript of your
    deposition is ready for your review.
(8)
    You have 35 days from the date of this letter to read,
(9) correct if necessary, and sign your transcript. It
    will then be sealed and sent to the examining attorney
(10) pursuant to the applicable law. You are not required
    by law to read and sign your deposition.
(11)
    You may either come to our office to read and sign the
(12) original transcript, or you may contact your attorney
    or the attorney who arranged for you to be present at
(13) your deposition. If they have ordered a copy of the
    transcript, you may review their copy and make
(14) corrections by submitting, signing and returning the
    attached form.
(15)
    If you choose to review your transcript at our office,
(16) please call first to make an appointment. Should you
    have any questions regarding these instructions,
(17) please call.
(18) Thank you for your cooperation in this matter.
(19) Sincerely,
(20) NOGARA REPORTING SERVICE
    130 Battery Street, Suite 580
(21) San Francisco, California 94111
    (415) 398-1889
(22)
(23)
(24)
(25)