1  Kathleen Maylin (SBN 155371)
   Cara Ching-Senaha (SBN 209467)
2  JACKSON LEWIS LLP
   199 Fremont Street, 10th Floor
3  San Francisco, California 94105
   Telephone: (415) 394-9400
4  Facsimile: (415) 394-9401

5  Attorneys for Defendants
   NATIONAL RAILROAD PASSENGER
6  CORPORATION dba AMTRAK and JOE DEELY

7

8                UNITED STATES DISTRICT COURT

9                NORTHERN DISTRICT OF CALIFORNIA

10

11  JOHN EARL CAMPBELL,                    Case No. C05-05434 MJJ (EDL)

12            Plaintiff,                   **DECLARATION OF CARA CHING-
                                           SENAHA IN SUPPORT OF
13       v.                               DEFENDANT NATIONAL RAILROAD
                                           PASSENGER CORPORATION'S
14  NATIONAL    RAILROAD    PASSENGER      OPPOSITION TO PLAINTIFF'S
    CORPORATION dba AMTRAK, JOE DEELY,     NOTICE OF MOTION AND MOTION
15  and DOES 1-15, inclusive,             TO COMPEL FURTHER ANSWERS
                                           TO INTERROGATORIES**
16            Defendants.
                                           Complaint Filed:   12/30/05
17                                         FAC Filed:         2/23/06
                                           Trial:             7/23/2007
18
                                           Hearing Date: May 1, 2007
19                                         Hearing Time: 9:00 a.m.
                                           Dept.: Courtroom E, 15th Floor
20
                                           Magistrate Judge Elizabeth D. Laporte
21

22

23

24                         **DISCOVERY MATTER**

25

26

27

28
                                    1

1    I, Cara Ching-Senaha, declare on the basis of personal knowledge:

2        1.      I am an attorney with the law firm of Jackson Lewis LLP, counsel of record for

3    Defendants NATIONAL RAILROAD PASSENGER CORPORATION dba AMTRAK and JOE

4    DEELY.   I am licensed to practice law in the above-referenced district court.   I make the

5    following statements based on personal knowledge.

6        2.      I have reviewed in its entirety the transcript for Mr. John Campbell's deposition,

7    taken on February 26, 2007.  Attached hereto as Exhibit A are true and correct copies of select

8    pages from Mr. Campbell's deposition and select deposition exhibits, as referenced in Defendant

9    National Railroad Passenger Corporation's Opposition to Plaintiff's Notice Of Motion And

10   Motion To Compel Further Answers To Interrogatories (aka "Amtrak's Opposition"), to be heard

11   on May 1, 2007.

12       3.      Attached hereto as Exhibit B is the Declaration of Larry Follis, referenced in

13   Amtrak's Opposition.

14       4.      Attached hereto as Exhibit C is the Declaration of Susan Venturelli, referenced in

15   Amtrak's Opposition.

16       5.      Attached hereto as Exhibit D is the Declaration of Gregg Baxter, referenced in

17   Amtrak's Opposition.

18       6.      Attached hereto as Exhibit E is the Declaration of Steve Shelton, referenced in

19   Amtrak's Opposition.

20       7.      Before any motion to compel as a result of an alleged failure to provide or

21   participate in discovery can be filed, the parties must make good faith attempts to resolve the

22   matter informally.  As part of the good faith requirement, a party must meet and confer and allow

23   sufficient time for the parties to discuss and explore informal resolution of their differences

24   before any motion to compel is filed.  *Obregon v. Superior Court*, 67 Cal.App.4th 424, 428

25   (1998).

26       8.      In this case, Plaintiff's counsel waited two weeks after Amtrak served its responses

27   to contact me in a so-called effort to "meet and confer." Attached hereto as Exhibit F is a true and

28   correct copy of Plaintiff's counsel's March 20th letter, in which she contacted our office for the

1    first time about Amtrak's interrogatory responses.

2        9.    In her March 20th letter, Plaintiff's counsel demanded that defense counsel respond

3    and supplement Amtrak's responses by the following day. *See* Exhibit F hereto. Plaintiff's

4    demand was per se unreasonable. *Obregon v. Superior Court*, 67 Cal.App.4[th] 424, 428 (1998).

5        10.    The unreasonableness of Plaintiff's counsel's position was compounded by the

6    fact that she *knew* that I was out of the office all day on March 20th and scheduled to vacation out-

7    of-state starting on March 21st. Plaintiff's counsel was advised of this fact via my Out Of Office

8    message, which stated that I would be out of the office on March 20th during which I would not

9    have access to email or voicemail, and that I would also begin my vacation on March 21st through

10   April 2nd. My Out of Office message is sent to all who send me an email message. Plaintiff's

11   counsel sent me an email message on an unrelated issue on March 20th and therefore, knew that I

12   was away from the office on the day she sent her letter and the next day, on which she demanded

13   an immediate response. Even after Plaintiff's counsel became aware of these facts, she filed on

14   March 21st this motion to compel.

15       11.    Fed.R.Civ.Proc. 33 limits written interrogatories to 25 in number "including all

16   discrete subparts." (emphasis added) As such, interrogatories containing discrete subparts are

17   counted as separate interrogatories towards the interrogatory limit. In addition, the Court at the

18   start of the litigation limited the number of interrogatories that a party may propound to 30, absent

19   a separate court order. Attached hereto as Exhibit G is a true and correct copy of the Court's Pre-

20   Trial Order, dated April 18, 2006.

21       12.    Plaintiff exceeded the 30 interrogatory maximum set by the Court.

22       13.    Plaintiff's Interrogatories 13 – 17 ask Amtrak to identify the persons who decided

23   the hire or promotion of 24 individuals to Engineer. It would be unduly burdensome and

24   oppressive to require Amtrak to provide specific responses. Amtrak has no computerized records

25   to identify which person or persons made the decisions to hire or promote. Accordingly, Amtrak

26   produced more than six months ago documents on every applicant for every Engineer position for

27   which Plaintiff contends he applied, even when Amtrak's records show and Plaintiff's admissions

28   prove that Plaintiff never applied for any position outside of Oakland. These same records

---

3

1    include applications, interview notes prepared by the persons who conducted the interviews, other

2    supporting documentation, and papers signed by those who approved the final hire/promotion

3    decision.   Therefore, the information that Plaintiff requests in Interrogatories 13 – 17 is contained

4    in the paper records that Amtrak produced to Plaintiff in August of 2006 and is equally available

5    to Plaintiff as to Amtrak.

6          Executed this 10th day of April, 2007 in San Francisco, California.  I declare under penalty

7    of perjury under the laws of California and the United States of America that the foregoing is true

8    and correct.

9

10                                     _Cara Ching-e_____

11                                     CARA CHING-SENAHA

12

13

14    H:\N\National Railroad Passenger Corp (40707)\Campbell (89560)\Pleadings\Pltf 2d mtn to compel (re Amtrak IOG response)\CMC
      Decl ISO Op to MTC to be heard 050107 CMC041007.doc

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEF. AMTRAK'S OPP TO PL'S MTC AND ENLARGE DISCOVERY          Case No. C05-05434 MJJ (EDL)

# EXHIBIT A

| | | |
|---|---|---|
| 1 | post all open positions? | 12:14:14 |
| 2 | A.   Correct. | |
| 3 | Q.   And did you routinely look at that board? | |
| 4 | A.   Yes. | |
| 5 | Q.   Okay.  Were you -- did you -- well, let me ask | 12:14:19 |
| 6 | this:  Did you ever apply for a position, Mr. Campbell, | |
| 7 | outside of the Oakland site? | |
| 8 | A.   No. | |
| 9 | Q.   Is it fair to say that you weren't interested | |
| 10 | in a position outside of the Oakland site? | 12:14:34 |
| 11 | MS. PRICE:  Objection.  Vague; overbroad; | |
| 12 | vague as to time. | |
| 13 | THE WITNESS:  Correct. | |
| 14 | MS. MAYLIN:  Q.  And why is that? | |
| 15 | A.   My mom was handicapped, and I needed to stay | 12:14:44 |
| 16 | close to home. | |
| 17 | Q.   Okay.  All right.  So your -- the -- on the | |
| 18 | extra boards for approximately a year? | |
| 19 | A.   Yes. | |
| 20 | Q.   Okay.  After that time, how did your position | 12:15:04 |
| 21 | change? | |
| 22 | A.   I had enough seniority to basically hold any | |
| 23 | position I wanted. | |
| 24 | Q.   "Any position" meaning what? | |
| 25 | A.   I -- I could bid on any position out of the | 12:15:17 |

DEPOSITION OF JOHN EARL CAMPBELL

```
 1   October '98.  Sir, you say that you applied for an       12:24:06
 2   engineer position in October 1998; is that right?
 3        A.   Uh-huh.
 4        Q.   Okay.  That's a yes?
 5        A.   Yes.                                            12:24:17
 6        Q.   Okay.  So did you fax in your application to
 7   the L.A. human resources?
 8        A.   No.  The very first time, I gave it back to
 9   Mr. Schulthies, the supervisor that gave it to me, after
10   I filled it out.                                          12:24:32
11        Q.   Why did you do that if you knew that you had
12   to fax or mail it to L.A. HR?
13        A.   Well, the first time he was going to write a
14   recommendation, which add a little weight, so that's why
15   I gave it back to him.                                    12:24:47
16        Q.   Okay.  Did he give it back to you with a
17   recommendation?
18        A.   No.  He said his boss, Tom Oughton, tore it up
19   and threw it in the trash.
20        Q.   Okay.  Mark Schulthies told you that?           12:24:59
21        A.   Yes.
22        Q.   When did Mark tell you that?
23        A.   He said Tom wanted me to be there a whole year
24   before I become an engineer.
25             MS. PRICE:  She said, when did he tell you.     12:25:11
```

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | Do you have the date? | 12:25:12 |
| 2 | THE WITNESS:  Oh.  Say, the first week of | |
| 3 | '98. | |
| 4 | MS. MAYLIN:  Q.  So Mark told you that Tom | |
| 5 | said you have to be there a year? | 12:25:17 |
| 6 | A.    Uh-huh. | |
| 7 | Q.    That's a yes? | |
| 8 | A.    Yes. | |
| 9 | Q.    Okay.  You got to use -- use words, | |
| 10 | Mr. Campbell.  All right. | 12:25:23 |
| 11 | Did you ever have a discussion yourself with | |
| 12 | Tom about your application? | |
| 13 | A.    No. | |
| 14 | Q.    Did you ever have a discussion with anybody | |
| 15 | else about your application in October '98? | 12:25:31 |
| 16 | A.    No. | |
| 17 | Q.    Okay.  Did you go get another application, | |
| 18 | fill it out, and fax or mail it to L.A.? | |
| 19 | A.    Not at that time, no. | |
| 20 | Q.    So is it fair to say that that was the end of | 12:25:43 |
| 21 | your application process at that time? | |
| 22 | A.    Yes. | |
| 23 | Q.    Okay.  All right.  And you actually | |
| 24 | volunteered to me a moment ago that there's a policy | |
| 25 | that -- to apply for an engineer position you have to be | 12:25:57 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | with Amtrak a year, correct? | 12:26:02 |
| 2 | A.   Correct. | |
| 3 | Q.   How did you first learn that? | |
| 4 | A.   I think they told it to us in class, when we | |
| 5 | got hired. | 12:26:12 |
| 6 | Q.   Oh, okay.  Do you recall who that was? | |
| 7 | A.   Tom Oughton. | |
| 8 | Q.   All right.  Did you ever hear to the contrary | |
| 9 | that that was not a policy? | |
| 10 | A.   No. | 12:26:23 |
| 11 | Q.   Okay.  Did you ever hear, Mr. Campbell, that | |
| 12 | there had been someone hired for an engineer position | |
| 13 | internally at Amtrak who had not been there a year prior | |
| 14 | to being hired? | |
| 15 | A.   Not at that time, but recently, yes. | 12:26:38 |
| 16 | Q.   Okay.  And what did you hear recently about | |
| 17 | that? | |
| 18 | A.   There's a list of name (sic) of people that | |
| 19 | been there -- there's a list of the year that Amtrak | |
| 20 | engineers know, and I have a list, but I don't have it | 12:26:52 |
| 21 | with me. | |
| 22 | Q.   Where is the list, sir? | |
| 23 | A.   At home. | |
| 24 | Q.   Okay.  Well, can you recall anybody's name who | |
| 25 | you believe was at Amtrak less than a year, but then was | 12:27:09 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | several incidents of misconduct during your employment. | 02:44:32 |
| 2 | Can you tell me the first time there was an incident | |
| 3 | where you were charged with a rules infraction? | |
| 4 | MS. PRICE:  Objection.  Lacks foundation; | |
| 5 | assumes facts.  It's also argumentative.  Also, object | 02:44:46 |
| 6 | to the preface. | |
| 7 | Do you need to have the question read back? | |
| 8 | Do you know what the question is? | |
| 9 | THE WITNESS:  Yeah. | |
| 10 | MS. MAYLIN:  Q.  When is the first time you | 02:45:05 |
| 11 | were charged with a rules infraction when you were | |
| 12 | employed by Amtrak? | |
| 13 | A.  I don't know the date, but it involved the | |
| 14 | boxcar derailing. | |
| 15 | MS. PRICE:  Okay.  She's asking you for the | 02:45:16 |
| 16 | date. | |
| 17 | THE WITNESS:  I don't have the dates. | |
| 18 | MS. MAYLIN:  Q.  Okay.  Was it in 2000, | |
| 19 | Mr. Campbell, March 24, 2000; does that sound right? | |
| 20 | A.  Yeah. | 02:45:27 |
| 21 | Q.  Okay.  And there was a boxcar derailment? | |
| 22 | A.  Yes. | |
| 23 | Q.  Okay.  And I understand that the recommended | |
| 24 | discipline for that misconduct was termination; is that | |
| 25 | correct? | 02:45:41 |

DEPOSITION OF JOHN EARL CAMPBELL

1      A.    No.                                                    02:45:41

2            MS. PRICE:   Objection.   Lacks foundation;

3      calls for speculation.

4            MS. MAYLIN:   Q.   Okay.   Well, do you recall,

5      Mr. Campbell, that that was the recommended discipline,    02:45:47

6      but that you acknowledged your misconduct, and you

7      waived your right to an formal investigation, and as a

8      result, you were issued instead a letter of reprimand?

9            MS. PRICE:   Objection.   Or, I'm sorry.   Are

10     you finished with the question?                             02:46:02

11           MS. MAYLIN:   Yes.

12           MS. PRICE:   Okay.   Objection.   The question is

13     compound; lacks foundation; assumes facts.

14           THE WITNESS:   Ask me the first part first.

15     Like she said, you asked me four different questions        02:46:15

16     there.

17           MS. MAYLIN:   Q.   Okay.   Let's try it -- I'll

18     try to ask you fewer than four.   I'll try to ask you

19     one.

20           Mr. Campbell, it is true in March 24, 2000 --         02:46:28

21     on March 24, 2000, that that incident resulted in a

22     charge of misconduct, but you admitted the misconduct;

23     is that correct?

24           MS. PRICE:   Objection.   It's still compound;

25     assumes facts, lacks foundation.                            02:46:50

DEPOSITION OF JOHN EARL CAMPBELL

114

| | |
|---|---|
| 1 | Just try to answer -- if you can, answer the | 02:46:53 |
| 2 | question. If you need to have it rephrased, let her |
| 3 | know. |
| 4 | THE WITNESS: I'm going to just say yes. |
| 5 | MS. PRICE: Don't just say yes. You need to | 02:47:04 |
| 6 | make sure your answer is accurate. |
| 7 | MS. MAYLIN: Q. Well, if you'd like to see |
| 8 | that language written on a piece of paper that you |
| 9 | signed, Mr. Campbell, I can certainly provide that. |
| 10 | Here's what I've marked as Exhibit 13. | 02:47:18 |
| 11 | A. Okay. |
| 12 | Q. There you go. Maybe you'll find that amusing |
| 13 | as well. |
| 14 | (Whereupon, Defendants' Exhibit No. |
| 15 | 13 was marked for identification.) | 04:48:10 |
| 16 | MS. PRICE: Okay. And the language that |
| 17 | you're suggesting to him where he says, "I acknowledge |
| 18 | my misconduct," is in what paragraph, Counsel? |
| 19 | MS. MAYLIN: Q. Is that your signature on the |
| 20 | page, sir? | 02:47:28 |
| 21 | A. No. |
| 22 | MS. PRICE: Can you -- you asked (sic) a |
| 23 | question pending when you made a statement that this |
| 24 | document reflected him acknowledging his misconduct. |
| 25 | Can you -- | 02:47:37 |

1     MS. MAYLIN:  I'm going to take him through it, 02:47:38

2 Counsel, if you'll stop talking.  I'd like to ask a

3 question.

4     MS. PRICE:  Well, I object.  The question you

5 asked earlier lacks foundation.  It was misleading.  It 02:47:44

6 was argumentative.  And I don't know if you're doing

7 that intentionally, but the record will reflect the

8 language that you just represented to the witness would

9 be in this document.  I don't see it here.  And you're

10 obviously declining to make that representation on the 02:47:58

11 record now that the document has been marked, but that's

12 contrary to what you represented to the witness before

13 you showed him the document.

14     MS. MAYLIN:  Q.  Mr. Campbell, is this your

15 signature on this page that I just marked as Exhibit 13? 02:48:11

16   A. That is my signature.

17   Q. Okay.  And see under "Charges" it states your

18 alleged failure to follow the general code of operating

19 rules, third edition, and it has a lot of numbers there,

20 but Safety Rule 5316E, and AMT3, Rule 16.2.  You 02:48:27

21 understood that that's what you were charged with,

22 correct?

23   A. Correct.

24   Q. And, specifically, under "Specification," it

25 states that there was damage to equipment during the 02:48:45

DEPOSITION OF JOHN EARL CAMPBELL

1    11 p.m. yard assignment of March 24, 2000, damage to the        02:48:45

2    cables occurred when 8804 was cut from 8030 on two

3    tracks, and further damage was done when 8804 was moved

4    to A track, and damages were unreported.  Did you

5    understand that those were the specifications of the        02:49:04

6    charges, Mr. Campbell?

7        A.    Yes.

8        Q.    Okay.  And did you agree to accept the

9    following discipline assessed by Amtrak, that a letter

10   of reprimand will be issued to you and placed in your        02:49:18

11   file?

12       A.    Yes.

13       Q.    Okay.  And you signed that you accepted that

14   discipline for those infractions on April 13, 2000,

15   correct?        02:49:31

16       A.    Correct.

17       Q.    Okay.  And you waived your right to a formal

18   investigation that had been scheduled for April 12,

19   2000, correct?

20       A.    Correct.        02:49:43

21       Q.    Okay.  And when you -- you understood that

22   when you waived your right to a formal investigation,

23   and you accept the discipline, that that means that you

24   did not contest the charges or the specifications,

25   correct?        02:49:58

| | |
|---|---|
| 1 | MS. PRICE:  Objection.  Lacks foundation; | 02:49:59 |
| 2 | calls for a legal conclusion. |
| 3 | MS. MAYLIN:  Q.  Correct, Mr. Campbell? |
| 4 | A.  Correct. |
| 5 | MS. PRICE:  Same objections. | 02:50:06 |
| 6 | MS. MAYLIN:  Q.  Did you ever learn, |
| 7 | Mr. Campbell, that had you not agreed to the discipline, |
| 8 | that that charge, those actually charges, three charges, |
| 9 | would be grounds for termination? |
| 10 | A.  First I'm hearing of it. | 02:50:41 |
| 11 | Q.  So the answer is no? |
| 12 | A.  No. |
| 13 | Q.  And as far as you know, a formal letter of |
| 14 | reprimand was put in your personnel file, correct? |
| 15 | A.  Correct. | 02:51:04 |
| 16 | Q.  Okay.  Do you recall having any -- being |
| 17 | charged with any rule infraction prior to 2000? |
| 18 | A.  No, I don't recall. |
| 19 | Q.  All right.  When is the next time you were |
| 20 | charged with a rule infraction? | 02:51:19 |
| 21 | A.  2002, maybe. |
| 22 | Q.  Okay.  What occurred then? |
| 23 | A.  That was the incident with the boxcar being |
| 24 | pushed off the track. |
| 25 | Q.  Oh, that was the derailment? | 02:51:33 |

DEPOSITION OF JOHN EARL CAMPBELL

1      A.   Yes.                                            02:51:35

2      Q.   Okay.  So that was where a boxcar actually

3  came off altogether, right?

4      A.   One wheel came off.  Not the whole bus.  Just

5  one wheel.                                               02:51:45

6      Q.   Okay.  Is that not serious when just one wheel

7  comes off, as opposed to all four?

8           MS. PRICE:  Objection.  Vague and ambiguous.

9           THE WITNESS:  Depends on who the boss is.

10          MS. MAYLIN:  Q.  Is that right, Mr. Campbell?   02:51:59

11  So a one-wheel derailment is not considered significant,

12  as far as you know?

13          MS. PRICE:  Objection.  Lacks foundation;

14  calls for speculation.  Also, vague and ambiguous.

15          THE WITNESS:  Any derailment is serious.        02:52:16

16          MS. MAYLIN:  Q.  All right.  How many rules

17  infractions were you charged with for that incident?

18      A.   I have no idea.

19      Q.   Okay.  Well, isn't it true, Mr. Campbell, that

20  you were charged with four infractions?  And I'll list  02:52:33

21  them and see if that refreshes your recollection.

22  Failing to work safely and to avoid damage to equipment

23  is one.  Failing to verify cars were properly secured

24  before coupling or moving.  That's two.  Failing to

25  control train movement while moving cars onto a spur    02:52:52

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | track.  That's three.  And moving a train at an unsafe | 02:52:56 |
| 2 | speed.  Four.  Does that refresh your recollection, sir? | |
| 3 | A.    Yes. | |
| 4 | Q.    Okay.  And it's true, isn't it, that Amtrak | |
| 5 | conducted a formal investigation in March 2002? | 02:53:09 |
| 6 | A.    Yes. | |
| 7 | Q.    Okay.  And there was a hearing where you | |
| 8 | testified, correct? | |
| 9 | A.    Correct. | |
| 10 | Q.    Okay.  And based largely on your own | 02:53:17 |
| 11 | admissions, you were assessed a 20-day suspension, | |
| 12 | correct? | |
| 13 | MS. PRICE:  Objection.  Lacks foundation; | |
| 14 | calls for speculation. | |
| 15 | THE WITNESS:  I thought it was ten. | 02:53:32 |
| 16 | MS. MAYLIN:  Q.  Yeah.  And actually what I | |
| 17 | have here, sir, and maybe this will refresh you | |
| 18 | recollection, it was a 20-day suspension, but ten days | |
| 19 | were held in abeyance.  Does that sound right? | |
| 20 | A.    Yes. | 02:53:42 |
| 21 | Q.    Okay.  And you completed your suspension in | |
| 22 | April 2002? | |
| 23 | A.    Yes. | |
| 24 | Q.    All right.  And your union appealed the | |
| 25 | suspension to the Public Law Board; is that true? | 02:53:53 |

| | | |
|---|---|---|
| 1 | A.  Yes. | 02:53:59 |
| 2 | Q.  Okay.  Well, sir, don't guess.  Do you | |
| 3 | remember that the union appealed for you? | |
| 4 | A.  Yes. | |
| 5 | Q.  All right.  And do you recall that in January | 02:54:06 |
| 6 | 2003, the law board upheld the suspension? | |
| 7 | A.  Yes. | |
| 8 | Q.  Okay.  By the way, sir, could you explain that | |
| 9 | first incident that we talked about in 2000, where there | |
| 10 | was damage, equipment was damaged, and that it wasn't | 02:54:39 |
| 11 | reported?  What actually occurred then? | |
| 12 | A.  Oh, this one (indicating)? | |
| 13 | Q.  Yeah. | |
| 14 | A.  Okay.  The cars have electrical cables on | |
| 15 | them, the passenger cars, and when we moved the car, the | 02:54:54 |
| 16 | electrical cable was still hooked to the ground power, | |
| 17 | which is the power coming from the -- the house, you | |
| 18 | know, the PG&E power, basically.  The mechanical | |
| 19 | problem -- the mechanical department is supposed to | |
| 20 | unhook that for us and then put a blue man-at-work flag | 02:55:14 |
| 21 | off.  They took the men-at-work flag off, but they | |
| 22 | didn't unhook it.  So when I saw that -- the men-at-work | |
| 23 | flag off, that tells me it's okay to pull, so I pulled | |
| 24 | it out and the cables was still pulled (sic) and pulled | |
| 25 | them all out.  So the mechanical half did their job, and | 02:55:30 |

| | | |
|---|---|---|
| 1 | I got blamed for it.  Simple as that. | 02:55:37 |
| 2 | Q.   Okay.  Well -- and then you didn't report the | |
| 3 | damage, right? | |
| 4 | A.   I didn't know it was damaged until somebody | |
| 5 | came and told me. | 02:55:47 |
| 6 | Q.   Okay.  Well, how did you know that the crew | |
| 7 | hadn't done -- the electrical crew hadn't done their job | |
| 8 | with the flag, though? | |
| 9 | A.   At the end of the shift they told me the car | |
| 10 | was damaged, after I had pulled it out and re-spotted, | 02:55:58 |
| 11 | getting ready to go home.  They said, oh, those cables | |
| 12 | were pulled out. | |
| 13 | I said, "What?" | |
| 14 | They said, "Yeah."  They were still hooked up, | |
| 15 | so that's how I knew.  It was like three hours later. | 02:56:12 |
| 16 | Q.   Okay.  So it was the delay in the three hours | |
| 17 | of non-reporting? | |
| 18 | A.   Yeah. | |
| 19 | MS. PRICE:  Objection.  Vague. | |
| 20 | MS. MAYLIN:  Q.  When was it -- when was it | 02:56:20 |
| 21 | reported, as far as you can recall? | |
| 22 | A.   They reported it to their supervisor, and then | |
| 23 | they -- their supervisor told me, and I wrote up a | |
| 24 | report. | |
| 25 | Q.   Okay.  As part of the yard conductor protocol, | 02:56:35 |

| | | |
|---|---|---|
| 1 | though, sir, shouldn't you have gone back and checked | 02:56:43 |
| 2 | yourself, regardless of the flag? | |
| 3 | MS. PRICE:  Objection.  Vague and ambiguous as | |
| 4 | to the "yard conductor protocol," something; | |
| 5 | unintelligible. | 02:56:54 |
| 6 | THE WITNESS:  That's true. | |
| 7 | MS. MAYLIN:  Q.  Okay.  And after that, I bet | |
| 8 | you double-checked to make sure, right? | |
| 9 | A.   For the record, my A/C did the move.  I was | |
| 10 | standing at the switch so -- but like earlier, I'm in | 02:57:08 |
| 11 | charge, so I get the blame, but I chewed him out. | |
| 12 | (Whereupon, Defendants' Exhibit No. | |
| 13 | 14 was marked for identification.) | |
| 14 | MS. MAYLIN:  Q.  All right.  What I've marked | |
| 15 | now is -- I think we're back to the '02 incident.  I've | 02:57:18 |
| 16 | marked as Exhibit 14 -- well, it is -- here we go. | |
| 17 | March 28, 2002.  There you go -- a letter addressed to | |
| 18 | you, Mr. Campbell, where it details the charges that | |
| 19 | we've already talked about on the record here.  And the | |
| 20 | bottom line is that a boxcar became derailed.  You | 02:58:00 |
| 21 | received this letter, sir? | |
| 22 | A.   Yes. | |
| 23 | Q.   Okay.  And the hearing officer of the Western | |
| 24 | Region, Roger Butler, found you guilty of the charges, | |
| 25 | correct? | 02:58:18 |

DEPOSITION OF JOHN EARL CAMPBELL

```
1        A.    Correct.                                      02:58:19

2        Q.    Okay.  And -- well, let's go on.  Sir, was

3   there another time when you were charged with a rules

4   infraction?

5        A.    The one that got me terminated.               02:58:54

6        Q.    Okay.  Well, before we talk about that, sir,

7   we talked a little bit about the Province, Terry

8   Province, situation.  Were you counseled about that

9   incident, Mr. Campbell?

10       A.    Not counseled.  Not charged.                  02:59:13

11       Q.    Okay.  Well, do you know whether or not

12  Mr. Province filed a complaint about that?

13       A.    Yes.

14       Q.    Okay.  And you submitted a response, correct?

15       A.    Probably.  I don't remember.                  02:59:31

16       Q.    All right.  Do you recall what Mr. Province

17  said you did?

18       A.    No.

19       Q.    Do you recall that Mr. Province alleged that

20  you threw a lantern at his head?                         02:59:41

21       A.    Yes, I recall that.

22       Q.    Okay.  Mr. Campbell, did you throw a lantern

23  at Mr. Province?

24       A.    No.

25       Q.    Did you toss a lantern in his direction?      02:59:52
```

DEPOSITION OF JOHN EARL CAMPBELL

| 1 | your signature there? | 03:56:00 |
| 2 | A.    Yes. | |
| 3 | Q.    It's a receipt, and you received on -- it | |
| 4 | looks like -- May 14, 2004, a copy of the "Service | |
| 5 | Standards Reference Manual for Train Service and | 03:56:10 |
| 6 | On-Board Service Employees," correct? | |
| 7 | A.    Correct. | |
| 8 | Q.    Okay.  And you understood that you were | |
| 9 | responsible for reading and updating the manual, and you | |
| 10 | had to follow the procedures, correct? | 03:56:23 |
| 11 | A.    Correct. | |
| 12 | Q.    And that's true of all the booklets and | |
| 13 | policies and procedures you received, you were | |
| 14 | responsible for reading, understanding and following, | |
| 15 | correct? | 03:56:37 |
| 16 | A.    Correct. | |
| 17 | (Whereupon, Defendants' Exhibit No. | |
| 18 | 19 was marked for identification.) | |
| 19 | MS. MAYLIN:  Q.  All right.  What I am marking | |
| 20 | now as Exhibit 19 is a two-page document.  It's a | 03:56:43 |
| 21 | September 17, 2004 letter to you signed by Patrick | |
| 22 | Gallagher.  There you go.  And this is Mr. Gallagher | |
| 23 | informing you that he finds that you were guilty of the | |
| 24 | charges, correct? | |
| 25 | A.    Correct. | 03:57:11 |

DEPOSITION OF JOHN EARL CAMPBELL

154

| | | |
|---|---|---|
| 1 | Q.    Okay.  And on page two, it details the charge | 03:57:11 |
| 2 | and the rule violation and the decision is to terminate | |
| 3 | you from service effective immediately, correct? | |
| 4 | A.    Correct. | |
| 5 | (Whereupon, Defendants' Exhibit No. | 03:37:38 |
| 6 | 20 was marked for identification.) | |
| 7 | MS. MAYLIN:  Q.  Okay.  All right.  And then | |
| 8 | on your behalf, the UTU requested that the discipline be | |
| 9 | expunged, correct?  And here I've got a September 28, | |
| 10 | 2004 letter -- there you go, Mr. Campbell -- addressed | 03:57:55 |
| 11 | to the Director-Labor Relations, at Amtrak.  It's from | |
| 12 | a Mr. A.L. -- oh, I'm going to mispronounce it -- | |
| 13 | Suozzo, S-u-o-z-z-o.  You received a copy of that, | |
| 14 | Mr. Campbell? | |
| 15 | A.    Yes. | 03:58:17 |
| 16 | Q.    All right. | |
| 17 | (Whereupon, Defendants' Exhibit No. | |
| 18 | 21 was marked for identification.) | |
| 19 | MS. MAYLIN:  Q.  And here what I've marked as | |
| 20 | Exhibit 21 is a three-page letter, November 9, 2004. | 03:58:40 |
| 21 | It's directed to Mr. Suozzo, and it is from Larry | |
| 22 | Hriczak, Director-Labor Relations, where the appeal on | |
| 23 | your behalf is denied.  You received that, Mr. Campbell? | |
| 24 | A.    Yes. | |
| 25 | Q.    Sir, during the hearing where you testified, | 03:59:10 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | A.   I was averaging 60 hours a week. | 05:10:14 |
| 2 | Q.   Okay.  What was the base; was it a 40-hour | |
| 3 | week? | |
| 4 | A.   Yes. | |
| 5 | Q.   Okay.  And you were averaging 20 hours of | 05:10:21 |
| 6 | overtime? | |
| 7 | A.   Yes. | |
| 8 | Q.   Okay.  Let's say in the six months prior to | |
| 9 | your separation, sir, how many weeks, if you can give me | |
| 10 | an estimate, were you working 20 hours overtime? | 05:10:35 |
| 11 | A.   Oh, that was standard at the job, was pulling | |
| 12 | like that, 60 hours. | |
| 13 | Q.   Okay.  Did you ever go over that? | |
| 14 | A.   Maybe once or twice. | |
| 15 | Q.   But typically 60 hours? | 05:10:48 |
| 16 | A.   Yes. | |
| 17 | Q.   All right.  So I think we talked about a June | |
| 18 | 1999 engineer position that you gave an application to | |
| 19 | Mark, and Mark reported back to you that Mr. Oughton | |
| 20 | tore it up and threw it away? | 05:11:10 |
| 21 | A.   Correct. | |
| 22 | Q.   Okay.  And you never faxed or mailed that | |
| 23 | application into the Los Angeles HR? | |
| 24 | A.   No. | |
| 25 | Q.   Okay.  Do you know, Mr. Campbell, what the | 05:11:22 |

DEPOSITION OF JOHN EARL CAMPBELL

```
 1              MS. MAYLIN:  Just a moment.                    05:28:59

 2                     (Discussion off the record.)

 3              MS. MAYLIN:  Q.  Okay.  So Mr. -- or Jason was

 4      lackadaisical in your opinion --

 5         A.   Yeah.                                          05:29:31

 6         Q.   -- and Mr. Poitier was just not smart?

 7         A.   Yeah.

 8         Q.   Okay.  And, sir, what makes you think that

 9      they had less seniority than you?

10         A.   Well, the seniority roster told me.            05:29:43

11         Q.   Okay.  But we have agreed, haven't we, that

12      seniority has nothing to do with whether or not an

13      individual is hired into an engineer position, correct?

14              MS. PRICE:  Objection.  Misstates the

15      witness's testimony.                                  05:29:56

16              THE WITNESS:  Yeah.

17              MS. MAYLIN:  Q.  I think we talked about that

18      there's no bid rights, right?

19         A.   We talked about it, yes.

20         Q.   Okay.  Is that true?                           05:30:05

21         A.   Is what true?

22         Q.   There's no bid rights, yes.

23         A.   Oh, there is no bid rights, yes.

24         Q.   Okay.  So seniority really doesn't matter

25      then, does it?                                        05:30:14
```

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | MS. PRICE:  Objection.  Misstates the | 05:30:15 |
| 2 | witness's testimony. | |
| 3 | THE WITNESS:  Yeah.  Seniority and bid rights | |
| 4 | are two different things. | |
| 5 | MS. MAYLIN:  Q.  Oh, all right.  Well, let me | 05:30:21 |
| 6 | ask you, as far as you understand, is there any | |
| 7 | requirement that Amtrak only hire, or first hire | |
| 8 | employees into an engineer position from a conductor | |
| 9 | position based on length of service? | |
| 10 | A.   No. | 05:30:40 |
| 11 | Q.   Okay.  All right.  Did you -- so we're up to | |
| 12 | November '03.  Thus far, sir, have you had any | |
| 13 | interviews for an engineer position? | |
| 14 | A.   I had one. | |
| 15 | Q.   When was that? | 05:31:00 |
| 16 | A.   I think either December '02 or January '03. | |
| 17 | Q.   Okay.  Who did you interview with? | |
| 18 | A.   I know one was Rich Barnes.  And I cannot | |
| 19 | remember the other two.  But Rich Barnes was definitely | |
| 20 | one of them. | 05:31:24 |
| 21 | Q.   Okay.  Can you describe the other two? | |
| 22 | A.   They was Caucasian, and they were engineers. | |
| 23 | One was a union rep.  That was Rich.  And the other two | |
| 24 | were engineers. | |
| 25 | Q.   Okay.  All right.  And you think that was in | 05:31:36 |

DEPOSITION OF JOHN EARL CAMPBELL



National Railroad Passenger Corporation. California Corridor, 1851-A 5th Street, Oakland, CA 94607



**Amtrak®**
**West**

## WAIVER OF RIGHT TO FORMAL INVESTIGATION

Date: April 12, 2000

I hereby waive my right to the Formal Investigation originally scheduled for April 12, 2000, 2:00 p.m., at Mechanical Facility, 250 Wood St., Oakland, California in connection with the following:

**Charges**: "Your alleged failure to follow the General Code of Operating Rules, Third Edition, 1.1.3, 6.28, 7.1, 7.3, & 7.5; Safety rule: 5316(e); and AMT-3 rule 16.2.2.

**Specifications**: Damage to equipment during the 11PM yard assignment of March 24, 2000. Damage to the cables occurred when 8804 was cut from car 8030 on 2 track. And further damage was done when 8804 was moved to 8 track. The 8027 and 8020 were in the 8 track. The 8020 was shoved into the 8027 by the move of the 8804. Damages were unreported.

I further hereby agree to accept the following discipline assessed by the National Railroad Passenger Corporation:

**A letter of reprimand will be issued to you and placed in your file.**

<u>John Campbell</u>
Employee Name (Print)

*Joh C bgphell*
Employee Signature

*4-13-00*
Date

*[signature]*
Witness Signature

*4-13-00*
Witness Signature

Cc: B. Barnes
    R. A. Wood
    Roger Butler - File # 0161.00
    R. Belloumini-UTU Local Chairman

EXHIBIT   13
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR #120

AN EQUAL OPPORTUNITY EMPLOYER     EXHIBIT B

National Railroad Passenger Corporation, Law Department, 344 Mira Loma Avenue, Glendale, California 91204

## DECISION



**March 28, 2002**
**File #LAX-UTU-02/DISC**
**Case #019.02**

FedEx Tracking #8313 2752 9178

Mr. John Campbell
2210 109th Avenue
Oakland, CA 94603

EXHIBIT 14
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

Dear Mr. Campbell:

By letter, dated January 17, 2002, you were charged with the following misconduct:

**Charge 1**: Your alleged violation of the *General Code of Operating - Fourth Edition - April 2, 2000 - Rule 6.28 - Movement on Other than Main Track*, which reads, "Except when moving on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

- ◆     Train.
- ◆     Engine.
- ◆     Railroad car.
- ◆     Men or equipment fouling the track.
- ◆     Stop Signal or Derail or switch lined improperly."

**Charge 2**: Your alleged violation of the *General Code of Operating Rules - Fourth Edition - April 2, 2000 - Rule 7.1, Switching Safely and Efficiently*, which reads in part... "While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property."

**Charge 3**: Your alleged violation of the *General Code of Operation Rules - Fourth Edition - April 2, 2000 - Rule 7.4 Precautions for Coupling or Moving Cars or Engines*, which reads "Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

Make couplings at a speed of not more than 4 MPH. Stretch the slack to ensure that all couplings are made."

**Charge 4**: Your alleged violation of the *General Code of Operation Rules - Fourth Edition - April 2, 2000 - Rule 7.12 Movements into Spur Tracks*, which reads in part... "When shoving into a spur track, control movement to prevent damage at the end of track...".

EXHIBIT D

**Decision Letter**
**Mr. John Campbell**
**Case #019.02**
**Page Two**

<u>**Specifications**</u>: It is alleged that while working as the Conductor on Yard Job CYO-4 on January 10, 2002, while shoving into Fume track in the Oakland yard with 17 cars and 3 units, you were directing the movement when an alleged hard coupling resulted in equipment damage and the derailment of a boxcar.

After one postponement, the Hearing Officer conducted a disciplinary investigation into the above-quoted charges. The investigation was conducted on March 15, 2002, in which your representative were in attendance. The following findings are based on the evidence and testimony presented at the investigation:

> The rule cited was in effect and applicable to you at the time of the alleged wrongdoing, as it is applicable to all Amtrak employees in your job category.

> The charges were sustained primarily, although not exclusively, by your own testimony and omission, and the testimony of Mr. Sid Birckett.

Based on the foregoing findings and the hearing record as a whole, I find that you are guilty of the above-quoted charges. The transcript of the aforementioned investigation will be forthcoming per the agreement with the union.

Sincerely,

*Roger R Butler*

Roger R. Butler
Hearing Officer
Western Region

09/17/2004  14:31    510435915                         AMTRAK                          PAGE  01
1. 03/16/2004  18:15    121   97092                     LAW. DEPARTMENT                  PAGE  01

NATIONAL RAILROAD PASSENGER CORPORATION
810 North Alameda Street, Los Angeles, CA 90012

## DECISION



September 17, 2004
File #LAX-UTU-04/DISC
Case #386.04

Federal Express #7919 3003 8200

Mr. John Campbell
2210 109th Avenue
Oakland, CA 94603

Dear Mr. Campbell:

By letter, dated August 6, 2004, Case #386.04, you were directed to appear for a formal investigation.

A formal disciplinary investigation was conducted on September 9, 2004, in which you and your union representative were in attendance. The following findings are based on the evidence and testimony presented at the investigation:

1.   The rules cited were in effect and applicable to you at the time of the alleged wrongdoing, as it is applicable to all Amtrak employees in your job category.

2.   Charge 2 was not sustained.

3.   Charges 1, 3, 4 and 5 were proven.  It is evident on the record by the testimony of the Corporation's witnesses and your own testimony that you clearly violated the rules and instructions regarding the movement and coupling of cars and engines.

Based on the foregoing findings and the hearing record as a whole, I find that you are guilty of the charges.  The transcript of the aforementioned investigation is enclosed.

Sincerely,

Patrick Gallagher
Hearing Officer
Western Region

EXHIBIT   ___  19
                        for identification
WITNESS:   J. Campbell
DATE:   2-26-07
SHARON TRUJILLO, CSR 6120

EXHIBIT   J

09/17/2004  14:31    5104340915                AMTRAK                        PAGE  02

**Decision Letter**
Mr. John Campbell
Case No. 386.04
Page Two



Based on the decision of Hearing Officer, Gallagher, you are hereby assessed discipline of:

    Termination from service, effective immediately. This decision is based on the current charges and your previous Discipline Record listed below:

| Date | Charge/Rule Violation | Discipline Assessed |
|------|----------------------|---------------------|
| 4/4/00 | GCOR Rules - 1.1.3 Accidents, Injuries, and defects, 6.28 Other than Main Track Movements, 7.1 Switching safely, 7.3 Switching precautions, 7.5 Testing Hand Brakes, 7.6 Securing cars and engines | Waived |
| 1/14/02 | GCOR Rules – 7.1 Switching Safely and Efficiently, 7.4 Precautions for Coupling and Moving Cars or Engines, 7.12 Movements into Spur Tracks | S10 |

Sincerely,

*SE Shelton*

S. E. Shelton
District Superintendent
Pacific Division – Bay District

SES/lr

cc:    E. Adams – UTU Chairman – Fed Ex Tracking 7902 6820 6654
       L. C. Hriczak – Director – Labor Relations
       T. Duffy – Director – Human Resources

# Notice of Formal Investigation
### Fed Ex Tracking # 7917 5568 9868

January 17, 2002

*EXH #1*

Mr. John E. Campbell
2210 109th Avenue
Oakland, CA 94603

**Case No. 019.02**

Dear Mr. Campbell:

You are hereby directed to appear for a Formal Investigation to be conducted as follows:

> **Date:** January 25, 2002
> **Time:** 3:00 PM
> **Location:** Amtrak's Jack London Station
> 245 2nd Street, 2nd Floor
> Oakland, CA 94607

The purpose of this investigation is to develop the facts and determine your responsibility, if any, in connection with the following:

**Charge 1:** Your alleged violation of the **General Code of Operating – Fourth Edition – April 2, 2000 – Rule 6.28 – Movement on Other than Main Track,** which reads, "Except when moving on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

- ❖ Train.
- ❖ Engine.
- ❖ Railroad car.
- ❖ Men or equipment fouling the track.
- ❖ Stop Signal or Derail or switch lined improperly."

**Charge 2:** Your alleged violation of the **General Code of Operating Rules – Fourth Edition – April 2, 2000 – Rule 7.1, Switching Safely and Efficiently,** which reads in part… "While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property."

EXHIBIT 27 for identification
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

Mr. John Campbell
Case No. 019.02
Page 2

**Charge 3:** Your alleged violation of the **General Code of Operating Rules – Fourth Edition – April 2, 2000 – Rule 7.4 Precautions for Coupling or Moving Cars or Engines,** which reads, "Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

Make couplings at a speed of not more than 4 MPH. Stretch the slack to ensure that all couplings are made."

**Charge 4:** Your alleged violation of the **General Code of Operating Rules – Fourth Edition – April 2, 2000 – Rule 7.12 Movements into Spur Tracks,** which reads in part… "When shoving into a spur track, control movement to prevent damage at the end of track.…"

**Specifications:** It is alleged that while working as the Conductor on Yard Job CYO-4 on January 10, 2002, while shoving into Fume track in the Oakland Yard with 17 cars and 3 units, you were directing the movement when an alleged hard coupling resulted in equipment damage and the derailment of a box car.

You may produce any witnesses you desire and may be accompanied by a representative as provided in your current and governing agreement, without expense to the National Railroad Passenger Corporation.

All requests for postponements of this investigation must be handled through the Hearing Office at (818) 547-2519.

Sincerely,


Gregg Baxter
Assistant General Manager
California Corridor

cc:    L. J. Commer - GM
       S. Birckett – AGM
       R. Wood – Labor Relations
       R. Butler – Hearing Office
       R. Belluomini – UTU Local Chairman
       L. Bellotti – Facility Manager
       D. Roberts – General Foreman
       M. McBride – Manager Operating Rules
       R. Robusto – Senior Director OPS

# EXHIBIT B

1    KATHLEEN MAYLIN (SBN: 155371)
     CARA CHING-SENAHA (SBN: 209467)
2    JACKSON LEWIS LLP
     199 Fremont Street, 10th Floor
3    San Francisco, California  94105
     Telephone:  (415) 394-9400
4    Facsimile:  (415) 394-9401

5    Attorneys for Defendant
     NATIONAL RAILROAD PASSENGER
6    CORPORATION dba AMTRAK and JOE DEELY

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11   JOHN EARL CAMPBELL                    Case No. C05-05434 MJJ

12              Plaintiff,                  **DECLARATION OF LARRY FOLLIS**
                                            **IN SUPPORT OF DEFENDANT'S**
13        v.                                **MOTION FOR SUMMARY**
                                            **JUDGMENT, OR IN THE**
14   NATIONAL RAILROAD PASSENGER            **ALTERNATIVE, PARTIAL**
     CORPORATION dba AMTRAK, JOE DEELY      **SUMMARY JUDGMENT**
15   and DOES 1-10 inclusive,
                                            DATE:      May 8, 2007
16              Defendants.                 TIME:      9:30 a.m.
                                            DEPT:      11
17

18

19        I, Larry Follis, declare:

20        1.     I  am  currently  employed  by  NATIONAL  RAILROAD  PASSENGER

21   CORPORATION dba AMTRAK as Road Foreman in Bakersfield.

22        2.     In about May of 2004, I served on an interview panel with Susan Venturelli and

23   Chad Skinner in order to interview applicants for Passenger Engineer Trainee, located in

24   Oakland.

25        3.     The panel interviewed John Campbell, among others.  During the interview, Mr.

26   Campbell said that he operated certain railroad equipment when he worked at Southern Pacific

27   Railroad as a Track Laborer.  When I heard this, I grew concerned because I, too, had worked at

28   Southern Pacific during the same period and I knew that Southern Pacific did not permit Track

                                         1

04/03/2007 13:19 FAX  4153949401                                    ☒ 003/003

1    Laborers to operate the sort of equipment Mr. Campbell said he had. While I do not recall the

2    specific sort of equipment Mr. Campbell said he operated at Southern Pacific, I recall very clearly

3    my concern that if Mr. Campbell operated the equipment he said he had at Southern Pacific, he

4    would have done so without official training or authority. I voiced my concern to the panel after

5    Mr. Campbell's interview ended.

6         4.    I did not recommend Mr. Campbell for consideration for the Engineer position, in

7    part because of the statement he made at the interview that he had operated equipment at

8    Southern Pacific that he was not authorized to operate under Southern Pacific's rules. I was

9    particularly concerned that Mr. Campbell would not follow Amtrak's safety rules and procedures,

10   if he was selected to serve as Engineer. In addition, I was concerned about Mr. Campbell's past

11   safety record, which the panel was apprised of after Mr. Campbell's interview but before the

12   panel made its recommendation to the Department. Notably, the panel recommended other

13   applicants, none of whom had a record of any safety or rules violation.

14        5.    The final hiring decision for Engineer is usually made by the Assistant

15   Superintendent for the location in question. I know this because I have participated in other hires

16   for Engineer. I have served on other interview panels and I have had discussions with the

17   Assistant Superintendent about my recommendation, and the process has been the same.

18   Although I do not specifically recall who was the Assistant Superintendent for the Pacific

19   Division (Oakland) in mid-2004, I believe it was Patrick Presseur. In any event, the Assistant

20   Superintendent made the hiring decision – not the Superintendent - to my knowledge.

21        Executed this 3rd day of April, 2007 in Merced, California. I declare under penalty of

22   perjury under the laws of California and the United States of America that the foregoing is true

23   and correct.

24

25

26                              LARRY FOLLIS

27

28

Decl. of Larry Follis in Support of Defendant's Mot. Sum. Judg. (Case No. C05-05434 MJJ)

02/01/2006  00:45    12097222290    AMTRAK    PAGE  03/03

EXHIBIT C

1  KATHLEEN MAYLIN (SBN: 155371)
   CARA CHING-SENAHA (SBN: 209467)
2  JACKSON LEWIS LLP
   199 Fremont Street, 10th Floor
3  San Francisco, California 94105
   Telephone: (415) 394-9400
4  Facsimile: (415) 394-9401

5  Attorneys for Defendant
   NATIONAL RAILROAD PASSENGER
6  CORPORATION dba AMTRAK and JOE DEELY

7

8                UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  JOHN EARL CAMPBELL              Case No. C05-05434 MJJ

12          Plaintiff,              **DECLARATION OF SUSAN
                                    VENTURELLI IN SUPPORT OF
13      v.                          DEFENDANT'S MOTION FOR
                                    SUMMARY JUDGMENT, OR IN THE
14  NATIONAL RAILROAD PASSENGER     ALTERNATIVE, PARTIAL
    CORPORATION dba AMTRAK, JOE DEELY  SUMMARY JUDGMENT**
15  and DOES 1-10 inclusive,
            Defendants.             DATE:    May 8, 2007
16                                  TIME:    9:30 a.m.
                                    DEPT:    11
17

18

19       I, Susan Venturelli, declare:

20       1.    I am currently employed by NATIONAL RAILROAD PASSENGER

21  CORPORATION dba AMTRAK as the Human Resources Officer in the Pacific Division. In my

22  position, I am partly responsible for disseminating Amtrak's EEO and other personnel policies.

23  As such, I have personal knowledge of Amtrak's personnel policies and procedures that were in

24  place during Mr. Campbell's employment. What information is not personally known by me, I

25  can attest to based upon my information and belief gained by a review of Amtrak's policies,

26  procedures, agreements, personnel records, and documents maintained in the normal course of

27  business.

28       2.    I also am responsible for recruitment for Amtrak job vacancies, both for internal

                                    1

1    and external applicants. My recruitment duties include screening applications and resumes,

2    interviewing applicants, contributing to the selection process, and issuing offer letters.

3         3.     Every year, Amtrak's President disseminates a reaffirmation notice to employees

4    regarding Amtrak's EEO Policy. Attached hereto as Exhibit A is a true and correct copy of

5    Amtrak's current notice titled "Equal Employment Opportunity Policy Reaffirmation." This

6    notice reaffirms Amtrak's commitment to ensuring that all employment related decisions are

7    made in a nondiscriminatory manner. This notice also makes clear that Supervisors are to act in

8    conjunction with Amtrak's EEO policies and are "individually responsible for supporting and

9    implementing Amtrak's policies."

10        4.     Starting in January 1995, Amtrak revised its Rules of Conduct booklet which was

11    retitled "Standards of EXCELLENCE an explanation of Amtrak's goals, values and

12    expectations." Since 1995, the booklet was (and still is) given to each new employee. Attached

13    hereto as Exhibit B are true and correct copies of pertinent excerpts from the Standards, in which

14    Amtrak discusses its anti-harassment policy and states, "we will not tolerate discrimination or

15    harassment *of any kind* by our employees toward our customers or co-workers." During Mr.

16    Campbell's employment with Amtrak, employees were given a copy of these policies, which they

17    acknowledged. Attached hereto as Exhibit C is a true and correct copy of the policies that were in

18    effect during the time Mr. Campbell was an employee at Amtrak and for which Mr. Campbell

19    acknowledged receiving.

20        5.     Since the 1970s, Amtrak has maintained and disseminated to employees a

21    handbook describing its formal internal procedure for reporting and responding to EEO

22    complaints. When Mr. Campbell was hired, Amtrak's 1994 handbook titled "EEO Internal

23    Complaint Procedures Handbook" was made available to all employees. Attached hereto as

24    Exhibit D is a true and correct copy of the April 1994 Handbook, which is still in effect. This

25    handbook explains how an employee filed an EEO complaint. It has separate sections explaining:

26    the purpose of the internal complaint procedure; who may file an internal complaint; where to

27    file; when to file; and how the internal complaint procedure worked. It also discusses Amtrak's

28    commitment to addressing any complaints. The handbook explains that the EEO office is not

2

1    intended to handle labor grievances or personnel practice complaints and that those complaints

2    should be directed to the Labor Relations or Personnel Departments. It encourages employees to

3    file as soon as possible, and no longer than a year after the occurrence of an event. It explains

4    that the EEO representative will investigate the allegation and corrective action will be taken as

5    necessary and appropriate.

6        6.    In addition, Amtrak has a separate Dispute Resolution Office that has the primary

7    responsibility and authority to investigate an EEO complaint brought by a current Amtrak

8    employee.

9        7.    Amtrak has maintained an Affirmative Action/Equal Employment Opportunity

10   policy as part of its corporate procedures since the Company's inception in 1971. Attached

11   hereto as Exhibit E is a true and correct copy of this policy, which was in effect during Mr.

12   Campbell's employment. It states the purpose of this section of the Procedures Manual is to

13   "establish a policy and employment environment which ensures fair and equitable treatment of all

14   applicants and employees." It also discusses Amtrak's managers' and supervisors'

15   responsibilities to ensure that all personnel actions and employment decisions are administered

16   without regard to race. It also discusses the internal complaint resolution process and how

17   Amtrak has put this in place as part of its good faith attempt to comply with Title VII. During

18   Plaintiff's employment with Amtrak, the company complied with all required federal and state

19   postings regarding discrimination/harassment.

20       8.    As part of my recruitment responsibilities, I routinely enforce the Amtrak policy

21   that internal candidates for promotion to Locomotive Engineer Trainee must have worked for the

22   company for at least one year within their craft. The "one year rule" is a widely known and

23   strictly enforced policy, and I routinely disqualify applicants on that basis.

24       9.    Applicants for promotion to the Locomotive Engineer Trainee position from the

25   Conductor position cannot take advantage of any bid or seniority rights. In other words, seniority

26   is not considered. Applicants to the Locomotive Engineer Trainee position are evaluated on the

27   basis of the applicant's interview score, safety record, discipline record, job experience, and

28   managers' recommendations.

3

Decl. of Susan Venturelli in Support of Defendant's Mot. Sum. Judg. (Case No. C05-05434 MJJ)

1      10.   It is my understanding that Mr. Campbell is inaccurately claiming that Brice

2   Carroll, Moyse Howard, and Jason Garman were promoted to Engineer within one year of their

3   employment. My review of personnel records refutes that. Instead, my review of personnel files

4   reveals the following: Brice Carroll was not selected to become and Engineer Trainee until he

5   was employed for one and a half years - Mr. Carroll is non-Caucasian; Mr. Howard has worked at

6   Amtrak since 1994 and has never been promoted to Engineer - Mr. Howard is African American;

7   and, Mr. Garman has worked for Amtrak since 1999 and was promoted to Engineer Trainee in

8   January 2004.

9      11.   Amtrak's HR department utilizes a computer tracking system to track, among

10   other things, the recruitment information of its employees. The system is called the "SAP

11   system," and contains information of all the applications that an employee has made over the

12   course of his/her employment since the system was implemented in the fourth quarter of the year

13   2000.

14      12.   My review of the SAP system reveals that Mr. Campbell has applied for two

15   promotions to the Locomotive Engineer Trainee position during his employment with Amtrak, at

16   least since end of fourth quarter of the year 2000. The first was for Job Requisition #50131788.

17   That job recruitment was handled by my counterpart currently in Los Angeles – Paul Ho. It is

18   consistent with my experience recruiting for Amtrak that an employee with serious safety or rules

19   violations or discipline is disqualified as an applicant for the position of Engineer Trainee.

20      13.   I have reviewed the list of applicants for three Job Requisition postings for

21   Locomotive Engineer Trainee in the year 2000: OAK0315, OC0031, and 50117308. My review

22   of the applicants for those postings reveals that Mr. Campbell did not apply for any of them.

23      14.   There was a Job Requisition posting in the year 2002 on October 16, 2002 for

24   Locomotive Engineer (Re-entry), No. 50156181. A qualified applicant for the position must be a

25   currently qualified Class I Engineer with a major railroad company. Mr. Campbell was not a

26   qualified Class I Engineer and thus he would not have been considered for the position.

27      15.   The only other promotion application Amtrak's SAP system reveals for Mr.

28   Campbell is for Job Requisition No. 50178956, Passenger Engineer Trainee, posted on May 10,

Decl. of Susan Venturelli in Support of Defendant's Mot. Sum. Judg. (Case No. C05-05434 MJJ)

1    2004.  Although similar positions were posted for Sacramento and San Jose, Mr. Campbell

2    applied for the Oakland position only.  I was on the interview panel for all postings.  I served on

3    the interview panel for the Oakland position with Larry Follis and Chad Skinner.  Mr. Campbell

4    was not offered the position because of his prior safety and rules violations and discipline record.

5        16.    In response to the May 2004 posting, there were four candidates who had been

6    recommended to the Department as qualified for hire for the Oakland positions.    These

7    individuals were: Brice Carroll, George Solimine, John Hansen, and Patrick Duncan (alternate).

8    Mr. Solimine also applied for the San Jose posting.  None of these individuals had a record of

9    prior safety or rules violations or discipline.  Therefore, Mssrs. Carroll, Hanson, and Duncan were

10    chosen to undergo Engineer Training for Oakland, and Mr. Solimine was chosen for San Jose.

11    Attached hereto as Exhibits F and G are true and correct copies of the disciplinary screening and

12    selection recommendation for the Oakland positions.

13        Executed this _3rd_ day of April, 2007 in Oakland, California.  I declare under penalty of

14    perjury under the laws of California and the United States of America that the foregoing is true

15    and correct.

16

17                                        _Susan Venturelli._
                                         SUSAN VENTURELLI

18

19

20

21

22

23

24

25

26

27

28

Decl. of Susan Venturelli in Support of Defendant's Mot. Sum. Judg. (Case No. C05-05434 MJJ)

# EXHIBIT A

NATIONAL RAILROAD PASSENGER CORPORATION
60 Massachusetts Avenue, NE, Washington, DC 20002



January 1, 2006

## EQUAL EMPLOYMENT OPPORTUNITY: IT'S YOUR JOB

Amtrak is committed to providing true equality for its employees and a work environment free of discrimination or harassment. Only in a professional, business atmosphere in which employees are treated with respect will we be able to provide our customers with the high quality of service they deserve. In order to meet these goals, the cooperation of every one of Amtrak's employees is needed. The message of inclusion and equal employment opportunity applies to all Amtrak employees and to all Amtrak operations, including the Company's commuter operations: Shoreline East; Maryland Rail Commuter; Virginia Railway Express; Peninsula; and Coaster.

Amtrak will not tolerate discrimination or harassment based on an individual's race, color, religion, sex, national origin, age, disability, sexual orientation, or veteran's status. Amtrak will administer its hiring, discipline, promotion, compensation, benefits, training and all other Company activities in compliance with this policy.

Likewise, no Amtrak employee should subject another employee or customer to discrimination or harassment of any sort. Racial, ethnic, religious, or sexual slurs have no place at Amtrak. This includes graffiti and printed material, as well as jokes and comments. Appropriate discipline — including termination when warranted -- will be used to address any violations of this policy.

Managers and supervisors should consult the Human Resources Department or the Business Diversity Department's Dispute Resolution Office (DRO) if they have any questions or concerns about the administration of this policy. Employees who believe this policy has not been followed may seek assistance from their department managers or file a complaint with the Dispute Resolution Office.

David J. Hughes
*Acting President and Chief Executive Officer*

# EXHIBIT B

# STANDARDS OF
# EXCELLENCE

### *An explanation of Amtrak's goals, values and expectations.*



**NRPC 2525 (1/95)**

D11383

*Standards of Excellence*

# TRUST AND HONESTY

Every productive employment relationship requires that the employee and his/her employer trust one another. So it is at Amtrak. When you become part of our company, we place our trust in you. In turn, you must conduct yourself honestly and in a way that reflects credit upon Amtrak.

*Because honesty is so important to trust and our ability to work together as a team, Amtrak has no tolerance for employees who are dishonest.*

Specifically, none of us has the right to use or take for our personal gain any funds, property or services belonging to the company, our coworkers or our customers. Remember that taking anything that is not yours, no matter how small the value, is stealing and, therefore, dishonest.

All of us have a stake in keeping our company financially viable. Our jobs depend on it! Therefore, we have a responsibility to use and account for Amtrak funds, property and services — including our rail travel privileges — with care and economy and to protect them from abuse. Damaging or wasting company property or the property of fellow workers harms us all and will not be tolerated.

Since all of us share this commitment to honesty, we expect you to report any behavior that is inconsistent with it.

# DISCRIMINATION

Amtrak will continue to be a leader in providing equal opportunity for employees in a work environment free of discrimination and harassment. As a matter of policy, we manage this company and administer our programs without regard to race, color, religion, sex, national origin, age, disability, sexual orientation or veteran's status and in conformance with all applicable federal, state and local laws.

Therefore, we will not tolerate discrimination or harassment *of any kind* by our employees toward our customers or coworkers, including but not limited to racial, ethnic, religious or sexual slurs, whether written or spoken.

D11389

# EXHIBIT C

# STANDARDS OF
# EXCELLENCE

### *An explanation of Amtrak's goals, values and expectations.*



**NRPC 2525 (1/95)**

D11383

*Standards of Excellence*

# LETTER FROM THE PRESIDENT

November 1994

Dear Fellow Employee:

Despite all the changes going on at Amtrak, one thing remains constant: our continuing focus on improving service to our customers. Our corporate mission says it all: *To consistently deliver a high-quality, safe, on-time rail passenger service that exceeds customer expectations.* Part of delivering high-quality service is knowing what our jobs are and what is expected of us.

At today's Amtrak, we must focus not only on how we treat our customers, but also on how we treat each other. For that reason, I have supported an effort that began shortly after I joined the company last December — rewriting the *Rules of Conduct*. This task, undertaken by a group of employees, has recently resulted in a new document, *Amtrak Standards of Excellence*, that represents a giant leap forward from the old, essentially negative prohibitions ("thou shalt not"), to a more positive approach that fosters an environment of mutual respect and support.

Some employees may think that this is not the time to introduce these new Standards of Excellence, that we have many other things to focus on for now. Others may believe that an environment of mutual respect and support is difficult — if not virtually impossible — to achieve at Amtrak. However, if we are to accomplish the goals we have set for ourselves, this is the kind of environment that must exist, and our standards provide an excellent framework for today's Amtrak.

Beginning January 1, 1995, all Amtrak employees will be expected to ensure that their behavior is consistent with these standards. Accordingly, you should read the *Standards of Excellence* and sign a statement at the end of the booklet acknowledging you have received it and committing yourself to following its requirements. After you have signed it, please return the receipt to your supervisor.

Also included in the booklet is a pledge of support for Amtrak's mission, goals and corporate values. I am asking you to sign this statement, too, and keep it as a reminder of your commitment to teamwork and customer service.

Rather than setting forth "more rules to follow," the *Amtrak Standards of Excellence* is a tool for helping us develop the kind of professional, customer-service-attitude we will need to achieve our corporate mission. I'm depending on each of you to make this commitment a personal one.

Sincerely,

Thomas M. Downs
President

D11384

*Standards of Excellence*

# KEY CORPORATE GOALS

Amtrak's six key corporate goals, listed below, guide our efforts
as we work to achieve our mission:

*Be recognized as the best passenger railroad in the world*

*Improve customer satisfaction*

*Foster employee involvement and commitment*

*Achieve safety excellence*

*Improve financial performance*

*Improve the quality of our products and services*

D11385

*Standards of Excellence*

# AMTRAK VALUES

The following values are the foundation for the way we do business.

**Customer Focus**
The customer is the key to our prosperity and survival, and in everything we do, we will continuously strive to understand and exceed our internal and external customers' needs.

**Continuous Improvement**
The continuous improvement of the quality of our work processes is a never-ending journey.

**Teamwork**
Employees working together to continuously improve the quality of service we provide to our customers will become a way of life. At the same time, individual initiative will be valued and recognized.

**Employee Involvement**
We value and respect each others' contributions and will continuously strive to foster an environment which will encourage and support the personal growth and job satisfaction of us all.

**Safety**
The safety of our passengers, our employees, the public, and our operating environment is our highest priority.

**Integrity**
We will always tell the truth. We will comply with the spirit and letter of laws, practice high ethical standards of conduct, be socially and environmentally responsible and strive to earn and maintain the trust and respect of our employees and the public.

**Employee Development**
We will continuously seek to provide the resources, equipment and training that will enhance our growth and provide better and continued job opportunities for our employees.

**Innovation**
We will encourage and support innovative approaches to our work that satisfy our customers' needs, improve the various aspects of our operations, and enhance the lives of our co-workers.

**Goodwill**
We value humor and perspective. They keep us in balance.

D11386

*Standards of Excellence*

# WHAT AMTRAK EXPECTS OF YOU

At Amtrak, we are proud of the contributions we make to the transportation industry and to the traveling public. Just as we have developed a mission, goals and values to guide us in our business, we have also developed standards of excellence, as explained in this booklet, to let everyone know what is expected of them. All employees — both agreement-covered and management, should be familiar with and follow these standards. Together with our corporate values, they help ensure mutual respect among Amtrak employees and fair and consistent treatment for all.

Please read this information carefully so you will understand what is expected of you. At the end of the booklet is a form for you to sign acknowledging that you have received a copy of the booklet. That form will be retained in your personnel file. The other form at the end of this booklet, which you keep, is equally important: It is a personal pledge of support for Amtrak's mission, to the safety of our operations, and to providing the best possible service to our customers.

In addition to these standards of excellence, rules specific to your job may also have been developed by your own department. You should ask your supervisor whether any such rules have been issued. If so, it is your responsibility to obtain and be governed by them.

*You should understand that failure to follow the standards of excellence outlined in this booklet — as well as the rules specific to your particular job — will result in appropriate corrective or disciplinary action up to and including dismissal.*

If you have any questions about the contents of this booklet, please see your supervisor or manager.

D11387

*Standards of Excellence*

# SAFETY

Amtrak's highest priority is the safety and well being of our employees and customers. Your help is essential to achieving that goal. You can begin by being sure that you understand and comply with all safety requirements related to your position. In many instances, it may be just a matter of using plain common sense.

Be aware of your work area and what you can do to ensure your own safety as well as the safety of others:

- Familiarize yourself with and obey safety guidelines pertinent to your department or craft. They contain wisdom gained from the experience of others who have come before you.

- Practice "good housekeeping" in your work area. Clean up spills, trash and other hazards as soon as they happen.

- Develop safe work habits and assist fellow employees in doing likewise. Report unsafe conditions to your immediate supervisor as quickly as possible. Alert fellow employees to any danger and, if necessary, take corrective action to prevent accidents or injuries.

- Use only company-approved or company-furnished tools and equipment. Safety glasses, aprons, gloves, hardhats, etc., are provided for your protection; use them when required.

- Firearms, explosives, knives or other weapons must not be in your possession unless authorized.

- Learn the emergency evacuation plan and security regulations in your area. Know how to protect yourself, your fellow workers and the public in the event of a fire, accident or natural disaster.

- Immediately report to your supervisor all injuries and illnesses that occur — to you, a fellow employee or the general public — while you are performing your duties or on Amtrak property.

To comply with legal obligations, Amtrak must be informed of injuries to **all** people that occur on Amtrak property. Although supervisors are responsible for the actual "reporting" of the event to Central Reporting, you must immediately report to someone in authority any job-related injuries or injuries that occur on Amtrak property to ensure that necessary medical attention is provided. Additionally, if you sustain off-duty injuries that may affect your ability to perform your duties safely, you must notify your supervisor.

*Working safely is required of all  employees, regardless of position*

D11388

*Standards of Excellence*

# TRUST AND HONESTY

Every productive employment relationship requires that the employee and his/her employer trust one another. So it is at Amtrak. When you become part of our company, we place our trust in you. In turn, you must conduct yourself honestly and in a way that reflects credit upon Amtrak.

*Because honesty is so important to trust and our ability to work together as a team, Amtrak has no tolerance for employees who are dishonest.*

Specifically, none of us has the right to use or take for our personal gain any funds, property or services belonging to the company, our coworkers or our customers. Remember that taking anything that is not yours, no matter how small the value, is stealing and, therefore, dishonest.

All of us have a stake in keeping our company financially viable. Our jobs depend on it! Therefore, we have a responsibility to use and account for Amtrak funds, property and services — including our rail travel privileges — with care and economy and to protect them from abuse. Damaging or wasting company property or the property of fellow workers harms us all and will not be tolerated.

Since all of us share this commitment to honesty, we expect you to report any behavior that is inconsistent with it.

# DISCRIMINATION

Amtrak will continue to be a leader in providing equal opportunity for employees in a work environment free of discrimination and harassment. As a matter of policy, we manage this company and administer our programs without regard to race, color, religion, sex, national origin, age, disability, sexual orientation or veteran's status and in conformance with all applicable federal, state and local laws.

Therefore, we will not tolerate discrimination or harassment *of any kind* by our employees toward our customers or coworkers, including but not limited to racial, ethnic, religious or sexual slurs, whether written or spoken.

D11389

*Standards of Excellence*

# ATTENDING TO DUTIES

Amtrak's success depends on using all available resources in the most efficient and productive way possible. As an Amtrak employee and, therefore, the company's most important resource, you have an obligation to perform your duties properly and in accordance with the standards set for your particular job. This requires that you remain alert to your duties at all times. Any activity or behavior that distracts or prevents you or others from attending to duties is unacceptable.

It is also important for all of us to report to work on time and perform our duties during our assigned hours. If you know you are going to be late for work, or if you are going to be absent altogether, inform your supervisor as much ahead of time as possible. Furthermore, some departments have established attendance requirements that apply specifically to employees at certain locations or in certain jobs. Be sure to ask your supervisor whether any such requirements apply to you.

# COMMUNICATIONS AND INFORMATION

Our communication systems are a vital link to our customers and coworkers, and we need you to do your part in keeping them open and accessible. They should be used for company business only, except in the case of an emergency.

It is most important that you provide the company an effective means of contacting you while you are away from work. Therefore, it is your responsibility to notify Amtrak's Personnel Department promptly of any change in your mailing address, telephone number or other means of contact.

At some point in your Amtrak career, you may have reason to work with information that is sensitive or confidential. Examples of such sensitive information would include information that could cause Amtrak financial loss, disruption of business, public embarrassment, or the loss of an employee's privacy. Should you find yourself in this situation, it is essential that you make a special effort to protect this confidential information from disclosure to individuals lacking authorization to know it.

D11390

*Standards of Excellence*

# PROFESSIONAL AND PERSONAL CONDUCT

Projecting a professional image is important in a customer-service business like ours. We make an impression by the way we look, the way we act and the way we treat our customers and each other.

## Teamwork

Being polite to each other is one of the basics of teamwork, so it is important that we all are considerate and respectful of each other. Part of teamwork is properly performing your duties. Another part is following instructions. Therefore, you must comply with all company and departmental policies, procedures and rules as well as all instructions, directions and orders from supervisors and managers.

The only exception to the above requirement arises when compliance with a particular instruction would cause a clear, immediate danger to you, your fellow employees, our customers, the public or company property.

## Conduct

On the Amtrak team, there is no place for activities or behaviors that compromise the safety, satisfaction and well-being of our customers, the public or our fellow employees. Therefore, boisterous conduct such as fighting, rudeness, assault, intimidation, horseplay and using profane or vulgar language is unacceptable. It is important to remain calm and be courteous to all customers, even those who may be difficult at times.

## Conduct while on business or personal travel

While on Amtrak business or personal travel using our rail travel privileges, it is important to make a good impression on our fellow travelers. After all, you are a representative of Amtrak. You and members of your family traveling on a free or reduced-rate basis should act and dress in a manner that will not be objectionable to other passengers. You should also be careful not to hinder other Amtrak employees from properly performing their duties.

## Appearance

For those employees who serve customers directly, the way we look identifies us to them. We want them to know who we are and feel comfortable approaching us for help. We must be neat and clean in our appearance, following the dress and grooming standards established for our own work areas or departments.

## Gratuities

At Amtrak, we provide professional-quality service without expecting gratuities. Employees must never ask for — or solicit in any way — any type of tip or gratuity from customers or vendors.

D11391

*Standards of Excellence*

**Use of Tobacco**

In consideration of the health and comfort of our customers and employees, Amtrak supports a smoke-free environment. This means smoking is not permitted inside most Amtrak facilities — for example, in our offices, shops, vehicles, certain stations and aboard certain trains. Employees should be guided by specific local or departmental policies on the subject.

*If you smoke and would like to "kick the habit," help is available. Call your Employee Assistance Program (EAP) office, nearest Amtrak Nurse's office or local Personnel office to obtain information on smoking cessation programs.*

# ALCOHOL AND DRUGS

By its very nature, railroading is a constantly demanding and sometimes dangerous industry. Employees with alcohol or drugs in their systems can undermine workplace productivity and pose an unacceptable risk to the safety of passengers, fellow workers and themselves.

As a result, Amtrak's policy on alcohol and drugs is very strict: *While on Amtrak property, employees must be drug- and alcohol-free. Both the use and possession of these substances are inconsistent with this policy.*

An exception to this requirement may arise when a physician has prescribed medication for an employee's use. To comply with Amtrak's policy, the medication must be taken in accordance with the physician's instructions and must not interfere with the safe performance of the employee's job. Because even over-the-counter medications (antihistamines, cough medicines, pain killers, etc.) may affect fitness for work, employees should check with their physicians to determine effects on their alertness, coordination and reactions.

*In any case, you must notify your supervisor if you are taking medication — either prescribed or over-the-counter — that could interfere with the safe performance of your job.*

You should understand that we enforce this policy through both drug and alcohol testing. More information on testing can be found in Amtrak's Drug and Alcohol Policy, a copy of which can be obtained from your local Personnel office.

*If you think you may have a problem with alcohol or drugs and would like help, call your Employee Assistance Program (EAP) office, Division Nurse's office, local Personnel office, or local RedBlock representative for assistance.*

D11392

*Standards of Excellence*

# PLEDGE OF SUPPORT

As an Amtrak employee, I will become familiar with and support our company's mission, goals and corporate values.

I pledge to serve my customers' needs courteously and professionally, conforming to the company's standards of excellence at all times.

I further pledge to maintain safety in all operations, knowing that the safety of our passengers, our employees, the public, and our operating environment is our highest priority.

Signature: _____

Date: _____

*Keep this form for your own personal records.*

D11393

*Standards of Excellence*

# ACKNOWLEDGEMENT OF RECEIPT OF AMTRAK STANDARDS OF EXCELLENCE

I have received a copy of the booklet entitled "Amtrak Standards of Excellence." I understand that I should read the booklet carefully and that I will be expected to follow the standards of excellence outlined in it. I understand that failure to follow these standards will result in appropriate corrective or disciplinary action.

Employee Signature: _____

Print Name: _____

Date: _____

Signature of Company Representative: _____

Print name: _____

Date: _____

*Please detach this form and give to company representative for your employee file.*

**11**

D11394

*Standards of Excellence*



**Amtrak**
**Reprographic Services**
960 "V" Street, N.E.
Washington, D.C.  20018

# EXHIBIT D

personnel records and other employment data, interviews with supervisors and co-workers, and a review of any relevant personnel/labor relations policies and procedures.

3. All materials pertaining to the investigation of a complaint will be maintained within the EEO office in a special limited-access file and not within your personnel file.

4. The EEO office will keep complaints confidential to the maximum extent possible. However, it should be understood that thorough investigation of a complaint will generally require the investigator to discuss the issues under investigation with individuals who might have knowledge about them.

5. Corrective action will be taken when the facts indicate that it is appropriate.

6. You will be notified of the results of the completed investigation.

7. Your complaint will be resolved as quickly as possible. Every effort will be made to reach a determination within four months from the date on which the complaint was filed.

After a determination has been made, complaints will not be reinvestigated unless significant additional facts are demonstrated that change the nature of the complaint.

---

The Company prohibits any coercion, interference, intimidation, or reprisal against you (or any employee who assists you) for pursuing your complaint. If you feel such retaliatory action is being taken, you should contact the EEO Investigations Office immediately.

EEO Representatives may be found at the following locations and contacted at the numbers below:

| | | |
|---|---|---|
| Chicago | 210 S. Canal Street<br>Room 794<br>Chicago, IL 60606 | (312) 655-2244<br>(ATS) 821-2244 |
| Los Angeles | 800 N. Alameda Street<br>Los Angeles, CA 90012 | (213) 891-3590<br>(ATS) 761-3590 |
| New York | 400 W. 31st Street,<br>4th Floor<br>New York, NY 10001 | (212) 630-7404<br>(ATS) 521-7404 |
| Philadelphia | 30th Street Station,<br>2nd Floor<br>Philadelphia, PA 19104 | (215) 349-1493<br>(ATS) 728-1493 |
| Washington | 60 Massachusetts Ave., N.E.<br>3rd Floor<br>Washington, D.C. 20002 | (202) 906-3855<br>(ATS) 777-3855 |

---



# EEO

# INTERNAL

# COMPLAINT

# PROCEDURES

## H A N D B O O K



APRIL 1994

# INTRODUCTION

Amtrak is committed to ensuring that all employment decisions are based solely on job-related factors. To address any possible bias in employment decisions and to provide employees with an internal channel to resolve grievances, Equal Employment Opportunity ("EEO") Investigations Offices have been established throughout our system, each staffed by an EEO Representative. One of the most important programs administered by these Representatives is the Equal Employment Opportunity Internal Complaint Procedure.

Despite Amtrak's clearly stated policy of non-discrimination, the Company realizes that you, the employee, may encounter situations in which you feel you have experienced discrimination. Discrimination is considered to be unequal treatment because of race, color, religion, sex (including sexual harassment and pregnancy), national origin, age, disability, status as a disabled veteran or veteran of the Vietnam era or other factors covered by applicable federal, state or local laws. The Internal Complaint Procedure provides a means for employees to raise issues of discrimination for quick resolution within the Corporation. Of course, you are always encouraged to attempt to resolve complaints informally within the authorized supervisory chain-of-command, if at all possible, before filing a formal written complaint under this procedure.

This brochure explains the WHAT, WHO, WHERE, WHY, and HOW of the Internal Complaint Procedure.

# WHAT IS THE PURPOSE OF THE INTERNAL COMPLAINT PROCEDURE?

The primary purpose of the Internal Complaint Procedure is to provide employees with a vehicle for voicing and expeditiously resolving any claim that they have been treated unequally in their employment because of their race, color, religion, sex (including sexual harassment and pregnancy), national origin, age, disability, or status as a disabled veteran or a veteran of the Vietnam era or other factors covered by applicable state or local laws. This procedure is designed to address only problems of an EEO nature and is not intended to handle labor grievances or personnel practice complaints. Those types of complaints should be directed to the Labor Relations or Personnel Departments.

# WHO MAY FILE AN INTERNAL COMPLAINT?

Any Amtrak employee or former employee may file an Internal Complaint.

# WHERE TO FILE AN INTERNAL COMPLAINT

An Internal Complaint should be filed with the EEO Investigations Office. If the nearest EEO office is not near your work location, you may file a complaint at the nearest Personnel office, or you may call the EEO office and ask for a complaint form to be sent to your home.

# WHEN TO FILE AN INTERNAL COMPLAINT

You should file your Internal Complaint as soon as possible after you believe you have been discriminated against. However, only complaints which are filed within a year of the alleged discriminatory action will be accepted.

You are reminded that filing an Internal Complaint is not intended to, nor will it satisfy, the time limitations within which you must file complaints of discrimination with outside agencies.

# HOW DOES THE INTERNAL COMPLAINT PROCEDURE WORK?

When you first contact the EEO Investigations Unit, the representative will help you define your complaint and consider it from an objective viewpoint, to determine whether it is one that potentially involves discrimination. If it does not, the Representative will discuss with you why the complaint is not an appropriate one for the EEO Office and suggest ways in which it might be resolved. If the complaint has any potential EEO implications, the following procedure will be used:

1. If you have not already done so, you will be asked to provide a written complaint, setting forth the facts that support your claim of discrimination. You will then receive a letter acknowledging receipt of your complaint and telling you who will investigate it.

2. The EEO Representative will investigate the allegations contained in the written complaint. This investigation may include, but is not limited to, a review of relevant



## Dispute Resolution Office
### Who We Are and What We Do



# How to Reach Us

**Chicago, IL Office:**

- National Railroad Passenger Corporation
  Business Diversity Department
  Dispute Resolution Office
  210 South Canal Street
  Chicago, IL 60606

**Los Angeles, CA Office:**

- National Railroad Passenger Corporation
  Business Diversity Department
  Dispute Resolution Office
  810 North Alameda Street
  Los Angeles, CA 90012

**New York, NY Office:**

- National Railroad Passenger Corporation
  Business Diversity Department
  Dispute Resolution Office
  360 West 31st Street, 4th Floor
  New York, NY 10001

**Philadelphia, PA Office:**

- National Railroad Passenger Corporation
  Business Diversity Department
  Dispute Resolution Office
  2005 Market Street, 5th Floor, Suite 510, Box 19
  Philadelphia, PA 19103

**Washington, DC Office:**

- National Railroad Passenger Corporation
  Business Diversity Department
  Dispute Resolution Office
  60 Massachusetts Avenue, NE
  Washington, DC 20002

**Call toll-free:**

## 1-877-351-8338

If you believe that you have been discriminated against, harassed, or retaliated against...

you have the right to file a complaint with the federal Equal Employment Opportunity Commission (EEOC) and/or a state or local fair employment practices agency even if you file a complaint with the Amtrak Dispute Resolution Office. There are various federal laws (such as Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act, and the Age Discrimination in Employment Act of 1967) which prohibit employment discrimination. In addition, many states and local jurisdictions have anti-discrimination laws. A person claiming discrimination must file a complaint with the EEOC within certain time limits. Generally, a complaint must be filed with the EEOC within 180 days after the alleged discriminatory conduct occurred. However, in states where there are state/local agencies with authority to deal with discrimination complaints, complaints must be filed with the EEOC within 300 days after the alleged discriminatory conduct occurred. In order for a complaint to be timely filed with the EEOC, these time limits must be met even if an employee files a complaint with the Amtrak Dispute Resolution Office.

*Amtrak policy prohibits retaliation against any employee who reports or files a discrimination or harassment complaint, or who participates in or cooperates with an investigation into such allegations. Any employee who believes that he or she has been subjected to retaliation should immediately contact the Dispute Resolution Office.*

AMTRAK is a registered service mark of the National Railroad Passenger Corporation.



## The Dispute Resolution Office

### The Dispute Resolution Office Is:

- A unit of the Amtrak Business Diversity and Strategic Initiatives Department

- A neutral evaluator of workplace issues and disputes

- Responsible for addressing and resolving internal complaints of discrimination, harassment (including sexual harassment), retaliation, and unfair treatment on the basis of one's race, sex, color, religion, national origin, age, disability, veteran status, sexual orientation or other protected group status

- Authorized and committed to taking appropriate corrective action (including disciplinary action up to and including termination) where misconduct and/or violation of company policy are found

*Dispute Resolution Offices are located in Chicago, IL; Los Angeles, CA; New York, NY; Philadelphia, PA; and Washington, DC.*

## How You Can File a Complaint

### You may file a complaint if:

- You are a current, former, or retired Amtrak employee

- You applied for an Amtrak position

- The complaint is filed with the Dispute Resolution Office within one year of the date of the alleged discrimination or within one year of the time at which you learned of the alleged discrimination

*Even if you file an internal complaint with the Dispute Resolution Office, you still have the right to file a complaint with federal, state, and/or local government agencies authorized to handle discrimination complaints.*

### ...mplaints may be filed by:

Visiting the nearest Dispute Resolution Office in person and completing a formal complaint form

Telephone or e-mail

Writing the Dispute Resolution Office or submitting correspondence alleging discrimination through the Amtrak Employee Comment Program



## How the Process Works

*Amtrak takes discrimination complaints very seriously. Therefore, complaints filed with the Dispute Resolution Office will be addressed and resolved as promptly as practicable.*

### Once a complaint is filed:

- You will receive written confirmation of your complaint

- Your complaint will be evaluated by the Dispute Resolution Office to determine whether the complaint is timely filed, whether the complaint concerns matters handled by the Dispute Resolution Office, and the most appropriate manner in which to resolve the complaint

- Whenever possible, the Dispute Resolution Office will attempt to resolve your complaint by using alternative dispute resolution methods such as mediation, facilitated open dialogue, and neutral intervention within 30 days of the date that your complaint was filed

- Where the use of early resolution methods is not appropriate (such as where sexual harassment or retaliation is alleged) or where the early resolution attempt is unsuccessful, the Dispute Resolution Office will conduct a thorough fact-finding investigation. This investigation will be completed within 90 days of the date your complaint was filed

- At the conclusion of an investigation or successful early resolution attempt, the Dispute Resolution Office will notify you in writing of the results

# EXHIBIT E

| SUBJECT | CLASSIFICATION | DATE APPROVED | P/I NUMBER |
|---------|----------------|---------------|------------|
| Equal Opportunity/Affirmative Action | Business Diversity | August 9, 2005 | 5.1.0 |

1.0    <u>RESPONSIBILITY</u>

     Vice President - Business Diversity and Strategic Initiatives

2.0    <u>PURPOSE</u>

     To affirm the Company's commitment to equal opportunity for all persons regardless of race, color, religion, sex/gender, national origin, age, disability, sexual orientation, or status as a disabled veteran or veteran of the Vietnam Era, and other protected status.

3.0    <u>GENERAL</u>

     3.1    Amtrak is strongly committed to recruiting, hiring, training, promoting, and retaining in all job titles, the best qualified candidates without regard to race, color, religion, sex/gender national origin, age disability, sexual orientation, or status as a disabled veteran or veteran of the Vietnam Era or other protected status. Gender may be considered in the rare event that it is a bona fide occupational qualification. This commitment is based not only on Amtrak's obligation to comply with Equal Employment Opportunity laws, but also on its firm belief that the Company benefits from a diverse workforce where persons of various backgrounds contribute to the success of the Company.

     3.2    Managers and supervisors play a key role in ensuring that all personnel actions such as hiring, compensation, benefits, layoffs, return from layoffs, Company-sponsored training, educational tuition assistance, and social and recreational programs, are administered without regard to race, color, religion national origin, sex/gender, age, disability, or status as a disabled veteran or a veteran of the Vietnam Era or other protected status. As part of this role, managers and supervisors are expected to assist the Company periodically in developing and revising the Company's affirmative action plans by partnering with the Business Diversity Department to identify areas where the Company can improve its affirmative action efforts, and to help the Company establish reasonable and achievable goals. In addition, managers are responsible for making themselves aware of the Company's established goals and striving to meet those goals.

     3.3    Managers and supervisors are expected to be aware and comply with the Company's policies prohibiting discrimination and harassment. Therefore, the work performance of managers and supervisors will include evaluation of their equal employment opportunity efforts and results, among other criteria. Consequently, managers and supervisors should impress upon new employees the importance of the Company's Equal Employment Opportunity (EEO) and Affirmative Action policies and should actively support the Company's goals for hiring and promotion of women and minorities.

| APPROVED | REVISION NO. | SUPERSEDES | PAGE |
|----------|--------------|------------|------|
| David L. Gunn<br>President and Chief Executive Officer | New | DIV-1 | 1 of 2 |

| SUBJECT | CLASSIFICATION | DATE APPROVED | P/I NUMBER |
|---|---|---|---|
| Equal Opportunity/Affirmative Action | Business Diversity | August 9, 2005 | 5.1.0 |

4.0    SCOPE

    4.1    This policy applies to all employees and contract personnel.

    4.2    All personnel should be aware of the following Amtrak policies that have direct applicability to this policy:

        Anti-Discrimination and Anti-Harassment  -  DIV-2
        Employment, Promotion & Transfer  -  PERS-4

| APPROVED | REVISION NO. | SUPERSEDES | PAGE |
|---|---|---|---|
| David L. Gunn<br>President and Chief Executive Officer | New | DIV-1 | 2 of 2 |

# EXHIBIT F

**Venturelli, Susan**

| | |
|---|---|
| From: | Klaas, Jane |
| Sent: | Monday, July 12, 2004 12:49 PM |
| To: | Venturelli, Susan |
| Cc: | Preusser, Patrick |
| Subject: | Discipline Record |

   

CAMPBELL J.rtf     GALLO D.rtf     LY T.rtf     YACOVETTI M.rtf

I found no discipline records for:

Carroll, Brice
Solimine, George
Snyder, Heidi
Duvall, Wesley
Duncan, Patrick
Flippo, Tim

*Per phone call no discipline —*

*Kyser, James —*
*Hansen, John —*

1

D05787

# EXHIBIT G

**Venturelli, Susan**

| From: | Venturelli, Susan |
|---|---|
| Sent: | Monday, July 12, 2004 5:52 PM |
| To: | Duffy, Tim; Hanna, Barbara; Preusser, Patrick; Collins, Mark |
| Subject: | FW: Engineer Selections |

-----Original Message-----

| From: | Venturelli, Susan |
|---|---|
| Sent: | Monday, July 12, 2004 5:36 PM |
| To: | Preusser, Patrick |
| Subject: | Engineer Selections |

**Oakland (3 positions)**

~~Bruce Carroll~~
~~George Solimine~~
John Hansen    *DM ✓*

Alternate: ~~Patrick Duncan~~

**Sacramento (4 positions)**

~~Michael Iacovetti~~
~~Heidi Snyder~~
~~Wesley Duvall~~
~~Chanh Ly~~ Pending determination as to whether the 2 FRA reportables were safety violations--no discipline re the FRA reportables)  Thanh also had a rule violation in 2001 which we discussed with J. Deely who deemed it not serious enough for disqualification.    *not safety violations.*

Alternate: ~~Patrick Duncan~~

**San Jose (2 positions)**

Debrice Gallo (Rule violation of 4/03 was discussed with M. Collins who agreed it was not serious enough for disqualification.)  *Overruled by J. Commier, J. Deally*
~~Timothy Lippo~~

Alternate:

1

D05786

# EXHIBIT D



1   KATHLEEN MAYLIN (SBN 155371)
    CARA CHING-SENAHA (SBN 298467)
2   JACKSON LEWIS LLP
    199 Fremont Street, 10th Floor
3   San Francisco, California 94105
    Telephone: (415) 394-9400
4   Facsimile: (415) 394-9401

5   Attorneys for Defendants
    NATIONAL RAILROAD PASSENGER
6   CORPORATION dba AMTRAK and JOE DEELY

7

8                 UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10

11  JOHN EARL CAMPBELL                  Case No. C05-05434 MJJ

12           Plaintiff,                 **DECLARATION OF GREGG BAXTER
                                        IN SUPPORT OF DEFENDANT
13       v.                             NATIONAL RAILROAD PASSENGER
                                        CORPORATION'S MOTION FOR
14  NATIONAL RAILROAD PASSENGER         SUMMARY JUDGMENT, OR IN THE
    CORPORATION dba AMTRAK, JOE DEELY   ALTERNATIVE, PARTIAL
15  and DOES 1-15, inclusive,           SUMMARY JUDGMENT**

16           Defendants.               Date:    May 8, 2007
                                       Time:    9:30 a.m.
17                                     Ctrm.:   11
                                       Judge:   The Hon. Martin K. Jenkins
18
                                       Complaint Filed: 12/30/05
19                                     FAC Filed:        2/23/06
                                       Trial:           7/23/2007
20

21

22

23  I, Gregg Baxter, hereby declare:

24       1.    I was employed by NATIONAL RAILROAD PASSENGER CORPORATION

    dba AMTRAK from January 2001 to February 2005, in the position of Assistant Superintendent
25
    Road Operations. If called to testify, I could and would competently testify to the matters set
26
    forth below, which are within my personal knowledge.
27
         2.    I was the Charging Officer in connection with the investigative hearing concerning
28

                                          1

1   charges for rules violations against John Campbell with respect to a derailment and equipment

2   damage on January 10, 2002. Mr. Campbell was charged with violating Amtrak's General Code

3   of Operating rules, Rule 6.28 (Movement on Other than Main Track), Rule 7.1 (Switching Safely

4   and Efficiently), Rule 7.4 (Precautions for Coupling or Moving Cars or Engines), and Rule 7.12

5   (Movements into Spur Tracks). Attached hereto as Exhibit A is a true and correct copy of the

6   January 17, 2002 letter I sent to Mr. Campbell notifying him of the Formal Investigation hearing.

7        3.    A full hearing took place on March 15, 2002 where Mr. Campbell was allowed to

8   call witnesses and submit documentation in his defense. On March 28, 2002, the Hearing Officer

9   notified Mr. Campbell that the charges against him were sustained primarily by his own

10  testimony and omission. Mr. Campbell was given 20 days suspension as discipline, with ten days

11  to be served and ten days to be held in abeyance. A true and correct copy of the March 28, 2002

12  letter is attached as Exhibit B, which I received in the normal course of my duties as a Charging

13  Officer.

14       4.    The decision was appealed by the union to the Director of Labor Relations on

15  April 12, 2002. The appeal was denied on June 30, 2002.

16       5.    The dispute was submitted to the Public Law Board for a decision. In the normal

17  course of my duties, I was notified that the Board dismissed the appeal and the discipline against

18  Mr. Campbell was to stand.

19       6.    I also am aware through my duties as a Charging Officer that Mr. Campbell has

20  been charged with other rules infractions that have not gone to hearing. Specifically, on January

21  25, 2001, Mr. Campbell was charged with failing to follow the instructions of the Yard Foreman

22  and violating Amtrak's General Code of Operating Rules 1.6 and 1.13 (insubordination and

23  failing to comply with instructions from supervisors). Attached as Exhibit C is a true and correct

24  copy of the January 31, 2001 letter to Mr. Campbell notifying him of a Formal Investigation

25  hearing which I received in the normal course of my duties. Additionally, on January 17, 2002, it

26  came to my attention via and email from Patrick Duncan that he claimed Mr. Campbell had again

27  been insubordinate and had referred to Mr. Duncan on the open radio as "the white guy in the

28  office with a bad gene pool." I forwarded the email to Ray Belluomini, the Union Representative,

Mar 30 07 05:22a SuperOffice Operations Dep
Case 4:05-cv-05434-CW    Document 65-5    Filed 04/10/2007    Page 4 of 17
Case 3:05-cv-05434-MJJ    Document 44    Filed 04/08/2007 9205238 Page 3 of 16

1    and suggested that formal action may be taken. A true and correct copy of the February 2002

2    emails are attached as Exhibit D.

3      I declare under penalty of perjury under the laws of the United States of America that the

4    foregoing is true and correct. Executed this 30th day of March 2007 in Stockton, California.

5

6

7               GREGG BAXTER

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GREGG BAXTER IN SUPPORT OF DEFENDANTS' SUMMARY JUDGMENT
MOTION, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT    CASE NO. C05-05434 MJJ

# EXHIBIT A

# Notice of Formal Investigation
### Fed Ex Tracking # 7917 5568 9868

January 17, 2002

Mr. John E. Campbell
2210 109th Avenue
Oakland, CA  94603

Case No.  019.02

Dear Mr. Campbell:

You are hereby directed to appear for a Formal Investigation to be conducted as follows:

|  |  |
|---|---|
| **Date:** | January 25, 2002 |
| **Time:** | 3:00 PM |
| **Location:** | Amtrak's Jack London Station |
|  | 245 2nd Street, 2nd Floor |
|  | Oakland, CA  94607 |

The purpose of this investigation is to develop the facts and determine your responsibility, if any, in connection with the following:

**Charge 1:** Your alleged violation of the **General Code of Operating – Fourth Edition – April 2, 2000 – Rule 6.28 – Movement on Other than Main Track**, which reads, "Except when moving on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

> ❖ Train.
> ❖ Engine.
> ❖ Railroad car.
> ❖ Men or equipment fouling the track.
> ❖ Stop Signal or Derail or switch lined improperly."

**Charge 2:** Your alleged violation of the **General Code of Operating Rules – Fourth Edition – April 2, 2000 – Rule 7.1, Switching Safely and Efficiently,** which reads in part… "While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property."

Mr. John Campbell
Case No. 019.02
Page 2

**Charge 3:**  Your alleged violation of the General Code of Operating Rules – Fourth
Edition – April 2, 2000 – Rule 7.4 Precautions for Coupling or Moving Cars or
Engines, which reads, "Before coupling to or moving cars or engines, verify that the cars
or engines are properly secured and can be coupled and moved safely.

Make couplings at a speed of not more than 4 MPH.  Stretch the slack to ensure that all
couplings are made."

**Charge 4:**  Your alleged violation of the General Code of Operating Rules – Fourth
Edition – April 2, 2000 – Rule 7.12 Movements into Spur Tracks, which reads in
part... "When shoving into a spur track, control movement to prevent damage at the end
of track...."

**Specifications:**  It is alleged that while working as the Conductor on Yard Job CYO-4 on
January 10, 2002, while shoving into Fume track in the Oakland Yard with 17 cars and 3
units, you were directing the movement when an alleged hard coupling resulted in
equipment damage and the derailment of a box car.

You may produce any witnesses you desire and may be accompanied by a representative
as provided in your current and governing agreement, without expense to the National
Railroad Passenger Corporation.

All requests for postponements of this investigation must be handled through the Hearing
Office at (818) 547-2519.

Sincerely,


Gregg Baxter
Assistant General Manager
California Corridor

cc:    L. J. Commer - GM
        S. Birckett – AGM
        R. Wood – Labor Relations
        R. Butler – Hearing Office
        R. Belluomini – UTU Local Chairman
        L. Bellotti – Facility Manager
        D. Roberts – General Foreman
        M. McBride – Manager Operating Rules
        R. Robusto – Senior Director OPS

# EXHIBIT B

National Ra    Passenger Corporation, Law Department, 344 Mira (    venue, Glendale, California 91204

*DECISION*



**March 28, 2002**
**File #LAX-UTU-02/DISC**
**Case #019.02**

FedEx Tracking #8313 2752 9178

Mr. John Campbell
2210 109th Avenue
Oakland, CA 94603

Dear Mr. Campbell:

By letter, dated January 17, 2002, you were charged with the following misconduct:

**Charge 1**: Your alleged violation of the *General Code of Operating - Fourth Edition - April 2, 2000 - Rule 6.28 - Movement on Other than Main Track*, which reads, "Except when moving on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

- Train.
- Engine.
- Railroad car.
- Men or equipment fouling the track.
- Stop Signal or Derail or switch lined improperly."

**Charge 2**: Your alleged violation of the *General Code of Operating Rules - Fourth Edition - April 2, 2000 - Rule 7.1, Switching Safely and Efficiently*, which reads in part… "While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property."

**Charge 3**: Your alleged violation of the *General Code of Operation Rules - Fourth Edition - April 2, 2000 - Rule 7.4 Precautions for Coupling or Moving Cars or Engines*, which reads "Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

Make couplings at a speed of not more than 4 MPH. Stretch the slack to ensure that all couplings are made."

**Charge 4**: Your alleged violation of the *General Code of Operation Rules - Fourth Edition - April 2, 2000 - Rule 7.12 Movements into Spur Tracks*, which reads in part… "When shoving into a spur track, control movement to prevent damage at the end of track…"

Carrier's Exhibit No. **2**

D09685

Decision Letter
Mr. John Campbell
Case #019.02
Page Two

**Specifications**: It is alleged that while working as the Conductor on Yard Job CYO-4 on January 10, 2002, while shoving into Fume track in the Oakland yard with 17 cars and 3 units, you were directing the movement when an alleged hard coupling resulted in equipment damage and the derailment of a boxcar.

After one postponement, the Hearing Officer conducted a disciplinary investigation into the above-quoted charges. The investigation was conducted on March 15, 2002, in which your representative were in attendance. The following findings are based on the evidence and testimony presented at the investigation:

> The rule cited was in effect and applicable to you at the time of the alleged wrongdoing, as it is applicable to all Amtrak employees in your job category.

> The charges were sustained primarily, although not exclusively, by your own testimony and omission, and the testimony of Mr. Sid Birckett.

Based on the foregoing findings and the hearing record as a whole, I find that you are guilty of the above-quoted charges. The transcript of the aforementioned investigation will be forthcoming per the agreement with the union.

Sincerely,

*Roger R Butler*

Roger R. Butler
Hearing Officer
Western Region

D09686

Mar 22 02 04:17p    Jay Commer Litticorr    510-433-5515    p. 3
3-20-2002 2:46PM    FROM LAW DEPARTMENT 8185472532    P. 0

**Decision Letter**
**Mr. John Campbell**
**Case #019.02**
**Page Three**

Based on the decision of Hearing Officer Butler, you are hereby assessed discipline of:

* TEN DAYS SUSPENSION TO INCLUDE THE FOLLOWING:

* 4 Days Time Served from January 12, 2002 - January 15, 2002
  and 6 Days Suspension to be served between April 3, 2002 and to
  include April 8, 2002, and Ten Days to be held in abeyance.

Sincerely,

Jay Commer
General Manager
California Corridor

cc:    G. Baxter
       R. Belluomini-FedEx Tracking #8313 2752 1969
       Personnel
       Labor Relations

D09687

# EXHIBIT C

# Notice of Formal Investigation

John Campbell
2210 109th Ave
Oakland, CA 94603

Date: January 31, 2001
**Case: 041.01**

**Federal Express Tracking # 7904 6189 1084**
**(Signature Required)**
**US Mail**

Dear Mr. Campbell:

You are hereby directed to appear for a Formal Investigation to be conducted as follows:

|  |  |
|---|---|
| Date: | February 7th, 2001 |
| Time: | 10:00am |
| Location: | Oakland Mechanical Facility |
|  | 250 Wood St. |
|  | Oakland, CA 94607 |

The purpose of this investigation is to develop the facts and determine your responsibility, if any, in connection with the following:

Charges 1: Violation of "General Code of Operating Rules, 4th Edition, April 2, 2000."

**1.6.** **Conduct:**

Employees must not be....

3. Insubordinate

Charge 2: **1.13.** **Reporting and Complying with Instructions.**

Employees will report to and comply with instructions from supervisors who have the proper jurisdiction. Employees will comply with instructions issued by managers of various departments when the instructions apply to their duties.

1

John Campbell
2/1/2001
Page 2

**Specifications:** It is alleged that: while working as conductor on 3rd shift switch crew on January 25, 2001, you allegedly failed to follow the instructions of yard Foreman Nate Givens. Mr. Givens instructed you to add an express car off 2 track to the rear of train #6 on 4 track. Both you and the Engineer Anthony Onisko were given these instructions.

You may produce any witnesses you desire and may be accompanied by a representative as provided in your current and governing agreement, without expense to the National Railroad Passenger Corporation.

All requests for postponements of this investigation must be handled through the Hearing Officer at (213) 683-6704.

Sincerely,

*Sid Birckett*

Sid Birckett
Assistant General Manager-Customer Services
Oakland, CA

Cc:.    R. Belloumini (UTU)
        G. Baxter
        R. Butler

2

# EXHIBIT D

Case 4:05-cv-05434-CW    Document 65-5    Filed 04/10/2007    Page 16 of 17
Case 3:05-cv-05434-MJJ    Document 44    Filed 04/03/2007    Page 15 of 16

Page 1 of 2

## Ray Belluomini

| | |
|---|---|
| **From:** | "Baxter, Gregg" <baxterg2@Amtrak.com> |
| **To:** | "Ray Belluomini (E-mail)" <RAYUTU1732@ATTBI.COM> |
| **Sent:** | Friday, February 22, 2002 6:39 AM |
| **Subject:** | FW: 3rd shift yard job |

We might take formal action on this.
-----Original Message-----
**From:** Duncan, Patrick
**Sent:** Sunday, February 17, 2002 9:53 AM
**To:** Baxter, Gregg
**Cc:** Bellotti, Lou; Denton, Jerry; Commer, Jay
**Subject:** 3rd shift yard job

To: Gregg Baxter
From: Patrick Duncan
Subject: 3rd shift yard job
2/17/02

### *Statement of events*

     At 7:05am we had the diner, a sleeper, and the mail car on C-7 due to the fact that sleeper 32055 needed to have a wheel changed. The third shift Carmen were busy with an air problem on #723 when the third shift conductor asked Mr. Givens about the wheel on #6. Mr. Givens replied they were busy on the air problem on #723 and the conductor replied that "Mr. Duncan better get his butt in motion" referring to the wheel. At approximately 7:30am my day light conductor informed me he did not have an assistant conductor, I than informed Mr. Givens to inform the third shift crew of this situation and to ask them to stay to put #6 back together. The third shift conductor replied "My crew dies in half an hour so you better get on it." I than asked the conductor what time he died and he replied "In a half hour", I replied, "what actual time do you die on the law" Mr. Campbell replied "half hour". I stated to Mr. Campbell that I would make some phone calls and find out what time they died on the law.

     I called the crew dispatcher and asked her the time the third shift crew died, after some searching she informed me that the third shift yard job was good until 10:00am. I called Mr. Campbell on the radio and said "I understand you guys are good until 10:00am so you will have time to put #6 together after the wheel is changed." Mr. Campbell replied "you can only ask us to stay for overtime and we are denying it." I than told Mr. Campbell "I am giving you a direct order to stay because if you do not make #6 it will be late, do you understand the situation." Mr. Campbell than replied "we are leaving in a half hour." I told Mr. Campbell "I want him to understand the situation so that when I inform his boss we all have the facts straight." Mr. Campbell than asked "do you have somebody on the wheel?" I did not reply. Mr. Campbell than asked "do you have enough brain cells to answer the question, do you have any body on the wheel?" I told him I did not appreciate him talking to me in that manner on the radio but to answer his question "yes I do have people working on the wheel." Mr. Campbell's reply was "yeah, you win a cookie"

     Later the Carmen called and informed me that the wheel was not correctly spotted and it needed to be respotted. My Carmen also told me he asked the conductor and got no response. I than called the conductor and asked him to respot the wheel on the sleeper, the conductor replied "if you drop the flags I will, duh?"

     Upon spotting the car the conductor made a reference to the "the white guy in the office with a bad gene pool" the engineer, Lars, responded in a joking manner "I don't appreciate you talking to me like that on the radio." Mr. Campbell replied "I love my engineer." I than asked both of them to come to

2/22/02

Case 4:05-cv-05434-CW    Document 65-5    Filed 04/10/2007    Page 17 of 17
Case 3:05-cv-05434-MJJ    Document 44    Filed 04/03/2007    Page 16 of 16

Page 2 of 2

the office to discuss the matter at which time Mr. Campbell replied " why its much funnier on the radio so everyone can hear us" ____

Thank you,
Patrick Duncan

2/22/02

# EXHIBIT E

1  KATHLEEN MAYLIN (SBN 155371)
   CARA CHING-SENAHA (SBN 298467)
2  JACKSON LEWIS LLP
   199 Fremont Street, 10th Floor
3  San Francisco, California 94105
   Telephone: (415) 394-9400
4  Facsimile: (415) 394-9401

5  Attorneys for Defendants
   NATIONAL RAILROAD PASSENGER
6  CORPORATION dba AMTRAK and JOE DEELY

7

8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10

11  JOHN EARL CAMPBELL            Case No. C05-05434 MJJ

12          Plaintiff,            **DECLARATION OF STEVE
                                  SHELTON IN SUPPORT OF
13      v.                        DEFENDANTS' NATIONAL
                                  RAILROAD PASSENGER
14  NATIONAL RAILROAD PASSENGER   CORPORATION'S AND JOE DEELY'S
    CORPORATION dba AMTRAK, JOE DEELY   MOTION FOR SUMMARY
15  and DOES 1-15, inclusive,     JUDGMENT, OR IN THE
                                  ALTERNATIVE, SUMMARY
16          Defendants.           ADJUDICATION**

17                                Date:     May 8, 2007
                                  Time:     9:30 a.m.
18                                Ctrm.:    11
                                  Judge:    The Hon. Martin K. Jenkins
19
                                  Complaint Filed:  12/30/05
20                                FAC Filed:        2/23/06
                                  Trial:            7/23/2007
21

22

23
    I, Steve Shelton, hereby declare:
24
          1.     I am an employee of NATIONAL RAILROAD PASSENGER CORPORATION
25
    dba AMTRAK. I am employed as District Superintendent in Amtrak's Pacific Division, and have
26
    held that position since March 2004. I have been employed by Amtrak since 1988. If called to
27
    testify, I could and would competently testify to the matters set forth below, which are within my
28

                                      1

1   personal knowledge.

2        2.      As District Superintendent of the Pacific Division, I am ultimately responsible for

3   supervising all engineers, conductors, station personnel, and on board service employees in the

4   District (approximately 450 employees) and also responsible for the safe and efficient operation

5   of 2,000 miles of railroad. My responsibilities include evaluating and assessing discipline, up to

6   and including termination, on Amtrak employees who violate Amtrak rules and policies.    My

7   duties also include ensuring Amtrak employees observe and comply with railroad safety and

8   operations rules and policies. Adherence to these rules and policies is critical to further Amtrak's

9   ongoing commitment and responsibility to provide a safe work environment for employees who

10  work with large and inherently dangerous equipment and machinery. The rules and policies also

11  further Amtrak's commitment to assure the utmost safety of its passengers and customers.

12       3.      Amtrak employs conductors, such as Mr. Campbell was employed, pursuant to a

13  collective bargaining agreement with the United Transportation Union. That agreement provides

14  that a conductor will not be disciplined without the benefit of a hearing, and includes a right of

15  appeal. Attached hereto as Exhibit A is a true and correct copy of excerpts of the collective

16  bargaining agreement pertaining to discipline and investigation that governed Mr. Campbell's

17  employment and in effect from October 27, 1999.

18       4.      A Yard Conductor is primarily responsible for switching equipment for train make

19  up to stage trains for departure and arrival. Adherence to safety and operation rules and policies

20  is a critical job function for every member of a crew, but given the high frequency that a Yard

21  Conductor switches equipment, it is especially critical for a Yard Conductor to follow all

22  applicable rules and policies.

23       5.      After being charged with a disciplinary violation, a formal investigatory hearing is

24  convened in which the employee, the employee's union representative, and a company

25  representative (referred to as the Charging Officer) attend the hearing and present evidence to a

26  Hearing Officer. The Hearing Officer is a full-time management employee. At the hearing, the

27  employee has the ability to call any witness desired. The hearing is recorded and transcribed.

28  The decision of the Hearing Officer may be appealed to the Labor Relations officer, and that

1    decision may be appealed to the Public Law Board where the claim is finally decided by a panel

2    of three: an Organization Member (union), a Carrier Member (company), and a Neutral Member

3    (non-railroad affiliated) who is the Chairman of the Board.

4        6.    A waiver under the disciplinary process is a plea bargain that is negotiated

5    between the union and management, where the employee admits guilt to a rule or rules violation

6    and waives his right to a hearing in exchange for a negotiated specified discipline.

7        7.    Amtrak's Progressive Discipline Procedures are guidelines for dealing with

8    offenses by employees.  Under the guidelines, a third formal discipline is grounds for dismissal.

9    Further, suspension of ten days is considered a very serious penalty and dismissal is the likely

10   result of any future infraction after an employee receives a ten (or more) day's suspension.

11   Attached hereto as Exhibit B is a true and correct copy of Amtrak's Counseling and Discipline

12   Guidelines Summary.

13       8.    Amtrak's safety and operating rules are included in extensive materials and

14   instructions provided to Amtrak conductors and engineers, including: the General Code of

15   Operating Rules; Service Standards for Train Service Employees; AMT – 3, Amtrak Air Brake

16   and Train Handling Rules and Instructions; and, AMT – 5, Safety Instruction for Transportation

17   Employees.  All Amtrak conductors and engineers are charged with knowing and following the

18   rules as a condition of employment.  True and correct portions of these policies, pertinent to Mr.

19   Campbell's job performance, are attached hereto as Exhibit C.

20       9.    Engineers and conductors are in different crafts, belong to different unions, and

21   hold no bid or seniority rights to the other's positions.

22       10.   Mr. Campbell was involved in a serious incident on July 24, 2004 where he later

23   was charged with cutting (disabling) the brakes on a locomotive and failing to properly secure it

24   prior to coupling it with other cars, which resulted in the locomotive moving down the tracks on

25   its own volition and another employee having to run along the moving locomotive to engage the

26   brakes.  The incident resulted in Mr. Campbell being charged with five violations of portions of

27   Amtrak's Service Standards for Train Service Employees, Amtrak's General Code of Operating

28   Rules, and Amtrak Air Brake and Train Handling Rules and Instructions.

1     11.    A formal hearing was conducted on September 9, 2004. The hearing officer

2    issued a Decision on September 17, 2004 whereby Mr. Campbell was found guilty on four of the

3    charges. Given the seriousness of the charges and my review of Mr. Campbell's prior safety

4    record which showed he had two prior disciplinary actions in his file based on either admitted or

5    adjudicated violations (and the last one that involved a derailment resulted in a twenty-day

6    suspension of ten actual days and ten days held in abeyance), I concluded that the necessary,

7    appropriate, and just discipline, and consistent with Amtrak policy and practice, was to terminate

8    Mr. Campbell's employment. Attached hereto as Exhibit D is a true and correct copy of my

9    September 17, 2004 letter attached to the Decision of the Hearing Officer, notifying Mr.

10    Campbell of his termination.

11     12.    On September 28, 2004, the union appealed Mr. Campbell's termination to

12    Amtrak's Director of Labor Relations. On November 9, 2004, the Director denied the appeal, and

13    noted that "Claimant's approach to operating rule compliance is the proverbial 'accident waiting

14    to happen'" and continued that Amtrak "should not be required to retain Claimant until there is a

15    serious incident where injuries, damage or delays occur because of Claimant's misguided

16    decision to short cut operating rules." Attached hereto as Exhibit E is a true and correct copy of

17    the November 9, 2004 letter, received by me in the normal course of my employment.

18     13.    The union appealed the Director of Labor Relations' decision to the Public Law

19    Board on November 10, 2004. The Public Law Board dismissed the claim (denied the appeal) on

20    February 24, 2006 and upheld Mr. Campbell's termination. The Board noted that Mr. Campbell's

21    prior Operating Rule violations in both prior instances were violations involved safely switching,

22    coupling and securing equipment, and that the current instance he failed to properly secure brakes

23    prior to coupling. The Board concluded they could not find error with Amtrak's conclusion that

24    Mr. Campbell "has been afforded sufficient opportunity to correct his behavior to comply with

25    the Carrier's operating rules and failed to do so." Attached hereto as Exhibit F is a true and

26    correct copy of the February 24, 2006 Public Law Board decision, which I received in the normal

27    course of my employment at Amtrak.

28     14.    Mr. Campbell's race played no part in my decision to recommend termination of

1   his employment.

2       15.   At the time Mr. Campbell was separated, I had no information that he had filed a

3   DFEH charge previously or that he had filed an EEOC charge some eight months before (on

4   January 28, 2004) charging that he was passed by for a promotion to Engineer because of his

5   race. Indeed, I did not learn of any EEOC or DFEH charge until after Mr. Campbell filed this

6   lawsuit on December 30, 2005.

7       I declare under penalty of perjury under the laws of the United States of America that the

8   foregoing is true and correct. Executed this 30th day of March 2007 in Oakland, California.

9

10                          _S. E. Shelton_____

11                          STEVE SHELTON

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF STEVE SHELTON IN SUPPORT OF DEFENDANTS' SUMMARY JUDGMENT
MOTION, OR IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT    CASE NO. C05-05434 MJJ

# EXHIBIT A

# AGREEMENT

## BETWEEN

## THE NATIONAL RAILROAD PASSENGER CORPORATION

## (AMTRAK)

## AND

## CONDUCTORS AND ASSISTANT CONDUCTORS (OC)

## REPRESENTED BY THE

## UNITED TRANSPORTATION UNION (OC)

## JANUARY 29, 1986

**REPRINTED:**       **APRIL 1, 1994**
**REVISED:**           **OCTOBER 27, 1999**

The following represents a synthesis of the current collective bargaining agreement between the parties, reflecting updates to the agreement since its effective date of January 29, 1986. The parties have attempted to make this update as comprehensive as possible; however, there may be letter agreements which have been inadvertently omitted from this revision. Any such letters are not superceded by this synthesis and remain in effect according to their own terms.

*Labor Relations Printout: As of November 1, 2000*

Case 4:05-cv-05434-CW    Document 65-6    Filed 04/10/2007    Page 9 of 52
Case 3:05-cv-05434-MJJ    Document 50    Filed 04/03/2007    Page 8 of 51

*UTU-OC*

### Section 2 - Adopted from Agreement dated May 23, 1983

a.  Passenger Conductors and Assistant Passenger Conductors will furnish all information required on time slips so that proper identification of payments can be made.

b.  An itemized statement of the employee's daily earnings for each pay period will be furnished with the employee's pay draft. A brochure type pamphlet containing applicable codes will be provided each employee to enable him to determine what payments were made for each date.

c.  The requirement set forth in paragraph (e) of Rule 24 for initial denial of monetary claims for compensation alleged to be due will be satisfied when a monetary claim is identified and disallowed on an itemized statement of earnings form issued within the time limit specified in Rule 24. If an employee feels he has been improperly paid on the itemized statement of daily earnings form, he will submit his claim or grievance to the Local Chairman for appeal handling in accordance with paragraph (f) of Rule 24.

d.  The itemized statement of daily earnings form will serve as notification of payment of claims and no further notification will be required.

e.  Employees should use the itemized statement of daily earnings as the basis of reporting any overpayments.

### RULE 25 - DISCIPLINE

a.  Except as provided in paragraph (e), employees will not have a reprimand noted their discipline records nor be suspended or dismissed from the service without a fair and impartial trial.

b.  When a major offense has been committed, an employee considered by management to be guilty thereof may be held out of service pending a trial and decision. A major offense is generally recognized as:

　1.  Dishonesty, including falsification of reports or other documents;

　2.  Extreme negligence;

　3.  Use of possession of alcoholic beverages, intoxicants, narcotics; or

　4.  Insubordination, disorderly or immoral conduct, or any offense bringing discredit upon the Corporation.

c.  1.  An employee who is required to make a statement prior to the trial in connection with any matter, which may eventuate in the application of discipline to any employee, may if he/she desires to be represented, be accompanied by a duly accredited representative. A copy of his/her statement, if reduced to writing and signed by him/her, will be furnished to him by the Corporation upon his request and to the duly accredited representative when requested. Only one such statement may be required.

　2.  Employees who are required to attend investigation immediately after having finished work, or just prior to reporting for work and who do not thereby lost time on their assignments or

*UTU-OC*

extra boards, will be allowed continuous time at their regular hourly rate for the time spent in attending the trial, unless they are found guilty of the offense involved.

3. If an employee is required to lose time in order to make such statement and is not assessed discipline in connection with the incident involved, he/she will be paid the greater of the amount actually earned on the date(s) of such statement and the amount he/she would have earned had he/she not been required to make the statement.

4. If required to attend investigation at other than the times mentioned in paragraph "2" hereof, and without losing time thereby on their assignments or extra boards, they will be compensated a minimum of eight (8) hours at a rate of the last service performed for the time spent attending investigation, unless they are found guilty of the offense involved.

5. No payment except such as may be required under paragraph "1." "2." or "3" of this Rule will made to employees for any traveling necessary for attendance at a trial.

6. Except when held off duty because of a major offense, extra employees required to attend investigation will retain their relative standing on the extra board.

7. This Rule will apply to employees required to attend trial and also to employees required to attend investigation or trial as witnesses.

d. 1. An employee who is accused of an offense and who is directed to report for a trial therefore, will be given reasonable advance notice in writing of the specific charge on which he/she is to be tried and the time and place of the trial.

2. When a letter of complaint against an employee is the basis for requiring him/her to attend the trial, the employee will be furnished a copy of the written complaint together with the written notice for him/her to attend the trial.

3. Unless mutually agreeable between the Local Chairman and the Charging Officer, trials will be held at the employees home crew base.

e. Formal trials, except those involving a major offense, may be dispensed with should the employee involved and/or the Local Chairman and an authorized officer of the Corporation, through informal handling, be able to resolve the matter to their mutual interest. Requests for informal handling must be made at least twenty-four (24) hours before a formal trial is scheduled to begin. No formal transcript statement recording will be taken at the informal handling. When a case is handled informally and the matter of responsibility and discipline to be assessed, if any, is resolved, no formal trial will be required. A written notice of the discipline assessed and the reason therefor will be issued to the employee responsible, with a copy to the Local Chairman, if he/she participated in the informal handling, at the conclusion of the informal handling. Discipline matters resolved in accordance with this paragraph are final and binding.

f. Trials on matters which involve employees held out of service will be scheduled to begin within ten (10) days following date the accused is first held out of service. If not so scheduled, the charge will become null and void, and the employee will be paid the amount he/she would have earned had he/she not been held out of service.

29

Case 4:05-cv-05434-CW     Document 65-6     Filed 04/10/2007     Page 11 of 52
Case 3:05-cv-05434-MJJ     Document 50     Filed 04/03/2007     Page 10 of 51

*UTU-OC*

This time limit is subject to the availability of the accused and witnesses to attend trial and will be extended by the equivalent amount of time the accused employee and necessary witnesses are off duty account of sickness, temporary disability, discipline, leave of absence or vacation.

The ten (10) day time limit may be extended by mutual agreement, in writing between the Corporation and the accused employee or his/her duly accredited representative.

g. Trials on matters which do not involve employees being held out of service will scheduled to begin within twenty (20) days from the date of management's first knowledge of such matters. If not so scheduled, the charge will become null and void. This time limit is subject to the availability of the accused and witnesses to attend the trial and will be extended by the equivalent amount of time the accused employee and necessary witnesses are off duty account of sickness, temporary disability, disciplines, leave of absence or vacation.

The twenty (20) day time limit may be extended by mutual agreement, in writing, between the Corporation and the accused employee or his/her duly accredited representative.

h. If an employee desires to be represented at a trial, he/she may be accompanied by a duly accredited representative. The accused employee or his/her duly accredited representative will be permitted to question witnesses and those conducting the trial insofar as the interests of the employee are concerned. Such employee will make he/her own arrangement for the presence of the said representative, and no expense incident thereto will be borne by the Corporation.

An employee who may be subject to discipline and his/her duly accredited representative will have the right to be present during the entire trial. Witnesses appearing at the request of the Corporation at a trial will be called upon prior to the employee subject to discipline and those witnesses testifying on his/her behalf. Witnesses will be examined separately.

i. When an employee is assessed discipline, a true copy of the trial record will be given to the employee and to his/her duly accredited representative with the notice of discipline.

j. If discipline is to be imposed following trial and decision, the employee to be disciplined will be given a written notice thereof within fifteen (15) days of the date the trial is completed, and at least fifteen (15) days prior to the date on which the discipline is to become effective, except that in cases involving major offenses discipline may be made effective at any time after decision without advance notice.

The fifteen (15) day time limit to give written notice of discipline may be extended by mutual agreement, in writing, between the Corporation and the accused employee, or his/her duly accredited representative.

If no discipline is imposed following the trial and the employee was required to lose time as a result of such trial, he/she will be paid the greater of the amount actually earned on the date/dates of the trial and the amount he/she would have earned had he/she not attended the trial.

k. 1. Except where a major offense has been committed, if the discipline to be imposed is suspension, its application will be deferred unless within the succeeding six (6) month period; the accused employee commits another offense for which discipline by suspension is subsequently imposed.

Case 4:05-cv-05434-CW    Document 65-6    Filed 04/10/2007    Page 12 of 52
Case 3:05-cv-05434-MJJ    Document 50    Filed 04/03/2007    Page 11 of 51

UTU-OC

2. The six (6) month period in paragraph "k.1." will hereinafter be referred to as the probationary period.

3. Probationary periods will commence as of the date the employee is notified, in writing, of the discipline imposed.

4. If the disciplined employee maintains a record clear of offenses during the probationary period, he/she will not be required to serve the suspension. In all cases the suspended discipline will remain on the employee's record with the notation, "Suspension deferred."

5. If within the probationary period, the employee commits another offense, for which discipline by suspension is subsequently imposed, the suspension that was held in abeyance in paragraph "k1" will be applied when discipline is imposed for such other offense and a new period of probation will be started in connection with the subsequent offense.

6. Discipline by dismissal and suspension where a major offense has been committed will not be subject to the probationary period.

7. If the discipline to be applied is suspension, the time an employee is held out of service, and time lost making a statement and attending trial, will be:

    (A) Applied against the period of suspension for which the offense when the suspension is actually served.

    (B) Considered time lost without compensation if the employee does not serve the suspension due to compliance with paragraph "k4".

l.

1. Except as provided in paragraph (o), when an employee or his/her duly accredited representative considers the discipline imposed unjust and has appealed the case in writing to the Labor Relations officer having jurisdiction within fifteen (15) days of the date the employee is notified of the discipline, the employee will be given an appeal hearing.

2. The hearing on an appeal, if requested, will be granted within fifteen (15) days of the Labor Relations offices receipt of the request for an appeal hearing.

3. This appeal, where the discipline imposed is suspension, will act as a stay (except in the case of a major offense) in imposing the suspension until after the employee has been given a hearing.

m. At hearings on appeals, an employee may, if he desires to be represented at such hearing, be accompanied, without expense to the Corporation, by a duly accredited representative.

n. The designated officer of the Corporation will advise the employee of the decision, in writing, within fifteen (15) days of the date the appeal is heard. If an employee is not so advised, the appeal will be considered as having been sustained. This time limit may be extended by mutual agreement, in writing, between the designated officer of the Corporation and the accused employee or his/her duly accredited representative. If the decision, in cases of suspension, is to the effect that suspension will be imposed, either in whole or for a reduced period, the stay

Case 4:05-cv-05434-CW    Document 65-6    Filed 04/10/2007    Page 13 of 52
Case 3:05-cv-05434-MJJ    Document 50    Filed 04/03/2007    Page 12 of 51

*UTU-OC*

referred to in paragraph "l" will be lifted and suspension imposed subject to the provisions of Rule 25, paragraph "k".

Further appeal will be subject to the procedural provisions of paragraphs "g," "h," "i," "j," and "k" of Rule 24.

o. In appealing cases involving the discipline of dismissal, the General Chairman must, within 60 days after the date the decision is rendered, make an appeal in writing to the highest appeals officer of the Corporation requesting that he/she be given a written response or that the case be held in abeyance pending discussion in conference with the highest appeals officer of the Corporation. When a written response is requested, the highest appeals officer of the Corporation will given written notification of his/her decision to the General Chairman within 60 days after the date of his receipt of the appeal. When a request is made for the case to be held in abeyance pending discussion in conference, the conference will be arranged within 60 days after the highest officer of the Corporation receives the request for a conference. The highest appeals officer of the Corporation will give written notification of his/her decision to the General Chairman within 60 days after the date of the conference.

p. Decision by the Director, Labor Relations will be final and binding unless, within sixty (60) days after written notice of the decision, said officer is notified in writing that the decision is not acceptable.

All appeals from the decision of the Director, Labor Relations will be barred unless, within one hundred twenty (120) days from the date of said officer's decision, proceedings are instituted by the employee before a tribunal having jurisdiction pursuant to law or agreement over the matter involved.

q. If at any point in this appeals procedure or in proceedings before a tribunal having jurisdiction it is determined that the employee should not have been disciplined, any charges related thereto in the employee's personal service record will be voided and, if held out of service (suspended or dismissed), the employee will be reinstated with pay for all time lost and with seniority and other rights unimpaired.

r. If at any point in this appeals procedure or in proceedings before a tribunal having jurisdiction it is determined that the discipline imposed should be modified, the employee will be paid for all time lost in excess of such modified discipline.

s. The time limit provisions in this Rule may be extended at any level of handling in any particular case by mutual consent in writing by the duly authorized officer of the Corporation and the duly accredited representative of the Organization.

## RULE 26 - LEAVE OF ABSENCE

a. Employees will be allowed up to 30 days off duty upon receipt of permission from the proper official of the Corporation. Employees must request written leave of absence when they are to be off duty for more than 30 consecutive days.

b. A written leave of absence without impairment of seniority will be granted upon request to an employee for the following reasons:

# EXHIBIT B

*Progressive Discipline Procedures*

### Amtrak's Counseling and Discipline Guidelines Summary

Progressive discipline is an educational tool, not to be used if more effective ways of communicating and changing unacceptable behavior are available. Except for serious infractions where discipline may be necessary, counseling should first be used to change behavior. When it is apparent that counseling is not working, discipline may be utilized to change behavior.

Amtrak's guidelines for dealing with offenses generally provide for the following progression, depending on the circumstances:

Counseling:

1.  Verbal

2.  Written (warning letter)

Discipline:

3.  Reprimand or suspension of three (3) days or less

4.  Suspension of ten (10) days or less (more serious violations of operating rules involving hazards or accidents or major inconvenience to passengers may result in up to 30 days suspension)

5.  Dismissal

Employees should understand that a ten-day (or 30-day) suspension is a very serious penalty and dismissal will be the likely result of any future infraction.

These are guidelines only. For more serious offenses, this progression may start at Discipline steps 4 or 5, depending on circumstances. Further, the length of time between offenses, nature of offense, as well as an employee's overall service record, may impact what discipline is appropriate.

*May 1999*

# EXHIBIT C



# GCOR 2000

# General Code of Operating Rules

## Fourth Edition
Effective April 2, 2000

These rules herein govern the operation of the
railroads listed and must be complied with by all
employees regardless of gender whose duties are
in any way affected thereby.

They supersede all previous rules and instructions
inconsistent therewith.

© 2000 General Code of Operating Rules Committee, All rights reserved.

**GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000**   i-1

## Adopted by:

AT&L Railroad Company
Amtrak Western Division Peninsula Commute Service
Amtrak—Chicago Terminal
Amtrak—NOUPT
Acadiana Railway Company
Alabama & Gulf Railway
Alaska Railroad Corporation
Altamont Commuter Express Rail Authority
Apache Railway Company
Arizona and California Railway Company
Arizona Central Railroad
Arizona Eastern Railway Company
Arkansas Midland Railroad Company Inc.
Arkansas & Missouri Railroad Company
Ashtabula, Carson & Jefferson Railroad
Belt Railway Company of Chicago
BHP Nevada Railway Company
Burlington Northern Santa Fe Railway
California Western Railroad
Camas Prairie RailNet, Inc.
Canadian Pacific Railway
Cascade and Columbia River Railroad
Cedar Rapids & Iowa City Railway Company
Central California Traction Company
Central Kansas Railway
Central Montana Rail
Central Oregon & Pacific Railroad, Inc.
Chesapeake & Albemarle Railroad Company, Inc.
Council Bluffs Railway
Chicago Rail Link
Columbia Basin Railroad Co.
Columbia and Cowlitz Railway
Columbia Terminal
Dakota, Minnesota & Eastern Railroad
Dakota, Missouri Valley & Western Railroad, Inc.
Dakota Rail, Inc.
Dallas, Garland & Northeastern Railroad, Inc.
Daranelle & Russellville Railroad
DeQueen & Eastern Railroad Company
Duluth, Missabe & Iron Range Railway Company
Eastern Alabama Railway
Eastern Idaho Railroad
Escanaba & Lake Superior Railroad
Farmrail Corporation
Fort Worth & Western Railroad
Fox Valley & Western

Gateway Western Railway
Georgia Southwestern Railroad, Inc.
Georgia Woodlands Railroad
Grain Belt Corp
Grand Canyon Railway
Grand Rapids Eastern Railroad
Great Western Railway of Colorado
Great Western Railway of Iowa
Hutchinson and Northern Railway Company
Huron and Eastern Railway Company, Inc.
I&M Rail Link, LLC
Idaho Northern & Pacific Railroad Company
Illinois & Midland Railroad, Inc.
Illinois Railnet, Inc.
Indiana Rail Road Company
Indiana Southern Railroad, Inc.
Iowa Interstate Railroad Ltd.
Iowa Northern Railway Company
Jaxport Terminal Railway
Kansas City Southern Railway
Kansas City Terminal Railway Company
Lahaina Kaanapali & Pacific Railroad
Lewis and Clark Railway Company
Little Rock and Western Railway, LP
Louisiana and Delta Railroad Company
Manufacturers Junction Railway
McCloud Railway Company
Meridian and Bigbee Railroad
Mid-Michigan Railroad, Inc.
Minnesota, Dakota & Western Railway Company
Minnesota Northern Railroad, Inc.
Minnesota Commercial Railway Company
Minnesota Valley Transportation Company
Mississippi & Tennessee RailNet, Inc.
Missouri & Northern Arkansas Railroad Company, Inc.
Montana Rail Link
Montana Western Railway Company
Mount Vernon Terminal Railway, Inc.
Napa Valley Railroad Company
Nebkota Railway, Inc.
Nebraska, Kansas & Colorado RailNet
Nebraska Northeastern Railway Company
New England Central Railroad, Inc.
Newburgh & South Shore Railroad Company
New Orleans Lower Coast Railroad
New Orleans Public Belt Railroad
North Carolina & Virginia Railroad Company, Inc.

**i-2**         GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000

Northeast Illinois Regional Commuter Railroad Corp.
Northern Ohio & Western Railway
Northern Plains Railroad
Otter Tail Valley Railroad Company, Inc.
Osceola and St. Croix Valley Railroad Company
Pacific Harbor Line
Palouse River and Coulee City Railroad
Pecos Valley Southern Railway Company
Pend Oreille Valley Railroad
Pittsburgh Industrial Railroad
Point Comfort & Northern Railway Company
Port Bienville Railroad
Port of Tillamook Bay Railroad
Progressive Rail Inc.
Puget Sound & Pacific Railroad
Rarus Railway, Inc.
Red River Valley & Western Railroad Co.
Rio Valley Switching Company
Saginaw Valley Railroad Company
Sand Springs Railway Company
San Diego & Imperial Valley Railroad Company, Inc.
San Diego Northern Railway
San Joaquin Valley Railroad Co., Inc.
San Pedro and Southwestern Railway Compnay
Santa Cruz, Big Trees & Pacific Railway Company
Santa Fe Southern Railway, Inc.
Sault Ste. Marie Bridge Company
SEMO Port Railroad
Sierra Railroad Company
South Carolina Central Railroad Company, Inc.
South Central Tennessee Railroad
South East Kansas Railroad
South Plains Lamesa Railroad Ltd.
Southern Switching Company
Southwestern Railroad Company, Inc.
Southern California Regional Rail Authority
St. Croix Valley Railroad Company
St. Maries River Railroad Company
Tacoma Municipal Belt Line Railway
Texas, Gonzales & Northern Railway Company
Texas - New Mexico Division
Texas North Western Railway Company
Texas Rock Crusher Railway Co.
Toledo, Peoria & Western Railway
Transportación Ferroviaria Mexicana
Trinity Railway Express
Trona Railway Company
Tulsa-Sapulpa Union Railway Company

Twin Cities & Western Railroad Company
Union Pacific Railroad
Utah Central Railway
Utah Railway Company
Ventura County Railway Company
Virginia Southern Division
West Texas and Lubbock Railroad
Wichita, Tillman & Jackson Railway
Willamette & Pacific Railroad, Inc.
Willamette Valley Railroad
Willamina and Grand Ronde Railway
Wisconsin Central Ltd.
Wisconsin & Southern Railroad Company
Wyoming/Colorado Railroad Company
Yreka Western Railroad

**GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000**                    1-1

# 1.0    General Responsibilities

## 1.1    Safety

Safety is the most important element in performing duties. Obeying the rules is essential to job safety and continued employment.

### 1.1.1    Maintaining a Safe Course

In case of doubt or uncertainty, take the safe course.

### 1.1.2    Alert and Attentive

Employees must be careful to prevent injuring themselves or others. They must be alert and attentive when performing their duties and plan their work to avoid injury.

### 1.1.3    Accidents, Injuries, and Defects

Report by the first means of communication any accidents; personal injuries; defects in tracks, bridges, or signals; or any unusual condition that may affect the safe and efficient operation of the railroad. Where required, furnish a written report promptly after reporting the incident.

### 1.1.4    Condition of Equipment and Tools

Employees must check the condition of equipment and tools they use to perform their duties. Employees must not use defective equipment or tools until they are safe to use. Employees must report any defects to the proper authority.

## 1.2    Personal Injuries and Accidents

### 1.2.1    Care for Injured

When passengers or employees are injured, do everything possible to care for them.

### 1.2.2    Witnesses

If equipment is involved in personal injury, loss of life, or damage to property, the employee in charge must immediately secure the names, addresses, and occupations of all persons involved, including all persons at the scene when the accident occurred and those that arrived soon after. The employee in charge must secure the names regardless of whether these persons admit knowing anything about the accident.

The employee in charge must also obtain the license numbers of nearby automobiles. When necessary, other employees can assist in obtaining this information, which must be included in reports covering the incident.

Where signaling devices are provided or a flagman is on duty, the employee in charge and assisting employees must try to determine who, among the witnesses, can testify whether the signaling devices were functioning properly or if the flagman was performing his duties properly.

When possible, obtain the names of witnesses who can testify about the bell and whistle signals.

### 1.2.3    Equipment Inspection

If an accident results in personal injury or death, all tools, machinery, and other equipment involved, including the accident site, must be inspected promptly by the foreman, another person in charge of the work, or other competent inspectors. The inspector must promptly forward to his manager a report of the inspection. The report must include the condition of the equipment and the names of those making the inspection.

If requested by the claims department, the equipment inspected must be marked for identification and placed in custody of the responsible manager or employee.

**1-2**                  GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000

### 1.2.4    Mechanical Inspection

When engines, cars, or other equipment are involved in an accident that results in personal injury or death, the equipment must be inspected before it leaves the accident site.

A mechanical department employee must further inspect the equipment at the first terminal. This employee must promptly report inspection results to the proper manager.

### 1.2.5    Reporting

All cases of personal injury, while on duty or on company property, must be immediately reported to the proper manager and the prescribed form completed.

A personal injury that occurs while off duty that will in any way affect employee performance of duties must be reported to the proper manager as soon as possible. The injured employee must also complete the prescribed written form before returning to service.

If an employee receives a medical diagnosis of occupational illness, the employee must report it immediately to the proper manager.

### 1.2.6    Statements

Except when authorized by the proper manager:

- Information concerning accidents or personal injuries that occur to persons other than employees may be given only to an authorized representative of the railroad or an officer of the law.

- Information about the facts concerning the injury or death of an employee may be given only to a person in interest such as the injured employee, an immediate relative of the injured or deceased employee, an authorized representative of the railroad, or an officer of the law.

- Information in the files or in other privileged or confidential reports of the railroad concerning accidents or personal injuries may be given only to an authorized representative of the railroad.

### 1.2.7    Furnishing Information

Employees must not withhold information, or fail to give all the facts to those authorized to receive information regarding unusual events, accidents, personal injuries, or rule violations.

## 1.3    Rules

### 1.3.1    Rules, Regulations, and Instructions

**Safety Rules.** Employees must have a copy of, be familiar with, and comply with all safety rules issued in a separate book or in another form.

**General Code of Operating Rules.** Employees governed by these rules must have a current copy they can refer to while on duty.

**Hazardous Materials.** Employees who in any way handle hazardous materials must have a copy of the instructions or regulations for handling these materials. Employees must be familiar with and comply with these instructions or regulations.

**Air Brakes.** Employees whose duties are affected by air brake operation must have a copy of the rules and instructions for operating air brakes and train handling. Employees must know and obey these rules and instructions.

**Timetable/Special Instructions.** Employees whose duties are affected by the timetable/special instructions must have a current copy they can refer to while on duty.

**Train Dispatchers and Control Operators.** The train dispatchers and control operators must have a copy of the rules and instructions for train dispatchers and control operators. They must be familiar with and obey those rules and instructions.

**Classes.** Employees must be familiar with and obey all rules, regulations, and instructions and must attend required classes. They must pass the required examinations.

**GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000**    1-11

## 1.47    Duties of Trainmen and Enginemen

The conductor and the engineer are responsible for the safety and protection of their train and observance of the rules. If any conditions are not covered by the rules, they must take every precaution for protection.

**A. Conductor Responsibilities**

1. The conductor supervises the operation and administration of the train (if trains are combined with more than one conductor on board, the conductor with the most seniority takes charge). All persons employed on the train must obey the conductor's instructions, unless the instructions endanger the train's safety or violate rules. If any doubts arise concerning the authority for proceeding or safety, the conductor must consult with the engineer who will be equally responsible for the safety and proper handling of the train.

2. The conductor must advise the engineer and train dispatcher of any restriction placed on equipment being handled.

3. When the conductor is not present, other crew members must obey the instructions of the engineer concerning rules, safety, and protection of the train.

4. Freight conductors are responsible for the freight carried by their train. They are also responsible for ensuring that the freight is delivered with any accompanying documents to its destination or terminals. Freight conductors must maintain any required records.

**B. Engineer Responsibilities**

1. The engineer is responsible for safely and efficiently operating the engine. Crew members must obey the engineer's instructions that concern operating the engine. A student engineer or other qualified employee may operate the engine under close supervision of the engineer. Any employee that operates an engine must have a current certificate in his possession.

2. The engineer must check with the conductor to determine if any cars or units in the train require special handling.

**C. Conductor and Engineer Responsibilities**

1. Conductors and engineers must ensure that their subordinates are familiar with their duties, determine the extent of their experience and knowledge of the rules, and instruct them, when necessary, how to perform their work properly and safely.

**D. Other Crew Members' Responsibilities**

1. To ensure the train is operated safely and rules are observed, other crew members must assume as much responsibility as possible to prevent accidents or rule violations.

2. When the conductor or engineer fails to stop the train, or emergency requires, other crew members must stop the train immediately.

This page left blank intentionally.

**GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000**    6-11

- Men or equipment fouling the track.
- Stop signal.

    or

- Derail or switch lined improperly.

The crew must keep a lookout for broken rail and not exceed 20 MPH.

Comply with these requirements until the leading wheels reach a point where movement at restricted speed is no longer required.

## 6.28    Movement on Other than Main Track

Except when moving on a main track or on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

- Train.
- Engine.
- Railroad car.
- Men or equipment fouling the track.
- Stop signal.

    or

- Derail or switch lined improperly.

### 6.28.1    Sidings of Assigned Direction

Do not use sidings of an assigned direction in the opposite direction unless authorized by the train dispatcher.

### 6.28.2    Stopping Clear in Siding

When possible, a train entering a siding must not stop until the entire train is clear of the main track.

### 6.28.3    Cars or Equipment Left on Siding

Avoid leaving cars or equipment on sidings unless authorized by the train dispatcher, except in an emergency. In this case, notify the train dispatcher immediately.

## 6.29    Inspecting Trains

### 6.29.1    Inspecting Passing Trains

Employees must inspect passing trains. If they detect any of the following conditions, they must notify crew members on the passing train by any available means:

- Overheated journals.
- Sticking brakes.
- Sliding wheels.
- Wheels not properly positioned on the rail.
- Dragging equipment.
- Insecure contents.
- Signs of smoke or fire.
- Headlight or marker improperly displayed.
- Any other dangerous condition.

**6-12**          GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000

When possible, employees inspecting the passing train must advise crew members of the condition of their train.

When possible, a crew member on the engine of the train being inspected must notify a crew member on the rear of the train when the train is being inspected by other employees.

### Ground Inspections

When a train is stopped and is met or passed by another train, crew members must inspect the passing train. The trainman's inspection must be made from the ground if there is a safe location. If safe to do so, a trainman must cross the track and inspect the side of the passing train opposite the stopped train.

### Trackside Warning Detectors and Inspections

Crew members must be aware of trackside warning detectors and signals from persons inspecting their train. Stop the train immediately for an inspection when any of the following conditions exist:

• A crew member receives a stop signal.

• A trackside warning detector indicates a train defect.

   or

• A crew member is notified of a dangerous condition.

Movement must not proceed until it is safe.

### 6.29.2   Train Inspections by Crew Members

When a walking inspection of the train is required, and physical characteristics prevent a complete train inspection, inspect as much of the train as possible. The train may then be moved, but may not exceed 5 MPH for the distance necessary to complete the inspection.

While their train is moving, crew members must inspect it frequently and look for indications of defects in the train, especially when rounding curves.

When inspecting their train, crew members must observe the train closely for any of the following:

• Overheated journals.

• Sticking brakes.

• Sliding wheels.

• Wheels not properly positioned on the rail.

• Dragging equipment.

• Insecure contents.

• Signs of smoke or fire.

• Any other dangerous condition.

Crew members who discover defects while the train is moving must stop the train promptly and correct any defects, if possible. If the defective car must be set out, they must not attempt to move the car to the setout point unless it is safe to do so.

When a car is set out because of an overheated journal, any fire must be completely extinguished and precautions taken to prevent further ignition.

## 6.30   Receiving or Discharging Passengers

When a passenger train is receiving or discharging traffic, a train, engine, or piece of equipment must not pass between it and the station platform being used unless safeguards are provided.

**GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000**                    7-1

## 7.0    Switching

### 7.1    Switching Safely and Efficiently

While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property.

Do not leave cars or engines where they will foul equipment on adjacent tracks or cause injury to employees riding on the side of a car or engine.

### 7.2    Communication Between Crews Switching

To avoid injury or damage where engines may be working at both ends of a track or tracks, crews switching must have a clear understanding of movements to be made.

### 7.3    Additional Switching Precautions

The following equipment must not be unnecessarily switched or couplings made so as to damage the equipment or load:

- Passenger or outfit cars
- Intermodal or TOFC cars
- Cabooses
- Multi-level loads
- Cars containing livestock
- Open top loads subject to shifting

The following equipment must not be cut off in motion or struck by any car moving under its own momentum:

- Passenger cars
- Outfit cars
- High-value loads
- Engines
- Loaded-depressed-center flat cars
- Cars loaded with modular housing units
- Loaded articulated and solid drawbar-connected cars

### 7.4    Precautions for Coupling or Moving Cars or Engines

Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

Make couplings at a speed of not more than 4 MPH. Stretch the slack to ensure that all couplings are made.

### 7.5    Testing Hand Brakes

Employees must know how to operate the type of brakes they are using. When hand brakes must control or prevent car movement, test the brakes to ensure that they are operating properly before using them.

**7-2**  **GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000**

## 7.6  Securing Cars or Engines

Do not depend on air brakes to hold a train, engine, or cars in place when left unattended. Apply a sufficient number of hand brakes to prevent movement. If hand brakes are not adequate, block the wheels.

When the engine is coupled to a train or cars standing on a grade, do not release the hand brakes until the air brake system is fully charged.

When cars are moved from any track, apply enough hand brakes to prevent any remaining cars from moving.

## 7.7  Kicking or Dropping Cars

Kicking or dropping cars is permitted only when it will not endanger employees, equipment, or contents of cars.

Before dropping cars, crew members must fully understand the intended movement. They must verify that the track is sufficiently clear and that switches and hand brakes are in working order. If possible, the engine must run on a straight track. Cars must not be dropped over spring switches or dual control switches.

## 7.8  Coupling or Moving Cars on Tracks Where Cars are Being Loaded or Unloaded

Before coupling to or moving cars on tracks where cars are being loaded or unloaded, crew members must be sure that all of the following have been removed or cleared:

- Persons in, on, or about cars
- Platforms
- Boards
- Tank car couplings and connections
- Conveyors
- Loading or unloading spouts and similar appliances or connections
- Vehicles
- Other obstructions

In addition:

- Be careful to avoid damage to freight of partly loaded cars.
- Do not handle cars that are improperly or unevenly loaded if load could shift or fall from the car, or if the car could derail or overturn.
- Return any car placed for loading or unloading to the location it was found if it has not been released for movement.
- Do not pull empty cars from an unloading facility until any major accumulation of debris is removed.
- Ensure that plug-type and swinging doors on cars are properly closed or secured.

## 7.9  Switching Passenger or Occupied Outfit Cars

Before switching passenger equipment or occupied outfit cars:

- Couple the air hoses.
- Fully charge the brake system.
- Use the automatic brake valve when switching.

When coupling passenger or outfit cars:

- Stop the movement approximately 50 feet before the coupling is made.
- Have an employee on the ground direct the coupling.

**GENERAL CODE OF OPERATING RULES—Fourth Edition—April 2, 2000**    7-3

- Ensure couplers are fully compressed and stretched to ensure that knuckles are locked before making:

  - Air connections

  - Steam connections

  - Electrical connections

## 7.10    Movement Through Gates or Doorways

Before moving engines or cars through gates, doorways, or similar openings, stop to ensure that the gates, doorways, or openings are completely open and secure. When overhead or side clearances are close, make sure movement is safe.

## 7.11    Charging Necessary Air Brakes

Do not handle cars without charging the air brake system, unless the cars can be handled safely and stopped within the required distance. If necessary, couple the air hoses and charge the brake systems on a sufficient number of cars to control movement.

## 7.12    Movements Into Spur Tracks

When shoving cars into a spur track, control movement to prevent damage at the end of the track, and do the following:

- Stop movement 150 feet from the end of the track.

- Apply hand brakes, when necessary, to control slack.

- Have a crew member precede any further movement when it can be done safely.

- Move only on the crew member's signal.

## 7.13    Protection of Employees in Bowl Tracks

During humping operations, before a train or yard crew member goes between engines or cars on a bowl track to couple air hoses or adjust coupling devices, or before an employee performs maintenance on a bowl track, protection must be provided against cars released from the hump into the track as follows:

- The employee requesting protection must notify the employee controlling the switches that provide access from the hump to the track where the work will occur.

- After being notified, the switch controller must line any remote control switch against movement to the affected bowl track and apply a locking or blocking device to the control for that switch.

- The switch controller must then notify the employee that protection is provided. Protection will be maintained until the switch controller is advised that work is complete and protection is no longer required.

This page left blank intentionally.

AMT - 3

# NATIONAL RAILROAD
# PASSENGER CORPORATION



# AIR BRAKE AND TRAIN
# HANDLING RULES AND INSTRUCTIONS

These instructions apply to all Train and Engine service employees, Yardmasters, QP's, QMP's and certain Mechanical Department employees.

These instructions govern the testing and operation of air brake equipment on Amtrak trains and must be observed by all employees whose duties are in any way affected by them.

Employees whose duties require that they understand and comply with these instructions must attend the required classes.

Employees who are governed by these instructions will be provided with a copy, must maintain same and have it with them while on duty.

All rules and instructions apply to BOTH Passenger and Non-Passenger operations and equipment unless specifically indicated by section heading.

*George Binns*

G. P. Binns
Senior Director Compliance and Standards

*D. C. Scott*

D. C. Scott
System General Road Foreman

Effective August 3, 1980
Revised & Reissued August 19, 2002

**2.14.8**  A separate air brake slip must be filled out upon completion of the multiple lite locomotive departure test by mechanical forces and placed in the locomotive cab from which the consist will be operated.

**2.14.9**  Upon taking charge of lite and multiple lite locomotives, the locomotive engineer must ascertain that the required pre-departure inspections and tests have been performed, as evidenced by reviewing the required documentation as prescribed above.

**2.14.10**  The locomotive engineer, in addition to reviewing the prescribed MAP forms and separate air brake slip denoting that the pre-departure test was performed by the mechanical forces, must personally ascertain that the air brakes will properly respond to both the automatic and IBVs. This will require making two (2) Road / Class II tests of the brakes on the lite or multiple locomotive consist as follows:

    A.  Make the Road / Class II tests as prescribed.

    B.  Upon signal to apply the brakes, fully apply the independent brake, inspect brake application on the rear unit, signal to release the brakes, release the independent brake, and inspect brake release on the rear unit.

    C.  Main reservoir gauge on rear unit must be observed to determine that air is being restored prior to departure.

    **NOTE:** Assistance will be required by the locomotive engineer during the two Road / Class II Tests.

**2.14.11**  On lite and multiple lite consists which the pre-departure air brake test has been completed prior to the operating crew's arrival and for which no separate air brake slip is available, the crew will be required to perform the locomotive departure air brake test as prescribed in the Instruction 2.3 using the control station from which the movement will be operated. Main Reservoir gauge on the rear unit must be observed to determine that air pressure is being restored prior to being dispatched.

**2.14.12**  Lite and multiple lite locomotive movements require a locomotive Running Brake Test as per 2.4

**2.14.13**  When main reservoir supply is not available between multiple lite locomotives or on trailing units being towed dead, Instruction 2.8 must be complied with.

**2.14.14**  When M.U. hose connections cannot be coupled between multiple lite locomotives or on trailing units being towed dead, once such units have had their dead engine feature OPENED, the consist must be tested as prescribed in Instruction 4.2.1. Main Reservoir gauge on rear unit must be observed to determine that air pressure is being restored prior to being dispatched.

**2.14.15**  All other Air Brake and Train Handling Rules and Instructions remain in effect for lite and multiple lite locomotive movements.

**2.14.16**  Multiple lite locomotives may be moved within the confines of a yard or terminal without connecting the M.U. hoses, as long as the brake pipe and main reservoir hoses are connected with associated angle and main reservoir cocks open.

# Service Standards

### for
## Train Service &
## On-Board Service
## Employees

Effective 12:01am, May 3, 2004

# Manual No. 2

### Service Delivery Department



November 1, 2002

To all Co-Workers:

This book of Service Standards that has been provided to you is designed to assist you in ensuring the delivery of consistent, high quality service to our customers by the frontline employees under your supervision. It ties together, in a single reference document, many diverse company policies, procedures and standards that apply to the services our Train Service and On-Board Service employees perform. Read through this book carefully. Have it in your possession while on-duty for reference, if needed.

It is my expectation that you will enforce compliance with the Service Standards contained herein in the supervision and coaching of your employees, everyday.

This will be a dynamic document subject to frequent revision, simply because the business environment and customer expectations continually change. The most successful companies are those that can read that change and make corresponding adjustments in their business practices and standards. Changes will be made to this Manual through the issuance of Operations Standards Updates, and actual revision pages that will be published semi-annually, concurrent with the spring and fall timetable changes.

The primary goal of this Service Standards Manual is to ensure that Amtrak service is delivered consistently from train-to-train and station-to-station throughout our system. To that end, this Manual provides you with the most current Service Standards for the delivery of our service based on the new Amtrak organization.

We're all in this together, and your hard work and dedication are the keys to our success. Remember to stay focused on safety, on-time trains, revenue optimization, and customer services that exceed what our passengers expect.

Sincerely,

*Edw V. Walk*

Edward V. Walker, III
Vice President – Transportation

**Service Standards Manual No.2**

# Chapter 3B

Safety Rules for
Train Service
Employees

The instructions in this manual apply to train and engine employees, who must keep them available for reference while on duty. Employees must review and understand the Safety Instruction for each day, as indicated by the Safety Calendar.

Questions regarding the day's instruction should be referred to your Supervisor for clarification.

This manual is dedicated to your ongoing personal safety. Amtrak cares about providing you with a safe and healthy workplace.

These Safety Instructions are grouped for convenience and contain the basic safety and work practices that apply to your job. However, not all safety hazards that you may encounter in your daily work can be specifically covered. If you do not understand the safety instruction(s) or are not sure of the safe course of action for a particular circumstance, ask your supervisor for an interpretation and/or a clarification on the safest course of action. It is your responsibility to have a complete understanding of your job and to know of its possible hazards. Your commitment to the spirit of the Safety Instructions, in each work situation, affects your safety and that of your co-workers and our passengers.

We believe that almost all personal injuries are caused by the unsafe acts of people *and by reducing unsafe acts, injuries can and will be prevented.* Officers and supervisory personnel should make regular observations and checks to assure compliance with these instructions, and immediately report and/or correct unsafe acts as they occur.

## Chapter Contents

| Subject | Instruction Numbers | Page(s) |
|---|---|---|
| Safety Calendar | None | 3B-iii – 3B-v |
| General | 5000 – 5010 | 3B-1 – 3B-3 |
| Clothing and Personal Protective Equipment | 5100 – 5106 | 3B-4 – 3B-5 |
| Walking, Standing or Sitting | 5200 – 5207 | 3B-5 – 3B-7 |
| Working On or about Locomotives, Cars or Equipment | 5300 – 5330 | 3B-7 – 3B-14 |
| Working On or About 480 Volt Head End Power, or Power Supply | 5400 – 5405 | 3B-14 – 3B-15 |
| Operating Hand Brakes | 5500 – 5508 | 3B-15 – 3B-16 |
| Operating Switches | 5600 – 5606 | 3B-17 – 3B-18 |
| Miscellaneous | 5700 – 5702 | 3B-19 |
| Switching Operations Fatality Analysis (S.O.F.A.) | 5800 – 5801 | 3B-19 |

**5701 Hoisting Equipment**

Keep clear of hoisting equipment boom or suspended load on hoisting equipment. Stand in the clear while a pull or hoist is made with cable, chain or other tackle.

**5702 Maintain a Braced Condition**

When using any tool, tackle, device, appliance or other item, place feet firmly, maintain braced position, and keep hands and other parts of the body in the clear.

## Switching Operations Fatality Analysis (S.O.F.A.)

**5800 Coupling or Uncoupling Engine or Cars**

Prior to going on, under or between standing equipment for the purpose of coupling or uncoupling engines or cars, crew members must:

- Discuss safety matters and work to be performed.
- Communicate before action is taken.
- Protect against moving equipment.
- Secure equipment before action is taken.
- Mentor less experienced employees to perform service safely.

**5801 Less than a Year of Service**

Train and Engine service employees with less than one (1) year service and performing duties referred to in instruction 5800 must wear an orange arm band while performing such service.

# EXHIBIT D

NATIONAL RAILROAD PASSEN ~R CORPORATION
810 North Alameda Street, Los Angeles, CA 90012

## DECISION



**September 17, 2004**
**File #LAX-UTU-04/DISC**
**Case #386.04**

RECEIVED

SEP 27 2004

GENERAL COMMITTEE OF ADJUSTMENT
CR-SAA/AMTRAK

Federal Express #7919 3003 8200

Mr. John Campbell
2210 109th Avenue
Oakland, CA 94603

Dear Mr. Campbell:

By letter, dated August 6, 2004, Case #386.04, you were directed to appear for a formal investigation.

A formal disciplinary investigation was conducted on September 9, 2004, in which you and your union representative were in attendance. The following findings are based on the evidence and testimony presented at the investigation:

1.  The rules cited were in effect and applicable to you at the time of the alleged wrongdoing, as it is applicable to all Amtrak employees in your job category.

2.  Charge 2 was not sustained.

3.  Charges 1, 3, 4 and 5 were proven. It is evident on the record by the testimony of the Corporation's witnesses and your own testimony that you clearly violated the rules and instructions regarding the movement and coupling of cars and engines.

Based on the foregoing findings and the hearing record as a whole, I find that you are guilty of the charges. The transcript of the aforementioned investigation is enclosed.

Sincerely,

Patrick Gallagher
Hearing Officer
Western Region

EXHIBIT "C"

Decision Letter
Mr. John Campbell
Case No. 386.04
Page Two



Based on the decision of Hearing Officer, Gallagher, you are hereby assessed discipline of:

Termination from service, effective immediately. This decision is based on the current charges and your previous Discipline Record listed below:

| Date | Charge/Rule Violation | Discipline Assessed |
|------|----------------------|---------------------|
| 4/4/00 | GCOR Rules - 1.1.3 Accidents, Injuries, and defects, 6.28 Other than Main Track Movements, 7.1 Switching safely, 7.3 Switching precautions, 7.5 Testing Hand Brakes, 7.6 Securing cars and engines | Waived |
| 1/14/02 | GCOR Rules – 7.1 Switching Safely and Efficiently, 7.4 Precautions for Coupling and Moving Cars or Engines, 7.12 Movements into Spur Tracks | S10 |

Sincerely,

*S E Shelton*

S. E. Shelton
District Superintendent
Pacific Division – Bay District

SES/lr

cc:    E. Adams – UTU Chairman – Fed Ex Tracking 7902 6820 6654
       L. C. Hriczak – Director – Labor Relations
       T. Duffy – Director – Human Resources

# EXHIBIT E

November 9, 2004

Mr. A. L. Suozzo, General Chairperson
United Transportation Union
1515 Market Street, Suite 708
Philadelphia, PA 19102

Re:    OC-UTU-SD-1678D
       J. Campbell

Dear Mr. Suozzo:

We discussed this case during our conference on October 27, 2004, with Mr. R. M. Lenfest, of
your staff. The case involves the dismissal of Conductor John Campbell, Oakland, California, in
connection with the following charges:

> "Charge 1: Your alleged violation of Amtrak's Service Standards for Train Service
> Employees - Manual No. 2 (effective 5/3/2004) - Chapter 3B - Safety Rules for Train
> Service Employees - Rule 5800 - Coupling or Uncoupling Engine or Cars, which reads
>
> > 'Prior to going on, under or between standing equipment for the purpose
> > of coupling or uncoupling engines or cars, crewmembers must:
> >
> > - Discuss safety matters and work to be performed.
> > - Communicate before action is taken.
> > - Protect against moving equipment.
> > - Secure equipment before action is taken.
> > - Mentor less experienced employees to perform service safely.'
>
> Charge 2: Your alleged violation of General Code of Operating Rules - Fourth Edition -
> April 2, 2000 - Rule 7.1 - Switching Safely and Efficiently, which reads in part... 'While
> switching, employees must work safely and efficiently and avoid damage to contents of
> cars, equipment, structures, or other property.'
>
> Charge 3: Your alleged violation of General Code of Operating Rules - Fourth Edition -
> April 2, 2000 - Rule 1.47 - Duties of Trainmen and Enginemen, Item D Other Crew
> Members' Responsibilities, Part 1. 'To ensure the train is operated safely and rules are
> observed, other crew members must assume as much responsibility as possible to prevent
> accidents or rules violations.'

Mr. A. L. Suozzo  
November 9, 2004  
Page 2

Re:    <u>OC-UTU-SD-1678D</u>  
       J. Campbell

Charge 4: Your alleged violation of General Code of Operating Rules - Fourth Edition - April 2, 2000 - Rule 7.4 - Precautions for Coupling or Moving Cars or Engines, which reads in part... 'Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.'

Charge 5: Your alleged violation of Amtrak Air Brake and Train Handling Rules and Instructions, AMT-3 - Revised and Reissued August 19, 2002 - Rule 2.14.16: which reads... 'Multiple lite locomotives may be moved within the confines of a yard or terminal without connecting the M.U. hoses, as long as the brake pipe and main reservoir hoses are connected with associated angle and main reservoir cocks open.'

Specification: It is alleged that on July 24, 2004 while assigned to position CYO103 working as the Conductor in the Oakland Diesel Shop you cut out the brakes on a locomotive and failed to properly secure it prior to coupling."

During conference, the Organization contended that the Carrier failed to call the assistant conductor to testify; that the Claimant's inability to connect air hoses on the pit mitigated his guilt; and that Claimant's actions did not result in damage or delay to a train. The union contended further, that in any event, the discipline assessed was excessive. For these reasons, the Organization requested that the discipline be expunged from the Claimant's record and that he be restored to service with pay for time lost and all rights and benefits unimpaired.

The record indicates that the Claimant was properly notified, in writing, of the charge against him and was given proper notice to appear for the investigation on August 10, 2004. At the investigation, which had been postponed–by mutual agreement–until September 9, 2004, the Claimant was present and represented by a duly authorized representative of the Organization, who was permitted to cross-examine witnesses and present evidence on his behalf.

There is no evidence in the record in this case that any action of the carrier was an abuse of the discretion vested in it. The record clearly shows that the Claimant's rights to a fair and impartial investigation were not violated and that there is substantial evidence to support the Hearing Officer's finding that he was guilty of charges 1, 3, 4 and 5. Charge 2 was not sustained.

The Carrier was not required to call the assistant conductor to testify inasmuch as the charges were proven through the testimony of Mr. Dave West, Foreman, as well as Claimant's admission that he disabled the brakes on the locomotive and left it on the pit. Their testimony disclosed that the locomotive rolled away during a hard coupling on the service track because the Claimant had disabled its brakes. The record reveals that Foreman West ran after the locomotive, boarded it, cut the trucks back in, and was able to stop it from rolling further.

Mr. A. L. Suozzo                        Re:    <u>OC-UTU-SD-1678D</u>
November 9, 2004                               J. Campbell
Page 3

The Claimant has offered no evidence in support of his unsubstantiated assertion that it was
unsafe to cut in the locomotive's trucks while it was on the pit. Such contention is nothing more
than a self-serving attempt to mitigate his admitted violation of the rules with which charged.

Finally, in view of the Claimant's admission and in consideration of his service record, which
includes progressive discipline, both a reprimand and a twenty-day suspension (ten days actual
and ten held in abeyance), for operating rule violations involving switching, securing, and
coupling equipment, the discipline assessed was commensurate and was not arbitrary, capricious
or excessive. The Claimant has been afforded sufficient opportunity to correct his behavior to
comply with the Carrier's operating rules and failed to do so. The Carrier need not retain
employees in its service who are unable to work safely and are either unable or unwilling to
comply with the Carrier's operating rules.

For these reasons, your appeal is denied in its entirety.

Very truly yours,

Larry C. Hriczak
Director-Labor Relations

bc:    Joe Deely
       Steve Shelton
       Bob Schmitt
       Milton Lundy
       Betty Blair
       Jim Ryan
       Lou De Phillips
       Jennifer Rieker
       Val Giulian
       Lisa Caridine
       Dick Wood
       Rick Sandler
       Library

# EXHIBIT F

## PUBLIC LAW BOARD NO. 6478

**Case No. 120**
**Award No. 120**

(United Transportation Union
**PARTIES TO DISPUTE:** (

(National Railroad Passenger Corporation (Amtrak)
(  [System Docket OC-UTU-SD-1678D]

### STATEMENT OF CLAIM:

"Request the discipline of dismissal imposed upon J. Campbell be expunged from his record and that he be restored to service with seniority and vacation rights unimpaired and compensated for all time and expenses incurred inclusive of Health and Welfare premiums, Reduced Train Crew Allowance and Productivity Savings Sharing Allowance and credit for Railroad Retirement payments for each month for all time lost in connection therewith:

Charge 1: Your alleged violation of Amtrak's Service Standards for Train Service Employees – Manual No. 2, (effective 5/3/2004) – Chapter 3B – Safety Rules for Train Service Employees – Rule 5800 – Coupling or Uncoupling Engine or Cars, which reads:

'Prior to going on, under or between standing equipment for the purpose of coupling or uncoupling engines or cars, crewmembers must:

- Discuss safety matters and work to be performed.
- Communicate before action is taken.
- Protect against moving equipment.
- Secure equipment before action is taken.
- Mentor less experienced employees to perform service safely.'

Charge 2: Your alleged violation of General Code of Operating Rules-Fourth Edition – April 2, 2000-Rule 7.1 – Switching Safely and Efficiently, which reads in part . . . 'While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property.'

Public Law Board No. 6478
Case No. 120; Award No. 120
Page 2 of 5

**Charge 3:  Your alleged violation of General Code of Operating Rules - Fourth Edition – April 2, 2000-Rule 1.47 – Duties of Trainmen and Enginemen, Item D Other Crew Members' Responsibilities, Part 1.  'To ensure the train is operated safely and rules are observed other crew members must assume as much responsibility as possible to prevent accidents or rule violations.'**

**Charge 4:  Your alleged violation of General Code of Operating Rules - Fourth Edition – April 2, 2000-Rule 7.4 – Precautions for Coupling or Moving Cars or Engines, which reads in part . . . 'Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.'**

**Charge 5:  Your alleged violation of Amtrak Air Brake and Train Handling Rules And Instructions, AMT-3-Revised and Reissued August 19, 2002-Rule 2.14.16:  which reads:  'Multiple lite locomotives may be moved within the confines of a yard or terminal without connecting the M.U. hoses, as long as the brake pipe and main reservoir hoses are connected with associated angle and main reservoir cocks open.'**

**Specification:  It is alleged that on July 24, 2004 while assigned to position CYO103 working as the Conductor in the Oakland Diesel Shop you cut out the brakes on a locomotive and failed to properly secure it prior to coupling."**

## FINDINGS:

This Board, after hearing upon the whole record and all the evidence finds that the Carrier and the Employee involved in this dispute are respectively Carrier and Employee within the meaning of the Railway Labor Act, as amended; this Board has jurisdiction over the dispute involved herein; and, the parties were given due notice of hearing thereon.

A hearing was held on September 9, 2004, subsequent to a mutually agreed postponement.  The hearing involved an investigation into charges

Public Law Board No. 6478
Case No. 120; Award No. 120
Page 3 of 5

and specification over Claimant's alleged failure on July 24, 2004 to secure the brakes on a locomotive prior to coupling. Claimant had received proper notification on August 6, 2004 and the investigation permitted him all the rights and benefits of the Agreement.

The Organization argues that one error made by the Carrier is the failure to have present at the hearing the Assistant Conductor. In addition to the procedural error, the merits of the case were not proven. The Organization argues that the Claimant was unable to connect the air hoses over the pit; followed procedures that had been common practice; and that there was no damage or delay as a result of the Claimant's actions. Importantly, as he was not found guilty of Charge 2, the Claimant's behavior did not justify the excessive discipline of dismissal.

With regard to the procedural issue, the Carrier maintains that it proved its case. It argues that it need not call witnesses beyond those that will meet its burden. It proved the Claimant violated operating rules with the testimony of those present at the hearing. Further, with regard to merits, the Claimant admitted that he had disabled the brakes. This allowed the locomotive to roll away when it was hard coupled on the service track. The admission of the Claimant and the further testimony of the Mechanical Foreman proved the Claimant guilty of Charges 1, 3, 4 and 5. The Claimant was not found guilty of Charge 2. However, due to the Claimant's past record, the discipline was fully justified.

The Board's first obligation is to consider the Organization's procedural issue. There was no showing in this record that the Assistant Conductor had any material knowledge or relevant facts directly bearing on the Charges. Once the Carrier made a *prima facie* case against the Claimant, the burden shifted to the Organization to call whatever witness would shift that burden. The Organization made no showing that the Assistant Conductor was important, or that his testimony was directly on point to develop the Claimant's defense. There was no argument that the Carrier refused a recess for the Organization to present the witness, or that the Carrier prevented the Claimant from calling him. As such, and finding no procedural error, the Board turns to the merits.

The evidence of record from the Mechanical Supervisor is that the

Public Law Board No. 6478
Case No. 120; Award No. 120
Page 4 of 5

Claimant allowed the locomotive to remain on the pit with disabled brakes that did not prevent it from rolling. On July 24, 2004, Mechanical Supervisor West testified, "they hit the locomotive hard and the locomotive took off on its own." In fact, he had to run after it and set the brakes to stop the equipment. When asked, if, "when you made the moves, you . . . you did leave one loco on the service track unsecured. Is that correct?" the Claimant said, "Yes." The Operating Rules require that the brakes be secured. Clearly, the Carrier has met its burden of proof.

A study of the Claimant's position does not find persuasive support. The fact that the train was on flat ground; the argument that it was common procedure over the pit to disable the brakes; the lack of damage and injury, or the fact that the train was not delayed, do not go to the heart of the issue. Operating Rules are extremely important and, if not for the quick action of Supervisor West, the outcome of this event could have been far more serious. The Carrier has met its burden of proof and the only issue remaining is the quantum of discipline.

Discipline is meant to be instructive, corrective and progressive in such behaviors as herein before this Board. The Claimant has two prior instances of Operating Rule violations. His first was four years earlier and he was reprimanded. His second was approximately two years earlier and he was given a twenty (20) day suspension (ten days actual, ten held in abeyance). In both instances, this six year employee was found guilty of violating GCOR Rule 7.1. In both prior cases, the Claimant violated Operating Rules which involved safely switching, coupling and securing equipment. In this instance, the Claimant failed to properly secure the brakes prior to coupling. The Carrier argues that, "The Claimant has been afforded sufficient opportunity to correct his behavior to comply with the Carrier's operating rules and failed to do so." In this record, we are unable to find error with the Carrier's judgment. As such, we are constrained to deny the claim.

Public Law Board No. 6478
Case No. 120; Award No. 120
Page 5 of 5

**AWARD:**

**The claim is denied.**

*Marty E. Zusman*

**Marty E. Zusman, Chairman**
**Neutral Member**

*Iannone*

**C. A. Iannone**
**Organization Member**

*William H. Robinson Jr.*

**Wm. H. Robinson, Jr.**
**Carrier Member**

Date: 2/24/06

*Assent is attached*

# ORGANIZATION MEMBER'S DISSENT
# TO AWARD NO. 120
# OF PUBLIC LAW BOARD NO. 6478

It is obvious that the Majority maintains an unrealistic view regarding the application of operating rules in connection with moving railroad equipment. It is also apparent that the Majority was unable to give the Claimant the benefit of the doubt. The Neutral member was duped into believing that "if it was not for the quick action of the Supervisor, the outcome of this event could have been far more serious." The Organization's Member of the Board views this statement by the Carrier's Member to be an exaggeration intended to create the illusion of danger where none existed. Unfortunately, for the Claimant, the Neutral Member was not able to clear the unrealistic image of suggestive danger from his mind.

The Claimant emphatically stated that for the past 5 years, he switched in the same manner, employing the same safety practices as every other crew that switched in that territory. The record reveals that the physical characteristic of the territory is flat. The record supports the fact that there was no accident, no derailment, no damage and no train delay. The Claimant was in control of the move and made the "joint" about 2 miles an hour. The engine in questioned rolled approximately a "half engine length". The record reveals that the engine was coming to a stop even before the brakes were cut in. These facts were ignored and dismissed by the Majority.

In light of the Claimant's record, the discipline is harsh, excessive and not consistent with discipline assessed in similar cases, not just on Amtrak, but in the entire industry.

Organization's Member

EXHIBIT F

**PRICE AND ASSOCIATES**
**A PROFESSIONAL LAW CORPORATION**
**1611 TELEGRAPH AVENUE, SUITE 1450**
**OAKLAND, CA 94612**
**TELEPHONE: (510) 452-0292**
**FACSIMILE: (510) 452-5625**

---

# FAX TRANSMISSION COVER SHEET

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DATE:      March 20, 2007

TO:        Cara Ching-Senaha, Esq.
           Mitchell Boomer, Esq.
           Jackson Lewis LLP
           199 Fremont Street, 10th Floor
           San Francisco, CA 94105

FAX NO:    (415) 394-9401
PHONE NO:  (415) 394-9400

FROM:      PAMELA Y. PRICE, ESQ.

RE:        Campbell v. National Passenger Railroad Corporation, et al.,
           U.S. District Court Case No. C05-5434 MJJ MEJ

           **TOTAL NUMBER OF PAGES, INCLUDING COVER SHEET:** __4__

TIME SENT: __11:30 a.m.__

ENCLOSED:  Letter from Pamela Y. Price dated March 20, 2007

IF YOU DO NOT RECEIVE ALL PAGES OF THIS TRANSMISSION, PLEASE CONTACT
DORETHA AT (510) 452-0292.

## * * CONFIDENTIALITY NOTICE * *

**The information contained in this facsimile communication may be protected by the attorney-client and/or the attorney work product privileges. The communication is intended only for the use of the individual or entity named above. The privileges are not waived by virtue of this communication having been sent by facsimile. If the person actually receiving this facsimile or any other reader of the facsimile is not the named recipient, or the employee or agent responsible to deliver it to the named recipient, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us by telephone, and**

R:\PYP\1147\FAX.OPC.wpd

# PRICE AND ASSOCIATES

### A PROFESSIONAL LAW CORPORATION

### RESPONSIBLE, RELIABLE & EXPERIENCED LEGAL SERVICES

THE LATHAM SQUARE BUILDING
1611 TELEGRAPH AVENUE, SUITE 1450
OAKLAND, CALIFORNIA 94612

VOICE: (510) 452-0292
FAX: (510) 452-5625
WEB ADDRESS: www.pypesq.com

March 20, 2007

**VIA EMAIL AND FACSIMILE**

Cara Ching-Senaha, Esq.
Kathleen Maylin, Esq.
Jackson Lewis LLP
199 Fremont Street, 10th Floor
San Francisco, CA 94105

      Re:    <u>Campbell v. National Railroad Passenger Corporation d/b/a Amtrak, et al,</u>
                U.S. District Court Case No. C05-5434 MJJ MEJ

Dear Counsel:

        I am writing regarding Defendant Amtrak's Answers to Interrogatories, Set No. 1, in an attempt to meet and confer prior to bringing a Motion to Compel. Specifically, I find that Defendant's Answers to Interrogatory No. 1 is deficient, and Defendant refused to answer Interrogatory Nos. 5, 6, 9 through 18.

        With respect to Defendant's Answer to Interrogatory No. 1, it appears that a restrictive interpretation of the term "complaint" informs the response. It was not our intent, however, to limit the Interrogatory to court cases. Evidence of other complaints against Amtrak would be highly relevant, and admissible under Rule 404 of the Federal Rules of Evidence. (*See Heyne v. Caruso,* 69 F.3d 1475, 1469-1481 (9th Cir. 1994); *Morgan v. National Passenger Railroad Corporation,* 232 F.3d 1008, 1018 (9th Cir. 2000), *affirmed in part and reversed in part on other grounds in National Railroad Passenger Corporation v. Morgan,* 536 U.S. 101, 122 S.Ct. 2061, 2074 (2002).) Please let me know whether you will agree to supplement Defendant's answer by providing information regarding internal and/or informal complaints.

        Plaintiff's Interrogatory Nos. 5 and 6, sought certain information about the racial composition of Amtrak's workforce in the Pacific Division. This information can be used to demonstrate the context and the environment in which Mr. Campbell was employed, and Amtrak's

Cara Ching-Senaha, Esq.
Kathleen Maylin, Esq.
Jackson Lewis LLP
March 20, 2007
Page -2-

hiring and termination practices. It has long been held that the Defendants' hiring and termination practices may be used to prove intentional discrimination. (*Stender v. Lucky's Stores*, 803 F.Supp. 259, 331-332 (N.D.Cal. 1992); *Estes v. Dick Smith Ford, Inc.*, 856 F.2d 1097 (8th Cir. 1988).) As you may know, in this District, discovery of this nature is routinely allowed.

Defendant's remaining objections to Interrogatory Nos. 9 through 18, with one exception, appear to be boilerplate objections, lacking in substance or meaningful consideration of the Interrogatory. As we pointed out in our pending motion to compel, such objections will not alone constitute a successful objection, nor will a general objection fulfill the objecting party's burden to explain its objections. (*Ramirez v. County of Los Angeles*, 231 F.R.D. 407, 409 (C.D.Cal. 2005).) General objections are not sufficient to raise any substantial, meaningful or enforceable objections to any particular discovery request. (*In re Air Crash at Taipei, Taiwan*, 211 F.R.D. 374, 376 (C.D.Cal. 2002); *Walker v. Lakewood Condominium Owners Association*, 186 F.R.D. 584, 587 (C.D.Cal. 1999); *Taylor v. Los Angeles Police Department*, 1999 WL 33101661 (C.D.Cal. 1999).)

It appears that the primary basis for Defendant's refusal to answer Interrogatory Nos. 9 through 18 is the assertion in Defendant's answers to Interrogatory Nos. 7 and 8 that " this interrogatory shall count as six separate interrogatories and that Plaintiff has exceeded the permissible number of interrogatories." Without a clear statement of the basis for this assertion, I can only presume that Defendant believes that the request to list the engineers by year creates subparts which should be counted separately. There is no authority which supports this assertion. In fact, the discovery rules are clear that when an Interrogatory addresses a single subject, it should be counted as a single Interrogatory, not subparts. (*Prochaska & Assocs. V. Merrill Lynch, Pierce,, Fenner & Smith, Inc.* (D NE 1993) 155 FRD 189, 191; *Safeco of America v. Rawstrom* (CD CA 1998) 181 FRD 441, 445).)

Please review this information as soon as possible and advise whether you will agree to supplement Defendant's answer to Interrogatory No. 1 and provide answers to Interrogatory Nos. 5, 6, 9 through 18 by 4:00 p.m. on March 21, 2007. Due to the short timeline previously stipulated to by the parties to resolve any discovery issues arising out of Defendant's discovery responses, we will need to have an answer by that time or file a Motion to Compel on these items. It is my understanding that you will be leaving for vacation today, however, I presume that another associate will be handling this case in your absence. Given everyone's limited availability, if you require additional time to reconsider your position, please let Doretha in my office know if you are amenable to extending the time for a motion to compel to the close of business this Friday, March 23rd.

Cara Ching-Senaha, Esq.
Kathleen Maylin, Esq.
Jackson Lewis LLP
March 20, 2007
Page -3-

       Thank you for your prompt attention to this matter. Please respond by letter or e-mail as soon as possible. I will only be able to check my e-mail later this afternoon or tomorrow morning due to other commitments.

Very truly yours

PRICE AND ASSOCIATES

/s/ *Pamela Y. Price*

PAMELA Y. PRICE

PYP/drh/1143/L205

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

CAMPBELL,
        Plaintiff,

v.

NATIONAL PASSENGER RAILROAD
CORPORATION ET AL,

        Defendants.
_____/

No. 05-05434 MJJ

**PRETRIAL ORDER**

It is hereby **ORDERED** pursuant to F.R.C.P. and the Local Rules of this Court:

**TRIAL DATE**: Monday, **July 23, 2007**  at 8:30 a.m., Courtroom 11, 19th floor.
TRIAL LENGTH is estimated to be   **10-25**  days. (**X**) jury  () court

PRETRIAL CONFERENCE DATE: Tuesday, **July 10, 2007**  at 3:30 p.m.
(Counsel who intend to try the case must attend the pretrial conference.  Counsel shall be prepared to discuss all aspects of the case, including settlement.  Pretrial to conform to the attached instructions.)

DISCOVERY LIMITS:

| | | | | | |
|---|---|---|---|---|---|
| Depositions: | Pltf. | <u>10</u> | Def. | <u>10</u> |
| Interrogs. | Pltf. | <u>30</u> | Def. | <u>30</u> |
| Doc. Req.: | Pltf. | <u>30</u> | Def. | <u>30</u> |
| Req. Adm.: | Pltf. | <u>-</u> | Def. | <u>-</u> |

(Per Federal Rules of Civil Procedure and Local Rules, subject to any  provisions below)

NON-EXPERT DISCOVERY CUTOFF is:     **2/16/2007**

DESIGNATION OF EXPERTS:    **2/25/2007**    Pltf.  **3**    Def:  **3**
    EXPERT REPORTS:        **3/2/2007**
    DESIGNATION OF SUPPLEMENTAL/REBUTTAL EXPERTS: **3/16/2007**
    SUPPLEMENTAL/REBUTTAL REPORTS:      **3/16/2007**
    Parties shall conform to Federal Rule of Civil Procedure 26(a)(2).

EXPERT DISCOVERY CUTOFF is:     **3/30/2007**

DISPOSITIVE MOTIONS SHALL be heard by:    **5/8/2007**

SETTLEMENT CONFERENCE shall be held before Magistrate **Judge James** and scheduled to
    take place    **June 2007**

FURTHER STATUS CONFERENCE:     at 2:00 p.m.

**ADDITIONAL ORDERS:**
<u>**Parties can stipulate to length of plaintiff's deposition.**</u>
<u>**Matter referred to ENE.**</u>

**PLAINTIFF IS ORDERED TO SERVE A COPY OF THIS ORDER ON ANY PARTY
SUBSEQUENTLY JOINED IN THIS ACTION.**

Dated:    **April 18, 2006**

                                      MARTIN J. JENKINS
                                      United States District Judge

United States District Court
For the Northern District of California

## PRETRIAL INSTRUCTIONS

Counsel SHALL meet and confer in good faith in advance of complying with the following pretrial requirements for the purpose of preparing for the Pretrial Conference and to discuss settlement.

### A.    20 CALENDAR DAYS PRIOR TO PRETRIAL CONFERENCE

The following shall be accomplished not later than **20 calendar days** prior to the scheduled Pretrial Conference:

1.    **PRETRIAL STATEMENT**:  The parties shall comply in all respects with FRCivP 16(c)(1)(2)(3)(4)(7)(13)(14)(15)(16)

2.    **JURY INSTRUCTIONS**:

a.    Joint Set of Agreed Upon Instructions:  The parties shall jointly prepare a set of agreed upon jury instructions, and shall file an original and two copies of same **20 calendar days** prior to the Pretrial Conference.

b.    Separate Instructions:  Separate instructions may be submitted only as to those instructions upon which the parties cannot agree.  Each separate instruction shall note on its face the identity of the party submitting such instruction.

No later than **10 calendar days** prior to the Pretrial Conference, the party or parties objecting to an instruction shall file a written objection to such instruction.  The form of the objection shall be as follows:

(1) Set forth in full the instruction to which the objection is made;

(2) Provide concise argument and citations to authority explaining why the opposing party's instruction is improper; and

(3) Set forth in full an alternative instruction, if any.

An original and two copies of the separate instructions with objections shall be filed **10 calendar days** prior to the Pretrial Conference.

c.    Substance and Format of Instructions:  The instructions shall cover all substantive issues.  Proposed instruction shall be consecutively numbered.  Each proposed instruction shall be typed in full on a separate page and cover only one subject, to be indicated in the title.  Citations to the authorities upon which the instruction is based shall be included.  Instructions shall be brief, clear, written in plain English and free of argument.  Pattern or form instructions shall be revised to address the particular facts and issues of this case.

d.    Preliminary Statement and Instructions:  If the parties wish to have a preliminary statement read to the jury, and/or preliminary instructions given to the jury, they shall jointly prepare and submit to the Court, **one week** prior to trial, the text of the statement and instructions, clearly marked.

e.    Clean Copies:  The parties shall be prepared to submit two clean copies of instructions without citations, titles or attribution on or before the date trial commences.

3.    **FINDINGS OF FACT and CONCLUSIONS OF LAW**:  In non-jury cases, each party shall serve and lodge with the Court proposed findings of fact and conclusions of law on all material issues.  Proposed findings shall be brief, written in plain English and free of pejorative language and argument.

2

4.    **EXHIBITS**:

a.    <u>Provide Copies of Exhibits to Other Parties</u>:  Each party shall provide every other party with one set of all proposed exhibits, charts, schedules, summaries, diagrams and other similar documentary materials to be used in its case in chief at trial, together with a complete list **(see attached)** of all such proposed exhibits.  Voluminous exhibits shall be reduced by elimination of irrelevant portions or through the use of summaries.  Each item shall be <u>pre-marked with an exhibit sticker</u> **(see attached)**, plaintiff's exhibits with numbers, defendant's exhibits with letters.  If there are numerous exhibits, they should be provided in three-ring binders with marked tab separators.  All exhibits which have not been provided as required are subject to exclusion.

b.    <u>Stipulations re Admissibility</u>:  Prior to the Pretrial Conference, the parties shall make a good faith effort to stipulate exhibits into evidence and be prepared to place their admission on the record at the Pretrial Conference.  If stipulation to admission in evidence is not possible, the parties shall make every effort to stipulate to authenticity and foundation absent a legitimate (not tactical) objection.

c.    <u>Provide Copies of Exhibits to Court</u>:  One set of exhibits shall be provided to the Court on the **one week prior to trial.**.  Each set shall be in binders, tabbed and indexed.

d.    <u>Disposition of Exhibits After Trial</u>:  Upon the conclusion of the trial, each party shall retain its exhibits through the appellate process.  It is each party's responsibility to make arrangements with the Clerk of the Court to file the record on appeal.

5.    **WITNESSES**:

a.    <u>Jury Trials</u>:  The Pretrial Conference Statement shall include a witness list required by FRCivP 16(c)(7).  Expert witnesses shall be listed separately.  In addition, in the case of expert witnesses, the summary shall **clearly state the expert's theories and conclusions and the bases therefor and SHALL be accompanied by a curriculum vitae**; if the expert has prepared a report in preparation for the testimony, a copy thereof shall be furnished to opposing counsel.  Witnesses not included on the list may be excluded from testifying.

b.    <u>Non-Jury Trials</u>:  In non-jury cases, each party shall serve and lodge with the Court a written <u>narrative statement</u> of the proposed direct testimony of each witness under that party's control in lieu of a summary.  Each statement shall be marked as an exhibit and shall be in a form suitable to be received into evidence.

6.    **MOTIONS IN LIMINE**:  Motions in limine are limited to motions to exclude specific items of evidence (i.e. specific testimony or exhibits) on a ground and upon such authority as would be sufficient to sustain an objection to such evidence at trial.  Motions in limine shall be filed and served no later than **ten Court days** prior to the date set for the pretrial conference.  Any party opposing such a motion in limine shall file and serve its opposition papers no later than **five Court days** prior to the pretrial conference.  No reply papers will be considered.

**B.    10 COURT DAYS PRIOR TO PRETRIAL CONFERENCE**

The following shall be accomplished not later than **10 Court days** prior to the Pretrial Conference:

1.    <u>List of Exhibits With Stipulations and Objections</u> - The parties shall file with the Court a list of all exhibits admitted by stipulation; and a list of all exhibits as to which objections have been made, with a brief notation indicating which party objects and for what reason.

2.    <u>Objections to Other Evidence</u> - In addition to exhibit lists, counsel shall confer with respect to any other evidentiary objections in advance of the Pretrial Conference as required by Local Rule.  Each party shall file and serve a statement briefly identifying each item objected to, the grounds for the objection and the position of the offering party as stated at the conference.

3

3.      <u>Voir Dire and Verdict Forms</u> - Each party shall serve and file proposed questions for jury voir dire and a proposed form of verdict.

## C.      **OTHER PRETRIAL MATTERS**

1.      <u>Citations</u> - In all Pretrial Statements, memoranda of points and authorities and jury instructions, citations shall be as follows:  (1) all United States Supreme Court citations shall be to both the official reporter and to the <u>West Supreme Court Reporter</u>, (2) all citations to California state courts shall be to both the official reporter and to the <u>West California Reporter</u>, and (3) all citations to the courts of any other state shall be to both the official reporter of that state and to the <u>West Regional Reporter</u>.

2.      <u>Settlement Conferences</u> - Any party utilizing another form of Alternative Dispute Resolution who wishes to arrange a settlement conference before a judge or magistrate judge thereafter may do so by contacting the Courtroom Deputy.

3.      <u>Copies</u> - Unless otherwise indicated, each document filed or lodged with the Court must be accompanied by a copy for use in the Judge's chambers.  In addition, one copy of the witness and exhibit lists should be furnished to the court reporter.

4.      <u>Daily Transcripts</u> - If transcripts will be requested during or immediately after trial, arrangements must be made with the court reporter at least **one week** before trial commences.

Attachments

4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

CASE NO. C-                MJJ                                    DATE:

_____ v. _____              EXHIBIT LIST

(  ) Plaintiff                                        (  ) Defendant

| EXHIBIT NUMBER | MARKED | ADMITTED | SPONSORING WITNESS | DESCRIPTION |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

Case No.

**PLNTF** Exhibit No. _____

Date Entered _____

Signature _____

Case No.

**DEFT** Exhibit No. _____

Date Entered _____

Signature _____

---

Case No.

**PLNTF** Exhibit No. _____

Date Entered _____

Signature _____

Case No.

**DEFT** Exhibit No. _____

Date Entered _____

Signature _____

---

Case No.

**PLNTF** Exhibit No. _____

Date Entered _____

Signature _____

Case No.

**DEFT** Exhibit No. _____

Date Entered _____

Signature _____

---

Case No.

**PLNTF** Exhibit No. _____

Date Entered _____

Signature _____

Case No.

**DEFT** Exhibit No. _____

Date Entered _____

Signature _____

---

Case No.

**PLNTF** Exhibit No. _____

Date Entered _____

Signature _____

Case No.

**DEFT** Exhibit No. _____

Date Entered _____

Signature _____

---

Case No.

**PLNTF** Exhibit No. _____

Date Entered _____

Signature _____

Case No.

**DEFT** Exhibit No. _____

Date Entered _____

Signature _____

---

Case No.

**PLNTF** Exhibit No. _____

Date Entered _____

Signature _____

Case No.

**DEFT** Exhibit No. _____

Date Entered _____

Signature _____