1  KATHLEEN MAYLIN (SBN (SBN 155371)
   CARA CHING-SENAHA (SBN 298467)
2  JACKSON LEWIS LLP
   199 Fremont Street, 10th Floor
3  San Francisco, California 94105
   Telephone: (415) 394-9400
4  Facsimile: (415) 394-9401

5  Attorneys for Defendants
   NATIONAL RAILROAD PASSENGER
6  CORPORATION dba AMTRAK and JOE DEELY

7

8                  UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11 JOHN EARL CAMPBELL,                    Case No. C05-05434 MJJ

12              Plaintiff,                **NOTICE OF ERRATA TO
                                          DECLARATION OF CARA CHING-
13     v.                                 SENAHA IN SUPPORT OF
                                          DEFENDANTS' NATIONAL
14                                        RAILROAD PASSENGER
   NATIONAL RAILROAD PASSENGER            CORPORATION'S AND JOE DEELY'S
15 CORPORATION dba AMTRAK, JOE DEELY,     MOTION FOR SUMMARY
   and DOES 1-15, inclusive,              JUDGMENT, OR IN THE
16                                        ALTERNATIVE, SUMMARY
              Defendants.                 ADJUDICATION**
17

18                                        Date:      May 8, 2007
                                          Time:      9:30 a.m.
19                                        Courtroom: 11
                                          Floor:     19
20                                        Judge:     The Hon. Martin J. Jenkins

21                                        Complaint Filed:    12/30/05
                                          FAC Filed:          2/23/06
22                                        Trial Date:         7/23/2007

23                                        **[Fed.R.Civ.Proc. 56]**

24

25 TO THE ABOVE-ENTITLED COURT, PLAINTIFF JOHN CAMPBELL AND HIS

26 COUNSEL OF RECORD:

27      The Declaration of Cara Ching-Senaha submitted in support of the Motion for Summary

28 Judgment of Defendants NATIONAL RAILROAD PASSENGER CORPORATION aka

                                    1

1   AMTRAK and JOE DEELY, duly electronically filed with Defendants' moving papers on April

2   3, 2007, included attached exhibits consisting of deposition transcript excerpts, of which pertinent

3   excerpts were highlighted.    The electronic filing of the document resulted in the highlighted

4   portions of the excerpts appearing heavily shaded when the document is retrieved from the Pacer

5   electronic document system, and thus the testimony is difficult if not impossible to read.

6   Defendants come now and resubmit the Ching-Senaha Declaration with the highlighted transcript

7   portions replaced with underlined or bracketed excerpts which will not compromise the

8   readability of the transcript excerpts.

9

10                              Respectfully Submitted,

11  Date:  April 17, 2007          JACKSON LEWIS LLP

12

13                         By:    _____
                                  KATHLEEN MAYLIN
14                                CARA CHING-SENAHA
                                  Attorneys for Defendants
15                                NATIONAL RAILROAD PASSENGER
                                  CORPORATION dba AMTRAK and JOE
16                                DEELY

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF ERRATA TO DEC OF CARA CHING-SENAHA ISO DEFS' NATIONAL RAILROAD
PASSENGER CORPORATION'S AND JOE DEELY'S MSJ, OR SA        Case No. C05-05434 MJJ

1    KATHLEEN MAYLIN (SBN (SBN 155371)
     CARA CHING-SENAHA (SBN 298467)
2    JACKSON LEWIS LLP
     199 Fremont Street, 10th Floor
3    San Francisco, California 94105
     Telephone: (415) 394-9400
4    Facsimile: (415) 394-9401

5    Attorneys for Defendants
     NATIONAL RAILROAD PASSENGER
6    CORPORATION dba AMTRAK and JOE DEELY

7

8                          UNITED STATES DISTRICT COURT

9                         NORTHERN DISTRICT OF CALIFORNIA

10

11   JOHN EARL CAMPBELL,                      Case No. C05-05434 MJJ

12                 Plaintiff,                 **DECLARATION OF CARA CHING-
                                              SENAHA IN SUPPORT OF
13                                            DEFENDANTS' NATIONAL
            v.                                RAILROAD PASSENGER
14                                            CORPORATION'S AND JOE DEELY'S
     NATIONAL RAILROAD PASSENGER              MOTION FOR SUMMARY
15   CORPORATION dba AMTRAK, JOE DEELY,       JUDGMENT, OR IN THE
     and DOES 1-15, inclusive,                ALTERNATIVE, SUMMARY
16                                            ADJUDICATION**

17                 Defendants.                [Notice of Motion, Memorandum of Points
                                              and Authorities, and Declarations in
18                                            Support of Motion concurrently filed]

19
                                              Date:          May 8, 2007
20                                            Time:          9:30 a.m.
                                              Courtroom:     11
21                                            Floor:         19
                                              Judge:         The Hon. Martin J. Jenkins
22
                                              Complaint Filed:    12/30/05
23                                            FAC Filed:          2/23/06
                                              Trial Date:         7/23/2007
24
                                              [Fed.R.Civ.Proc. 56]
25

26   I, Cara Ching-Senaha, declare on the basis of personal knowledge:

27          1.     I am an attorney with the law firm of Jackson Lewis LLP, counsel of record for

28   Defendants NATIONAL RAILROAD PASSENGER CORPORATION dba AMTRAK and JOE

                                              1

1   DEELY.  I am licensed to practice law in the above-referenc      rt.  I make the

2   following statements based on personal knowledge.

3          2.      I have reviewed in its entirety the transcript for Mr. John Campbell's deposition,

4   taken February 26, 2007.  Attached hereto as <u>Exhibit A</u> are true and correct copies of select pages

5   from Mr. Campbell's deposition and select deposition exhibits, as referenced in Defendants'

6   Memorandum of Points and Authorities.

7          3.      I have reviewed in its entirety the transcript for Susan Venturelli's deposition,

8   taken March 23, 2007.  Attached hereto as <u>Exhibit B</u> are true and correct copies of select pages

9   from Ms. Venturelli's deposition, as referenced in Defendants' Memorandum of Points and

10  Authorities.

11         4.      I have reviewed in its entirety the transcript for Joseph Deely's deposition, taken

12  February 15, 2007.  Attached hereto as <u>Exhibit C</u> are true and correct copies of select pages from

13  Mr. Deely's deposition, as referenced in Defendants' Memorandum of Points and Authorities.

14         Executed this 3rd day of April, 2007 in San Francisco, California.  I declare under penalty

15  of perjury under the laws of California and the United States of America that the foregoing is true

16  and correct.

17

18                                          _Cara Ching_
19                                          CARA CHING-SENAHA

20

21

22

23

24

25

26

27

28

DECL. OF CARA CHING-SENAHA ISO DEF. NAT'L RAILROAD'S NOTICE OF MOT. & MOT. FOR SUMM. J. AND PARTIAL SUMM J.

# EXHBIT A; PT. 1



1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3               ---oOo---

4    JOHN EARL CAMPBELL,          )
                                  )
5              Plaintiff,         )
                                  )
6    vs.                          )    No. C05-05434 MJJ
                                  )
7    NATIONAL RAILROAD PASSENGER  )
     CORPORATION dba AMTRAK, JOE  )
8    DEELY and DOES 1 through 15  )
     inclusive,                   )
9                                 )
               Defendants.        )
10   _____)

**CERTIFIED COPY**

J|G  Jane GROSSMAN
R|S  REPORTING Services

11

12

13

14

15        DEPOSITION OF JOHN EARL CAMPBELL

16             February 26, 2007

17

18

19

20        Taken by SHARON TRUJILLO

21             CSR No. 6120

22

23

24     JANE GROSSMAN REPORTING SERVICES
       1939 Harrison Street, Suite 460
25        Oakland, California 94612
              510.444.4500

DEPOSITION OF JOHN EARL CAMPBELL

1

1    lawsuit, sir, that you've been discriminated against          12:00:11

2    because of your race?

3        A.    No.

4        Q.    Have you ever claimed, sir, that you've been

5    dis- -- I'm sorry, harassed because of your race?              12:00:20

6        A.    No.

7        Q.    Have you ever claimed, prior to this lawsuit,

8    that you have been retaliated against?

9        A.    No.

10       Q.    Have you ever seen a healthcare provider for        12:00:33

11   any psychological problems?

12       A.    No.

13       Q.    And then when I say "healthcare provider," I

14   mean counselor, therapist, you know -- heavens, it could

15   even be your pastor, minister, someone who provides           12:00:49

16   mental health counseling.

17       A.    No.

18           MS. PRICE:   I'm going to object as overbroad

19   and vague.

20           MS. MAYLIN:   Q.   Have you ever complained to a      12:01:04

21   medical doctor or healthcare provider that you are

22   having psychological problems?

23       A.    No.

24       Q.    Have you ever been subjected to someone using

25   racial slurs or offensive language towards you?               12:01:28

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | A.    Yes. | 12:01:34 |
| 2 | Q.    How many times? | |
| 3 | A.    I haven't counted, but many, many times. | |
| 4 | Q.    Okay.  How about in the work context, has that | |
| 5 | ever happened? | 12:01:47 |
| 6 | A.    Not to my face. | |
| 7 | Q.    Okay.  Okay.  So you've never heard it | |
| 8 | yourself; is that fair to say? | |
| 9 | A.    No.  Yes. | |
| 10 | Q.    Sir, have you ever been fired before, other | 12:02:11 |
| 11 | than from Amtrak? | |
| 12 | A.    No. | |
| 13 | Q.    Why did you leave Southern Pacific? | |
| 14 | A.    After the lawsuit was settled, part of the | |
| 15 | settlement was, you know, that I leave.  It wasn't | 12:02:26 |
| 16 | termination.  It was just part of the settlement. | |
| 17 | Q.    And I suspect that you also agreed not to ever | |
| 18 | reapply for employment; is that true? | |
| 19 | A.    At Southern Pacific, yes. | |
| 20 | Q.    Were you a member of a union at Southern | 12:02:41 |
| 21 | Pacific? | |
| 22 | A.    Yes. | |
| 23 | Q.    Which union is that? | |
| 24 | A.    Brotherhood of Maintenance Subways. | |
| 25 | Q.    Did you ever belong to that union again? | 12:02:53 |

DEPOSITION OF JOHN EARL CAMPBELL

35

| | | |
|---|---|---|
| 1 | A.    No. | 12:02:55 |
| 2 | Q.    And as a member of that union, you were able | |
| 3 | to file a grievance if you ever felt that you were being | |
| 4 | treated unfairly, correct? | |
| 5 | A.    Yes. | 12:03:04 |
| 6 | Q.    Did you ever file any grievances while you | |
| 7 | were at Southern Pacific? | |
| 8 | A.    No. | |
| 9 | Q.    Did you ever feel that you were treated | |
| 10 | unfairly while you worked at Southern Pacific? | 12:03:10 |
| 11 | A.    No. | |
| 12 | Q.    Do you have any understanding, sir, as to why | |
| 13 | Southern Pacific wanted you to leave your job as a | |
| 14 | condition of the settlement agreement? | |
| 15 | A.    They wasn't sure my back was 100 percent | 12:03:30 |
| 16 | well. | |
| 17 | Q.    That was your understanding? | |
| 18 | A.    Yes. | |
| 19 | Q.    Did you have any other understanding? | |
| 20 | A.    No. | 12:03:46 |
| 21 | Q.    What were your duties at Southern Pacific? | |
| 22 | A.    Track laborer. | |
| 23 | Q.    What does that mean? | |
| 24 | A.    Basically, hard manual labor. | |
| 25 | Q.    And when you say "track," meaning on the | 12:04:02 |

DEPOSITION OF JOHN EARL CAMPBELL

36

1     tracks?

                                                                                12:04:04

2          A.     Yes.

3          Q.     Could you give me maybe a paragraph as to what

4     you would do on a daily basis?

5          A.     If something derailed, track laborers would be          12:04:11

6     one of the ones that fixed it.  We repaired any damage

7     to the track.  Replace ties.  Replace rail.  Basically,

8     hard, grueling work.

9          Q.     Heavy lifting?

10         A.     Exactly.          12:04:30

11         Q.     Did you use machinery as well?

12         A.     Yes.

13         Q.     What type of machinery did you use?

14         A.     Backhoe.  Tamper.  End loaders.  Dump truck.

15    Tie handlers.  Scaffolder.  Spike -- spike -- there's          12:04:40

16    numerous.  I could -- I can't think of nothing else, but

17    it's numerous machines.

18         Q.     Okay.  How long did you work at Southern

19    Pacific?

20         A.     Eight years.          12:05:03

21         Q.     While you were there, sir, had you ever been

22    subjected to discipline?

23         A.     No.

24         Q.     Okay.

25                MS. MAYLIN:   What I'd like to do is mark as          12:05:16

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | Q.   What position did you apply for? | 12:09:06 |
| 2 | A.   Assistant conductor. | |
| 3 | Q.   Okay.  And did you eventually interview for | |
| 4 | the position? | |
| 5 | A.   Yes. | 12:09:22 |
| 6 | Q.   Okay.  Who did you interview with? | |
| 7 | A.   Denise Sargeant, Tom Oughton, and Dan Johnson. | |
| 8 | Q.   And I understand you were hired? | |
| 9 | A.   Yes. | |
| 10 | Q.   Okay.  What was your starting salary, sir? | 12:09:43 |
| 11 | A.   Nine thirty an hour. | |
| 12 | Q.   And did you join the union at that time? | |
| 13 | A.   After 90 days, yes. | |
| 14 | Q.   Which union did you join? | |
| 15 | A.   The UTU. | 12:09:59 |
| 16 | Q.   And what was your -- I'm sorry.  What were | |
| 17 | your job duties as an assistant conductor? | |
| 18 | A.   Basically, I help passengers on and off the | |
| 19 | train, take tickets, make sure of the safe operation of | |
| 20 | the train I was assigned to. | 12:10:21 |
| 21 | Q.   No hard labor I take it? | |
| 22 | A.   No. | |
| 23 | Q.   And, sir, you mentioned safe operation of the | |
| 24 | trains.  Did you have a -- a handbook or a guideline | |
| 25 | that you had to follow as far as safety regulations? | 12:10:41 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | A.    Yes. | 12:10:44 |
| 2 | Q.    Okay.  How many booklets or handbooks did you | |
| 3 | have, do you recall? | |
| 4 | A.    Five. | |
| 5 | Q.    Do you recall the names of those books? | 12:10:53 |
| 6 | A.    I -- ATM (sic) -- AMT, Amtrak Safety Book. | |
| 7 | Union Pacific Special Instruction.  Union Pacific | |
| 8 | Timetable.  BNSF Special Instruction.  BNSF Timetable. | |
| 9 | Q.    Okay.  And it was your job to understand the | |
| 10 | safety rules in those five books? | 12:11:20 |
| 11 | A.    Correct. | |
| 12 | Q.    Okay.  All right.  Let's see, here.  So when | |
| 13 | was it that you were initially hired, sir? | |
| 14 | A.    September of '98. | |
| 15 | Q.    Okay.  How long did you remain in the position | 12:11:36 |
| 16 | of assistant conductor? | |
| 17 | A.    One year. | |
| 18 | Q.    So to September '99? | |
| 19 | A.    Yes. | |
| 20 | Q.    Who was your supervisor at that time? | 12:11:46 |
| 21 | A.    Tom Oughton and Mark Schulthies. | |
| 22 | Q.    I'm sorry? | |
| 23 | A.    Mark Schulthies. | |
| 24 | Q.    What were their positions, if you know? | |
| 25 | A.    One was road foreman of engines.  I don't know | 12:12:07 |

DEPOSITION OF JOHN EARL CAMPBELL

42

| | | |
|---|---|---|
| 1 | at that site? | 12:16:30 |
| 2 | A.    The boss of the crew, not of the yard. | |
| 3 | Q.    Got it.  Got it.  Okay.  All right.  And did | |
| 4 | you get that position, Mr. Campbell? | |
| 5 | A.    The first time, no. | 12:16:39 |
| 6 | Q.    Did you have an understanding as to why you | |
| 7 | didn't get that position? | |
| 8 | A.    Someone with more seniority bidded on it. | |
| 9 | Q.    Okay.  So you didn't have a problem with that, | |
| 10 | did you? | 12:16:54 |
| 11 | A.    No.  Seniority based, no problem. | |
| 12 | Q.    Okay.  All right.  And when -- did you | |
| 13 | continue after that, then, working the extra boards? | |
| 14 | A.    No.  I became the assistant yard conductor | |
| 15 | after that. | 12:17:09 |
| 16 | Q.    How did you acquire that job? | |
| 17 | A.    I bidded on it. | |
| 18 | Q.    Okay.  Can you give me a month and year? | |
| 19 | A.    Not -- I can't narrow it down to exact -- but | |
| 20 | it was 1999, thereabouts. | 12:17:30 |
| 21 | Q.    Okay.  Who was your supervisor then? | |
| 22 | A.    I think it's still Oughton, Schulthies. | |
| 23 | Q.    Okay.  What was your shift? | |
| 24 | A.    First part it was the swing shift, which is | |
| 25 | 4 p.m. to 2 a.m. | 12:17:53 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | Q.    Okay. | 12:17:58 |
| 2 | A.    And several months later I got the 10 p.m. to | |
| 3 | 6 a.m. midnight yard. | |
| 4 | Q.    Okay.  Did your pay change when you got that | |
| 5 | position? | 12:18:11 |
| 6 | A.    No. | |
| 7 | Q.    Okay.  So you were still making nine thirty an | |
| 8 | hour? | |
| 9 | A.    No.  Nine thirty an hour is for class when | |
| 10 | they're training us.  After 90 days it went up to like | 12:18:22 |
| 11 | 17 bucks. | |
| 12 | Q.    Oh.  Okay.  All right.  So the same pay, | |
| 13 | though, for an assistant yard conductor as an assistant | |
| 14 | conductor? | |
| 15 | A.    An assistant conductor on the road make a | 12:18:35 |
| 16 | little more than a yard conductor.  The -- the hourly | |
| 17 | rate is the same, but we get other things, like being | |
| 18 | away from home for more than three or four hours.  Stuff | |
| 19 | like that.  Little things that makes it more.  The yard | |
| 20 | conductor is just a flat hourly rate. | 12:18:56 |
| 21 | Q.    Okay.  All right.  Okay.  So in '99, you're | |
| 22 | the assistant yard conductor.  You have the same | |
| 23 | supervisors.  Did your job change after that time? | |
| 24 | A.    I became a yard conductor maybe a year later, | |
| 25 | 2000. | 12:19:23 |

DEPOSITION OF JOHN EARL CAMPBELL

48

| | | |
|---|---|---|
| 1 | Q.   Okay.   Prior to -- so you put a bid on a yard | 12:19:31 |
| 2 | conductor job? | |
| 3 | A.   Exactly. | |
| 4 | Q.   Okay.   Prior to that time in 2000 -- by the -- | |
| 5 | oh, before I ask that, do you recall the month in  2000? | 12:19:40 |
| 6 | A.   No.   I do not. | |
| 7 | Q.   Okay.   Prior to putting a bid on a yard | |
| 8 | conductor job, though, in 2000, had you bid on any other | |
| 9 | jobs, or applied for any other jobs, other than what | |
| 10 | you've testified to? | 12:19:55 |
| 11 | A.   I applied for the train engineer's job. | |
| 12 | Q.   Okay.   And when did you do that? | |
| 13 | A.   October of '98. | |
| 14 | Q.   How are you sure about the date, sir? | |
| 15 | A.   Because I only been there a month, and my | 12:20:11 |
| 16 | supervisor, Mark Schulthies, saw me moving the | |
| 17 | locomotive around the yard, and he was just surprised I | |
| 18 | was -- I just got hired, and he didn't know I knew how | |
| 19 | to do that, so he gave me an application for a train | |
| 20 | engineer. | 12:20:29 |
| 21 | Q.   And that was in October '98? | |
| 22 | A.   Uh-huh. | |
| 23 | Q.   That's a yes? | |
| 24 | A.   Yes. | |
| 25 | Q.   And, sir, was it within proper Amtrak protocol | 12:20:35 |

DEPOSITION OF JOHN EARL CAMPBELL

49

1      Q.    Now, when you say "you mail it in or fax it

2    in," who do you send it to?

3      A.    '98 you send it to L.A. human resources.

4      Q.    L.A.?

5      A.    Yeah.   That's where human resources was at the

6    time.

7      Q.    Okay.  So even for a position in Oakland you

8    have to send your application to L.A.?

9      A.    Yes.

10      Q.    All right.  And you knew that in 1998 even?

11      A.    Oh, yes.

12      Q.    Okay.  How long was it that you would have to

13    send an application to L.A. in order to apply for an

14    engineer position in Oakland?

15            MS. PRICE:  Objection.  Vague.

16            THE WITNESS:  The way it worked back then,

17    every six months they would put up a bulletin for

18    engineers, and every six months I would apply.

19            MS. MAYLIN:  Q.  Okay.  So as far as you can

20    recall, sir, was that the practice, as far as sending

21    the application to L.A.?

22      A.    Yes.

23      Q.    All the way through 2004?

24      A.    Yes.

25      Q.    Okay.  All right.  So let's go back to the --

DEPOSITION OF JOHN EARL CAMPBELL

52

|    |                                                                          |          |
|----|--------------------------------------------------------------------------|----------|
| 1  | October '98.  Sir, you say that you applied for an                       | 12:24:06 |
| 2  | engineer position in October 1998; is that right?                        |          |
| 3  | A.    Uh-huh.                                                             |          |
| 4  | Q.    Okay.  That's a yes?                                                |          |
| 5  | A.    Yes.                                                                | 12:24:17 |
| 6  | Q.    Okay.  So did you fax in your application to                        |          |
| 7  | the L.A. human resources?                                                 |          |
| 8  | A.    No.  The very first time, I gave it back to                        |          |
| 9  | Mr. Schulthies, the supervisor that gave it to me, after                 |          |
| 10 | I filled it out.                                                         | 12:24:32 |
| 11 | Q.    Why did you do that if you knew that you had                       |          |
| 12 | to fax or mail it to L.A. HR?                                            |          |
| 13 | A.    Well, the first time he was going to write a                       |          |
| 14 | recommendation, which add a little weight, so that's why                 |          |
| 15 | I gave it back to him.                                                   | 12:24:47 |
| 16 | Q.    Okay.  Did he give it back to you with a                           |          |
| 17 | recommendation?                                                          |          |
| 18 | A.    No.  He said his boss, Tom Oughton, tore it up                     |          |
| 19 | and threw it in the trash.                                              |          |
| 20 | Q.    Okay.  Mark Schulthies told you that?                             | 12:24:59 |
| 21 | A.    Yes.                                                                |          |
| 22 | Q.    When did Mark tell you that?                                       |          |
| 23 | A.    He said Tom wanted me to be there a whole year                    |          |
| 24 | before I become an engineer.                                            |          |
| 25 | MS. PRICE:  She said, when did he tell you.                               | 12:25:11 |

DEPOSITION OF JOHN EARL CAMPBELL

53

| | | |
|---|---|---|
| 1 | Do you have the date? | 12:25:12 |
| 2 | THE WITNESS:  Oh.  Say, the first week of | |
| 3 | '98. | |
| 4 | MS. MAYLIN:  Q.  So Mark told you that Tom | |
| 5 | said you have to be there a year? | 12:25:17 |
| 6 | A.    Uh-huh. | |
| 7 | Q.    That's a yes? | |
| 8 | A.    Yes. | |
| 9 | Q.    Okay.  You got to use -- use words, | |
| 10 | Mr. Campbell.  All right. | 12:25:23 |
| 11 | Did you ever have a discussion yourself with | |
| 12 | Tom about your application? | |
| 13 | A.    No. | |
| 14 | Q.    Did you ever have a discussion with anybody | |
| 15 | else about your application in October '98? | 12:25:31 |
| 16 | A.    No. | |
| 17 | Q.    Okay.  Did you go get another application, | |
| 18 | fill it out, and fax or mail it to L.A.? | |
| 19 | A.    Not at that time, no. | |
| 20 | Q.    So is it fair to say that that was the end of | 12:25:43 |
| 21 | your application process at that time? | |
| 22 | A.    Yes. | |
| 23 | Q.    Okay.  All right.  And you actually | |
| 24 | volunteered to me a moment ago that there's a policy | |
| 25 | that -- to apply for an engineer position you have to be | 12:25:57 |

DEPOSITION OF JOHN EARL CAMPBELL

54

| | | |
|---|---|---|
| 1 | with Amtrak a year, correct? | 12:26:02 |
| 2 | A.    Correct. | |
| 3 | Q.    How did you first learn that? | |
| 4 | A.    I think they told it to us in class, when we | |
| 5 | got hired. | 12:26:12 |
| 6 | Q.    Oh, okay.  Do you recall who that was? | |
| 7 | A.    Tom Oughton. | |
| 8 | Q.    All right.  Did you ever hear to the contrary | |
| 9 | that that was not a policy? | |
| 10 | A.    No. | 12:26:23 |
| 11 | Q.    Okay.  Did you ever hear, Mr. Campbell, that | |
| 12 | there had been someone hired for an engineer position | |
| 13 | internally at Amtrak who had not been there a year prior | |
| 14 | to being hired? | |
| 15 | A.    Not at that time, but recently, yes. | 12:26:38 |
| 16 | Q.    Okay.  And what did you hear recently about | |
| 17 | that? | |
| 18 | A.    There's a list of name (sic) of people that | |
| 19 | been there -- there's a list of the year that Amtrak | |
| 20 | engineers know, and I have a list, but I don't have it | 12:26:52 |
| 21 | with me. | |
| 22 | Q.    Where is the list, sir? | |
| 23 | A.    At home. | |
| 24 | Q.    Okay.  Well, can you recall anybody's name who | |
| 25 | you believe was at Amtrak less than a year, but then was | 12:27:09 |

DEPOSITION OF JOHN EARL CAMPBELL

55

```
 1   hired into an engineer position?
 2         A.    Brice.  Howard.  Jason Garman.
 3         Q.    Price (sic).  Howard.  I'm sorry?
 4         A.    Brice.
 5         Q.    Oh, Brice.  Howard.
 6         A.    Jason Garman.
 7         Q.    Garman?
 8         A.    Uh-huh.  I know there are 34 names on this
 9   list, but I can't go down all of them.
10         Q.    Okay.  So you claim that there are 34 people
11   that you know that were at Amtrak less than a year, but
12   hired into an engineer position?
13         A.    Yes.
14         Q.    Okay.  Do you know Mr. Brice (sic)?
15         A.    Yes.
16         Q.    And do you know Mr. Howard?
17         A.    Yes.
18         Q.    Do you know Mr. Garman?
19         A.    Yes.
20         Q.    Can you think of any others of the 34?
21         A.    Not off the top of my head.
22         Q.    Sir, what race is Mr. Brice (sic)?
23         A.    He's -- I'm going to say he's white and
24   Chinese.  I know he's bi-racial because his dad is
25   bi-racial.
```

DEPOSITION OF JOHN EARL CAMPBELL

1      Q.   Okay.  As far as you can tell, he's Caucasian

2   and Asian?

3      A.   Yes.

4      Q.   Okay.  And what race is Mr. Howard?

5      A.   White.

6      Q.   And what race is Mr. Garman?

7      A.   White.

8      Q.   Okay.  And do you know the other 34

9   individuals, sir?

10     A.   All of them are white.

11     Q.   Except for Mr. Brice (sic)?

12     A.   Yes.

13     Q.   But, I mean, my question was:  Do you know

14  them personally?

15     A.   Yes.  Most of them are out of the Oakland crew

16  base.  I trained all these people.

17     Q.   Okay.  And how do you know, sir, that they --

18  that Mr. Brice (sic) worked for less than a year at

19  Amtrak prior to being an engineer?

20     A.   Because I trained him as a conductor in San

21  Francisco, and within nine months he was gone to -- back

22  East to become an engineer.

23     Q.   Okay.  I thought that you had told me earlier

24  that you only worked at the Oakland site.  Did you also

25  work in San Francisco?

DEPOSITION OF JOHN EARL CAMPBELL

```
1    AFTERNOON SESSION                         1:27 P.M.    12:30:56

2

3              EXAMINATION BY MS. MAYLIN (Resumed)

4

5              THE VIDEOGRAPHER:  We are back on the record.    01:27:18

6    It is 1:27.

7              MS. MAYLIN:  Okay.  What I marked here as

8    Exhibit 2 is a -- let's see, one, two -- four-page

9    document, Bates-stamped D10282 through 285.

10                        (Whereupon, Defendants' Exhibit No.    01:27:43

11                         2 was marked for identification.)

12              MS. MAYLIN:  Q.  There you go, Mr. Campbell.

13    Mr. Campbell, this appears to be your application for

14    employment with Amtrak; is that correct?

15         A.    Yes.                                           01:27:52

16         Q.    Okay.  And that is your signature at the

17    bottom of the first page?

18         A.    Yes.

19              MS. PRICE:  Counsel, before we go on,

20    Mr. Campbell has two items of information he needs to     01:28:01

21    clarify.

22              Go ahead.

23              THE WITNESS:  My job insurance only lasted a

24    year, not two years.  And the second year I cashed in my

25    401K and my savings, so that's -- so that's -- that --    01:28:16
```

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | MS. PRICE:  Same objection.  Calls for a legal | 01:31:39 |
| 2 | conclusion, and I'm -- it's also argumentative and | |
| 3 | misstates the witness's testimony. | |
| 4 | THE WITNESS:  No. | |
| 5 | MS. MAYLIN:  Q.  Mr. Campbell, you filed a | 01:32:01 |
| 6 | couple of administrative charges with the EEOC and DFEH. | |
| 7 | Do you recall that? | |
| 8 | A.   Yes. | |
| 9 | Q.   Let's see what I did with them.  Here we go. | |
| 10 | Okay.  How many charges did you file, that you can | 01:32:20 |
| 11 | recall? | |
| 12 | A.   Two. | |
| 13 | Q.   Two? | |
| 14 | A.   Yes. | |
| 15 | Q.   All right.  Were they both with the EEOC or | 01:32:28 |
| 16 | with the DFEH, or one each, or do you recall? | |
| 17 | A.   I think they were both with the EEOC. | |
| 18 | Q.   All right.  Well, I'll give you the one that I | |
| 19 | have as being the first one, and I'll see if that's | |
| 20 | true.  What I'm marking as Exhibit 3 is a one-page | 01:32:49 |
| 21 | document, Bates-stamped D09919.  Here you go. | |
| 22 | (Whereupon, Defendants' Exhibit No. | |
| 23 | 3 was marked for identification.) | |
| 24 | MS. MAYLIN:  Q.  Mr. Campbell, this appears to | |
| 25 | me to be a charge of discrimination filed with the EEOC. | 01:33:11 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | It looks like it was signed on January 28, 2004 and | 01:33:15 |
| 2 | marked received by the EEOC on February 9, 2004.  Sir, | |
| 3 | is that your signature at the bottom? | |
| 4 | A.    Yes. | |
| 5 | Q.    Okay.  Do you recall submitting this form to | 01:33:27 |
| 6 | the EEOC, Mr. Campbell? | |
| 7 | A.    Yes. | |
| 8 | Q.    And, sir, was this the first of the charges | |
| 9 | that you filed with either the EEOC or DFEH? | |
| 10 | A.    Yes. | 01:33:38 |
| 11 | Q.    Okay.  And, sir, were you represented by | |
| 12 | counsel at the time that you signed this and submitted | |
| 13 | it? | |
| 14 | A.    No. | |
| 15 | Q.    Okay.  Did anyone help you fill this out? | 01:33:49 |
| 16 | A.    No. | |
| 17 | Q.    You did it all on your own? | |
| 18 | A.    Yes. | |
| 19 | Q.    Okay.  So the typed part of the document, | |
| 20 | where there's some fill-in-the-blanks, or there's Xs and | 01:34:00 |
| 21 | some blanks, and then there's some typed-in information, | |
| 22 | did you type that in yourself? | |
| 23 | A.    No. | |
| 24 | Q.    Who typed that, as far as you know? | |
| 25 | A.    I suppose somebody at the EEOC. | 01:34:15 |

DEPOSITION OF JOHN EARL CAMPBELL

```
 1   one was filed?                                          01:42:07

 2        A.    Actually, this is the second one, I think.

 3        Q.    Are you sure about that?

 4        A.    Yeah.

 5        Q.    Hum.  Well, let's see here.  That was January  01:42:16

 6   '04.

 7        A.    Uh-huh.

 8        Q.    All right.  You think there was one filed

 9   before that?

10        A.    Yes.                                          01:42:33

11                    (Whereupon, Defendants' Exhibit No.

12                     5 was marked for identification.)

13                MS. MAYLIN:  Q.  Okay.  What I'm marking now

14   as Exhibit 5 -- this is going to be a test.  Let's

15   see -- is a one-page document, with a little rip at the  01:42:54

16   top left.  There you go, Mr. Campbell.  It's

17   Bates-stamped 0000001 (sic). Mr. Campbell, is that your

18   signature at the bottom?

19        A.    Yes.

20        Q.    Okay.  And did you sign that around August 16, 01:43:23

21   2005?

22        A.    It is dated that, yes.

23        Q.    Okay.  Well, do you believe that you signed it

24   the -- on the day that you dated it?

25        A.    Yes.                                          01:43:34
```

DEPOSITION OF JOHN EARL CAMPBELL

75

1       Q.   All right.  And, sir, you signed it also under       01:43:34
2   penalty of perjury, correct?
3       A.   Yes.
4       Q.   All right.  And, sir, is this the second
5   administrative charge that you filed?                          01:43:44
6       A.   Apparently this is the second.
7       Q.   Okay.  And it looks like that's August '05, as
8   opposed to 2004.  So let me ask you a question here.
9   Does that refresh your recollection that the one we just
10  looked at, Exhibit (sic) 3 and 4, that that was the           01:44:01
11  first one you filed?
12      A.   Yes.
13      Q.   Okay.  And what we're looking at now, Exhibit
14  5, that was the second one that you filed?
15      A.   Yes.                                                  01:44:14
16      Q.   All right.  And, sir, it looks to me like this
17  administrative charge was filed with the Department of
18  Fair Employment and Housing.  Is that your recollection
19  as well?
20      A.   Yes.                                                  01:44:27
21      Q.   Okay.  Did you have counsel at the time you
22  filed this?
23      A.   '05.  Yes.
24      Q.   Okay.  And was -- is that your current
25  counsel, Price and Associates?                                 01:44:37

DEPOSITION OF JOHN EARL CAMPBELL

76

| | | |
|---|---|---|
| 1 | you sent in an old resume? | 01:52:14 |
| 2 | "Isn't that true? | |
| 3 | "Answer:  I also sent in an Amtrak | |
| 4 | application with this resume, so...") | |
| 5 | MS. PRICE:  Thank you. | 01:53:09 |
| 6 | MS. MAYLIN:  Q.  I guess we're taking a break, | |
| 7 | Mr. Campbell. | |
| 8 | THE VIDEOGRAPHER:  It is 1:53.  We're going | |
| 9 | off the record. | |
| 10 | (Recess taken:  1:53 p.m. until 2:02 p.m.) | 01:53:18 |
| 11 | THE VIDEOGRAPHER:  We are back on the record. | |
| 12 | It is 2:02. | |
| 13 | MS. MAYLIN:  Q.  Actually, I'm sorry, we've | |
| 14 | got to go off the record just for a sec. | |
| 15 | THE VIDEOGRAPHER:  We're going off the record. | 02:03:30 |
| 16 | It is 2:03. | |
| 17 | (Recess taken:  2:03 p.m. until 2:04 p.m.) | |
| 18 | THE VIDEOGRAPHER:  We are back on the record, | |
| 19 | and it is 2:04. | |
| 20 | MS. MAYLIN:  Q.  Okay.  Mr. Campbell, you were | 02:04:14 |
| 21 | initially hired, as you said, as an assistant conductor. | |
| 22 | What I'm marking here as Exhibit 7 is a multiple-page | |
| 23 | document, D01276 (sic) and 77.  Here you go.  This is | |
| 24 | the letter you received from Amtrak, correct? | |
| 25 | A.  Correct. | 02:04:39 |

DEPOSITION OF JOHN EARL CAMPBELL

| 1 | (Whereupon, Defendants' Exhibit No. | 02:04:41 |
| 2 | 7 was marked for identification.) | |
| 3 | MS. MAYLIN:  Q.  And that was sent to you by | |
| 4 | Denise Sargeant, who you testified was the | |
| 5 | African-American member of the panel who you interviewed | 02:04:49 |
| 6 | with, correct? | |
| 7 | A.    Correct. | |
| 8 | Q.    Okay.  And when you started with Amtrak, you | |
| 9 | got quite a few booklets and documents to look at, | |
| 10 | didn't you? | 02:05:04 |
| 11 | A.    Yes. | |
| 12 | Q.    Okay.  And what I'm marking here as Exhibit 8 | |
| 13 | is a "New-Hire Checklist - Agreement..."  There you go, | |
| 14 | Mr. Campbell.  D10275. | |
| 15 | (Whereupon, Defendants' Exhibit No. | 02:05:17 |
| 16 | 8 was marked for identification.) | |
| 17 | MS. MAYLIN:  Q.  And that's your signature on | |
| 18 | that page, correct? | |
| 19 | A.    Correct. | |
| 20 | Q.    Okay.  And on September 30, 1998, you signed | 02:05:23 |
| 21 | that you received all of the information that are marked | |
| 22 | as "yes" checks, correct? | |
| 23 | A.    Correct. | |
| 24 | Q.    Okay.  And, sir, you do see that you've | |
| 25 | checked "yes" that you received the company's Equal | 02:05:50 |

DEPOSITION OF JOHN EARL CAMPBELL

84

| | | |
|---|---|---|
| 1 | Employment Opportunity Policy; do you see that? | 02:05:54 |
| 2 | A.    Yes. | |
| 3 | Q.    Okay.   And you did receive that, didn't you? | |
| 4 | A.    Yes. | |
| 5 | Q.    Okay.   And you also received harassment | 02:06:00 |
| 6 | information as well? | |
| 7 | A.    Yes. | |
| 8 | Q.    Okay.   And you understood, didn't you, | |
| 9 | Mr. Campbell, that Amtrak had a pretty detailed | |
| 10 | harassment and -- non-harassment, non-discrimination | 02:06:15 |
| 11 | policy and complaint procedure, correct? | |
| 12 | MS. PRICE:   Objection.   Vague and ambiguous as | |
| 13 | to "pretty detailed." | |
| 14 | THE WITNESS:   Correct. | |
| 15 | MS. MAYLIN:   Q.   Okay.   And indeed, you | 02:06:28 |
| 16 | understood, over the years of your employment at Amtrak, | |
| 17 | that Amtrak has an EEOC -- I'm sorry, an EEO officer who | |
| 18 | is responsible for taking any complaints and | |
| 19 | investigating complaints, correct? | |
| 20 | MS. PRICE:   Objection.   Lacks foundation; | 02:06:47 |
| 21 | assumes facts; calls for speculation. | |
| 22 | THE WITNESS:   Correct. | |
| 23 | MS. MAYLIN:   Q.   Okay.   And you had two times | |
| 24 | during your employment where you had contact with the | |
| 25 | EEOC officer, didn't you? | 02:07:02 |

DEPOSITION OF JOHN EARL CAMPBELL

85

```
 1        Q.    And I don't recall if I asked you, who were      02:25:58
 2   your supervisors when you were a yard conductor?
 3        A.    At the time, Mark Schulthies and Tom Oughton.
 4        Q.    Okay.  And how did your duties change as a
 5   yard director from being an assistant conductor?           02:26:11
 6        A.    Just the bid process.
 7        Q.    But what was -- what was the change in your
 8   actual day-to-day duties?
 9             MS. PRICE:  Objection.  Lacks foundation;
10   assumes facts.                                             02:26:22
11             THE WITNESS:  I just went from being number
12   two to number one in charge of -- you know,
13   authority-wise.
14             MS. MAYLIN:  Q.  So it didn't change your
15   duties at all?                                             02:26:33
16        A.    It just gave me more responsibilities.
17        Q.    What more responsibility did it give you?
18        A.    I was in charge of all of the moves in the
19   yard involving the trains, make-up, break-up.
20   Everything was basically on me.                            02:26:45
21        Q.    Okay.  When you say you're in charge of all
22   the moves in the yard, what does that mean?
23        A.    The mechanical foreman would give us a switch
24   list, and I would have to perform, you know, and I had
25   like ten hours to do it, so...                             02:27:05
```

DEPOSITION OF JOHN EARL CAMPBELL

| | |
|---|---|
| 1 | several incidents of misconduct during your employment. | 02:44:32 |
| 2 | Can you tell me the first time there was an incident |
| 3 | where you were charged with a rules infraction? |
| 4 |      MS. PRICE:  Objection.  Lacks foundation; |
| 5 | assumes facts.  It's also argumentative.  Also, object | 02:44:46 |
| 6 | to the preface. |
| 7 |      Do you need to have the question read back? |
| 8 | Do you know what the question is? |
| 9 |      THE WITNESS:  Yeah. |
| 10 |      MS. MAYLIN:  Q.  When is the first time you | 02:45:05 |
| 11 | were charged with a rules infraction when you were |
| 12 | employed by Amtrak? |
| 13 |     A.  I don't know the date, but it involved the |
| 14 | boxcar derailing. |
| 15 |      MS. PRICE:  Okay.  She's asking you for the | 02:45:16 |
| 16 | date. |
| 17 |      THE WITNESS:  I don't have the dates. |
| 18 |      MS. MAYLIN:  Q.  Okay.  Was it in 2000, |
| 19 | Mr. Campbell, March 24, 2000; does that sound right? |
| 20 |     A.  Yeah. | 02:45:27 |
| 21 |     Q.  Okay.  And there was a boxcar derailment? |
| 22 |     A.  Yes. |
| 23 |     Q.  Okay.  And I understand that the recommended |
| 24 | discipline for that misconduct was termination; is that |
| 25 | correct? | 02:45:41 |

DEPOSITION OF JOHN EARL CAMPBELL

113

| | |
|---|---|
| 1 | A.    No. | 02:45:41 |

```
 1      A.    No.                                    02:45:41
 2           MS. PRICE:  Objection.  Lacks foundation;
 3  calls for speculation.
 4           MS. MAYLIN:  Q.  Okay.  Well, do you recall,
 5  Mr. Campbell, that that was the recommended discipline,  02:45:47
 6  but that you acknowledged your misconduct, and you
 7  waived your right to an formal investigation, and as a
 8  result, you were issued instead a letter of reprimand?
 9           MS. PRICE:  Objection.  Or, I'm sorry.  Are
10  you finished with the question?                    02:46:02
11           MS. MAYLIN:  Yes.
12           MS. PRICE:  Okay.  Objection.  The question is
13  compound; lacks foundation; assumes facts.
14           THE WITNESS:  Ask me the first part first.
15  Like she said, you asked me four different questions  02:46:15
16  there.
17           MS. MAYLIN:  Q.  Okay.  Let's try it -- I'll
18  try to ask you fewer than four.  I'll try to ask you
19  one.
20           Mr. Campbell, it is true in March 24, 2000 --  02:46:28
21  on March 24, 2000, that that incident resulted in a
22  charge of misconduct, but you admitted the misconduct;
23  is that correct?
24           MS. PRICE:  Objection.  It's still compound;
25  assumes facts, lacks foundation.                   02:46:50
```

DEPOSITION OF JOHN EARL CAMPBELL

114

```
1          Just try to answer -- if you can, answer the      02:46:53
2   question.  If you need to have it rephrased, let her
3   know.
4          THE WITNESS:  I'm going to just say yes.
5          MS. PRICE:  Don't just say yes.  You need to      02:47:04
6   make sure your answer is accurate.
7          MS. MAYLIN:  Q.  Well, if you'd like to see
8   that language written on a piece of paper that you
9   signed, Mr. Campbell, I can certainly provide that.
10  Here's what I've marked as Exhibit 13.                    02:47:18
11     A.   Okay.
12     Q.   There you go.  Maybe you'll find that amusing
13  as well.
14                   (Whereupon, Defendants' Exhibit No.
15                   13 was marked for identification.)       04:48:10
16         MS. PRICE:  Okay.  And the language that
17  you're suggesting to him where he says, "I acknowledge
18  my misconduct," is in what paragraph, Counsel?
19         MS. MAYLIN:  Q.  Is that your signature on the
20  page, sir?                                                02:47:28
21     A.   No.
22         MS. PRICE:  Can you -- you asked (sic) a
23  question pending when you made a statement that this
24  document reflected him acknowledging his misconduct.
25  Can you --                                                02:47:37
```

DEPOSITION OF JOHN EARL CAMPBELL

115

| | | |
|---|---|---|
| 1 | MS. MAYLIN:  I'm going to take him through it, | 02:47:38 |
| 2 | Counsel, if you'll stop talking.  I'd like to ask a | |
| 3 | question. | |
| 4 | MS. PRICE:  Well, I object.  The question you | |
| 5 | asked earlier lacks foundation.  It was misleading.  It | 02:47:44 |
| 6 | was argumentative.  And I don't know if you're doing | |
| 7 | that intentionally, but the record will reflect the | |
| 8 | language that you just represented to the witness would | |
| 9 | be in this document.  I don't see it here.  And you're | |
| 10 | obviously declining to make that representation on the | 02:47:58 |
| 11 | record now that the document has been marked, but that's | |
| 12 | contrary to what you represented to the witness before | |
| 13 | you showed him the document. | |
| 14 | MS. MAYLIN:  Q.  Mr. Campbell, is this your | |
| 15 | signature on this page that I just marked as Exhibit 13? | 02:48:11 |
| 16 | A.   That is my signature. | |
| 17 | Q.   Okay.  And see under "Charges" it states your | |
| 18 | alleged failure to follow the general code of operating | |
| 19 | rules, third edition, and it has a lot of numbers there, | |
| 20 | but Safety Rule 5316E, and AMT3, Rule 16.2.  You | 02:48:27 |
| 21 | understood that that's what you were charged with, | |
| 22 | correct? | |
| 23 | A.   Correct. | |
| 24 | Q.   And, specifically, under "Specification," it | |
| 25 | states that there was damage to equipment during the | 02:48:45 |

DEPOSITION OF JOHN EARL CAMPBELL

```
 1   11 p.m. yard assignment of March 24, 2000, damage to the      02:48:45

 2   cables occurred when 8804 was cut from 8030 on two

 3   tracks, and further damage was done when 8804 was moved

 4   to A track, and damages were unreported.  Did you

 5   understand that those were the specifications of the        02:49:04

 6   charges, Mr. Campbell?

 7        A.   Yes.

 8        Q.   Okay.  And did you agree to accept the

 9   following discipline assessed by Amtrak, that a letter

10   of reprimand will be issued to you and placed in your       02:49:18

11   file?

12        A.   Yes.

13        Q.   Okay.  And you signed that you accepted that

14   discipline for those infractions on April 13, 2000,

15   correct?                                                    02:49:31

16        A.   Correct.

17        Q.   Okay.  And you waived your right to a formal

18   investigation that had been scheduled for April 12,

19   2000, correct?

20        A.   Correct.                                          02:49:43

21        Q.   Okay.  And when you -- you understood that

22   when you waived your right to a formal investigation,

23   and you accept the discipline, that that means that you

24   did not contest the charges or the specifications,

25   correct?                                                    02:49:58
```

DEPOSITION OF JOHN EARL CAMPBELL

1        MS. PRICE:  Objection.  Lacks foundation;          02:49:59

2   calls for a legal conclusion.

3        MS. MAYLIN:  Q.  Correct, Mr. Campbell?

4        A.   Correct.

5        MS. PRICE:  Same objections.                       02:50:06

6        MS. MAYLIN:  Q.  Did you ever learn,

7   Mr. Campbell, that had you not agreed to the discipline,

8   that that charge, those actually charges, three charges,

9   would be grounds for termination?

10       A.   First I'm hearing of it.                       02:50:41

11       Q.   So the answer is no?

12       A.   No.

13       Q.   And as far as you know, a formal letter of

14  reprimand was put in your personnel file, correct?

15       A.   Correct.                                       02:51:04

16       Q.   Okay.  Do you recall having any -- being

17  charged with any rule infraction prior to 2000?

18       A.   No, I don't recall.

19       Q.   All right.  When is the next time you were

20  charged with a rule infraction?                          02:51:19

21       A.   2002, maybe.

22       Q.   Okay.  What occurred then?

23       A.   That was the incident with the boxcar being

24  pushed off the track.

25       Q.   Oh, that was the derailment?                   02:51:33

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | A.    Yes. | 02:51:35 |
| 2 | Q.    Okay.  So that was where a boxcar actually | |
| 3 | came off altogether, right? | |
| 4 | A.    One wheel came off.  Not the whole bus.  Just | |
| 5 | one wheel. | 02:51:45 |
| 6 | Q.    Okay.  Is that not serious when just one wheel | |
| 7 | comes off, as opposed to all four? | |
| 8 | MS. PRICE:  Objection.  Vague and ambiguous. | |
| 9 | THE WITNESS:  Depends on who the boss is. | |
| 10 | MS. MAYLIN:  Q.  Is that right, Mr. Campbell? | 02:51:59 |
| 11 | So a one-wheel derailment is not considered significant, | |
| 12 | as far as you know? | |
| 13 | MS. PRICE:  Objection.  Lacks foundation; | |
| 14 | calls for speculation.  Also, vague and ambiguous. | |
| 15 | THE WITNESS:  Any derailment is serious. | 02:52:16 |
| 16 | MS. MAYLIN:  Q.  All right.  How many rules | |
| 17 | infractions were you charged with for that incident? | |
| 18 | A.    I have no idea. | |
| 19 | Q.    Okay.  Well, isn't it true, Mr. Campbell, that | |
| 20 | you were charged with four infractions?  And I'll list | 02:52:33 |
| 21 | them and see if that refreshes your recollection. | |
| 22 | Failing to work safely and to avoid damage to equipment | |
| 23 | is one.  Failing to verify cars were properly secured | |
| 24 | before coupling or moving.  That's two.  Failing to | |
| 25 | control train movement while moving cars onto a spur | 02:52:52 |

DEPOSITION OF JOHN EARL CAMPBELL

| | |
|---|---|
| 1 | track.  That's three.  And moving a train at an unsafe | 02:52:56 |
| 2 | speed.  Four.  Does that refresh your recollection, sir? |
| 3 | A.  Yes. |
| 4 | Q.  Okay.  And it's true, isn't it, that Amtrak |
| 5 | conducted a formal investigation in March 2002? | 02:53:09 |
| 6 | A.  Yes. |
| 7 | Q.  Okay.  And there was a hearing where you |
| 8 | testified, correct? |
| 9 | A.  Correct. |
| 10 | Q.  Okay.  And based largely on your own | 02:53:17 |
| 11 | admissions, you were assessed a 20-day suspension, |
| 12 | correct? |
| 13 | MS. PRICE:  Objection.  Lacks foundation; |
| 14 | calls for speculation. |
| 15 | THE WITNESS:  I thought it was ten. | 02:53:32 |
| 16 | MS. MAYLIN:  Q.  Yeah.  And actually what I |
| 17 | have here, sir, and maybe this will refresh you |
| 18 | recollection, it was a 20-day suspension, but ten days |
| 19 | were held in abeyance.  Does that sound right? |
| 20 | A.  Yes. | 02:53:42 |
| 21 | Q.  Okay.  And you completed your suspension in |
| 22 | April 2002? |
| 23 | A.  Yes. |
| 24 | Q.  All right.  And your union appealed the |
| 25 | suspension to the Public Law Board; is that true? | 02:53:53 |

DEPOSITION OF JOHN EARL CAMPBELL

120

|     |                                                                |            |
| --- | -------------------------------------------------------------- | ---------- |
| 1   | A.   Yes.                                                       | 02:53:59   |
| 2   | Q.   Okay.  Well, sir, don't guess.  Do you                    |            |
| 3   | remember that the union appealed for you?                      |            |
| 4   | A.   Yes.                                                       |            |
| 5   | Q.   All right.  And do you recall that in January             | 02:54:06   |
| 6   | 2003, the law board upheld the suspension?                     |            |
| 7   | A.   Yes.                                                       |            |
| 8   | Q.   Okay.  By the way, sir, could you explain that            |            |
| 9   | first incident that we talked about in 2000, where there       |            |
| 10  | was damage, equipment was damaged, and that it wasn't          | 02:54:39   |
| 11  | reported?  What actually occurred then?                        |            |
| 12  | A.   Oh, this one (indicating)?                                 |            |
| 13  | Q.   Yeah.                                                      |            |
| 14  | A.   Okay.  The cars have electrical cables on                 |            |
| 15  | them, the passenger cars, and when we moved the car, the       | 02:54:54   |
| 16  | electrical cable was still hooked to the ground power,         |            |
| 17  | which is the power coming from the -- the house, you           |            |
| 18  | know, the PG&E power, basically.  The mechanical               |            |
| 19  | problem -- the mechanical department is supposed to            |            |
| 20  | unhook that for us and then put a blue man-at-work flag        | 02:55:14   |
| 21  | off.  They took the men-at-work flag off, but they            |            |
| 22  | didn't unhook it.  So when I saw that -- the men-at-work       |            |
| 23  | flag off, that tells me it's okay to pull, so I pulled         |            |
| 24  | it out and the cables was still pulled (sic) and pulled        |            |
| 25  | them all out.  So the mechanical half did their job, and       | 02:55:30   |

DEPOSITION OF JOHN EARL CAMPBELL

121

1    I got blamed for it.  Simple as that.                    02:55:37

2         Q.  Okay.  Well -- and then you didn't report the

3    damage, right?

4         A.  I didn't know it was damaged until somebody

5    came and told me.                                        02:55:47

6         Q.  Okay.  Well, how did you know that the crew

7    hadn't done -- the electrical crew hadn't done their job

8    with the flag, though?

9         A.  At the end of the shift they told me the car

10   was damaged, after I had pulled it out and re-spotted,    02:55:58

11   getting ready to go home.  They said, oh, those cables

12   were pulled out.

13        I said, "What?"

14        They said, "Yeah."  They were still hooked up,

15   so that's how I knew.  It was like three hours later.     02:56:12

16        Q.  Okay.  So it was the delay in the three hours

17   of non-reporting?

18        A.  Yeah.

19        MS. PRICE:  Objection.  Vague.

20        MS. MAYLIN:  Q.  When was it -- when was it          02:56:20

21   reported, as far as you can recall?

22        A.  They reported it to their supervisor, and then

23   they -- their supervisor told me, and I wrote up a

24   report.

25        Q.  Okay.  As part of the yard conductor protocol,   02:56:35

DEPOSITION OF JOHN EARL CAMPBELL

```
 1   though, sir, shouldn't you have gone back and checked    02:56:43
 2   yourself, regardless of the flag?
 3           MS. PRICE:  Objection.  Vague and ambiguous as
 4   to the "yard conductor protocol," something;
 5   unintelligible.                                          02:56:54
 6           THE WITNESS:  That's true.
 7           MS. MAYLIN:  Q.  Okay.  And after that, I bet
 8   you double-checked to make sure, right?
 9       A.  For the record, my A/C did the move.  I was
10   standing at the switch so -- but like earlier, I'm in    02:57:08
11   charge, so I get the blame, but I chewed him out.
12                   (Whereupon, Defendants' Exhibit No.
13                    14 was marked for identification.)
14           MS. MAYLIN:  Q.  All right.  What I've marked
15   now is -- I think we're back to the '02 incident.  I've  02:57:18
16   marked as Exhibit 14 -- well, it is -- here we go.
17   March 28, 2002.  There you go -- a letter addressed to
18   you, Mr. Campbell, where it details the charges that
19   we've already talked about on the record here.  And the
20   bottom line is that a boxcar became derailed.  You       02:58:00
21   received this letter, sir?
22       A.  Yes.
23       Q.  Okay.  And the hearing officer of the Western
24   Region, Roger Butler, found you guilty of the charges,
25   correct?                                                 02:58:18
```

DEPOSITION OF JOHN EARL CAMPBELL

```
 1      A.   Correct.                                    02:58:19
 2      Q.   Okay.  And -- well, let's go on.  Sir, was
 3    there another time when you were charged with a rules
 4    infraction?
 5      A.   The one that got me terminated.             02:58:54
 6      Q.   Okay.  Well, before we talk about that, sir,
 7    we talked a little bit about the Province, Terry
 8    Province, situation.  Were you counseled about that
 9    incident, Mr. Campbell?
10      A.   Not counseled.  Not charged.                02:59:13
11      Q.   Okay.  Well, do you know whether or not
12    Mr. Province filed a complaint about that?
13      A.   Yes.
14      Q.   Okay.  And you submitted a response, correct?
15      A.   Probably.  I don't remember.                02:59:31
16      Q.   All right.  Do you recall what Mr. Province
17    said you did?
18      A.   No.
19      Q.   Do you recall that Mr. Province alleged that
20    you threw a lantern at his head?                   02:59:41
21      A.   Yes, I recall that.
22      Q.   Okay.  Mr. Campbell, did you throw a lantern
23    at Mr. Province?
24      A.   No.
25      Q.   Did you toss a lantern in his direction?    02:59:52
```

DEPOSITION OF JOHN EARL CAMPBELL

124

| | | |
|---|---|---|
| 1 | just make your objections as to form -- you have this | 03:09:54 |
| 2 | running stream of consciousness going on that is really | |
| 3 | improper, and you're the one who's confusing the | |
| 4 | interrogation.  I asked Mr. Campbell, because it says | |
| 5 | right here in his statement, "Did I scream?  Yes.  Did I | 03:10:09 |
| 6 | berate him?  Probably." | |
| 7 | Q.  My question is:  What do you remember saying | |
| 8 | during this communication with Mr. Province? | |
| 9 | A.  This was three years ago.  I don't know what | |
| 10 | I said.  All I know is the screaming and yelling. | 03:10:22 |
| 11 | That's -- | |
| 12 | Q.  Okay.  So you don't remember what you said, | |
| 13 | but just you were screaming and yelling? | |
| 14 | A.  We both were. | |
| 15 | MS. PRICE:  Okay.  That's it.  We need to | 03:10:32 |
| 16 | take -- | |
| 17 | MS. MAYLIN:  Okay.  We'll go ahead and take a | |
| 18 | five-minute break. | |
| 19 | MS. PRICE:  Oh, ten minutes, please. | |
| 20 | THE VIDEOGRAPHER:  It is 3:10.  We are going | 03:10:42 |
| 21 | off the record. | |
| 22 | (Recess taken:  3:10 p.m. until 3:31 p.m.) | |
| 23 | THE VIDEOGRAPHER:  We are back on the record. | |
| 24 | It is 3:31. | |
| 25 | MS. MAYLIN:  Q.  Okay.  Mr. Campbell, you | 03:31:01 |

DEPOSITION OF JOHN EARL CAMPBELL

134

```
 1   recall earlier we looked at that DFEH charge and the        03:31:03
 2   EEOC charge, and you've still got it in front of you
 3   there.  Sir, it is true, isn't it, that you never filed
 4   either a DFEH or an EEOC charge against Joe Deely,
 5   correct?                                                    03:31:23
 6        A.   Correct.
 7        Q.   Okay.
 8             MS. PRICE:  I'm sorry.  I meant to object.  It
 9   calls for a legal conclusion, and I'm sorry are we --
10   Counsel, sorry.  You just misstated the document so --     03:31:31
11   are you referring the witness to Exhibit 5 or --
12             MS. MAYLIN:  I wasn't referring him to either
13   one.  I just asked a question, Counsel.
14             MS. PRICE:  I'm sorry, then I misunderstood.
15   Maybe the witness did, too.                                03:31:51
16             Could I have the question read back, please?
17             MS. MAYLIN:  You know, Counsel, why on earth
18   are you having every question read back?  If you could
19   just listen.  He's already answered.  I'm going to move
20   on to another question.                                    03:32:01
21             MS. PRICE:  Well, I object.  Your question,
22   once again, was misleading.  As I -- and I'm having it
23   read back because you refuse to acknowledge the record.
24             MS. MAYLIN:  Oh, boy.
25             MS. PRICE:  You changed the record, and I        03:32:11
```

| | | |
|---|---|---|
| 1 | MS. MAYLIN:  Q.  Mr. Campbell, take a look, | 03:33:25 |
| 2 | please, I've just marked a document as Exhibit 17. | |
| 3 | Sir, is this the fax that you sent to Paul Ho in regard | |
| 4 | to your November 2003 application for an engineer | |
| 5 | position? | 03:33:44 |
| 6 | A.  Yes. | |
| 7 | Q.  And at the bottom of Bates-stamped D09960 and | |
| 8 | D09961, at the bottom there, that's your fax | |
| 9 | transmission line, is it, Mr. Campbell? | |
| 10 | A.  Correct. | 03:34:03 |
| 11 | Q.  Okay.  And it shows that it was faxed from | |
| 12 | your phone or your fax machine to Mr. Ho, correct? | |
| 13 | A.  Correct. | |
| 14 | Q.  Okay.  And you did indeed then send Mr. Ho an | |
| 15 | old resume, correct, Mr. Campbell? | 03:34:19 |
| 16 | A.  Correct. | |
| 17 | Q.  Okay.  Did you ever send Mr. Ho an updated | |
| 18 | resume for that November 2003 position? | |
| 19 | A.  I don't recall. | |
| 20 | Q.  Well, I understand that you don't recall doing | 03:34:48 |
| 21 | it or not, sir, but do you have any recollection that | |
| 22 | you did? | |
| 23 | MS. PRICE:  The question is argumentative.  I | |
| 24 | object. | |
| 25 | THE WITNESS:  No. | 03:35:00 |

DEPOSITION OF JOHN EARL CAMPBELL

1      A.   No.                                                      03:37:43

2      Q.   Okay.  All right.  Mr. Campbell, do you have

3  any reason to think that your supervisors, during

4  December 2002, that's the Province altercation time

5  frame -- do you have any reason to think that your     03:37:56

6  supervisors did not know about that altercation?

7      A.   No.

8           MS. PRICE:  Objection.  Vague as to "that

9  altercation"; assumes facts.

10          MS. MAYLIN:  Q.  Okay.  And is there any        03:38:09

11  reason, sir, that -- that you think that your

12  supervisors didn't know about the January 2002 car

13  derailment?

14     A.   No.

15     Q.   Is there any reason that you think that your    03:38:33

16  supervisors wouldn't know about the 2000 equipment

17  damage and failure to report equipment damage?

18     A.   No.

19     Q.   Okay.  All right.  When is the next time you

20  were charged with a rules infraction?                  03:38:50

21     A.   I think the July 2004 incident.

22     Q.   Okay.  What incident was that?

23     A.   I was accused of cutting the brakes out of a

24  locomotive.

25     Q.   What does that mean, "cutting the brakes out"?  03:39:08

DEPOSITION OF JOHN EARL CAMPBELL

```
 1        A.    They've got these little valves on the bottom     03:39:11
 2   of the locomotive near the wheels.  If the wheels lock
 3   up, you turn the valves, and it releases the brakes so
 4   you can pull the locomotive, you know, without brakes.
 5        Q.    Okay.  And is that true, Mr. Campbell?           03:39:25
 6             MS. PRICE:  Objection.  Is what true?
 7             THE WITNESS:  Yeah.  Is what true?
 8             MS. MAYLIN:  Q.  Sure.  The -- the charge that
 9   you violated that rule?
10             MS. PRICE:  Objection.  Lacks foundation;        03:39:43
11   calls for speculation; vague as to "that rule."
12             MS. MAYLIN:  Q.  Do you understand what I'm
13   asking, Mr. Campbell?
14        A.    I understand it, but you're wording it wrong.
15        Q.    Okay.  Well, why don't you correct me.  I'm     03:39:57
16   not in the business like you are.
17        A.    It's true I was charged with that violation.
18        Q.    Okay.
19        A.    That's the answer.  It's true I was charged
20   with that violation.                                       03:40:08
21        Q.    Okay.  Is it true that you committed that
22   violation?
23        A.    No.
24        Q.    Okay.  All right.  Okay.  I understand that
25   there was a formal hearing in response to that charge;     03:40:23
```

DEPOSITION OF JOHN EARL CAMPBELL

140

```
 1    is that correct?                                      03:40:27

 2        A.    Yes.

 3        Q.    Do you recall when the hearing took place?

 4        A.    I don't have the exact dates.

 5        Q.    All right.  A couple of months after the    03:40:35

 6    incident?

 7        A.    Yes.

 8        Q.    Okay.  And do you recall who the hearing

 9    officer was?

10        A.    I know the charging officer was Tim Sheridan. 03:40:46

11    The hearing officer I can't recall.

12        Q.    Okay.  How about Patrick Gallagher; does that

13    refresh your recollection?

14        A.    Yes.

15        Q.    And do you recall what decision Patrick      03:40:58

16    Gallagher came to?

17        A.    Termination.

18        Q.    Okay.  All right.  How many charges were you

19    charged with from that incident, do you recall?

20        A.    I don't recall.                              03:41:14

21        Q.    Okay.  All right.  And did your union appeal

22    that decision?

23        A.    Yes.

24        Q.    Okay.  And what was the finding of the appeal,

25    if you recall?                                         03:41:35
```

DEPOSITION OF JOHN EARL CAMPBELL

141

| | | |
|---|---|---|
| 1 | A.    They upheld the company's position of | 03:41:37 |
| 2 | termination. | |
| 3 | Q.    Okay.  Did you receive -- and was that by the | |
| 4 | Public Law Board? | |
| 5 | A.    Say that again. | 03:41:50 |
| 6 | Q.    Sure.  Was that decision by the Public Law | |
| 7 | Board? | |
| 8 | A.    I believe so. | |
| 9 | Q.    All right.  And did you receive a copy of the | |
| 10 | decision? | 03:42:01 |
| 11 | A.    Yes. | |
| 12 | Q.    And I think I asked you, there was a hearing | |
| 13 | where you testified; is that correct? | |
| 14 | A.    Correct. | |
| 15 | Q.    All right.  And others testified as well? | 03:42:17 |
| 16 | A.    One other person testified.   Two people | |
| 17 | testified. | |
| 18 | Q.    Okay.  Who else testified? | |
| 19 | A.    I believe Dave West and Earl Friend. | |
| 20 | Q.    Okay.  Did you hear Dave and Earl's testimony? | 03:42:36 |
| 21 | A.    I read it later. | |
| 22 | Q.    When you read the testimony, did you form the | |
| 23 | opinion that they had testified truthfully? | |
| 24 | MS. PRICE:   Objection.  Lacks foundation; | |
| 25 | calls for speculation; assumes facts. | 03:42:49 |

DEPOSITION OF JOHN EARL CAMPBELL

1   of rules infractions?                                    03:54:33

2       A.    No.

3       Q.    Okay.  Now that we've been talking about it

4   for a little bit, can you think of any other employees

5   who had more than two formal rules infractions and were  03:54:48

6   not fired?

7       A.    At this time, I can't recollect.  There are

8   some, but I can't recollect.

9       Q.    What I'm marking -- oh, you know what, I

10  marked some other documents a while ago and didn't use   03:55:22

11  them.

12                      (Whereupon, Defendants' Exhibit No.

13                      12 was marked for identification.)

14          MS. MAYLIN:  Q.  Here's Exhibit 12,

15  Mr. Campbell, Bates-stamped D10292, Acknowledgement of   03:55:28

16  Receipt of Amtrak's Standards of Excellence.  Sir, did

17  you sign that on September 30, '98?

18      A.    Yes.

19      Q.    Okay.  And at that time, you received a copy

20  of the booklet, correct?                                 03:55:45

21      A.    Correct.

22                      (Whereupon, Defendants' Exhibit No.

23                      11 was marked for identification.)

24          MS. MAYLIN:  Q.  Okay.  And here is Exhibit

25  11, a one-page document, D10498.  Mr. Campbell, is that  03:55:51

DEPOSITION OF JOHN EARL CAMPBELL

153

1    your signature there?                                      03:56:00

2        A.    Yes.

3        Q.    It's a receipt, and you received on -- it

4    looks like -- May 14, 2004, a copy of the "Service

5    Standards Reference Manual for Train Service and           03:56:10

6    On-Board Service Employees," correct?

7        A.    Correct.

8        Q.    Okay.  And you understood that you were

9    responsible for reading and updating the manual, and you

10   had to follow the procedures, correct?                     03:56:23

11       A.    Correct.

12       Q.    And that's true of all the booklets and

13   policies and procedures you received, you were

14   responsible for reading, understanding and following,

15   correct?                                                   03:56:37

16       A.    Correct.

17                    (Whereupon, Defendants' Exhibit No.

18                    19 was marked for identification.)

19            MS. MAYLIN:  Q.  All right.  What I am marking

20   now as Exhibit 19 is a two-page document.  It's a         03:56:43

21   September 17, 2004 letter to you signed by Patrick

22   Gallagher.  There you go.  And this is Mr. Gallagher

23   informing you that he finds that you were guilty of the

24   charges, correct?

25       A.    Correct.                                         03:57:11

                  DEPOSITION OF JOHN EARL CAMPBELL

1    Q.   Okay.  And on page two, it details the charge    03:57:11

2  and the rule violation and the decision is to terminate

3  you from service effective immediately, correct?

4        A.   Correct.

5                      (Whereupon, Defendants' Exhibit No.    03:37:38

6                      20 was marked for identification.)

7        MS. MAYLIN:   Q.   Okay.  All right.  And then

8  on your behalf, the UTU requested that the discipline be

9  expunged, correct?  And here I've got a September 28,

10  2004 letter -- there you go, Mr. Campbell -- addressed    03:57:55

11  to the Director-Labor Relations, at Amtrak.  It's from

12  a Mr. A.L. -- oh, I'm going to mispronounce it --

13  Suozzo, S-u-o-z-z-o.  You received a copy of that,

14  Mr. Campbell?

15        A.   Yes.                                            03:58:17

16        Q.   All right.

17                      (Whereupon, Defendants' Exhibit No.

18                      21 was marked for identification.)

19        MS. MAYLIN:   Q.   And here what I've marked as

20  Exhibit 21 is a three-page letter, November 9, 2004.      03:58:40

21  It's directed to Mr. Suozzo, and it is from Larry

22  Hriczak, Director-Labor Relations, where the appeal on

23  your behalf is denied.  You received that, Mr. Campbell?

24        A.   Yes.

25        Q.   Sir, during the hearing where you testified,    03:59:10

DEPOSITION OF JOHN EARL CAMPBELL

155

| | | |
|---|---|---|
| 1 | of rules infractions, where you went through hearing -- | 04:23:15 |
| 2 | A.    Uh-huh. | |
| 3 | Q.    -- and appeal even -- | |
| 4 | A.    Uh-huh. | |
| 5 | Q.    -- was there any other time, Mr. Campbell, | 04:23:24 |
| 6 | where you had the union on your behalf file a grievance? | |
| 7 | A.    File a grievance? | |
| 8 | Q.    Sure. | |
| 9 | A.    I don't think so, no. | |
| 10 | Q.    Okay.  Was there any other time where you | 04:23:38 |
| 11 | asked the union to represent you because you felt you | |
| 12 | were being treated unfairly by Amtrak? | |
| 13 | A.    I don't believe so. | |
| 14 | Q.    Okay.  Now, other than -- we saw at the | |
| 15 | beginning of your employment, you -- you filed -- you | 04:24:08 |
| 16 | signed the acknowledgement for the EEO policy, for the | |
| 17 | harassment policy, you got a copy of the contract, other | |
| 18 | than the documents you received about non-discrimination | |
| 19 | and non-harassment, Mr. Campbell, were you aware of | |
| 20 | postings in the workplace about Amtrak's policy against | 04:24:33 |
| 21 | harassment and discrimination? | |
| 22 | A.    Yes. | |
| 23 | Q.    Where did you see those? | |
| 24 | A.    We have bulletin boards, and they're posted on | |
| 25 | the bulletin boards next to the B.S., next to our rules. | 04:24:44 |

1    You know, it's basically a community bulletin board.        04:24:50
2    Everything is up there.

3        Q.    Okay.  And how about -- were you aware that
4    there was a hotline or employee assistant number that
5    you could call as well if you felt that you were being     04:25:02
6    subjected to harassment or discrimination?
7             MS. PRICE:  Objection.  Lacks foundation;
8    assumes facts.
9             THE WITNESS:  I didn't know about the hotline.
10            MS. MAYLIN:  Q.  Okay.  Did you ever complain      04:25:13
11   to any supervisor that you felt that you were being
12   subjected to harassment or discrimination?
13       A.    Supervisors, no.
14       Q.    Okay.  Other than Sue Venturelli, when you
15   sent her that e-mail that we've already talked about,       04:25:32
16   did you ever contact anybody in HR or anyone in
17   administration to complain that you felt you were being
18   discriminated against?
19            MS. PRICE:  Objection.  Vague and ambiguous;
20   compound; lacks foundation; assumes facts.                  04:25:49
21            THE WITNESS:  I sent an e-mail to David Gunn,
22   the president of Amtrak.
23            MS. MAYLIN:  Q.  I'm sorry, you sent an e-mail
24   to David Gunn?
25       A.    Uh-huh.                                           04:26:10

DEPOSITION OF JOHN EARL CAMPBELL

1      A.    I was averaging 60 hours a week.                    05:10:14

2      Q.    Okay.  What was the base; was it a 40-hour

3  week?

4      A.    Yes.

5      Q.    Okay.  And you were averaging 20 hours of          05:10:21

6  overtime?

7      A.    Yes.

8      Q.    Okay.  Let's say in the six months prior to

9  your separation, sir, how many weeks, if you can give me

10  an estimate, were you working 20 hours overtime?           05:10:35

11      A.    Oh, that was standard at the job, was pulling

12  like that, 60 hours.

13      Q.    Okay.  Did you ever go over that?

14      A.    Maybe once or twice.

15      Q.    But typically 60 hours?                           05:10:48

16      A.    Yes.

17      Q.    All right.  So I think we talked about a June

18  1999 engineer position that you gave an application to

19  Mark, and Mark reported back to you that Mr. Oughton

20  tore it up and threw it away?                              05:11:10

21      A.    Correct.

22      Q.    Okay.  And you never faxed or mailed that

23  application into the Los Angeles HR?

24      A.    No.

25      Q.    Okay.  Do you know, Mr. Campbell, what the        05:11:22

DEPOSITION OF JOHN EARL CAMPBELL

187

```
 1    other applicants, correct?                              05:13:41

 2            MS. PRICE:  Objection.  Incomplete

 3    hypothetical; assumes facts.

 4            THE WITNESS:  Yes.

 5                    (Whereupon, Defendants' Exhibit No.      04:48:10

 6                    23 was marked for identification.)

 7            MS. MAYLIN:  Q.  I'm marking as Exhibit 23, a

 8    two-page document.  Here you go, Mr. Campbell.  It's a

 9    job reference 50173583.  Have you seen this job posting

10    before, Mr. Campbell?                                   05:14:07

11        A.   Yes.

12        Q.   Okay.  And this is the November 21, '03

13    posting, right?

14        A.   Yes.

15        Q.   Okay.  And this is the one where you faxed     05:14:16

16    your resume over to Mr. Ho, right?

17        A.   Yes.

18        Q.   Okay.  And, sir, do you have any reason to

19    dispute the -- well, that's going to be phrased badly.

20    Sir, you understood that the summary of duties here are 05:14:32

21    the duties that Amtrak requires their engineers to

22    perform, correct?

23        A.   Yes.

24        Q.   Okay.  And you understood that the "Education"

25    criteria, which is the next paragraph, is the required  05:14:48
```

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | education for Amtrak engineers, correct? | 05:14:54 |
| 2 | A.   Correct. | |
| 3 | Q.   And you understood that the "Work Experience," | |
| 4 | the next section is the work experience that's required | |
| 5 | for Amtrak engineers or applicants to an Amtrak engineer | 05:15:07 |
| 6 | position, that they must have that, correct? | |
| 7 | A.   Correct. | |
| 8 | Q.   Okay.  And under "Other Requirements," you | |
| 9 | understood that those other requirements are also | |
| 10 | necessary for an applicant to have who was trying for an | 05:15:17 |
| 11 | engineer position, correct? | |
| 12 | A.   Correct. | |
| 13 | Q.   Okay.  And then on the second page, it says, | |
| 14 | "Other."  Then you understood that the applicant, or | |
| 15 | successful applicant would undergo engineering training, | 05:15:41 |
| 16 | correct? | |
| 17 | A.   Correct. | |
| 18 | Q.   And then at the end, under "Job Notes" it | |
| 19 | has a last day to apply category, years experience, | |
| 20 | et cetera, you understood that those were additional | 05:15:54 |
| 21 | criteria for applicants, correct? | |
| 22 | A.   Correct. | |
| 23 | Q.   Okay.  Under "Work Experience," sir, and also | |
| 24 | it's listed in "Summary of Duties," you understood that | |
| 25 | a successful applicant for an engineer position with | 05:16:24 |

DEPOSITION OF JOHN EARL CAMPBELL

191

| | | |
|---|---|---|
| 1 | Amtrak would have to have a safe work record, correct? | 05:16:25 |
| 2 | A.    Correct. | |
| 3 | Q.    Okay.    After June 1999, sir, did you again | |
| 4 | ever apply for an engineer position at Amtrak? | |
| 5 | A.    Yes. | 05:16:49 |
| 6 | Q.    When was that? | |
| 7 | A.    Every six months, twice a year. | |
| 8 | Q.    Okay.    And how did you submit those | |
| 9 | applications? | |
| 10 | A.    Fax and mail. | 05:16:58 |
| 11 | Q.    To the L.A. HR? | |
| 12 | A.    (Nods head.) | |
| 13 | Q.    Got to say the word. | |
| 14 | A.    Oh.    Yes. | |
| 15 | Q.    Okay.    And, sir, when you did that, did you | 05:17:06 |
| 16 | keep a copy of your application? | |
| 17 | MS. PRICE:    Objection.    Vague; overbroad. | |
| 18 | THE WITNESS:    No. | |
| 19 | MS. MAYLIN:    Q.    Okay.    Well, did you do it | |
| 20 | every six months just as a matter of routine regardless | 05:17:20 |
| 21 | of what was posted, or did you do it in response to | |
| 22 | seeing a posting? | |
| 23 | A.    I did it in response to seeing a posting. | |
| 24 | Q.    Okay.    So, let's see, you saw a posting in | |
| 25 | June '99, and you sent in your fax, right? | 05:17:33 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | MS. MAYLIN: Just a moment. | 05:28:59 |
| 2 | (Discussion off the record.) | |
| 3 | MS. MAYLIN: Q. Okay. So Mr. -- or Jason was | |
| 4 | lackadaisical in your opinion -- | |
| 5 | A. Yeah. | 05:29:31 |
| 6 | Q. -- and Mr. Poitier was just not smart? | |
| 7 | A. Yeah. | |
| 8 | Q. Okay. And, sir, what makes you think that | |
| 9 | they had less seniority than you? | |
| 10 | A. Well, the seniority roster told me. | 05:29:43 |
| 11 | Q. Okay. But we have agreed, haven't we, that | |
| 12 | seniority has nothing to do with whether or not an | |
| 13 | individual is hired into an engineer position, correct? | |
| 14 | MS. PRICE: Objection. Misstates the | |
| 15 | witness's testimony. | 05:29:56 |
| 16 | THE WITNESS: Yeah. | |
| 17 | MS. MAYLIN: Q. I think we talked about that | |
| 18 | there's no bid rights, right? | |
| 19 | A. We talked about it, yes. | |
| 20 | Q. Okay. Is that true? | 05:30:05 |
| 21 | A. Is what true? | |
| 22 | Q. There's no bid rights, yes. | |
| 23 | A. Oh, there is no bid rights, yes. | |
| 24 | Q. Okay. So seniority really doesn't matter | |
| 25 | then, does it? | 05:30:14 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | MS. PRICE: Objection. Misstates the | 05:30:15 |
| 2 | witness's testimony. | |
| 3 | THE WITNESS: Yeah. Seniority and bid rights | |
| 4 | are two different things. | |
| 5 | MS. MAYLIN: Q. Oh, all right. Well, let me | 05:30:21 |
| 6 | ask you, as far as you understand, is there any | |
| 7 | requirement that Amtrak only hire, or first hire | |
| 8 | employees into an engineer position from a conductor | |
| 9 | position based on length of service? | |
| 10 | A. No. | 05:30:40 |
| 11 | Q. Okay. All right. Did you -- so we're up to | |
| 12 | November '03. Thus far, sir, have you had any | |
| 13 | interviews for an engineer position? | |
| 14 | A. I had one. | |
| 15 | Q. When was that? | 05:31:00 |
| 16 | A. I think either December '02 or January '03. | |
| 17 | Q. Okay. Who did you interview with? | |
| 18 | A. I know one was Rich Barnes. And I cannot | |
| 19 | remember the other two. But Rich Barnes was definitely | |
| 20 | one of them. | 05:31:24 |
| 21 | Q. Okay. Can you describe the other two? | |
| 22 | A. They was Caucasian, and they were engineers. | |
| 23 | One was a union rep. That was Rich. And the other two | |
| 24 | were engineers. | |
| 25 | Q. Okay. All right. And you think that was in | 05:31:36 |

DEPOSITION OF JOHN EARL CAMPBELL

```
1      A.    I spoke to him.                              05:41:31

2      Q.    Meaning, hello, how you doing or --

3      A.    Lou Bellotti introduced the crew one morning,

4  and he said, "That's my night crew:  Ray Clarke, John

5  Campbell, Lars Michelson."                             05:41:42

6            And I had said, "Hi, Joe."  I don't think he

7  liked that.  I think I was supposed to say, "Hi,

8  Mr. Deely."

9      Q.    Okay.  Did you have any other communications

10  with him?                                             05:42:03

11     A.    I left him a message on his phone a couple of

12  times, when I had a problem with -- a mechanical

13  problem.  I called him directly.

14     Q.    Did he call you back?

15     A.    No.                                          05:42:10

16     Q.    Okay.  All right.  What information do you

17  have, Mr. Campbell, that Mr. Deely had any influence on

18  your termination?

19     A.    All I have is word of mouth, you know.

20     Q.    Okay.  And who told you that Mr. Deely had    05:42:26

21  anything to do with your termination?

22           MS. PRICE:  I'm going to have to instruct --

23  I'm compelled to instruct the witness, do not disclose

24  any conversations with counsel.  She's asking you about

25  conversations you've had with people outside of         05:42:41
```

DEPOSITION OF JOHN EARL CAMPBELL

1    A.    Again, the seniority list would tell you that,    05:45:27

2    but I know it was five people this time.

3    Q.    Okay.  How about their races, do you know

4    their races?

5    A.    Four were Caucasian and one was Vietnamese.    05:45:53

6    Q.    Okay.  So the first time you filed a DFEH

7    charge or EEOC charge was January '04; I think we talked

8    about.  Did you have any communication with anybody

9    within Amtrak about the fact that you had filed a DFEH

10   charge, or I'm sorry.  I think at that time it was an    05:46:31

11   EEOC charge.  Did you have any communication with

12   anybody about that?

13   A.    No supervisors.

14   Q.    Okay.  Well, how about co-workers?

15   A.    Probably.    05:46:44

16   Q.    What makes you say "probably"?

17   A.    You know, frustration.  Vent.  You talk to

18   people.

19   Q.    So you mentioned it to some co-workers?

20   A.    Yes.    05:46:56

21   Q.    All right.  Other than that, did you have any

22   communication with anybody within Amtrak about the fact

23   that you filed that EEOC charge in 2004, January 2004?

24   A.    Supervisor-wise, I don't think so.

25   Q.    Yeah.  How about anybody from HR?    05:47:12

DEPOSITION OF JOHN EARL CAMPBELL

```
 1        A.    No.                                               05:47:15

 2        Q.    All right.  Anybody from administration?

 3        A.    I don't believe so.

 4        Q.    Okay.  Do you have any information that

 5   anybody at Amtrak even knew that you had filed a -- an     05:47:26

 6   EEOC charge in January '04?

 7             MS. PRICE:  I'm going to object and instruct

 8   the witness again.

 9             You have to filter out any questions when she

10   says any information.                                      05:47:42

11             I object.  The question is overbroad.  It

12   seeks to invade the attorney-client privilege.

13             I will allow you to answer the question, but

14   you cannot -- you cannot disclose any communications

15   between you --                                             05:47:54

16             THE WITNESS:  Between you and me.

17             MS. PRICE:  Right.  Any conversation with me

18   or anybody in my office.

19             THE WITNESS:  Okay.  Repeat the question.

20             MS. MAYLIN:  Could you reread it?  Thank you,    05:48:05

21   Sharon.

22             (Whereupon, the record was read as follows:

23             "Question:  Do you have any information

24             that anybody at Amtrak even knew that you

25             had filed a -- an EEOC charge in January         05:48:07
```

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | '04?") | 05:48:07 |
| 2 | THE WITNESS:  I would assume EEOC sent them a | |
| 3 | copy of my complaint. | |
| 4 | MS. MAYLIN:  Q.  Okay.  I'm not asking for | |
| 5 | your assumption, Mr. Campbell.  Do you have any | 05:48:35 |
| 6 | information that anybody at Amtrak knew that you filed | |
| 7 | it? | |
| 8 | MS. PRICE:  Well, I'm going to object.  The | |
| 9 | question is argumentative.  He's given you his response, | |
| 10 | so you want to answer -- | 05:48:48 |
| 11 | Do you have some other information you can | |
| 12 | give her? | |
| 13 | THE WITNESS:  No. | |
| 14 | MS. MAYLIN:  Q.  Okay.  All right.  Is there | |
| 15 | any other time, Mr. Campbell, that you can recall | 05:49:03 |
| 16 | applying for an engineer position at Amtrak? | |
| 17 | A.    I think we've covered all of it. | |
| 18 | Q.    Okay.  Let me ask you this, Mr. Campbell:  Do | |
| 19 | you have any information that you -- your filing an EEOC | |
| 20 | charge in January '04 had any bearing on Amtrak's | 05:49:35 |
| 21 | decision to terminate you in September of '04? | |
| 22 | MS. PRICE:  I'm going to object.  The question | |
| 23 | is overbroad.  It calls for a legal conclusion.  It | |
| 24 | lacks foundation; calls for speculation.  Also, to the | |
| 25 | extent it's overbroad, I'm going to ask -- have to | 05:50:00 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | instruct the witness again. | 05:50:04 |
| 2 | You have to filter it.  Do not answer -- | |
| 3 | disclose any conversations or information that you've | |
| 4 | learned from talking to anyone in my office. | |
| 5 | THE WITNESS:  Okay.  The question again? | 05:50:18 |
| 6 | MS. MAYLIN:  Q.  Sure.  Do you have any reason | |
| 7 | to believe, Mr. Campbell, that the fact that you filed | |
| 8 | an EEOC charge in January '04 had any bearing on | |
| 9 | Amtrak's decision to terminate you in September '04? | |
| 10 | MS. PRICE:  Same objections. | 05:50:38 |
| 11 | THE WITNESS:  Coincident, maybe. | |
| 12 | MS. MAYLIN:  Q.  Okay.  Other than your | |
| 13 | feeling that it's coincidence, any other reason? | |
| 14 | A.    Nothing I can prove. | |
| 15 | Q.    Well, is there anything you can talk about | 05:50:53 |
| 16 | other than just your feeling that there might be some | |
| 17 | connection? | |
| 18 | A.    I can say, word through the grapevine is | |
| 19 | Mr. Deely did not like me because I was outspoken, and | |
| 20 | within months -- two months after I heard that, I was | 05:51:15 |
| 21 | fired. | |
| 22 | Q.    Okay. | |
| 23 | A.    So... | |
| 24 | Q.    All right.  But now let's get back to my | |
| 25 | question.  I appreciate the information, but back to my | 05:51:20 |

```
 1   question.  Do you have any information that there was      05:51:22
 2   any connection between a January '04 EEOC charge and a
 3   September '04 decision to terminate you?
 4          MS. PRICE:  Same objection.
 5          MS. MAYLIN:  Q.  Other than what you've told      05:51:34
 6   me.
 7          MS. PRICE:  Other than what you've already
 8   testified to, and subject to the same objection.
 9          MS. MAYLIN:  Right.
10          THE WITNESS:  I have no information.            05:51:41
11          MS. MAYLIN:  Q.  Okay.  Same question now, a
12   little different, do you have any information, sir, that
13   your race had any bearing on Amtrak's decision to
14   terminate you in September '04?
15          MS. PRICE:  Same objection.  Same instruction.  05:52:00
16          THE WITNESS:  I compared my record against the
17   other gentlemen that we talked about earlier, and they
18   did stuff that caused more and more damage than I got
19   accused of, and they're still working, so that's my gut
20   feeling.                                               05:52:20
21          MS. MAYLIN:  Q.  Okay.  And we're talking
22   about Ray, Bill, and John?
23      A.   Yes.
24      Q.   Okay.  Other than your belief that Ray, Bill,
25   and John had more rules infractions than you did, or    05:52:29
```

DEPOSITION OF JOHN EARL CAMPBELL

219

| | | |
|---|---|---|
| 1 | MS. MAYLIN:  Q.  Do you know -- | 06:23:38 |
| 2 | MS. PRICE:  He is available in ten minutes, so | |
| 3 | we'll have to take a break then. | |
| 4 | MS. MAYLIN:  Q.  Do you know if Dan Roberts | |
| 5 | had ever been issued a 20-day suspension for a rules | 06:23:45 |
| 6 | infraction? | |
| 7 | A.  Again, I don't know. | |
| 8 | Q.  Do you know if Dan Roberts had a formal | |
| 9 | reprimand in his file? | |
| 10 | A.  I do not know. | 06:23:56 |
| 11 | Q.  And do you know any of those things about | |
| 12 | Alfonso Bell? | |
| 13 | A.  No, I do not. | |
| 14 | Q.  Okay.  Okay.  If you could go down to page | |
| 15 | 000019.  This August 10, 2004 letter, Mr. Campbell. | 06:24:20 |
| 16 | A.  Uh-huh. | |
| 17 | Q.  Did you receive that from the Local Committee | |
| 18 | of Adjustment? | |
| 19 | A.  Let me read it. | |
| 20 | Q.  Okay. | 06:24:37 |
| 21 | A.  (Reviewing document.)  Yes, I remember | |
| 22 | receiving this. | |
| 23 | Q.  Okay.  Sir, do you have any information that | |
| 24 | Amtrak considers additional information above and beyond | |
| 25 | the ranking after the panel interview? | 06:25:34 |

DEPOSITION OF JOHN EARL CAMPBELL

1    Q.   All right.  Okay.  All right.  Sir, you --      08:03:37

2    well, in 2000 -- well, we've been talking a little bit

3    here, sir.  Earlier you'd listed three people for me who

4    you think had equal to or greater than numbers of rules

5    infractions -- can you -- and yet they were promoted.      08:04:14

6    Can you recall anyone else, now that we've been talking

7    for a bit, quite a long bit?

8       A.   No.

9                        (Whereupon, Defendants' Exhibit No.

10                       31 was marked for identification.)      04:48:10

11           MS. MAYLIN:   Q.   Okay.  What I'm attaching now

12    as Exhibit 31 -- I'm going to bunch these together.

13    Exhibit 31, Bates-stamped D01794, 95, 96, 97, and 98.

14    Now, I can't remember if we put this in as '01 or not,

15    are these all the exhibits?  Oh, you've got some here,      08:05:28

16    too?

17       A.   Yes.

18       Q.   Let me take a quick look.  We may have done

19    this, and then we can move on.  Here we go.  8/6/01.

20    Yeah.  Okay.  I think we got that.      08:05:46

21           All right.  What I have marked, though, as

22    Exhibit 31 then -- I'm going to make it a shorter

23    version -- and that is D01794.

24           Sir, we talked earlier about an '01

25    application.  Was this the posting that you applied for?      08:06:27

DEPOSITION OF JOHN EARL CAMPBELL

291

| | | |
|---|---|---|
| 1 | A.   Yes. | 08:06:49 |
| 2 | Q.   Okay.  If you take a look back at Exhibit 24, | |
| 3 | sir, you'll take a look on -- right above your signature | |
| 4 | on Bates-stamped D01798, under "Applicant's | |
| 5 | Qualifications," it says, "17 years of railroad | 08:07:06 |
| 6 | experience started in the S.P. track department, coupled | |
| 7 | with three years of T&E experience with Amtrak West." | |
| 8 | Sir, did you have 17 years of railroad experience in | |
| 9 | August '01? | |
| 10 | A.   It was combined with -- not 17, no. | 08:07:26 |
| 11 | Q.   Okay.  How many years railroad experience did | |
| 12 | you have in August '01?  I think you had eight years at | |
| 13 | the prior job, right? | |
| 14 | A.   Uh-huh.  And three years at Amtrak. | |
| 15 | Q.   Okay.  So that's 11 years, right? | 08:07:50 |
| 16 | A.   Yeah. | |
| 17 | Q.   So you were off by six years; is that true? | |
| 18 | A.   Yeah.  Where does it say "17" at? | |
| 19 | Q.   Where does it say that, sir? | |
| 20 | A.   The 17, yes. | 08:08:02 |
| 21 | Q.   Here.  If you -- here.  D01798.  You see where | |
| 22 | you signed here?  Do you see it now? | |
| 23 | A.   Yeah.  I think that's more than seven. | |
| 24 | Q.   Okay.  Well, in any event, 17 years is not | |
| 25 | true, correct? | 08:08:28 |

DEPOSITION OF JOHN EARL CAMPBELL

| | | |
|---|---|---|
| 1 | we are back on the record. | 08:22:47 |
| 2 | MS. MAYLIN:  Q.  Okay.  Mr. Campbell, earlier | |
| 3 | we looked at some -- the DFEH charge and the EEOC | |
| 4 | charge.  When you filled out that information, sir, you | |
| 5 | didn't hold anything back, did you? | 08:23:02 |
| 6 | MS. PRICE:  Objection.  Vague and ambiguous, | |
| 7 | and also lacks foundation; assumes facts; misstates the | |
| 8 | witness's testimony. | |
| 9 | MS. MAYLIN:  Q.  Go ahead, Mr. Campbell. | |
| 10 | A.    I don't think so. | 08:23:18 |
| 11 | Q.    Okay.  I mean, you didn't deliberately | |
| 12 | withhold information from either the EEOC or the DFEH, | |
| 13 | did you? | |
| 14 | A.    Not to my knowledge, no. | |
| 15 | Q.    Okay.  Mr. Campbell, it is true, isn't it, | 08:23:33 |
| 16 | that on some of your engineer applications you never | |
| 17 | received confirmation that they received your | |
| 18 | application, correct? | |
| 19 | A.    Correct. | |
| 20 | Q.    Okay.  So you can't say for sure, can you, | 08:23:54 |
| 21 | Mr. Campbell, that Amtrak received each and every one of | |
| 22 | your applications? | |
| 23 | A.    Correct. | |
| 24 | Q.    Okay.  And, really, the only ones that you can | |
| 25 | for sure say that Amtrak received are the ones where | 08:24:07 |

| | | |
|---|---|---|
| 1 | they sent you a -- a response -- a responsive letter, | 08:24:12 |
| 2 | correct? | |
| 3 | A.    Correct. | |
| 4 | Q.    All right.  And I think we looked at that, and | |
| 5 | that was on two occasions you received a responsive | 08:24:22 |
| 6 | letter, correct? | |
| 7 | A.    Correct. | |
| 8 | Q.    Then, Mr. Campbell, we do need to finish up, | |
| 9 | unfortunately. | |
| 10 | Have you told me all the ways in which being | 08:24:35 |
| 11 | terminated from Amtrak has affected you emotionally? | |
| 12 | A.    Mostly financially, spiritually. | |
| 13 | Q.    You told me that you've been feeling | |
| 14 | depressed, you've been introverted, and you believe | |
| 15 | that your eye has been having a problem because of | 08:24:58 |
| 16 | stress? | |
| 17 | A.    Yes. | |
| 18 | Q.    Any other ways, sir? | |
| 19 | A.    Those are the three major ways. | |
| 20 | Q.    Okay.  And have -- any of those three ways, | 08:25:12 |
| 21 | have they prevented you from working at Fed Ex, | |
| 22 | reporting to work and doing your job at Fed Ex? | |
| 23 | A.    No. | |
| 24 | Q.    Okay.  And have you talked to any family | |
| 25 | members or friends about the way you're feeling? | 08:25:29 |

DEPOSITION OF JOHN EARL CAMPBELL

1                   CERTIFICATE OF REPORTER

2

3         I, SHARON TRUJILLO, a Certified Shorthand

4 Reporter, hereby certify that the witness in the

5 foregoing deposition was by me duly sworn to tell the

6 truth, the whole truth, and nothing but the truth in the

7 within-entitled cause;

8         That said deposition was taken in shorthand by

9 me, a disinterested person, at the time and place

10 therein stated, and that the testimony of the said

11 witness was thereafter reduced to typewriting, by

12 computer, under my direction and supervision;

13         I further certify that I am not of counsel or

14 attorney for either or any of the parties to the said

15 deposition, nor in any way interested in the event of

16 this cause, and that I am not related to any of the

17 parties thereto.

18                  Dated:  March 7, 2007

19

20

21

22        SHARON TRUJILLO, CSR No. 6120

23

24

DEPOSITION OF JOHN EARL CAMPBELL

# EXHBIT A; PT. 2



# APPLICATION FOR EMPLOYMENT

IT IS THE POLICY OF THE **NATIONAL RAILROAD PASSENGER CORPORATION** TO PROVIDE EMPLOYMENT, TRAINING, COMPENSATION, PROMOTION AND OTHER CONDITIONS OF EMPLOYMENT IN A MANNER WHICH IS IN ACCORDANCE WITH ALL LEGAL REQUIREMENTS REGARDING RACE, COLOR, RELIGION, NATIONAL ORIGIN, SEX, AGE, DISABILITY, OR VETERAN STATUS.



**Please read carefully. Pre-Employment Statement**

I certify that the information contained in this application is correct to the best of my knowledge. I understand that falsification of this information or failure to provide complete and accurate information are grounds for dismissal. I authorize the Employment/Professional/Personal references listed to give you any and all information concerning my previous employment and any pertinent information they may have. I voluntarily give Amtrak the right to make a thorough investigation of my past employment and activities, and I agree to cooperate in such investigation. I release from all liability or responsibility all persons, companies or corporations supplying any information to Amtrak. NOTE: In accordance with the **FAIR CREDIT REPORTING ACT (Pre-Notification)**, I understand that as part of Amtrak's procedure for processing my application, an investigative report may be made whereby information is obtained through personal interviews with third parties, such as family members, business associates, financial sources, friends, neighbors, or others with whom I am acquainted. I understand that my employment with Amtrak is conditioned on successfully passing a physical examination, which will include a test to detect the presence of drugs and/or alcohol, and any future physical examinations as may be required by the Company. In consideration of my employment, I agree, if employed in a non-agreement position, that my employment and compensation can be terminated with or without cause, and with or without notice, at any time, at the option of either the Company or myself. I understand that no representative of Amtrak, other than the President or Assistant Vice President of Personnel, has any authority to, enter into any agreement for employment for any specified period of time, or to make any agreement contrary to terms of this Pre-Employment Statement, or any Amtrak Policy.

---

APPLICANT'S SIGNATURE: *John Campbell*

EXHIBIT *1* for identification
WITNESS: *J. Campbell*
DATE: *2-26-07*
SHARON TRUJILLO, CSR 6120

DATE: *9-1-98*

LAST NAME: *Campbell, John*
FIRST: *John*
M.I.: *F*
JOB APPLYING FOR: *ASST. Conductor*
DATE OF APPLICATION: *8-2-98*

D10282

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | 376-2004-00295 |

|  | California Department Of Fair Employment & Housing | and EEOC |
|---|---|---|
|  | State or local Agency, if any |  |

| Name (indicate Mr., Ms., Mrs.) | Home Phone No. (Incl Area Code) | Date of Birth |
|---|---|---|
| Mr. John E. Campbell | (510) 632-4260 | 11-20-1961 |

| Street Address | City, State and ZIP Code |
|---|---|
| 2210-109th Avenue, Oakland, CA 94603 | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|
| AMTRAK | Under 15 | (415) 591-7839 |

| Street Address | City, State and ZIP Code |
|---|---|
| ~~5th and Townsend, San Francisco, CA 94111~~  1351  St H  ST.  Bldg A. OMN-94  60 | |

| Name | No. Employees, Members | Phone No. (Include Area Code) |
|---|---|---|

| Street Address | City, State and ZIP Code |
|---|---|

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☒ RACE  ☐ COLOR  ☐ SEX  ☐ RELIGION  ☐ NATIONAL ORIGIN<br>☐ RETALIATION  ☐ AGE  ☐ DISABILITY  ☐ OTHER (Specify below.) | Earliest: 01-08-2004    Latest: 01-08-2004<br>☐ CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

"Hired=OAKLAND"

I was hired in 1998 and am a Conductor in the ~~San Francisco~~, California crew base. In November 2003 I faxed my application for Engineer to Respondent's Human Resources office in Los Angeles. Interviews were held in December 2003, but I was not called. I learned on or about January 8, 2004 that the selectees were Jason Garmon and Michael Poirier, both Caucasian.

I am senior to both selectees and believe I am better qualified for promotion. To the best of my knowledge and belief, Respondent has not promoted any Black employee to Engineer since 1998.

I believe I have been discriminated against because of my race, Black, in violation of the statute.

RECEIVED

FEB 09 2004

EEOC - OLO

EXHIBIT 3 for identification
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| x 1-28-04    x John E. Campbell<br>Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |

D09919

Please list all employment starting with your present or most recent employer. A[...]ude relevant voluntary and /or part-time work experience.   Use additional sheet(s) if necessary.

**PRESENT COMPANY** DEW TRANSPORTATION

STREET ADDRESS 1338 S Rowan Ave    CITY Los Angeles    STATE CA    ZIP CODE 90023

DATES EMPLOYED FROM 5-98 TO PRESENT    SUPERVISOR'S NAME Cornell Thompson    PRESENT SALARY 10.00 p. H.

TELEPHONE NO. (800) 444-0471    YOUR JOB TITLE TRUCK driver

MAJOR DUTIES: driving & delivering Around the Bay Area

WHY DO YOU WISH TO CHANGE? Benefits & A Bump in Pay.

MAY WE CONTACT THE ABOVE NOW? YES ☑ NO ☐ IF NOT, WHEN?

**PRIOR COMPANY** County of Alameda

STREET ADDRESS 8000 Edgewater Drive    CITY Oakland, CA    STATE    ZIP CODE 94621

DATES EMPLOYED FROM 4-97 TO PRESENT    SUPERVISOR'S NAME Marcelin Vasquez    SALARY 5.75 p. Hour

TELEPHONE NO. (510) 639-1321    YOUR JOB TITLE CARE-giver

MAJOR DUTIES: CARE FOR THE disable

REASON FOR LEAVING Still with them

**PRIOR COMPANY** VIA MESSENGER SERVICE

STREET ADDRESS 1736 6th St    CITY San Francisco    STATE CA    ZIP CODE 94111

DATES EMPLOYED FROM 3-92 TO 4-97    SUPERVISOR'S NAME Mike Goodman    SALARY 6.75 p. H.

TELEPHONE NO. ( )    YOUR JOB TITLE COURIER

MAJOR DUTIES: delivered inter-office mail through out Nor-Cal.

REASON FOR LEAVING: Company Went Bankrupt.

**PRIOR COMPANY** Southern Pacific Trans.

STREET ADDRESS 1357 5th Ave    CITY Oakland    STATE Ca    ZIP CODE 94607

DATES EMPLOYED FROM 5-84 TO 3-92    SUPERVISOR'S NAME Jim Smith    SALARY 14.95 p. H.

TELEPHONE NO. (510) 891-7759    YOUR JOB TITLE MACHINE Operator

MAJOR DUTIES: Maintain & Repair Railroad Right-Of-Way

REASON FOR LEAVING: Furlough

D10284

DO YOU HAVE ANY RELATIVES EMPLOYED __ AMTRAK?    YES ☐    NO ☑

A RELATIVE IS A:

MOTHER, FATHER, MOTHER-IN-LAW, FATHER-IN-LAW, HUSBAND, WIFE, SON, DAUGHTER, SON-IN-LAW, DAUGHTER-IN-LAW, GRANDPARENT, GRANDCHILD, BROTHER, SISTER, BROTHER-IN-LAW, SISTER-IN-LAW, AUNT, UNCLE, NIECE, NEPHEW, STEPPARENT, STEPCHILD OF AN EMPLOYEE OR AN EMPLOYEE'S SPOUSE

IF YES, PLEASE LIST:

| NAME | RELATIONSHIP | POSITION | LOCATION |
|------|--------------|----------|----------|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

PROFESSIONAL/PERSONAL REFERENCES

| NAME | ADDRESS | TELEPHONE NO. | OCCUPATION |
|------|---------|---------------|------------|
| Zelma Lollie | 305 N. Alvin BASTROP, LA 71220 | (3?) 375-281 0677 | MOTEL MANAGER |
| Cornell Thompson DEW TRANS | 1338 S. Rowan AVE LOS Angeles, CA 90023 | (800) 444-0471 | DISPATCHER |
| WAde HENDERSON | 8823 D. St. OAKLAND, CA | (510) 836-8844 | CITY WORKER |

HAVE YOU EVER:

BEEN CONVICTED OF A CRIME WHICH HAS NOT BEEN EXPUNGED OR REMOVE FROM YOUR RECORD?    ☐ YES  ☑ NO

BEEN DISCIPLINED OR DISCHARGED FOR ABSENTEEISM, TARDINESS, FAILURE TO NOTIFY YOUR COMPANY WHEN ABSENT, OR ANY OTHER ATTENDANCE-RELATED REASON?    ☐ YES  ☑ NO

BEEN DISCIPLINED OR DISCHARGED FOR THEFT, UNAUTHORIZED REMOVAL OF COMPANY PROPERTY, OR RELATED OFFENSES?    ☐ YES  ☑ NO

BEEN DISCIPLINED OR DISCHARGED FOR FIGHTING, ASSAULT, OR RELATED OFFENSES?    ☐ YES  ☑ NO

BEEN DISCIPLINED OR DISCHARGED FOR INSUBORDINATION?    ☐ YES  ☑ NO

BEEN DISCIPLINED OR DISCHARGED FOR POSSESSION OR USE OF ALCOHOL OR DRUGS AT WORK?    ☐ YES  ☑ NO

BEEN TERMINATED OR ASKED TO RESIGN FROM EMPLOYMENT FOR ANY REASON?    ☐ YES  ☑ NO

IF YOU ANSWERED YES TO ANY OF THE ABOVE QUESTIONS, PLEASE EXPLAIN.

D10285

PLEASE DESCRIBE ANY OTHER EXPERIENCES, SKILLS, LANGUAGES OR QUALIFICATIONS WHICH YOU CONSIDER RELEVANT TO YOUR ABILITY TO PERFORM THE JOB FOR WHICH YOU ARE APPLYING

PIOR RAILROAD EXP. KNOW ABOUT D.T.C. TRACK WARRANTS, WHEN A SWITCH IS PROPERLY LINED. HOW TO COUPLE-UNCOUPLE CAR; CAN OPERATE A LOCOMOTIVE.

NRPC 2187 (7/94)

WE APPRECIATE YOUR INTEREST IN AMTRAK AND THE TIME YOU HAVE TAKEN TO PREPARE THIS APPLICATION.

EEOC Form 5 (5/01)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA  ☒ EEOC | 376-2004-00295 |

| California Department Of Fair Employment & Housing | | and EEOC |
|---|---|---|

*State or local Agency, if any*

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone No. *(Incl Area Code)* | Date of Birth |
|---|---|---|
| Mr. John E. Campbell | (510) 632-4260 | 11-20-1961 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| 2210-109th Avenue, Oakland, CA 94603 | | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| AMTRAK | Under 15 | (415) 591-7839 |

| Street Address | City, State and ZIP Code | |
|---|---|---|
| ~~5th and Townsend, San Francisco, CA 94111~~  1351 80th STH ST. Bldg A. OAK-94606660 | | |

| Name | No. Employees, Members | Phone No. *(Include Area Code)* |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code | |
|---|---|---|

**DISCRIMINATION BASED ON** *(Check appropriate box(es).)*

[X] RACE  [ ] COLOR  [ ] SEX  [ ] RELIGION  [ ] NATIONAL ORIGIN
[ ] RETALIATION  [ ] AGE  [ ] DISABILITY  [ ] OTHER *(Specify below.)*

DATE(S) DISCRIMINATION TOOK PLACE
Earliest 01-08-2004    Latest 01-08-2004

[ ] CONTINUING ACTION

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

"HiRed & OAKLAnd"

I was hired in 1998 and am a Conductor in the ~~San Francisco~~, California crew base. In November 2003 I faxed my application for Engineer to Respondent's Human Resources office in Los Angeles. Interviews were held in December 2003, but I was not called. I learned on or about January 8, 2004 that the selectees were Jason Garmon and Michael Poirier, both Caucasian.

I am senior to both selectees and believe I am better qualified for promotion. To the best of my knowledge and belief, Respondent has not promoted any Black employee to Engineer since 1998.

I believe I have been discriminated against because of my race, Black, in violation of the statute.

RECEIVED
FEB 09 2004
EEOC - 010

EXHIBIT 3
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

D09919

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| x 1-28-04    x *John E. Campbell*  Date    Charging Party Signature | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(month, day, year)* |

EEOC Form 161-B (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### NOTICE OF RIGHT TO SUE (*ISSUED ON REQUEST*)

To:   John E. Campbell
      2210 109th Avenue
      Oakland, CA 94603

From:   Oakland Local Office
        1301 Clay Street
        Suite 1170-N
        Oakland, CA 94612

[ ]   On behalf of person(s) aggrieved whose identity is
      CONFIDENTIAL (29 CFR § 1601.7(a))

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 376-2004-00295 | Julian F. Melendres,<br>Investigator Support Asst | (510) 637-3242 |

(See also the additional information enclosed with this form.)

NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[X]   More than 180 days have passed since the filing of this charge.

[ ]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, the paragraph marked below applies to your case:

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*Joyce Hendy*                          10/15/04

Enclosure(s)                    Joyce A. Hendy,          (Date Mailed)
                                   Director

cc:   Elias Munoz
      EEO Compliance Manager
      NATIONAL RR PASSENGER COR

EXHIBIT **4**
(DEFT)
WITNESS: *J. Campbell*
DATE: *2-26-07*
SHARON TRUJILLO, CSR 6120

000008

# * * * EMPLOYMENT * * *

OMPLAINT OF DISCRIMINATION UNDER    DFEH #    E-200506-M-0250-00-c
HE PROVISIONS OF THE CALIFORNIA
AIR EMPLOYMENT AND HOUSING ACT                    DFEH USE ONLY

## CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

UR NAME (indicate Mr. or Ms.)    TELEPHONE NUMBER (INCLUDE AREA CODE)
John Earl Campbell    810-632-4266

DRESS    2210 109TH Ave.

TY/STATE/ZIP    OAKLand CA 94603    COUNTY Alameda    COUNTY CODE

AMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP
OMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:
ME    AMTRAK    TELEPHONE NUMBER (include Area Code)

DRESS    5040 Water St.    5th Floor    DFEH USE ONLY

TY/STATE/ZIP    OAKLand CA    94607    COUNTY    COUNTY CODE

. OF EMPLOYEES/MEMBERS (if known)    DATE MOST RECENT OR CONTINUING DISCRIMINATION    RESPONDENT CODE
TOOK PLACE (month, day, and year)

E PARTICULARS ARE:

n SEPT. 17, 2004 I was  ✓ fired    ___ denied employment    ___ denied family or medical leave
___ laid off    ___ denied promotion    ___ denied pregnancy leave
___ demoted    ___ denied transfer    ___ denied equal pay
___ harassed    ___ denied accommodation    ___ denied right to wear pants
___ genetic characteristics testing    ___ impermissible non-job-related inquiry    ___ denied pregnancy accommodation
___ forced to quit    ___ other (specify)

r Joe deely    Division Supt.
Name of Person    Job Title (supervisor/manager/personnel director/etc.)

ecause of my: ___ sex    ___ national origin/ancestry    ___ physical disability    ___ cancer    (Circle one) filing;
___ age    ___ marital status    ___ mental disability    ___ genetic characteristic    Protesting; participating in
___ religion    ___ sexual orientation    investigation (retaliation for)
✓ race/color    ___ association    ___ other (specify)

e reason given by    Joe deely - Division Supt.
Name of Person and Job Title

Vas    RETALIATION FOR FILING AN EEOC DISCRIMINATION
ecause of    COMPLAIN AghiNST AMTRAK FOR NOT PROMOTING
lease state
hat you    BLACKS TO THE ENGINEER POSITION IN OAKLand
elieve to be
ason(s)]

h to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right-to-sue notice. I understand that if I
s a federal notice of right-to-sue, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the
H "Notice of Case Closure," or within 300 days of the alleged discriminatory act, whichever is earlier.

e not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair
loyment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action."

lare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to
rs stated on my information and belief, and as to those matters I believe it to be true.

d    8-16-05    John Earl Campbell
COMPLAINANT'S SIGNATURE

OAKLand
City

EXHIBIT _5_
WITNESS: Jo Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 9120

REC
DATE FILED: 08/17/0 AUG 1 7 2005    000015

-300-03 (01/05)
RTMENT OF FAIR EMPLOYMENT AND HOUSING    STATE OF CALIFORNIA

STATE OF CALIFORNIA - STATE AND CONSUMER SERVICE AGENCY                    ARNOLD SCHWARZENEGGER, Governor

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**
1515 Clay Street, Suite 701, Oakland, CA 94612-2512
(510) 622-2941 TTY (800) 700-2320 Fax (510) 622-2951
www.dfeh.ca.gov



August 29, 2005

JOHN EARL CAMPBELL
2210 109th Avenue
Oakland, CA 94603

RE:    E200506M0250-00-c
       CAMPBELL/AMTRAK

Dear JOHN EARL CAMPBELL:

### NOTICE OF CASE CLOSURE

This letter informs that the above-referenced complaint that was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective
August 17, 2005 because an immediate right-to-sue notice was requested. DFEH
will take no further action on the complaint.

This letter is also the Right-To-Sue Notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the
Fair Employment and Housing Act against the person, employer, labor organization
or employment agency named in the above-referenced complaint. The civil action
must be filed within one year from the date of this letter.

If a federal notice of Right-To-Sue is wanted, the U.S. Equal Employment
Opportunity Commission (EEOC) must be visited to file a complaint within 30 days
of receipt of this DFEH *Notice of Case Closure* or within 300 days of the alleged
discriminatory act, whichever is earlier.

EXHIBIT (DEF) 6 for identification
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 8120

EXHIBIT A

Notice of Case Closure
Page Two

The Department of Fair Employment and Housing does not retain case files beyond
three years after a complaint is filed, unless the case is still open at the end of the
three-year period.

Sincerely,

Dorothy Padilla
District Administrator

cc:    Case File

EEO Representative
Human Resource Department
AMTRAK
5041 Water Street 5th Fl
Oakland, CA  94607

DFEH-200-43 (04/03)

NEW- HIRE CHECKLIST - AGREEMENT COVERED POSITION

| YES | NO | N/A | |
|---|---|---|---|
| ( ✓ ) | ( ) | ( ) | NRPC 2525 STANDARDS OF EXCELLENCE |
| ( ) | ( ✓ ) | ( ) | HEALTH & WELFARE BENEFITS - AMPLAN |
| ( ✓ ) | ( ) | ( ) | NATIONAL DENTAL PLAN - AETNA GP12000 |
| ( ✓ ) | ( ) | ( ) | BUSINESS TRAVEL ACCIDENT INSURANCE (CG0386430-06) |
| ( ) | ( ✓ ) | ( ) | APPLICABLE LABOR AGREEMENT: |
| ( ✓ ) | ( ) | ( ) | EEO INTERNAL COMPLAINT PROCEDURES HANDOUT |
| ( ✗ ) | ( ✓ ) | ( ) | AFFIRMATIVE ACTION PROGRAM |
| ( ✓ ) | ( ) | ( ) | EQUAL EMPLOYMENT OPPORTUNITY POLICY |
| ( ✓ ) | ( ) | ( ) | ATTENDANCE POLICY |
| ( ✓ ) | ( ) | ( ) | FEDERAL/STATE W4 FORMS |
| ( ✓ ) | ( ) | ( ) | EMPLOYEE INFORMATION FORM - NRPC 2001 |
| ( ) | ( ) | ( ) | AUTHORIZATION FOR DIRECT DEPOSIT - NRPC 2032 |
| ( ✓ ) | ( ) | ( ) | SAVINGS BOND APPLICATION FORM |
| ( ✓ ) | ( ) | ( ) | EMPLOYEE ASSISTANCE PROGRAM BOOKLET |
| ( ✓ ) | ( ) | ( ) | EDUCATIONAL ASSISTANCE POLICY |
| ( ✓ ) | ( ) | ( ) | RAILROAD RETIREMENT & SURVIVOR BENEFITS BOOKLET |
| ( ✓ ) | ( ) | ( ) | EMPLOYEE ELIGIBILITY VERIFICATION (INS FORM - I-9) |
| ( ✓ ) | ( ) | ( ) | SEXUAL HARASSMENT INFORMATION |
| ( ✓ ) | ( ) | ( ) | FLASH PASS |

EXHIBIT ___
WITNESS: S. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR #120

DATE: 9-30-98    SIGNATURE: ~~John E Campbell~~ - John Ed Campbell

SS #: 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    NAME: John Earl Campbell
(PLEASE PRINT)

POSITION. ASST. Conductor    D10275

PERSONNEL DEPARTMENT REPRESENTATIVE: Denise H. Sargeant

# Receipt

My signature indicates that I have received a copy
of the *Service Standards Reference Manual for
Train Service and On-Board Service Employees.*
I understand that I am responsible for reading and
updating my manual and that I must follow the
procedures outlined. I also understand that this
receipt will be placed in my personnel file.

Name: _John Campbell_
(please print)

Signature: _John Campbell_

Date: _5-14-04_

Issuing Location: _Oakland_

Service Standards Manual No.2

EXHIBIT PLT / /
DEF'D for identification
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

D10498

# ACKNOWLEDGEMENT OF RECEIPT OF ●TRAK
## STANDARDS OF EXCELLENCE

I have received a copy of the booklet entitled "Amtrak Standards of Excellence."
I understand that I should read the booklet carefully and that I will be expected to
follow the standards of excellence outlined in it. I understand that failure to follow
these standards will result in appropriate corrective or disciplinary action.

Employee Signature: *John Earl Campbell*

Print Name: *JOHN EARL CAMPBELL*

Date: *9-30-98*

Signature of Company Representative: *Denise H Sargeant*

Print name: *DENISE H. SARGEANT*

Date: *9/30/98*

*Please detach this form and give to company representative for your employee file.*

ii

EXHIBIT PLT. DEFT. *12* for identification
WITNESS: *J. Campbell*
DATE: *2-26-07*
SHARON TRUJILLO, CSR 6120

D10292

 

 National Railroad Passenger Corporation, California Corridor, 1851-A 5th Street, Oakland, CA 94607

**Amtrak®**
**West**

## WAIVER OF RIGHT TO FORMAL INVESTIGATION

Date: April 12, 2000

I hereby waive my right to the Formal Investigation originally scheduled for April 12, 2000, 2:00 p.m., at Mechanical Facility, 250 Wood St., Oakland, California in connection with the following:

**Charges**: "Your alleged failure to follow the General Code of Operating Rules, Third Edition, 1.1.3, 6.28, 7.1, 7.3, & 7.5; Safety rule: 5316(e); and AMT-3 rule 16.2.2.

**Specifications**: Damage to equipment during the 11PM yard assignment of March 24, 2000. Damage to the cables occurred when 8804 was cut from car 8030 on 2 track. And further damage was done when 8804 was moved to 8 track. The 8027 and 8020 were in the 8 track. The 8020 was shoved into the 8027 by the move of the 8804. Damages were unreported.

I further hereby agree to accept the following discipline assessed by the National Railroad Passenger Corporation:

**A letter of reprimand will be issued to you and placed in your file.**

John Campbell
Employee Name (Print)

_signature_
Employee Signature

4-13-00
Date

_signature_
Witness Signature

4-13-00
Witness Signature

Cc: B. Barnes
R. A. Wood
Roger Butler - File # 0161.00
R. Belloumini-UTU Local Chairman

EXHIBIT 13
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR #120

AN EQUAL OPPORTUNITY EMPLOYER    EXHIBIT B



National Railroad Passenger Corporation, Law Department, 344 Mira Loma Avenue, Glendale, California  91204

## DECISION



**March 28, 2002**
**File #LAX-UTU-02/DISC**
**Case #019.02**

FedEx Tracking #8313 2752 9178

Mr. John Campbell
2210 109th Avenue
Oakland, CA 94603

```
EXHIBIT   PER        14
          DEFT.           for identification
WITNESS:       J. Campbell
DATE:       2-26-07
        SHARON TRUJILLO, CSR 6120
```

Dear Mr. Campbell:

By letter, dated January 17, 2002, you were charged with the following misconduct:

**Charge 1**: Your alleged violation of the **_General Code of Operating - Fourth Edition - April 2, 2000 - Rule 6.28 - Movement on Other than Main Track_**, which reads, "Except when moving on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

- ♦ Train.
- ♦ Engine.
- ♦ Railroad car.
- ♦ Men or equipment fouling the track.
- ♦ Stop Signal or Derail or switch lined improperly."

**Charge 2**: Your alleged violation of the **_General Code of Operating Rules - Fourth Edition - April 2, 2000 - Rule 7.1, Switching Safely and Efficiently_**, which reads in part... "While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property."

**Charge 3**: Your alleged violation of the **_General Code of Operation Rules - Fourth Edition - April 2, 2000 - Rule 7.4 Precautions for Coupling or Moving Cars or Engines_**, which reads "Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

Make couplings at a speed of not more than 4 MPH.  Stretch the slack to ensure that all couplings are made."

**Charge 4**: Your alleged violation of the **_General Code of Operation Rules - Fourth Edition - April 2, 2000 - Rule 7.12 Movements into Spur Tracks_**, which reads in part... "When shoving into a spur track, control movement to prevent damage at the end of track...".

EXHIBIT D

**Decision Letter**
**Mr. John Campbell**
**Case #019.02**
**Page Two**

**Specifications**: It is alleged that while working as the Conductor on Yard Job CYO-4 on January 10, 2002, while shoving into Fume track in the Oakland yard with 17 cars and 3 units, you were directing the movement when an alleged hard coupling resulted in equipment damage and the derailment of a boxcar.

After one postponement, the Hearing Officer conducted a disciplinary investigation into the above-quoted charges. The investigation was conducted on March 15, 2002, in which your representative were in attendance. The following findings are based on the evidence and testimony presented at the investigation:

> The rule cited was in effect and applicable to you at the time of the alleged wrongdoing, as it is applicable to all Amtrak employees in your job category.

> The charges were sustained primarily, although not exclusively, by your own testimony and omission, and the testimony of Mr. Sid Birckett.

Based on the foregoing findings and the hearing record as a whole, I find that you are guilty of the above-quoted charges. The transcript of the aforementioned investigation will be forthcoming per the agreement with the union.

Sincerely,

*Roger R Butler*

Roger R. Butler
Hearing Officer
Western Region

Mar 22 02 04:17p     Jay Commer CalifCorr     510-433-5915     p.4
3-20-2002 2:46PM     FROM⬤W DEPAPTMENT 8185472532     ⬤     ▸ ɑ

**Decision Letter**
**Mr. John Campbell**
**Case #019.02**
**Page Three**

Based on the decision of Hearing Officer Butler, you are hereby assessed discipline of:

\* TEN DAYS SUSPENSION TO INCLUDE THE FOLLOWING:

\* 4 Days Time Served from January 12, 2002 – January 15, 2002
and 6 Days Suspension to be served between April 3, 2002 and to
include April 8, 2002, and Ten Days to be held in abeyance.

Sincerely,

*Jay Commer*
Jay Commer
General Manager
California Corridor

cc:     G. Baxter
R. Belluomini-FedEx Tracking #8313 2752 1989
Personnel
Labor Relations



AMTRAK Jo0A

50l735 83

Engine SERVICE

C/0

EXTERNAL PAUl HO

FAXED
Not been
to Paul    11-19-03

EXHIBIT 17
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

D09960

11/19/03  12:02  FAX 15106524280  JOHN F. CAMPBELL

JOHN CAMPBELL
2210 109th. AVE.
(510) 632-5081
OAKLAND, CALIFORNIA
94603-4032


JOB HISTORY

5-84/2-92    SOUTHERN PACIFIC TRANS.
             MACHINE OPERATOR
             REPAIR RAILROAD RIGHT-OF-WAY; OPERATED SEVERAL TRACK MACHINES
             TAMPERS,BALLAST REGULATOR,HI-RAILER, ETC.

2-92/4-97    VIA MESSENGER SERVICE
             COURIER
             DELIVERED INTER-OFFICE IN DOWNTOWN SAN FRANCISCO.

4-97/PRESENT  COUNTY OF ALAMEDA
             IN-HOME CARE GIVER
             PROVIDE IN-HOME SERVICE TO THE AGING & DISABLE.


EDUCATION

9-80/6-81
             MERRITT COLLEGE  1 SEMESTER-LITERATURE          OAKLAND.CA

10-77/6-80
             OAKLAND HIGH SCHOOL    CLASS OF 80         3.26 G.P.A.


ACTIVITIES   FISHING,HIKING,FOOTBALL,BASEBALL & BOWLING.
AWARDS       PERFECT ATTENDENCE SR.YEAR OF HIGH SCHOOL.
             SAFETY AWARD 1987 SOUTHERN PACIFIC.


REFERENCES        AVAILABLE UPON REQUEST


D09961

09/17/2004  14:31    5104370915        AMTRAK    PAGE  01
1. 05/16/2004  10:15    121   37092    LAW DEPARTMENT    PAGE  01

NATIONAL RAILROAD PASSENGER CORPORATION
810 North Alameda Street, Los Angeles, CA 90012

## DECISION



September 17, 2004
File #LAX-UTU-04/DISC
Case #386.04

Federal Express #7919 3003 8200

Mr. John Campbell
2210 109ᵗʰ Avenue
Oakland, CA 94603

Dear Mr. Campbell:

By letter, dated August 6, 2004, Case #386.04, you were directed to appear for a formal investigation.

A formal disciplinary investigation was conducted on September 9, 2004, in which you and your union representative were in attendance. The following findings are based on the evidence and testimony presented at the investigation:

1.    The rules cited were in effect and applicable to you at the time of the alleged wrongdoing, as it is applicable to all Amtrak employees in your job category.

2.    Charge 2 was not sustained.

3.    Charges 1, 3, 4 and 5 were proven.  It is evident on the record by the testimony of the Corporation's witnesses and your own testimony that you clearly violated the rules and instructions regarding the movement and coupling of cars and engines.

Based on the foregoing findings and the hearing record as a whole, I find that you are guilty of the charges.  The transcript of the aforementioned investigation is enclosed.

Sincerely,

Patrick Gallagher
Hearing Officer
Western Region

EXHIBIT    PLT____ 19
              DEF____    for identification
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

EXHIBIT  J

09/17/2004  14:31     510435▇915          AMTRAK          ●                    PAGE  02

**Decision Letter**
Mr. John Campbell
Case No. 386.04
Page Two



Based on the decision of Hearing Officer, Gallagher, you are hereby assessed discipline of:

Termination from service, effective immediately. This decision is based on the current charges and your previous Discipline Record listed below:

| Date | Charge/Rule Violation | Discipline Assessed |
|------|----------------------|---------------------|
| 4/4/00 | GCOR Rules - 1.1.3 Accidents, Injuries, and defects, 6.28 Other than Main Track Movements, 7.1 Switching safely, 7.3 Switching precautions, 7.5 Testing Hand Brakes, 7.6 Securing cars and engines | Waived |
| 1/14/02 | GCOR Rules – 7.1 Switching Safely and Efficiently, 7.4 Precautions for Coupling and Moving Cars or Engines, 7.12 Movements into Spur Tracks | S10 |

Sincerely,

*SE Shelton*

S. E. Shelton
District Superintendent
Pacific Division – Bay District

SES/lr

cc:     B. Adams – UTU Chairman – Fed Ex Tracking 7902 6820 6654
        L. C. Hriczak – Director – Labor Relations
        T. Duffy – Director – Human Resources

November 9, 2004

Mr. A. L. Suozzo, General Chairperson
United Transportation Union
1515 Market Street, Suite 708
Philadelphia, PA 19102

Re:    OC-UTU-SD-1678D
       J. Campbell

Dear Mr. Suozzo:

We discussed this case during our conference on October 27, 2004, with Mr. R. M. Lenfest, of
your staff. The case involves the dismissal of Conductor John Campbell, Oakland, California, in
connection with the following charges:

> "Charge 1: Your alleged violation of Amtrak's Service Standards for Train Service
> Employees - Manual No. 2 (effective 5/3/2004) - Chapter 3B - Safety Rules for Train
> Service Employees - Rule 5800 - Coupling or Uncoupling Engine or Cars, which reads
>
> > 'Prior to going on, under or between standing equipment for the purpose
> > of coupling or uncoupling engines or cars, crewmembers must:
> >
> > - Discuss safety matters and work to be performed.
> > - Communicate before action is taken.
> > - Protect against moving equipment.
> > - Secure equipment before action is taken.
> > - Mentor less experienced employees to perform service safely.'

Charge 2: Your alleged violation of General Code of Operating Rules - Fourth Edition -
April 2, 2000 - Rule 7.1 - Switching Safely and Efficiently, which reads in part... 'While
switching, employees must work safely and efficiently and avoid damage to contents of
cars, equipment, structures, or other property.'

Charge 3: Your alleged violation of General Code of Operating Rules - Fourth Edition -
April 2, 2000 - Rule 1.47 - Duties of Trainmen and Enginemen, Item D Other Crew
Members' Responsibilities, Part 1. 'To ensure the train is operated safely and rules are
observed, other crew members must assume as much responsibility as possible to prevent
accidents or rules violations.'

EXHIBIT ___ 2-1
RLT.
DEPT.    for identification
WITNESS:    J. Campbell
DATE:    2-26-07
SHARON TRUJILLO, CSR 6120

EXHIBIT M

Mr. A. L. Suozzo　　　　　　　　　Re:　OC-UTU-SD-1678D
November 9, 2004　　　　　　　　　　　J. Campbell
Page 2

> Charge 4:  Your alleged violation of General Code of Operating Rules - Fourth Edition - April 2, 2000 - Rule 7.4 - Precautions for Coupling or Moving Cars or Engines, which reads in part... 'Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.'

> Charge 5: Your alleged violation of Amtrak Air Brake and Train Handling Rules and Instructions, AMT-3 - Revised and Reissued August 19, 2002 - Rule 2.14.16: which reads... 'Multiple lite locomotives may be moved within the confines of a yard or terminal without connecting the M.U. hoses, as long as the brake pipe and main reservoir hoses are connected with associated angle and main reservoir cocks open.'

> Specification: It is alleged that on July 24, 2004 while assigned to position CYO103 working as the Conductor in the Oakland Diesel Shop you cut out the brakes on a locomotive and failed to properly secure it prior to coupling."

During conference, the Organization contended that the Carrier failed to call the assistant conductor to testify; that the Claimant's inability to connect air hoses on the pit mitigated his guilt; and that Claimant's actions did not result in damage or delay to a train.  The union contended further, that in any event, the discipline assessed was excessive.  For these reasons, the Organization requested that the discipline be expunged from the Claimant's record and that he be restored to service with pay for time lost and all rights and benefits unimpaired.

The record indicates that the Claimant was properly notified, in writing, of the charge against him and was given proper notice to appear for the investigation on August 10, 2004.  At the investigation, which had been postponed–by mutual agreement–until September 9, 2004, the Claimant was present and represented by a duly authorized representative of the Organization, who was permitted to cross-examine witnesses and present evidence on his behalf.

There is no evidence in the record in this case that any action of the carrier was an abuse of the discretion vested in it.  The record clearly shows that the Claimant's rights to a fair and impartial investigation were not violated and that there is substantial evidence to support the Hearing Officer's finding that he was guilty of charges 1, 3, 4 and 5.  Charge 2 was not sustained.

The Carrier was not required to call the assistant conductor to testify inasmuch as the charges were proven through the testimony of Mr. Dave West, Foreman, as well as Claimant's admission that he disabled the brakes on the locomotive and left it on the pit.  Their testimony disclosed that the locomotive rolled away during a hard coupling on the service track because the Claimant had disabled its brakes. The record reveals that Foreman West ran after the locomotive, boarded it, cut the trucks back in, and was able to stop it from rolling further.

Mr. A. L. Suozzo                          Re:    OC-UTU-SD-1678D
November 9, 2004                                 J. Campbell
Page 3

The Claimant has offered no evidence in support of his unsubstantiated assertion that it was
unsafe to cut in the locomotive's trucks while it was on the pit. Such contention is nothing more
than a self-serving attempt to mitigate his admitted violation of the rules with which charged.

Finally, in view of the Claimant's admission and in consideration of his service record, which
includes progressive discipline, both a reprimand and a twenty-day suspension (ten days actual
and ten held in abeyance), for operating rule violations involving switching, securing, and
coupling equipment, the discipline assessed was commensurate and was not arbitrary, capricious
or excessive. The Claimant has been afforded sufficient opportunity to correct his behavior to
comply with the Carrier's operating rules and failed to do so. The Carrier need not retain
employees in its service who are unable to work safely and are either unable or unwilling to
comply with the Carrier's operating rules.

For these reasons, your appeal is denied in its entirety.

Very truly yours,

*Larry C. Hriczak 11/9/04*

Larry C. Hriczak
Director-Labor Relations

bc:    Joe Deely
       Steve Shelton
       Bob Schmitt
       Milton Lundy
       Betty Blair
       Jim Ryan
       Lou De Phillips
       Jennifer Rieker
       Val Giulian
       Lisa Caridine
       Dick Wood
       Rick Sandler
       Library



Page 1 of 2

Job Reference # 50173583

**Amtrak - California-Oakland/East Bay - Passenger Enigneer (2) eff 11/14/2003**

The closing date for this position is November 21, 2003. The salary for this position is $16.11 per hour.

Internal applicants only.

Summary of Duties:
Consistently and safely operates locomotives and trains in compliance with federal regulations and corporate policies. Operates equipment during varying work hours within a 24/7 transportation environment maintaining alertness, situational awareness and vigilance. Thinks and functions independently and utilizes clear and effective verbal communication skills in interaction with fellow crew members and other personnel responsible for safe and efficient train movement.

Education:
High School diploma or GED required. Some college or vocational training preferred.

Work Experience:
Some work experience demonstrating the ability to maintain alertness, awareness and vigilance, as well as clear, effective verbal communication skills in the performance of work. Satisfactory attendance and safe work record. Prior railroad operating experience and work history that demonstrates ability to adapt to variable and often changing work hours preferred. Preference given to individuals who were trained by a Class 1 carrier or equivalent passenger railroad and are currently certified as Class 1 Train Service Engineers.

Other Requirements:
1. Must provide a certified copy of motor vehicle driving record from the chief of the state driver's licensing agency in which the applicant was last issued a license and any license(s) issued or reissued from other state(s) within the preceding 60 months. Motor vehicle records must be void of any drug and alcohol violations within the previous 36 months.
2. Must have a motor vehicle driving record void of any convictions or state action canceling, revoking, suspending or denying a driver's license for operating a motor vehicle while under the influence of or impaired by alcohol or a controlled substance within the last 36 months or a record of refusal to undergo such testing as required by state law within the last 36 months.
3. Must sign a release of records authorizing all previous railroad employers to provide Amtrak with background information, if applicable. In accordance with FRA regulations, previous

http://www.teamrewards.net/task/job_posting.jsp?ts_am3q25ml2k13=2704                    11/14/2003

railroad service records must be void of any drug and alcohol violations within the previous 60 months.

Other:
If selected, incumbent will be required to successfully complete Engineer Training as follows:
Individuals not previously certified as Class 1 Train Service Engineers:
7-10 weeks classroom and field work while headquartered at Amtrak's Training Center in Wilmington, DE; followed by extensive qualifying and on-the-job training associated with the Crew Base for which hired; paid at the student training rate until incumbent achieves certification as a Class 1 Train Service Engineer (currently $16.11/hour straight time).

Individuals currently certified as Class 1 Train Service Engineers:
2-4 weeks classroom and field work while headquartered at Amtrak's Training Center in Wilmington, DE, followed by additional qualifying associated with the Crew Base for which hired; paid at the rate determined by the agreement schedule.

Incumbents are subject to periodic medical examinations including random drug and alcohol screenings.

Travel:
100 percent
Job Notes

**Last Day to Apply:** 11/21/2003
**Job Category:** Transportation
**Years of Experience:** 1- 5
**Travel Requirements:** High
**Relocation Benefits may Apply:** No
**Referral Bonus:** 0 points

AMTRAK is an equal opportunity employer committed to employing a diverse workforce. Internal AMTRAK employees must complete a job opportunities application to apply for positions.

© Copyright 2001 TeamRewards.com. All Rights Reserved.

# Notice of Formal Investigation
### Fed Ex Tracking # 7917 5568 9868

January 17, 2002

*EXH #1*

Mr. John E. Campbell
2210 109th Avenue
Oakland, CA 94603

**Case No. 019.02**

Dear Mr. Campbell:

You are hereby directed to appear for a Formal Investigation to be conducted as follows:

| | |
|---|---|
| **Date:** | January 25, 2002 |
| **Time:** | 3:00 PM |
| **Location:** | Amtrak's Jack London Station |
| | 245 2nd Street, 2nd Floor |
| | Oakland, CA 94607 |

The purpose of this investigation is to develop the facts and determine your responsibility, if any, in connection with the following:

**Charge 1:** Your alleged violation of the **General Code of Operating – Fourth Edition – April 2, 2000 – Rule 6.28 – Movement on Other than Main Track,** which reads, "Except when moving on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

- ❖ Train.
- ❖ Engine.
- ❖ Railroad car.
- ❖ Men or equipment fouling the track.
- ❖ Stop Signal or Derail or switch lined improperly."

**Charge 2:** Your alleged violation of the **General Code of Operating Rules – Fourth Edition – April 2, 2000 – Rule 7.1, Switching Safely and Efficiently,** which reads in part… "While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property."

EXHIBIT ___27___
for identification
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

Mr. John Campbell
Case No. 019.02
Page 2

**Charge 3:** Your alleged violation of the **General Code of Operating Rules – Fourth Edition – April 2, 2000 – Rule 7.4 Precautions for Coupling or Moving Cars or Engines,** which reads, "Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

Make couplings at a speed of not more than 4 MPH. Stretch the slack to ensure that all couplings are made."

**Charge 4:** Your alleged violation of the **General Code of Operating Rules – Fourth Edition – April 2, 2000 – Rule 7.12 Movements into Spur Tracks,** which reads in part… "When shoving into a spur track, control movement to prevent damage at the end of track.…"

**Specifications:** It is alleged that while working as the Conductor on Yard Job CYO-4 on January 10, 2002, while shoving into Fume track in the Oakland Yard with 17 cars and 3 units, you were directing the movement when an alleged hard coupling resulted in equipment damage and the derailment of a box car.

You may produce any witnesses you desire and may be accompanied by a representative as provided in your current and governing agreement, without expense to the National Railroad Passenger Corporation.

All requests for postponements of this investigation must be handled through the Hearing Office at (818) 547-2519.

Sincerely,


Gregg Baxter
Assistant General Manager
California Corridor

cc:     L. J. Commer - GM
        S. Birckett – AGM
        R. Wood – Labor Relations
        R. Butler – Hearing Office
        R. Belluomini – UTU Local Chairman
        L. Bellotti – Facility Manager
        D. Roberts – General Foreman
        M. McBride – Manager Operating Rules
        R. Robusto – Senior Director OPS

PUBLIC LAW BOARD NO. 6478

Case No. 37
Award No. 37

(United Transportation Union

**PARTIES TO DISPUTE:** (

(National Railroad Passenger Corporation (Amtrak)

**STATEMENT OF CLAIM:**

"Request the discipline of a ten days suspension to include the following: 4 days time served from January 12, 2002 – January 15, 2002 and 6 days suspension to be served between April 3, 2002 and to include April 8, 2002, and ten days to be held in abeyance, imposed upon John Campbell be rescinded and expunged from this record, and that he be compensated for all time lost in connection with the following charges:

**Charge 1:** Your alleged violation of the <u>General Code of Operating – Fourth Editions - April 2, 2000 - Rule 6.28 - Movement on Other Than Main Track,</u> which reads, 'Except when moving on a track where a block system is in effect, trains or engines must move at a speed that allows them to stop within half the range of vision short of:

- **Train**
- **Engine**
- **Railroad Car.**
- **Men or equipment fouling the track.**
- **Stop Signal or Derail or switch lined improperly.'**

**Charge 2:** Your alleged violation of the <u>General Code of Operating – Fourth Editions - April 2, 2000 - Rule 7.1 Switching Safely and Efficiently,</u> which reads in part... 'While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property.'

**Charge 3:** Your alleged violation of <u>General Code of Operating - Fourth Editions - April 2, 2000 - Rule 7.4 Precautions for Coupling or Moving Cars or Engines,</u> which reads, 'Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

EXHIBIT DEF# 29 for identification
J. Campbell
WITNESS:
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

D09554

Public Law Board No. 6478
Case No. 37: Award No. 37
Page 2 of 3

'Make couplings at a speed of not more than 4 MPH. Stretch the slack to ensure that all couplings are made.'

Charge 4: Your alleged violation of <u>General Code of Operating - Fourth Editions - April 2, 2000 - Rule 7.12 Movements into Spur Tracks</u>, which reads in part... 'When shoving into a spur track, control movement to prevent damage at the end of the track...'

<u>Specifications</u>: It is alleged that while working as the Conductor on Yard Job CYO-4 on January 10, 2002, while shoving into the Fume track in the Oakland yard with 17 cars and 3 units, you were directing the movement when an alleged hard coupling resulted in equipment damage and the derailment of a boxcar."    [System Docket OC-UTU-SD-829D]

## FINDINGS:

This Board, after hearing upon the whole record and all the evidence finds that the Carrier and the Employee involved in this dispute are respectively Carrier and Employee within the meaning of the Railway Labor Act, as amended; this Board has jurisdiction over the dispute involved herein; and, the parties were given due notice of hearing thereon.

This Board will forego a full discussion of the instant case due to its careful examination of the record on the property. The Agreement provision specifically sets forth in Rule 25 (Discipline) the procedures for appeal. Once the discipline is imposed, the appeal must be made within fifteen (15) days "to the Labor Relations officer having jurisdiction" in the process. There is no dispute in this record, that the Claimant was notified by date of March 28, 2002 of the Carrier's findings of guilt. There is no dispute in this record that the Organization filed claim with the Carrier's highest officer by letter of April 12, 2002. There is no record of any proper handling at the second level of appeal before it went to the highest officer.

The Board is compelled by Section 3, First (I) of the Railway Labor Act, which precludes consideration of claims that are not "handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes", *to dismiss such claims*. When, as here, the appeal process has clearly not been followed in the usual manner on the property, the Board has no recourse, but to dismiss the

D09555

Public Law Board No. 6478
Case No. 37: Award No. 37
Page 3 of 3

dispute without reaching the merits. The Carrier's position on property with regards to this issue is deemed proper. The claim must be dismissed.

**AWARD:**

The claim is dismissed.

Marty E. Zusman, Chairman
Neutral Member

C. A. Iannone
Organization Member

Wm. H. Robinson, Jr.
Carrier Member

Date: 8/2/04

D09556

# united transportation union

A.L. Suozzo
General Chairperson

GENERAL COMMITTEE OF ADJUSTMENT GO-769

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK)
MASSACHUSETTS BAY COMMUTER RAILROAD (MBCR)
HERZOG TRANSIT SERVICES, INC.
CONRAIL SAA

**CERTIFIED MAIL**
**RETURNED RECEIPT REQUESTED**
**& REGULAR MAIL**
**7004 1350 0005 2727 1918**

R. M. Lenfest, Jr.
Vice Chairperson

G. R. Galvin
Secretary

July 18, 2005

Mr. John E. Campbell
2210 109th Ave.
Oakland, CA 94603

Dear Sir and Brother:

This is to advise you that the following claim in connection with which you are the Claimant, will be heard by Public Law Board No. 6478, on Monday, August 8, 2005, at 9:00 AM in the Carrier's office, Labor Relations Conference Room, 30th Street Station, 2nd Floor South Tower, Philadelphia, PA.

**System Docket No. OC-UTU-SD- SD-1678D-** Request the discipline of dismissal imposed upon J. Campbell be expunged from his record and that he be restored to service with seniority and vacation rights unimpaired and compensated for all time and expenses incurred inclusive of Health and Welfare premiums, Reduced Train Crew Allowance and Productivity Savings Sharing Allowance and credit for Railroad Retirement payments for each month for all time lost in connection therewith:

"**Charge 1:**   Your alleged violation of Amtrak's Service Standards for Train Service Employees - Manual No. 2, (effective 5/3/2004-Chapter 3B - Safety Rules for Train Service Employees - Rule 5800 – Coupling or Uncoupling Engine or Cars, which reads:

'Prior to going on, under or between standing equipment for the purpose of coupling or uncoupling engines or cars, crewmembers must:

- Discuss safety matters and work to be performed.
- Communicate before action is taken.
- Protect against moving equipment.
- Secure equipment before action is taken.
- Mentor less experienced employees to perform service safely.'



000109

1515 MARKET STREET, SUITE 708, PHILADELPHIA, PENNSYLVANIA 19102

Mr. John E. Campbell
July 18, 2005
Page 2

**Charge 2:** Your alleged violation of **General Code of Operating Rules-Fourth Edition - April 2, 2000-Rule 7.1 – Switching Safely and Efficiently,** which reads in part . . . 'While switching, employees must work safely and efficiently and avoid damage to contents of cars, equipment, structures, or other property.'

**Charge 3:** Your alleged violation of **General Code of Operating Rules - Fourth Edition - April 2, 2000--Rule 1.47 – Duties of Trainmen and Enginemen, Item D Other Crew Members' Responsibilities, Part 1.** 'To ensure the train is operated safely and rules are observed, other crew members must assume as much responsibility as possible to prevent accidents or rule violations."

**Charge 4:** Your alleged violation of **General Code of Operating Rules-Fourth Edition - April 2, 2000--Rule 7.4- Precautions for Coupling or Moving Cars or Engines,** which reads in part . .. 'Before coupling to or moving cars or engines, verify that the cars or engines are properly secured and can be coupled and moved safely.

**Charge 5:** your alleged violation of **Amtrak Air Brake and Train Handling Rules And Instructions, AMT-3-Revised and Reissued August 19, 2002-Rule 2.14.16:** which reads: 'Multiple lite locomotives may be moved within the confines of a yard or terminal without connecting the M.U. hoses, as long as the brake pipe and main reservoir hoses are connected with associated angle and main reservoir cocks open.

**Specification:** It is alleged that on July 24, 2004 while assigned to position CYO103 working as the Conductor in the Oakland Diesel Shop you cut out the brakes on a locomotive and failed to properly secure it prior to coupling."

If you desire to attend, you may do so, without expense to the United Transportation Union. Please advise this office if your intention is to attend the hearing.

Fraternally yours,

A. L. Suozzo
General Chairperson

ALS/rmb

G: Amtrak Discipline 2004/am Campbell

000110

S0131788

## AMTRAK JOB REQUISITION AND QUALIFICATION PROFILE

POSTING NO._____　　　　　　　　　　　　　　　　　　　　　　DATE:_____

| **DEPARTMENT:** CUSTOMER SERVICE | **REPORTS TO:** M. COLLINS |
|---|---|
| **JOB TITLE:** LOCOMOTIVE ENGINEER (12) | **CONTACT:** C. T. Miller |
| _TRAINEE_ | **PHONE #:** ATS: 767-4993 |

| **JOB CODE:** | **GRADE:** | | **DATE REQUIRED:** 11/1/01 | **MINIMUM SALARY:** BLE Agmt. |
|---|---|---|---|---|
| **RES CEN:** 7270　**FIS LOC:** 6184 | **FUNC:** 1642　**MSA LOC:** SJC01 | | | |
| **PARTIALLY EXCEPTED:** | | **NON-AGREEMENT:** | | |
| **FULLY EXCEPTED:** | | **AGREEMENT:** | X | |
| **DEPARTMENT UNDERUTILIZED:** | | **NEW POSITION:** YES | | |
| **FEMALE:**　**MINORITY:**　**NONE:** | | **REPLACEMENT FOR:** RETIREES & TRANSFERS | | |

| **OUTSIDE CANDIDATES CONSIDERED:** | NO | **RELOCATION BENEFITS APPLY:** | NO |
|---|---|---|---|
| **POSITION SUBJECT TO REASSIGNMENT:** | NO | | |

**SUMMARY OF DUTIES:**

Locomotive engineers are responsible for the safe operation of diesel electric locomotive, complying with train orders, bulletin orders, wayside signals, railroad regulations, railroad operating rules, special instructions and federal, state, and local regulations to transport passengers and equipment safely and efficiently. Locomotive engineers perform required tests and make inspections of equipment and air brakes, as required. The position involves working alone and apart in physical isolation while integrating activities with others. Locomotive engineers must have the ability to multitask and retain large amounts of material to memory and must make timely and critical decisions under stressful situations to safeguard lives and property.

**EDUCATION:**

　　**MUST HAVE.** High school diploma or equivalent.
　　**PREFERRED:**

**WORK EXPERIENCE:**　　　(include specific areas, length time, type of work, etc.)

　　**MUST HAVE:** Valid drivers license and meet FRA regulation requirements for drivers license check.
　　**PREFERRED:** GCOR qualifications. Must have satisfactory prior work record. Preference may be given to locally qualified candidates.

**COMMUNICATION AND INTERPERSONAL SKILLS:**

Strong written and verbal communication skills are needed. Must be able to read and write English.

**OTHER REQUIREMENTS:**

Must be able to accept work assigned, willing to work and travel away from home. Work rotating shifts and holidays, weekends and irregular hours. Must be able to report to work within two hours from time of call.

**SUPERVISORY RESPONSIBILITIES:**　　　(number of people, scope, etc.)
　　　　　　　NONE

| **TRAVEL:** | Yes | **PERCENTAGE:** | 100% |
|---|---|---|---|

**COMMENTS:**
REPLACEMENTS FOR RETIREES AND TRANSFERS - 100% COMMUTER

　　　　　　　(print name below)　　　　　　　　　　　　　　　　　　　　**DATED:**
**DEPARTMENTAL APPROVAL:** David Nogar　　**SIGNATURE:** _____　7/23/01
　　**PERSONNEL APPROVAL:**　　　　　　　**SIGNATURE:** _____

**PERSONNEL OFFICE USE ONLY:**　　　　　　　　**CONTROL NUMBER:** _____
**DATE FILLED:**_____　**PERSON HIRED:**_____　**SOURCE OF HIRE:** _____
**DATE OFFER LETTER SENT:**_____　**DATE ACCEPTANCE RECEIVED:**_____　**REPORTING DATE:**_____
**PERSONNEL**
**REPRESENTATIVE:** PAUL HO　　　　**TOTAL DAYS REQUIRED TO FILL POSITION:**_____
**COMMENTS:**

IRPC 2002　　　adapted by rls/engineering/tax = 1/99　　　date filled out:　　　typist:

Post for 2 weeks

D01794

EXHIBIT 31
PLT DEPT
for identification
WITNESS: J. Campbell
DATE: 2-26-07
SHARON TRUJILLO, CSR 6120

# EXHIBIT B

1

UNTIED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JOHN EARL CAMPBELL,

              Plaintiff,

     vs.                     No. C-05-05434 MJJ

NATIONAL RAILROAD PASSENGER
CORPORATION, et al.,

              Defendants.

_____/

COPY


DEPOSITION OF SUSAN VENTURELLI

March 23, 2007


PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
DEBORAH A. PIERSON
CSR NO. 7988

1    operating rules, any discipline that the employee would

2    have on file.

3    Q.    How are those policies involved in your work?

4    A.    As far as selecting qualified candidates.

5    Q.    What does that mean?

6    A.    For instance, if a person had a serious violation,

7    he or she would not normally be considered for a

8    vacancy.

9    Q.    You are the one that decides who gets considered,

10   correct?

11   A.    Along with the department.  I ask the department

12   for information about the employee's work record.  I

13   can also check with the hearing office.  Personnel

14   files are in Los Angeles, so I don't have access to

15   those, unless I were to plan far ahead.

16         The records that the hearing office would have

17   would be the most up to date.

18   Q.    Are they accessible to you?

19   A.    By request.

20   Q.    When you stay "hearing office," you are referring

21   to an office in Los Angeles?

22   A.    Yes, I am.

23   Q.    So you can request records from them; is that

24   accurate?

25   A.    I can request information as to whether the

1    employee has discipline on file.  If there would be

2    discipline on file, then we would look into it further.

3    Q.   Is it your perception that you can get information

4    more quickly from the hearing office in LA than from

5    the personnel office in LA?

6    A.   The discipline documents are created in the

7    hearing office.  After all of that is taken care of,

8    then they are sent to the personnel office.  So if I

9    call the hearing office, I would have the latest

10   information.

11   Q.   Then what information do you typically ask for

12   from the department regarding discipline?

13   A.   I ask about safety violations.  I ask about

14   discipline on file.  I ask about attendance and work

15   performance.

16   Q.   Who do you direct your questions to?

17   A.   One of the department managers.

18   Q.   Do you have a particular liaison person, a

19   particular person that you ask, or you just pick

20   somebody?

21   A.   It depends on the position.  If I'm recruiting,

22   for instance, for an on-board service job, the person I

23   would contact would be the on-board service manager or

24   crew base manager.  So there's no one particular

25   person; it depends on the job.

1    A.    Yes.

2    Q.    In what way?

3    A.    I was part of the interview team that selected

4    him.

5    Q.    Any other connection to that promotion?

6    A.    I hired him initially as an assistant conductor.

7    Q.    When was that?

8    A.    Probably two years prior, so I would estimate

9    2002.

10   Q.    Any other connection to the promotion of

11   Mike Yacovetti?

12   A.    No.

13   Q.    Then directing your attention to the next request,

14   number eight, did you participate in any way in the

15   promotion of Patrick Duncan?

16   A.    Yes.

17   Q.    In what way?

18   A.    I was involved in his selection as part of the

19   interview team for the engineer position.

20   Q.    Any other way?

21   A.    I believe I initially hired him as a coach

22   cleaner.

23   Q.    Any other connection to the promotion of

24   Patrick Duncan to the engineer position?

25   A.    No.

1  Q.    Directing your attention to request number nine,

2  were you involved in any way in the promotion of

3  Thahn Ly?

4  A.    Yes.

5  Q.    In what way?

6  A.    I was part of the interview team that selected him

7  for the position of engineer.  I also initially was

8  involved in his promotion to assistant conductor.

9  Q.    Directing your attention to request number ten.

10  A.    Yes.

11  Q.    Were you involved in any way in the promotion of

12  John Hansen?

13  A.    Yes, I was.

14  Q.    In what way?

15  A.    I was part of the interview team that selected him

16  for the engineer position.

17  Q.    Any other way?

18  A.    No.

19  Q.    Directing your attention to request number 11,

20  were you involved in any way in the promotion of

21  Wes Duvall to the engineer position?

22  A.    Yes.

23  Q.    In what way?

24  A.    I was part of the team that interviewed and

25  selected him for the position of engineer.

1    Q.    Any other connection with that promotion?

2    A.    No.

3    Q.    Directing your attention to the next request

4    number 11 -- Did I ask about Wes Duvall?

5    A.    Yes, you did.

6    Q.    So number 12, Heidi Snyder, were you involved in

7    any way in the promotion of Heidi Snyder to an engineer

8    position?

9    A.    Yes, I was.

10    Q.    In what way?

11    A.    As part of interview team that selected her for

12    the position of engineer.

13    Q.    Any other way?

14    A.    No.

15    Q.    Directing your attention to request number 13,

16    were you involved in the promotion of Brice Carroll --

17    A.    Yes.

18    Q.    -- to an engineer position?

19    A.    Yes.

20    Q.    In what way?

21    A.    As part of the interview team that selected him

22    for the engineer promotion.

23    Q.    In any other way?

24    A.    With regard to the hiring for this position?

25    Q.    Yes, the promotion to engineer.

1    Q.    Why not?

2    A.    I simply don't.

3          MS. PRICE:            Okay.  Mark the record,

4    please.

5    Q.    Can you tell us, is there a reason why you don't?

6    A.    Perhaps lack of time.

7    Q.    When you say "perhaps," that's kind of a red flag

8    to me that suggest that it's maybe not factual.  So we

9    don't want you to speculate or guess.

10   A.    All right.  Thank you.

11   Q.    So can you tell me, is there a particular reason

12   why you don't ask the department for positive

13   information about a candidate?

14   A.    The form I generally send out does ask the

15   department to rate the employee on different

16   components, work record, safety record, attendance.

17   The rating can be high or it can be low, which would

18   serve as a positive recommendation.

19   Q.    What form is that?  What is it called?

20   A.    Background check form.

21   Q.    Is this a form that you have developed, or is it

22   an Amtrak form?

23   A.    It's a form that we have used in the human

24   resources department for a number of years.

25   Q.    My question was a little different.  Did you

1    develop the form, or is it an Amtrak form?

2    A.    I don't know who developed the form.

3    Q.    Okay.

4    A.    Someone in our office at one time developed the

5    form.  I've had some input.  I don't remember if it

6    originated with me or with another recruiter or with a

7    manager.

8    Q.    You send that form out whenever there's a

9    promotion that you are involved in?

10   A.    On a fairly consistent basis.

11   Q.    Do you remember getting a form like that for

12   John Campbell in connection with his application for

13   engineer?

14   A.    I don't remember.

15   Q.    And I take it no one has asked you to provide that

16   form since 2004?

17   A.    No.

18   Q.    Is that fair?

19        MS. MAYLIN:            If you can answer excluding

20   attorney/client communication, go ahead and answer.  So

21   if you can answer excluding communications with

22   attorneys, you can go ahead and do that.

23        THE WITNESS:           No.

24        MS. PRICE:             Q.   Who do you report to?

25   A.    Officially, I report to director Tim Duffy in

1    Los Angeles.  On a day-to-day basis, I have more

2    contact with our manager, Barbara Hanna.

3    Q.    When a matter is in litigation, is there a person

4    within either the legal department or within the human

5    resources department that serves as your contact

6    person?

7    A.    I don't know.

8    Q.    This background check form that you have

9    described, is it a preprinted form?

10   A.    Yes.

11   Q.    Does it have a title across the top of it that

12   says "Background Check"?

13   A.    Yes.

14   Q.    All right.  Typically, does the manager that you

15   have spoken to within the department sign the form?

16   A.    Yes.

17   Q.    You have testified that you think you spoke to

18   Patrick Pruesser about John Campbell's application for

19   engineer; is that correct?

20   A.    To the best of my knowledge or memory.

21   Q.    What was his position at the time?

22   A.    Assistant superintendent.

23   Q.    For what?

24   A.    For transportation.

25   Q.    Do you have a memory of what you asked

1    Mr. Pruesser?

2         MS. MAYLIN:              Vague and ambiguous.  I

3    assume you are talking about Mr. Campbell.

4         MS. PRICE:              Yes, about Mr. Campbell.  We

5    don't have to assume.

6    Q.    The question is, do you recall what you asked

7    Mr. Pruesser about Mr. Campbell?

8    A.    I asked Mr. Preusser to provide information on the

9    background checks for a number of candidates, all the

10   candidates that he would have been directly supervising

11   or indirectly supervising.  Specifically, I asked about

12   attendance, safety, operating rules, discipline.

13   Q.    Do you have a memory of what Mr. Pruesser said to

14   you on those subjects, as it related to John Campbell?

15   A.    Not specifically.

16   Q.    Do you have any kind of general recollection of

17   what Mr. Pruesser told you?

18   A.    That he had rule violations on his record.

19   Q.    Did he tell you what type of rule violations?

20   A.    A rule violation would be considered a serious

21   rule violation, operating --

22   Q.    Yes.  My question is what type.

23   A.    Oh, no, no.

24   Q.    They have all kinds of rule violations.

25   A.    I apologize.  My familiarity with all the rules is

1  not such that I'd be an expert in understanding exactly

2  what rule it was.

3      MS. MAYLIN:        She's just asking what you

4  you can recall.  Can you recall?

5      THE WITNESS:        No.  I don't, other than what

6  I have told you.

7      MS. PRICE:        Q.  So you don't remember if

8  Mr. Preusser told you what type of rule violations or

9  what particular rule violation?

10  A.    No.  I don't remember that.

11  Q.    Did you ask him to fill out the background check

12  form for Mr. Campbell?

13  A.    I remember having sent out the background check

14  forms.  I don't remember whether I got that specific

15  form back or not.

16      When we began the recruitment process, the first

17  step was testing, which was actually a personality

18  index, because I hadn't gotten the background checks

19  back, and the time to recruit was limited.

20      I went ahead and invited all the applicants to

21  take the test.  I still hadn't gotten the background

22  checks back by the time I needed to schedule

23  interviews.  So again, I invited all the candidates who

24  were recommended based on the personality survey to

25  come for the interview.

1    I believe I received the background checks after

2    that, or information, at least, after that.

3    Q.    Do you believe you received the information in

4    writing after the interviews?

5    A.    Yes.

6    Q.    Do you believe you had your conversation with

7    Mr. Pruesser about the candidates after the interviews?

8    A.    Yes.

9    Q.    In the interviews, do you recall that there were

10    persons other than yourself who participated in the

11    interviews?

12    A.    Yes.

13    Q.    Who else participated in the interviews?

14    A.    Managers from San Jose, managers, I believe, from

15    Sacramento, and managers from Oakland representing each

16    crew base for where the vacancy was posted.

17    Q.    Do you recall who those persons were?

18    A.    I don't have a visual memory of who was actually

19    there.  Again, to the best of my knowledge,

20    Billy Rogers from San Jose was there.  A union rep was

21    there; I believe it was Chad Skinner, and I'm not sure

22    who the management representatives from Oakland and

23    Sacramento were.

24    Q.    How was it determined who would be on the

25    interview panel?

41

1   A.    Whoever would have been the hiring manager or the

2   direct supervisor is generally who would be selected to

3   interview on the panel.

4   Q.    Who makes that selection?

5   A.    Generally, the assistant superintendent.

6   Q.    In this case, who was that?

7        MS. MAYLIN:        Again, I assume we are

8   talking about Mr. Campbell's --

9        MS. PRICE:        Q.  Well, the round of

10  interviews that Mr. Campbell participated in.

11  A.    I believe that would have been Patrick Pruesser

12  for Oakland.  I don't remember if we had an assistant

13  superintendent in Sacramento at that time.

14  Q.    So Mr. Preusser tells someone who he wants to have

15  participate in the interviews; is that correct?

16  A.    He assigns someone to participate in the

17  interviews.

18  Q.    That person, are they then in communication with

19  you?

20  A.    Yes.

21  Q.    You schedule the interviews, correct?

22  A.    Right.

23  Q.    So you then contact the people who are going to be

24  the panelists for the interviews and make arrangements

25  for them to be there, correct?

42

1    A.    At times, I would, or at times, that person's

2    supervisor, in this case, who would have been

3    Mr. Pruesser, would direct them to join the interviews.

4    For instance, I might call and say, "We need to do

5    interviews.  Can you have someone join us for the

6    interviews on such and such a date."

7    Q.    All right.  Do you provide materials to the

8    panelists for the interviews?

9    A.    I share the applicant's application, and I give

10   each interviewer an interview booklet with a list of

11   questions and writing space.

12   Q.    What is the interview booklet called?

13   A.    Locomotive Engineer Hiring Interview.

14       MS. PRICE:         Mark the record, please.

15   Q.    Where does the booklet come from?

16   A.    It was developed at the corporate level and is

17   used throughout Amtrak.

18   Q.    You give them the booklet.  I'm sorry, you say the

19   booklet has questions and then a place for them to

20   write answers?

21   A.    That's correct.

22   Q.    What do the panelists typically do with the

23   booklet after the interview is completed?

24       MS. MAYLIN:        Calls for speculation.

25       MS. PRICE:         Q.  If you know.  We don't

1       Los Angeles.

2       Q.    Does he hold your position now in Los Angeles?

3       A.    Right.

4       Q.    Did you have communication with Mr. Ho regarding

5       Mr. Campbell?

6       A.    Not to my recollection.

7       Q.    Do you know who Elias Munoz is?

8       A.    Yes, I do.

9       Q.    Did you have any communication with Mr. Munoz

10      regarding Mr. Campbell?

11      A.    I don't recall.

12      Q.    Do you know who Rickie Donofrio is?

13      A.    Yes.

14      Q.    Did you have any communication with Ms. Donofrio

15      regarding Mr. Campbell?

16      A.    I don't recall any conversation with Rickie.

17      Q.    Do you know who Barbara Hanna is?

18      A.    Yes, I do.

19      Q.    You indicated she is a person that you have

20      reported to in the past.

21      A.    I reported directly to her when I was in

22      Los Angeles.  I report to her in an operating sense

23      currently, for instance, day-to-day recruitment issues,

24      questions that I have, I work with her.

25      Q.    Have you ever had any communication with Ms. Hanna

1    regarding John Campbell?

2    A.    Yes.

3    Q.    Before the promotional exam that you recall, did

4    you have conversations with Ms. Hanna regarding

5    John Campbell?

6    A.    Yes.

7    Q.    How many times?

8    A.    I believe once.

9    Q.    In connection with what subject matter?

10   A.    I received an e-mail from John Campbell.  He was

11   angry that a job had been posted for external re-entry

12   engineer and was not open to internal non-engineers.

13   Q.    Is that what he said in the e-mail?

14   A.    That's what I remember his concern was, that the

15   job had been posted for re-entry engineers, and he had

16   been denied a promotion to engineer previously, and I

17   was concerned that he may have been overlooked, and I

18   reported that to Ms. Hanna.

19   Q.    Did you respond to Mr. Campbell's e-mail?

20   A.    I don't believe I did.

21   Q.    Why not?

22   A.    On Ms. Hanna's advice.

23   Q.    What did she tell you?

24   A.    Well, she was concerned that the e-mail was

25   inappropriate.

1    Q.    Are you done with your answer?

2    A.    You are asking why I didn't respond to the e-mail;

3    is that right?

4    Q.    I'm asking what did she tell you with respect to

5    telling you not to respond to the e-mail, yes, ma'am.

6    A.    She wanted to look into the matter.

7    Q.    Anything else?

8    A.    She was disturbed by the inappropriateness of the

9    communication, and she reported that to our diversity

10    department.

11    Q.    Did she indicate that she was going to respond to

12    the e-mail?

13    A.    That was my understanding.

14    Q.    Did you ever see a response from her to

15    Mr. Campbell to the e-mail?

16    A.    Not to my recollection.

17    Q.    Did she ever tell you she had, in fact, sent a

18    response to Mr. Campbell?

19    A.    I don't remember.

20    Q.    Any other communication with Ms. Hanna regarding

21    Mr. Campbell, prior to the promotional interviews?

22    A.    No, not to my recollection.

23    Q.    Are you familiar with Larry Follis?

24    A.    Yes.

25    Q.    Did Mr. Follis participate in any of the

50

1    promotional interviews involving Mr. Campbell?

2    A.    Now that you mention his name, he may have been

3    the department representative.

4    Q.    Going back to that process --

5    A.    Yes.

6    Q.    -- is there any requirement that there be a union

7    representative on the selection panel?

8    A.    The union is part of the panel.

9    Q.    Based on what?

10   A.    Based on our procedure for hiring or promoting

11   engineers.

12   Q.    Is that procedure written?

13   A.    I believe it is.

14   Q.    Do you recall what it's called?

15   A.    No, I don't.

16   Q.    Do you recall where the procedure is located?

17   A.    I don't recall.

18   Q.    How did you first learn about that procedure?

19   A.    When we began using the new procedure for

20   locomotive engineers, we were given a short

21   introduction to that hiring process.

22   Q.    Okay.

23   A.    At the time, I was not involved in hiring

24   engineers, so I don't have much memory of it from that

25   time.  When I came to Oakland was the first time that I

PATRICIA CALLAHAN & ASSOCIATES

54

1    Q.    Okay.  All right.  I'm going to show you a

2    document that's been previously marked as Exhibit 10 to

3    the deposition of John Campbell, and if you can review

4    that and let us know when you are finished reviewing

5    it.

6    A.    Okay.

7    Q.    Is that the e-mail you testified about earlier --

8    A.    Yes.

9    Q.    -- that Ms. Hanna -- you have to wait until I

10   finish the question, otherwise --

11   A.    I'm sorry.  Forgive me.

12   Q.    Is that the e-mail that you testified earlier

13   about this morning?

14   A.    Yes.

15   Q.    And I believe you testified Ms. Hanna thought

16   there was something inappropriate about the e-mail; is

17   that correct?

18   A.    Yes.

19   Q.    Was it Ms. Hanna or you that thought there was

20   something inappropriate about the e-mail?

21   A.    Both.

22   Q.    What was it that you thought was inappropriate

23   about the e-mail?

24   A.    The e-mail, I thought, was inappropriate for a

25   business communication, and I thought the comment

1   "calling off the EEOC dogs" was a little

2   unbusinesslike.  I don't think of the EEOC as dogs.

3   Q.    Anything else?

4   A.    Based on what he alleged, that he had been passed

5   over five times, I was concerned.

6   Q.    My question is a little different.

7   A.    I'm sorry.  I have forgotten the question, then.

8   Would you repeat it?

9   Q.    Can you tell us what else you thought about this

10  e-mail was inappropriate, if anything?

11  A.    I don't see anything else that comes to mind.  I

12  don't know what -- Well, that is part of the e-mail

13  address.

14  Q.    Are you finished with your answer?

15  A.    If I understand.

16  Q.    What is it about the e-mail that Ms. Hanna shared

17  with you that she thought was inappropriate?

18  A.    The e-mail address.

19  Q.    Anything else?

20  A.    I believe that's it.

21  Q.    Directing your attention to the content of the

22  e-mail, did you have information about any of the

23  content, any of the issues raised in the content of the

24  e-mail?

25  A.    When I brought this to Ms. Hanna's attention, she

1    A.    No, I don't recall.

2    Q.    Do you recall discussing Mr. Campbell's concerns

3    with him at the time of his interview?

4         MS. MAYLIN:         Vague and ambiguous --

5         THE WITNESS:        I don't recall that.

6         MS. MAYLIN:         I'm sorry.  Wait.  Vague and

7    ambiguous as to time.

8         Go ahead.

9         MS. PRICE:      She's answered.

10   Q.    Do you want to change your answer?

11   A.    Can I assume that you are speaking about the

12   interview for the 2004 posting?

13   Q.    Yes, ma'am.

14   A.    Then no, I don't recall any such conversation.

15   Q.    How many times did you interview Mr. Campbell?

16   A.    Once.

17   Q.    That was in 2004?

18   A.    Correct.

19   Q.    Do you recall that interview with Mr. Campbell?

20   A.    Vaguely, I recall it.

21   Q.    Do you recall any communication that passed

22   between Mr. Campbell and the interviewers?

23   A.    Not specifically.

24   Q.    Do you recall any responses that Mr. Campbell made

25   to any questions during the interview?

62

1    A.    Not specifically.

2    Q.    Do you recall any ratings that were given to

3    Mr. Campbell as a result of the interview?

4    A.    I have a general recollection that the ratings

5    were high.

6          MS. PRICE:          Mark the record, please.

7    Q.    Let's go ahead and mark this, because I don't

8    think it's been marked before.

9          Counsel, if you know, has this been marked before?

10         (Discussion off the record.)

11         MS. PRICE:          For the record, it's actually

12   part of Exhibit 25, and I'm going to call this 25-A.

13         For the record, it's a letter dated August 10,

14   2004, to John E. Campbell from C.M. Skinner.

15   Q.    Have you finished reviewing it?

16   A.    Yes.

17   Q.    Have you ever seen that document before?

18   A.    No, I haven't.

19         (PLAINTIFF'S EXHIBIT NO. 25-A WAS MARKED

20         FOR IDENTIFICATION.)

21         MS. PRICE:          Q.    This letter indicates

22   that there was an interview of John Campbell on July 7,

23   in which you and Larry Follis and Chad Skinner

24   participated; is that true?

25   A.    To the best of my knowledge, yes.

1   Q.   It indicates that the organization participates in

2   the interview and hiring process.  Do you see that?

3   A.   I see that.

4   Q.   I take it, based on your prior testimony, that's

5   true, as well?

6   A.   I'm sorry.  There was a question?

7   Q.   Yes.  I take it, based on your prior testimony,

8   it's a true statement that the organization

9   participates in the interview and hiring process?

10  A.   In the interview process.  The hiring decision is

11  the department's.

12  Q.   What do you mean by that?

13  A.   The transportation department, the hiring manager.

14  Q.   Who in this case was the hiring manager?

15  A.   That would have been Patrick Pruesser, ultimately.

16  Q.   Interesting.  Why do you say that?

17  A.   The department produces paperwork selecting the

18  candidates.  My authorization to make a job offer to a

19  candidate is based on paperwork the department is

20  responsible for producing; it's called form 2000.

21  Q.   Yes.

22  A.   The department produces this.  That is my

23  authorization to fill the position.

24  Q.   What relationship, if any, is there between the

25  interview process and the department's decision to

1   hire?

2   A.    The interview process identifies the best

3   qualified candidates based on the interview.

4   Q.    How is that related, if at all, to the hiring

5   process as you are describing it?

6   A.    It would follow that the department would want to

7   hire the best qualified candidate, the most

8   highly-rated candidates.

9   Q.    Is the information about the rating communicated

10  to the hiring official in some way from the interviews?

11  A.    Yes.

12  Q.    How?

13  A.    By the applicant or the department interviewers or

14  by myself.

15  Q.    Does the hiring official get a copy of the

16  ratings?

17  A.    No.

18  Q.    Is the information communicated to the hiring

19  official at any time prior to the time the decision is

20  made to hire the person?

21  A.    Interview scores may be relayed to the hiring

22  official.

23  Q.    Is that normally done?

24  A.    Yes.

25  Q.    How?

1          THE WITNESS:          I see it here on the paper,

2     but I don't specifically remember it.

3          MS. PRICE:          Q.  A few minutes ago you

4     testified that when you read this, you remembered

5     something.  Is that not accurate?  You are saying you

6     don't really remember the meeting -- whether there was

7     a meeting or not.

8     A.    I don't specifically remember it, no; I really

9     don't.

10    Q.    Do you remember having any conversation with

11    Patrick Preusser about the candidates for the engineer

12    position for which John Campbell interviewed in July

13    2004?

14    A.    A very foggy recollection that I spoke with him.

15    Q.    Do you have any memory of any basis on which

16    John Campbell was disqualified from the selection

17    process, either before or after you spoke to

18    Patrick Preusser?

19    A.    I remember that he was disqualified because he had

20    had a rule violation in the last three years.

21    Q.    What is that memory based upon?

22    A.    It's based on a conversation with Patrick

23    Preusser.

24    Q.    After the interviews?

25    A.    Yes.

1  Q.    What do you recall about that conversation with

2  Patrick Preusser?

3  A.    Very -- I don't recall it specifically.  I have a

4  general memory of it.

5  Q.    Something in your general memory tells you that

6  based on that conversation with Patrick Preusser,

7  that's how John Campbell was disqualified, that

8  something in that conversation lead to John Campbell

9  being disqualified?

10  A.    I remember also that we received documentation

11  from the hearing office to the effect that he had a

12  rule violation.

13  Q.    What kind of documentation?

14  A.    It was an e-mail.

15  Q.    From whom?

16  A.    From the secretary of that department.

17  Q.    Was it directed to you?

18  A.    I don't remember specifically whether the

19  department made the direct request to her or whether I

20  was copied in or whether I was given a copy.

21  Q.    Is it your recollection that it was based on an

22  e-mail and a conversation with Patrick Preusser that

23  John Campbell was disqualified from the selection

24  process for 2004?

25      MS. MAYLIN:            Lack of foundation.  Calls

1    for speculation.

2        THE WITNESS:        Does that mean I can answer?

3        MS. PRICE:        Q.  You can answer the

4    question.  That means she's objecting.

5    A.    I'm sorry.  I got side-tracked.  Would you repeat

6    what you asked me?

7        (Record read by reporter:

8        "Q.  Is it your recollection that it was based on

9    an e-mail and a conversation with Patrick Preusser that

10    John Campbell was disqualified from the selection

11    process for 2004?")

12        MS. MAYLIN:        I object again.  Calls for

13    speculation and lack of foundation.

14        You can answer.

15        THE WITNESS:        Yes.

16        MS. PRICE:        Q.  Is it your testimony that

17    it's because he had a rule violation within the past

18    three years that that was the basis on which he was

19    disqualified?

20        MS. MAYLIN:        Lack of foundation.

21    Misstates testimony.

22        THE WITNESS:        I got side-tracked again.

23        (Record read by reporter:

24        "Q.  Is it your testimony that it's because he had

25    a rule violation within the past three years, that that

1    was the basis on which he was disqualified?")

2         MS. MAYLIN:         Same objection that it

3    misstates testimony, lack of foundation.

4         THE WITNESS:         To the best of my

5    recollection, yes.

6         MS. PRICE:         Q.  Is there some written

7    policy or procedure that you are aware of that says

8    that a person with a rule violation cannot be promoted?

9         MS. MAYLIN:         Vague and ambiguous.

10        THE WITNESS:         It's my understanding that

11   that is the case.

12        MS. PRICE:         Q.  What is your

13   understanding based on?

14   A.    It would be based on practice.

15   Q.    Was anyone else disqualified from the 2004

16   engineer selection process because of a rule violation?

17   A.    I believe so.

18   Q.    Do you recall the names of any of those persons?

19   A.    Can I --

20        MS. MAYLIN:         You can answer yes or no.

21        THE WITNESS:         May I explain first?

22        MS. MAYLIN:         As long as you don't disclose

23   names, sure.

24        THE WITNESS:         Okay.  I can remember people

25   being disqualified for rule violations, and the answer

1    is yes.

2         MS. PRICE:          Q.  Can you tell us who they

3    were?

4         MS. MAYLIN:          Unfortunately, no, because

5    that violates personnel privacy rights.  If you want to

6    get information, though, Pam, how about if you identify

7    them applicant A, applicant B, and then you can get

8    information, and then we can argue later about whether

9    or not you are entitled to the individuals' names,

10   which I know is going to probably be subject to a

11   motion.  But no, we can't give the individuals' names.

12        THE WITNESS:          Okay.

13        MS. PRICE:          Certify the question, please.

14   Q.   Your counsel is suggesting that we go by applicant

15   A or applicant B.  Does that help you in telling us --

16   A.   Yes, okay.

17   Q.   -- who was disqualified?

18   A.   Applicant A was disqualified for having had a rule

19   violation in the last 14 months, if I remember

20   correctly.

21   Q.   Yes.  Was that person an employee in the Oakland

22   area?

23   A.   No.

24   Q.   Okay.

25   A.   Should I give the location?  It was part of

```
 1    A.    No.

 2          MS. MAYLIN:           Lack of foundation -- Belated

 3    objection.  Lack of foundation.  Vague and ambiguous as

 4    to time.

 5          THE WITNESS:          Ask your question again,

 6    please.

 7          MS. PRICE:            You answered the question.

 8    That's fine.

 9          MS. MAYLIN:           We are waiting for another

10    question.

11          THE WITNESS:          I see.

12          MS. PRICE:            Q.   Do you know if you've

13    ever seen this form before?

14    A.    This specific form --

15    Q.    Yes, ma'am.

16    A.    -- or a blank form?

17    Q.    This one signed by Steve Shelton.

18    A.    No.  I never saw this.

19    Q.    That's my question.

20    A.    I never saw that.

21    Q.    Do you know if Mr. Shelton gave you a background

22    check form for Mr. Yacovetti in 2004?

23    A.    I don't know that for sure.

24    Q.    Do you know of any other candidates that were

25    promoted to engineer, even though they had rule
```

1    violations, a history of discipline proceedings?

2    A.    No, I don't.

3         MS. MAYLIN:              Vague and ambiguous as to

4    time.  I assume it's ever.

5         MS. PRICE:              No, for the 2004 promotion;

6    that's what we are talking about.

7    Q.    Do you need the question restated?

8    A.    Please.

9    Q.    Do you know of other candidates that participated

10   in the 2004 hiring interviews that were not

11   disqualified, even though they had disciplinary

12   violations in their employment history?

13   A.    No, I don't know that.

14   Q.    Do you know of any procedure whereby the

15   department can waive disciplinary violations and hire

16   someone even if they have disciplinary violations?

17   A.    I'm not aware of that.

18   Q.    You are not aware of that?

19   A.    I don't know.

20   Q.    What do you know about the allegations in

21   Mr. Campbell's complaint?

22   A.    Can you be more specific, please?

23   Q.    No.  That's what your lawyers say you will testify

24   about, the allegations in plaintiff's complaint.  Do

25   you have any information about that?

1    A.    You asked me who made the decision regarding who

2    was to be hired and who was to be eliminated because of

3    discipline.

4    Q.    Yes, ma'am.

5    A.    And I indicated that it was Patrick Preusser.    I

6    don't know that that decision was his or whether he was

7    communicating it.

8    Q.    Oh.

9    A.    Okay.

10   Q.    Why don't you know that?

11   A.    Because I wasn't there.

12   Q.    As part of your duties, you don't normally know

13   who makes the decision to hire or disqualify people?

14   A.    I know it comes from the department.    I can't tell

15   you specifically what dealings the department has

16   within.

17   Q.    They don't share that with you?

18   A.    No.

19   Q.    So how do you know that?    Did Mr. Preusser

20   communicate something to you?

21   A.    Yes.

22   Q.    What?

23   A.    The people who were to be selected and the people

24   who did not meet the criteria.

25   Q.    When did he do that?

1   A.   Subsequent to the interviews.

2   Q.   Do you know the date?

3   A.   The date given in the letter is a reasonable date;

4   I can't tell you for certain it was exactly that date.

5   Q.   Can you tell me if your understanding is different

6   from the assertion in the letter that the organization

7   is entitled to be present when those kinds of decisions

8   are being made?

9   A.   It's my understanding the decision is the

10  department's.   It's my understanding that the union

11  should be involved in the interviews, but not in the

12  selection, in the ultimate decision.   That is the

13  responsibility of the department, in conjunction with

14  human resources.

15  Q.   What is your understanding based upon?

16  A.   A conversation with my manager.

17  Q.   Anything else?

18  A.   General procedures, how we do things.

19  Q.   Okay.   What are the general procedures that you

20  are thinking of that support your understanding in

21  writing?

22  A.   I believe I've seen them; I can't tell you where

23  they are.

24  Q.   What manager told you this was the procedure?

25  A.   I discussed it with my manager, Barbara Hanna.

102

1    against based on his race?

2    A.    No.

3    Q.    Who was that person?

4    A.    That was an internal candidate for a machinist's

5    position.

6    Q.    Are you aware of Mr. Clipper's complaint of race

7    discrimination for the engineer position?

8        MS. MAYLIN:        Lack of foundation.

9        THE WITNESS:        I don't have any knowledge of

10    it.

11        MS. PRICE:        Q.  Have you ever seen this

12    before?

13    A.    You asked me specifically had I seen that

14    completed form.

15    Q.    Yes, ma'am.

16    A.    I said no.

17    Q.    Thank you.

18        (PLAINTIFF'S EXHIBIT NO. 34 WAS MARKED FOR

19        IDENTIFICATION.)

20        MS. PRICE:        Q.  For the record, we've

21    marked as Exhibit 34 a one-page document dated July 12,

22    2004, which appears to be an e-mail to you.

23        Can you take a look at it and let us know when you

24    finish reviewing it.

25    A.    I finished.

1    Q.    Do you recognize this document?

2    A.    Yes.

3    Q.    What is it?

4    A.    A response from the hearing office on discipline

5    records.

6    Q.    Jane Klaas is with the hearing office?

7    A.    Yes.

8    Q.    Do you know why this is being sent to you on

9    7/12/2004?

10    A.    Because we requested information.

11    Q.    Did you request this information before the

12    interviews?

13    A.    I don't know when I requested it or whether we

14    requested it at the time on the day of the interviews,

15    but I had not received any information back from the

16    department when I set up the interviews.

17    Q.    Do you have any practice as to when you request

18    information?

19    A.    Generally, yes.

20    Q.    What is your practice?

21    A.    Prior to calling someone for an interview, the

22    information is requested.

23    Q.    I'm sorry.  Jane Klaas, she works in the hearing

24    office; is that correct?

25    A.    Yes

1      (PLAINTIFF'S EXHIBIT NO. 35 WAS MARKED FOR

2      IDENTIFICATION.)

3          MS. PRICE:          For the record, Exhibit 35

4    appears to be a series of e-mails dated July 12, 2004,

5    to and from Ms. Venturelli.

6    Q.    If you could review that and let us know when you

7    are finished reviewing it.

8    A.    Okay.

9    Q.    All right.  What is this document?

10   A.    It's an e-mail.

11   Q.    Is it one e-mail or two?

12   A.    It appears that I forwarded this.

13   Q.    Looking at the one on the bottom, what are you

14   trying to communicate in this e-mail, the one that's

15   5:36 p.m. to Patrick Pruesser?  What is your purpose

16   here?

17   A.    Possible candidates for the vacancies we had to

18   fill.

19   Q.    Where did you get these names from?

20   A.    Our list of candidates, and this is kind of a

21   follow-up on the candidates, apparently, or candidates

22   we discussed.

23   Q.    Looking under Oakland, three positions, you have

24   four names there.  Why are those four names there?

25   What does that signify?

1  A.   Because they were all possible candidates.

2  Q.   Is there a reason why Mr. Campbell's name is not

3  there?  Do you understand what I'm asking you?

4  A.   Yeah.

5  Q.   No or yes?  I didn't hear you.  I'm trying to

6  determine why you have those four names listed under

7  Oakland.

8  A.   Because they were the possible candidates.  They

9  had not been disqualified based on their rule

10 violations.

11 Q.   Well, okay.  Are you saying that everybody else

12 had been disqualified except for these four?

13 A.   Well, you need to understand that all of the

14 candidates didn't apply for all of the jobs, and I

15 can't tell you which candidates may have applied for

16 more than one job.

17 Q.   I'm just trying to figure out, are you saying the

18 only reason why these people are listed is because of

19 all the people who applied for Oakland, these are the

20 ones who were not disqualified?

21 A.   That appears so.

22 Q.   You prepared the e-mail; you tell me.

23 A.   It's been three years, and I have not looked at

24 the records, so I cannot tell you everyone who applied.

25 Q.   That's not what I'm asking.

1    A.    I understand that.

2          MS. PRICE:          Mark the record, please.

3    Q.    Do you have any idea why you listed those four

4    people under Oakland, other than what you testified to?

5    A.    After the selections were made by the department,

6    this DMV 3122 referred to forms that would be needed.

7    The DMV would be Department of Motor Vehicles, and the

8    3122 is a drug and alcohol authorization that allows

9    Amtrak to check on an applicant's drug and alcohol

10   history, as far as testing is concerned.

11   Q.    Is that your handwriting on the form?

12   A.    Yes.

13   Q.    All the handwriting that is there is yours?

14   A.    It looks like mine.

15   Q.    Is it your recollection that at the time you sent

16   the e-mail -- just looking at these four names under

17   Oakland, these people had been selected by the

18   department?

19   A.    Yes.

20   Q.    Directing your attention under Sacramento, there

21   are four names there.

22   A.    Yes.

23   Q.    Is it your recollection that these four people had

24   been selected by the department in Sacramento?

25   A.    Yes.

108

1 Q. Who?

2 A. I remember the initial recommendations were

3 Debrice Gallo.  There was another candidate,

4 Diana Booker.

5   MS. MAYLIN:    Wasn't the question Oakland?

6   THE WITNESS:   Oh.

7   MS. PRICE:    Q.  Yes, ma'am.

8 A. Let me amend my answer, then.  Debrice Gallo

9 applied for both locations.

10 Q. Yes, ma'am.  Was she recommended for Oakland?

11 A. She was recommended for either, Oakland and

12 San Jose, the two places she'd applied.

13 Q. Anyone else that you can recall?

14 A. For Oakland, Brice Carroll was recommended,

15 Heidi Snyder, Wes Duvall.  Those were the initial

16 recommendations that I remember, to the best of my

17 ability.

18 Q. You don't remember John Campbell being recommended

19 for promotion to engineer at the conclusion of the

20 interviews?

21 A. No, I don't.  I don't remember him not being

22 recommended, either.  Hmm, I think there was a general

23 consensus, just based on point totals.  I don't think

24 there was any formal decision about who was going to be

25 selected at that time.  The information was then going

1    Q.   Was Mr. Follis the department's representative for

2    the Sacramento positions, as well?

3    A.   Yes.  To the best of my memory, he was

4    representing both.

5    Q.   Do you recall if he was given, either verbally or

6    in writing, a list of candidates being recommended by

7    the interview panel for hire by the department in

8    Sacramento?

9    A.   I don't know if he was given a list.

10    Q.   Was it your normal practice to come up with a list

11    of names after the interview process for consideration

12    by the department?

13    A.   An informal list of possibilities.

14    Q.   That was your practice, an informal list?

15    A.   At that time, yes.

16    Q.   Is there some reason why that practice wasn't

17    followed in connection with these interviews?

18    MS. MAYLIN:       Lack of foundation.

19    THE WITNESS:      Mr. Follis' recommendations

20    to the department would serve as an informal list.

21    MS. PRICE:        Q.   Okay.  Did he share those

22    with you?

23    A.   I don't recall.

24    Q.   Would it be normal procedure for the department

25    representative to share with you who he or she intended

1    to recommend to the department?

2    A.    Because we didn't have background checks at the

3    time of the interviews, I think we deviated from that

4    by not making any formal selections.  I think the

5    interviewers may have had a sense of who would be

6    recommended, but without the background, we couldn't do

7    a formal recommendation.

8    Q.    My question was a little different.

9          Can you read it back?

10         (Record read by reporter:

11         "Q.    Would it be normal procedure for the

12    department representative to share with you who he or

13    she intended to recommend to the department?")

14         THE WITNESS:          Yes.

15         MS. PRICE:          Q.   Now, directing your

16    attention back to Exhibit 35, do you know if you got

17    these names from Mr. Follis?

18    A.    I don't believe so.  I don't remember.

19    Q.    Do you remember if you got the names from someone

20    else within the department?

21    A.    I don't remember.

22    Q.    Let me direct your attention to the paragraph or

23    list of names under Sacramento, four positions.  There

24    you have Michael Yacovetti.  Do you see that?

25    A.    Yes.

1      MS. MAYLIN:        Otherwise, you lead Pam down

2  a road that she can't go, okay.

3      THE WITNESS:      I apologize.

4      MS. PRICE:        Q.  Directing your attention

5  to the San Jose paragraph, you have Debrice Gallo, and

6  you have some notes -- a lot of stuff after her name.

7  Starting with the typewritten information, did you type

8  that?

9  A.    Yes.

10  Q.    What does that mean?

11  A.    It means Debrice Gallo had a rule violation.  The

12  department felt it was not serious enough to disqualify

13  her, but that decision was overruled.

14  Q.    You have a handwritten note "overruled by

15  J. Commer J. Deally, D-e-a-l-l-y.

16  A.    It should be D-e-e-l-y.

17  Q.    So your handwritten note refers to Joe Deely

18  again?

19  A.    Yes.

20  Q.    And did you speak to Mr. Deely about Ms. Gallo's

21  promotion?

22  A.    Yes.

23  Q.    What did he say?

24  A.    He said that, "I'm very concerned about the rule

25  violations and the injuries in our division.  I have to

1    send a very strong message that it won't be tolerated."

2    Q.    Okay.  What did you say?

3    A.    With regard to the three years that he felt was

4    necessary, I said, "That's a long time," and he

5    responded that he just was very intent on improving the

6    safety record, improving the operating rule compliance,

7    and he felt that was the only way that the employees

8    would understand how serious we took that.

9    Q.    Anything else that you recall about the

10   conversation with you and Mr. Deely?

11   A.    No.

12   Q.    Was anyone else present?

13   A.    I don't remember.

14   Q.    Did your conversation with Mr. Deely take place in

15   person or on the phone?

16   A.    I remember it was in person.

17   Q.    Did you discuss with Mr. Deely the fact that

18   Mr. Collins had agreed that it was not serious enough

19   for disqualification?

20   A.    I may have discussed that with him; I can't

21   remember specifically.

22   Q.    Did you subsequently learn that Ms. Gallo had been

23   promoted?

24   A.    Excuse me.

25   Q.    Did you subsequently learn that Ms. Gallo had been

1 promoted?

2 A. Yes.  I knew it.

3 Q. At the time she was promoted, was it more than

4 three years since her last rule violation?

5   MS. MAYLIN:  Calls for speculation.

6   MS. PRICE:  Q.  If you know.

7 A. She was promoted later in the year.

8   MS. MAYLIN:  It was a yes or no question.

9 Read it back, please.

10   (Record read by reporter:

11   "Q.  At the time she was promoted, was it more

12 than three years since her last rule violation?")

13   THE WITNESS:  No.

14   MS. PRICE:  Q.  So did Mr. Deely change

15 his mind when she was promoted?

16 A. Mr. Deely or the department, on a national level,

17 changed the time limit.

18 Q. You talked to somebody on a national level?

19 A. I did, later in the year.

20 Q. Who did you talk to in the department in

21 connection with Ms. Gallo's promotion later in the

22 year?

23 A. Mr. Deely.

24 Q. Tell me what you recall about that conversation.

25 A. I recall that he told me that he felt that 18

1    months was as much as the national group would agree

2    to.   His preference or the national preference was for

3    three years, but there was not total agreement on that.

4    Q.    When you say he told you that the national

5    preference was for three years, what does that mean?

6    What is your understanding of what that means?

7    A.    My understanding is that in order to be promoted

8    to a rule-oriented, dangerous job, a person should not

9    have any rule violations, serious rule violations in

10   the last three years.

11   Q.    How is it that people -- for instance, with

12   Mr. Ly, how is it that Mr. Deely is able to say that

13   his rule violation was not serious enough for

14   disqualification, if there's a rule for three years?

15       MS. MAYLIN:          Calls for speculation.

16       THE WITNESS:          I have very limited knowledge

17   of operating rules.   That needs to be decided by

18   people who are experts in the rules.

19       MS. MAYLIN:          Is the answer you don't know?

20       THE WITNESS:          I don't know.

21       MS. MAYLIN:          If you can, just give your

22   answer.  You don't need to qualify all of your answers.

23       THE WITNESS:          Thank you.

24       MS. PRICE:           Q.  When you discussed

25   Ms. Gallo with Mr. Deely, did you raise with him the

**Venturelli, Susan**

| | |
|---|---|
| From: | Klaas, Jane |
| Sent: | Monday, July 12, 2004 12:49 PM |
| To: | Venturelli, Susan |
| Cc: | Preusser, Patrick |
| Subject: | Discipline Record |

   

CAMPBELL J.rtf     GALLO D.rtf     LY T.rtf     YACOVETTI M.rtf

I found no discipline records for:

    Carroll, Brice
    Sollmine, George
    Snyder, Heidi
    Duvall, Wesley
    Duncan, Patrick
    Flippo, Tim

*Per phone call no discipline—*

   *Kyser, James —*
   *Hansen, John —*

PL EXHIBIT
34
Venturelli
3/23/07

D05787

1

**35**

## Venturelli, Susan

| | |
|---|---|
| **From:** | Venturelli, Susan |
| **Sent:** | Monday, July 12, 2004 5:52 PM |
| **To:** | Duffy, Tim; Hanna, Barbara; Preusser, Patrick; Collins, Mark |
| **Subject:** | FW: Engineer Selections |

———Original Message———
| | |
|---|---|
| **From:** | Venturelli, Susan |
| **Sent:** | Monday, July 12, 2004 5:36 PM |
| **To:** | Preusser, Patrick |
| **Subject:** | Engineer Selections |

**Oakland (3 positions)**

~~Steve Carroll~~
~~George Schimm~~
John Hansen     DU √
Alternate: ~~Patrick Duncan~~

**Sacramento (4 positions)**

~~Michael Yaravelli~~
~~Hugh Suhr~~
~~Wesley Duvall~~
~~Brian Tha~~ (Pending determination as to whether the 2 FRA reportables were safety violations—no discipline re the FRA reportables)  Thanh also had a rule violation in 2001which we discussed with J. Deely who deemed it not serious enough for disqualification.     *not safety violations.*

Alternate: Patrick Duncan    *3 ×   → DU √*

**San Jose (2 positions)**

*.DU √*
Debrice Gallo (Rule violation of 4/03 was discussed with M. Collins who agreed it was not serious enough for disqualification.)  *Overruled by J-Commer, J. Deally*
~~Timothy Lippo~~

Alternate: ~~...~~



D05786

134

## CERTIFICATE

4     I, the undersigned, a Certified Shorthand

5    Reporter, State of California, hereby certify that the

6    witness in the foregoing deposition was by me first

7    duly sworn to testify to the truth, the whole truth,

8    and nothing but the truth in the within-entitled cause;

9    that said deposition was taken at the time and place

10   therein stated; that the testimony of said witness was

11   reported by me, a disinterested person, and was

12   thereafter transcribed under my direction into

13   typewriting; that the foregoing is a full, complete and

14   true record of said testimony; and that the witness was

15   given an opportunity to read and, if necessary, correct

16   said deposition and to subscribe the same.

17     I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any way

20   interested in the outcome of the cause named in said

21   caption.

22     Executed this 2nd day of April 2007.

DEBORAH A. PIERSON
CSR No. 7988

# EXHIBIT C

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN EARL CAMPBELL,

          Plaintiff,

   vs.                   No. C05-05434 MJJ

NATIONAL RAILROAD PASSENGER
CORPORATION dba AMTRAK, JOE
DEELY and DOES 1 through 15,
inclusive,

          Defendants.
_____/



DEPOSITION OF JOE DEELY

February 15, 2007

PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
LaRelle M. Fagundes
CSR No. 9762

1    A.       No.

2    Q.       Okay.

3             Are there any changes you wish to make to

4    your testimony from this morning?

5    A.       No.

6    Q.       Okay.

7             Do you receive any reports on any regular

8    basis, whether annually, quarterly, monthly, of

9    identifying the people hired in the Pacific

10   division?

11   A.       No.

12   Q.       All right.  Same question with respect to

13   promotions within the Pacific division.

14   A.       Not a specific report, no.

15   Q.       Okay.  All right.

16            Is it your testimony that you did not --

17   you don't recall any involvement that you had in

18   Mr. Campbell's termination?

19            MR. OBORNE:  Objection.  Vague and

20   ambiguous.

21            THE WITNESS:  I don't recall any

22   involvement.

23            MS. PRICE:  Q.  Do you recall any

24   involvement in Mr. -- in the decision not to

25   promote Mr. Campbell in either 2003 or 2004?

CERTIFICATE

1
2    I, the undersigned, a Certified Shorthand

3    Reporter, State of California, hereby certify that

4    the witness in the foregoing deposition was by me

5    first duly sworn to testify to the truth, the whole

6    truth, and nothing but the truth in the

7    within-entitled cause; that said deposition was

8    taken at the time and place therein stated; that

9    the testimony of said witness was reported by me, a

10   disinterested person, and was thereafter

11   transcribed under my direction into typewriting;

12   that the foregoing is a full, complete and true

13   record of said testimony; and that the witness was

14   given an opportunity to read and, if necessary,

15   correct said deposition and to subscribe the same.

16       I further certify that I am not of counsel

17   or attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any

19   way interested in the outcome of the cause named in

20   said caption.

21       Executed this 1st day of March, 2007.

22
23   _Larelle M. Fagundes_

24   LARELLE M. FAGUNDES, CSR 9762

25