1   PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
    PRICE AND ASSOCIATES
2   The Latham Square Building
    1611 Telegraph Avenue, Suite 1450
3   Oakland, CA  94612
    Telephone:  (510) 452-0292
4   Facsimile: (510) 452-5625

5   Attorneys for Plaintiff
    JOHN EARL CAMPBELL
6

7

8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11

12

13  JOHN EARL CAMPBELL,                 )   NO. C05-5434 MJJ (EDL)
                                        )
14          Plaintiff,                  )   **PLAINTIFF'S REQUEST FOR JUDICIAL**
                                        )   **NOTICE IN OPPOSITION TO**
15  v.                                  )   **DEFENDANTS JOSEPH DEELY AND**
                                        )   **NATIONAL RAILROAD PASSENGER**
16  NATIONAL PASSENGER RAILROAD         )   **CORPORATION'S MOTIONS FOR**
    CORPORATION dba AMTRAK, JOE         )   **SUMMARY JUDGMENT OR IN THE**
17  DEELY, and DOES 1-15, inclusive,    )   **ALTERNATIVE, PARTIAL SUMMARY**
                                        )   **JUDGMENT**
18          Defendants.                 )
    _____ )   DATE:       May 22, 2007
19                                          TIME:       9:30 a.m.
                                            DEPT:       CTRM. 11, 19th Floor
20
                                            HONORABLE MARTIN J. JENKINS
21
                                            DISCOVERY CUT-OFF:    March 23, 2007
22
                                            TRIAL DATE:           July 23, 2007
23

24

25

26

27

28

                                   -1-

**TO:    DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that Plaintiff JOHN EARL CAMPBELL will ask the Court to take judicial notice of the following documents pursuant to Federal Rule of Evidence, Rule 201(d):

1.    Declaration of Mary J. Fontaine in Opposition to Defendant's Motion for Summary Judgment in *Hardeman v. Amtrak*, U. S. District Court Case No. C04 3360 SI;

2.    Declaration of Debrice Gallo in Opposition to Defendant's Motion for Summary Judgment in *Hardeman v. Amtrak*, U. S. District Court Case No. C04 3360 SI;

3.    Declaration of C. Faheem. Hardeman in Opposition to Defendant's Motion for Summary Judgment in *Hardeman v. Amtrak*, U. S. District Court Case No. C04 3360 SI.

4.    Declaration of Meriola Gotthardt in Opposition to Defendant's Motion for Summary Judgment in *Morgan v. Amtrak*, U. S. District Court Case No. C96-03585 SI;

5.    Declaration of Michael Williams in Opposition to Defendant's Motion for Summary Judgment in *Morgan v. Amtrak*, U. S. District Court Case No. C96-03585 SI;

6.    Declaration of Joe George in Opposition to Defendant's Motion for Summary Judgment in *Morgan v. Amtrak*, U. S. District Court Case No. C96-03585 SI;

7.    Declaration of Arthur Elwood Conley in Opposition to Defendant's Motion for Summary Judgment in *Morgan v. Amtrak*, U. S. District Court Case No. C96-03585 SI;

8.    Amended Declaration of Abner J. Morgan, Jr. in Opposition to Defendant's Motion for Summary Judgment in *Morgan v. Amtrak*, U. S. District Court Case No. C96-03585 SI;

9.    Department of Fair Employment And Housing Enforcement Division Directive No. 233.

Dated: May 1, 2007                                    PRICE AND ASSOCIATES


                                            /s/ *Pamela Y. Price*
                                            PAMELA Y. PRICE, Attorneys for Plaintiff
                                            JOHN EARL CAMPBELL

ATTACHMENT - EXHIBIT -1

1  PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
   OK-HEE SHIM, ESQ. (STATE BAR NO. 240998)
2  PRICE AND ASSOCIATES
   A Professional Law Corporation
3  The Latham Square Building
   1611 Telegraph Avenue, Suite 1450
4  Oakland, CA 94612
   Telephone: (510) 452-0292
5  Facsimile: (510) 452-5625

6  Attorneys for Plaintiff
   C. FAHEEM R. HARDEMAN
7

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12

13 C. FAHEEM R. HARDEMAN,            )    NO. C04-3360 SI
                                     )
14              Plaintiff,           )    **DECLARATION OF MARY J.**
                                     )    **FONTAINE IN OPPOSITION TO**
15 v.                                )    **DEFENDANT'S MOTION FOR**
                                     )    **SUMMARY JUDGMENT**
16                                   )
17 AMTRAK/CALTRAIN RAILROAD,         )    DATE       July 28, 2006
                                     )    TIME:      9:00 a.m.
18              Defendant.           )    DEPT:      10, 19th Floor
                                     )
19 _____  )    HON. SUSAN ILLSTON

20

21         I, MARY J. FONTAINE, declare that:

22         1.    I am a resident of the State of California.  I make this Declaration on personal

23 knowledge in opposition to Defendant's Motion for Summary Judgment.

24         2.    I am a Caucasian woman.  I was employed by Amtrak from March 1988 to

25 October 1992.

26         3.    I took a leave of absence from Amtrak for approximately one (1) year in

27 1989.

28

1    4.    While employed at Amtrak, I held the positions of Assistant Conductor and

2    Conductor, respectively.

3    5.    During the time I worked at Amtrak, Joe Deely was first Transportation

4    Superintendent, then Superintendent of the Oakland Yard.

5    6.    During approximately my last two years working at Amtrak, from 1990 to

6    1992, Joe Deely was my immediate supervisor.

7    7.    I was and still am familiar with Joe Deely's voice. I could recognize it

8    anywhere. While working at Amtrak, I heard Joe Deely use racial epithets to refer to African-

9    American employees.

10    8.    On one particular occasion, I was at the Transportation Office at the Oakland

11    Station. I was located in the outer office, and Joe Deely was around the corner inside of his office.

12    I heard Deely talking to another person, either in his office or on the phone. I heard Deely referring

13    to an African-American Transportation Department clerk, Renee, as a "n*gger."

14    9.    During my last two years at Amtrak, I was elected to be Chairman of the

15    Local Committee of Adjustment, a function akin to a Shop Steward or Griever, for my union, the

16    United Transportation Union ("UTU").

17    10.    Through my position at the UTU, I represented other Conductors in

18    disciplinary matters, pay problems, vacation time and other employment issues subject to the

19    contract between UTU and Amtrak.

20    11.    In my capacity as union representative, I regularly met with Joe Deely

21    informally, during one-on-one meetings to discuss, among other issues, disciplinary matters.

22    12.    Through my dealings with Joe Deely involving union issues, I observed that

23    he had a racist attitude towards African-Americans. I observed that he treated people of color in a

24    derogatory manner. He would speak to African-Americans alternating with condescending or

25    aggressive tones of voice, whereas when he addressed Caucasian employees, men in particular, his

26    tone was more solicitous. His body posture would also reflect his derogatory attitude towards

27    African-Americans.

28

-2-
DECLARATION OF MARY J. FONTAINE (C04-3360 SI)

13.    Over the course of attending these informal meetings with Joe Deely, I observed that he tended to handle disciplinary matters involving white employees informally, while disciplinary matters involving Black employees were handled formally more often.

14.    I have represented African-American Conductors at disciplinary hearings for infractions that would have been handled informally, if handled at all, had they involved a Caucasian Conductor.

15.    On one occasion, I worked with an African-American Conductor, Charles Washington, who was being disciplined for allegedly sitting in a private room in a sleeper car, visiting with a passenger.  The passenger was a witness and appeared via telephone on Mr. Washington's behalf, stating that nothing out of order occurred in the sleeper car.

16.    Though Mr. Washington was not formally investigated, Joe Deely harassed him about the incident for several months and threatened to have a formal investigation.

17.    On another occasion involving Charles Washington and a passenger issue, yet another passenger appeared as a witness on Mr. Washington's behalf at a formal investigation because Joe Deely was not willing to handle the matter informally.

18.    In my experience, if Charles Washington were white, questions involving Conductor behavior or interaction with passengers would not have been turned in for disciplinary consideration.  Even if the matter involving Conductor behavior or interaction with passengers was handled as a disciplinary matter, and if Charles Washington were Caucasian, the worst outcome would have been remedial training.  Instead, Mr. Washington was subjected to formal investigation.

19.    In my experience as a UTU representative, I know of many incidents arising out of personnel in the Operating Department involving revenue problems that were being discussed informally.

20.    I represented another African-American Conductor, O.B. Scott, who was being formally investigated on a revenue issue, contrary to the practice of handling revenue issues with leniency.  It is my opinion that in O.B. Scott's case, a formal investigation was not warranted.  Furthermore, the allegations against him were not substantiated.  He was, however, terminated.  Joe

1139P204MSJ

-3-
DECLARATION OF MARY J. FONTAINE (C04-3360 SI)

1  Deely was the Hearing Officer. I believe in this case he was also the deciding official.

2      21.  Over the course of my employment at Amtrak, the incident involving Mr.

3  Scott was the first time I was aware of where a Conductor or Assistant Conductor was formally

4  disciplined over a revenue matter. As a practice, employees identified as having revenue issues

5  were given great leniency. The employee in question generally met privately with Mr. Deely to

6  discuss the problem. Often, employees would simply remit the missing revenue over the course of

7  time. This occurred without any formal investigation.

8      I declare under penalty of perjury under the laws of the State of California and the

9  United States that the foregoing is true and correct. If called as a witness, I could and would testify

10  competently to the matters stated herein.

11      Executed this 6th day of July, 2006, at Berkeley, California.

12                          /s/

13      _____

14      MARY J. FONTAINE, Declarant

15

16

17

18  \

19

20

21

22

23

24

25

26

27

28

1139P204MSJ

ATTACHMENT - EXHIBIT -2

PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
OK-HEE SHIM, ESQ. (STATE BAR NO. 240998)
PRICE AND ASSOCIATES
A Professional Law Corporation
The Latham Square Building
1611 Telegraph Avenue, Suite 1450
Oakland, CA 94612
Telephone: (510) 452-0292
Facsimile: (510) 452-5625

Attorneys for Plaintiff
C. FAHEEM R. HARDEMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| C. FAHEEM R. HARDEMAN, | ) | NO. C04-3360 SI |
| Plaintiff, | ) ) | **DECLARATION OF DEBRICE** |
| | ) | **GALLO IN OPPOSITION TO** |
| v. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| AMTRAK/CALTRAIN RAILROAD, | ) | DATE:        July 28, 2006 |
| | ) | TIME:        9:00 a.m. |
| Defendant. | ) | DEPT:        10, 19th Floor |
| _____ | ) | HONORABLE SUSAN ILLSTON |

I, DEBRICE GALLO, declare that:

1.      I began working at Amtrak in 1994 as a coach cleaner. Prior to starting at Amtrak, I was employed as a dental assistant for nearly nine years. I assisted private dentists, and I also worked at Delta Dental, a non-profit organization that provides benefits to a variety of employers. I am an African-American woman. I make this Declaration on personal knowledge in opposition to Defendant's Motion for Summary Judgment.

2.      In 2001, I was promoted to Assistant Conductor. I became a Locomotive Engineer in 2004.

-1-
DECLARATION OF DEBRICE GALLO (C04-3360 SI)

3.    I applied for engine service in 2001. I had eight (8) years of seniority at Amtrak that year. I was passed over in favor of people with less seniority than I.

4.    I applied for engine service again in 2002, 2003 and 2004. I was passed over in favor of people with less seniority than I, including some whom I had trained and some who were at Amtrak barely one (1) year.

5.    In 2004, I was initially told that I was being passed over for engine service again on grounds that I had a waiver in my file resulting from an incident that occurred in February 2003, which had been my only instance of discipline at that time. When I applied for engine service in 2004, it had been one (1) year and three (3) months since the incident in question.

6.    Brice Carroll and John Hanson were promoted over me in 2004, though they had been at Amtrak only for fifteen (15) months. George Solomini and Tim Flipp, who were promoted over me in 2004, had been at Amtrak two (2) years. At that time, I had been at Amtrak for ten (10) years.

7.    The infraction in February 2003 for which I was cited occurred at Redwood City Station. It was pouring rain. There were two crews involved in a maneuver to swap equipment. One crew included me as the Conductor and Mike Cecconi as engineer. The second crew consisted of John Campbell as the conductor and another engineer. My crew was shoving a lite engine.

8.    As Conductor, it is my duty to communicate to the engineer when it is okay to move the engine.

9.    The engine was approximately twenty (20) feet from a switch.

10.    Mike Cecconi impatiently beckoned me to get back onto the engine. I jumped onto the engine, but before I could say a word to Engineer Cecconi, he ran through the switch approximately twenty (20) feet away. He had not waited for me to notify him whether the switch was clear or not. He split the switch.

11.    Everyone who is present during a maneuver, whether as an observer, trainee or student, has the responsibility to protect the movement of the train.

12.    Tom McCracken was the supervisor present at the time. He was standing at the switch when I jumped back onto the engine. Because he was present, if he saw that the switch was not lined, he should have notified Cecconi not to proceed through it. Mr. McCracken is Caucasian.

13.    Similarly, Lee Guillory was present as an observer, and getting paid for his time. Because he was also present, if he saw that the switch was not lined, he should have notified Cecconi not to proceed through it.

14.    Following the incident, Tom McCracken, Lee Guillory and Mike Cecconi had a discussion in Tom McCracken's Amtrak-issued car. Although the car seated four people, I was excluded from joining their discussion. So instead, I went and sat in the cab of engine.

15.    When McCracken, Guillory and Cecconi were finished with their discussion, Guillory and Engineer Cecconi took the train to San Jose Station. I, however, was pulled from service by Tom McCracken and administered a drug and alcohol test.

16.    Eventually, I was charged with an operating rule violation. I signed a waiver, receiving five (5) days of unpaid suspension, of which I served three (3) days. It was my very first instance of discipline, after nearly ten years of working at Amtrak. No one else was cited for this incident.

17.    I have witnessed other incidents of operating rule violations involving Engineer Cecconi where he was not investigated or disciplined. Mr. Cecconi is Caucasian.

18.    One such incident also occurred in or about February 2003 in Redwood City. The crew on that day included me and Mike Cecconi as engineer. Lee Guillory, whose title was Assistant Conductor, was also present but not assigned to our crew. He was there on "special duty."

19.    The maneuver we were engaging in involved a "drop," which means that a car is dropped to the side and the engine keeps going. When a car is dropped, it means that the engineer "cut" the car. On Caltrain, dropping passenger cars is a violation. We were working with freight cars that day.

///

1139P205MSJ

-3-
DECLARATION OF DEBRICE GALLO (C04-3360 SI)

20.    I observed the assigned Assistant Conductor, who is Caucasian, cut the car while Cecconi operated engine at approximately twenty (20) miles per hour.  The correct procedure for coupling cars is to travel up to only four (4) miles per hour.

21.    Before the maneuver, I warned the Assistant Conductor and Mike Cecconi not to engage in it, but they went ahead and dropped the cars.  Mr. Cecconi was shoving the engine, i.e. moving backwards, but he did not have anybody protecting the movement.  As a result, he hit the cut cars behind him at approximately twenty (20) miles per hour.

22.    Due to the rate of the engine's high speed at impact, there was a lot of damage to the engine.  The damage I observed was the following: All of pipes to the radiator were split; there was water coming out of the bottom of the engine; the engine was knocked off the block four inches; the radio was sheared off the console; all of the floorboards came up; and the frame of the engine was bent in the middle.  I also know that the engine was out of service for months.

23.    As an Engineer, I know that if an engineer causes equipment damage above a certain dollar amount, the Federal Railway Association rules require his or her the license be taken away.  To my knowledge, Mike Cecconi's license was not taken away, he was never investigated or disciplined for this incident.  The matter was simply pushed under the rug.

24.    I and other employees used to refer to Mike Cecconi as "Teflon Don," because no disciplinary action ever "stuck" to him.  He routinely violates Amtrak's operating rules without any consequence or discipline.  I have personally witnessed him commit rules violations for which he was not cited.

25.    I also know of Bruce Shelton's reputation among Caltrain employees.  His reputation is that he has "tested every single derail that Amtrak has," meaning, he has run through a lot of derail switches, at the rate of about one switch per year.  Although Mr. Shelton has been suspended for the split switches, he has always been permitted to return to work.  Mr. Shelton is Caucasian.

26.    On April 10, 2003, I was part of the crew that experienced a derailment in Redwood City.  I was the Assistant Conductor, John Campbell was the Conductor and Mark Jaeger

1  was the engineer.  Although we ran over the switch and there was a derailment, nobody was

2  disciplined because it was found to have been caused by a defective switch.  Mark Jaeger is

3  Caucasian.

4          I declare under penalty of perjury under the laws of the State of California and the

5  United States that the foregoing is true and correct.  If called as a witness, I could and would testify

6  competently to the matters stated herein.

7          Executed this 7th day of July, 2006, at Oakland, California.

8

9                                          /s/
                                _____
10                              DEBRICE GALLO, Declarant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-5-
DECLARATION OF DEBRICE GALLO (C04-3360 SI)

ATTACHMENT - EXHIBIT -3

PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
OK-HEE SHIM, ESQ. (STATE BAR NO. 240998)
PRICE AND ASSOCIATES
A Professional Law Corporation
The Latham Square Building
1611 Telegraph Avenue, Suite 1450
Oakland, CA 94612
Telephone: (510) 452-0292
Facsimile: (510) 452-5625

Attorneys for Plaintiff
C. FAHEEM R. HARDEMAN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| C. FAHEEM R. HARDEMAN, | ) | NO. C04-3360 SI |
| | ) | |
| Plaintiff, | ) | **DECLARATION OF C. FAHEEM R.** |
| | ) | **HARDEMAN IN OPPOSITION TO** |
| v. | ) | **DEFENDANT'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT** |
| | ) | |
| AMTRAK/CALTRAIN RAILROAD, | ) | DATE:        July 28, 2006 |
| | ) | TIME:        9:00 a.m. |
| Defendant. | ) | DEPT:       10, 15th Floor |
| _____ | ) | |
| | | HON. SUSAN ILLSTON |

I, C. FAHEEM R. HARDEMAN, declare that:

1.      I am the Plaintiff in the above-entitled action against Amtrak.  I make this Declaration on personal knowledge in opposition to Defendant's Motion for Summary Judgment.

2.      I was employed by Defendant Amtrak for eleven (11) years from June 1992 to May 30, 2003.  At the time of my termination, I was working as a Locomotive Engineer.

3.      I am a native of the Bay Area.  I was born in Martinez, California and raised in the East Bay.  I graduated from Skyline High School in Oakland in 1973.  I attended Humboldt State University and received my B.A. in or about 1977.  I then attended Cal State Hayward for approximately a year working on a Masters' degree in Public Administration.

-1-
DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

1    4.    Prior to my employment with Amtrak, in addition to various odd jobs, I was

2  employed as a Firefighter with the City of Richmond, California for approximately ten (10) years.  I

3  also obtained my real estate salesperson's license in 1980.  I obtained my real estate broker's license

4  in or about 1989.  Between 1980 and 1992, I was employed with several real estate firms, including

5  my own, up until I was hired to work for Amtrak.

6    5.    I began working for Defendant AMTRAK as an Assistant Conductor ("AC")

7  on June 19, 1992.  I interviewed with Caltrain by chance and I was hired on the spot as an Assistant

8  Conductor.  In May 1993, I became an engineer assigned to the San Francisco Yard after

9  successfully completing the engineer training program.  My working conditions deteriorated rapidly

10 when I tried to become an Engineer.  I had to lobby and advocate on my behalf to even train and sit

11 for the qualifying exam.

12    6.    During the week of May 11, 1993, I was informed of the results of the

13 interviews for the position of Locomotive Engineer.  Bob Peterson, then Road Foreman of Engines,

14 explained how all applicants scored closely to each other during the interview process, and stated

15 that the only way to distinguish applicants was by seniority.  At that time, I had the requisite

16 seniority to make me eligible for the position, as calculated from my hiring date at Amtrak.  I also

17 felt that I had interviewed well.

18    7.    Notwithstanding my conversation with Mr. Peterson, I was passed over in

19 favor of Mr. Gibson, a candidate with less seniority at Amtrak than I.  Even though Mr. Gibson had

20 prior engine service experience before coming to Amtrak, he had been out of service for five years.

21 There would be no objective advantage of hiring him over me, because he would have to complete

22 the same training program in Wilmington, Delaware and log the same amount of training hours as I.

23    8.    I lodged a complaint, voicing my protest to Amtrak management that I was

24 being passed over for someone with less seniority.  It was only in the eleventh hour, that is, a day or

25 two before the extensive engineer training program was set to start, that I was informed by

26 telephone I could have the job.  I accepted and attended the training program in Delaware in June

27 1993.  I successfully completed my probation and qualified as an Engineer on February 1, 1995.

28

9.      During my employment with Amtrak, there were never more than five African-American Engineers on the Caltrain P.C.S. at any given time. Between 1990 and 1998, I was the only African-American hired or promoted to Engineer. With the exception of a Human Resources Manager, Caltrain's management appeared to consist solely of white males. There were more African-American Conductors or Assistant Conductors than African-American Engineers, but in my estimate, never more than a dozen African-American Conductors out of hundreds of Conductors working on the Caltrain line.

10.     During my tenure as an Engineer with Amtrak, I was never told that I was an unsafe Engineer, or that my performance was "inadequate." In fact, I was consistently commended by my supervisors as being "a good engineer," "careful" and "very safety conscious." My performance as an Engineer was evaluated every six months between February 1995 up to the date of my termination. I never received a "bad" evaluation. I have some but not all of my semi-annual evaluations. (True and correct copies of all of the Amtrak Locomotive Engineer Evaluation-Form 1875 in my possession for this period of time are attached hereto as Exhibit A.)

11.     In September 1995, my supervisor's comments on my performance included the statement that I was "excellent at maintaining proper speed" and "very safety conscious." (See Exhibit A, Bates No. 000708.) In my evaluation in December 1997, my supervisor's comments included the statement that "Mr. Hardeman is a careful engineer, very aware of the need for safety." (See Exhibit A, Bates No. 000709.) In June 1998, my supervisor's comments on my performance were that:

> Good engineer. Very aware of need for safety. Very good job of communicating with crew and mechanical forces. Good use of bell and whistle. Excellent speed control in mechanical tracks.

(See Exhibit A, Bates No. 000710.)

12.     In my November 1998 semi-annual performance evaluation, my supervisor again commented that I was a "good engineer." (See Exhibit A, Bates No. 000711.) This comment was repeated in my December 1999 performance evaluation. (See Exhibit A.) In June 2001, my

-3-

1  supervisor did not make written comments, however, my overall performance score increased from

2  a "2" to a "1" which, according to Amtrak's rating scheme means that "employee consistently

3  demonstrates skill and knowledge above average." (See Exhibit A, Bates No. 000712.).

4      13.    In my experience at Amtrak, Amtrak's disciplinary practices were subjective,

5  where the severity of discipline hinged on the identity of the employee in question.    Whether or not

6  charges were brought against an employee depended more on who you were than the nature or

7  seriousness of the alleged rule violation.  Managers routinely picked and chose who they wanted to

8  discipline.  Rules were not always followed, and it depended on who the person was and who found

9  them doing something wrong that determined whether discipline would be imposed or what type of

10 discipline.

11     14.    On July 11, 2001, I was being evaluated again by Billy Rogers, a different

12 supervisor, despite my excellent evaluation on June 4, 2001.  Ironically, while Mr. Rogers was

13 present with me and my train was loading passengers at the station, we observed Engineer Robert

14 Castiglione drive Train No. 70 through the station without stopping.  Mr. Rogers asked me "is that

15 illegal?"  In fact, it was quite illegal and very dangerous to drive a train through a station without

16 stopping or communicating with another train already in the station.  Except in extremely rare

17 circumstances, it is a clear violation of Amtrak's operating rules.  I made a contemporaneous note of

18 the incident on my Engineer Evaluation form.  (See Exhibit A, Bates No. 000713.)  Mr. Rogers did

19 not make any effort to cite Mr. Castiglione at the time.  To the best of my knowledge, Mr.

20 Castiglione was not cited nor disciplined and no other official record of the incident was created.

21 (See Exhibits A and B to the Declaration of Elias Munoz in Support of Defendant's Motion for

22 Summary Judgment.)

23     15.    In contrast, on July 22, 2001, I was the Engineer where the train was delayed

24 because it could not pass an air brake test.  I was operating a new engine and kept testing the air

25 brake without success.  At some point, I discovered that an Amtrak rule book was sitting on the

26 switch which controlled the brake release - the book must have accidently been pushed onto the

27 switch, preventing me from being able to set the brakes.  This was my first actual, albeit minor,

28

-4-

1   operating rule violation in almost seven (7) years, since September 18, 1994. Although the

2   placement of the book was totally inadvertent and unknown to me, I received a fifteen (15) day

3   suspension.

4           16.     Between 1994 and 2001, I was cited at various times for tardiness. (See

5   Exhibits E, G & I to the Declaration of R. Scott Erlewine in Support of Defendant's Motion for

6   Summary Judgment ("hereinafter Erlewine DEN").)  In April 1997, I received a five (5) day

7   suspension for tardiness. (See Erlewine DEN, Ex. F.)  In March 1999, I received a Formal

8   Reprimand for tardiness. (See Erlewine DEN, Ex. H.)  In March 2000, I received a ten (10) day

9   suspension when a co-worker and I returned late from dinner. (See Erlewine DEN, Ex. J.)

10          17.     On December 13, 2002, I was involved in a derailment when AC Charles

11  Breda accidentally threw a railroad switch. At the time, my crew included AC Breda, AC Soule and

12  two trainees. I was moving the train forward after I received a verbal signal from the AC to do so.

13  This was a routine move that was based upon our switch list. I had gone over the switch a few

14  minutes earlier and was not aware that the switch had been re-lined before I was told to move back

15  over it.  The switch should have been locked by the AC after I passed over it the first time because

16  the switch list indicated that I should return over the same track.

17          18.     Immediately after we derailed, AC Breda apologized to me profusely and

18  acknowledged his error in throwing the switch into the wrong direction. The Amtrak manager who

19  reported to the scene initially took AC Breda away as if he was going to be disciplined. Shortly

20  thereafter, I was called in for an interview and taken out of service. Though I was not at fault for

21  the derailment of the car, I was charged with a rule violation and received a thirty (30) day

22  suspension, with fifteen (15) days held in abeyance.

23          19.     On April 10, 2003, my crew included AC Paul Soule and AC Bruce Shelton.

24  At that time, AC Soule had approximately thirty-three (33) years of service on the railroad,

25  including approximately six (6) years  working in the San Francisco Yard. I knew that he was an

26  experienced conductor and I relied upon his experience and expertise. We had worked together for

27  at least five (5) months prior to this date.

28

1139P202MSJ

-5-

DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

20.     As an engineer, I was responsible for controlling the brakes and gas of the train.  Under Amtrak's rules and operating procedures, however, I cannot move the train without being directed to do so by my conductor.  On April 10, 2003, as part of their duties, AC Soule and AC Shelton were responsible for directing me, ensuring a clear pathway and proper alignment of switches, and providing me with instructions before and during the actual movement of the train.

21.     Neither AC Soule nor AC Shelton upheld their duties to 'be on the point' or 'protect the movement of the train.  Being "on the point" means that a conductor will either ride at the leading edge of the train or walk in front of the train in the direction of travel to ensure that the track is clear.

22.     Prior to the derailment, we had approached a red signal light.  In order to pass this signal, we had to receive clearance from San Jose Control.  AC Soule contacted San Jose Control by radio and received clearance from San Jose Control Operator Denver Payne to continue past the red signal.  AC Soule appeared to be in a hurry to move the engine, and motioned to me to move the engine backward.  I insisted that I come to a full stop as required by Amtrak's operating rules.  After I came to a full stop and blew my whistle, I proceeded slowly along the track.

23.     Due to the curvature of the track, my vision was restricted.  I relied upon AC Soule to be my eyes while backing the engine into what is called a "pocket track."  We were backing the engine into this pocket track to be stored for future use.  I properly relied on AC Soule's go-ahead signal to back up before the train derailed.  There were four (4) switches between the red signal at Switch 45 and the derail switch No. 39.  Although I was looking backwards in the sideview mirror from time to time, I could not see the switches or the tracks below us as we moved backwards.  I did not see the derail switch and I was not looking for it.

24.     At no time did AC Soule ask me if the switches were lined properly, or if the track was clear to proceed, or anything of that nature.  I did not "call the route" or give any type of verbal indication to AC Soule that the switches were lined properly for the move.  On the contrary, it was his primary responsibility as the Assistant Conductor to ensure that the movement was protected.  I saw him looking at the tracks from the sideview mirror on the engine.  There was no

-6-
DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

1   conversation between us to the effect that no one needed to be on the ground in front of the train

2   protecting the movement as we backed up.

3           25.     Prior to this incident, while I understood that it was part of my responsibility

4   as the Engineer to stop the train if the track was not clear, I had never been told or asked to get

5   down from the engine myself to protect the movement.  It was always my understanding that this

6   was the Conductor's responsibility.  In my nine (9) years as an Engineer, I had never had occasion

7   to direct a Conductor on how to protect the movement.

8           26.     At the time of the derailment, I was very surprised.  Both AC Soule and

9   Shelton also appeared surprised to discover that the derail switch was active.  As soon as we

10  realized that we had derailed, AC Soule immediately stated to AC Shelton and I that "San Jose

11  Control "fu- - -ed up" by giving us the go-ahead past the red signal.  He also stated that "we did

12  nothing wrong.  Don't you guys worry about it.  We got permission to go by the signal.  San Jose

13  Control messed up."

14          27.     The engine derailed on Switch No. 39.  Prior to the derailment on that day, I

15  had shoved engines and trains over that switch.  I had never seen Switch 39 operating in a derail

16  position.  The normal position of that switch was lined to go into the pocket.    As far as I knew, that

17  derail switch was not in service.  Having that particular switch in service and using it as a derail

18  would be particularly hazardous because it leads directly into the employee parking lot.  In the event

19  of a derail on that particular switch, the risk of injuring persons or destroying property would be

20  quite substantial.

21          28.     I believe that the train was traveling less than five (5) miles per hour at the

22  time of the derailment.  There were no injuries to any person and only minimal damage to the train.

23  I observed the engine being put back onto the track and it was put back into service that day.

24          29.     I was taken out of service that day along with AC Soule and AC Shelton.  We

25  are all required to submit to drug tests.  I was out of service for approximately three (3) days.  I

26  passed the drug test and was told to return to work on the Yard.

27          30.     Throughout my career with Amtrak, I have been subject to random drug tests.

28

1139P202MSJ

DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

1  I have never failed a drug test. Normally, I receive a written result of the drug test. I never received

2  the actual results of my drug test from the April 10th derailment which was highly unusual, and

3  caused me to suspect some irregularities in Amtrak's investigation of this incident.

4          31.    On the day of the derailment, I prepared a brief statement for the report that is

5  normally prepared following an unusual incident. I gave my statement to one of the Amtrak

6  managers. I was not interviewed or questioned about what happened that day, nor at any tine

7  thereafter. I never spoke to any Amtrak manager regarding AC Soule's statement that I allegedly

8  told him that the route was clear. No one from Amtrak ever asked me if AC Soule had asked the

9  question, or if I made the alleged statement to AC Soule. Once I returned to work a few days after

10  the incident, I continued to work as normal until the date that I was terminated.

11          32.    Following the Investigatory Hearing on May 22, 2003 regarding the

12  derailment on April 10, 2003, Amtrak terminated my employment. Prior to my termination, Amtrak

13  offered me a thirty (30) day suspension. By contrast, AC Soule, who is Caucasian, was assessed

14  five days suspension, of which only one day was served and four days held in abeyance. AC

15  Shelton, also Caucasian, was assessed three days of suspension, and Charge One against him was

16  withdrawn. Based on my knowledge and experience as an engineer, I believe that the discipline

17  assessed against me for this incident far exceeded the discipline typically imposed on other

18  employees for similar rule violations.

19          33.    I was terminated on May 30, 2003. In July 2003, approximately two (2)

20  months later, Amtrak offered me a "conditional reinstatement" to service waiver, which included a

21  waiver of any claims arising out of the April 10th derailment and a "last chance" agreement. I also

22  would not receive any back pay for the sixty (60) days of missed work. I declined the offer because

23  I felt that the discipline was harshly disproportionate and that Amtrak's entire course of conduct in

24  the matter was racially motivated.

25          34.    Throughout my employment at Amtrak, I was aware that I was being treated

26  differently because of my race. The work environment frequently felt hostile. While I was still on

27  probation as an Engineer, it was a frequent occurrence that as I approached a station, other engineers

28

1139P202MSJ

1   on trains already at the station would cut their headlights off.  Without seeing the headlights of

2   another train, I could be mislead to think that the train was no longer in the station.  This created a

3   dangerous situation because of the potential for me to hit a passenger, and it was a rule violation for

4   me to go through the station while another train was there without stopping.  As a result of this type

5   of conduct, I made it my practice to drive the train with extreme caution when approaching a

6   station, and every time I came to a station, I operated as if another train were in the station.  I

7   stopped relying upon the headlights of my fellow engineers.  It made my early experience very

8   stressful.

9           35.     During the first few years of my employment as Engineer, there were

10  constant problems with the crew clerks when I was on the extra board.  As a new Engineer, I

11  received my work assignments through the extra board which operates like a registry - when

12  assignments are available, Engineers and conductors are called according primarily to seniority.

13  New employees are called first.  As long as you were listed on the extra board, you were required to

14  report to duty upon notification from the crew clerks.

15          36.     One particular occasion stands out when my grandmother passed away on

16  July 5, 1997.  The crew clerk refused to accept the fact that I would not be available to take an

17  assignment.  Another incident occurred on September 20, 1996, when I was initially called, but then

18  denied the right to work because I was not listed on the San Jose extra board.  Their hostile

19  demeanors made me dread calling into the extra board.

20          37.     In September 1994, there was an incident in San Jose involving myself and

21  Carlos Caynos.  I was a new Engineer and Mr. Caynos was acting as the Conductor.  We split a

22  switch and I determined that the switch was actually defective.  Nonetheless, both Mr. Caynos and I

23  waived an investigatory hearing and accepted discipline for this incident.

24          38.     During a subsequent meeting with Bob Peterson, Mr. Peterson told me that

25  he had lost respect for me following the 1994 San Jose incident, that I had 'fallen from his good

26  graces.'  He also suggested that it would 'take a while' to get back into his good graces, that I

27  should 'shape up' and 'not cause trouble for the following six months.'  He accused me of having

28

1139P202MSJ

-9-
DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

1  told Mr. Caynos a 'cockamamie story' to shift the blame on him.

2      39.      During the same meeting, I was also falsely accused of "stealing company

3  funds" by getting unauthorized extra board funds. Mr. Peterson asked me why had I received

4  $500.00 guarantee funds, whereas Mike Shanahan had only gotten $100.00? Mr. Peterson was

5  highly upset at that point of the meeting. He also told me that I marked up too late, and directed my

6  union representative to open the provision of the Union contract relating to marking up after

7  completing assignments. I explained that the crew clerks give Engineers three hours to mark up

8  before breaking the guarantee.

9      40.      On December 4, 1995, Frank Hogan called me for a job at 9:30 a.m., even

10 though I was not eligible until 10:10 a.m. following the required rest period. Mr. Hogan said he had

11 made a mistake. The next day, after a phone call from Mr. Hogan at 10:40 a.m., I called him back

12 at 10:43 a.m. During the conversation with Mr. Hogan, he began to insinuate that I had marked up

13 late or missed calls for jobs. When I asked him how many times in the past year I had marked up

14 late or missed calls, it became apparent to me that he was trying to blame me for an extra board

15 problem Amtrak was having.

16     41.      On December 24, 1995, I received misinformation regarding the time to sign

17 up for a job for December 25, 1995. I was told to sign up by 6:30 p.m., whereas the time expired at

18 6:00 p.m. I would have missed my chance to work had I relied on the misinformation given to me.

19 Fortunately, I signed up early and was able to work that day.

20     42.      I was also falsely accused of refusing job assignments. For example, on

21 January 15, 1996, someone named Billy wanted to write me up for refusing to cover an assignment.

22 The day before, on January 14th, I called Billy at 8:30 p.m., 11:30 p.m., 12:00 a.m. and 12:30 a.m.,

23 asking Billy to page me if there is an early job available. At 1:45 a.m., Billy paged me for a 5:40

24 a.m. assignment in San Francisco. I returned the page to accept the job. Fifteen minutes later,

25 however, Billy told me he would write me up for refusing to cover an assignment.

26     43.      In December 1996, I purchased a new 1997 Mercedes E-class automobile.

27 My Caucasian co-workers made petty snide comments about the fact that I had a new car. On at

28

                                -10-

1    least three occasions, my car was vandalized while parked in the employee parking lot. On each

2    occasion, none of the surrounding vehicles appeared to be damaged. Eventually, I had to park my

3    car outside the employee parking lot on the public street.

4            44.    There were also times when I was shunned and ostracized by my co-workers

5    as I described in my deposition on May 2, 2006. (See Ex. 8 to the Declaration of R. Scott Erlewine

6    at pp. 170:25-171:1-21.) Eventually, I stopped going to the locker room on my breaks to avoid my

7    co-workers. On one occasion, Mr. Peterson told me that I was "too arrogant" because I was an

8    engineer now. In early 2003, Trainmaster and Supervisor Al Sturken motioned me to come towards

9    him by curling his finger, as though I were a child. It was a demeaning gesture.

10           45.    Throughout 1996 and 1997, Mr. Peterson continued to treat me differently

11   than Caucasian engineers. Things came to a head with an incident on February 16, 1997, where Mr.

12   Peterson ordered me to report to work in violation of the union rules. When I brought this issue to

13   his attention, he became extremely angry, yelled at me and implied that I was a baby before he hung

14   up on me. Despite the intervention of my union representative, Mr. Peterson insisted that I show up

15   to work at the San Jose Yard. Even though I followed his orders to work the San Jose Yard, on

16   February 19th, Mr. Peterson manipulated my work schedule to keep me from working extra hours.

17           46.    On June 25, 1999, I asked Mr. Peterson if there were any assignments

18   available. Mr. Peterson told me that all jobs were filled and stated that "you don't want to work, so

19   we don't need you." In actuality, I was seeking work and did not refuse to cover assignments. For

20   example, on January 18, 1996, I accepted a late call from Joel O'Connor: I accepted a call at 7:27

21   p.m. to mark up at 7:30 p.m. for a 7:55 p.m. train.

22           47.    On September 29, 2000, as I was approaching a tunnel, Signal 3.8 was

23   thrown red in my face without warning. When I notified Lou at San Jose Control, he told me that it

24   was normal, that Jim Richie, an Engineer on another train going through the tunnel, had put the

25   switch into hand throw. This was not normal and could have easily caused me to be subjected to

26   discipline for failing to stop at a red signal.

27           48.    I was also falsely accused of failure to protect an assignment. On

28

1139P202MSJ

-11-

DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

  
January 7, 2002, I had a flat tire while on my way to work. I called the Trainmaster, the Mechanical Foreman, the sign-up room and San Jose Control, and notified them all that I would be late, but still in time to operate Train No. 64. I asked Frank, a co-worker, to have someone air test the train in advance. I arrived at the Yard six minutes prior to departure, getting to the train with four minutes to spare.

49.     Trainmaster Al Sturken came to the train to tell me that the assignment was filled and that I was to go home. When I asked for the reason I was being sent home, he smugly told me, 'because we can't let you work with those shoes and there was no job briefing.' There was still enough time to get my work boots, but he told me that the decision had been made and that I was welcome to call Mark Collins, then the Road Foreman of Engineers. When I asked for his number, Al was stalling, while passengers were still loading. I finally talked to Mark Collins, but not until after the train pulled away from the station. I requested a letter in my file specifying the details of this incident, that I did make efforts to protect my assignment despite the flat tire on my way to work. I was eventually paid for that day.

50.     On another occasion, in the winter of 2003, as I was walking to my assignment with my Caucasian co-workers, I was pursued by Amtrak police with lights flashing and sirens blaring on the Yard, as though I were a criminal. Two officers rushed up to me and surrounded me. I was later told it was because I was not wearing a name tag and the officers did not recognize me. None of the other Caucasian crew members were wearing their name tags, yet I was the only one singled out and pursued by Amtrak police. I also had been working on Amtrak property for more than ten (10) years. I knew that this incident was a case of racial profiling and requested that Amtrak investigate the matter and issue me a formal apology. Supervisor Michael Howard and Trainmaster Al Sturken denied both of these requests. I felt humiliated in front of my co-workers, who later found it humorous to use the radio to call me 'criminal' and 'crook' following that incident. Radio transmissions teasing me in this manner could be heard throughout Amtrak's property from San Jose to San Francisco.

51.     In addition, I was excluded from opportunities given Caucasian Engineers.

-12-
DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

1   For instance, in approximately 2001, an Engineer who was already licensed but was training on

2   Caltrain territory rode with me for approximately one to two weeks on my regular run from San

3   Jose to San Francisco. I asked Supervisor Mark Collins about getting compensated because

4   Engineer Instructors normally get additional compensation. Mr. Collins informed me that I would

5   not receive the normal compensation given to other Caucasian engineers who served as Instructors.

6       52.     I also asked Mr. Collins why there were Engineers with less seniority than I

7   who were Engineer Instructors, even though I had expressed interest in becoming an Instructor. Mr.

8   Collins told me that it was because of my alleged 'tardiness' and 'other issues.' I asked him if I

9   were getting punished. He denied that I was getting punished, just that I would not be selected for

10  this type of employment opportunity and/or receive additional compensation.

11      53.     I was always aware that because I am African-American, I was being keenly

12  watched by Amtrak management for any hint of mistakes or missteps. When I agreed to waive my

13  right to investigatory hearings over the years, I did so to avoid what I was told would be more

14  severe punishment if an investigatory hearing were actually convened. I signed the waiver in

15  December 2002 attached as Exhibit N to the Erlewine Declaration even though I knew I was not at

16  fault and the fifteen (15) day suspension was unfair because once Will Hastings and Billy Rogers

17  were involved, I believed that it would come down to my word against theirs.

18      54.     I refused to take the waivers offered in 2003 because I thought that the

19  evidence would clearly show that I was not at fault, specifically, the defective wiring of the switch

20  and the fact that I could not see the derail switch would be easily proven. I thought that bringing the

21  case before a neutral third party would expose Amtrak's racist practices.

22      55.     I am a proud father of five children. I could not afford to walk away from a

23  full-time job while I still have young children to raise. I worked diligently to become an excellent

24  Amtrak Engineer and provide the utmost service and safety for Caltrain passengers. The

25  termination of my employment was extremely unfair and devastating to me and my family.

26          I declare under penalty of perjury under the laws of the State of California and the

27  United States that the foregoing is true and correct. If called as a witness, I could and would testify

28

-13-
DECLARATION OF C. FAHEEM R. HARDEMAN (C04-3360 SI)

1   competently to the matters stated herein.

2           Executed this 7th day of July, 2006, at Oakland, California.

3                                   /s/

4                           _____

5                           C. FAHEEM R. HARDEMAN Declarant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# AMTRAK LOCOMOTIVE ENGINEER EVALUATION—FORM 1875

804000

**EMPLOYEE IDENTIFICATION NO.**
OSC 12 | 13 | 14

**CREWBASE** 15 | 16
5 3 9

**DIVISION** 17 | 19
1 0 0
1

**SUPERVISOR ID NO.** 29
5 | 4 | 6 | 6 | 6 | 2 | 8 | 2 | 3

**EVALUATION DATE** 30
0 | 9 | 2 | 2 | 0 | 5

OPTION (A,B,C, OR D)

**EMPLOYEE'S LAST NAME** 10
A 5 6 0 9 0 9 4 4 5 1 7
HARDEMAN

**FIRST NAME** 11
CLIFFORD
M.I.
R

**SUPERVISOR LAST NAME**
PETERSON

**FIRST NAME**
ROBERT
M.I.
R

**OPERATED FROM** 36 | 38
SEA

**ENGINE NO.** 46
0 9 0 1 7

**OPERATED TO** 39 | 41
SJC

**NO. OF ENGS.** 50
1

**NO. OF CARS** 51 | 52
0 4

| | | | | | |
|---|---|---|---|---|---|
| **OPER. RULES** 42 | **SPECIAL INSTR.** 45 | **WRIT. AUTH.** 46 55 | **SAFETY INSTR.** 49 56 | **RADIO PRO.** 57 | **P.C.** 58 |
| 2 | 2 | 2 | 1 | 1 | 0 |

| **THROTTLE** 53 | **IND.BRK.** 54 | **AUTO. BRK.** 55 64 | **DYN. BRK.** 65 | **BLEND. BRK.** 66 | **AIR** 59 |
| 2 | 2 | 2 | 2 | 0 | 2 |

| **START** 62 | **STOP** 63 | **SCHEDULE** 68 69 | **EQUIP.** 70 | **TROUBLESHOOTING** 71 | **SPEED** 60 |
| 2 | 2 | 2 | 2 | 2 | 1 |

| **SIGNAL** 61 | **OVERALL SCORE** 72 |
| 2 | 2 |

**SUPERVISOR'S COMMENTS**

**AREA(S) NEEDING IMPROVEMENT**

CLIFTON ONLY 3 YRS. EXPERIENCE ON
PROGRESSING TOWARD HIS GOAL OF BEING
ENGINEER WITH PROFESSIONALISM IN HIS
AT MAINTAINING PRIOR SPEED WERY
CONSCIOUS.

264

388

NRPC 2819

I have reviewed this evaluation with the employee and provided employee with a copy. SUPERVISOR'S SIGNATURE ___
I have received a completed copy of this evaluation and understand its contents. My signature does not indicate my agreement with this evaluation.
EMPLOYEE'S SIGNATURE ___

# FORM 1875 INSTRUCTIONS AND CODES

## NOTE:

**Blocks** (NOTE: Print legibly. All zeroes should be slashed - Ø)

1-10    Employee's Identification No.

11    OPTION (A,B,C, OR D): A = Add, B = Browse, C = Change, D = Delete

12-13    OCC.-Employee's Qualification at time of Evaluation

ER = Engineer    FE = Fireman    ET = Engineer Trainee

14-16    CREWBASE - Enter Engineer's Crewbase

17-19    DIVISION-Employer's Home Division

100= Western Division        400= Philadelphia Division
200= Midwest Division        500= New York Division
300= Washington Division     600= Boston Division

20-29    Supervisor's Employee Identification Number.

30-35    Date on which Engineer Evaluation was performed.

36-38    OPERATED FROM - Enter the location at which the evaluation was begun.

39-41    OPERATED TO - Enter the location at which the evaluation was ended.

42-45    TRAIN NO. - Timetable schedule number of train.

46-49    ENGINE NO. - Enter Lead Locomotive, or Control Car Number.

50    NO. OF ENGS. - Enter total number of locomotives in train's consist. If locomotive consist affected train handling characteristics, this must be noted in "SUPERVISOR'S COMMENTS" section.

51-52    NO. OF CARS - Enter total number of cars in train's consist.

**USE THE CRITERIA IN ITEMS 0 THROUGH 4 BELOW FOR ASSIGNING A PERFORMANCE LEVEL NUMBER FOR CATEGORIES 53 THROUGH 72.**

0    Enter a ZERO if category is not applicable.    (Does not apply to item No. 72)

1    Employee consistently demonstrates skill and knowledge above average level results in safe and efficient train operation.

2    Employee fulfills all requirements for skill and knowledge. There may be a minor deviation above or below expectations, but the general performance level results in safe and efficient train operation.

3    An employee with sufficient time and experience who shows shortcomings in knowledge and/or skill. Also applicable to an employee who is progressing adequately, but is not yet fulfilling all position requirements.

4    Performance is unsatisfactory and does not meet minimum job standards.

---

When an employee is given a 3, or 4 rating in any field, specific information regarding what corrective actions are deemed appropriate to eliminate the employee's deficiencies, and what the employee's deficiencies are, **must** be included in "SUPERVISOR'S COMMENTS", and in "AREA(S) NEEDING IMPROVEMENT", respectively.

An employee given an OVERALL rating of 4 must be withheld from service until brought up to standard. A formal program of instruction must be fulfilled in order to accomplish this goal. Prior to returning to service, the employee must complete a qualifying run with a Supervisor, and achieve an OVERALL evaluation rating of at least 3.

## KNOWLEDGE OF/COMPLIANCE WITH:

53    Operating Rules

54    Special Instructions

55    Written Authorities

56    Safety Instructions

57    Radio Procedures

58    Requirements of the Physical Characteristics of the territory the train is operated over.

59    Air Brake Instructions

60    Speeds required by Operating Rules, Special Instructions, or operating conditions.

61    Signal Indications

## ENROUTE TRAIN HANDLING ABILITY INVOLVING USE OF:

62    Throttle

63    Independent brake

64    Automatic brake

65    Dynamic brake

66    Blended brake

## SKILL/KNOWLEDGE EXHIBITED WHEN:

67    Starting train

68    Stopping train

69    Maintaining schedule

## KNOWLEDGE OF:

70    Assigned equipment -

71    Troubleshooting procedures

72    OVERALL SCORE - See above for specific instructions regarding this item.

73-264    SUPERVISOR'S COMMENTS - This section **must** be completed in certain instances as noted above.

265-368    AREA(S) NEEDING IMPROVEMENT - This section **must** be completed in certain instances as noted above.

# AMTRAK LOCOMOTIVE ENGINEER EVALUATION—FORM 1875

**EMPLOYEE IDENTIFICATION NO.**

| OCC. 12 13 | SUPERVISOR ID NO. 20 | | | | | | | | | | 29 |
|---|---|---|---|---|---|---|---|---|---|---|---|

**EVALUATION DATE**: 1 2 0 8 9 7

**CREWBASE** 14 16: SJC

**DIVISION** 17 19: 1010

**OPTION (A,B,C, OR D)** 11

**EMPLOYEE'S LAST NAME** 10: HASTINGS

05109014517

**FIRST NAME** 11: CLIFFORD

**SUPERVISOR LAST NAME**: WILLIAM...

**FIRST NAME**: WILLIAM

| | Score | | | |
|---|---|---|---|---|
| OPER. RULES 53 | 2 | SPECIAL INSTR. 54 | 2 | |
| THROTTLE 62 | 1 | IND. BRK. 63 | 2 | |
| START 67 | 1 | STOP 68 | 2 | |

**TRAIN NO.** 35: (illegible)

**OPERATED FROM** 36 38: SJC

**ENGINE NO.** 38: 0910

**OPERATED TO** 39: SJC

**NO. OF ENGS.** 41: 1

| | | | | |
|---|---|---|---|---|
| WRIT. AUTH. 46 55 | 2 | SAFETY INSTR. 49 56 | 2 | |
| AUTO. BRK. 64 | 2 | RADIO PRO. 57 | 1 | |
| SCHEDULE 69 | 2 | EQUIP. 70 | 1 | |
| DYN. BRK. 65 | 1 | P.C. 58 | 2 | |
| BLEND. BRK. 66 | 2 | AIR 59 51 52 | 2 | |
| TROUBLESHOOTING 71 | 1 | SPEED 60 | 2 | |
| | | SIGNAL 61 | 2 | |

**NO. OF CARS** 50: 2

**OVERALL SCORE** 72: 2

**M.I.**: (handwritten)

**SUPERVISOR'S COMMENTS**

WAS WATCHED PERFORMING HIS HANDLE OF THE ENGINEER VERY CAREFUL ENGINEER VERY WATCHED OF THIS TRIP FOR SAFETY SMOOTH STARTS WAS GOOD USE OF AIR BRAKE AND WATCH SIGNALS GOOD USE OF BRAKE AND WATCH SIGNALS

**AREA(S) NEEDING IMPROVEMENT**

264

388

**SUPERVISOR'S SIGNATURE** W. Griffin

**EMPLOYEE'S SIGNATURE** (signature)

I have reviewed this evaluation with the employee and provided employee with a copy. SUPERVISOR'S SIGNATURE
I have received a completed copy of this evaluation and understand its contents. My signature does not indicate my agreement with this evaluation. EMPLOYEE'S SIGNATURE

.RPC 2819

607000

# FORM 1875 INSTRUCTIONS AND CODES

**Blocks** (NOTE: Print legibly. All zeroes should be slashed - 0̸)

**1-10** Employee's Identification No.

**11** OPTION (A,B,C, OR D): A = Add, B = Browse, C = Change, D = Delete

**12-13** OCC - Employee's Qualification at time of Evaluation
ER = Engineer    FE = Fireman    ET = Engineer Trainee

**14-16** CREWBASE - Enter Employee's Crewbase

**17-19** DIVISION-Employee's Home Division:

| | |
|---|---|
| 100=Western Division | 400= Philadelphia Division |
| 200=Midwest Division | 500= New York Division |
| 300=Washington Division | 600= Boston Division |

**20-29** Supervisor's Employee Identification Number.

**30-35** Date on which Engineer Evaluation was performed.

**36-38** OPERATED FROM - Enter the location at which the evaluation was begun.

**39-41** OPERATED TO - Enter the location at which the evaluation was ended.

**42-45** TRAIN NO. - Timetable schedule number of train.

**46-49** ENGINE NO. - Enter Lead Locomotive, or Control Car Number.

**50** NO. OF ENGS. - Enter total number of locomotives in train's consist. If locomotives consist affected train handling characteristics, this must be noted in "SUPERVISOR'S COMMENTS" section.

**51-52** NO. OF CARS - Enter total number of cars in train's consist.

**USE THE CRITERIA IN ITEMS 0 THROUGH 4 BELOW FOR ASSIGNING A PERFORMANCE LEVEL NUMBER FOR CATEGORIES 53 THROUGH 72.**

**0** Enter a ZERO if category is not applicable. (Does not apply to item No. 72)

**1.** Employee consistently demonstrates skill and knowledge above average.

**2.** Employee fulfills all requirements for skill and knowledge. There may be a minor deviation above or below expectations, but the general performance level results in safe and efficient train operation.

**3.** An employee with sufficient time and experience who shows shortcomings in knowledge and/or skill. Also applicable to an employee who is progressing adequately, but is not yet fulfilling all position requirements.

**4.** Performance is unsatisfactory and does not meet minimum job standards.

**NOTE:**

When an employee is given a 3 or 4 rating in any field, specific information regarding what corrective actions are deemed appropriate to eliminate the employee's deficiencies, and what the employee must do **must** be included in "SUPERVISOR'S COMMENTS", and in "AREA(S) NEEDING IMPROVEMENT", respectively.

An employee given an **OVERALL** rating of 4 must be withheld from service until brought up to standard. A formal program of instruction must be fulfilled in order to accomplish this goal. Prior to returning to service, the employee must complete a qualifying run with a Supervisor, and achieve an **OVERALL** evaluation rating of at least 3.

**KNOWLEDGE OF/COMPLIANCE WITH:**

53 Operating Rules
54 Special Instructions
55 Written Authorities
56 Safety Instructions
57 Radio Procedures
58 Requirements of the Physical Characteristics of the territory the train is operated over.
59 Air Brake Instructions
60 Speeds required by Operating Rules, Special Instructions, or operating conditions.
61 Signal Indications

**ENROUTE TRAIN HANDLING ABILITY INVOLVING USE OF:**

62 Throttle
63 Independent brake
64 Automatic brake
65 Dynamic brake
66 Blended brake

**SKILL/KNOWLEDGE EXHIBITED WHEN:**

67 Starting train
68 Stopping train
69 Maintaining schedule

**KNOWLEDGE OF:**

70 Assigned equipment
71 Troubleshooting procedures
72 OVERALL SCORE - See above for specific instructions regarding this item.

73-264 SUPERVISOR'S COMMENTS - This section **must** be completed in certain instances as noted above.

265-388 AREA(S) NEEDING IMPROVEMENT - This section **must** be completed in certain instances as noted above.

010000

NRPC 2819

# AMTRAK LOCOMOTIVE ENGINEER EVALUATION—FORM 1875

**EMPLOYEE IDENTIFICATION NO.**

| CC. 13 | SUPERVISOR ID NO. 20 | CREWBASE 14 16 | DIVISION 17 19 |
|---|---|---|---|
| 12 | SJC | SJC | 100 |

**EVALUATION DATE** 20
10 29 98

**TRAIN NO.** 35
S J Y D

**OPTION (A,B,C, OR D)** 11

**EMPLOYEE'S LAST NAME** 10
HARDEMAN

**FIRST NAME** 11
WILLIAM

**M.I.** E

**SUPERVISOR LAST NAME**
HASTINGS

**ENGINE NO.** 38
O S I V

**OPERATED FROM** 36
SJC

**OPERATED TO** 39
SJC

**NO. OF ENGS.** 41 50
1

**NO. OF CARS** 51 52
O S

**SPEED** 60
1

**SIGNAL** 61
2

**M.I.** 
A

| Field | No. | Value |
|---|---|---|
| OPER. RULES | 42 | 2 |
| SPECIAL INSTR. | 45 | 2 |
| WRIT. AUTH. | 46 | 2 |
| SAFETY INSTR. | 49 | 2 |
| RADIO PRO. | 57 | 1 |
| P.C. | 58 | 2 |
| AIR | 59 | 2 |
| TROUBLESHOOTING | 71 | 2 |
| THROTTLE | 53 | 2 |
| IND. BRK. | 54 | 2 |
| AUTO. BRK. | 55 | 2 |
| DYN. BRK. | 56 | 2 |
| EQUIP. | 65 | 2 |
| BLEND. BRK. | 66 | 2 |
| OVERALL SCORE | 72 | 2 |
| START | 62 | 2 |
| STOP | 63 | 2 |
| SCHEDULE | 64 | 2 |
| | 67 | |
| | 68 | |
| | 69 | |
| | 70 | |

**SUPERVISOR'S COMMENTS**

GOOD FAMILIARIZATION VERY AWARE OF NEEDS FOR SAFETY
VERY GOOD JOB OF COMMUNICATIONS WITH CREW AND
MECHANICAL FORCES. GOOD USE OF BRAKES AND
THROTTLE. EXCELLENT SPEED CONTROL IN MOUNTAINOUS
TRACKS.

**AREA(S) NEEDING IMPROVEMENT**

264

388

I have reviewed this evaluation with the employee and provided employee with a copy. SUPERVISOR'S SIGNATURE

I have received a completed copy of this evaluation and understand its contents. My signature does not indicate my agreement with this evaluation.

EMPLOYEE'S SIGNATURE

FORM 860 INSTRUCTIONS AND CODES

DATE:

1-10   Employee's Identification No.

1-10   OPERATED ELEC. ON 24. A—Rail  B. Pneigo  C. s Chrono  D. Diesel

6-13   EXEC. Employee's Qualification at time of Evaluation

         CR=Engineer   IE=Engineer   ET=Employee Trainee

14-16  OPERBASE: Area Employee's Home Division

7-19   DIVISION Employee's Home Division

         105  Northern Division          Philadelphia Division
         206  Midwest Division            590  New York Division
         400  Washington Division         490  Boston Division

20-29  Supervisor's Employee Identification Number

20-36  Date on which Employee Evaluation was performed

36-38  OPERATED FROM - Enter the location at which the evaluation was helped

39-41  OPERATED TO - Entry the location at which the evaluation was ended

42-45  TRAIN NO. - Timetable schedule number of train

46-49  ENGINE NO. - Enter Lead Locomotive or Control Car Number

50     NO. OF ENGS. - Enter total number of locomotives in train's consist

51-52  No. OF CARS - Enter total number of cars in train's consist

USE THE CRITERIA IN ITEMS 0 THROUGH 4 BELOW FOR ASSIGNING A PERFORMANCE LEVEL NUMBER FOR CATEGORIES 53 THROUGH 72.

0  Enter a ZERO if category is not applicable

1  Employee fails all requirements for the job knowledge. There may be a more deviation above or below expectations, but the general performance level results in safe and efficient train operation.

2  Employee fulfills all requirements for job knowledge and/or skills. Also applicable to an employee who is progressing favorably, but is not yet fulfilling all position requirements.

4  Performance is an exceedingly and drives over high maximum job standards.

KNOWLEDGE OF/COMPLIANCE WITH:

53  Operating Rules
54  Special Instructions
55  Written Notices
56  Safety Instructions
57  Radio Procedures
58  Requirements of the Physical Characteristics operated over

59  Air Brake Procedures
60  Speeds required by Operating Rules, Special Instructions, or operating conditions
61  Signal Indications

AMOUNT TRAIN HANDLING ABILITY INVOLVING USE OF:

62  Throttle
63  Independent brake
64  Automatic brake
65  Dynamic brake
66  Parking brake

SKILLS/KNOWLEDGE EXHIBITED WHILE:

67  Starting train
68  Stopping train
69  Making train movement

KNOWLEDGE OF:

70  Assigned equipment
71  Troubleshooting procedures
72  OVERALL SCORE - Use average for specific evaluation on category this item.

F-264

SUPERVISOR'S COMMENTS - Use section must be completed in certain instances as noted above.

112000

000711

# AMTRAK LOCOMOTIVE ENGINEER EVALUATION—FORM 1875

**EMPLOYEE IDENTIFICATION NO.** 1

**SUPERVISOR ID NO.** 16

**CREWBASE** 14  SJC

**OCC.** 13  FCC

**DIVISION** 17  TPO

**EVALUATION DATE** 20  7/10/98

**TRAIN NO.** 35  072617

**SUPERVISOR ID NO.** — 29

**EMPLOYEE IDENTIFICATION NO.** 05010204117 (10)

**OPTION (A.B.C. OR D)** 11

**EMPLOYEE'S LAST NAME** 10  HARDEMAN

**FIRST NAME** WILLIAM  C

**M.I.** R (4)

**OPERATED FROM** 36  SJC
**ENGINE NO.** 38  02617
**OPERATED TO** 39  SLO
**NO. OF ENGS.** 41  1
**NO. OF CARS** 51  04 (5b)

**SUPERVISOR LAST NAME** 10  HASTINGS
**FIRST NAME** WILLIAM  C

| | | |
|---|---|---|
| **OPER. RULES** 53  2 | **SPECIAL INSTR.** 54  2 | **WRIT. AUTH.** 55  2 |
| **THROTTLE** 62  2 | **IND.BRK.** 63  2 | **AUTO. BRK.** 64  2 |
| **START** 67  1 | **STOP** 68  2 | **SCHEDULE** 69  2 |

**SAFETY INSTR.** 56  2
**RADIO PRO.** 57  1
**P.C.** 58  2
**BLEND. BRK.** 66  2
**AIR** 59  2
**SPEED** 60  2

**DYN. BRK.** 65  2
**EQUIP.** 70  2
**TROUBLESHOOTING** 71

**SIGNAL** 61  1
**OVERALL SCORE** 72  2

**M.I.** R

## SUPERVISOR'S COMMENTS

GOOD ENGINEER ADHERED TO BLOW WHISTLE AT
CROSSINGS. WENT FOR EMERGENCY ORDERS. GOOD USE
OF BELL AND WHISTLE. GOOD CONVENTIONAL STATIONS WITH A
CREW.

## AREA(S) NEEDING IMPROVEMENT

264

388

I have reviewed this evaluation with the employee and provided employee with a copy. SUPERVISOR'S SIGNATURE
I have received a completed copy of this evaluation and understand its contents. My signature does not indicate my agreement with this evaluation.

**SUPERVISOR'S SIGNATURE** _William Hastings_

**EMPLOYEE'S SIGNATURE** _____

NRPC 2819

# FORM 1675 INSTRUCTIONS AND CODES

**NOTE:**

When an employee is given a 3 or 4 rating in any field, specific information regarding what corrective actions are deemed appropriate to eliminate the employee's deficiencies, and what the employee's deficiencies are, must be included in "SUPERVISOR'S COMMENTS", and in "AREA(S) NEEDING IMPROVEMENT", respectively.

An employee given an OVERALL rating of 4 must be withheld from service until brought up to standard. A formal program of instruction must be fulfilled in order to accomplish this goal. Prior to returning to service, the employee must complete a qualifying run with a Supervisor, and achieve an OVERALL evaluation rating of at least 3.

| Block No. | NOTE: Print legibly. All entries should be added in #2. |
|---|---|
| 1-10 | Employee's Identification No. |
| 11 | OPTION (A,B,C, OR D) A = Add, B = Browse, C = Change, D = Delete |
| 12-13 | OCC: Employee's Occupation at time of Evaluation |
| | E1 = Engineer     E3 = Fireman     E4 = Engineer Trainee |
| 14-15 | CRAFT: Enter Employee's Craft Code |
| 17-19 | DIVISION: Enter Employee's Home Division |
| | 100 = Western Division        400 = Philadelphia Division |
| | 200 = Central Division        500 = New York Division |
| | 300 = Washington Division     600 = Boston Division |
| 20-29 | Supervisor's Employee Identification Number. |
| 30-35 | Date on which Engineer Evaluation was performed. |
| 36-38 | OPERATED FROM - Enter the location at which the evaluation was begun. |
| 39-41 | OPERATED TO - Enter the location at which the evaluation was ended. |
| 42-45 | TRAIN NO - Timetable schedule number of train. |
| 46-49 | ENGINE NO. - Enter Lead Locomotive, or Control Car Number. |
| 50 | NO. OF ENGS - Enter total number of locomotives in train's consist. If locomotive consist affects train handling characteristics, this must be listed in "SUPERVISOR'S COMMENTS" section. |
| 51-52 | NO. OF CARS - Enter total number of cars in train's consist |

**USE THE CRITERIA IN ITEMS 0 THROUGH 4 BELOW FOR ASSIGNING A PERFORMANCE LEVEL NUMBER FOR CATEGORIES 53 THROUGH 72.**

0. Enter a ZERO if category is not applicable.  (Does not apply to item No. 72)
1. Employee consistently demonstrates skill and knowledge; above average level results in safe and efficient train operation.
2. Employee meets all requirements for skill and knowledge. Does not have a recent adverse history in job expectations, but the general performance level results in safe and efficient train operation.
3. An employee with sustained time and experience who shows shortcomings in knowledge and/or skill. Also applicable to an employee who is progressing adequately, but is short of fulfilling all position requirements.
4. Inexperience or lack of ability and does not meet minimum job expectations.

**KNOWLEDGE OF/COMPLIANCE WITH:**

| 53 | Operating Rules |
| 54 | Special Instructions |
| 55 | Written Authorities |
| 56 | Safety Instructions |
| 57 | Radio Procedures |
| 58 | Requirements of the Physical Characteristics of the territory the train is operating over. |
| 59 | Air Brake Instructions |
| 60 | Speeds required by Operating Rules, Special Instructions, or operating conditions |
| 61 | Signal Indications |

**ENROUTE TRAIN HANDLING ABILITY INVOLVING USE OF:**

| 62 | Throttle |
| 63 | Independent brake |
| 64 | Automatic brake |
| 65 | Dynamic brake |
| 66 | Blended brake |

**SKILL/KNOWLEDGE EXHIBITED WHEN:**

| 67 | Starting train |
| 68 | Stopping train |
| 69 | Maintaining schedule |

**KNOWLEDGE OF:**

| 70 | Assigned equipment |
| 71 | Handling/setting procedures in effect |
| 72 | OVERALL SCORE. See above or reverse for instructions in rating. |

SUPERVISOR'S COMMENTS - To be used as necessary. Entry made in categories 53 through 72 must be explained.

AREA(S) NEEDING IMPROVEMENT - Provided entry made in this section.

000712
NRPC 2819

# AMTRAK LOCOMOTIVE ENGINEER EVALUATION—FORM 1875

EMPLOYEE IDENTIFICATION NO. 1

OPTION (A,B,C, OR D) 11

OCC. 12 13 — ET

CREWBASE 14 16 — SAP

SUPERVISOR ID NO. 17 19

DIVISION 19 — 1.00

EVALUATION DATE 20 30 — 01/04/01

TRAIN NO. 35 — 764

SPECIAL INSTR. 45 — 1

OPER. RULES 42 53 — 1

EMPLOYEE'S LAST NAME 10 — HARDEGRAM

SUPERVISOR LAST NAME — COLLINS

FIRST NAME 11 — MARK

M.I.

M.I.

OPERATED FROM 36 — ATO

ENGINE NO. 38 — 9272

OPERATED TO 39 41 — STR

NO. OF ENGS. 50 — 1

NO. OF CARS 51 52 — 04

| Field | No. | Score |
|---|---|---|
| THROTTLE | 62 | 2 |
| START | 67 | 2 |
| IND.BRK. | 63 | 1 |
| STOP | 68 | 1 |
| WRIT. AUTH. | 55 | 1 |
| AUTO. BRK. | 64 | 2 |
| SAFETY INSTR. | 56 | 2 |
| SCHEDULE | 69 | 2 |
| DYN. BRK. | 65 | 2 |
| EQUIP. | 70 | 2 |
| RADIO PRO. | 57 | 1 |
| P.C. | 58 | 1 |
| BLEND. BRK. | 66 | 2 |
| TROUBLESHOOTING | 71 | 2 |
| AIR | 59 | 2 |
| SPEED | 60 | 1 |
| SIGNAL | 61 | 1 |

OVERALL SCORE 72 — 1

SUPERVISOR'S COMMENTS

AREA(S) NEEDING IMPROVEMENT

264

388

33

I have reviewed this evaluation with the employee and provided employee with a copy. SUPERVISOR'S SIGNATURE

I have received a completed copy of this evaluation and understand its contents. My signature does not indicate my agreement with this evaluation.
EMPLOYEE'S SIGNATURE

# FORM 1875 INSTRUCTIONS AND CODES

**Blocks** (NOTE: Print legibly. All zeros should be slashed - Ø)

- **1-10** Employee's Identification No.
- **11** OPTION (A,B,C, OR D) A=Add, B = Browse, C = Change, D = Delete
- **12-13** OCC: Employee's Qualification at time of Evaluation

  ER = Engineer  FR = Fireman  ET = Engineer Trainee
- **14-16** CREWBASE - Enter Employee's Crewbase
- **17-19** DIVISION-Employee's Home Division.

  100=Western Division  400=Philadelphia Division
  200=Midwest Division  500=New York Division
  300=Washington Division  600=Boston Division
- **20-29** Supervisor's Employee Identification Number.
- **30-35** Date on which Engineer Evaluation was performed
- **36-38** OPERATED FROM - Enter the location at which the evaluation was begun
- **39-41** OPERATED TO - Enter the location at which the evaluation was ended.
- **42-45** TRAIN NO. - Timetable schedule number of train.
- **46-49** ENGINE NO. - Enter Lead Locomotive, or Control Car Number.
- **50** NO. OF ENGS. - Enter total number of locomotives in train's consist. If locomotive consist affected train handling characteristics, this must be noted in "SUPERVISOR'S COMMENTS" section.
- **51-52** NO. OF CARS. - Enter total number of cars in train's consist.

---

RATE THE CRITERIA IN ITEMS 0 THROUGH 4 BELOW FOR ASSIGNING A PERFORMANCE LEVEL NUMBER FOR CATEGORIES 53 THROUGH 72.

0. Enter a ZERO if category is not applicable. (Does not apply to item No. 72)
1. Employee consistently demonstrates skill and knowledge above average.
2. Employee fulfills all requirements for skill and knowledge. There may be a minor deviation above or below expectations, but the general performance level results in safe and efficient train operation.
3. An employee's skill, proficiency and experience who shows shortcomings in knowledge and/or skill. Also appropriate for an employee who is progressing adequately, but is not yet fulfilling all practical requirements.
4. Performance is unsatisfactory and does not meet minimum job standards.

---

**NOTE:**

When an employee is given a 3 or 4 rating in any field, specific information regarding what corrective actions are deemed appropriate to eliminate the employee's deficiencies, and what the employee must do to accomplish this goal, must be included in "SUPERVISOR'S COMMENTS", and in "AREA(S) NEEDING IMPROVEMENT", respectively.

An employee given an OVERALL rating of 4 must be withheld from service until brought up to standard. A formal program of instruction must be fulfilled in order to accomplish this goal. Prior to returning to service, the employee must complete a qualifying run with a "Supervisor" and achieve an OVERALL evaluation rating of at least 3.

**KNOWLEDGE OF/COMPLIANCE WITH:**

- 53 Operating Rules
- 54 Special Instructions
- 55 Written Authorities
- 56 Safety Instructions
- 57 Radio Procedures
- 58 Requirements of the Physical Characteristics of the territory the train is operated over.
- 59 Air Brake Instructions
- 60 Speeds required by Operating Rules, Special Instructions, or operating conditions.
- 61 Signal Indications

**ENROUTE TRAIN HANDLING ABILITY REGARDING USE OF:**

- 62 Throttle
- 63 Independent brake
- 64 Automatic brake
- 65 Dynamic brake
- 66 Flowed brake

**SKILL/KNOWLEDGE EXHIBITED WHEN:**

- 67 Starting train
- 68 Stopping train
- 69 Maintaining schedule

**KNOWLEDGE OF:**

- 70 Assigned equipment
- 71 Troubleshooting procedures
- 72 OVERALL SCORE - See below for specific instructions regarding this item.

73-264 SUPERVISOR'S COMMENTS - This section must be completed in certain instances as noted above.

265-388 AREA(S) NEEDING IMPROVEMENT - This section must be completed in certain instances as noted above.



000713

**Blocks** (NOTE: Print legibly. All zeroes should be slashed - 0)

1-10  Employee's Identification No.

11  OPTION (A,B,C, OR D) A=Add, B=Brown, C=Change, D=Delete

12-13  OCC-Employee's Qualification at time of Evaluation
  ER = Engineer   FE = Fireman   ET = Engineer Trainee

14-16  CREWBASE - Enter Employee's Crewbase

17-19  DIVISION-Employee's Home Division:
  100=Western Division   400=Philadelphia Division
  200=Midwest Division   500=New York Division
  30M=Washington Division   600=Boston Division

20-29  Supervisor's Employee Identification Number

30-35  Date on when Engineer Evaluation was performed

38-38  OPERATED FROM - Enter the location at which the evaluation was begun

39-41  OPERATED TO - Enter the location at which the evaluation was ended

42-45  TRAIN NO. - Enter schedule number of train.

46-49  ENGINE NO. - Enter Lead Locomotive, or Control Car Number.

50  NO. OF ENGS. - Enter total number of locomotives in train's consist. If locomotives consist affected train handling characteristics, this must be noted in "SUPERVISOR'S COMMENTS" section.

51-52  NO. OF CARS - Enter total number of cars in train's consist.

USE THE CRITERIA IN ITEMS 0 THROUGH 4 BELOW FOR ASSIGNING A PERFORMANCE LEVEL NUMBER FOR CATEGORIES 53 THROUGH 72.

0  Enter a ZERO if category is not applicable. (Does not apply to item No. 72)

1  Employee consistently demonstrates skill and knowledge above average.

2  Employee fulfills all requirements for skill and knowledge expected of an employee at this level of experience, but the general performance level results in safe and efficient train operation. There may be a few deviations.

3  An employee with sufficient time and experience who shows shortcomings in knowledge and/or skill. Also applicable to an employee who is progressing adequately, but is not yet fulfilling all job level requirements.

4  Performance is unsatisfactory and does not meet minimum job standards.

---

FORM 1975 INSTRUCTIONS AND CODES

**NOTE:**

When an employee is given a 3 or 4 rating in any field, specific information regarding what corrective actions are deemed appropriate to eliminate the employee's deficiencies, and what the employee's deficiencies are, must be included in "SUPERVISOR'S COMMENTS" and in "AREA(S) NEEDING IMPROVEMENT", respectively.

An employee given an OVERALL rating of 4 must be withheld from service until brought up to standard. A formal program of instruction must be conducted in order to accomplish this goal. Prior to returning to service, the employee must complete a qualifying run with a Supervisor, and achieve an OVERALL evaluation rating of at least 3.

KNOWLEDGE OF/COMPLIANCE WITH:

53  Operating Rules
54  Special Instructions
55  Written Authorities
56  Safety Instructions
57  Radio Procedures
58  Requirements of the Physical Characteristics of the territory the train is operated over.
59  Air Brake Instructions
60  Speeds required by Operating Rules, special instructions, or operating conditions.
61  Signal Indications

ENROUTE TRAIN HANDLING ABILITY INVOLVING USE OF:

62  Throttle
63  Independent brake
64  Automatic brake
65  Dynamic brake
66  Blended brake

SKILL/KNOWLEDGE EXHIBITED WHILE:

67  Starting train
68  Stopping train
69  Maintaining schedule

KNOWLEDGE OF:

70  Assigned equipment
71  Troubleshooting procedures
72  OVERALL SCORE - See above for specific indications regarding this item.

73-264  SUPERVISOR'S COMMENTS - This section must be completed in certain instances as noted above.

265-398  AREA(S) NEEDING IMPROVEMENT - This section must be completed in certain instances as noted above.



# ATTACHMENT - EXHIBIT -4

1  PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
   BERNADETTE A. RIGO, ESQ. (STATE BAR NO. 190272)
2  PRICE AND ASSOCIATES
   1300 Clay Street, Suite 340
3  Oakland, CA 94612
   Telephone: (510) 452-0292
4
   Attorneys for Plaintiff
5  ABNER J. MORGAN, JR.

RECEIVED

1998 AUG -4  A 2: 29

RICHARD W. WIEKING, CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA.

6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11  ABNER J. MORGAN, JR.              )   No. C96-03585 SI
                                      )
12          Plaintiff,                )
                                      )   **DECLARATION OF MERIOLA
13  v.                                )   GOTTHARDT IN OPPOSITION TO
                                      )   DEFENDANT AMTRAK'S MOTION
14  NATIONAL RAILROAD PASSENGER       )   FOR SUMMARY JUDGMENT OR, IN
    CORPORATION dba AMTRAK, and DOES  )   THE ALTERNATIVE, FOR
15  1-10, inclusive,                  )   SUMMARY ADJUDICATION OF
                                      )   ISSUES**
16          Defendants.               )
    _____    )   DATE:   AUGUST 28, 1998
17                                        TIME:   9:00 A.M.
                                          PLACE:  COURTROOM 4
18                                        HONORABLE SUSAN ILLSTON

19       I, MERIOLA GOTTHARDT, declare:

20       1.      I worked for the National Railroad Passenger Corporation ("Amtrak") for

21  approximately eight (8) years as an engineer. I worked at the Oakland Maintenance Yard ("the

22  Yard") California throughout my employment at Amtrak. I make this Declaration on personal

23  knowledge in opposition to Amtrak's Motion for Summary Judgment.

24       2.      In approximately 1992, I heard Chuck Berg, a road foreman of engines,

25  tell J.W. Deely ("Deely"), then Amtrak's Director of the California Corridor, that he was going to

26  give a document to one of those "nigger bitches" to type. Deely did not reprimand Berg.

27       3.      In approximately 1993, while standing outside of the main office at the

28  Yard, I heard Deely state that the problem with these niggers is that after you train them, they

063P10

            DECLARATION OF MERIOLA GOTTHARDT (C96-03585 SI )

1   walk out on you.

2           4.      On several occasions, I overheard Michael Bordenave, an Amtrak

3   Foreman, address and refer to black employees as "niggers."

4           5.      I have complained to Deely regarding the use of racial slurs in the Yard.

5   Nothing was done in response to my complaint.

6           6.      In approximately late 1994 or early 1995, I saw Bordenave and Abner J.

7   Morgan having a heated discussion. I heard Mr. Bordenave say that he was going to tell that Mr.

8   Morgan threatened him and they would believe him.

9           7.      In approximately late 1994, Mr. Bordenave ordered me to use an engine

10  with no steps to move car trains. I informed him that this was a violation of federal law, which

11  could result in deaths. I also told Mr. Bordenave that if I got into trouble for following his order,

12  I would inform people that he gave me the order. Mr. Bordenave replied that if I did not follow

13  his order he will fire me for insubordination and that he would deny giving me the order if I got

14  into trouble for it.

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

PRICE AND ASSOCIATES
1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

1063P10

DECLARATION OF MERIOLA GOTTHARDT (C96-03585 SI )

1        I declare under penalty of perjury under the laws of the State of California and the

2    United States that the foregoing is true and correct.  If called as a witness in this matter, I could

3    and would testify competently to the facts stated herein.

4        Executed this 30ᵗʰ day of July, 1998 at Oakland, California.

6    *Meriola Gotthardt*

   MERIOLA GOTTHARDT

1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

063P10

DECLARATION OF MERIOLA GOTTHARDT (C96-03585 SI )

# ATTACHMENT - EXHIBIT -5

1 | PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
2 | BERNADETTE A. RIGO, ESQ. (STATE BAR NO. 190272)
PRICE AND ASSOCIATES
1300 Clay Street, Suite 340
3 | Oakland, CA 94612
Telephone: (510) 452-0292

RECEIVED

1998 AUG -4 A 2: 28

RICHARD W. WIEKING, CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA.

4 | Attorneys for Plaintiff
5 | ABNER J. MORGAN, JR.

6

7

8 | UNITED STATES DISTRICT COURT

9 | NORTHERN DISTRICT OF CALIFORNIA

10

11 | ABNER J. MORGAN, JR.                          )   No. C96-03585 SI
                                                )
12 |          Plaintiff,                          )
                                                )   **DECLARATION OF MICHAEL**
13 | v.                                           )   **WILLIAMS IN OPPOSITION TO**
                                                )   **DEFENDANT AMTRAK'S MOTION**
14 | NATIONAL RAILROAD PASSENGER                  )   **FOR SUMMARY JUDGMENT OR, IN**
     CORPORATION dba AMTRAK, and DOES            )   **THE ALTERNATIVE, FOR**
15 | 1-10, inclusive,                             )   **SUMMARY ADJUDICATION OF**
                                                )   **ISSUES**
16 |          Defendants.                         )
                                                )   DATE:    AUGUST 28, 1998
17 | ───────────────────────────────             )   TIME:    9:00 A.M.
                                                    PLACE:   COURTROOM 4
18 |                                                 HONORABLE SUSAN ILLSTON

19

20 |          I, MICHAEL WIILIAMS, declare:

21 |          1.      I currently work for Union Pacific Railroad Company (formerly "Southern

22 | Pacific"). I have worked in the railroad industry for a total of approximately nineteen (19) years.

23 | I make this Declaration on personal knowledge in opposition to Defendant's Motion for

24 | Summary Judgment.

25 |          2.      I worked for the National Railroad Passenger Corporation ("Amtrak") for

26 | approximately six (6) years from October 1989 through October 1995 as a Car Inspector. I

27 | worked at Amtrak's Oakland Maintenance Yard ("the Yard"), California throughout my

28 | employment at Union Pacific and Amtrak.

63P12

DECLARATION OF MICHAEL WILLIAMS (C96-03585 SI)

1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

3.     Jerry Denton was one of my supervisors when I worked at Amtrak. I have overheard Denton on numerous occasions tell "Nigger jokes." In approximately 1995, I overheard Denton say "God damn Niggers."

4.     I found racist notes and other texts exhibiting racial animus in my locker three to four times a week. For example, in approximately 1995, I found a picture taped to a string portraying a white Portuguese holding the chopped heads of black Africans.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on _____*Aug 1*_____, 1998, at Oakland, California.


MICHAEL WILLIAMS

DECLARATION OF MICHAEL WILLIAMS (C96-03585 SI)

ATTACHMENT - EXHIBIT -6

PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
BERNADETTE A. RIGO, ESQ. (STATE BAR NO. 190272)
PRICE AND ASSOCIATES
1300 Clay Street, Suite 340
Oakland, CA 94612
Telephone: (510) 452-0292

Attorneys for Plaintiff
ABNER J. MORGAN, JR.

RECEIVED

1998 AUG -4  A 2: 23

RICHARD W. WIEKING, CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ABNER J. MORGAN, JR. | No. C96-03585 SI |
| Plaintiff, | |
| v. | **DECLARATION OF JOE GEORGE IN OPPOSITION TO DEFENDANT AMTRAK'S MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, FOR SUMMARY ADJUDICATION OF ISSUES** |
| NATIONAL RAILROAD PASSENGER CORPORATION dba AMTRAK, and DOES 1-10, inclusive, | |
| Defendants. | DATE:   AUGUST 28, 1998<br>TIME:    9:00 A.M.<br>PLACE:  COURTROOM 4<br>HONORABLE SUSAN ILLSTON |

I, JOE GEORGE, declare:

1.     I have worked for Union Pacific (formerly "Southern Pacific") for approximately twenty (20) years as a laborer. I worked at the Oakland Maintenance Yard in Oakland, California throughout my employment at Union Pacific. I make this Declaration on personal knowledge in opposition to Defendant National Railroad Passenger Corporation's ("Amtrak") Motion for Summary Judgment.

2.     I have been the Local Chairman of the National Conference of Firemen and Oilers for six (6) years.

3.     Amtrak and Union Pacific employees have worked together at the Oakland Maintenance Yard ("Yard") since I started working at Union Pacific in 1978.

3P13

-1-
DECLARATION OF JOE GEORGE (C96-03585 SI)

1            4.      I have worked with Jerry Denton and R.D. Vandenburg in the past and

2    have observed them talk in a profane and rude manner to both Amtrak and Union Pacific

3    employees on several occasions.  I requested Mr. Denton and Mr. Vandenburg to stop talking to

4    the employees in such a manner.  I informed them that if I talked to them in such a manner, I

5    would be brought up on charges.  Mr. Denton and Mr. Vandenburg did not respond to my

6    requests.

7            5.      In approximately 1989, Amtrak contracted with Union Pacific to provide

8    services to Amtrak.  Many Union Pacific employees transferred to Amtrak to work for a six year

9    period.  I wanted to transfer to Amtrak because of better benefits.  I would also be the most

10   senior person in my craft.  After I put in the bid for the transfer, Mr. Denton threatened me by

11   stating that if I transferred to Amtrak, he would fire my "black ass."

12           6.      In approximately June 1989, I was getting mustard from an Amtrak train,

13   a common practice in the Yard.  Mr. Vandenburg saw me getting the mustard and a

14   confrontation ensued.  When I subsequently saw Mr. Vandenburg, I apologized for my part in

15   the incident.  He replied, "Now your black ass wants to apologize." I was taken aback and did not

16   know what to say.  I received a three day suspension for the incident for being out my work area.

17   I again ran into Mr. Vandenburg after my suspension and he made the following comment:

18   "Your black ass got a three day suspension."

19           7.      In approximately 1991 or 1992, one of the Amtrak employees I

20   represented reported to Mr. Denton that she was physically threatened by one of her supervisors,

21   Bob Modick.  Mr. Modick is white.  No investigation was conducted concerning this employee's

22   complaint.

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

///

1        I declare under penalty of perjury under the laws of the United States that the

2    foregoing is true and correct.  Executed on **8 - 31**    , 1998, at Oakland, California.

3

4

5

6    JOE GEORGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

13

DECLARATION OF JOE GEORGE (C96-03585 SI)

# ATTACHMENT - EXHIBIT -7

PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
BERNADETTE A. RIGO, ESQ. (STATE BAR NO. 190272)
PRICE AND ASSOCIATES
1300 Clay Street, Suite 340
Oakland, CA 94612
Telephone: (510) 452-0292

RECEIVED

1998 AUG -4 A 2: 29

RICHARD W. WIEKING, CLERK
U.S. DISTRICT COURT
NO. DIST. OF CA.

Attorneys for Plaintiff
ABNER J. MORGAN, JR.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ABNER J. MORGAN, JR. | ) | No. C96-03585 SI |
| Plaintiff, | ) | |
| | ) | **DECLARATION OF ARTHUR** |
| v. | ) | **ELWOOD CONLEY IN OPPOSITION** |
| | ) | **TO DEFENDANT'S MOTION FOR** |
| NATIONAL RAILROAD PASSENGER | ) | **SUMMARY JUDGMENT** |
| CORPORATION dba AMTRAK, and DOES | ) | |
| 1-10, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

I, Arthur Elwood Conley, declare:

1.     I worked for Union Pacific (formerly "Southern Pacific") for eighteen (18) years as a pipefitter and a temporary foreman.   I make this Declaration on personal knowledge in opposition to National Railroad Passenger Corporation's ("Amtrak") Motion for Summary Judgment.

2.     I worked for Amtrak from approximately 1989 to 1992 as a pipefitter and a temporary foreman.  I was the temporary Car Foreman for the Mechanical Department, Roundhouse Foreman, and Foreman of the Private Rail Cars.

3.     In 1991, I had two meetings with then House Representative Barbara

*LAW OFFICES*
***PRICE AND ASSOCIATES***
*1300 CLAY STREET, SUITE 340*
*OAKLAND, CA 94612*
*Telephone (510) 452-0292*

1063P9

-1-

DECLARATION OF ARTHUR ELWOOD CONLEY (C96-03585 SI)

1  Boxer. One of those meetings took place in Amtrak's Oakland Maintenance Yard. I complained

2  to Barbara Boxer regarding the employment conditions at Amtrak Oakland Maintenance Yard.

3         4.     R.D. Vandenburg displayed his displeasure and offense at my attending

4  the meetings with Barbara Boxer. Within days after the meetings, Mr. Vandenburg told me that

5  he wanted to have a meeting with me. He then asked whether I would need to go to Barbara

6  Boxer to cry about anything.

7         5.     In 1992, I was terminated by Amtrak for reasons that are still not clear to

8  me.

9         6.     I have heard Amtrak management including R.D. Vandenburg, Raymond

10  Borge, and Jerry Denton make racial slurs. I remember Mr. Borge on several occasions refer to

11  African American employees as "shuffle-butt niggers." Mr. Borge even imitated the way he

12  perceived African American employees walked to explain what the term meant. On several

13  occasions, Mr. Vandenburg and Mr. Denton were present when Mr. Borge made these comments

14  and imitations.

15         I declare under penalty of perjury under the laws of the United States that the

16  foregoing is true and correct. Executed on _July 28Th_, 1998, at Oakland, California.

17

18

19  ARTHUR ELWOOD CONLEY

20

21

22

23

24

25

26

27

28

1063P9

-2-

DECLARATION OF ARTHUR ELWOOD CONLEY (C96-03585 SI)

ATTACHMENT - EXHIBIT -8

1   PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
2   BERNADETTE A. RIGO, ESQ. (STATE BAR NO. 190272)
    PRICE AND ASSOCIATES
3   1300 Clay Street, Suite 340
    Oakland, CA 94612
4   Telephone: (510) 452-0292

    Attorneys for Plaintiff
5   ABNER J. MORGAN, JR.

**ORIGINAL FILED**

AUG 6 1998

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

6

7

8                   UNITED STATES DISTRICT COURT

9                 NORTHERN DISTRICT OF CALIFORNIA

10

11  ABNER J. MORGAN, JR.                  )   No. C96-03585 SI
                                          )
12              Plaintiff,                )
                                          )   **AMENDED DECLARATION OF**
13  v.                                    )   **ABNER J. MORGAN, JR. IN**
                                          )   **OPPOSITION TO DEFENDANT**
14  NATIONAL RAILROAD PASSENGER           )   **AMTRAK'S MOTION FOR**
    CORPORATION dba AMTRAK, and DOES      )   **SUMMARY JUDGMENT OR, IN THE**
15  1-10, inclusive,                      )   **ALTERNATIVE, FOR SUMMARY**
                                          )   **ADJUDICATION OF ISSUES**
16              Defendants.               )
    _____)   DATE:   AUGUST 28, 1998
17                                            TIME:    9:00 A.M.
                                              PLACE:  COURTROOM 4
18                                            HONORABLE SUSAN ILLSTON

19

20          I, ABNER J. MORGAN, JR., declare:

21          1.      I am the Plaintiff in the above-entitled action. I make this Declaration on

22  personal knowledge in opposition to Defendant National Railroad Passenger Corporation's

23  ("Amtrak") Motion for Summary Judgment Or, in the Alternative, for Summary Adjudication of

24  Issues.

25          2.      I worked for Amtrak for approximately five (5) years. I worked at the

26  Oakland Maintenance Yard ("the Yard") in Oakland, California throughout my employment at

27  Amtrak.

28          3.      I received training in the electronics field from the United States Air

                                      -1-
        AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

Force and had six years of experience as an Electrician prior to working for Amtrak.

4.    I was hired on August 15, 1990. Upon being hired, Amtrak paid me $9.69 an hour. R.D. Vandenburg ("Vandenburg"), former Facility Manager at the Yard, told me that he would increase my pay to the Electrician rate after my probationary period.

5.    Several months later, I discovered that I was not hired as an Electrician but as an "Electrician Helper." I was the only Electrician Helper at the Yard and in Amtrak's Western Division. Despite performing the duties of an Electrician for approximately two years, my position was not reclassified and my pay was not increased until April 1992. Amtrak hired other less qualified Caucasian Electricians between the beginning of 1991 and April 1992 and paid them at an Electrician's rate. During the five (5) years of my employment with Amtrak, I was one of the five African-American Electricians assigned to the Yard.

6.    Throughout the course of my employment with Amtrak, I have been subjected to a continuous pattern of discrimination on the basis of my race, and retaliation for complaining regarding the racism. (A true and correct copy of the EEOC Charge and Affidavit I filed on February 27, 1995 is attached hereto as Exhibit A.) On May 25, 1993, I wrote to Amtrak's EEO regarding the continuing racial discrimination I was experiencing at the Yard. (A true and correct copy of my May 25, 1993 letter is attached hereto as Exhibit B.) On May 30, 1993, I wrote to Amtrak's EEO to complain about Amtrak management's continuing discriminatory conduct including being reassigned to the graveyard shift. (A true and correct copy of my May 30, 1993 letter is attached as Exhibit C.)

7.    In approximately 1991, Jerry Denton, an Amtrak General Foreman at the Yard, ordered Eddie Harper, an African-American employee to search for a bomb with a flashlight. Mr. Harper was a carman and not a bomb expert.

8.    On February 25, 1991, Vandenburg and Denton ordered me to go into a meeting because I called in sick the night before. I refused to go into the meeting without a union representative. Vandenburg and Denton charged me with a Rule L violation. On March 22, 1991, Amtrak terminated me for this alleged Rule L violation.

9.    After I filed a grievance and several months of not receiving pay, Amtrak

-2-
AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

63P20

reinstated me on June 16, 1991. My termination was replaced with a ten (10) day suspension.

10.    On August 13, 1991, I made a written request to enter Amtrak's apprenticeship program to its personnel office in Los Angeles. Amtrak did not formally respond to my request. Thereafter, on August 17, 1991, Vandenburg told me that **he** ran the Yard and that I stood "a snowball's chance in hell of becoming an electrician."

11.    During the course of my employment, I complained repeatedly about the blatant racism and pattern of racial discrimination by Amtrak's managers at the Yard. On October 4, 1991, I submitted a written complaint to Amtrak's Equal Employment Opportunity (EEO) office. I never received a formal response. (A true and correct copy of my letter to EEO dated October 4, 1991 is attached as Exhibit D.)

12.    Within days, on October 16, 1991, Denton charged me with a Rule L Violation. I protested strenuously that his action was racially motivated. I complained again in writing.

13.    In late 1991, I and several other Amtrak employees from the Yard met with Barbara Boxer to complain about employee morale and discriminatory conditions at Amtrak. In a letter dated January 22, 1992, Barbara Boxer demanded that Amtrak commence investigation into the employment conditions at the Amtrak's Yard.

14.    From November 1991 to December 19, 1994, I have made several requests to see my personnel file. (Attached as Exhibit E are true and correct copies of my requests.) On December 13, 1991, Vandenburg placed a letter of counseling in my work file without my prior knowledge, accusing me of being argumentative and threatening.

15.    Vandenburg denied each request that I made to see my personnel file except for one time when I brought in my union representative to demand that I have a right to review my file. I have never been given any Request Form to review of my personnel file.

16.    In response to Congresswoman Boxer's request, Amtrak's General Inspector, Fred Weiderhold, visited the Yard on three separate occasions in 1992. I personally met with Mr. Weiderhold. Following my meeting with Mr. Weiderhold, I tried repeatedly to bring the continuing discriminatory and retaliatory practices at Amtrak to his attention. On

AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

3P20

LAW OFFICES
PRICE AND ASSOCIATES
1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

1   September 23, 1992, I wrote a letter to Mr. Weiderhold regarding a September 17, 1992 meeting

2   with Vandenburg and Borge wherein I was counseled for alleged absenteeism.  I did not receive

3   a response. (A true and correct copy of my September 17, 1992 letter is attached as Exhibit F.)

4           17.    On September 17, 1992, Vandenburg and Raymond Borge, an Amtrak

5   Foreman, counseled me for absenteeism.  Vandenburg wrote to L.W. Bullock, Vandenburg's

6   supervisor and Amtrak's General Superintendent of the Western Division, to inform him to

7   report that my absenteeism problem was in part due to my taking time off to take care of my son,

8   who attempted to commit suicide.

9           18.    On September 19, 1992, Mike Fabian, an Amtrak Foreman at the Yard,

10   ordered me to clean up the tar from Track 6.  This was outside of my craft and not in my job

11   description.

12           19.    On November 29, 1992, Earl Geske, an Amtrak Foreman at the Yard,

13   charged me with a Rule L violation for not picking up all of the tie wraps within a two mile

14   radius within my eight hour shift.  This task was outside of my craft and not in my job

15   description.   Nonetheless, I picked up the wraps, which are small pieces of wire like the ties

16   used on plastic bread loaf wrappers, until it got too dark for me to see them.  I asked Mr. Geske

17   why he wrote me up when he watched me pick up tie wraps until it was dark.  It was literally

18   impossible for me to pick up all of the wraps.  He replied that he was only doing what they told

19   him to do.  When I asked whether Vandenburg was the one who gave him the order, he nodded

20   his head in confirmation.

21           20.    On April 26, 1993, Denton issued me a written counseling for alleged

22   absenteeism.

23           21.    On May 13,1993, I requested Vandenburg to change my hours

24   temporarily in order to care for my son who is handicapped and has a seizure disorder while my

25   family and I went on a trip to Boston.  Alternatively, I requested Vandenburg for a leave of

26   absence for one day in addition to using my regular vacation.  Vandenburg summarily denied

27   my requests.

28           22.    On May 21, 1993, I had a telephone conference with Vandenburg

1    regarding why my name was taken off the list of people who were going to receive HVAC

2    training.  Vandenburg told me that I did not have the mental capacity for such training.

3        23.    On May 28, 1993, my job was abolished and I was reassigned to

4    graveyard shift.

5        24.    On July 14, 1993, I was charged with a Rule O violation and suspended

6    for fifteen (15) days for taking an extra vacation day to care for my son who is handicapped and

7    has a seizure disorder while my family and I went on a trip to Boston.  Following a lengthy

8    union grievance, Amtrak settled the dispute in November 1994, and I received back pay and the

9    suspension was ordered expunged from my file.

10        25.    On October 13, 1993, I was charged with allegedly violating Rule F-1 and

11    F-3 by making improper remarks to a union representative.  Ken Phillips, an Amtrak employee,

12    overheard the conversation.  After an investigatory hearing in December 1993,, I was found not

13    guilty of the charges which were ordered expunged from my file.  Vandenburg did not comply

14    with the expungement order.

15        26.    On October 14, 1993, Vandenburg assaulted me by placing both hands on

16    my shoulders and forcing my upper torso to my knees.  I reported the incident to the police.

17    Amtrak never investigated the matter.

18        27.    On October 21, 1993, I complained to Amtrak's EEO regarding

19    Vandenburg assault.  (A true and correct copy of my October 21, 1993 letter is attached hereto

20    as Exhibit G.)  I was never interviewed or contacted by EEO.

21        28.    In December 1993, Louis Bellotti, an Amtrak Foreman at the Yard,

22    canceled a  training scheduled for me without any explanation.

23        29.    On January 14, 1994, Bellotti and Denton required me to bring a doctor's

24    note for one day's sickness.  This requirement was not included in Amtrak's sick leave policy.  I

25    lost three (3) days pay.

26        30.    On January 18, 1994, I complained to Amtrak's EEO regarding the

27    cancellation of the training.  I did not ever receive any response to my complaint.  (A true and

28    correct copy of my January 18, 1994 complaint is attached hereto as Exhibit H.)

-5-

AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

P20

31. In June 1994, my pay was docked for jury duty in violation of the Union Contract.

32. I had the right to be paid for days that I served on jury duty pursuant to the Agreement Between the National Railroad Passenger Corporation And Its Employees Represented By The International Brotherhood of Electrical Workers ("Agreement"). Rule 17 states that "an employee will not be required to work on his assignment on days on which jury duty...is scheduled to begin...within four hours of the...ending of his assignment." (A true and correct copy of Rule 17 of the Agreement is attached hereto as Exhibit I.)

33. In order to receive pay for jury duty, I had to turn in the check that the court gave me. I attempted to turn in my check for my jury duty on January 30, 1995 to Foreman Markar. He refused to take it. I still have the original check. (A true and correct copy of the "Statement of Appearance for Jury Duty" is attached hereto as Exhibit J.)

34. On September 9, 1994, I was charged with a Rule L violation for failing to complete work assignments on two train cars. One of the cars was assigned to George Guse, a Caucasian Amtrak Electrician. Guse was not charged with any Rule violations. I was suspended for fifteen (15) days.

35. During Amtrak's investigatory hearing into my 1994 suspension, I saw the hearing officer, Carlos Hernandez, and the charging officer, Ray Borge, arrive at the hearing in the same Amtrak vehicle.

36. In 1995, my rest days or days off were Tuesdays and Wednesdays. I worked the third shift from 12:00 a.m. to 8:00 a.m.

37. I have not been paid for serving jury duty on January 30, 1995.

38. On February 4, 1995, my supervisor, Michael Bordenave told me that all he would have to say is that I threatened him and they would believe him. I did not at any point threaten Mr. Bordenave. Bordenave reported that I threatened him to Denton.

39. Thereafter, Denton ordered me to go into his office. I asked for a union representative, and was denied. I then asked if co-worker Michael Shaw could be my witness. Denton responded by ordering everybody to leave the main office, and screamed at me to get my

-6-

AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

PRICE AND ASSOCIATES
1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

63P20

"black ass" into his office. I refused to go into Denton's office because I did not have union representation or a witness, and was highly offended by Denton's racist remark. I was charged with a violation of AMTRAK's Rules and terminated.

40.    During the Investigatory Hearing into my termination, the Charging Officer, Dustin Davis, accompanied the Hearing Officer John Eschenbach to and from the hearing.

41.    Notwithstanding my numerous and repeated complaints to Amtrak's EEO office, I was never interviewed by any Amtrak EEO officer regarding my discrimination complaints against the managers at the Yard. Throughout my employment, I only had cursory conversations with these EEO officers and no real investigation of my complaints was ever made. Additionally, when a response was made to my complaint there was always a delay of at least six (6) months.

42.    In November 1994, Robert Craven, a white Amtrak, Electrician, fabricated that while in the men's locker room he overheard a conversation I had with my wife wherein I allegedly said that I would wait at the gate to assault Bordenave. The nearest telephone that I could have used was approximately one hundred (100) yards away from the locker room.

43.    A few days before Mr. Craven made the false statement, he referred to Luerean Butler as a "black bitch." I reprimanded him for making such a racist comment.

44.    The racist comments by Amtrak management; repeated disciplinary actions; continuous harassment by Amtrak management; and the discriminatory way Amtrak management treated me and other African-American employees created a hostile environment at Amtrak.

45.    I have been retaliated against by AMTRAK management by instituting disciplinary actions against me whenever I reported the discrimination that existed at the Yard.

46.    When I filed my EEOC Charge, I was not represented by counsel, nor did I receive the assistance of an attorney. I have no legal training.

47.    As a consequence of AMTRAK's discriminatory and retaliatory actions, I

LAW OFFICES
PRICE AND ASSOCIATES
1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

-7-
AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

1063P20

1   had been deprived of the opportunity to earn a livelihood and provide for his family.  I have

2   suffered anxiety and extreme emotional distress.

3   ///

4   ///

5   ///

6   ///

7   ///

8   ///

9   ///

10  ///

11  ///

12  ///

13  ///

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28

*PRICE AND ASSOCIATES*
*1300 CLAY STREET, SUITE 340*
*OAKLAND, CA 94612*
*Telephone (510) 452-0292*

063P20

-8-

AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

1    I declare under penalty of perjury under the laws of the State of California and the

2   United States that the foregoing is true and correct.  If called as a witness in this matter, I could

3   and would testify competently to the facts stated herein.

4    Executed this 6 day of August, 1998 at Oakland, California.

5

6

7    ABNER J. MORGAN, JR.

8

9

10

11

LAW OFFICES
PRICE AND ASSOCIATES
1300 CLAY STREET, SUITE 340
OAKLAND, CA 94612
Telephone (510) 452-0292

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1063P20

AMENDED DECLARATION OF ABNER J. MORGAN (C96-03585 SI)

# CHARGE DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 376950209 |

## CA DEPT FAIR EMPLOYMENT & HOUSING
*State or local Agency, if any*        and EEOC

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Abner J. Morgan, Jr. | (510) 582-3684 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 2984 Pickford Way, Hayward, CA 94541 | | 03/01/53 |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| Amtrak | Cat C (201-500) | (510) 645-4625 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 250 Wood Street, Oakland, CA 94621 | | 001 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate box(es))*

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| / / | 02/17/95 |
| ☐ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I am an Electrician on the night shift and have worked for Respondent since August of 1990. In 1991, I started protesting discriminatory treatment of myself and other Black employees of Respondent. Since that time I have been subjected to retaliation. Most recently the following retaliatory acts occurred. In October of 1994, I was denied updated refrigeration and air conditioning training. In December of 1994, I was access to my work record. In February of 1995, I was suspended without pay and brought up on charges of threatening and using profane language against my Supervisor and the General Foreman, both of whom are white. In early February of 1995, my pay was docked for days I served on jury duty.

I allege that the above employer has and is continuing to discriminate against me because of my race, Black, and because I have protested discriminatory actions made unlawful under Title VII of the Civil Rights Act of 1964, as amended.

RECEIVED

FEB 27 '95

EEOC - OAKLAND

☐ I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY · (When necessary for State and Local Requirements)

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief

I declare under penalty of perjury that the foregoing is true and correct.

SIGNATURE OF COMPLAINANT

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE
(Day, month, and year)

Date 2-27-95   Charging Party *(Signature)*

EEOC FORM 5 (Rev. 06/92)

FILE COPY   **EXHIBIT A**

| STATE OF CALIFORNIA | CASE NAME Morgan, Jr. vs Amtra |
| CITY/COUNTY OF Hayward/Alameda | CASE NUMBER 376950209 |

# AFFIDAVIT

I, Abner J. Morgan, Jr. being first duly sworn upon my oath affirm and hereby say:
(Name)

I have been given assurances by an Agent of the U.S. Equal Employment Opportunity Commission that this Affidavit will be considered confidential by the United States Government and will not be disclosed as long as the case remains open unless it becomes necessary for the Government to produce the affidavit in a formal proceeding. Upon the closing of this case, the Affidavit may be subject to disclosure in accordance with Agency policy.

I am 41 years of age, my gender is Male and my racial identity is Black.
(sex)                                              (race)

I reside at 2984 Pickford Way
(Number/Street)

City of Hayward , County of Alameda

State of CA , Zip Code 94541 .

My telephone number is (including area code) (510) 582-3684 .

My statement concerns Amtrak which is
(Name of Union/Company/Agency)

located at 250 Wood Street
(Number/Street)

in Oakland CA 94621
(City)          (State)   (Zip)

My job classification is (if applicable) Electrician
(job title)

My immediate supervisor is (if applicable) Mike Bordenave, Foreman
(Name)                              (job title)

I have been employed with Respondent since August 12, 1990 and am currently an Electrician on the night shift. On an ongoing basis I have written and filed several complaints of racial discrimination against Respondent. The company has made attempts to fire me on several occasions because of the complaints I have made. The last time they tried to fire me was in March of 1991. In October of 1993, I filed the most recent complaint.

On February 7, 1995, I was pulled out of service and suspended pending investigation due to alleged violation of company Rules of conduct. I am accused of threatening the Foreman, Mike Bordenave and the General Foreman, J. Denton, both of whom are White males. I am also accused of using profane language. These are some of the same management officials I have complained about in the past with respect to the their racist attitudes towards me and other minority employees. These charges are no more than a continued pattern of harassment and retaliation. Glen Fisher, a White Electrician has cursed at Mike Bordenave and he has not been disciplined. This occurred in January of 1995 at a safety meeting in front of multiple witnesses. Luke LNU, a Carman cursed Mike Bordenave and he has not been disciplined. This also occurred in in September of 1994 and January of 1995. Luke was not disciplined. Greg

AJmJr  Page 1 of 2
(initials)

STATE OF _____ CALIFORNIA _____

CITY/COUNTY OF __ Hayward/Alameda __

CASE ___ **Morgan, Jr. vs Amtra**

CASE NUMBER ___ 376950209

## AFFIDAVIT (cont.)

Huntington has also cursed Bordenave without being disciplined. The witness statements submitted on my behalf indicated that I was not guilty of the charges against me; yet, I was suspended without pay and made to go through a formal investigation.

On February 17, 1995, a hearing was held on the matter of the charges. Both the Hearing Officer and the Charging Official came to the meeting together in one car. It was evident during the meeting that they were in agreement that I was going to lose. The results of the hearing are due March 3, 1995.

At the hearing, I presented the company with a check from when I served on jury duty. They refused to take it without explanation even though they docked my pay for this time away from work.

I have learned that individuals who testified on my behalf at the hearing are starting to be harassed. Michael Shaw, Coach Cleaner, Ira Turner, Coach Cleaner (510)638-0354, Greg Huntington (707)763-9370, J.T. Johnson, Laborer and Joyce Judkins (510)569-9219.

In October of 1994, Ray Borge, Facilities Manager called an Electrician Trainer, Gary Breborn at home and advised him not to train me. This was update training on air conditioning and refrigeration. I do not have Gary's home telephone number; however, he is still employed by the company and has advised me that he will testify to the truth if asked. I was the only Eletrician excluded from the training. One other Black Electrician received the training.

I have also been denied opportunity to see my work record. My most recent request and rejection was in December of 1994.

I allege that the above employer has and continues to discriminate against me because of my race, Black, and because I have openly complained verbally and in writing about discriminatory practices in the workplace.

I have read and had an opportunity to correct this Affidavit consisting of _____ handwritten ☐ typed ☐ pages and swear that these facts are true and correct to the best of my knowledge and belief.

_H. Sam James Morgan_

Subscribed and sworn to before me

this 27 day of FEB 1995

EEOC AFF-B (08/89)

Date:  May 25, 1993
To:    J Denton/R.D.Vandenburge  EEO Officer
From:  Abner J. Morgan
Subj:  Complaint of Disclamation
       Amtrak Officer Vandenburge/Denton
       Date of offence 5/14/93

---

I have taken offense to your blatant acts of selective prosecution. It has manifested itself into an act of retaliation against those of color as Abner Morgan and Leroy Delaney. These acts seem to occur around the times we question the way those suspected practices are used for promotion, training schools, job assignments, and unwarranted prosecution. As I stated in the meeting, I know what it feels like to be singled out. For example, when Abner Morgan was the only person given a letter of counseling miss stating the facts. Mr. Gesky watched me pick up tie wraps until it was dark. I could not believe it when he wrote that I did not pick up any. Again, these acts happen after I had submitted a request to view and get a copy of my work record. My many requests will show proof that I have suspected that you have directed your manager to selective unwarranted prosecution of Abner Morgan.

I witnessed Vandenburge destroy the letters that were in my personnel file. These letters were there and would prove that I was doing Journeymen work, but being paid as a helper. Now because of this, Vandenburge refuses to let me view or get copies of the things in my file. I suspect that there are some negative things in my file.

Now I have really experienced the ultimate act of discrimination and what seems to me an admit of honest feeling and the calculated and direct discrimination to deny Abner Morgan Knowledge. Knowledge that I have been in quest for from day one. Knowledge that had been Promised. Knowledge that would allow me to complete my job with better efficiency and confidence. This knowledge that has been given to fellow employees who had only been hired three weeks on the job. I have worked nine straight weeks of Sundays in a row by myself so that others could obtain this knowledge. Now that it is time for Abner Morgan to attend school, I was informed by Vandenburge "you want me to answer your question honestly, it was my decision, you don't have the mental capability to past the test." I was astounded, but not surprised by Vandenburge's answer to a direct question because this is not the first time I have witnessed Vandenburge's honest intent to intervene when it comes to Abner Morgan obtaining knowledge.

1.    Abner Morgan was on the list to attend the Air Conditioning Freon recovery systems school with the second-set employees.

2.    Vandenburge took Abner Morgan's name off the list, why ?

3.    I have tried in vain to talk to Vandenburg. I have voice my concerns. I revealed to him personal family matters that have been part of jokes.

**EXHIBIT B**

-2-

4.     I put in for a leave of absence, but it was given no consideration.

I feel that Vandenburge has given me the ultimatum to either put my son in danger or put my job on the line.  I know with the new family leave bill that was signed by our President, something can be worked out.

Sincerely,


Abner James Morgan, Jr

May 30, 1993
To:        EEO officer
From:      Abner J Morgan
Subject:   Retaliation From EEO Complaint
           Discriminating Official R D Vandenburge


Ms Rollins:

I have endured countless of racial acts of discrimination from
Vandenburge.  Prior to May 15, 1993 I have not filed an EEO
complaint, since then I have experienced unbearable amounts of
humiliation, verbal abuse, and retaliation.  For example:

1.   On May 21, 1993,  I talked to Vandenburge on the phone and
     asked why I was taken off the list to attend  the AC school.
     I was told by Vandenburge that "I did not have the mental
     capabilities to finish the school."

     I had been on the original list to attend the second session
     of classes for five months.  Vandenburge took my name off
     the list and replaced it with two other employees.  After I
     filed my recent EEO complaint, I talked to Fred Weiderhold,
     and explained this situation to him.  Two days later, the
     acts of reprisal began.

2.   On Monday, May 24, 1993 Vandenburge denied my recently
     submitted Leave of Absence with no explanation
     consideration.  The imperative nature of this Leave of
     Absence was not even considered by Vandenburge.  When I
     asked for the Employee Assistance Program (EAP) phone
     number, it took my supervisor all the way up to Vandenburge
     four days to give me a phone number so that I could talk to
     someone who could help me.  When I questioned General
     Foreman, Jerry Denton, why ...

     ... May 26, 1993, I was humiliated in front of fellow
     employees at a Safety Luncheon by Vandenburge.  As I was
     leaving, I thanked fellow employees and management for the
     lunch and told them that they deserved this lunch.
     Vandenburge then proceeded to verbally reprimand me in front
     of the employees for not using the words "earned the lunch"

4.   On Friday, May 28, 1993, Vandenburge abolished my job and
     reposted it on graveyard shift (12:00 - 8:00 a.m.).  months
     ago, I explained to Vandenburge in a private meeting that my
     handicapped son has a seizure disorder and that the seizures
     ... evenings.  Being home in the

EXHIBIT C

I feel as if these blatant acts of discrimination, humiliation and intimidation should not be tolerated by Amtrak. It has been well documented, that the behavior and the practices used to discipline employees has been questionable, to say the least.

I feel that Vandenburge has caused my family and myself great pain by his show of hatred toward my outspoken and strong personality. I do know that Amtrak has rules against these things, and I would like them implemented to show that this type of discrimination cannot be tolerated in an organization in the 90's.

Help,

July 22, 1992

blatant disregard of our union

To my Nnion, AmTrak EEOdead, Congress Dellams

I have work at AmTrak Oaklan Maintence
yard For 15 month In those 15 mouth It has
Become so painful to watch my fellow miaories
employees and myself be subjected to A onslauter
of Wronsful fieeing! Blantent Racesiom, Union contract
violatians And Veeble abuse By A group of unsentive
power vain (White Mangers) I name these Mangers
Vandenburge, Dent Coleman, Boege. Because I
want them to face Theie Acser I do not want them
to say the so unkown person Made these
acevzation. My Fellow mionary employee will Sive theie
own Account's And I will owly talk about
my stelf. I also use the word White mansers Because Oaki
Maintace yard has NO Black Mangers.

1) on March 22 1991 I was fieed Because
I would not go into A MEETING with Three
mangers Vandenburg Dent Coleman So The charge
was Not obey A direcit Oeder. My Job was
awarded back to me After 6 month and
pay was Restored.

2) on or About March I wrote antrak A requst to
go to there school foe An Electric Apreidice I
Yited had explen to them that I had over
10 y. electrical Back and that I had preform
the duties of A Jouerman Electrica at
Antrak and owly recive the pay of a
electriam helper I was sivn A test Alons
with othir emptoyees HAlf way tru the test
told that I did not score high enos
my teste weve termunated when I
r About thy test scores They said to
MR PERAvAll At the Los Angles office

(E28)    3pg
1ST
Letter
to Boxer    (91)

EXHIBIT D

I did write Mr Peaval. on Aug 13 1991
Mr Percival never wrote ~~my~~ me back The
reply came From Vandenborg on Aug 17, 1991
Vandenborge call me Into the outer office
and Said Qoot " You wrote ~~Perci~~ Percival
~ LA WE I will tell you something MR
you stand A snow ball change in Hell
before you become an eletrain ~~Here~~.
I told you I run this office. we gave
you a ~~test~~ And you didn't pass it." I then
Ask that what ~~they~~ saide what was
my score. I would Like to know ~~where~~
I score low so that I may study it
for the next time. He then name other
employee that he would send before
me. I then walk out of the office and
Ask other employee did they hear it
they repley yes.

3) When I WAS ~~hired~~ on At Amtrak
~~vandenborg~~ Told me they would bring me in
s A helper Because ~~If~~ I came in as a
Joweryman I would make lest money
and then After ~~6month~~ they could
change me to A Joweryman. My exprence
as All documented They have A copy of
~~um~~ All. They Return them to me on
~ About March I ~~to~~ bleve they may
~~f~~ taken them from my folder to
substancheate them pareing me helper pay.

4) They Amtrak has only onty Electrain
~~lper~~ At oakland That ME And A far AS
I Know I am the only one In the system
~~my~~ have hair another Eletrain A Joweman
~~I~~ do not ~~know~~ his Quilsacation ~~But~~ But I do
~~now~~ He is white and had no Amtrake exprence

I do have AmTrak expernce I have work
doing Electrict Jonerman Work And I The
Log book from Aug 15, 1990 to March 22 1991
will prove that I have Repair Replace
Rework And modifie Amtrak Equpment
with out help. So what is there reason
for not leting ME Became a Full Jonerman
or send ME to the Eletranic School

You may ask Did I seek help yes
I Call Steve Tallackson The Amtrak EEO
Officer In Cago And He told me he
felt that it was not a EEO problem
So I ask you Who do I talk to
to get this thing scoule

As I write this complant I Know
that these mangers that I have Name
will retaleyate Stay tune

Help

To Vandenburg
From Abner J Morgan
Sbj: Request to see Personal Records
Date Nov 16, 1991
Time 3:00 Pm

When I came to work today I went to
Gew Forman S Coleman And ask to see my personal
Records. Mr Coleman Said No When I ask why He
Said He had no Key. I then ask what were
the Prosature to see my records He said put
it into writing.

Abner J Morgan
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

Van,

What I told Morgan was that I
didn't have the key to the file —
He asked "Do I need to put it in writing?"
I told him that would be good.
this is what he gave me.

S Cole

D

**EXHIBIT E**

January 24, 1993


To:      R. D. Vandenburge
From:    Abner J Morgan
Subject: Request To see Personal Records



    I gave  my general foreman E Geskie copy of a request to view
and get a copy of my personal records.  This request was  made in
Dec. 1. 1992 and as of this date I have not gotten a response

Your attention To This Matter would be  appreciated
          Abner J Morgan

cc ISEW


Mr. Morgan :
    The proper procedures to review your
personal records was posted on the bulletin board
I'm sure if you follow the rules you will
get what you want.


D 000702

13
tMay 21, 1993

MAY 13 1993

Mr. Vanderburg
AMTRAK

Dear Mr. Vanderburg:

I am hereby requesting your considering in changing my hours from June 24th until July 5, 1993 to be 9:00 to 5:00 p.m. My family is taking a vacation and I must be available to care for my disabled son during that time period. He is in a program from 9:00 to 5:00 monday tru friday.Because of his seizure disorder We can not fine the proper personal to handle him other than the time that I have stated. This is one of the family issue that has been disuse and this is one of the time that my family need me. I will not leave my son in the hands of anyone that is unquality or dose not have the confidence of my family.

    If you can not grant my request here are some other things that can be concerded.
    1. I have one week and oneday personal leave left the other day,s can be leave of absent
    2.You can consider this as a request for leave of absent for the day,stated with out pay

    I request that this be handly by you Mr Vanderburg THIS LETTER IS FOR THE FACILTY MANGER OR ABOVE. THIS IS MY PERSONAL BUSENESS.


    Just like Amtrak is a team The Morgan family is a team


            YOUR ANSER IN A TIMELY FEROID WOULD BE GREATLY APRESHEATED
                    THE MORGAN FAMILY

c:\vandenburge2

**Amtrak**

To Peesonal
From Abnaer J Morgan
Date 12-16-94
Review of Personal File

I Abner Morgan am requesting to view
my personal work/personal file keep at Amtrak
L-A office. I have been told by RD Vandunburg
that there is no form for this request. If
so Let this Letter serve as an official form
and Respectly ask for a date and time that
my IBEW Repersentive and myself can Review
and get copy of and thing that we feel
should not be in my file

Anticipating your timly Reply
Thank you

Abner James Morgan Jr
Oakland Maintence Yard
Electraiw
SSN 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

Home
2984 Picksord wy
Hayward CA 94541
510.582-3684

CC IBEW
EEOC

0000960

Amtrak

To Vandebug
From Abner Morga
Date 12-16-94
Sbj Review of WORK Records

As Per Section IIA page 3086 Personal Department
Policies & Procedures

I Am Requesting to review my work record
that is on file at the OAKLAND YARD
This request has been turn down before
IT is now as was before my right As
A vion employee to review And have taken
out Any docement that HAS been outdated
And put in without my Knolese

Abner J Morga

CC IBEW
CC Congress Dellams
    EEOC

0000961

December 19, 1994

TO:   Personnel

FR:   Abner J. Morgan

RE:   **REVIEW OF PERSONAL FILE**


I, Abner J. Morgan, Jr. am requesting to view my personnel file kept in Amtrak's Los Angeles office. I have been told by R.D. Vandenburg that there is no official form for this request. So this letter will serve as an official request to view my personnel file. Please let me know the date and time that my IBEW Union Representative and myself can review and get a copy of anything we feel should not be in my file.

I am anticipating your timely response.


Abner J. Morgan, Jr.
Oakland Maintenance Yard
Electrician

Home:
2984 Pickford Way
Hayward, CA  94541-4530
(510) 582-3684

cc:   IBEW
        EEOC

December 19, 1994

TO:    R.D. VANDENBERG

FR:    Abner J. Morgan, Jr.

RE:    REVIEW OF WORK RECORDS

As per Sections IIA, page 3086, Personnel Department Policies and Procedures, I am requesting to review my work record on file at the Oakland Maintenance Yard.

This request has been turned down before.  It is now as it was before my right as a union employee to review and have documents taken out of my file that are outdated or put inside my file without my knowledge.

0000959

September 23, 1992

TO:        Fred Wderhold, Jr.

FROM:      Abner Morgan, Jr.

---

Dear Mr. Wderhold:

I am keeping you informed on what happened at our meeting on September 17, 1992 with myself, my union representative, Mr. Vandenburg and Ray Borge. I think you will be surprised at some of the things that were established and revealed.

I was called to this investigation because of my absenteeism (see leave record). On August 27th and 28th, I took off because of sickness. I brought in a doctor's note from my doctor. This was given to my foreman, Mike Fabian. I also made a copy for my records. Mr. Vandenburg said he never go it. But as he was talking and moving around, the note fell from the packet of papers he had in his hand. I also asked him if he had received a letter from my Family Psychologist, Patricia Canson (PhD). Mr. Vandenburg denied he had received it also. I gave him a copy of the letter. When I brought up the fact that I had only been sick only one other time this year. That fact was not taken into account. I also informed him that the other days that I had been off was because of family problems and that when I had called in I stated family problems was the reason for me not coming in. Whenever I have called in, I have given them 3 to 4 hours prior notice before my official reporting time and to prove this fact, it is in the foreman's log book. They did not want to get the log book they refused to allow me to substantiate my statement. Then they said what about the time you were late. Again, I asked that the foreman log book be made available for proof that anytime I thought that I would be one minute late, I would always stop and call in. Mr. Vandenburg verbally told me that my family problems were not his concern, his only concern was that others would use Abner Morgan's absenteeism and say why can Abner take off and not me.

I informed Mr. Vandenburg that my first and foremost priority is The Morgan Family and that my letter from my doctor should have explained how important my family is to me. Mr. Vandenburg then read a letter he said was written by a Mr. Lydon that stated if you were late or absent three times in a 90-day period for any reason, that you would be brought into an investigation. When I asked my union steward did he ever see this letter he stated no. I then asked for a copy to get clarification from the General Chairman, Vandenburg said he would give me a copy, but he didn't. At the end of our meeting, Mr. Vandenburg did (chill out) and listen.

**EXHIBIT F**

4.    Up drove Mr. Denton and asked that we go into the office. I went with them without saying a word. We got into the office and Mike Fabian said I told Mr. Morgan to dig up the tar on 3 track and I saw him sitting down on a car. He gave me some lip about time slip. I need him to just do whatever I ask him. I sat in silence until after Denton read me the riot act about cleanliness. Then I asked was it my turn to talk.

5.    I show Mr. Denton my line up sheet that said clean up 6 track not 3 track. Then I informed Denton that I never refused or said that I would not do what I was told and Mr. Fabian confirmed that fact. He just said I was slow in doing it. I then said what do you want me to do and what order do you want me to do it in. I went outside and dug up tar and picked up tie raps and finished my shift of work and went home without any problems. The next day after I called and talked to Mr. Carter, I receive a copy of Mr. Lydon's Amtrack Policy on Absenteeism.

Please note on the attached memo where the "thirty day period" has obviously been changed. As I have stated before, Mr. Vandenburg has used someone else's name and has forged a document.

Mr. Vandenburg has a problem when it is pointed out when he does something wrong or when he is caught in a lie. I had to come in six hours before my work shift so that this man could try to insult my intelligence by lying and trying to say he didn't receive my doctor's note, and that my family must wonder if I will have a job tomorrow because of this man hatred and vendetta of myself and any others who dare to question his authority.

Sir, I have tried to understand this man. I have talked to him, I have given him the benefit of the doubt. He is very concerned about the opinion of him that I gave to you. I can only tell the truth. But his actions against me, not only me but most of us that brought these issues to Congresswomen Barbara Boxer, are evident. I love working for Amtrak and only want what all other Amtrak employees want and that is to be able to come to work and do the best job for Amtrak. I want too feel that if I put in for a new job that the selection process will be fair and that my job is secure. People on the job see what has happens to me and I don't think it makes them feel good. Ask them.

We the Morgan Family
and Amtrak Family need
your help and understanding

Mr. Vandenburg did acknowledge that:

1. when ever I called in and said that I have a family problem, that it is bona fide
2. when I called in and said that I was sick, that if it is more than 3 days, that I must bring in a doctor note.
3. that I would receive a copy of the letter from Mr. Lydon.

I have no problem with the above. I got the feeling that we both understood each other. But the messages I got on Saturday, September 19, 1992 was confusing.

Facts as they happened on September 19, 1992 from my notes.

1. Punch in at 4:02 p.m., two minutes late because of traffic because of soccer game 75 miles away. Foreman Mike Fabian said don't punch in I will write you in. I said no I am late and I don't want any one to say I was later than what I am. I can only be honest.

2. Foreman Mike Fabian gave me my line up sheet and on it was my work assignment of cars to be worked and also clean the head of 6 track. I asked for a clarification of what type of clean up. He said I want you to clean and dig up the **tar** that has dropped from the engine. I then informed Mr. Fabian that as told to everyone from the General Foreman Gesky that the electrician clean area was the pipe shop and that I was the first electrician to volunteer and clean the shop and each craft had a work area to clean and that the laborer's area was the tracks. Mr. Fabian said I am the Foreman now and I am telling you to dig up the tar. I said  Fabian I will do anything you ask me to do, but I am informing you that I will notify the union that you are having me do work that we both know is out of my craft.

3. I went and was working on the cars and was sitting down writing on the map form when Mr. Fabian appeared. He called a new employee who also came over. He then told me to dig out the tar. I said to Fabian I will do what you said, but again I am going to time slip you. Mr. Fabian became angry and walked off the train. I went over to six track and began to clean it up picking up the paper and cigarette butts. Note: there was no tar on six track. Mr. Fabian then appeared and informed me that he had in fact called Vandenburg and someone would be coming down to take care of things.

*October 21, 1993*

To:      *EEO*
From:    *Abner Morgan*

---

*Again I am writing to you to inform you of the many blatant act of discrimination that I have had to endure at the hands of AmTrak mangers - **R. D. Vandenburge** and **Ray Borge**.*

*On 8-19-93 I was informed that Vandenburge and Ray Borge called a coach cleaner into the office.    There they questioned him about his knowledge of a conversation that took place in June, 93 between Henry Riso, union person.  When he told them that it was a normal conversation, Borge tried to get him to say things that were not true.  When he told them that he would not change his statement, Vandenburge told him that he could make things hard on him.*

*On 10-04-93, the first day of class, I was pulled out and given a letter to show up for a fact finding investigation. On 10-11-93, I showed up for this fact finding thing and answered all Vandenburge's questions - proved my innocence. I thought things would be over with because they had talked to the other employee and he had calibrated my version of what took place.*

*On 10-11-93, I received a call from my union person asking would I accept a deal of receiving ten days back from the fifteen they took from me.  I turned it down. I then knew that Vandenburge had been told that I said no to the deal.*

*On 10-12-93, a letter of notice of a formal investigation for 10-22-93 was typed.  On 10-14-93, I was seated in class with my back to the door when Vandenburge came up behind me and grabbed my shoulders and begin to shake them violently forced my upper body to my knees. I have filed a report with SP police and OPD.  This Act was witnessed by three other employees that were in the room and were two feet away.  They have all given statements that say they saw him do this to me.*

*On 10-15-93 at 8:00 a.m. I was given the letter for the investigation*

*I have endured numerous acts of verbal abuse from Vandenburge.  I have endure the time off without pay for things that others do on a daily basis. I have endured Vandenburge telling me that my family means nothing to him.   BUT I WILL BE DAMMED IF I SHOULD HAVE TO STAND FOR A MAN THAT HATES MY GUTS TO PUT HIS HANDS ON ME*

*LAST CHANCE AMTRAK*
*ABNER J MORGAN*

**EXHIBIT G**

*IBCW*
*Bob Ramirez*
*Fax 213 5508208*

January 18, 1994

To:        EEO Officer
From:      Abner J, Morgan
Subject:   Acts of Discrimination Report - 1994

As I did in 1993, I will continue to document the many act of discrimination that I encounter. These blatant acts seem to go unnoticed and unpunished by Amtrak - Western Division. I charge that Amtrak Officer R D Vandenburg and R. Borge have violated my union rights and my human rights. I want to work at AmTrak without harassment. May I also state that my first EEO complaint filed on 5/25/93 has not been resolved. I would like this file as the second.

1.   On 12/9/93 I was brought up on charges that was manufactured by Vandenburge and a SP employee . These charges cost AmTrak the salary of seven people. In this formal investigation, the hearing officer stopped the proceedings and ruled in my favor because he could see that the charges were not supported by any evidence.  (See letter enclosed dated December 16, 1993, Case #303.93 - Decision).

2.   On 12/27/93 I was ready to start a school that all my fellow electricians had previously completed,  and as usual I was one of  the last to go to the school because Vandenburge has said that I would get training over his dead body. The instructor G. Beanborn had told me that I was to work over until 1:00 that day and work through my rest days with Saturday and Sunday off.  These were the same provisions made for my fellow electricians that were on the same shift.

     I had gotten one hour into the school when Foeman L. Bilotti saw Beanborn and myself going through some of the equipment and he left and return about ten minutes later.  He said " Abner didn't they tell you that your school had been cancelled! To Beanborn's amazement, but not my surprise, we both said that we had not been informed . I was paid for 1-1\2 hours of work. The school has not been rescheduled.

3.   On January 4, 1993 the Oakland maintenance yard was inspected by the Division Superintendent, Bullock.  This was the same superintendent that my Congressman, Ronald Dilemmas, had written to on behalf of myself.

**EXHIBIT H**

4.  During this inspection, I was told that Bullock found what he said were **RODENT DROPPINGS**, and took offense to it. I was given a letter of counselling. (See attached letter dated January 4, 1994). They found nothing wrong with the two pages of mechanical defects that I had repaired.

4.  On 1/7/94, I put in a request to view and get a copy of my work record. My request has been ignored as of this date.

On 1/13/94 I called in one day sick. I work midnight shift (12:00 till 8:00 am. The next day my answering machine had a message on it from Lou Bulottie, Amtrak Officer, " Abner I understand that you called in sick last night. You didn't state your reason. So you can not come back to work until you bring in a doctor's note. I was not shocked but I was amazed by the frequency that the AmTrak mangers would inflict upon me, violating not only Amtrak policy, but our union contract. You see, this has happened more than once. The last time I called in sick was 11/16/93.

This recent time it cost me another day's pay because my doctor office could not see me until the next day. This time it was before the holiday, so the office wasn't open until 1/17/94. I know that there are other employees that they don't require a doctor's notes from when they return to work.

These outright acts of reprisals, this, as well as other acts, are well documented and should be addressed. I would like them to cease all of these actions. I am also requesting that these days be given back to me. I was ready and willing to work. I request I be compensated for January 13, 1994 until January 17, 1994.

(g)  Employees held away from their headquarters at the direction of the Company, on assigned rest days or holidays in accordance with this Rule, shall be allowed a minimum of 1 day at pro-rata rate for each such day.

RULE 17

JURY DUTY: (Amended December 6, 1978, Mediation Agreement, Case No. 10221)

When a regularly assigned employee is summoned for jury duty and is required to lose time from his assignment as a result thereof, he shall be paid for actual time lost with a maximum of a basic day's pay at the straight time rate of his position for each day lost less the amount allowed him for jury service for each such day, excepting allowances paid by the court for meals, lodging or transportation, subject to the following qualification requirements and limitations:

(1)  An employee must furnish the carrier with a statement from the court of jury allowances paid and the days on which jury duty was performed.

(2)  The number of days for which jury duty pay shall be paid is limited to a maximum of 60 days in any calendar year.

(3)  No jury duty pay will be allowed for any day as to which the employee is entitled to vacation or holiday pay.

(4)  When an employee is excused from railroad service account of jury duty the carrier shall have the option of determining whether or not the employee's regular position shall be blanked, notwithstanding the provisions of any other rules.

(5)  Except as provided in paragraph (6), an employee will not be required to work on his assignment on days on which jury duty:

    (a)  ends within four hours of the start of his assignment; or

    (b)  is scheduled to begin during the hours of his assignment or within four hours of the beginning or ending of his assignment.

(6)  On any day that an employee is released from jury duty and four or more hours of his work assignment remain, he will immediately inform his supervisor and report for work if advised to do so.

**EXHIBIT I**

THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF ALAMEDA

'Statement of appearance for jury duty'

This will certify that _Abner J McKcnzieSR_

did, pursuant to order of this court, report for jury duty in this court and answered roll call

1-30-96

This certification covers only the date noted.

RONALD G. OVERHOLT
Jury Commissioner

By _____

$5.00 Jury Fee

**EXHIBIT J**

ATTACHMENT - EXHIBIT 9



| DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING *ENFORCEMENT DIVISION DIRECTIVE* | DIRECTIVE NUMBER **233** DISTRIBUTION DATE February 7, 2005 |
| --- | --- |

1.    **SUBJECT:  SERVICE OF COMPLAINTS**

2.    **PURPOSE:**  To set forth the procedures for serving complaints filed with the Department of Fair Employment and Housing (DFEH).

3.    **BACKGROUND:**    Government Code section 12962 requires that complaints be served in person or by certified mail upon the person, employer, labor organization, or employment agency alleged to have committed the unlawful practice.  Section 12962 also requires that service occur at the time of the initial contact with the respondent or within 60 days, whichever occurs first.  This Directive describes the procedures for serving employment, Unruh, and Ralph Act complaints and provides guidelines for ensuring that complaints are properly served.

4.    **PROCEDURES:**

    A.    **Service Timeframes and Process:**

        1)    Government Code section 12962 requires that complaints be served within sixty (60) days of filing.  Department policy, however, provides that complaints be served as soon as possible after filing, according to the following guidelines:

            a)    Every effort should be made to serve complaints within two (2) working days of filing.

            b)    Complaints that are dual filed with the EEOC **must** be served within ten (10) working days of filing.

            c)    When the complaint is filed on complaint form DFEH 300-03 ("c" complaints), <u>and the complainant has indicated that he or she has hired or retained private counsel for the purpose of representation of the claim in court</u>, the private counsel, and not the Department, shall have the complaint served on the respondent(s).  Within two (2) working days, and in no case later than ten (10) days, from the complaint filing date, the support staff will mail a copy of the complaint and related

documents to the complainant's attorney in accordance with the instructions in the <u>Enforcement Division's Clerical Case Processing Manual</u>.

d)   When the complaint is filed on complaint form DFEH 300-03 ("c" complaints) and complainant has <u>not</u> hired or retained private counsel, or the complaint is filed on complaint form DFEH 300-04 ("b" complaints) regardless of whether the complainant has hired or retained private counsel, then support staff shall serve the complaint and related documents on respondent(s) in accordance with the instructions in the <u>Enforcement Division's Clerical Case Processing Manual</u> within two (2) working days, and in no case later than ten (10) days, from the complaint filing date. A copy of the Right-to-Sue notice shall simultaneously be mailed to the complainant.

2)   In the unusual event when service by the Department is not effectuated within the 60-day period required by Government Code section 12962 (e.g., the respondent refuses to accept service, etc.), it is the Department's position that service is valid as long as it is <u>initiated</u> within 60 days from filing.

a)   When service was not initiated within 60 days of filing, the original complaint will continue to be used for service. A new complaint will not be filed. In the event that a respondent disputes jurisdiction, the District Administrator will immediately contact the assigned attorney.

b)   If, after initiating service, it is determined the respondent's name is incorrect, **the complaint will be amended** to reflect the correct respondent name. If the respondent's address is incorrect, the original complaint will be **corrected** to redress the error and copied for a second service. (An address correction is <u>NOT</u> an amendment.)

c)   Every service attempt will be recorded in the Case Diary and reflect the name of the person attempting service,

DIR 233                          -2-                          04/19/05