1  PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
   PRICE AND ASSOCIATES
2  The Latham Square Building
   1611 Telegraph Avenue, Suite 1450
3  Oakland, CA 94612
   Telephone: (510) 452-0292
4  Facsimile: (510) 452-5625

5  Attorneys for Plaintiff
   JOHN E. CAMPBELL

6

7

8                    UNITED STATES DISTRICT COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10

11

12 JOHN EARL CAMPBELL,              )  NO. C05-5434 MJJ (EDL)
                                    )
13          Plaintiff,              )  **DECLARATION OF PAMELA Y. PRICE**
                                    )  **IN OPPOSITION TO DEFENDANTS**
14 v.                               )  **JOSEPH DEELY AND NATIONAL**
                                    )  **RAILROAD PASSENGER**
15 NATIONAL PASSENGER RAILROAD      )  **CORPORATION'S MOTIONS FOR**
   CORPORATION dba AMTRAK, JOE      )  **SUMMARY JUDGMENT, OR IN THE**
16 DEELY, and DOES 1-15, inclusive, )  **ALTERNATIVE, PARTIAL SUMMARY**
                                    )  **JUDGMENT**
17          Defendants.            )  _____
                                    )
18 _____ )  DATE:      May 22, 2007
                                       TIME:      9:30 a.m.
19                                     DEPT.:     Courtroom 11, 19th Floor

20                                     HON. JUDGE MARTIN J. JENKINS

21                                     DISCOVERY CUT-OFF:    March 23, 2007

22                                     TRIAL DATE:           July 23, 2007

23          I, PAMELA Y. PRICE, declare that:

24          1.    I am an attorney duly licensed to practice law in the State of California,

25 and the lead attorney of record for Plaintiff JOHN EARL CAMPBELL  I make this Declaration

26 on personal knowledge in opposition to Defendant's Motion for Summary Judgment.

27          2.    True and correct copies of pages 1, 7, 9, 10, 11, 12, 13, 16-17, 23, 25, 26,

28 28-31, 36, 37, 42-43, 46-47, 60-62, 65 and 67 and Exhibits 2, 3, 4 and 5 of Defendant Joe

-1-
DECLARATION OF PAMELA Y. PRICE (C05-5434 MJJ (EDL))

1   Deely's deposition transcript are attached hereto as Exhibit A.  Mr. Deely's deposition was taken

2   on February 15, 2007.  The attached transcript accurately reflects the questions asked and

3   answers given by the witness.

4            3.       Exhibit 3 to the deposition transcript of Joe Deely submitted as Exhibit A

5   is a true and correct copy of a letter from Elias Munoz to the EEOC in response to Mr.

6   Campbell's race discrimination complaint regarding Amtrak's refusal to promote African-

7   Americans to the engineer position dated June 9, 2004.

8            4.       Exhibit 4 to the deposition transcript of Joe Deely submitted as Exhibit A

9   is a true and correct copy of a letter from Elias Munoz to the EEOC in response to Christopher

10  Clipper's race discrimination regarding Amtrak's refusal to promote African-Americans to the

11  engineer position dated June 9, 2004.

12           5.       True and correct copies of pages 9, 151-152 and 168 and Exhibits 41 and

13  42 of Defendant Joe Deely's deposition transcript in the case of *Howard v. Amtrak*, U. S. District

14  Court Case No. C05-4069 SI  are attached hereto as Exhibit B.  Mr. Deely's deposition was

15  taken on February 15, 2007.  The attached transcript accurately reflects the questions asked and

16  answers given by the witness.

17           6.       True and correct copies of pages 4, 24, 33-40, 42-49, 53-67, 69-71, 74-80,

18  83-86, 101-102, 105-110, 112-119, 125-130, 132-134, 140, 144, 150-152, 155-158, 161-163,

19  167-169, 172-173, 175-183, 189-190 and 196-201 of Mark Carl Schulties' deposition transcript

20  are attached hereto as Exhibit C.  Mr. Schulties' deposition was taken on March 22, 2007.  The

21  attached transcript accurately reflects the questions asked and answers given by the witness.

22           7.       True and correct copies of pages 5-7, 18-21, 23-27, 32-33, 36-37, and 38-

23  43 of Richard Barrow's deposition transcript are attached hereto as Exhibit D.  Mr. Barrow's

24  deposition was taken on March 26, 2007.  The attached transcript accurately reflects the

25  questions asked and answers given by the witness.

26           8.       True and correct copies of pages 1, 4, 6, 11-13, 18-21, 23-24, 26-27, 29-

27  30, 46-48 of Anthony Gillard's deposition transcript are attached hereto as Exhibit E.  Mr.

28  Gillard's deposition was taken on March 7, 2007.  The attached transcript accurately reflects the

1  questions asked and answers given by the witness.

2          9.        True and correct copies of pages 1, 6, 15, 22, 29-32, 43-44, 45-46, 48-49,

3  52-55, 70-74, 80-84, 86-88, 93-96, 104-105, 108, 115, 125-128 of Steve Shelton's deposition

4  transcript are attached hereto as Exhibit F.  Mr. Shelton's deposition was taken on April 4, 2007.

5  The attached transcript accurately reflects the questions asked and answers given by the witness.

6          10.       True and correct copies of pages 1, 10, 65-66, 104-108, 114-119, 121-127

7  and Exhibits 32, 35 and 36 of Susan Venturelli's deposition transcript are attached hereto as

8  Exhibit G.  Ms. Venturelli's deposition was taken on March 23, 2007.  The attached transcript

9  accurately reflects the questions asked and answers given by the witness.

10         11.       True and correct copies of pages 1, 3, 4, 6, 7-37 and Exhibits 41, 42, 43A,

11  44, 45, 47, and 48 of Raymond Clarke's deposition transcript are submitted under seal as Exhibit

12  H.  Mr. Clarke's deposition was taken on April 25, 2007.  Exhibit H accurately reflects the

13  questions asked and answers given by the witness.

14         12.       True and correct copies of pages 1, 6, 15, 16, 25, 44, 45, 47, 49, 53, 54,

15  56, 34, 36, 101, 104, 105, 106, 107, 109, 110, 111, 112, 125 and 126 of Donald Bruce Shelton's

16  deposition transcript are attached hereto as Exhibit I.  Confidential pages 61-71, 74-82, 84-85,

17  116, 119-120 and Ex. 77, 78, 79 and 80 of Donald Bruce Shelton's deposition transcript are

18  confidential and submitted separately under seal.  Mr. Shelton's deposition was taken on June

19  26, 2006, in the case of *Hardeman v. Amtrak/Caltrain Railroad*, U.S.D.C. Case No. C04-3360

20  SI.  The attached transcript accurately reflects the questions asked and answers given by the

21  witness.

22         13.       True and correct copies of pages   20, 22, 23, 24, 34, 54, 55, 56, 57, 66 and

23  67 of Denver Jay Payne's deposition transcript are attached hereto as Exhibit J.  Mr. Payne's

24  deposition was taken on April 17, 2006, in the case of *Hardeman v. Amtrak/Caltrain Railroad*,

25  U.S.D.C. Case No. C04-3360 SI.   The attached transcript accurately reflects the questions asked

26  and answers given by the witness.

27         14.       I have received and reviewed the documents produced by Defendant

28  National Railroad Passenger Corporation D/B/A Amtrak which purport to be the Locomotive

-3-

1 Engineer Interview Booklets for the candidates interviewed in July 2004 for the Locomotive

2 Engineer position.  A true and correct copy of a Locomotive Engineer Interview Booklet for Mr.

3 Campbell's interview which bears the signature of Larry Follis is attached hereto as Exhibit K.

4 A true and correct copy of a Locomotive Engineer Interview Booklet for Mr. Campbell's

5 interview which bears the signature of Susan Venturelli is attached hereto as Exhibit L.  Both of

6 these documents reflect that Mr. Campbell's Team Score was a "37."

7         15.     I have also reviewed the Locomotive Engineer Interview Booklets

8 produced by Defendants for the seven candidates whom Ms. Venturelli indicated were the

9 successful candidates.  The Candidate Evaluation Summary Matrix for each of these candidates

10 indicates that they received team scores as follows:

| NO. | NAME | TEAM SCORE |
| --- | --- | --- |
| 1. | Mike Yacovetti | 36 |
| 2. | Patrick Duncan | 32 |
| 3. | Than Ly | 33 |
| 4. | John Hanson | 34 |
| 5. | Wesley Duvall | 34 |
| 6. | Heidi Snyder | 35 |
| 7. | Brice Carroll | 37 |
| 8. | George Solimine | 37 |

(True and correct copies of the Candidate Evaluation Summary Matrix forms for each of these

candidates bates-stamped Nos. D07029, D08990, D07237, D07405, D06892, D07137, D09087

and D05672 are attached hereto in the order of their names as they appear in the table above as

Exhibit M.)

        16.     A true and correct copy of Defendant National Railroad Passenger

Corporation D/B/A Amtrak's Probation Policy dated April 12, 2004 is attached as Exhibit 41 to

the deposition of Defendant Deely.  This document was identified and authenticated by

Defendant Deely in his deposition taken in the case of *Howard v. Amtrak*, U. S. District Court

Case No. C05-4069 SI submitted herewith as Exhibit B.

1       17.   A true and correct copy of Defendant National Railroad Passenger

2  Corporation D/B/A Amtrak's Termination Policy dated February 2000 is attached as Exhibit 42

3  to the deposition of Defendant Deely.  This document was identified and authenticated by

4  Defendant Deely in his deposition taken in the case of *Howard v. Amtrak*, U. S. District Court

5  Case No. C05-4069 SI submitted herewith as Exhibit B.

6       18.   During the course of discovery, we requested a variety of documents

7  related to Mr. Campbell's employment.  To date, AMTRAK has produced almost 13,000

8  documents.  On April 30, 2007, the day before the due date of our opposition to the instant

9  motion, AMTRAK produced another 1,136 pages of documents.  I have reviewed the documents

10  myself and directed various members of my staff on multiple occasions to review the documents.

11  In all of the documents produced by Defendants, I have not yet seen (1) a Letter of Reprimand

12  issued to Mr. Campbell in or about March 2000; or (2) a complete Discipline Worksheet which

13  accurately and completely reflects his alleged series of rules violations; or (3) a Background

14  Check for Internal Candidates Form for Mr. Campbell in the form of Exhibits 36 and 37 to the

15  deposition of Sue Venturelli submitted herewith as Exhibit G.

16       19.   On April 4, 2007, at the deposition of Steven Shelton, I advised defense

17  counsel Kathleen Maylin that the only Discipline Assessment Worksheet for Mr. Campbell

18  which we were able to locate in Defendants' entire production of documents dated September

19  13, 2004 appeared to be incomplete.  Counsel confirmed on the record that Defendants have

20  failed to provide her with an accurate or complete copy of the Discipline Assessment Worksheet

21  which Mr. Shelton claims he relied upon to terminate Mr. Campbell.  (See Exhibit F attached

22  hereto at pp. 43:20-44:24; 48:4-49:23; 86:5-16; 87:11-88:20.)

23       20.   The 1,136 documents produced by AMTRAK on April 30th included the

24  personnel files of Frank J. Caron, an Assistant Conductor trained by Mr. Campbell.  Mr. Caron

25  was promoted to Engineer Trainee in December 2002 over Mr. Campbell.  (True and correct

26  copies of the relevant documents reflecting Mr. Caron's employment history are submitted under

27  seal as Exhibit N.)

28       I declare under penalty of perjury under the laws of the State of California and the

1    United States that the foregoing is true and correct.  If called as a witness, I could and would

2    testify competently to the matters stated herein.

3              Executed this 1st day of May 2007, at Oakland, California.

4

                                    /s/ *Pamela Y. Price*
5                                   PAMELA Y. PRICE, Declarant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN EARL CAMPBELL,

      Plaintiff,

   vs.                        No. C05-05434 MJJ

NATIONAL RAILROAD PASSENGER
CORPORATION dba AMTRAK, JOE
DEELY and DOES 1 through 15,
inclusive,



      Defendants.

_____/

DEPOSITION OF JOE DEELY

February 15, 2007

PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
LaRelle M. Fagundes
CSR No. 9762

EXHIBIT A

1            **JOE DEELY,**

2        being first duly sworn, testified as follows:

3

4                **EXAMINATION BY MS. PRICE**

5            MS. PRICE:  We're starting the deposition

6    in the -- actually, I've got the wrong lawyer.

7            MR. OBORNE:  Why don't we go off the

8    record.

9            MS. PRICE:  Off the record, yeah.

10           (Off the record.)

11           MS. PRICE:  All right.  Back on the record.

12   Q.      Mr. Deely, you're here today.  We've agreed

13   to set aside this day to have your deposition in

14   two separate cases.  So, for your point of

15   reference, I'm going to do the Campbell deposition

16   first.

17   A.      Okay.

18   Q.      Okay.  And the record should reflect, as it

19   will, that Mr. Oborne is here on the Campbell

20   deposition as your attorney, even though previously

21   we were informed he was not your attorney.

22           So I need to make that note for the record.

23           MR. OBORNE:  Let me just clarify that the

24   Jackson Lewis firm represents Mr. Deely and Amtrak.

25   I'm an attorney with Jackson Lewis.  So it doesn't

PATRICIA CALLAHAN & ASSOCIATES

1   if Jackson Lewis could have given us our documents

2   in January.  That would have been fabulous.  But

3   now we have an extension of time, I believe, till

4   sometime in March premised on the representation

5   that you were no longer the attorney of record for

6   this case.

7         MR. OBORNE:  Well, I don't know if that was

8   the representation.  There is a new lead counsel in

9   the Campbell case.  We can move on with this

10   deposition.

11         MS. PRICE:  Right.  And there's a new lead

12   counsel, and we don't have our documents, and we've

13   had to give the Jackson Lewis law firm an extension

14   of time until March because of that situation.

15         All right.

16   Q.     So, Mr. Deely, having focused your

17   attention on the Campbell matter, let me start by

18   asking you what your current position is.

19   A.     General superintendent civic division.

20   Q.    Okay.

21         And what areas, geographic areas, are

22   included in your -- in the Pacific division?

23   A.     Central California to Vancover, British

24   Columbia; east to Minot, North Dakota and to Grand

25   Junction, Colorado; and the San Francisco computer

1    service.

2    Q.        Okay.

3              How long have you held that position as the

4    superintendent of the Pacific route?

5    A.        Since November of 2002.

6    Q.        And what are your duties and

7    responsibilities?

8              MR. OBORNE:  Objection.  Vague and

9    ambiguous.

10             MS. PRICE:  Q.  You can answer.

11   A.        Okay.  Day-to-day responsibility of all

12   Amtrak functions on the division.

13   Q.        What does that mean?  Can you be more

14   specific, please?

15   A.        . Responsibility for the transportation,

16   mechanical departments, on-board service, stations.

17   Q.        Okay.

18   A.        That would be it.

19   Q.        When you say "responsibility," how many

20   people report to you?

21             MR. OBORNE:  Objection.  Vague and

22   ambiguous.

23             You can answer if you understand.  If you

24   understand the question, you can answer it.

25             THE WITNESS:  There's approximately 1,250

PATRICIA CALLAHAN & ASSOCIATES

1    employees on the division.

2              MS. PRICE:   Q.   How many direct reports do

3    you have?

4    A.        Five.

5    Q.        What positions do they hold?

6    A.        Three district superintendents, a manager

7    of business operations and an administrator.

8    Q.        Who is the administrator?

9    A.        Pamela Johnston with a "T."

10   Q.        And what are her duties?

11   A.        She has the administrative

12   responsibilities.

13   Q.        What does that mean?

14   A.        She handles the office calendar, meetings,

15   and any task, pretty much the administrative tasks

16   that I assign her to.

17   Q.        Does she work for anyone else?

18   A.        No.

19   Q.        Who are the district superintendents that

20   report to you?

21   A.        Jay Commer, Caltrain; Steve Shelton, Bay

22   District; and Kurt Laird, Northwest District.

23   Q.        And what are their duties and

24   responsibilities?

25   A.        They have --

1          MR. OBORNE:  Objection.  Vague and

2    ambiguous.  Objection.  Compound.

3          You can answer if you understand.

4          THE WITNESS:  Their responsibilities are

5    for their specific districts, overall day-to-day

6    operation of Amtrak trains.

7          MS. PRICE:  Q.  Did you select any of those

8    persons for their positions?

9    A.      I selected Mr. Shelton.

10   Q.      When?

11   A.      In 2004, I believe.

12   Q.      What was the process by which he was

13   selected?

14   A.      He was interviewed among other candidates.

15   Q.      Anything else as part of the selection

16   process?

17   A.      No, the routine interview process.

18   Q.      Were you -- who participated in the

19   interview?

20   A.      Myself --

21          MR. OBORNE:  Objection.  Calls for

22   speculation.

23          But you can answer.

24          THE WITNESS:  Myself and an HR, human

25   resources, manager.  I don't recall who it was.

1          MS. PRICE:   Q.   When you say an "HR, human

2    resources, manager," what are you referring to?

3    A.        There's two people that participate.   The

4    department participates and a representative from

5    the personnel department, HR department.

6    Q.        Okay.

7              This representative, is the person's office

8    in Oakland or somewhere else?

9              MR. OBORNE:   Objection.   Vague and

10   ambiguous.

11             THE WITNESS:   I'm not sure if it was from

12   the Oakland office or Los Angeles.

13             MS. PRICE:   Okay.

14   Q.        Anything else involved in the selection

15   process for Mr. Shelton?

16             MR. OBORNE:   Objection.   Vague and

17   ambiguous.

18             THE WITNESS:   No.

19             MS. PRICE:   Okay.

20   Q.        And you indicated there was a fifth person

21   that reports to you.

22             Who is that person?

23   A.        Suzanne Fike.

24   Q.        What position does she hold?

25   A.        Manager of business operations management.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.      Before you left Amtrak in 1999 to go to

2    Gray Line, who did you report to?

3    A.      Gil Malery.

4    Q.      What position did he hold?

5    A.      President Amtrak West business unit.

6    Q.      All right.

7            How many times have you been deposed in the

8    last five years?

9    A.      Five years?  None that I recall.

10   Q.      Have you ever been a party to litigation

11   before now?

12           MR. OBORNE:  Objection.  Vague and

13   ambiguous.

14           MS. PRICE:  Q.  Either a plaintiff or a

15   defendant?  Excuse me.  Sorry.

16           MR. OBORNE:  Calls for speculation.

17           But you can answer if you know.

18           THE WITNESS:  I have been involved in

19   two -- three federal court cases.

20           MS. PRICE:  Okay.

21   Q.      As a plaintiff or a defendant?

22   A.      Defendant.

23   Q.      Okay.

24           What's the name --

25   A.      I'm sorry.  That would be --

```
 1            MR. OBORNE:  The defendant.  In this

 2    lawsuit, you're a defendant, if that helps.

 3            THE WITNESS:  Yeah.  Okay.

 4            It would be the defendant, right.

 5            MS. PRICE:  Okay.

 6    Q.      What's the name of the first case?

 7    A.      Let's see.  I believe the first one would

 8    have been Selby.

 9    Q.      What's the name of the second case?

10    A.      Goddart.

11    Q.      What's the name of the third case?

12    A.      Morgan.

13    Q.      Okay.

14            Other than cases where you've been named --

15    withdraw that.

16            Other than those three cases, can you tell

17    me if you have been accused of race discrimination

18    by any other employees?

19            MR. OBORNE:  Objection.  Vague and

20    ambiguous.  Calls for speculation.

21            MS. PRICE:  Q.  You can answer.

22    A.      No.

23    Q.      Okay.  Let me go over the deposition

24    procedures.

25            The court reporter has placed you under
```

1        MS. PRICE:   Q.   Do you wish to clarify

2   something about your prior testimony?

3   A.      There were two letters that I saw in a file

4   that accused me of racial discrimination.   They

5   were not directed to me.

6   Q.      Okay.

7   A.      And I'm familiar with those.

8   Q.      All right.

9           And were the letters authored by the same

10  person?

11          MR. OBORNE:   Objection.   Calls for

12  speculation.

13          You can answer.

14          THE WITNESS:   No.

15          MS. PRICE:   Okay.

16  Q.      Who was the author of one of the letters?

17  A.      Mary Fontaine.

18  Q.      And who was the author of the other letter?

19  A.      Martin Yeager.

20  Q.      When you say there were two letters in a

21  file, what file did you see these letters in?

22  A.      It was information provided to me by the

23  Amtrak law department.

24  Q.      Where is this file now?

25          MR. OBORNE:   Objection.   Calls for

1    Q.        Okay.

2              What were the substance of the allegations

3    that Martin Yeager made against you?

4    A.        Overhearing a conversation.

5    Q.        Okay.

6              A conversation to which you were a party?

7              MR. OBORNE:  Objection.  Misstates his

8    testimony.  It's vague and ambiguous.

9              THE WITNESS:  That's what he wrote.

10             MS. PRICE:  Q.  Were you familiar with what

11   conversation he was referring to?

12   A.        No.

13   Q.        What did he say about the conversation,

14   Mr. Deely?

15   A.        I don't recall the specifics.

16   Q.        Can you tell us generally what he said?

17   A.        I believe my recollection was that I used

18   the "N" word.

19   Q.        Who was the letter to?

20   A.        I don't recall.

21   Q.        When did you last see this letter?

22   A.        In the late '90s, I believe.

23   Q.        Did you respond in any way to the letter

24   from Mr. Yeager?

25             MR. OBORNE:  Objection.  Vague and

1    A.        No.

2    Q.        Did you review any documents to prepare for

3    the deposition?

4              MR. OBORNE:  Objection.  Vague and

5    ambiguous.

6              THE WITNESS:  No, not this one.

7              MS. PRICE:  Let me mark this as Exhibit 1,

8    please.  No, I'm sorry.  Back up.  I'm sorry.

9              So let's mark this as Exhibit 1.

10                         (PLAINTIFF'S EXHIBIT NO. 1

11                         WAS MARKED FOR IDENTIFICATION.)

12             MS. PRICE:  For the record, we have marked

13   as Exhibit 1 a charge of discrimination filed with

14   the EEOC and which is charge number 376-2004-00295.

15   It's dated January 28th, 2004, received February

16   9th, 2004.

17   Q.        If you could take a moment to look at that,

18   then I'll asked you some questions.

19   A.        Okay.

20   Q.        Have you ever seen that document before?

21   A.        No.

22   Q.        What information do you receive, if any,

23   when a charge of discrimination is filed against --

24   or filed by employees within your jurisdiction with

25   an external agency?

PATRICIA CALLAHAN & ASSOCIATES

1          MR. OBORNE:  Objection.  Vague and

2   ambiguous.  Calls for speculation.

3          THE WITNESS:  The process would be the law

4   department normally would call the people involved.

5          MS. PRICE:  Okay.

6   Q.     And when you say "the law department," what

7   functions are included within that department?

8          MR. OBORNE:  Objection.  Calls for

9   speculation.

10          MS. PRICE:  Q.  If you know.

11   A.     I don't understand the question.

12   Q.     Okay.  Let me ask it a different way.

13          Are you familiar with a person named

14   Elias Munoz?

15   A.     . Yes.

16   Q.     He's Amtrak's EEO compliance manager.

17          MR. OBORNE:  Objection.  Calls for

18   speculation.

19          MS. PRICE:  Q.  Are you aware of that?

20   A.     I believe that's his title.

21   Q.     Does he work in the law department?

22          MR. OBORNE:  Objection.  Calls for

23   speculation.  It's vague and ambiguous.

24          THE WITNESS:  Yes.

25          MS. PRICE:  Q.  Is there a separate --

PATRICIA CALLAHAN & ASSOCIATES

1    well, within the -- withdraw that.

2           Within the law department, is there a

3    separate unit that handles EEO complaints?

4           MR. OBORNE:  Objection.  Vague and

5    ambiguous.  Calls for speculation.

6           THE WITNESS:  I don't know for sure.

7           MS. PRICE:  Okay.

8    Q.     Do you have any knowledge or information as

9    to how the law department is organized in terms of

10    its different functions?

11          MR. OBORNE:  Objection.  Calls for

12    speculation.  It's vague and ambiguous.

13          THE WITNESS:  No.

14          MS. PRICE:  Q.  So your statement that the

15    law department would contact the people involved,

16    what is that based on?

17    A.     If your name is part of the charge of

18    discrimination.

19          MS. PRICE:  Let me mark this as Exhibit 2.

20                        (PLAINTIFF'S EXHIBIT NO. 2

21                        WAS MARKED FOR IDENTIFICATION.)

22          MS. PRICE:  For the record, we marked as

23    Exhibit 2 a complaint of discrimination filed with

24    the Department of Fair Employment and Housing.  It

25    has a DFEH number E-200506-M-0250-00-C.

1          MS. PRICE:  Q.  If you could take a look at

2     that, and let us know when you finish reviewing.

3          For the record, we've marked as Exhibit 3 a

4     letter to Joyce A. Hendy dated June 9th, 2004,

5     which we believe to be three pages, from

6     Elias Munoz.

7     A.        Okay.

8     Q.        Have you ever seen that document before?

9     A.        Not that I recall.

10    Q.        Are you familiar with any of the

11    information set forth therein?

12         MR. OBORNE:  Objection.  Vague and

13    ambiguous.  It's compound.

14         THE WITNESS:  No.

15         MS. PRICE:  Interesting.

16    Q.        Other than -- as the district

17    superintendent -- no.  Excuse me.  Your position

18    is -- I apologize.

19         As the superintendent -- that's the

20    position you currently hold, correct?

21    A.        General superintendent.

22    Q.        General superintendent.

23         As the general superintendent, do you have

24    any responsibilities under Amtrak's business

25    diversity policies?

PATRICIA CALLAHAN & ASSOCIATES

1        MR. OBORNE:  Objection.  Vague and

2    ambiguous.  Calls for speculation.

3        THE WITNESS:  Yes.

4        MS. PRICE:  Q.  What are those

5    responsibilities?

6        MR. OBORNE:  Same objections.

7        THE WITNESS:  Keep the workplace free of

8    discrimination.

9        MS. PRICE:  Q.  And how are you expected to

10    implement those responsibilities?

11        MR. OBORNE:  Objection.  Calls for

12    speculation.  It's vague and ambiguous.

13        THE WITNESS:  Overall responsibility for

14    the operation and ensure that any complaints are

15    investigated and to ensure there's a

16    nondiscriminatory climate.

17        MS. PRICE:  Q.  Any other responsibilities

18    under the business diversity policies?

19        MR. OBORNE:  Objection.  It's vague and

20    ambiguous.  Calls for speculation.

21        THE WITNESS:  Generally, that would be it.

22        MS. PRICE:  Q.  Are those responsibilities

23    reflected in any writing, to the best of your

24    knowledge?

25    A.        Yes.

1    terminated?

2        MR. OBORNE:  Objection.  Calls for

3    speculation.

4        THE WITNESS:  That is my understanding.

5        MS. PRICE:  Okay.

6    Q.    Do you have responsibilities under the

7    Amtrak equal employment policy?

8        MR. OBORNE:  Objection.  Vague and

9    ambiguous.  Calls for speculation.

10        THE WITNESS:  Yes.

11        MS. PRICE:  Q.  Are they the same as the

12    responsibilities under the business diversity

13    policy?

14        MR. OBORNE:  Same objections.

15        THE WITNESS:  Yes.

16        MS. PRICE:  Q.  Are they in writing?  Are

17    your responsibilities under the EEO policy in

18    writing?

19    A.    Yes.

20    Q.    Okay.

21        And how did you receive them?

22    A.    They're part of the corporate policies and

23    procedures manual.

24    Q.    Have you ever been asked to acknowledge in

25    writing your understanding of those

1      exactly how you phrased it.

2           But can you tell us what steps you have

3      taken to ensure this climate, as you described it?

4           MR. OBORNE:  Objection.  Misstates his

5      testimony.

6           Answer if you understand it.

7           THE WITNESS:  One of the ways is to observe

8      the workplace, address any issues that are under

9      our purview.  To clarify, the investigation -- we

10     have a diversity department.  When we get a

11     complaint, we do the initial investigation to

12     determine as many facts as we can find, then

13     contact the diversity department, and they will

14     either tell us to move forward, that it's under

15     their purview or that they will take the

16     investigation over from there.

17          MS. PRICE:  Q.  Where is this diversity

18     department located?

19     A.      Los Angeles.

20     Q.      Is it separate and apart from the EEO

21     compliance unit within the law department?

22     A.      That is my understanding.

23     Q.      Okay.

24          And who is your contact person in the

25     diversity department, if you have one?

PATRICIA CALLAHAN & ASSOCIATES

1         MR. OBORNE:  Objection.  Vague and

2    ambiguous.

3         THE WITNESS:  Rickie Donofrio.

4         MS. PRICE:  Okay.

5    Q.    And when you say "observe the workplace,"

6    what do you mean by that?

7    A.    Specifically the environment, graffiti, for

8    example, anything of nonwork-related jokes or

9    anything of that nature posted on bulletin boards,

10   observing managers dealing with employees, and

11   aggressively addressing any complaints that we

12   receive either from passengers or employees.

13   Q.    And when you say "the environment," are

14   you -- what physical facility are you referring to?

15        MR. OBORNE:  Objection.  Vague and

16   ambiguous.

17        THE WITNESS:  Locker rooms, employee areas.

18        MS. PRICE:  Q.  And you do that where?

19        MR. OBORNE:  Objection.  Vague and

20   ambiguous.

21        THE WITNESS:  Throughout the division.

22        MS. PRICE:  Okay.

23   Q.    So that includes facilities in what cities?

24   A.    Every city in the division.

25   Q.    Okay.

1          (PLAINTIFF'S EXHIBIT NO. 4

2          WAS MARKED FOR IDENTIFICATION.)

3          MS. PRICE:  Q.  We've marked as Exhibit 4 a

4    letter to Joyce A. Hendy dated June 9th, 2004, from

5    Elias Munoz.

6          If you could take a look at that and let us

7    know when you finish reviewing it.

8    A.          I've already reviewed it.

9    Q.          Okay.

10         Have you ever seen that document before?

11         MR. OBORNE:  Objection.  Asked and

12   answered.

13         THE WITNESS:  Not that I recall.

14         MS. PRICE:  Q.  Are you familiar with any

15   of the information set forth therein?

16         MR. OBORNE:  Objection.  Asked and

17   answered.

18         THE WITNESS:  No.

19         MR. OBORNE:  A belated objection.  It's

20   vague and ambiguous as well.

21         MS. PRICE:  Okay.

22   Q.          Did you become aware at any time in 2004

23   that there was an allegation that African-Americans

24   were being excluded from the engineer positions

25   within the Pacific region?

PATRICIA  CALLAHAN  &  ASSOCIATES

1          MR. OBORNE: Objection. Vague and

2   ambiguous.

3          THE WITNESS: No. First knowledge was when

4   I received the call from the attorney.

5          MS. PRICE: Okay.

6   Q.    And you don't know when that was?

7   A.    No.

8   Q.    Okay.

9          And other than the conversation with that

10  attorney or some other attorney, is it true that

11  you have not had any conversations with anyone

12  within the company about the allegation that

13  African-Americans are being excluded from the

14  engineer classification within the Pacific

15  division?

16  A.    Other than Mr. Oborne and whoever that

17  attorney was, that's it.

18  Q.    Okay. All right.

19         Now, in 2004, there was a verdict in favor

20  of Abner Morgan based on racial harassment.

21         You're aware of that, correct?

22         MR. OBORNE: Objection. Vague and

23  ambiguous.

24         THE WITNESS: Vaguely.

25         MS. PRICE: Okay.

1    Q.        Following the entering of the judgment in

2    that case, did you have any discussion with anyone

3    within the company regarding the issues that were

4    decided in that case?

5              MR. OBORNE:  Objection.  Vague and

6    ambiguous.  Calls for speculation.  Calls for a

7    legal opinion or conclusion.

8              And to the extent it calls for an

9    attorney-client communication, don't answer that.

10             MS. PRICE:  Q.  And so the record is clear,

11   I'm not asking you for conversations with lawyers

12   unless that person is functioning in some other

13   capacity.  I'm really asking about conversations

14   that you had with people within the company,

15   managers.

16   A.        None that I recall.

17   Q.        The company had a representative who

18   attended the Morgan trial.

19             Do you recall who that person was?

20             MR. OBORNE:  Objection.  Vague and

21   ambiguous.  Calls for speculation.

22             THE WITNESS:  No, I don't.

23             MS. PRICE:  Q.  Did you play any role in

24   designating that person to represent the company

25   during the trial?

PATRICIA CALLAHAN & ASSOCIATES

```
 1    of '04, do you recall if there was any reference to

 2    the judgment in the Morgan racial harassment case?

 3    A.      No, I don't recall any.

 4    Q.      And how did you learn about that judgment?

 5    A.      Which judgment?

 6    Q.      The Morgan racial harassment case.

 7    A.      I don't remember.

 8    Q.      All right.

 9            What role, if any, do you play in the

10    discipline of employees within the Pacific region?

11            MR. OBORNE:  Objection.  Vague and

12    ambiguous.  Compound.  Calls for speculation.

13            THE WITNESS:  All discipline

14    recommendations are forwarded to me in a discipline

15    assessment worksheet, and I review it before

16    discipline is assessed for consistency and

17    fairness.

18            MS. PRICE:  Q.  And do you have a written

19    procedure that you use to review these discipline

20    worksheets?

21            MR. OBORNE:  Objection.  Vague and

22    ambiguous.

23            THE WITNESS:  My direct report will

24    complete the form and submit it to me with their

25    recommendation of what they want for discipline.
```

PATRICIA CALLAHAN & ASSOCIATES

1              MS. PRICE:  Q.  You indicate there's a

2     discipline assessment policy in writing.

3              It's a written policy, right?

4     A.       Yes.

5     Q.       Okay.

6              And you use that policy to review the

7     discipline worksheets that you receive?

8     A.       Yes.

9     Q.       Okay.

10             How do you use it?

11    A.       There's a formal policy how discipline is

12    assessed.  I review the discipline assessment

13    worksheet of the employee's past history.  And I

14    ensure that the policy is complied with before

15    discipline is assessed.

16    Q.       When you said that you ensure the policy is

17    complied with, what is it that you're trying to

18    ensure is being complied with in the policy?

19    A.       That the steps of the discipline process

20    have been followed and are commensurate with the

21    discipline recommended.

22             MR. OBORNE:  Let's take a quick break.

23             MS. PRICE:  Mark the record, please.

24             (Recess taken from 12:09 to 12:16.)

25             MS. PRICE:  Q.  How do you ensure

PATRICIA CALLAHAN & ASSOCIATES

**\* EMPLOYMENT \* \* \***

COMPLAINT OF DISCRIMINATION UNDER   DFEH # _____

THE PROVISIONS OF THE CALIFORNIA

FAIR EMPLOYMENT AND HOUSING ACT

E-200506-M-0250-00-c

DFEH USE ONLY

## CALIFORNIA DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

YOUR NAME (indicate Mr. or Ms.)    John Earl Campbell

TELEPHONE NUMBER (INCLUDE AREA CODE)   510-652-4260

ADDRESS   2210 109TH Ave.

CITY/STATE/ZIP   Oakland CA 94603

COUNTY   Alameda    COUNTY CODE

NAMED IS THE EMPLOYER, PERSON, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, OR STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME:

NAME   Amtrak

TELEPHONE NUMBER (Include Area Code)

ADDRESS   5040 Water St.  5th Floor

DFEH USE ONLY

CITY/STATE/ZIP   Oakland  CA

COUNTY   94607    COUNTY CODE

NO. OF EMPLOYEES/MEMBERS (if known)   DATE MOST RECENT OR CONTINUING DISCRIMINATION TOOK PLACE (month, day, and year)

RESPONDENT CODE

THE PARTICULARS ARE:

SEPT. 17, 2004   I was

- ✓ fired
- ___ laid off
- ___ demoted
- ___ harassed
- ___ genetic characteristics testing
- ___ forced to quit

- ___ denied employment
- ___ denied promotion
- ___ denied transfer
- ___ denied accommodation
- ___ impermissible non-job-related inquiry
- ___ other (specify)

- ___ denied family or medical leave
- ___ denied pregnancy leave
- ___ denied equal pay
- ___ denied right to wear pants
- ___ denied pregnancy accommodation

Joe deely

Name of Person

Division Supt.

Job Title (supervisor/manager/personnel director/etc.)

because of my:
- ___ sex
- ___ age
- ✓ religion
- ✓ race/color
- ___ national origin/ancestry
- ___ marital status
- ___ sexual orientation
- ___ association
- ___ physical disability
- ___ mental disability
- ___ cancer
- ___ genetic characteristic
- ___ other (specify) _____

(Circle one) filing;
Protesting; participating in
investigation (retaliation for)

the reason given by   Joe deely - Division Supt.

Name of Person and Job Title

I was

because of

[please state

what you

believe to be

reason(s)]

Retaliation For Filing An EEOC Discrimination

Complain Against Amtrak For Not Promoting

Blacks To The Engineer position in Oakland

I wish to pursue this matter in court. I hereby request that the Department of Fair Employment and Housing provide a right-to-sue notice. I understand that if I want a federal notice of right-to-sue, I must visit the U.S. Equal Employment Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of the DFEH "Notice of Case Closure," or within 300 days of the alleged discriminatory act, whichever is earlier.

I have not been coerced into making this request, nor do I make it based on fear of retaliation if I do not do so. I understand it is the Department of Fair Employment and Housing's policy to not process or reopen a complaint once the complaint has been closed on the basis of "Complainant Elected Court Action."

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct of my own knowledge except as to matters stated on my information and belief, and as to those matters I believe it to be true.

Dated   8-16-05

COMPLAINANT'S SIGNATURE

OAKLAND

City

EXHIBIT
2
Deely 2-15-07

REC...

DATE FILED:   08/17/05   AUG 17 2005

Dept...
Employm...

DFEH-300-03 (01/05)

DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING

STATE OF CALIFORNIA

NATIONAL RAILROAD PASSENGER CORPORATION
810 North Alameda Street, Los Angeles, CA 90012

Elias Muñoz
EEO Compliance Manager
344 Mira Loma Avenue
Glendale, CA 91204
818-547-2532; 818-547-2532 fax



June 9, 2004

Joyce A. Hendy
Director
Equal Employment Opportunity Commission
1301 Clay Street, Suite 1170-N
Oakland, California 94612

RE:    376-2004-00295
       Campbell/AMTRAK (National Railroad Passenger Corporation)

Dear Ms. Hendy:

The National Railroad Passenger Corporation, or "Amtrak" (Respondent), hereby responds to Charge Number 376-2004-00295 filed by John E. Campbell (Charging Party) on February 9, 2004. Charging Party alleges Amtrak discriminated against him on the basis of his race (Black) because he was not selected as an Engineer Trainee.

Specifically, Charging Party alleges that he had more seniority as a Conductor than the two White Applicants chosen, and that therefore he was more qualified for promotion from Conductor to Engineer, and that Respondent has not promoted any Black employee to Engineer since 1998.

Charging Party failed to properly apply for the position. His application stated that he was an external applicant, not an employee of Amtrak.

As discussed in more detail below, Charging Party's claim is without merit.

Respondent's Business Diversity, Equal Employment, and Anti-Harassment policies forbid discrimination in any term and condition of employment, including candidate selection, on the basis of race, or any other protected category. The policy provides for immediate and effective redress for any allegation of discrimination. (See **Exhibit A, Anti-Discrimination policy**)

Charging Party was first employed by Respondent as an Assistant Conductor on September 30, 1998. Charging Party subsequently qualified and was promoted to Conductor. He remains employed in that capacity to date. However, he has been on an extended sick leave since April 10, 2002. (**Exhibit B, Employment Summary**)

The information contained in this letter is provided to you solely with the understanding that it will be kept confidential to the maximum extent allowed by law.



EXHIBIT LF
3
Deely 2-15-07

D09916



*June 9, 2004*
*Page 2*

**Allegation- Charging Party was not chosen because of his race, Black**

Charging Party alleges that he was not chosen for one of two Engineer Trainee positions in January 2004 because of his Race (Black). In support of that allegation, Charging Party states that he had more seniority than the two White Applicants chosen for the Engineer Trainee positions, and therefore believes he was more qualified for promotion.

On November 14, 2003, Respondent posted notices for Engineer Trainee positions with a closing date of November 21, 2003. The notice specified that only internal applicants would be considered. On November 19, 2003, Charging Party submitted a faxed two-page application that did not indicate that he was an Amtrak Employee. In fact, the resume stated that Charging Party is employed by the County of Alameda as an In-Home Care Giver, and has been employed as such since April of 1997. On it's face, Charging Party's application made him ineligible for the position of Engineer Trainee since the job announcement made it clear that only internal applicants would be considered. (**Exhibit B, Job Announcement**). Twelve internal employees applied within the appropriate time period and met the minimum qualifications. Of the 12, two (2) were Black/African-American, one was Hispanic, and the rest were White. Of those twelve, six were chosen for interview. Of those six, two were Black/African American. One of the White applicants withdrew. (**Exhibit C, Summary of Applicants identifying name, Race, Sex, hired or not hired**).

Charging Party precluded himself from consideration, by not indicating that he was an Amtrak employee. Nowhere on his application does he indicate that he is an Amtrak employee. Quite the opposite, he claims to be a long-term employee of the County of Alameda. It is unreasonable for Charging Party to expect that Respondent would screen every application to determine if the applicant has somehow misstated who they work for, or to somehow catch that this John Campbell might actually be an employee. (**Exhibit D, Charging Party's application and resume**)

There is no promotional right from Conductor to Engineer, or Engineer Trainee. Engineers are members of the BLE Union. Engineers are a different craft, with different seniority lists than Conductors. The crafts and seniority systems are completely different. There is no interchange between the two. Charging Party is a member of the TCU Union, and if he believes his seniority rights were violated, he has direct remedy through his union. Charging Party did not file any grievance regarding seniority rights violations in relation to the engineer position because none exist.

The six individuals interviewed participated in a structured panel interview. All were interviewed by the same panel, and each were asked the same set of predetermined written questions, utilizing the Locomotive Engineer Interview Booklet. Each interviewer scored the response to each questions as it was asked, and entered the score in the booklet. At the end of each of the interviews, the individual interviewer totaled the score for each question, and entered the panel's score. By adding the total scores, each interviewee received a total score for the interview.

The two candidates ultimately selected received combined scores of 37 and 34. The two African-American candidates received combined scores of 19 and 32. The remaining two white candidates received combined scores of 30 and 34. (**Exhibit E, Application packets, including all testing and evaluation documents and notes for the successful candidates**)

Charging Party's allegation that his time as a Conductor made him more eligible for promotion to the Engineer Trainee program than the two successful candidates is simply wrong. There is no promotion from one craft to another. If an opening exists in a different craft a person must apply, meet the minimum qualifications as posted, then demonstrate that they are the best qualified. A review of **Exhibit E** clearly demonstrates that the persons were chosen because of job related experience, qualifications, and training. Race was not a factor.

D09915

 

*June 9, 2004*
*Page 3*

**Allegation- Respondent has not promoted any Black Employees to Engineer since 1998**

Charging Party alleges that to the best of his knowledge, Respondent has not promoted any Black employees to Engineer since 1998, and that translates to proof that he was not chosen because of his race, Black.

As demonstrated above, there is no promotional right to an Engineer position. When positions are available, they are posted, and any employee who believes they qualify can apply. Sometimes the application process is limited to internal employees, and sometimes it is open to external applicants. Either way, each applicant is evaluated for minimum qualifications, screened, tested and set for interview.   As demonstrated in Exhibit D, the applicants are chosen based on job related qualifications, experience, and training, not any protected basis.

**Exhibit E, (Complete list of all Engineers, including Race and date of hire)** demonstrates that Respondent has hired and employs Engineers of all races and ethnicities.

**Summary**

Charging Party excluded himself from any consideration for the internal employee only position by submitting an application that claimed he was a long term employee of Alameda County. Six internal applicants were selected and interviewed pursuant to a pre-determined set of questions. The two best-qualified applicants were offered the positions. Of the six interviewed, two are African-American. Charging Party's race was simply not a factor. Charging Party's reliance on seniority and his belief as to promotions as proof of race allegations is misplaced and insufficient to sustain a charge of discrimination.

For the reasons set forth above, Respondent respectfully requests that the Commission issue a finding of No Cause in this matter.

Sincerely,

Elias Muñoz
EEO Compliance Manager

D09927

 

NATIONAL RAIL PASSEN CORPORATION
810 North Alameda Street, Los Angeles, CA 90012

Elias Muñoz
EEO Compliance Manager
344 Mira Loma Avenue
Glendale, CA 91204
818-547-2532;  818-547-2532 fax



June 9, 2004

Joyce A. Hendy
Director
Equal Employment Opportunity Commission
1301 Clay Street, Suite 1170-N
Oakland, California 94612

RE:    376-2004-00823
       CLIPPER/AMTRAK (National Railroad Passenger Corporation)

Dear Ms. Hendy:

The National Railroad Passenger Corporation, or "Amtrak" (Respondent), hereby responds to Charge Number 376-2004-00823 filed by Christopher E. Clipper (Charging Party) on February 5, 2004. Charging Party alleges Amtrak discriminated against him on the basis of his race (Black) because he was not selected as an Engineer Trainee.

Specifically, Charging Party alleges that he had more seniority as a Conductor than the two White Applicants chosen, and that therefore he was more qualified for promotion from Conductor to Engineer, and that Respondent has not promoted any Black employee to Engineer since 1998.

 As discussed in more detail below, Charging Party's claim is without merit.

Respondent's Business Diversity, Equal Employment, and Anti-Harassment policies forbid discrimination in any term and condition of employment, including candidate selection, on the basis of race, or any other protected category. The policy provides for immediate and effective redress for any allegation of discrimination. (See Exhibit A, Anti-Discrimination policy)

Charging Party was first employed by Respondent as an Assistant Conductor on February 9, 2000. On March 22, 2000, Charging Party was qualified and promoted to Conductor. He remains employed in that capacity to date. (Exhibit B, Employment Summary)

The information contained in this letter is provided to you solely with the understanding that it will be kept confidential to the maximum extent allowed by law.



EXHIBIT ⌐F

4

Deely 2-15-07

**Allegation- Charging Party was not chosen because of his race, Black**

Charging Party alleges that he was not chosen for one of two Engineer Trainee positions in January 2004 because of his Race (Black). In support of that allegation, Charging Party states that he had

D09928

 

*June 9, 2004*
*Page 2*

more seniority than the two White Applicants chosen for the Engineer Trainee positions, and therefore believes he was more qualified for promotion.

There is no promotional right from Conductor to Engineer, or Engineer Trainee. Engineers are members of the BLE Union. Engineers are a different craft, with different seniority lists than Conductors. The crafts and seniority systems are completely different. There is no interchange between the two. Charging Party is a member of the UTU Union, and if he believes his seniority rights were violated, he has direct remedy through his union. Charging Party did not file any grievance regarding seniority rights violations in relation to the engineer position because none exist.

On November 14, 2003, Respondent posted notices for Engineer Trainee positions with a closing date of November 21, 2003. The notice specified that only internal applicants would be considered (Exhibit C, Job Announcement). Charging Party and 11 other employees applied within the appropriate time period and met the minimum qualifications. Of the 12, two (2) were Black/African-American, one was Hispanic, and the rest were White. Of those twelve, six were chosen for interview. Of those six, two were Black/African American. One of the White applicants withdrew. (Exhibit D, Summary of Applicants identifying name, Race, Sex, hired or not hired).

The six individuals interviewed participated in a structured panel interview. All were interviewed by the same panel, and each were asked the same set of predetermined written questions, utilizing the Locomotive Engineer Interview Booklet. Each interviewer scored the response to each questions as it was asked, and entered the score in the booklet. At the end of each of the interviews, the individual interviewer totaled the score for each question, and entered the panel's score. By adding the total scores, each interviewee received a total score for the interview.

The two candidates ultimately selected received combined scores of 37 and 34. Charging Party received a combined score of 19. The other African-American candidate received a combined score of 32. The remaining two white candidates received combined scores of 30 and 34. (Exhibit E, Application packets, including all testing and evaluation documents)

Charging Party's allegation that his few months more time as a Conductor made him more eligible for promotion to the Engineer Trainee program than the two successful candidates is simply wrong. There is no promotion from one craft to another. If an opening exists in a different craft a person must apply, meet the minimum qualifications as posted, then demonstrate that they are the best qualified. A review of Exhibit E clearly demonstrates that the persons were chosen on job related experience, qualifications, and training. Race was not a factor.

### Allegation- Respondent has not promoted any Black Employees to Engineer since 1998

Charging Party alleges that to the best of his knowledge, Respondent has not promoted any Black employees to Engineer since 1998, and that translates to proof that he was not chosen because of his race, Black.

As demonstrated above, there is no promotional right to an Engineer position. When positions are available, they are posted, and any employee who believes they qualify can apply. Sometimes the application process is limited to internal employees, and sometimes it is open to external applicants. Either way, each applicant is evaluated for minimum qualifications, screened, tested and set for interview. As demonstrated in Exhibit E, the applicants are chosen based on job related qualifications, experience, and training, not any protected basis.

Exhibit F, (Complete list of all Engineers, including Race and date of hire) demonstrates that Respondent has hired and employs Engineers of all races and ethnicities. Moreover, only 11 of more than 250 Engineers have been hired since 1998. Those 11 were hired at the same time in Philadelphia.

D09929




*June 9, 2004*
*Page 3*

### Summary

Charging Party was interviewed pursuant to a pre-determined set of questions asked of all applicants for the Engineer Trainee position. The two best-qualified applicants were offered the positions. Of the six interviewed, two are African-American. Charging Party was less qualified than the other five applicants. His race was simply not a factor. Charging Party's allegation regarding seniority and promotions as proof of race discrimination is misplaced and insufficient to sustain a charge of discrimination.

For the reasons set forth above, Respondent respectfully requests that the Commission issue a finding of No Cause in this matter.

Sincerely,

Elias Muñoz
EEO Compliance Manager

D09930



# Discipline Assessment Worksheet

## Employee Information

| Date | Employee Name | | Employee Number | Amtrak Hire Date |
|---|---|---|---|---|
| 09 / 13 / 2004 | John Campbell | | 00008295 | 09 / 30 / 1998 |
| **Craft** | | **Crew Base/Work Location** | | |
| enginer | | oakland | | |

## Incident Information

| Date of Incident | Charge/Rule Violation |
|---|---|
| 07 / 24 / 2004 | Service Standard Rule 5800,GCOR 1.47, 7.4 and AMT-3 Rule 2.14.16 |

**Brief Description of Incident**
While working assignment CYO103 employee cut out the brakes on a locomotive and failed to properly secure it prior to coupling,

**Contributing or Mitigating Factors**
Situational Awearness was not complied with.

**Recommended Discipline**
Termination

| Manager Recommending Discipline | Telephone Number |
|---|---|
| **S. E. Shelton** | **(510) 238-4385** |
| **Manager's Title** | Fax Number |
| **Bay District Supcrintendent** | **(510) 433-5915** |
| Department Superintendent's Approval | |

## Discipline History

**Previous Discipline**  ☒ Yes    ☐ No

| 1.  Date: | Charge/Rule Violation | Discipline Assessed |
|---|---|---|
| 04 / 04 / 2000 | Unsafe switching causing damage in yard | waived |
| 2.  Date: | Charge/Rule Violation | Discipline Assessed |
| 01 / 31 / 2001 | Insubordination, Failure to follow instructions of yard foreman | withdrawn |



EXHIBIT LF

5

Deely    2-15-07

<u>CERTIFICATE</u>

1

2        I, the undersigned, a Certified Shorthand

3    Reporter, State of California, hereby certify that

4    the witness in the foregoing deposition was by me

5    first duly sworn to testify to the truth, the whole

6    truth, and nothing but the truth in the

7    within-entitled cause; that said deposition was

8    taken at the time and place therein stated; that

9    the testimony of said witness was reported by me, a

10    disinterested person, and was thereafter

11    transcribed under my direction into typewriting;

12    that the foregoing is a full, complete and true

13    record of said testimony; and that the witness was

14    given an opportunity to read and, if necessary,

15    correct said deposition and to subscribe the same.

16        I further certify that I am not of counsel

17    or attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any

19    way interested in the outcome of the cause named in

20    said caption.

21        Executed this 1st day of March, 2007.

22

23

24    LARELLE M. FAGUNDES, CSR 9762

25

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


MOYSE HOWARD, JR.,

        Plaintiff,

   vs.

NATIONAL RAILROAD PASSENGER
CORPORATION, dba AMTRAK;
STEVE SHELTON; PATSY HALL;
JOE DEELY; and DOES 1 through
15,

        Defendants.

_____/

No. C05-4069 SI




DEPOSITION OF JOE DEELY

February 15, 2007


PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
LaRelle M. Fagundes
CSR No. 9762

EXHIBIT B

1   if Jackson Lewis could have given us our documents

2   in January.  That would have been fabulous.  But

3   now we have an extension of time, I believe, till

4   sometime in March premised on the representation

5   that you were no longer the attorney of record for

6   this case.

7           MR. OBORNE:  Well, I don't know if that was

8   the representation.  There is a new lead counsel in

9   the Campbell case.  We can move on with this

10  deposition.

11          MS. PRICE:  Right.  And there's a new lead

12  counsel, and we don't have our documents, and we've

13  had to give the Jackson Lewis law firm an extension

14  of time until March because of that situation.

15          All right.

16  Q.      So, Mr. Deely, having focused your

17  attention on the Campbell matter, let me start by

18  asking you what your current position is.

19  A.      General superintendent civic division.

20  Q.      Okay.

21          And what areas, geographic areas, are

22  included in your -- in the Pacific division?

23  A.      Central California to Vancover, British

24  Columbia; east to Minot, North Dakota and to Grand

25  Junction, Colorado; and the San Francisco computer

1    please.

2                        (PLAINTIFF'S EXHIBIT NO. 41

3                        WAS MARKED FOR IDENTIFICATION.)

4              MS. PRICE:  For the record, we've marked as

5    Exhibit 41 a two-page document Bates stamped

6    D03866, D03867, which is on the subject of

7    probation.

8    Q.      If you could review that, and let us know

9    when you finish reviewing it.

10   A.      Okay.

11   Q.      Are you familiar with the statement of

12   policy reflected in Exhibit 41?

13             MR. OBORNE:  Objection.  Vague and

14   ambiguous.

15             THE WITNESS:  Yes, I am.

16             MS. PRICE:  Okay.

17   Q.      And is it your understanding that this does

18   not apply to managerial employees?

19             MR. OBORNE:  Objection.  Vague and

20   ambiguous.

21             THE WITNESS:  No.  My understanding is this

22   does apply to management employees.

23                        (PLAINTIFF'S EXHIBIT NO. 42

24                        WAS MARKED FOR IDENTIFICATION.)

25             MS. PRICE:  Okay.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.        Then directing your attention to what's

2    been marked as Exhibit 42, which, for the record,

3    is a policy statement regarding termination Bates

4    stamped D04049 through D04051, if you could review

5    that -- oh, it's dated revised February 2000.

6              If you can review that and let us know when

7    you finish reviewing it.

8    A.        Okay.

9    Q.        Are you familiar with the policy statement

10   for termination?

11             MR. OBORNE:  Objection.  Vague and

12   ambiguous.

13             MS. PRICE:  Q.   That we marked as Exhibit

14   42.  I apologize.

15   A.        Yes.

16   Q.        Were you familiar with it in August of

17   2004?

18   A.        Yes.

19   Q.        And was it your understanding that this

20   policy did not apply to managers?

21   A.        No.  It's my understanding the policy does

22   apply to managers.

23   Q.        Okay.

24             Did you have any discussion with anyone in

25   August of 2004 whether or not to place Mr. Howard

PATRICIA CALLAHAN & ASSOCIATES

<u>CERTIFICATE</u>

I, the undersigned, a Certified Shorthand Reporter, State of California, hereby certify that the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed this 1st day of March, 2007.

LARELLE M. FAGUNDES, CSR 9762

PATRICIA CALLAHAN & ASSOCIATES

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JOHN EARL CAMPBELL,

      Plaintiff,                                   )

vs.                               CASE NO.
                               C05-5434 MJJ(MEJ)
NATIONAL PASSENGER RAILROAD
CORPORATION dba AMTRAK, JOE DEELY,
and DOES 1-15, inclusive,



      Defendants.
_____/


DEPOSITION OF RICHARD BARROW

March 26, 2007


PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  (510) 835-3993
San Francisco, California (415) 788-3993
Castro Valley, California (510) 885-2371
Facsimile (510) 247-9775
WeReport@aol.com

Reported by:
LAURA AXELSEN
C.S.R. NO. 6173

**EXHIBIT D**

5

1           BE IT REMEMBERED THAT, pursuant to Notice of

2      Taking Deposition, and on Monday, March 26, 2007,

3      commencing at the hour of 10:23 a.m. of the said day, at

4      the offices of PRICE & ASSOCIATES, 1611 Telegraph

5      Avenue, Oakland, California, before me, LAURA AXELSEN, a

6      certified shorthand reporter, State of California,

7      personally appeared RICHARD BARROW, a witness in the

8      above-entitled court and cause, produced on behalf of

9      the plaintiff, who, being by me first duly sworn, was

10     then and there examined and interrogated by Attorney

11     PAMELA Y. PRICE, representing the offices of PRICE &

12     ASSOCIATES, 1611 Telegraph Avenue, Suite 1450, Oakland,

13     California, counsel for the plaintiff.

14

15                    APPEARANCES OF COUNSEL

16

17     FOR THE PLAINTIFF:

18

19          PRICE & ASSOCIATES

20          BY: PAMELA Y. PRICE, ESQ.

21          1611 Telegraph Avenue, Suite 1450

22          Oakland, California  94612

23     ////

24     ////

25     ////

7

1                    RICHARD BARROW,

2      having been duly sworn, testified as follows:

3              EXAMINATION BY MS. PRICE

4          MS. PRICE:   Q.    Okay.   Good morning,

5   Mr. Barrows.

6   A.      Good morning.

7   Q.      How you doing?

8   A.      I am tired like usual.

9   Q.      I see.  Do you work nights?

10  A.      I work a split shift, two days and two nights.

11  So my sleep pattern's always messed up.

12  Q.      Okay.

13  A.      And my whole life is harder than work.  So --

14  Q.      I see.  Well, I promise I won't keep you long.

15  I don't know about -- the process involves more than me,

16  but my part is fairly simple and straightforward.  We

17  talked last week, and you indicated you've not been

18  deposed before.

19  A.      Right.

20  Q.      But both Ms. -- someone from Ms. Maylin's office

21  and I have given you some information about the

22  deposition, but for the record, I need to go over some

23  of the procedures that are --

24  A.      Okay.

25  Q.      -- relevant.  The court reporter has placed you

18

1    A.      Yes.

2    Q.      Okay.  And at that point, do you recall whether

3    or not you had been served with a subpoena or contacted

4    by an investigator?

5    A.      No, that was the first time I had been contacted

6    by anyone.

7    Q.      Uh-huh.  Was in the telephone call?

8    A.      Yes.

9    Q.      Okay.  All right.  All right.  I want to direct

10   your attention to the matters -- we discussed two

11   matters on Friday.  One was with respect to people or

12   the practice of cutting the trucks on the yard.  Have

13   you had a chance to think about whether -- or have you

14   had a chance to think about who would -- withdraw that.

15           First, let me have you, for the record, can you

16   describe the practice of cutting the trucks on the yard?

17   A.        Okay.  The practice of cutting trucks out or

18   cutting out brakes usually happens when, for instance,

19   you try to move a piece of equipment, whether it's an

20   engine or a car, and maybe the equipment is damaged.  So

21   there will be damage to the air brake.  So meaning once

22   you couple up and hook the air brakes up, the brakes

23   won't release on that piece of equipment, and you can't

24   move it.  So it would be common practice to cut the

25   brakes out on that piece of equipment to be able to move

1    it to wherever they want you to move it to.

2    Q.      Okay.

3    A.      Or some cases there are pits in the yard that

4    have, you know, somewhere from five to, you know,

5    sometimes as far as five or ten feet drops, and you have

6    to go in between the cars over the pit to lace up the

7    air hoses, and then depending on, you know, your size,

8    whether you're a large person or a very petite person,

9    it could be dangerous to go in leaning over a pit,

10   hooking up air hoses, because literally one slip, you

11   can go down into a pit.

12        So especially prior to this incident, you know,

13   you used to see people, you know, in the old yard -- we

14   have a new yard that we moved into in '04.  So in the

15   old yard, you would definitely see people cut the trucks

16   out over the pit so they didn't, you know, lean over the

17   pit and pull the equipment off of the pit and then hook

18   the air hoses up and then cut the trucks back in and

19   then move the equipment the way it was supposed to be.

20   So it was common practice to cut the trucks.  Some

21   people I've seen just do it just to be lazy.

22   Q.      Uh-huh.

23   A.      You know, they didn't want to get in, hook air

24   hoses up, and they'll cut trucks out, just to take a

25   shortcut, but for the most part, it was either because

1    the equipment was damaged and they couldn't get it to

2    move or, you know, it was -- you know, they didn't want

3    to be leaning over a pit.

4    Q.        Uh-huh.

5    A.        And they would cut the trucks out.  So, you

6    know, that's pretty much common practice.

7    Q.        Okay.  Prior to the incident where Mr. Campbell

8    was fired, do you recall anyone else being counseled or

9    disciplined or warned -- well, take out disciplined.  Do

10   you recall anyone else being counseled or warned not to

11   cut out the trucks?

12            MS. MAYLIN:  Calls for speculation.

13            MS. PRICE:  Q.    You can answer.

14   A.        I don't know of it.  I don't know -- I'm not

15   aware that it was -- you know, I mean, obviously, I'm

16   aware that it was a rule, but I'm not aware that it was

17   being told specifically, look, don't cut these trucks

18   out or, you know, because they're -- I don't know how to

19   say it, but there are certain rules that get violated

20   daily that everybody pretty much is aware of, this

21   being -- kind of falling under that category, one of the

22   rules that it was, you know, it's a rule violation, but

23   it wasn't looked upon as a big deal.  So I never saw or

24   never personally was I instructed or have I ever seen

25   anybody else pulled aside, say, you know, don't cut

21

1   these trucks out.  It was kind of after that incident

2   where it became more of a big deal.

3   Q.      Uh-huh.  Before Mr. Campbell's termination, do

4   you have any information that indicates one way or the

5   other whether the managers on the yard were aware of the

6   practice?

7          MS. MAYLIN:  Calls for speculation.

8          THE WITNESS:  I'm not aware of it.  I'm not

9   aware of it.  I just -- again, I would have to speculate

10  that -- that -- okay.

11         MS. MAYLIN:  You can't speculate.

12         THE WITNESS:  I can't do that.  Well, I'm not

13  aware of it.

14         MS. PRICE:  Q.    Okay.  Did you -- during the

15  times when this practice was on-going, were there Amtrak

16  managers working on the yard?

17         MS. MAYLIN:  And this is just so vague and

18  ambiguous, calls for speculation.  It's way over broad

19  as to time.  You can go ahead and answer, if you can.

20         THE WITNESS:  Okay.  There are Amtrak managers

21  that were there at the time.  Now, of course, most of

22  the time, I worked the yard at 2:00, 3:00, 4:00, 5:00

23  o'clock in the morning.  So there aren't as many

24  managers as there are during the day.  There might be

25  one manager, and they're not constantly watching us

23

1    two separate departments.  There's mechanical

2    department, which is, you know, all the mechanics and

3    people that work on a train.  Then there's train and

4    engine department, which are engineers and conductors.

5    And I was not aware of a manager on duty for my

6    department, train and engine service, at that time.

7    Q.       Okay.  I asked you if you could identify by name

8    any persons that you recall in your experience who did

9    engage in the practice of cutting trucks.

10   A.       Right.

11   Q.       So do you have that information?

12           MS. MAYLIN:  It's vague and ambiguous, calls for

13   speculation.

14           THE WITNESS:  Yeah, I have.  Would you like me

15   to name some names?

16           MS. PRICE:   Q.   Yes, please.

17   A.       Okay.  Well, we can say Ray Clark, Anthony

18   Gilliard, Cynthia Hubbard, Mike Chapel, Kevin Mayberry,

19   Chris Clipper, Al Sturken.  I believe I've seen Mike

20   Howard cut trucks out.  And it's -- you know, those

21   are -- just I can just say pretty much across the board

22   any regular yard conductor that I've worked with over

23   the years at some point in time has cut trucks out, not

24   saying that it was a common practice for them to do it.

25   Some do it more than others.

PATRICIA CALLAHAN & ASSOCIATES, INC.

24

1    Q.        Uh-huh.

2    A.        But I've seen just about everybody do it at

3    least once.

4    Q.        Uh-huh.  Okay.  Well, let me direct your

5    attention to after -- well, tell me what you recall

6    about the July 24th, 2004, incident.

7              MS. MAYLIN:  Lacks foundation.

8              THE WITNESS:  This is the incident where the --

9    where the engine rolled?

10             MS. PRICE:  Q.    Yes.  Yes.

11   A.        Okay.  What I recall.  We had to go into the UP

12   diesel shop with -- I believe we had maybe two engines

13   shoving backwards, and Anthony Gilliard was the

14   conductor in charge of the move.  So he was basically my

15   eyes, giving me car counts and, you know, which would

16   dictate my speed and how I run, because I can't see.  So

17   I remember John was kind of maybe two or three tracks

18   over, and I believe he was setting up, like, the

19   equipment that we were going to eventually couple into

20   and getting that equipment ready for us to couple into,

21   after we coupled into these engines that we pulled out.

22             So Anthony was in charge of the movement.  He

23   gave me a back up sign, hand sign, a back up sign, and I

24   believe he gave me like a three or four car count,

25   meaning that we had, you know, three or four cars' worth

25

1    of space.  So proceed.  I backed up at a speed of about

2    five miles an hour, and as we went into a curve -- you

3    go into a slight right hand curve.  So Anthony would

4    have been out of my sight for, you know, approximately a

5    half a car, and I guess as we went into the curve --

6             MS. MAYLIN:  Okay.  You can't speculate.  You

7    can only testify to what you actually saw or

8    experienced.

9             THE WITNESS:  Okay.  So as we went into the

10   curve, Anthony had given me three or four car count, and

11   he went out of my sight for maybe two or three seconds,

12   and I heard John's voice on the radio saying -- yelling,

13   "That'll do.  That'll do," you know for me to stop

14   immediately.  As I heard his voice yell, "That'll do.

15   That'll do," we slammed into some equipment at about

16   five miles an hour.

17            MS. PRICE:  Q.    Uh-huh.

18   A.       Which is, you know, pretty hard jolt, especially

19   when you're not expecting it.

20   Q.       Uh-huh.

21   A.       And so after we hit this equipment, I sat in the

22   seat for about 10 or 15 seconds just trying to stay

23   calm.

24   Q.       Uh-huh.

25   A.       Not get mad, and after I kind of took a few deep

PATRICIA CALLAHAN & ASSOCIATES, INC.

26

1    breaths, I climbed down off the equipment, walked back
2    to where the collision had taken place, and I went and
3    talked to Anthony and said, "What happened?"  He said --
4    first thing he said was, "I'm sorry.  I wasn't paying
5    attention," and I cut him off, and I said, "I know
6    you're new, and I don't expect you to know how to do
7    this job or know how to do everything the way it's
8    supposed to be done, but I do expect you to pay
9    attention."
10   Q.      Uh-huh.
11   A.      And so I probably dropped some F bombs on him, I
12   think, and told him, you know, "You need to go home.  If
13   you can't pay attention, go home."
14   Q.      Uh-huh.
15   A.      "And John and I will finish it without you."
16   Q.      Uh-huh.
17   A.      And so I just remember after that, he went home,
18   and then John and I finished the job the rest of the
19   night.
20   Q.      Okay.  Did you move any other trucks that night?
21   A.      Can you --
22   Q.      Well, I mean, you were trying to move this
23   truck, right, so as in the work that you completed that
24   night, was that the last truck that you moved?
25   A.      No.  We still -- it was pretty early in the

PATRICIA CALLAHAN & ASSOCIATES, INC.

27

1   night, actually.  So we ended up moving -- you know, we

2   still had several trains to put together and engines to

3   bring out of the diesel shop to hook up to the train.

4   So we still had pretty much a good amount of work left

5   for the night.

6   Q.      Were you able to complete that work even though

7   Mr. Gilliard was gone?

8   A.      Yes.  We completed it and completed it early.  I

9   remember we completed it two or three hours early.

10  Q.      And was that the first time that you, as an

11  engineer, had, you know, moved trucks or made cuts and

12  did your regular work with just one conductor?

13  A.      No.  I've worked with several crews before that

14  where people have been sent home because they -- for one

15  reason or another, they just weren't safe to work with,

16  or they didn't -- weren't doing their job right, or a

17  guy got sick or something and -- or sometimes I've

18  worked with one person because that's all they had.  It

19  wasn't anybody on the extra board to call in.  So, you

20  know, that wasn't the first time or the last time --

21  Q.      Okay.

22  A.      -- that that's happened.

23  Q.      Okay.  All right.  Now, you're a friend of

24  Mr. Campbell's, correct?

25  A.      Yes.

PATRICIA CALLAHAN & ASSOCIATES, INC.

32

1   A.      Right, just based on, you know, coming in the

2   yard and knowing that there was an incident, because

3   once there's an incident in a yard, you know, you'll see

4   the equipment damaged, if there's like a side swipe, a

5   piece of equipment, you know, you can see like a big

6   dent in the side of a train car, and so, you know, the

7   bosses will tell you what happened, or, you know, maybe

8   the crew is still there when you come to work because

9   they're getting questioned, and, you know, you have to

10  go through drug test and, you know, urine test and type

11  of thing.  So they might still be there, and just by

12  talking to them, you know, talking to them, say hey,

13  man, what happened?  Hey man, what happened?  So I know

14  based on those types of things.

15  Q.      Uh-huh.  Following the July 24th incident, did

16  any member of management come and question you about

17  what happened that night?

18  A.      Yes, that morning when we got off work, which I

19  believe we got off work at I want to say 6:00 or

20  7:00 o'clock -- I can't remember the exact times of

21  those shifts, but it was 6:00 or 7:00 o'clock in the

22  morning.  We were about to go home, and Earl Friend, who

23  is now an engineer, but he was a road foreman at the

24  time, approached John and I and asked us about the

25  incident.

33

1    Q.        Did he take notes?

2    A.        I don't remember.

3    Q.        Were you ever asked to sign a statement?

4    A.        No.

5    Q.        To the best of your knowledge, was there any

6    damage to the equipment?

7    A.        There was none.

8    Q.        Okay.  Was anyone injured?

9    A.        No.

10   Q.        Okay.  And did Mr. Friend at that time when he

11   was talking to you say what the concern, if there was a

12   concern, what it was?

13   A.        Uh, when he talked to me specifically, no, I

14   think the more -- he was more concerned the fact that I

15   had told Anthony Gilliard I was going kick his ass if I

16   got fired.

17   Q.        Uh-huh.

18   A.        So that was pretty much his main concern, and I

19   had told Earl, like I, you know, when I see Anthony,

20   I'll apologize to him.  I just -- you know, but that was

21   more his concern.

22            MS. MAYLIN:  Objection, calls for speculation.

23   You just got to state what was said.  You can't

24   speculate about his concern.

25            MS. PRICE:  I object, Counsel, and I want

36

1  you finish your answer, please?  I'm sorry.

2  A.    Yeah.  So I remember he asked me what I had said

3  to Anthony.  I told him what I had said.  Then we talked

4  about why we sent Anthony home, which was I told him

5  Anthony had told me he wasn't paying attention, and

6  that's why we made the hard joint.  So that's why John

7  and I told him to go home, that if he couldn't pay

8  attention to what he was doing, that he needed to go

9  home, and we would do it ourselves, and that's the only

10  thing I really remember about the conversation.  I don't

11  remember anything else really.

12  Q.    At any time after that conversation and before

13  Mr. Campbell was fired, did any manager come to you and

14  ask you any other questions about that July 24th

15  incident?

16  A.    No, I've never been asked about it since that

17  day.  Earl Friend was the only one that I spoke to about

18  it.

19  Q.    Were you ever present on the yard when someone

20  refused to cut out a truck because -- stating that it

21  was because John Campbell was fired for doing so?

22  A.    Yes.

23  Q.    When was that?

24  A.    The last time was just -- what's the date?

25  Monday.  So it would have been Saturday.

37

```
 1    Q.      Okay.  And who was the person that refused to
 2    cut out the truck?
 3    A.      Brian Tavarez.
 4    Q.      What is his position?
 5    A.      Conductor.
 6    Q.      And who asked him to cut out the truck?
 7    A.      Mike Jordan, a mechanical coach yard foreman.
 8    Q.      Okay.  And what was your understanding of the
 9    circumstances under which Mr. Tavarez was being asked to
10    cut out the truck?
11            MS. MAYLIN:  Calls for speculation.
12            THE WITNESS:  He -- there was a car on a
13    specific track, which is called 9 track, that they
14    wanted us to move off of that track, but it was damaged.
15    Brian said, "How do you want me to move it because it's
16    damaged, and I can't -- and the brakes won't release?"
17    Mike Jordan said, "You can cut the trucks out and move
18    it," and Brian cut him off right mid sentence and said,
19    "That's not going to happen."  He said, "I'm not cutting
20    the trucks out, especially with what happened to John
21    Campbell."
22    Q.      What was Mr. Jordan's response, if any?
23    A.      Mike Jordan said, "Okay."  He said, "Well, don't
24    worry about it."  Then he gave us instructions on
25    something else to do.
```

38

1    Q.    Okay.  And was the equipment moved at any time

2    while you were on the yard?

3    A.    No.

4    Q.    Okay.  Prior to that incident on this Saturday,

5    do you recall an incident that occurred when David Gunn,

6    the president of Amtrak, was visiting the yard?

7    A.    Yes.

8    Q.    What do you recall about that event?

9         MS. MAYLIN:  Vague and ambiguous, lacks

10   foundation.

11        THE WITNESS:  We, my crew, which was the

12   conductor was -- I'm so bad with names.  Give me a

13   second to think of the names.

14        MS. PRICE:    Q.    That's okay.

15   A.    Don Magers, Tom Souza was the assistant

16   conductor, and I was the engineer.  So that was my crew.

17   The new yard hadn't opened yet.  So David Gunn and --

18   who was, you know, president of Amtrak at the time, and

19   his top assistant had come to Oakland.  I guess they're

20   on a tour of the west coast, and they had come to

21   Oakland and were going to see this new yard, and we had

22   to go over to the new yard and go into a shop area.

23   It's like a big shop area with, you know, doors, and

24   they can work on the locomotives and equipment inside

25   the shop area, and they wanted us to go in to inside

39

1    this house and pull out a locomotive that was in there.

2    They wanted to I guess take pictures and stuff like

3    that.

4         So as we went over there and went into the shop

5    to pull this locomotive out, it wasn't running, and the

6    specific locomotive is called a P42, and you can't get

7    the brakes to release on a P42 unless the engine is

8    running.  If it's not running, you have to hook up a

9    hose called main reservoir hose which will allow the

10    brakes to release.  On any other type of equipment, like

11    an F59, or, you know, all you have to do is hook up the

12    brake pipe, and even if the engine's not running, the

13    brakes will release.

14         But on this P42, you have to hook up the main

15    reservoir, or you have to get the engine to run in order

16    for the brakes to release.  So we hooked up to this

17    engine.  Don Magers and Tom Souza hooked up the brake

18    pipe, and they couldn't get the brakes to release.  Now,

19    I knew, you know, just having the experience, how to get

20    the brakes to release.  I just assumed they all knew

21    because there were mechanical -- other mechanical

22    foremen there.  And they couldn't get the brakes to

23    release on this engine.

24    Q.    Okay.

25    A.    So I was sitting in the locomotive, and Don

40

1   Magers came up to me and said, "The brakes won't

2   release.  They just told me to cut the trucks out."  And

3   this was maybe a few months after John had got fired,

4   and he said, "And I told them I'm not cutting the trucks

5   out because, you know, we just had somebody get fired,

6   and I'm not cutting the trucks out."

7          So I said, "Are you serious?  They just told you

8   to cut the trucks out?"  And I was kind of surprised

9   because, you know, we had the president of Amtrak there,

10  his top assistant.  Alphonso Bell was a mechanical

11  foreman at the time was there.  Dan Roberts was a

12  mechanical manager was there was the one who instructed

13  Don Magers to cut the trucks out.

14         And so -- and Dan Roberts and Alphonso then cut

15  the trucks out that we ended up pulling the engine out

16  and park the engine, and it was -- and so I just

17  remember we were just kind of baffled that, you know,

18  with all this stuff had just happened, and he was

19  instructed to cut the trucks out.

20         Now, I, you know, I knew all we had to do was

21  hook the main reservoir up and -- or get the locomotive

22  started and running, and I do remember they did not want

23  to start the locomotive because we were inside the

24  house.  So they were more concerned that this was going

25  to -- they didn't want exhaust fumes inside the house,

PATRICIA CALLAHAN & ASSOCIATES, INC.

41

1    and that was -- they were more concerned with starting

2    the engine up inside the house, and that's why they

3    wanted to cut the trucks out instead of actually

4    starting the engine and having the brakes just release

5    normally.

6    Q.      When you say inside the house --

7    A.      Right.

8    Q.       -- the house is the storage facility where the

9    engine -- the locomotive was stored?

10   A.      Right.  It's actually like a maintenance

11   facility where they -- you can park the engines inside

12   over a pit, and they can, like, work on wheels or in

13   changing out wheels, or it's where we have all the

14   actual wheels stored inside the house and where they do

15   all the mechanical changes on locomotives.  They work on

16   it inside what's called the house.

17   Q.      Okay.

18   A.      And there's maybe I want to say nine, ten, so

19   there's four tracks inside there where you can store

20   equipment.

21   Q.      Okay.  All right.  Did you see Dan Roberts cut

22   the brakes on the equipment?

23   A.      No.

24   Q.      Okay.  How do you know he did it?

25   A.      Don Magers told me.

42

1   Q.    Okay.

2   A.    He was on the ground. I was in the engine. So

3  they were on the ground, and Don Magers told me.

4   Q.    Okay. Did you hear Dan Roberts tell Don Magers

5  to cut out the trucks?

6   A.    No. He came up and told me. Don Magers came

7  and told me --

8   Q.    Uh-huh.

9   A.    -- "They told me to cut the trucks out, but I'm

10  not cutting the trucks out."

11   Q.    And did he -- he told you why he refused to cut

12  the trucks out?

13   A.    Yes.

14   Q.    What did he tell you?

15   A.    He said he wasn't cutting the trucks out because

16  John Campbell had just got fired for it, and he wasn't

17  going to get fired for it if something happened.

18   Q.    Okay. And you mentioned that there are other

19  rules that are commonly violated. Can you describe what

20  some of those are?

21   A.    Well, I'd say on a daily basis, you have

22  people -- you see people get off and on moving

23  equipment.

24   Q.    Uh-huh.

25   A.    There's an air brake rule, like when you shove

43

1    equipment, you're supposed to have a tail hose hooked up

2    to it so that you can make an emergency application

3    where the conductor can actually stop the movement

4    himself instead of relying on me.

5    Q.      Uh-huh.

6    A.      Like, for instance, you know, there's something

7    crazy happens, and they don't think I can stop the train

8    fast enough.  You know, there's an air or a tail hose

9    that they're supposed to have hooked up to the rear

10   where they're able to man it and make an emergency

11   application, doing what's called safety stops where you

12   stop maybe 50 feet prior to making a couple.  Lot of

13   times that rule's violated on a daily basis.

14          And I would say what I do as far as switching

15   goes, that's probably -- those are probably daily things

16   that are -- and prior to actually the, you know, the

17   incident with John, I think cutting the trucks out was

18   maybe not as frequent as those, but, you know, it was

19   pretty common that people would cut trucks out.

20   Q.      Uh-huh.

21   A.      That just became more and more uncommon after

22   John was terminated for it.

23   Q.      Okay.  Have you in your experience with the

24   company assigned to that yard noticed any difference in

25   the way that white guys who violate the rules are

PATRICIA CALLAHAN & ASSOCIATES, INC.

55

CERTIFICATE

1

2

3       I, the undersigned, a Certified Shorthand

4  Reporter, State of California, hereby certify that the

5  witness in the foregoing deposition was by me first duly

6  sworn to testify to the truth, the whole truth, and

7  nothing but the truth in the within-entitled cause; that

8  said deposition was taken at the time and place therein

9  stated; that the testimony of the said witness was

10 reported by me, a disinterested person, and was

11 thereafter transcribed under my direction into

12 typewriting; that the foregoing is a full, complete, and

13 true record of said testimony; and that the witness was

14 given an opportunity to read it and, if necessary,

15 correct said deposition and to subscribe the same.

16       I further certify that I am not of counsel or

17 attorney for either or any of the parties in the

18 foregoing deposition and caption named, nor in any way

19 interested in the outcome of the cause named in said

20 caption.

21       Executed this 6th day of April, 2007.

22

23

24 LAURA AXELSEN, C.S.R. 6173

25

PATRICIA CALLAHAN & ASSOCIATES, INC.

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JOHN EARL CAMPBELL,

      Plaintiff,

vs.

NATIONAL PASSENGER RAILROAD
CORPORTATION, dba AMTRAK,
JOE DEELY, AND DOES 1-15,
inclusive,

      Defendants.

_____/

CASE NO.
C05-5434 MJJ (MEJ)




DEPOSITION OF ANTHONY GILLARD

March 7, 2007



PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California   (510) 835-3993
San Francisco, California (415) 788-3993
Castro Valley, California (510) 885-2371
Facsimile (510) 247-9775
WeReport@aol.com


Reported by:
WENDY C. BROWN
C.S.R. NO. 5697

EXHIBIT E

4

1      BE IT REMEMBERED THAT, pursuant to Notice of

2  Taking Deposition, and on Wednesday, March 7, 2007,

3  commencing at the hour of 2:07 o'clock p.m. of the said

4  day, at law offices of PRICE AND ASSOCIATES, The Latham

5  Square Building, 1611 Telegraph Avenue, Suite 1450,

6  Oakland, California, before me, WENDY C. BROWN, a

7  Certified Shorthand Reporter for the State of

8  California, personally appeared ANTHONY GILLARD, a

9  witness in the above-entitled court and cause, produced

10  on behalf of the defendant, who, being by me first duly

11  sworn, was then and there examined and interrogated by

12  Attorney PAMELA Y. PRICE, representing the law offices

13  of PRICE AND ASSOCIATES, The Latham Square Building,

14  1611 Telegraph Avenue, Suite 1450, Oakland, California,

15  counsel for the plaintiff.

16

17              APPEARANCES OF COUNSEL

18

19  FOR THE PLAINTIFF:

20

21       PRICE AND ASSOCIATES

22       BY:  PAMELA Y. PRICE, ESQ.

23       The Latham Square Building

24       1611 Telegraph Avenue, Suite 1450

25       Oakland, California  94612

6

1                          ANTHONY GILLARD,

2          being first duly sworn, testified as follows:

3

4                    EXAMINATION BY MS. PRICE

5          MS. PRICE:          Q.   Would you state your

6   full name for the record, please.

7   A.        Anthony Gillard.

8   Q.        And Mr. Gillard, how do you spell your name?

9   A.        Last name?

10  Q.        Yes.

11  A.        G-i-l-l-a-r-d.

12  Q.        Okay.  We've been butchering your name up till

13  now.

14  A.        Gillard, I'm sure.  A popular one.

15  Q.        Geller, Gillard, I've seen multiple spellings.

16  So I appreciate you're finally here and you can tell us

17  what it really is supposed to look like.

18            What is your current occupation?

19  A.        Conductor.

20  Q.        And how long have you been a conductor?

21  A.        Three -- about three and a half years.

22  Q.        Before you were a conductor, what kind of

23  position did you hold?

24  A.        I was sales and service at a tire company.

25  Q.        So is the conductor position your first job with

11

1   before you answer the question.  Do you understand that?

2   A.      Yes.

3   Q.      Okay.  If I ask you a question and you answer

4   the question without telling me that you didn't

5   understand the question, then I will assume that the

6   answer you gave was true and correct; do you understand

7   that?

8   A.      Yes, I do.

9   Q.      Okay.  Is there any reason you know of that we

10  can't proceed with your deposition at this time?

11  A.      No, I don't.

12  Q.      Okay.  What did you do to prepare for this

13  deposition, if anything?

14  A.      Nothing.

15  Q.      Okay.  That's fine.

16          I'm here to -- one of the things I wanted to ask

17  you about is an event that happened on July 24th, 2004,

18  where you were working with Mr. Campbell.  Do you have

19  that event in mind?

20  A.      Yes, I do.

21  Q.      Okay.  Have you thought about that event since

22  somebody told you you were coming for a deposition?

23  A.      Yes, I have.

24  Q.      Okay.  All right.  Have you looked at any

25  documents about that event?

PATRICIA CALLAHAN & ASSOCIATES

12

1   A.      No, I haven't.

2   Q.      Okay.  Had anyone, prior to today, asked you for

3   a statement about what happened on July 24th, 2004?

4   A.      Yes.

5   Q.      Who asked you for that?

6   A.      Um, Ching Senaha and Ms. Maylin.

7   Q.      Okay.  All right.  Other than the lawyers, did

8   anyone from Amtrak ask you for any statements?

9   A.      No.

10  Q.      Now, did you become aware, prior to Ms. Maylin

11  and Ms. Senaha getting in touch with you, that there had

12  been an investigatory hearing about that -- about

13  something that happened on July 24th, 2004?

14  A.      Not -- not -- including me, no, I have never

15  heard anything about a hearing that was going on, no.

16  Q.      Did you know that Mr. Campbell was fired before

17  today?

18  A.      Yes, I did.

19  Q.      And how did you find out about that?

20  A.      Just rumors in the crew base, when you walk

21  through, you hear people saying, you know, so-and-so had

22  been fired.

23  Q.      How many times did you work with Mr. Campbell

24  before he was fired?

25  A.      Never.

13

1  Q.        Okay.  Well, you worked with him July 24th,

2  2004; is that correct?

3  A.        That's correct.

4  Q.        Is that the only time you worked with --

5  A.        That's the only time.

6  Q.        All right.

7            What do you recall about that night; did

8  something unusual happen that night, morning?

9  A.        Made a -- made a bad joint, and the equipment

10 started to roll a little bit, and -- I mean, that was

11 pretty much the major event of that night.

12 Q.        Okay.  Before that event, or before that night,

13 had you been working in the Oakland yard?

14 A.        Yes, I had.

15 Q.        Okay.  How long?

16 A.        How long had I been working?

17 Q.        In that yard, yeah.

18 A.        That was probably my third or fourth time in the

19 yard.

20 Q.        Okay.  Where did you normally work?

21 A.        On the road.

22 Q.        And what do you mean by that?

23 A.        On the trains.  I was an assistant conductor on

24 the trains.

25 Q.        And did you have a particular route?

```
 1              MS. PRICE:          Q.  Thank you, Mr. Gillard.

 2  And I appreciate that you listened to my instruction.

 3  If at any time you don't understand a question, you need

 4  to tell me that.  I don't need your lawyer to tell me

 5  that.  She can't tell me that.  Only you can tell me.

 6              So I'm asking you, that night of the event --

 7  you've testified that there -- the major event of the

 8  night was a bad joint, correct?

 9  A.          Correct.

10  Q.          What were you doing immediately before the bad

11  joint happened?

12  A.          I was on the point of the equipment that we were

13  moving to make the joint with the locomotive that was

14  sitting by itself.

15  Q.          Okay.

16  A.          And there was a slight curve on the track, and I

17  was giving the hand signs, and I looked back and noticed

18  that I was out of sight, but we were already really

19  close.  And I got on the radio said "Stop," and we had

20  -- Mr. Barrows plugged the train, which takes all the

21  air out and makes the brakes apply.  But at that point

22  we were right there, so when he plugged it, we probably

23  hit it at two and a half miles an hour, which is a legal

24  joint, but I don't know if it was the pin that didn't

25  make or if it was the knuckles didn't line up, but it
```

PATRICIA CALLAHAN & ASSOCIATES

19

1  caused it to hit and kind of start to move the other

2  piece of equipment, started blowing by itself.

3  Q.      Okay.  And what did you do then?

4  A.        As new as I was, I kind of panicked.  I got off

5  the equipment, didn't know what to do; I didn't know why

6  the equipment was rolling.  And that's when the trucks

7  had got cut back in and the equipment stopped.

8  Q.      Okay.  So where did you go when you panicked and

9  got off the train?

10 A.        I stood right there and watched the train

11 rolling, 'cause I had no clue why it was rolling,

12 'cause -- so I then was just kind of by the equipment at

13 the train that I was originally on, and was standing

14 there, and then the trucks got cut back in and the

15 equipment stopped, and that was that.

16 Q.      Okay.  Did you speak to anyone after you saw the

17 train rolling?

18 A.        Um, well, we all kind of conversed, everybody

19 that was there, myself, John Campbell, the engineer, and

20 I think that was originally the three of us started

21 talking, and then I was pulled aside by the diesel shop

22 foreman, Ron Ford.

23 Q.      Okay.  What do you recall about the conversation

24 where the three of you were talking, if anything?

25 A.        I don't remember what the conversation was

20

1  about.

2  Q.      Okay.

3  A.      I know the engineer was pretty upset because he

4  had just been in an incident several -- two, three weeks

5  prior, so he was upset because he didn't want anything

6  happen, because he had just gotten back from being on

7  the ground.  So I knew he was upset, but other than

8  that, like I said, you know, I didn't know what had

9  happened, because I had no clue why a piece of equipment

10  would be rolling.

11  Q.      Okay.  And then you say you had a conversation

12  with Mr. Ford?

13  A.      Yeah, because I was pretty upset, so Ron Ford

14  had pulled my me and said, "Don't worry about it.

15  Nothing was put on the ground, nobody was injured, no

16  equipment was damaged.  Don't worry about it."

17  Q.      Okay.  And okay.  And then do you recall being

18  sent home that night?

19  A.      Yes, I do.

20  Q.      Okay.  How long after your conversation with

21  Ron Ford was it that you were asked to go home?

22  A.      Um, 30, 45 minutes.  I don't remember the exact

23  time.  We had finished the moves with the locomotives,

24  and then we were doing another move, and that's when I

25  was sent home.

21

1  Q.      Okay.  Who sent you home?

2  A.      Uh, John Campbell.

3  Q.      What was your understanding of why you were sent

4  home?

5  A.      My understanding was that the engineer was

6  upset, and that John knew how to calm him down, and we

7  didn't have that much work left, and it was best I went

8  home because of the mistake, so ....

9  Q.      Okay.  And is that what Mr. Campbell said to you

10 before he sent you home?

11 A.      Yes, that I had been -- that Gaylin was upset,

12 and he knew how to calm him down, and that I -- you

13 know, go ahead and take -- go ahead and go home.

14 Q.      Okay.  Did you speak to anyone else other than

15 Mr. Campbell and Mr. Ford and Mr. Barrows before you

16 went home that night?

17 A.      No.

18 Q.      Okay.  And then who's the next person that spoke

19 to you about the event, the rolling of the locomotive?

20 A.      I was called about 7:00 in the morning by

21 Tim Sheridan.

22 Q.      Okay.  And what do you recall about that

23 conversation?

24 A.      Um, when I answered the phone, he said, "I want

25 to know what the F happened last night in the yard."

23

1  rather profane statement to you, correct?

2  A.      Yes.

3  Q.      Did you know what he was talking about?

4  A.      Yes, I did.

5  Q.      Okay.  So what did you tell him?

6  A.      I had told him that I was on the point, and that

7  we'd gone around the curve, and I got out of sight with

8  the engineer, and that I got on the radio and said

9  "Stop," and that we made a hard joint, and the equipment

10  started to roll.

11        And then he said, "Did" -- "Who cut out the

12  trucks?"  And I said, "I don't know."  And then he asked

13  if I'd cut out the trucks.  And I said, "I don't even

14  know what cutting out the trucks means."  And then he

15  said, "Next time you come into work, come in and talk to

16  me."

17  Q.      Okay.  Did you do that?

18  A.      Yes, I did.

19  Q.      When was that?

20  A.      You know, I don't remember.  It might have been

21  a day or two later.  I was on the extra board, so I was

22  on call, so I'm not exactly sure what day it was that I

23  got called back to work.

24  Q.      You think it was within a week of --

25  A.      Oh, yeah, definitely.

24

1   Q.      Okay.  When you went back to work the first time

2   you talked to Mr. Sheridan --

3   A.      That's correct.

4   Q.      -- tell me about that; what do you recall about

5   that conversation?

6   A.      He had -- basically, it was kind of a verbal

7   warning, I guess is what you'd call it.  He said, you

8   know, "You need to be a little more aware on the point

9   that you're going out of sight of the engineer and, you

10  know, this is why these kinds of things happen, and, you

11  know, that's" -- then he strictly said, "You don't cut

12  out trucks, and that's the reason why, right there," and

13  then that was it.

14          He just kind of gave me -- explained why that

15  rule was in -- why they had that rule, and be more aware

16  of my surroundings and ....

17  Q.      What was his demeanor?

18  A.      He was -- he was calm at that point, 'cause I

19  guess he had time to cool off from that morning.  He

20  kind of had a temper, so he had time to cool off, so he

21  seemed pretty calm.

22  Q.      Um-hum.  Did he say to you, "This is a verbal

23  warning," or did you --

24  A.      No, he did not.

25  Q.      How long had you been on the extra board at that

26

1   All he said was, "I'm cooled down now.  Don't worry

2   about it," and that was that.

3   Q.      Okay.  Now, after this event, did you learn what

4   it means to cut out the trucks?

5   A.      Yes, I did.

6   Q.      Okay.  What's your understanding now of what

7   that means?

8   A.      When you cut out the trucks, that basically

9   releases the brakes from the wheels, so it's free --

10  free rolling.

11  Q.      Um-hum.  Okay.  And have you ever been at work

12  on any other occasion in the yard where someone cut out

13  the trucks?

14  A.      Yes.

15  Q.      Okay.  On how many occasions?

16  A.      Uh, once.  I was actually instructed to cut out

17  the trucks.

18  Q.      Okay.  And is that the only time you can recall?

19  A.      That's the only time I can recall.

20  Q.      Who instructed you to cut out the trucks?

21  A.      It was the P.M. foreman, Lorraine -- I don't

22  know her last name.

23  Q.      Butler, Vanderstreet, something like that?

24  A.      I don't -- I don't know.  I just know her by

25  "Lorraine."

PATRICIA CALLAHAN & ASSOCIATES

27

```
1   Q.      Okay.

2   A.      She had asked if I can move a piece of

3   equipment.  They had been working on some valves that

4   actually dealt with the air system, and so you couldn't

5   make air on it, but there was air in it to have the

6   brakes applied.  So she wanted it moved from one end of

7   the yard to the other.  And I said I couldn't do it

8   because I couldn't cut out the trucks, and then she had

9   called one of my bosses, and they instructed it would be

10  okay so they could finish working on it, so I cut out

11  the trucks.

12  Q.      Was the woman Lorraine an African-American

13  woman?

14  A.      Yeah.

15  Q.      And when you cut out the trucks, what did you do

16  to do that?

17  A.      Well, I made the joint, and then once the joint

18  was made, I walked over, and there's just a little

19  handle -- they're all labeled, and it says, "brake

20  cut-out cock," and you just turn the angle cock and it

21  cuts them out.

22  Q.      And did you move the truck at that point, or did

23  someone else move it?

24  A.      I moved it once I had cut them out, yes.

25  Q.      And how far did you move it?
```

29

1  A.      No.

2  Q.      Okay.  How many times has he spoken to you in

3  that manner?

4  A.      In what manner?

5  Q.      Where he's warning you about some rule

6  violation.

7  A.      One other time.

8  Q.      Okay.  And when was that?

9  A.      That was prior to that incident, the -- I don't

10  know if it was a month, three weeks, two months.  It was

11  with Mr. Barrows and a conductor, and we were moving a

12  piece of equipment from the diesel shop, it was a

13  locomotive.

14         And we had walked over to get the engine, and

15  Mr. Barrows got on it, and it was coupled to another

16  engine, so I made the cut, and I started to back up.

17  And when he went to back up, he went to do his air test

18  once he started moving and realized that there was no

19  brakes.

20         And he said something on the radio, I'm not sure

21  what he said, but the conductor -- it was some

22  terminology that I didn't know, and the other conductor

23  knew what it was, went over and cut in the brakes.

24  Someone had cut out the brakes on the trucks and stopped

25  it.  And when it stopped it, he'd ran a switch.

PATRICIA CALLAHAN & ASSOCIATES

30

1   So when he told -- and I was at one end of the

2   yard, the conductor was at the other end of the yard

3   with the locomotive, and he didn't check the last

4   switch, so when he gave Gaylin the A-head symbol, hand

5   sign, Gaylin started to go ahead to come to me.  And so

6   he had already split the switch, so it put the engine on

7   the ground.

8   Q.      Okay.

9   A.      So we had to go in and do our drug tests and

10  stuff like that, and -- you know, he said that there was

11  nothing I could have really done being at the other end

12  of the yard, but he said, "Always have your eyes open,

13  and if something like that happens, always walk the

14  incident, around it, to make sure an incident like that

15  doesn't happen, where you split a switch behind you."

16  Q.      Okay.

17          I'm sorry, can you read back the last two

18  sentences of his answer?

19          (Record read.)

20          MS. PRICE:          Q.  When you say he told you

21  when something like that happens, always walk around it,

22  is the -- what are you referring to, or what was your

23  understanding of what he was referring to when he said

24  when "something like that happens"?

25  A.      When an incidence where a piece of equipment

46

1  saw him going towards that locomotive, yes.

2  Q.      Okay.  Did you see Mr. Ford at about that same

3  time?

4  A.      No, I did not.

5  Q.      Did you see Dave West --

6  A.      No, I --

7  Q.      -- at about that time?

8  A.      You know, I don't remember that.

9  Q.      Did you ever see Dave West running towards the

10 engine?

11 A.      I didn't even know who Dave West was until a few

12 days after that.

13 Q.      Okay.  After someone cut the truck in and the

14 engine stopped, did you apologize to Mr. Campbell?

15 A.      Yes, I did.

16 Q.      Okay.  What did you apologize for?

17 A.      For making the hard joint, and when it started

18 to roll -- you know, once everything got stopped, I

19 said, "I'm sorry, I should have known that I was out of

20 sight with the engineer."

21 Q.      Okay.  In your later conversation with

22 Mr. Sheridan, did you tell him that you thought that you

23 had done something that might have caused the incident

24 or even contributed to the incident?

25 A.      Me losing sight of the engineer?

47

```
 1        MS. MAYLIN:        Just listen to her question.
 2  She's asking what you said.
 3        THE WITNESS:        What I had said to
 4  Tim Sheridan?
 5        MS. PRICE:        Q.  Yes, sir.
 6  A.      I had told him that I had lost sight of the
 7  engineer --
 8  Q.      Um-hum.
 9  A.      -- and that I hadn't realized it -- he couldn't
10  see my lantern anymore, and that I should have gone to
11  my radio.
12         But we were -- at that point, we had -- we're
13  close where that's -- when I yelled "stop," when I
14  looked back and noticed that I was out of sight, and
15  then I said "Stop," and someone else had said "Stop" on
16  the radio, so when I talked to Tim Sheridan, I said, you
17  know, "I guess I should have noticed that I was out of
18  sight sooner."
19  Q.      Um-hum.  And what did he say about that, if
20  anything?
21  A.      He had said, "Yeah, that partially, you know,
22  you do have to be aware and you do need to notice and be
23  aware of your engineer all the time.  You've got to
24  actually glance and make sure they're still in sight.
25  But," he said, "the engineer is also supposed to stop
```

1  the minute you are out of sight."

2  Q.    Did Mr. Sheridan ever say anything to you

3  suggesting that it was improper for you to have gone

4  home that night?

5  A.    I don't remember him saying anything to me about

6  me being sent home.

7  Q.    Um-hum.

8  A.    I don't recall him saying that.

9  Q.    Okay.  You don't recall him asking you how you

10  got sent home or why you got sent home, or anything like

11  that?

12  A.    Once -- when he'd called me on the phone, and

13  once he had asked, you know, what had happened, and I

14  explained to him, you know, this is what happened, he

15  had said -- what did he -- you know, I don't -- he had

16  mentioned something about me being sent home, and I

17  said, you know, "I was told to go home."  And that was

18  -- that was pretty much it.

19  Q.    Um-hum.

20  A.    And he didn't bring anything else up about me

21  being sent home.

22      MS. PRICE:        All right, then.  Okay.  I

23  have nothing further.  Thank you very much.

24      THE WITNESS:        You're welcome.

25      MS. PRICE:        I appreciate your time.

50

# CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and, if necessary, correct said deposition and to subscribe to the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.  Executed this 1st day of December, 2003.

CERTIFIED SHORTHAND REPORTER
NO. 5697

PATRICIA CALLAHAN & ASSOCIATES

UNTIED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA


JOHN EARL CAMPBELL,

                    Plaintiff,

          vs.                               No. C-05-05434 MJJ

NATIONAL RAILROAD PASSENGER
CORPORATION, et al.,                        

                    Defendants.

_____/




DEPOSITION OF SUSAN VENTURELLI

March 23, 2007



PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
DEBORAH A. PIERSON
CSR NO. 7988

EXHIBIT G

10

<u>SUSAN VENTURELLI</u>

Being first duly sworn, testified as follows:


EXAMINATION BY MS. PRICE

MS. PRICE:          Q.  Would you state your full

name for the record, please.

A.  Susan Venturelli.

Q.  And what is your current occupation,

Ms. Venturelli?

A.  I am a human resources officer for Amtrak.

Q.  How long have you held that position?

A.  The title has change somewhat over the years, but

I've held that position since about 1992, 1993.

Q.  How long have you been with Amtrak?

A.  Nineteen years.

Q.  What position did you hold before you had this

position?

A.  I was a human resources assistant.

Q.  Where was your office located when you first

started?

A.  Los Angeles.

Q.  Where is it now?

A.  My office is now in Oakland.

Q.  What are your duties as a human resources person?

A.  My primary duty is recruitment.  I also do

1    A.    In a variety of ways, verbally, in the form of an

2    e-mail.   That would be all.

3    Q.    By whom?

4    A.    Either by myself or by the interviewers from the

5    department.

6    Q.    Do you have a recollection of how the ratings for

7    the position that John Campbell interviewed for on

8    July 7, 2004, were communicated to Mr. Preusser?

9    A.    No, I do not.

10   Q.    You don't recall if you gave him that information

11   or if someone else gave him that information; is that

12   correct?

13   A.    That's correct.

14   Q.    According to Exhibit 25-A, in the third paragraph

15   on page one, it indicates that the organization later

16   discovered that Patrick Preusser had a meeting with you

17   on Monday July 11, 2004, to discuss the potential

18   candidates that were to be selected.

19         Do you see that?

20   A.    Yes.

21   Q.    Is that true?

22   A.    To the best of my recollection, it would be true.

23   Q.    How was that meeting set up?

24   A.    I don't know or I don't remember.

25   Q.    Were you and Mr. Preusser the only ones present at

1    the meeting?

2    A.    Yes.

3    Q.    How long did the meeting last?

4    A.    I don't remember.

5    Q.    What do you recall about that meeting?

6    A.    Very little.

7    Q.    Tell us what you do recall, the little bit that

8    you do remember.

9    A.    Specifically, I don't remember anything.

10   Q.    But you do remember being there?

11   A.    When I saw it in your document or in this

12   document.

13   Q.    Yes, you saw it?

14   A.    I didn't remember having specifically met with him

15   in person.  I didn't really remember specifically

16   having met with him.

17   Q.    But now you do?

18   A.    Not directly, no, I really don't.  I'm sorry.

19   Q.    You don't have to apologize.

20        MS. MAYLIN:          You have to be real careful

21   about your testimony.  Just because you see something

22   written here, what Pam is asking you is your

23   recollection of events.  If you have a recollection,

24   give her your recollection, if you don't, tell her you

25   see it there in the paper, but you don't remember.

PATRICIA CALLAHAN & ASSOCIATES

104

1          (PLAINTIFF'S EXHIBIT NO. 35 WAS MARKED FOR

2      IDENTIFICATION.)

3          MS. PRICE:           For the record, Exhibit 35

4   appears to be a series of e-mails dated July 12, 2004,

5   to and from Ms. Venturelli.

6   Q.   If you could review that and let us know when you

7   are finished reviewing it.

8   A.   Okay.

9   Q.   All right.  What is this document?

10  A.   It's an e-mail.

11  Q.   Is it one e-mail or two?

12  A.   It appears that I forwarded this.

13  Q.   Looking at the one on the bottom, what are you

14  trying to communicate in this e-mail, the one that's

15  5:36 p.m. to Patrick Pruesser?  What is your purpose

16  here?

17  A.   Possible candidates for the vacancies we had to

18  fill.

19  Q.   Where did you get these names from?

20  A.   Our list of candidates, and this is kind of a

21  follow-up on the candidates, apparently, or candidates

22  we discussed.

23  Q.   Looking under Oakland, three positions, you have

24  four names there.  Why are those four names there?

25  What does that signify?

105

1    A.    Because they were all possible candidates.

2    Q.    Is there a reason why Mr. Campbell's name is not

3    there?  Do you understand what I'm asking you?

4    A.    Yeah.

5    Q.    No or yes?  I didn't hear you.  I'm trying to

6    determine why you have those four names listed under

7    Oakland.

8    A.    Because they were the possible candidates.  They

9    had not been disqualified based on their rule

10   violations.

11   Q.    Well, okay.  Are you saying that everybody else

12   had been disqualified except for these four?

13   A.    Well, you need to understand that all of the

14   candidates didn't apply for all of the jobs, and I

15   can't tell you which candidates may have applied for

16   more than one job.

17   Q.    I'm just trying to figure out, are you saying the

18   only reason why these people are listed is because of

19   all the people who applied for Oakland, these are the

20   ones who were not disqualified?

21   A.    That appears so.

22   Q.    You prepared the e-mail; you tell me.

23   A.    It's been three years, and I have not looked at

24   the records, so I cannot tell you everyone who applied.

25   Q.    That's not what I'm asking.

PATRICIA CALLAHAN & ASSOCIATES

1    A.    I understand that.

2          MS. PRICE:          Mark the record, please.

3    Q.    Do you have any idea why you listed those four

4    people under Oakland, other than what you testified to?

5    A.    After the selections were made by the department,

6    this DMV 3122 referred to forms that would be needed.

7    The DMV would be Department of Motor Vehicles, and the

8    3122 is a drug and alcohol authorization that allows

9    Amtrak to check on an applicant's drug and alcohol

10   history, as far as testing is concerned.

11   Q.    Is that your handwriting on the form?

12   A.    Yes.

13   Q.    All the handwriting that is there is yours?

14   A.    It looks like mine.

15   Q.    Is it your recollection that at the time you sent

16   the e-mail -- just looking at these four names under

17   Oakland, these people had been selected by the

18   department?

19   A.    Yes.

20   Q.    Directing your attention under Sacramento, there

21   are four names there.

22   A.    Yes.

23   Q.    Is it your recollection that these four people had

24   been selected by the department in Sacramento?

25   A.    Yes.

1    Q.    Then directing your attention to the section under

2    San Jose, two positions --

3    A.    Yes.

4    Q.    -- there are three names.  Is it your recollection

5    those three people had been selected by the department?

6    A.    Yes.

7    Q.    Going back to the interview process, when the

8    candidate emerges from the interview, does the

9    interview panel make a recommendation to the department

10    as to who it should hire?

11    A.    Yes.

12    Q.    How does it do that?

13    A.    Through the road foreman or the department

14    representative.

15    Q.    Are the names given to that person at the

16    conclusion of the interviews?

17    A.    That person writes them down and shares them.

18        MS. PRICE:        Mark the record, please.

19    Q.    Is there a form?

20    A.    No, there is not.  He writes them down or

21    transmits  the information verbally.

22    Q.    Do you have any recollection of who the interview

23    panel recommended be selected for the positions in

24    Oakland in 2004?

25    A.    I remember some.

108

1    Q.    Who?

2    A.    I remember the initial recommendations were

3    Debrice Gallo.  There was another candidate,

4    Diana Booker.

5         MS. MAYLIN:            Wasn't the question Oakland?

6         THE WITNESS:           Oh.

7         MS. PRICE:             Q.  Yes, ma'am.

8    A.    Let me amend my answer, then.  Debrice Gallo

9    applied for both locations.

10   Q.    Yes, ma'am.  Was she recommended for Oakland?

11   A.    She was recommended for either, Oakland and

12   San Jose, the two places she'd applied.

13   Q.    Anyone else that you can recall?

14   A.    For Oakland, Brice Carroll was recommended,

15   Heidi Snyder, Wes Duvall.  Those were the initial

16   recommendations that I remember, to the best of my

17   ability.

18   Q.    You don't remember John Campbell being recommended

19   for promotion to engineer at the conclusion of the

20   interviews?

21   A.    No, I don't.  I don't remember him not being

22   recommended, either.  Hmm, I think there was a general

23   consensus, just based on point totals.  I don't think

24   there was any formal decision about who was going to be

25   selected at that time.  The information was then going

1          MS. PRICE:                Q.   Is it your understanding

2    that in the selection process, if an employee has

3    safety violations, you don't consider those?

4    A.    It would depend on the severity of it and the time

5    elapsed.

6    Q.    Who makes the decision whether or not it should be

7    considered?

8    A.    That would be the department's decision.

9    Q.    Are you the person that gives the department the

10   information as to whether the person has safety

11   violations?

12   A.    No.

13   Q.    How does the department get the information?

14   A.    During the selection process, the department has a

15   record of the employee's attendance, his safety, as

16   well as discipline.

17   Q.    Directing your attention to Thanh Ly's name.

18   A.    Yes.

19   Q.    Did you type that information in there following

20   his name?

21   A.    I believe I did.

22   Q.    Where did you get that information?

23   A.    From the department.

24   Q.    Who told you this information?

25   A.    I don't remember.

115

1  Q.   Tell us what it means when you say, "Pending

2  determination as to whether the two FRA reportables

3  were safety violations -- no discipline re the FRA

4  reports."  What does that mean?

5  A.   A person who is injured on the job, under certain

6  circumstances, is an FRA reportable injury; maybe it's

7  cutting your finger, and if the person goes to the

8  hospital and requires certain medication, then it's

9  reportable.

10 Q.   Yes, ma'am.

11 A.   If we're talking about safety violations, that

12 means the person needs to be charged with that

13 violation.  If the person isn't charged, then he isn't

14 guilty of having a violation.  There has to be a

15 charge.

16 Q.   When you say, "Pending determination as to whether

17 the two FRA reportables were safety violations," does

18 that mean you are going to get some more information?

19 A.   I remember the department wanted to disqualify

20 Thanh Lee, and I challenged the department, because

21 when he mentioned a safety violation or an injury, I

22 said, "Wait a minute, we don't talk about injuries.

23 Was this a safety violation?  Was he ever charged?"

24 The answer was, "No, he was not charged."  So we

25 disregarded that.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.    Who told you the department wanted to disqualify

2    him?

3    A.    The department has a database they keep on

4    injuries and FRA reportables, and they advised me of

5    that.  I can't tell you which person it was.

6    Q.    Was it Patrick Pruesser that told you the

7    department wanted to disqualify Mr. Ly?

8    A.    I don't know; I believe so, to the best of my

9    memory.

10    Q.    Then it says, "Thanh also had a rule violation in

11    2001, which we discussed with Joe Deely, who deemed it

12    not serious enough for disqualification."

13    A.    Okay.

14    Q.    What does that mean?

15    A.    First of all, the rule violation was in 2001, so I

16    don't know for sure whether that was included within

17    three years or not.  Certain rule violations are so

18    serious that we want to be very cautious about

19    recommending somebody, choosing somebody who has such a

20    rule violation.  I don't remember what his rule

21    violation was.

22    Q.    Did you have a discussion with Joe Deely?

23    A.    I believe so.

24    Q.    What do you recall about that discussion?

25    A.    I recall only what I see written here.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.    And what was that?

2    A.    That we discussed the 2001 rule violation and that

3    Mr. Deely felt it was not serious enough to disqualify

4    Thanh.

5    Q.    Did he say why?

6    A.    No, not that I remember.

7    Q.    Why were you discussing the matter with Mr. Deely?

8    Why were you discussing Mr. Ly's promotion with

9    Mr. Deely?

10    A.    I can't remember.

11    Q.    What was Mr. Deely's position at the time?

12    A.    General superintendent.

13    Q.    Was there anyone else who participated in the

14    discussion?

15    A.    By the use of the word "we," I assume there is,

16    and since the e-mail is to Patrick Preusser, I'm going

17    to have to assume that he was part of that discussion.

18    Q.    We don't want you to assume anything.  You are

19    testifying under oath.

20    A.    Okay.  Because I do not remember specifically, I'm

21    giving you what I can give you in all honesty.

22        MS. MAYLIN:        Sue, the thing is,

23    speculating isn't an answer.  So you need to be able to

24    say and feel comfortable saying you don't recall.

25        THE WITNESS:        I don't recall.

1     MS. MAYLIN:          Otherwise, you lead Pam down

2     a road that she can't go, okay.

3     THE WITNESS:          I apologize.

4     MS. PRICE:          Q.   Directing your attention

5     to the San Jose paragraph, you have Debrice Gallo, and

6     you have some notes -- a lot of stuff after her name.

7     Starting with the typewritten information, did you type

8     that?

9     A.   Yes.

10    Q.   What does that mean?

11    A.   It means Debrice Gallo had a rule violation.  The

12    department felt it was not serious enough to disqualify

13    her, but that decision was overruled.

14    Q.   You have a handwritten note "overruled by

15    J. Commer J. Deally, D-e-a-l-l-y.

16    A.   It should be D-e-e-l-y.

17    Q.   So your handwritten note refers to Joe Deely

18    again?

19    A.   Yes.

20    Q.   And did you speak to Mr. Deely about Ms. Gallo's

21    promotion?

22    A.   Yes.

23    Q.   What did he say?

24    A.   He said that, "I'm very concerned about the rule

25    violations and the injuries in our division.  I have to

119

1   send a very strong message that it won't be tolerated."

2   Q.   Okay.  What did you say?

3   A.   With regard to the three years that he felt was

4   necessary, I said, "That's a long time," and he

5   responded that he just was very intent on improving the

6   safety record, improving the operating rule compliance,

7   and he felt that was the only way that the employees

8   would understand how serious we took that.

9   Q.   Anything else that you recall about the

10  conversation with you and Mr. Deely?

11  A.   No.

12  Q.   Was anyone else present?

13  A.   I don't remember.

14  Q.   Did your conversation with Mr. Deely take place in

15  person or on the phone?

16  A.   I remember it was in person.

17  Q.   Did you discuss with Mr. Deely the fact that

18  Mr. Collins had agreed that it was not serious enough

19  for disqualification?

20  A.   I may have discussed that with him; I can't

21  remember specifically.

22  Q.   Did you subsequently learn that Ms. Gallo had been

23  promoted?

24  A.   Excuse me.

25  Q.   Did you subsequently learn that Ms. Gallo had been

121

1    months was as much as the national group would agree

2    to.  His preference or the national preference was for

3    three years, but there was not total agreement on that.

4    Q.   When you say he told you that the national

5    preference was for three years, what does that mean?

6    What is your understanding of what that means?

7    A.   My understanding is that in order to be promoted

8    to a rule-oriented, dangerous job, a person should not

9    have any rule violations, serious rule violations in

10   the last three years.

11   Q.   How is it that people -- for instance, with

12   Mr. Ly, how is it that Mr. Deely is able to say that

13   his rule violation was not serious enough for

14   disqualification, if there's a rule for three years?

15        MS. MAYLIN:          Calls for speculation.

16        THE WITNESS:         I have very limited knowledge

17   of operating rules.   That needs to be decided by

18   people who are experts in the rules.

19        MS. MAYLIN:          Is the answer you don't know?

20        THE WITNESS:         I don't know.

21        MS. MAYLIN:          If you can, just give your

22   answer.  You don't need to qualify all of your answers.

23        THE WITNESS:         Thank you.

24        MS. PRICE:           Q.  When you discussed

25   Ms. Gallo with Mr. Deely, did you raise with him the

PATRICIA CALLAHAN & ASSOCIATES

1    fact that he was willing to waive the three-year rule

2    for Mr. Ly but not for Ms. Gallo?

3    A.    No, I didn't.

4    Q.    Was Mr. Thomas Goosetree involved at all in the

5    selection of the employees for the Oakland position?

6    A.    Not to my knowledge.  Let me correct that.  If a

7    person was selected for an Oakland position,

8    Mr. Goosetree was a manager from San Jose, so if

9    employees worked in San Jose, then he would have been

10    responsible, as the direct supervisor, for completing a

11    background check.  But as far as being in the selection

12    of that person as part of the interview, I would say

13    no.

14        MS. PRICE:          Let's mark this as the next

15    in order.

16        (PLAINTIFF'S EXHIBIT NOS. 36 AND 37 WERE

17        MARKED FOR IDENTIFICATION.)

18        MS. PRICE:          For the record, we've marked

19    as Exhibit 36 a Background Check for Internal

20    Candidates for Brice Carroll, dated June 4, 2004, and

21    for Exhibit 37, a Background Check for Internal

22    Candidates, also dated June 4, 2004, for John C.

23    Hansen.

24    Q.    If you could look at those and let us know when

25    you have finished reviewing them.

123

1    A.    I'm finished.

2    Q.    Have you ever seen those before?

3    A.    Yes.

4    Q.    Did you receive those as part of the selection

5    process in 2004 for the engineer's position?

6    A.    Yes.

7    Q.    What role, if any, does the supervisor's

8    evaluation of the employee in section four play in the

9    selection of the person for the position?

10   A.    We take it into consideration.

11   Q.    Who is "we"?

12   A.    I guess me.

13   Q.    What do you do with the information?

14   A.    I share it with the department, the hiring

15   department.

16   Q.    In 2004, do you recall sharing the information

17   from Mr. Goosetree's evaluation of Brice Carroll with

18   anyone from the department as part of the selection

19   process?

20   A.    No, I don't.

21   Q.    Is it true that a rating of two means the person

22   is below average?

23   A.    That's correct.

24   Q.    Do you recall any discussion about why the

25   department would promote Brice Carroll, given his

124

1  supervisor's evaluation of his performance was below

2  average?

3  A.    He interviewed well.

4  Q.    Anything else?

5  A.    As I said, I don't recall sharing this

6  information, and I don't recall seeing the information.

7  It's been three years.

8  Q.    Do you recall Brice Carroll's interview?

9  A.    Yes.

10  Q.    Was it your impression that he gave a good

11  interview?

12  A.    Yes.

13  Q.    Do you recall John Campbell's interview?

14  A.    Yes.

15  Q.    How would you describe his interview?

16  A.    He gave a good interview.

17  Q.    You mentioned earlier that you took some steps to

18  ensure better tracking of applicants in the wake of the

19  consent decree.  What did you mean by that?

20  A.    Amtrak began using a new system, SAP, for all

21  employee records, for business, for all sorts of

22  applications.

23        The recruitment module in the SAP system was very

24  extensive, and as a company, we opted to enter everyone

25  who applied in that SAP system to provide better

125

1    tracking.

2    Q.    When did you start doing that?

3    A.    2000.

4    Q.    So anyone who applied for a position after 2000,

5    or in 2000 and thereafter, would be included in this

6    SAP system?

7    A.    Yes.

8    Q.    Would the system indicate whether they worked for

9    the company or not?

10    A.    Yes.

11    Q.    If you're in the SAP system as a current employee

12    and you applied for a position after that, would your

13    name come up as a current employee?

14    A.    It should.    It comes up as a possible match; but

15    often there's no way to tell if the match and what we

16    have in SAP is talking about the same person.

17    Q.    Is this like a database?

18    A.    Yes.

19    Q.    Does it keep track of how many times a person

20    applies for a position?

21    A.    Yes.

22    Q.    Does it keep track of what positions the person

23    has applied for?

24    A.    Yes.

25    Q.    So when a person submits a new application, if

126

1    their name is in the system, will their name come up?

2    A.   If it's spelled the same, yes.

3    Q.   If the name comes up, what information will the

4    system give you about that person?

5    A.   The person's current address -- this is a new

6    system -- jobs that person has applied for, location of

7    the jobs the person has applied for, the phone number,

8    the recruiter associated, I believe, with previous

9    vacancies.  That pretty much covers it.

10   Q.   Who manages this SAP system, if anyone?

11   A.   It's managed at the corporate level.

12   Q.   By a person?

13   A.   Well, it's a very complex system, so there are --

14       MS. MAYLIN:           She's not asking about the

15   complexity; she just wants to know about who manages

16   it.

17       THE WITNESS:          I don't know the name of the

18   person that manages it.

19       MS. PRICE:            Q.  Is there a position or a

20   person that manages it?

21   A.   Various IT employees, as well as consultants,

22   various HR personnel.

23   Q.   Is there anyone in your department who has access

24   to this system?

25   A.   Everyone in my department has access to the

1   system.

2   Q.   Including yourself?

3   A.   Yes.

4   Q.   How do you access the information in the system?

5   A.   By putting in the person's name and doing a

6   search.

7   Q.   Who inputs the names of the applicants or the

8   information about the applicants?  Is that done by

9   someone in your department or somewhere else?

10       MS. MAYLIN:         Calls for speculation.

11       THE WITNESS:         The applicant information is

12  input by various human resources staff.  Information

13  for internals and externals is handled by, primarily,

14  personnel specialists or human resources specialists.

15  Applicant data on the recruitment side is handled

16  primarily by the recruiters.  Information from the

17  administration side for employees can transfer over to

18  the recruitment side of that application.

19       MS. PRICE:          Q.  Explain to me what you

20  mean by internals and externals.

21  A.   An internal candidate is a person who works for

22  Amtrak.  An external applicant is a person who does not

23  work for Amtrak at the present moment.

24  Q.   Are recruitments for internal candidates, is that

25  information input into this SAP system?

12-15-03;15:02  ;AMTRAK OAK TNE DEPT                          ;510 433 5635           # 2/  6

NATIONAL RAILROAD PASSENGER CORPORATION
530 Water Street, Oakland, CA 94607



## BACKGROUND CHECK FOR INTERNAL CANDIDATES

To: Mr. Steve Shelton                     Date: December 12, 2003
From: Paul Ho, Human Resources            Subject: Yacouetti
                                          SSN: ▮▮▮▮▮▮▮▮▮

The aforementioned employee from your department is being considered for the position of **Locomotive Engineer Trainee** in Oakland, CA. We would appreciate your evaluation of this employee.

1. How much time has employee taken in last 12 months.
   Absences _26_ Tardies _0_ Early Departures _0_
   Has employee been counseled in these areas? Yes _____ No _____
   Form of counseling: _____.

2. Has employee had any safety violations in the past 12 months?
   Yes _X_ No _____. If yes, please indicate number and reasons.

3. Has employee ever been in any disciplinary proceedings?
   Yes _X_ No _____. If yes, please explain.

4. Performance factors: Please evaluate employee in the following areas.

   GRADE FOR SKILL LEVEL AND PERFORMANCE FACTORS:
   1=Poor  2=Below Average  3=Average  4=Above Average  5=Superior

   _3_ Work Performance            _3_ Interpersonal Skills
   _2_ Communication Skills        _1_ Motivation
   _3_ Customer Service            _2_ Stress Management
   _2_ Maturity & Judgment

Signed _SC Shelton_          Title _Asst. supt._        Date _12-15-03_

Please email or fax this form to **213.576.5566** ASAP. Thank you for your cooperation.

D03646

"38"

**Venturelli, Susan**

| | |
|---|---|
| **From:** | Venturelli, Susan |
| **Sent:** | Monday, July 12, 2004 5:52 PM |
| **To:** | Duffy, Tim; Hanna, Barbara; Preusser, Patrick; Collins, Mark |
| **Subject:** | FW: Engineer Selections |

-----Original Message-----

| | |
|---|---|
| **From:** | Venturelli, Susan |
| **Sent:** | Monday, July 12, 2004 5:36 PM |
| **To:** | Preusser, Patrick |
| **Subject:** | Engineer Selections |

**Oakland (3 positions)**

~~Bruce Carroll~~

~~George Schirna~~

**John Hansen**

Alternate: ~~Patrick Duncan~~

**Sacramento (4 positions)**

~~Michael Yacovetti~~

~~Heidi Snyder~~

~~Wesley Duvall~~

~~Thanh Huynh~~ Pending determination as to whether the 2 FRA reportables were safety violations--no discipline re the FRA reportables) Thanh also had a rule violation in 2001 which we discussed with J. Deely who deemed it not serious enough for disqualification.   *not safety violations.*

Alternate: ~~Patrick Duncan~~

**San Jose (2 positions)**

**Debrice Gallo** (Rule violation of 4/03 was discussed with M. Collins who agreed it was not serious enough for disqualification.) *Overruled by J-Commer, J. Deally*

~~Timothy Filippo~~

Alternate: ~~....~~

1

D05786

AMTRAK - CHILLER        Fax:408-271-4994         Jul  2 2004  15:52        P.07

05/08/2004  11:01    5104335919                                                PAGE  14

Amtrak®

## BACKGROUND CHECK FOR INTERNAL CANDIDATES

TO: *Tom Gooretree*    DATE: June 4, 2004

FROM:    Susan Venturelli, HR Officer

SUBJECT:    *Brice Carroll*
SSN:
DATE OF HIRE:

The aforementioned employee from your department is being considered for the position of
Passenger Engineer Trainee. We would appreciate your evaluation of this employee.

1.    How much time off has employee taken in the last 12 months?
      Absences _13_    Tardies_____    Early Departures_____
      (Please indicate if the above are excused or unexcused)

      Has employee ever been counseled in any areas listed above?
      Yes: _/_        No:_____
      Form of Counseling:    *LETTER ATTENDENCE*

2.    Has employee had any safety **violations** in the past 12 months?
      Yes:_____        No:_____
      If yes, please indicate number and reason(s):

3.    Has employee ever been disciplined?
      Yes:_____        No:_____
      If yes, please explain in detail

4.    Performance Factors: (Please evaluate employee in the following areas)

      _2_  Work Performance           _2_  Interpersonal Skills
      _2_  Communication Skills        _2_  Motivation
      _2_  Customer Service            _2_  Maturity & Judgment
      _2_  Stress Management

## GRID FOR SKILL LEVEL AND PERFORMANCE FACTORS:

1 = Poor    2 = Below Average    3= Average    4= Above Average    5= Superior

Signed:_____    Title: *DIRECT OF OPS*    Date: *2-2-04*

Please fax this form to ATS 764-5919. Thank you for your cooperation.

EXHIBIT
36

D06814

1                           <u>CERTIFICATE</u>

2

3

4          I, the undersigned, a Certified Shorthand

5     Reporter, State of California, hereby certify that the

6     witness in the foregoing deposition was by me first

7     duly sworn to testify to the truth, the whole truth,

8     and nothing but the truth in the within-entitled cause;

9     that said deposition was taken at the time and place

10    therein stated; that the testimony of said witness was

11    reported by me, a disinterested person, and was

12    thereafter transcribed under my direction into

13    typewriting; that the foregoing is a full, complete and

14    true record of said testimony; and that the witness was

15    given an opportunity to read and, if necessary, correct

16    said deposition and to subscribe the same.

17         I further certify that I am not of counsel or

18    attorney for either or any of the parties in the

19    foregoing deposition and caption named, nor in any way

20    interested in the outcome of the cause named in said

21    caption.

22         Executed this 2nd day of April 2007.

23

24

25                        _____
                          DEBORAH A. PIERSON
                          CSR No. 7988

                    PATRICIA CALLAHAN & ASSOCIATES

D. Campbell 11/8/06



# Locomotive Engineer Interview Booklet 2003

D08676

Human Resources                    December 2003

**EXHIBIT K**

## AMTRAK LOCOMOTIVE ENGINEER INTERVIEW INSTRUCTIONS

Part 1:  Pre-Interview Activities

DO:

1) Review the candidate's application form, resume, work record, and other supporting documentation, and take notes on any specific areas of inquiry you might want to focus on in the interview
2) Make sure the candidate's records indicate that s/he has completed all pre-interview testing (administered by Amtrak Human Resources)
3) Make sure that you identify a room for your interview that is comfortable (seating arrangements, temperature, etc.) and that will feature minimal interruptions
4) Turn off cell phones, pagers, etc. for the duration of the interview
5) Focus your attention on the interview during your time with the candidate – minimize other work distractions and interruptions
6) Let the candidate do most of the talking – if you are talking 40% or more of the time, you are talking too much
7) Take notes during the interview – complete the rating form provided, making notes and providing written justification for your numerical ratings

DO NOT:

1) DO NOT use a telephone interview to substitute for a face-to-face interview
2) DO NOT ask interview questions that are not job-related, or that focus on inappropriate and/or unlawful areas of inquiry (i.e., marital status, family size, physical condition, etc.)
3) DO NOT "Squeeze-in" an interview while you are busy with other work activities – you are responsible for helping Amtrak make a smart, long-term employment decision about the candidate in question (not to mention the training dollars that will be spent preparing the individual to become a Locomotive Engineer)
4) DO NOT DOMINATE THE INTERVIEW – ask the questions provided, ask questions based on your review of the candidate's background, and let the candidate "sell" you on his/her merits for the position
5) DO NOT SUBMIT INCOMPLETE RATING FORMS OR OTHER PAPERWORK – please help the interview process flow smoothly by accurately (and legibly) completing the paperwork that is part of the process

D08677

<u>Part 2: Conducting the Interview</u>

1) Welcome the candidate to the interview process
   - Introduce yourself
   - Thank the candidate for his/her interest in the position
   - State that the interview will last approximately 45 minutes
   - Go through a safety briefing (exits, emergency procedures, etc.)

2) Ensure that the candidate has completed the "Realistic Job Preview" for the position of Locomotive Engineer, and has a signed "RJP Certification Form" and a signed "Engineer Task Checklist" for you
   - IF YES – PROCEED WITH THE INTERVIEW
   - IF NO – HAVE THE PERSON COMPLETE THE RJP, SIGN THE RJP CERTIFICATION FORM AND THE ENGINEER TASK CHECKLIST, THEN PROCEED WITH THE INTERVIEW

3) Conduct the Interview for the candidate
   - Complete the "Rating Booklet" contained in the following pages
   - Make careful notes documenting your ratings
   - Follow the instructions provided

<u>Part 3: Post-Interview Activities</u>

   - Review the notes you have made for each question, and indicate the candidate's score on each item
   - Transfer the candidate's score on each item to the "Candidate Interview Performance" matrix, and sum the candidate's scores
   - Provide your rating of the candidate's "Overall Suitability" in the space provided
   - Work with your interview team to determine a "team rating" of the candidate's overall suitability, and indicate same in the space provided
   - Sign and date the final page of the rating booklet
   - Notify _____ of your decision about the candidate, and forward all written documentation of the interview (the interview booklet, any notes, and any candidate materials) to _____ in the Human Resources Department

D08678

# LOCOMOTIVE ENGINEER RATING BOOKLET

## STEP 1:  OPENING THE INTERVIEW

**SAY:**

"Hello.  You must be ____(candidate's name).  My name is _____, and I am the ___(your position title)_____.  I am looking forward to speaking with you today regarding your interest in the position of Locomotive Engineer".

"Our interview time will last about 45 minutes today.  You will be free to ask questions at the end of our interview period.  Our interview time will allow me to learn a little bit more about your background, and why you are interested in the position of Locomotive Engineer".

Before we get started, let me go through a Safety Briefing with you.  Our nearest exit is __(describe____), and a telephone for emergencies is ___(describe)___ .  If we need to convene outside of the building, let's meet at the ____(describe landmark)___ .  Is there anything I have forgotten in the safety briefing?"

"Is there anything you need before we get started – would you like some water or anything?"  (ATTEMPT TO MAKE THE INTERVIEWEE AS COMFORTABLE AS POSSIBLE)

## STEP 2:  CONDUCTING THE INTERVIEW

_Ask the following questions verbatim._  Listen carefully to the candidate's responses, making notes in the spaces provided.  Circle any of the "Themes to Look For" that are mentioned by the candidate.

D08679

## Question #1:  Review of Realistic Job Preview

"Before we begin – have you completed the  "Realistic Job Preview" for the position of Locomotive Engineer, and do you have a signed "RJP Certification Form" and a signed "Engineer Checklist" for me?

CHECK:        ☒ "YES" -- proceed with the interview

☐ "NO" -- STOP THE INTERVIEW

(If the person answers "No" to the above question, OR DOES NOT HAVE A SIGNED RJP CERTIFICATION FORM OR TASK CHECKLIST WITH THEM, notify them that they were supposed to do this prior to the interview.  Have the candidate review the RJP, have them sign the appropriate paperwork and submit it to you, then proceed with the interview.

Notes:_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

D08680

## Question #2: Work Background

"Tell me a little bit about your background – where did you go to school, and what is your work experience (both with Amtrak and prior to joining Amtrak)".

| 3  | 2 ☐ | 1 ☐ |
|---|---|---|
| Has a wide variety of prior job experiences, each with important responsibilities; has Amtrak experience(s) that will enhance his/her transition to becoming a Locomotive Engineer | Has a solid track record of previous employment, and has moved to positions with additional responsibilities throughout his/her career; prior Amtrak experience(s) will not facilitate his/her transition to becoming a Locomotive Engineer | Has very limited work experiences; does not show a history of moving to positions with increased responsibility; has held predominantly lower-level employment; Amtrak experience is very limited and irrelevant to the position of Locomotive Engineer |

NOTES: 8 YRS TRACK DEPT. S.P. AMTRAK
PROMOTED 1999, BABY BULLET PROJECT PCS
1992 TO 1998 CDL LICENSED

D08681

## Question #3;  Why Interested in Becoming an Engineer?"

"Why are you interested in becoming a Locomotive Engineer with Amtrak?"

**Probing Questions:**
Why do you think you would be a good Locomotive Engineer?
What characteristics do you have that you feel would make you a successful Locomotive Engineer?

| 3☐ | 2  | 1☐ |
|---|---|---|
| Expresses an interest in and affinity for the work of an Engineer; wants to take on the responsibilities associated with being an Engineer; describes how his/her characteristics will allow them to be effective in the role; shows evidence of understanding the challenges outlined in the "job preview", and is willing to take on these challenges | Expresses confidence in his/her ability to perform the duties of Engineer; shows a willingness to work under the job conditions outlined in the "job preview", but does not elaborate on how their personal characteristics will allow them to perform well as an Engineer | Shows little evidence of understanding the duties or responsibilities of a Locomotive Engineer; does not demonstrate an understanding of the job environment of the position, and does not describe "why" they are likely to be successful in the position |

NOTES: EXPERIENCED OPERATING LARGE EQUIPMENT

D08682

## Question #4:  Locomotive Engineer Training Program

"Becoming a Locomotive Engineer requires an extensive training program – both in classroom settings and on-the-job training out in the field.  Give an example of when you have had to complete a rigorous training program, either in your work experience or at school"

**Probing Questions:**
Describe the training program?
What were some of the challenges of the training program?
Was the training program in a classroom or in the field, and which did you prefer and why?

| 3 ☐ | 2 ▨ | 1 ☐ |
|---|---|---|
| Describes a complex, multi-faceted training program that was completed at work, school, or the military; demonstrates solid performance in both classroom and field training settings; previous experience demonstrates that they are likely to perform well in the training program | Describes the completion of a multi-stage training program of medium scope, and/or describes strong academic performance in school; past experience should allow them to successfully complete the Locomotive Engineer training program | Is not able to describe a past training and/or educational experience where they have demonstrated the ability to learn in classroom or field settings; has a poor record of academic performance; past experiences shed doubt on their ability to successfully complete the training program |

NOTES:  A/C TRAINING WITH AMTRAK

FOREMAN CLASS - FOREMAN @ WARMSPRINGS

PREPERS FIELD TRAINING

OUT TRAINING FOR MAINT, WAY EQUIPMENT

D08683

## Question #5:  Ability to Work Extended Hours

"Working as a Locomotive Engineer means being on-the-job for extended hours, including night, weekend, and holiday work.  How will you accommodate the demands of this type of schedule?"

**Probing Questions:**
Describe a situation when you had to work on a night, weekend, or holiday?
How would you adapt to a night, weekend, or holiday schedule?

| 3 | 2 | 1 |
|---|---|---|
| Relates past job experiences with shift work, extended hours, and/or weekend duty; demonstrates that they have thought through the challenging work schedule of an Engineer, and are willing to adapt to the demands of such a schedule | Does not have experience with extended hours or shift work, but demonstrates that they have thought-through the challenges of such a work schedule, and are willing to adapt to the demands placed by such a schedule | Has no experience with extended hours or shift work, and does not convey that they are willing to make the sacrifices necessary in such a work schedule (i.e., unwilling to be away from home, to work weekends, etc.) |

NOTES:   DOES NOT FEEL EFFECTED BY SHIFT WORK, WILLING TO WORK WEEKENDS

D08684

## Question #6:  Comfort and Experience with Heavy Machinery

"Working as an Engineer involves, of course, operating the locomotive.  What kinds of experiences do you have operating heavy machinery, or being in job settings that featured heavy equipment and/or machinery?"

**Probing Questions:**
What situation were you in when you operated heavy machinery?
What did you like or dislike about working with heavy machinery?

| 3 ▣ | 2 ▢ | 1 ▢ |
|---|---|---|
| Describes past job experiences where s/he has operated heavy machinery, and/or describes past work settings that have featured the noise,  heat, and "feel" of heavy equipment or machinery | Does not have work experiences with heavy equipment or machinery, but shows evidence of thinking through the job environment created by such machinery, and displays confidence that s/he will enjoy such settings | Has no experience with heavy equipment or machinery, and does not express an interest in learning about or working with such equipment; conveys that s/he would be uncomfortable in such settings |

NOTES:  _WORK TRAINS   MAINT.  OF  WAY  (EQUIPMENT)_
_LICENSED  CDL  DRIVER_

_ENJOYS  HEAVY  MACHINERY_

D08685

**Question #7:  Working in a Rule-Oriented and Procedures-Oriented Work Environment**

"Working as a Locomotive Engineer means requires that you adhere to railroad Operating Rules, Company Policies, and specified train handling procedures.  Give an example of when you have had to work in a heavily rule-oriented environment – how did you like working in this setting?"

**Probing Questions:**
What situations have you been in that are rule-oriented?
How did you handle a heavily rule-oriented environment?
Did you ever have to break a rule and why?

| 3 ■ | 2 □ | 1 □ |
|---|---|---|
| Displays a comfort with working in rules-oriented and procedure-oriented environments; has a track record of performing well in such environments; understands that rules and policies are in-place for a reason, and is willing to follow them | Does not have experience with heavily rule or procedure-oriented environments, but shows clear understanding that this is an expectation for Locomotive Engineers, and expresses willingness to work in such an environment | Has no experience with rule-oriented work environments; does not display an interest in such environments; does not convey that they would be satisfied and/or productive in such work environments |

NOTES: _WORK TRAIN ON PCS  BABY BULLET PROJECT,_
_HAS NOT BEEN IN CITUATION HAVING TO BREAK_
_RULE._

D08686

## Question #8:  Ability to Remain Attentive Over Extended Periods

"Locomotive Engineers are required to remain vigilant and observant over extended periods of time, even after they have worked for long stretches of time.  What job experiences have you had that required you to be detail-oriented and observant, particularly over a long period of time?"

**Probing Questions:**
How do you maintain and handle constant vigilance?
Was there a time when you were exhausted and could not remain attentive? What happened?
What was the situation where you had to remain attentive?

| 3  | 2☐ | 1☐ |
|---|---|---|
| Describes job experiences that have required focusing on details and "maintaining attention" for long periods; has performed jobs that required multi-tasking (including observations, and using information from observations to drive their subsequent actions) | Describes experiences where s/he has had to be detail-oriented OR attentive; conveys solid planning or "monitoring" skills; understands the importance of this characteristic for the position of Engineer, and demonstrates that they can develop in this area | Does not describe a situation requiring detail-orientation or attentiveness; does not indicate that they can learn or develop in this area; demonstrates indifference to this area |

NOTES: YARD EXPERIENCE, WORK TRAIN EXPERIENCE PCS
FEELS SLOWING DOWN AND TAKING BREAKS IS THE
WAY TO REMAIN ATTENTIVE.

D08687

**Question #9:  Ability to Work with Others as Part of a Team**

"Locomotive Engineers work "as a team" with other members of the train crew to ensure the safe and timely arrival of their train.  Give an example of when you have worked well as part of a team, and give an example of when you have been part of a team that was "challenging" or difficult".

**Probing Questions:**
What was challenging or difficult?
What did you say to each other?
How did you each react?
Did you involve others in resolving the situation? If so, who and how?
How did your interactions affect other team members?
How did it end up?
What was your relationship with the other person(s) after the fact?

| 3  | 2 ☐ | 1 ☐ |
|---|---|---|
| Demonstrates that they can fit-in well with a team environment; shares examples of when they have played important roles as part of a team; demonstrates that they are flexible and adaptable in team settings; shows that they are capable of handling challenges within the team | Describes some settings where they have worked well with others; shows that they are capable of fitting-in within a team environment; displays confidence that they can work well with other railroad members | Is not able to relate team-based work experiences; shows indifference towards working with others in this setting; does not convey the ability to fit-in as part of a team environment |

NOTES:

*Does not accept direction from persons outside of crew. Does not relate to teamwork. Prefers to solve problems independently. Does not accept direction from supervisors*

D08688

**Question #10:  Ability to Maintain a Calm Demeanor and Make Decisions Under Pressure**

"Locomotive Engineers must frequently make good decisions quickly, and under periods of pressure and stress.  Give an example of when your ability to maintain a calm demeanor and a "level head" allowed you to successfully resolve or problem".

**Probing Questions:**
What was the situation when you had to remain calm and think quickly?
What do you do to maintain composure in a stressful situation?
When you feel that the situation is overwhelming, what do you do?

| 3☐ | 2☐ | 1☐ |
|---|---|---|
| Describes specific situations where s/he has been able to make effective decisions under pressure; shows evidence of being resilient under pressure and stress; is capable of being decisive; does not shy-away from making decisions | Is able to relate general examples of when s/he has performed solidly under pressure; shows evidence of avoiding emotional mood swings or displays of temper when under stress; is likely to be resilient under pressure | Does not provide examples of when s/he has dealt effectively with pressure on the job; has not been in situations where pressure or stress were present; does not convey that s/he would capably handle pressure or stress in the work environment |

NOTES:  WORK TRAIN OT REDWOOD CITY DERAILED
REMAINS CALM UNDER PRESSURE, ENJOYS WORKING
UNDER STRESS.
GOOD PROBLEM SOLVING SKILLS

D08689

**Question #11:  Problem-Solving Ability**

"Locomotive Engineers frequently have to think through issues and come up with a course of action to resolve problems that arise during the course of their duties.  Give an example of when you have faced a tough problem on the job, and resolved it through your own thought process and your own effort.  Describe both the situation, and how you resolved it…".

**Probing Questions:**
What was the situation?
Did you determine the cause of the problem? If so, what was it?
How did you decide upon the option you chose?
Did you get anyone else involved in the problem?
What steps did you take to resolve the problem?
Did you weigh the pros and cons of the steps you took? If so, what were they?
What was the result?

| 3 | 2 | 1 |
|---|---|---|
| Describes a situation where s/he [a] identified a problem, [b] investigated and researched same, [c] enacted a course of action, and [d] monitored results and made additional improvements.  Clearly shows the ability to problem-solve on the job. | Describes an example of when s/he has had a role in resolving a work-related problem; shows some evidence of problem-solving skills, and the ability to think-through things on their own; is likely to master the problem-solving skills needed | Unable to relate examples of when they have used problem-solving skills on the job; examples provided do not show any depth of processing; does not appear interested in engaging in problem-solving or "thinking" pursuits |

NOTES:  YARD MOVE UP DERAILED ON LEAD - MADE
DECISION ON SWITCH MOVES TO GET POWER OUT TO
AMTRAK. INVOLVED MECHANICAL IN DECISION
PROCESS.

D08690

**Question #12:  Ability to Work in Solitary Settings**

"Give an example of when you have performed well in job roles that have required you to work by yourself, as well as situations where you have worked with others as part of a team.  Which kind of job setting do you prefer – working with others, or working by yourself?  Why?"

**Probing Questions:**
Describe a situation where you worked by yourself, but would have preferred to work with others?
Describe a situation where you worked with others, but would have preferred to work alone?

| 3 ☒ | 2 ☐ | 1 ☐ |
|------|------|------|
| Shows evidence of being flexible and adaptable re: working with others or by themselves; demonstrates that they have performed well in both job settings; conveys confidence in their ability to handle the largely solitary work environment of Engineers | Is comfortable working in largely solitary conditions; does not need a high level of social interaction on the job, but is comfortable in such settings; is willing to take on a largely solitary work role | Does not demonstrate any ability or willingness to work in a largely solitary work environment; claims to "need people interaction" while at work; does not convey that s/he would be capable of handling the largely solitary nature of the work |

NOTES:  ENJOYS WORKING WITH OTHERS.  WANTED TO
WORK ALONE WHEN OTHERS WERE NOT WORKING
AS A TEAM.

D08691

## Question #13:  Comfort in a Unionized Environment

"Give an example of when you have worked as part of a union environment – have your experiences been positive or negative, and why?  Or, if you have never worked in such an environment, what do you expect the benefits and drawbacks will be?"

**Probing Questions:**
What is your experience with a union environment?
What do you expect from a union environment?

| 3 ■ | 2 ☐ | 1 ☐ |
|---|---|---|
| Describes experiences where they have successfully worked in union environments; shows an understanding of the role of labor organizations; understands the importance of contractual agreements & union representatives | Does not have extensive experience working with labor unions, but demonstrates insight into the role of the labor organization and the purpose these organizations serve; understands their job duties will be outlined by union contracts | Has no experience with unionized work environments, and has low interest in working in such a setting; shows no understanding of the role of the labor organization; focuses on negative aspect of union employment (i.e., adhering to contracts;  dues) |

NOTES:

_Feels positive about union/ understands the role of organized labor. Not any involvement in local union._

D08692

## Question #14:  Questions from the Candidate

"We have been over a wide variety of questions today. Do you have some questions that you would like to ask me?"

| 3☒ | 2☐ | 1☐ |
|---|---|---|
| Asks a number of probing questions about the Engineer's job (work duties, work conditions, etc.); shows evidence of [a] researching the demands of the position and [b] identifying areas where they need more information about the job | Asks a few general questions about the position; shows evidence of having a reasonable understanding of the demands of the position; appears interested in learning more about the position | Does not ask questions about the position; shows no evidence of having researched the demands of the position; does not appear interested in learning more about the position |

NOTES:

_ASKS DIRECT PROBING QUESTIONS._

D08693

**STEP 3: CONCLUDING THE INTERVIEW**

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME. Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

**STEP 4: COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS**

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

**STEP 5: COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM**

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUTION SUMMARY MATRIX

|     |                                                        | Your Score | Team Score |
| --- | ------------------------------------------------------ | ---------- | ---------- |
| 1.  | Completed "Job Preview" prior to interview             | ---------- | ---------- |
| 2.  | Work Background                                         | 3          | 3          |
| 3.  | Why interested in becoming an Engineer                 | 2          | 2          |
| 4.  | Completing Locomotive Engineer Training                | 3          | 3          |
| 5.  | Ability to work extended hours                         | 2          | 2          |
| 6.  | Comfort and Experience with heavy machinery            | 3          | 3          |
| 7.  | Working in a rules- and procedure-oriented environment | 3          | 3          |
| 8.  | Ability to remain attentive over extended periods of time | 3       | 3          |
| 9.  | Ability to work with others as part of a team          | 3          | 3          |
| 10. | Ability to remain calm & make decisions under pressure | 3          | 3          |
| 11. | Problem-Solving Ability                                | 3          | 3          |
| 12. | Ability to work in solitary work environments          | 3          | 3          |
| 13. | Comfort in a unionized environment                     | 3          | 3          |
| 14. | Questions from the candidate                           | 3          | 3          |
|     | TOTAL                                                  | 37         | 37         |

**Please transfer totals to following page**

D08694

## YOUR OVERALL EVALUATION OF THE CANDIDATE

| **3** | **2** | **1** |
|---|---|---|
| Is in the top 1/3 of all candidates | Is in the middle 1/3 of all candidates | Is in the bottom 1/3 of all candidates |
| • Point total of 30 or greater | • Point total of 24 or greater | • Point total of 23 or below |
| • Only 1-2 answers of "1" | • Only 1-2 answers of "1" | • Numerous answers of "1" |
| • Will successfully pass training and become a top Engineer | • Will successfully pass training and become a solid Engineer | • Not likely to pass training and/or become a successful Engineer |

FINAL NOTES: ------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------

## TEAM EVALUATION OF THE CANDIDATE

| **3** | **2** | **1** |
|---|---|---|
| Is in the top 1/3 of all candidates | Is in the middle 1/3 of all candidates | Is in the bottom 1/3 of all candidates |
| • Point total of 30 or greater | • Point total of 24 or greater | • Point total of 23 or below |
| • Only 1-2 answers of "1" | • Only 1-2 answers of "1" | • Numerous answers of "1" |
| • Will successfully pass training and become a top Engineer | • Will successfully pass training and become a solid Engineer | • Not likely to pass training and/or become a successful Engineer |

FINAL NOTES: ------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------

YOUR NAME: _Larry C. Fobis_          SSN/ ID: ■■■■■■

POSITION WITH AMTRAK _RFE, BFD_

CHECK ONE:
[] Amtrak HR Representative  [] BLE Representative  ⊠ Amtrak Operations Representative

SIGNATURE: _____          DATE: _7-8-04_

D08695



# Locomotive Engineer
# Interview Booklet
# 2003

**EXHIBIT L**

D08716

Human Resources                    December 2003

## AMTRAK LOCOMOTIVE ENGINEER INTERVIEW INSTRUCTIONS

Part 1: Pre-Interview Activities

DO:

1) Review the candidate's application form, resume, work record, and other supporting documentation, and take notes on any specific areas of inquiry you might want to focus on in the interview
2) Make sure the candidate's records indicate that s/he has completed all pre-interview testing (administered by Amtrak Human Resources)
3) Make sure that you identify a room for your interview that is comfortable (seating arrangements, temperature, etc.) and that will feature minimal interruptions
4) Turn off cell phones, pagers, etc. for the duration of the interview
5) Focus your attention on the interview during your time with the candidate – minimize other work distractions and interruptions
6) Let the candidate do most of the talking – if you are talking 40% or more of the time, you are talking too much
7) Take notes during the interview – complete the rating form provided, making notes and providing written justification for your numerical ratings

DO NOT:

1) DO NOT use a telephone interview to substitute for a face-to-face interview
2) DO NOT ask interview questions that are not job-related, or that focus on inappropriate and/or unlawful areas of inquiry (i.e., marital status, family size, physical condition, etc.)
3) DO NOT "Squeeze-in" an interview while you are busy with other work activities – you are responsible for helping Amtrak make a smart, long-term employment decision about the candidate in question (not to mention the training dollars that will be spent preparing the individual to become a Locomotive Engineer)
4) DO NOT DOMINATE THE INTERVIEW – ask the questions provided, ask questions based on your review of the candidate's background, and let the candidate "sell" you on his/her merits for the position
5) DO NOT SUBMIT INCOMPLETE RATING FORMS OR OTHER PAPERWORK – please help the interview process flow smoothly by accurately (and legibly) completing the paperwork that is part of the process

D08717

Part 2:  Conducting the Interview

1) Welcome the candidate to the interview process
   - Introduce yourself
   - Thank the candidate for his/her interest in the position
   - State that the interview will last approximately 45 minutes
   - Go through a safety briefing (exits, emergency procedures, etc.)

2) Ensure that the candidate has completed the "Realistic Job Preview" for the position of Locomotive Engineer, and has a signed "RJP Certification Form" and a signed "Engineer Task Checklist" for you
   - IF YES -- PROCEED WITH THE INTERVIEW
   - IF NO – HAVE THE PERSON COMPLETE THE RJP, SIGN THE RJP CERTIFICATION FORM AND THE ENGINEER TASK CHECKLIST, THEN PROCEED WITH THE INTERVIEW

3) Conduct the Interview for the candidate
   - Complete the "Rating Booklet" contained in the following pages
   - Make careful notes documenting your ratings
   - Follow the instructions provided

Part 3:  Post-Interview Activities

   - Review the notes you have made for each question, and indicate the candidate's score on each item
   - Transfer the candidate's score on each item to the "Candidate Interview Performance" matrix, and sum the candidate's scores
   - Provide your rating of the candidate's "Overall Suitability" in the space provided
   - Work with your interview team to determine a "team rating" of the candidate's overall suitability, and indicate same in the space provided
   - Sign and date the final page of the rating booklet
   - Notify _____ of your decision about the candidate, and forward all written documentation of the interview (the interview booklet, any notes, and any candidate materials) to _____ in the Human Resources Department

D08718

# LOCOMOTIVE ENGINEER RATING BOOKLET

## STEP 1:  OPENING THE INTERVIEW

**SAY:**

"Hello.  You must be ____(candidate's name).  My name is _____, and I am the ___(your position title)_____.  I am looking forward to speaking with you today regarding your interest in the position of Locomotive Engineer".

"Our interview time will last about 45 minutes today.  You will be free to ask questions at the end of our interview period.  Our interview time will allow me to learn a little bit more about your background, and why you are interested in the position of Locomotive Engineer".

Before we get started, let me go through a Safety Briefing with you.  Our nearest exit is __(describe____), and a telephone for emergencies is ___(describe)___ .  If we need to convene outside of the building, let's meet at the ____(describe landmark)___ .  Is there anything I have forgotten in the safety briefing?"

"Is there anything you need before we get started – would you like some water or anything?"  (ATTEMPT TO MAKE THE INTERVIEWEE AS COMFORTABLE AS POSSIBLE)

## STEP 2:  CONDUCTING THE INTERVIEW

Ask the following questions verbatim.  Listen carefully to the candidate's responses, making notes in the spaces provided.  Circle any of the "Themes to Look For" that are mentioned by the candidate.

D08719

**Question #1:  Review of Realistic Job Preview**

"Before we begin – have you completed the  "Realistic Job Preview" for the position of Locomotive Engineer, and do you have a signed "RJP Certification Form" and a signed "Engineer Checklist" for me?

CHECK:        ☑ "YES" -- proceed with the interview

              ☐ "NO" -- STOP THE INTERVIEW

**(If the person answers "No" to the above question, OR DOES NOT HAVE A SIGNED RJP CERTIFICATION FORM OR TASK CHECKLIST WITH THEM, notify them that they were supposed to do this prior to the interview.  Have the candidate review the RJP, have them sign the appropriate paperwork and submit it to you, then proceed with the interview.**

Notes:

D08720

Question #2:  Work Background

"Tell me a little bit about your background – where did you go to school, and what is your work experience (both with Amtrak and prior to joining Amtrak)".

| 3 ☒ | 2 ☐ | 1 ☐ |
|---|---|---|
| Has a wide variety of prior job experiences, each with important responsibilities; has Amtrak experience(s) that will enhance his/her transition to becoming a Locomotive Engineer | Has a solid track record of previous employment, and has moved to positions with additional responsibilities throughout his/her career; prior Amtrak experience(s) will not facilitate his/her transition to becoming a Locomotive Engineer | Has very limited work experiences; does not show a history of moving to positions with increased responsibility; has held predominantly lower-level employment; Amtrak experience is very limited and irrelevant to the position of Locomotive Engineer |

NOTES: _HS._

_84 – 92  SP Track_
_Truck Driver – Class CDL A._
_9/98 AC Amtrak → Conductor '99_

**D08721**

**Question #3:  Why Interested in Becoming an Engineer?"**

"Why are you interested in becoming a Locomotive Engineer with Amtrak?"

**Probing Questions:**
Why do you think you would be a good Locomotive Engineer?
What characteristics do you have that you feel would make you a successful Locomotive Engineer?

| 3☐ | 2☒ | 1☐ |
|---|---|---|
| Expresses an interest in and affinity for the work of an Engineer; wants to take on the responsibilities associated with being an Engineer; describes how his/her characteristics will allow them to be effective in the role; shows evidence of understanding the challenges outlined in the "job preview", and is willing to take on these challenges | Expresses confidence in his/her ability to perform the duties of Engineer; shows a willingness to work under the job conditions outlined in the "job preview", but does not elaborate on how their personal characteristics will allow them to perform well as an Engineer | Shows little evidence of understanding the duties or responsibilities of a Locomotive Engineer; does not demonstrate an understanding of the job environment of the position, and does not describe "why" they are likely to be successful in the position |

NOTES:

_Money – Work train income 85K_

_Good at job, knowledge of / exp w/ heavy machines_
_Can run a tamper – sim to locomotive_

D08722

### Question #4: Locomotive Engineer Training Program

"Becoming a Locomotive Engineer requires an extensive training program – both in classroom settings and on-the-job training out in the field. Give an example of when you have had to complete a rigorous training program, either in your work experience or at school"

**Probing Questions:**
Describe the training program?
What were some of the challenges of the training program?
Was the training program in a classroom or in the field, and which did you prefer and why?

| 3 ☐ | 2 ☒ | 1 ☐ |
|---|---|---|
| Describes a complex, multi-faceted training program that was completed at work, school, or the military; demonstrates solid performance in both classroom and field training settings; previous experience demonstrates that they are likely to perform well in the training program | Describes the completion of a multi-stage training program of medium scope, and/or describes strong academic performance in school; past experience should allow them to successfully complete the Locomotive Engineer training program | Is not able to describe a past training and/or educational experience where they have demonstrated the ability to learn in classroom or field settings; has a poor record of academic performance; past experiences shed doubt on their ability to successfully complete the training program |

NOTES:

A.C. Class
Learn Rules - Classroom - strenuous
OJT - easy.
- Challenges - OJT - diff personalities of OJT
training Conductors
Battlefield promotion to MOW foreman
GCOR test 10 machine dates
Prefers OJT.

D08723

**Question #5:  Ability to Work Extended Hours**

"Working as a Locomotive Engineer means being on-the-job for extended hours, including night, weekend, and holiday work.  How will you accommodate the demands of this type of schedule?"

**Probing Questions:**
Describe a situation when you had to work on a night, weekend, or holiday?
How would you adapt to a night, weekend, or holiday schedule?

| 3 ☒ | 2 ☐ | 1 ☐ |
|---|---|---|
| Relates past job experiences with shift work, extended hours, and/or weekend duty; demonstrates that they have thought through the challenging work schedule of an Engineer, and are willing to adapt to the demands of such a schedule | Does not have experience with extended hours or shift work, but demonstrates that they have thought-through the challenges of such a work schedule, and are willing to adapt to the demands placed by such a schedule | Has no experience with extended hours or shift work, and does not convey that they are willing to make the sacrifices necessary in such a work schedule (i.e., unwilling to be away from home, to work weekends, etc.) |

NOTES: _Has worked nights since 1999 (Work train last 2 years) Works holidays, weekends - nature of the RR._

D08724

**Question #6: Comfort and Experience with Heavy Machinery**

"Working as an Engineer involves, of course, operating the locomotive. What kinds of experiences do you have operating heavy machinery, or being in job settings that featured heavy equipment and/or machinery?"

**Probing Questions:**
What situation were you in when you operated heavy machinery?
What did you like or dislike about working with heavy machinery?

| 3 ☒ | 2 ☐ | 1 ☐ |
|---|---|---|
| Describes past job experiences where s/he has operated heavy machinery, and/or describes past work settings that have featured the noise, heat, and "feel" of heavy equipment or machinery | Does not have work experiences with heavy equipment or machinery, but shows evidence of thinking through the job environment created by such machinery, and displays confidence that s/he will enjoy such settings | Has no experience with heavy equipment or machinery, and does not express an interest in learning about or working with such equipment; conveys that s/he would be uncomfortable in such settings |

NOTES: _____

Work train –

MOW – Qualified on ~ 10 machine

Around locomotives all the time

Truck driver – Class A

Love everything about heavy machinery

Grew up w tractors / fast cars

D08725

**Question #7: Working in a Rule-Oriented and Procedures-Oriented Work Environment**

"Working as a Locomotive Engineer means requires that you adhere to railroad Operating Rules, Company Policies, and specified train handling procedures. Give an example of when you have had to work in a heavily rule-oriented environment – how did you like working in this setting?"

**Probing Questions:**
What situations have you been in that are rule-oriented?
How did you handle a heavily rule-oriented environment?
Did you ever have to break a rule and why?

| 3☒ | 2☐ | 1☐ |
|---|---|---|
| Displays a comfort with working in rules-oriented and procedure-oriented environments; has a track record of performing well in such environments; understands that rules and policies are in-place for a reason, and is willing to follow them | Does not have experience with heavily rule or procedure-oriented environments, but shows clear understanding that this is an expectation for Locomotive Engineers, and expresses willingness to work in such an environment | Has no experience with rule-oriented work environments; does not display an interest in such environments; does not convey that they would be satisfied and/or productive in such work environments |

NOTES: _____

Work train - controlled by flagmen very restrictive - awareness critical rules to apply dependant upon location

Road test in Bakersfield - "Call dispatcher before" - only one who caught.

Never had to break a rule.

Categories of rules - Frustrating - Safety

"Every rule written in blood."

D08726

**Question #8: Ability to Remain Attentive Over Extended Periods**

"Locomotive Engineers are required to remain vigilant and observant over extended periods of time, even after they have worked for long stretches of time. What job experiences have you had that required you to be detail-oriented and observant, particularly over a long period of time?"

**Probing Questions:**
How do you maintain and handle constant vigilance?
Was there a time when you were exhausted and could not remain attentive? What happened?
What was the situation where you had to remain attentive?

| 3 ☑ | 2 ☐ | 1 ☐ |
|---|---|---|
| Describes job experiences that have required focusing on details and "maintaining attention" for long periods; has performed jobs that required multi-tasking (including observations, and using information from observations to drive their subsequent actions) | Describes experiences where s/he has had to be detail-oriented OR attentive; conveys solid planning or "monitoring" skills; understands the importance of this characteristic for the position of Engineer, and demonstrates that they can develop in this area | Does not describe a situation requiring detail-orientation or attentiveness; does not indicate that they can learn or develop in this area; demonstrates indifference to this area |

NOTES:

Yards -

Work train - no blue flags - need to be very observant.

When exhausted, take a break to prevent a mistake. Slow down - one move at a time.

D08727

**Question #9:  Ability to Work with Others as Part of a Team**

"Locomotive Engineers work "as a team" with other members of the train crew to ensure the safe and timely arrival of their train.  Give an example of when you have worked well as part of a team, and give an example of when you have been part of a team that was "challenging" or difficult".

**Probing Questions:**
What was challenging or difficult?
What did you say to each other?
How did you each react?
Did you involve others in resolving the situation? If so, who and how?
How did your interactions affect other team members?
How did it end up?
What was your relationship with the other person(s) after the fact?

| 3 ☒ | 2 ☐ | 1 ☐ |
|---|---|---|
| Demonstrates that they can fit-in well with a team environment; shares examples of when they have played important roles as part of a team; demonstrates that they are flexible and adaptable in team settings; shows that they are capable of handling challenges within the team | Describes some settings where they have worked well with others; shows that they are capable of fitting-in within a team environment; displays confidence that they can work well with other railroad members | Is not able to relate team-based work experiences; shows indifference towards working with others in this setting; does not convey the ability to fit-in as part of a team environment |

NOTES:

Well oiled machine - knows engineers, mechanical
foreman -

Yard a mess congested - nine track -

Supv sent pin-up crew to yd. Handled
clearing yard.

"Always have a plan B"

Get along w/ co workers

"Let me do it, you take the credit."

"Opinionated, but knows his job"

**D08728**

**Question #10:  Ability to Maintain a Calm Demeanor and Make Decisions Under Pressure**

"Locomotive Engineers must frequently make good decisions quickly, and under periods of pressure and stress.  Give an example of when your ability to maintain a calm demeanor and a "level head" allowed you to successfully resolve or problem".

**Probing Questions:**
What was the situation when you had to remain calm and think quickly?
What do you do to maintain composure in a stressful situation?
When you feel that the situation is overwhelming, what do you do?

| 3 ☒ | 2 ☐ | 1 ☐ |
|------|------|------|
| Describes specific situations where s/he has been able to make effective decisions under pressure; shows evidence of being resilient under pressure and stress; is capable of being decisive; does not shy-away from making decisions | Is able to relate general examples of when s/he has performed solidly under pressure; shows evidence of avoiding emotional mood swings or displays of temper when under stress; is likely to be resilient under pressure | Does not provide examples of when s/he has dealt effectively with pressure on the job; has not been in situations where pressure or stress were present; does not convey that s/he would capably handle pressure or stress in the work environment |

NOTES:

Defective switch at Redwood City - "that'll do"
Thrives on problems - pressure - got creative juices going
Makes job more interesting.

BNSF train broke in two. Instructed Suggested engineer back train into siding - cleared track, Amtrak could move ahead

D08729

Question #11: Problem-Solving Ability

"Locomotive Engineers frequently have to think through issues and come up with a course of action to resolve problems that arise during the course of their duties. Give an example of when you have faced a tough problem on the job, and resolved it through your own thought process and your own effort. Describe both the situation, and how you resolved it…".

**Probing Questions:**
What was the situation?
Did you determine the cause of the problem? If so, what was it?
How did you decide upon the option you chose?
Did you get anyone else involved in the problem?
What steps did you take to resolve the problem?
Did you weigh the pros and cons of the steps you took? If so, what were they?
What was the result?

| 3 ☒ | 2 ☐ | 1 ☐ |
|---|---|---|
| Describes a situation where s/he [a] identified a problem, [b] investigated and researched same, [c] enacted a course of action, and [d] monitored results and made additional improvements. Clearly shows the ability to problem-solve on the job. | Describes an example of when s/he has had a role in resolving a work-related problem; shows some evidence of problem-solving skills, and the ability to think-through things on their own; is likely to master the problem-solving skills needed | Unable to relate examples of when they have used problem-solving skills on the job; examples provided do not show any depth of processing; does not appear interested in engaging in problem-solving or "thinking" pursuits |

NOTES:

*no wheels was delivered*
*Bad wheels on cars switch out wheels from bad order other cars - made suggestion to foreman + accepted train got out on time*

D08730

## Question #12:  Ability to Work in Solitary Settings

"Give an example of when you have performed well in job roles that have required you to work by yourself, as well as situations where you have worked with others as part of a team.  Which kind of job setting do you prefer – working with others, or working by yourself?  Why?"

**Probing Questions:**
Describe a situation where you worked by yourself, but would have preferred to work with others?
Describe a situation where you worked with others, but would have preferred to work alone?

| 3 ☒ | 2 ☐ | 1 ☐ |
|------|------|------|
| Shows evidence of being flexible and adaptable re: working with others or by themselves; demonstrates that they have performed well in both job settings; conveys confidence in their ability to handle the largely solitary work environment of Engineers | Is comfortable working in largely solitary conditions; does not need a high level of social interaction on the job, but is comfortable in such settings; is willing to take on a largely solitary work role | Does not demonstrate any ability or willingness to work in a largely solitary work environment; claims to "need people interaction" while at work; does not convey that s/he would be capable of handling the largely solitary nature of the work |

NOTES:

Love working w/ team – yard crews that know the yard.

As a new AC. ended up working alone (w/o a conductor) w. engineer 43 nights

Working w/ people who didn't want to work in the OAK yard

Stormy night – switch list got soaked. Would have loved some help!

D08731

**Question #13:  Comfort in a Unionized Environment**

"Give an example of when you have worked as part of a union environment – have your experiences been positive or negative, and why?  Or, if you have never worked in such an environment, what do you expect the benefits and drawbacks will be?"

**Probing Questions:**
What is your experience with a union environment?
What do you expect from a union environment?

| 3 ☒ | 2 ☐ | 1 ☐ |
|------|------|------|
| Describes experiences where they have successfully worked in union environments; shows an understanding of the role of labor organizations; understands the importance of contractual agreements & union representatives | Does not have extensive experience working with labor unions, but demonstrates insight into the role of the labor organization and the purpose these organizations serve; understands their job duties will be outlined by union contracts | Has no experience with unionized work environments, and has low interest in working in such a setting; shows no understanding of the role of the labor organization; focuses on negative aspect of union employment (i.e., adhering to contracts;  dues) |

NOTES:

Amtrak.

Positive –
　　　Support ye discipline issues –
　　　union build America.
　　　Contract negotiation

D08732

**Question #14:  Questions from the Candidate**

"We have been over a wide variety of questions today. Do you have some questions that you would like to ask me?"

| 3 ☐ | 2 ☒ | 1 ☐ |
|---|---|---|
| Asks a number of probing questions about the Engineer's job (work duties, work conditions, etc.); shows evidence of [a] researching the demands of the position and [b] identifying areas where they need more information about the job | Asks a few general questions about the position; shows evidence of having a reasonable understanding of the demands of the position; appears interested in learning more about the position | Does not ask questions about the position; shows no evidence of having researched the demands of the position; does not appear interested in learning more about the position |

NOTES:

Qualities ?

Talked w engineers who attended training
daily updates. -

shoot for highest scores)
modules

D08733

## STEP 3: CONCLUDING THE INTERVIEW

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME.  Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

## STEP 4: COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

## STEP 5: COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUTION SUMMARY MATRIX

| | | Your Score | Team Score |
|---|---|---|---|
| 1. | Completed "Job Preview" prior to interview | ---------- | ---------- |
| 2. | Work Background | | |
| 3. | Why interested in becoming an Engineer | 3 | 3 |
| 4. | Completing Locomotive Engineer Training | 2 | 2 |
| 5. | Ability to work extended hours | 2 | 2 |
| 6. | Comfort and Experience with heavy machinery | 3 | 3 |
| 7. | Working in a rules- and procedure-oriented environment | 3 | 3 |
| 8. | Ability to remain attentive over extended periods of time | 3 | 3 |
| 9. | Ability to work with others as part of a team | 3 | 3 |
| 10. | Ability to remain calm & make decisions under pressure | 3 | 3 |
| 11. | Problem-Solving Ability | 3 | 3 |
| 12. | Ability to work in solitary work environments | 3 | 3 |
| 13. | Comfort in a unionized environment | 3 | 3 |
| 14. | Questions from the candidate | 3 | 3 |
| | TOTAL | 36 | 37 |

**Please transfer totals to following page**

D08734

## YOUR OVERALL EVALUATION OF THE CANDIDATE

| ③ Is in the top 1/3 of all candidates | 2 Is in the middle 1/3 of all candidates | 1 Is in the bottom 1/3 of all candidates |
|---|---|---|
| • Point total of 30 or greater<br>• Only 1-2 answers of "1"<br>• Will successfully pass training and become a top Engineer | • Point total of 24 or greater<br>• Only 1-2 answers of "1"<br>• Will successfully pass training and become a solid Engineer | • Point total of 23 or below<br>• Numerous answers of "1"<br>• Not likely to pass training and/or become a successful Engineer |

FINAL NOTES: --------------------------------------------------------------
----------------------------------------------------------------------------
----------------------------------------------------------------------------
----------------------------------------------------------------------------
----------------------------------------------------------------------------

## TEAM EVALUATION OF THE CANDIDATE

| ③ Is in the top 1/3 of all candidates | 2 Is in the middle 1/3 of all candidates | 1 Is in the bottom 1/3 of all candidates |
|---|---|---|
| • Point total of 30 or greater<br>• Only 1-2 answers of "1"<br>• Will successfully pass training and become a top Engineer | • Point total of 24 or greater<br>• Only 1-2 answers of "1"<br>• Will successfully pass training and become a solid Engineer | • Point total of 23 or below<br>• Numerous answers of "1"<br>• Not likely to pass training and/or become a successful Engineer |

FINAL NOTES: --------------------------------------------------------------
----------------------------------------------------------------------------
----------------------------------------------------------------------------
----------------------------------------------------------------------------
----------------------------------------------------------------------------

YOUR NAME: *Susan Venturelli*          SSN/ ID: ███████

POSITION WITH AMTRAK *H.R. Officer*

CHECK ONE:
[X] Amtrak HR Representative [] BLE Representative [] Amtrak Operations Representative

SIGNATURE: *Susan Venturelli*          DATE: 7/8/04

D08735

**STEP 3: CONCLUDING THE INTERVIEW**

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME. Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

**STEP 4: COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS**

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

**STEP 5: COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM**

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUATION SUMMARY MATRIX

| | | Your Score | Team Score |
|---|---|---|---|
| 1. | Completed "Job Preview" prior to interview | | |
| 2. | Work Background | 3 | 3 |
| 3. | Why interested in becoming an Engineer | 3 | 3 |
| 4. | Completing Locomotive Engineer Training | 3 | 3 |
| 5. | Ability to work extended hours | 3 | 3 |
| 6. | Comfort and Experience with heavy machinery | 3 | 3 |
| 7. | Working in a rules- and procedure-oriented environment | 3 | 3 |
| 8. | Ability to remain attentive over extended periods of time | 2 | 2 |
| 9. | Ability to work with others as part of a team | 2 | 2 |
| 10. | Ability to remain calm & make decisions under pressure | 2 | 2 |
| 11. | Problem-Solving Ability | 3 | 3 |
| 12. | Ability to work in solitary work environments | 2 | 3 |
| 13. | Comfort in a unionized environment | 3 | 3 |
| 14. | Questions from the candidate | 3 | 3 |
| | TOTAL | 35 | 36 |

Please transfer totals to following page

**EXHIBIT M**

**STEP 3: CONCLUDING THE INTERVIEW**

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME. Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

**STEP 4: COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS**

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

**STEP 5: COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM**

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUATION SUMMARY MATRIX

| | | Your Score | Team Score |
|---|---|---|---|
| 1. | Completed "Job Preview" prior to interview | | |
| 2. | Work Background | 3 | 3 |
| 3. | Why interested in becoming an Engineer | 2 | 2 |
| 4. | Completing Locomotive Engineer Training | 2 | 2 |
| 5. | Ability to work extended hours | 3 | 3 |
| 6. | Comfort and Experience with heavy machinery | 3 | 3 |
| 7. | Working in a rules- and procedure-oriented environment | 2 | 2 |
| 8. | Ability to remain attentive over extended periods of time | 2 | 2 |
| 9. | Ability to work with others as part of a team | 3 | 3 |
| 10. | Ability to remain calm & make decisions under pressure | 3 | 3 |
| 11. | Problem-Solving Ability | 2 | 2 |
| 12. | Ability to work in solitary work environments | 3 | 3 |
| 13. | Comfort in a unionized environment | 2 | 2 |
| 14. | Questions from the candidate | 2 | 2 |
| | **TOTAL** | 32 | 32 |

**Please transfer totals to following page**

D08990

**STEP 3:  CONCLUDING THE INTERVIEW**

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME.  Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

**STEP 4:  COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS**

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

**STEP 5:  COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM**

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUATION SUMMARY MATRIX

|    |                                                          | Your Score | Team Score |
|----|----------------------------------------------------------|------------|------------|
| 1. | Completed "Job Preview" prior to interview               |            |            |
| 2. | Work Background                                          | 3          | 3          |
| 3. | Why interested in becoming an Engineer                   | 2          | 3          |
| 4. | Completing Locomotive Engineer Training                  | 2          | 2          |
| 5. | Ability to work extended hours                           | 3          | 3          |
| 6. | Comfort and Experience with heavy machinery              | 3          | 3          |
| 7. | Working in a rules- and procedure-oriented environment   | 3          | 3          |
| 8. | Ability to remain attentive over extended periods of time| 2          | 2          |
| 9. | Ability to work with others as part of a team            | 3          | 3          |
| 10.| Ability to remain calm & make decisions under pressure   | 2          | 2          |
| 11.| Problem-Solving Ability                                  | 2          | 2          |
| 12.| Ability to work in solitary work environments            | 3          | 3          |
| 13.| Comfort in a unionized environment                       | 2          | 2          |
| 14.| Questions from the candidate                             | 2          | 2          |
|    | TOTAL                                                    |            | 33         |

**Please transfer totals to following page**

D07237

**STEP 3: CONCLUDING THE INTERVIEW**

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME. Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

**STEP 4: COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS**

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

**STEP 5: COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM**

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUATION SUMMARY MATRIX

|  | | Your Score | Team Score |
|---|---|---|---|
| 1. | Completed "Job Preview" prior to interview | ---------- | ---------- |
| 2. | Work Background | 2 | 2 |
| 3. | Why interested in becoming an Engineer | 2 | 3 |
| 4. | Completing Locomotive Engineer Training | 3 | 3 |
| 5. | Ability to work extended hours | 3 | 3 |
| 6. | Comfort and Experience with heavy machinery | 3 | 3 |
| 7. | Working in a rules- and procedure-oriented environment | 3 | 3 |
| 8. | Ability to remain attentive over extended periods of time | 2 | 2 |
| 9. | Ability to work with others as part of a team | 3 | 3 |
| 10. | Ability to remain calm & make decisions under pressure | 3 | 3 |
| 11. | Problem-Solving Ability | 2 | 2 |
| 12. | Ability to work in solitary work environments | 2 | 2 |
| 13. | Comfort in a unionized environment | 3 | 3 |
| 14. | Questions from the candidate | 2 | 2 |
| | TOTAL | 33 | 34 |

**Please transfer totals to following page**

D07405

**STEP 3:  CONCLUDING THE INTERVIEW**

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME.  Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

**STEP 4:  COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS**

- Review your notes and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

**STEP 5:  COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM**

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

---

## CANDIDATE EVALUTION SUMMARY MATRIX

|  |  | Your Score | Team Score |
|---|---|---|---|
| 1. | Completed "Job Preview" prior to interview | ---------- | ---------- |
| 2. | Work Background | 3 | 3 |
| 3. | Why interested in becoming an Engineer | 3 | 3 |
| 4. | Completing Locomotive Engineer Training | 3 | 3 |
| 5. | Ability to work extended hours | 3 | 3 |
| 6. | Comfort and Experience with heavy machinery | 3 | 3 |
| 7. | Working in a rules- and procedure-oriented environment | 2 | 2 |
| 8. | Ability to remain attentive over extended periods of time | 2 | 2 |
| 9. | Ability to work with others as part of a team | 2 | 2 |
| 10. | Ability to remain calm & make decisions under pressure | 2 | 3 |
| 11. | Problem-Solving Ability | 3 | 3 |
| 12. | Ability to work in solitary work environments | 3 | 2 |
| 13. | Comfort in a unionized environment | 3 | 3 |
| 14. | Questions from the candidate | 2 | 2 |
|  | TOTAL | 34 | 34 |

**Please transfer totals to following page**

D06892

**STEP 3: CONCLUDING THE INTERVIEW**

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME. Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

**STEP 4: COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS**

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

**STEP 5: COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM**

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

---

## CANDIDATE EVALUTION SUMMARY MATRIX

|  |  | Your Score | Team Score |
|---|---|---|---|
| 1. | Completed "Job Preview" prior to interview | ---------- | ---------- |
| 2. | Work Background | 3. | 3 |
| 3. | Why interested in becoming an Engineer | 2 | 3 |
| 4. | Completing Locomotive Engineer Training | 3. | 2 |
| 5. | Ability to work extended hours | 3 | 3 |
| 6. | Comfort and Experience with heavy machinery | 3 | 3 |
| 7. | Working in a rules- and procedure-oriented environment | 3 | 3 |
| 8. | Ability to remain attentive over extended periods of time | 2. | 2. |
| 9. | Ability to work with others as part of a team | 2 | 2 |
| 10. | Ability to remain calm & make decisions under pressure | 3 | 3. |
| 11. | Problem-Solving Ability | 3 | 2 |
| 12. | Ability to work in solitary work environments | 3 | 3. |
| 13. | Comfort in a unionized environment | 3 | 3 |
| 14. | Questions from the candidate | 3 | 3 |
|  | TOTAL | 36 | 35 |

**Please transfer totals to following page**

D07137

## STEP 3:  CONCLUDING THE INTERVIEW

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME.  Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

## STEP 4:  COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

## STEP 5:  COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUTION SUMMARY MATRIX

|    |                                                      | Your Score | Team Score |
|----|------------------------------------------------------|------------|------------|
| 1. | Completed "Job Preview" prior to interview           | ---------- | ---------- |
| 2. | Work Background                                      | 3          | 3          |
| 3. | Why interested in becoming an Engineer              | 3          | 3          |
| 4. | Completing Locomotive Engineer Training             | 3          | 3          |
| 5. | Ability to work extended hours                      | 3          | 2          |
| 6. | Comfort and Experience with heavy machinery         | 3          | 3          |
| 7. | Working in a rules- and procedure-oriented environment | 3       | 3          |
| 8. | Ability to remain attentive over extended periods of time | 3     | 3          |
| 9. | Ability to work with others as part of a team       | 3          | 3          |
| 10.| Ability to remain calm & make decisions under pressure | 3       | 3          |
| 11.| Problem-Solving Ability                             | 2          | 3          |
| 12.| Ability to work in solitary work environments       | 3          | 3          |
| 13.| Comfort in a unionized environment                  | 2          | 2          |
| 14.| Questions from the candidate                        | 2          | 2          |
|    | TOTAL                                               | 36         | 37         |

Please transfer totals to following page

D09087

STEP 3: CONCLUDING THE INTERVIEW

- REVIEW YOUR NOTES – make sure you have notes for each question that was asked – if you do not, go back and ask the candidate to elaborate on their earlier answers
- THANK THE PARTICIPANT FOR THEIR TIME.  Let them know the next steps in the process (that they will be contacted by the HR Department)
- DISMISS THE PARTICIPANT FROM THE INTERVIEW

STEP 4: COMPILE YOUR INDIVIDUAL INTERVIEW RATINGS

- Review your notes, and make a numerical rating for each item on the notes pages
- Sum your ratings using the "Candidate Evaluation Matrix" below
- Make your overall evaluation for the candidate

STEP 5: COMPARE YOUR RATINGS WITH THE OTHER MEMBERS OF THE TEAM

- Discuss differences in overall rating and overall score
- Discuss discrepancies in the ratings of individual items (if any)
- Come to a consensus decision on the candidate, and mark your interview form accordingly

## CANDIDATE EVALUTION SUMMARY MATRIX

|    |                                                           | Your Score | Team Score |
|----|-----------------------------------------------------------|------------|------------|
| 1. | Completed "Job Preview" prior to interview                | ---------- | ---------- |
| 2. | Work Background                                           | 3          | 3.         |
| 3. | Why interested in becoming an Engineer                    | 3          | 3.         |
| 4. | Completing Locomotive Engineer Training                   | 2          | 3.         |
| 5. | Ability to work extended hours                            | 3          | 3.         |
| 6. | Comfort and Experience with heavy machinery               | 3          | 3.         |
| 7. | Working in a rules- and procedure-oriented environment    | 3          | 3.         |
| 8. | Ability to remain attentive over extended periods of time | 2          | 2.         |
| 9. | Ability to work with others as part of a team             | 3          | 3          |
| 10.| Ability to remain calm & make decisions under pressure    | 3          | 3.         |
| 11.| Problem-Solving Ability                                   | 2          | 3          |
| 12.| Ability to work in solitary work environments             | 3          | 3          |
| 13.| Comfort in a unionized environment                        | 3          | 3          |
| 14.| Questions from the candidate                              | 3          | 3          |
|    | TOTAL                                                     | 36         | 37         |

**Please transfer totals to following page**

D05672