1

UNTIED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOHN EARL CAMPBELL,

                    Plaintiff,

          vs.                              No. C-05-05434 MJJ

NATIONAL RAILROAD PASSENGER
CORPORATION, et al.,                       

                    Defendants.

_____/

DEPOSITION OF STEVEN EDWARD SHELTON

April 4, 2007

PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
DEBORAH A. PIERSON
CSR NO. 7988

**EXHIBIT F**

1              BE IT REMEMBERED THAT, pursuant to Subpoena and

2    Notice of Taking Deposition, and on Tuesday, April 4,

3    2007, commencing at the hour of 10:20 a.m. of the said

4    day, at the law offices of PRICE & ASSOCIATES,

5    1611 Telegraph Avenue, Suite 1450, Oakland, California,

6    before me, DEBORAH A. PIERSON, a Certified Shorthand

7    Reporter, State of California, personally appeared

8    STEVEN EDWARD SHELTON, a witness in the above-entitled

9    court and cause, produced on behalf of the plaintiff

10   therein, who, being by me first duly sworn, was then

11   and there examined and interrogated by Attorney

12   PAMELA Y. PRICE, representing the law offices of PRICE

13   & ASSOCIATES, 1611 Telegraph Avenue, Suite 1450,

14   Oakland, California,  counsel for the plaintiff

15   therein.

16

17                  APPEARANCES OF COUNSEL

18

19   FOR PLAINTIFF:

20           PRICE & ASSOCIATES

21           BY:  PAMELA Y. PRICE, ESQ.

22           1611 Telegraph Avenue, Suite 1450

23           Oakland, California  94612

24

25

15

1   A.    Yes.

2   Q.    Is there any reason you know of that we can't

3   proceed with your deposition?

4   A.    None whatsoever.

5   Q.    Do you have any questions of me?

6   A.    No, ma'am.

7   Q.    What is your current position, Mr. Shelton?

8   A.    My title is district superintendent for the Bay

9   District.

10  Q.    How long have you held that position?

11  A.    Since March '04.

12  Q.    Prior to that, what position did you hold?

13  A.    I was an assistant superintendent for the

14  long-haul operations.

15  Q.    Where were you assigned?

16  A.    Oakland.

17  Q.    How long did you hold that position?

18  A.    Two years, I believe.

19  Q.    My information is that at some point in your

20  career you were an engineer; is that correct?

21  A.    Yes, ma'am.  I still am.

22  Q.    Okay.  What positions have you held with Amtrak

23  before you became a manager?

24  A.    Locomotive engineer.

25  Q.    When did you start that?

1    mean by that?

2    A.    We have a discipline progression policy.

3    Depending on the severity of the rule violation, there

4    would be different parameters involved.

5    Q.    When you say you have a discipline progression

6    policy -- and I'm sorry, I think I just misstated it,

7    but tell me what you are referring to.

8    A.    Generally, we look at discipline as a tool to

9    change the behavior of an employee to, hopefully, get

10   them back on track where they need to be.

11        If it's not extremely egregious, the first level

12   would be a verbal, a counseling.  The second could be a

13   letter of counseling.  Again, these are variables,

14   depending on the severity of the violation.  The third

15   would generally be a suspension of three days or more.

16   The fourth could be, depending, again, on the

17   seriousness, a suspension, and the fifth generally

18   would result in termination.

19   Q.    Regardless of the seriousness?

20   A.    No.  I stated earlier, it would all depend on the

21   severity of the incident.

22   Q.    Is that policy in writing, as far as you know?

23   A.    Yes.  I believe it came under Mr. Ed Walker's

24   signature.

25   Q.    During the time Mr. Pruesser reported to you, was

1  segmented into sections.  I'm operations.  I don't have

2  oversight or a great understanding of HR policy.

3  Q.    All right.  Do you participate in any way in the

4  termination of any employees who work in operations?

5  A.    Yes.

6  Q.    In what way?

7  A.    My signature would come on all termination

8  letters.

9  Q.    Do you have any other role, other than signing the

10  letter?

11  A.    Yes.

12  Q.    What else do you do as part of the termination

13  procedure?

14  A.    Whenever there's a rule violation and it goes to

15  an investigation, there's a transcript from the

16  investigation itself.  I would read the transcript.

17  Q.    Anything else?

18  A.    I would look at the previous history of the

19  employee.

20  Q.    What is your understanding as to why you are

21  reading the transcript and looking at the employee's

22  previous history?

23  A.    Because, as I mentioned earlier, we sort of have

24  the three-strike-you-are-out policy.  They have what

25  they call a Discipline Assessment Sheet that would come

30

1    to my desk.  I would look at the Discipline Assessment

2    Sheet and read the transcript, because I want to make

3    sure it was done properly.

4    Q.    Then after you review that information, what are

5    you supposed to do?

6    A.    Make my decision.

7    Q.    Your decision to discipline the person?

8    A.    Correct.

9    Q.    Now, as part of your decision, you say you look at

10    the Discipline Assessment Sheet?

11    A.    Correct.

12    Q.    What is the purpose of looking at that sheet?

13    A.    To see if there are any prior rule violations.

14    Q.    Do you have a memory of participating in

15    John Campbell's termination?

16    A.    No.

17    Q.    You don't recall looking at the transcript of an

18    investigatory hearing?

19    A.    No.

20    Q.    What is your understanding as to why Mr. Campbell

21    was terminated?

22        MS. MAYLIN:            Lack of foundation.

23        Go ahead.

24        MS. PRICE:            Q.  You can answer.

25    A.    That he had more than three rule violations

PATRICIA CALLAHAN & ASSOCIATES

1    leading up to his termination.

2    Q.    Really?  Have you looked at any documents to

3    verify that understanding?

4    A.    At the time it occurred.

5    Q.    What did you look at at the time it occurred?

6    A.    His Discipline Assessment Sheet.

7    Q.    Have you looked at anything to prepare for today's

8    deposition?

9    A.    Only my discovery.

10   Q.    When you say your "discovery," I have no idea what

11   you are talking about.  Can you be more specific?

12        MS. MAYLIN:          Declaration.

13        THE WITNESS:         Declaration, I'm sorry.

14        MS. PRICE:           Q.  What declaration is that?

15   A.    I'm not quite sure how to answer that.

16   Q.    Can you tell me the date of the declaration?

17   A.    March 30th.

18   Q.    Is this something you prepared recently --

19   A.    Yes.

20   Q.    -- or you looked at recently?  All right.

21   Anything else?

22   A.    No.

23   Q.    Is it your recollection that the reason why you

24   issued a letter terminating Mr. Campbell was because he

25   had more than three violations?

1    MS. MAYLIN:              Wait a minute.  Objection.

2    Lack of foundation.

3    MS. PRICE:              Q.  You can answer.

4    A.  The reason, to the best of my recollection, was

5    the policy supported termination.

6    Q.  What policy is that?

7    A.  The policy that if you have three or more major

8    rule violations, most likely you are going to be

9    terminated.

10   Q.  Is that policy in writing?

11   A.  Not that I've ever seen.

12   Q.  Where did you learn about that policy?

13   A.  Through human resources.

14   Q.  Anyone in particular?

15   A.  I can't recall.

16   Q.  When did you first learn about that policy?

17   A.  Probably 2002.

18   Q.  Do you recall what the circumstances were?

19   A.  No, ma'am.

20   Q.  When you say "probably," that's kind of a buzz

21   word that may suggest you are speculating.

22       Do you have a memory of how you learned of the

23   policy?

24   A.  No, ma'am.

25   Q.  Have you ever applied this policy to anyone, other

1    regarding Mr. Campbell's termination?

2    A.    I don't recall.

3    Q.    Was it your practice to confer with Mr. Deely when

4    you terminated the employment of an employee?

5    A.    Yes.

6    Q.    Why?

7    A.    He's my boss.

8    Q.    Was it your practice to document those

9    conversations?

10    A.    No.

11         MS. PRICE:         Let's take a five-minute

12    recess.

13         (A 15-minute recess was taken.)

14         MS. PRICE:         Q.  I'm going to show you

15    what has been previously marked as Exhibit 5 to the

16    deposition of Joe Deely.  If you could take a look at

17    that and let us know when you finish reviewing it.

18         For the record, I'm showing the witness a

19    Discipline Assessment Sheet.

20         Is that the Discipline Assessment Sheet that you

21    recall looking at for John Campbell.

22    A.    Yes.

23    Q.    Is that the only Discipline Assessment Sheet you

24    looked at for Mr. Campbell, as far as you recall?

25    A.    I don't recall this part being scratched out on

1  the original one, but I believe this is the only one I

2  ever saw, yes, and I think a portion of it is missing,

3  because it should have an NRPC number.  That is missing

4  on the bottom.

5       MS. PRICE:            Mark the record, please.

6  Q.   When you saw the document, it looked different

7  than this; is that your recollection?

8  A.   Yes.  I don't recall the scratched out part, and I

9  know there's more to the bottom of the form, because

10  all of our forms are identified with an NRPC number,

11  which means National Passenger Railroad form.

12  Q.   Directing your attention to the part that is

13  struck out, do you have any information or knowledge as

14  to why that is struck out?

15  A.   No, ma'am.

16  Q.   You indicated that you recall Mr. Campbell had, I

17  believe you said, about five prior rule violations at

18  the time of the termination?

19       MS. MAYLIN:            Lack of foundation.

20  Misstates testimony.

21       MS. PRICE:            Q.   How many rule violations

22  do you believe Mr. Campbell had at the time of his

23  termination?

24  A.   I would say, looking at this, three.

25  Q.   Where do you see those reflected on this document?

PATRICIA CALLAHAN & ASSOCIATES

1    A.    4/4/2000, unsafe switching, causing damage in

2    yard.  January 21st, '01, insubordination.  Failure to

3    follow instructions of yard foreman.  7/24/04, Service

4    Standard Rule 5800, GCOR 1.47, 7.4 and AMT-3 Rule

5    2.14.16.

6    Q.    Are those the three violations that you relied

7    upon to terminate Mr. Campbell?

8         MS. MAYLIN:           Lack of foundation.  Calls

9    for speculation.

10        THE WITNESS:           Yes.

11        MS. PRICE:             Q.  I see.

12        Do you know why the word "withdrawn" is typed on

13   this form?

14   A.    No, ma'am.

15   Q.    At the time you reviewed the form, you are saying,

16   as I understand your testimony, it was not lined out,

17   correct?

18   A.    That is my recollection, yes.

19   Q.    What was your understanding of what it meant where

20   it said "discipline assessed withdrawn"?

21   A.    I really can't remember, because other than your

22   refreshing my memory here, I can only see what I see.

23   I don't remember back to the original form.

24   Q.    Do you remember making any inquiry as to the

25   meaning of the words "discipline assessed withdrawn"?

1    A.    No, ma'am.

2    Q.    Do you recall making any inquiry as to the

3    circumstances that caused the April 2000 violation to

4    have discipline waived?

5    A.    No, ma'am.

6    Q.    You indicated earlier that termination usually

7    involves major rule violations; do you recall that

8    testimony?

9    A.    Yes.

10   Q.    What is your understanding of what a major rule

11   violation is?

12   A.    Anything that could cause bodily harm, harm to our

13   equipment or our employees.

14   Q.    Are you aware of any employees that have received

15   discipline waivers with no time for incidents that meet

16   your definition of major rule violations who have not

17   been terminated?

18         MS. MAYLIN:         Wait a minute.  Lack of

19   foundation.  Vague and ambiguous.

20         I think you are misusing the term "waiver," Pam.

21         But if you can understand the question and answer,

22   go ahead.

23         THE WITNESS:         I cannot recollect the

24   specifics of any particular ones.

25         Would you like me to explain waiver?

PATRICIA CALLAHAN & ASSOCIATES

48

1   we take a recess.  I need to get the judge involved in

2   this.

3        (A brief recess was taken.)

4        MS. PRICE:            Q.  Let me have you take a

5   look at Exhibit Number 6 to the deposition of

6   Mr. Deely.

7   A.   On this, I was kind of thinking, as I walked out

8   of the room, there was another rule violation on here,

9   and I'm not sure, I believe the date was 2002, because

10  I distinctly remember there was more than one.

11       There was sort of a theme to his rule violations,

12  and switching seemed to be it, and I believe it was --

13  I can't remember the month -- 2002, he had a rule

14  violation as well, which is not indicated on here.

15       MS. PRICE:            Q.  I'm sorry.  You are

16  testifying --

17       For the record, the witness seems to be referring

18  to Exhibit 5 to Mr. Deely's deposition, which is the

19  Discipline Assessment Worksheet.

20  Q.   And is it your testimony that some part of this

21  document has been redacted or that there was something

22  else on the document at the time you reviewed it?

23  A.   I already testified to that, that the bottom

24  portion of the form, probably two and a half inches, is

25  missing.  There should be one more entry for a rule

PATRICIA CALLAHAN & ASSOCIATES

1  violation in 2002 relating to switching.

2  Q.   So at the time you saw the document, in addition

3  to what you had earlier testified to, it also had some

4  more information on it that is apparently missing from

5  this document, correct?

6  A.   That is correct.  Do you want me to go to six?

7  Q.   Sure.  Take a look at six, and let us know when

8  you have finished reviewing it.

9       MS. PRICE:           I'm sorry.  Mark the record,

10  please.

11      Counsel, this document that the witness is saying

12  apparently has been redacted in some way, can we get

13  the actual document that has all of the information in

14  it?

15      MS. MAYLIN:          Oh, it's in the document

16  production, Pam.

17      MS. PRICE:           This is what I got.

18      MS. MAYLIN:          Well, you know, I'm a little

19  curious about that, because the Deely Exhibit 5 doesn't

20  have a Bates number on it.

21      MS. PRICE:           I'm aware of that.  We got

22  documents without Bates numbers.  That's a problem.

23  That was a problem a long time ago.

24      MS. MAYLIN:          You know what, actually, you

25  got our MSJ papers last night.  We have that.

52

1   Q.    You didn't look at Exhibit 6 before the break, did

2   you?

3   A.    No, ma'am.

4   Q.    When is the last time you saw Exhibit 6?

5   A.    I couldn't tell you.

6   Q.    Is it attached to your declaration, as far as you

7   know?

8   A.    I don't recall.

9   Q.    You made some reference that you thought there was

10  some type of pattern to Mr. Campbell's rule violations;

11  do you recall that testimony?

12  A.    Yes, ma'am.

13  Q.    What do you mean by that?

14  A.    Well, if you take -- on this Exhibit 6, it shows

15  7.1, switching safely, 7.3, switching precautions, 7.5,

16  testing hand brakes, 7.6, securing cars and engines,

17  even on January 14, '02, the same reference for

18  switching safely, 7.1, 7.4, precautions for coupling

19  moving cars or engines, and 7.12, movements into spur

20  tracks.  Basically, all the seven rules have to do with

21  switching.

22  Q.    What percentage of Mr. Campbell's job as a

23  conductor involved switching?

24  A.    I couldn't really break it down into a percentage.

25  Q.    Why not?

53

1    A.    I would have to know what he did for a long period

2    of time to get some kind of feel for what the

3    percentage is.

4    Q.    You don't know what Mr. Campbell's job

5    responsibilities were from 2000 up until the time you

6    terminated him?

7    A.    No, ma'am.

8    Q.    Did you look at his personnel file?

9    A.    No, ma'am.

10   Q.    Do you have some general understanding of what a

11   yard conductor does?

12   A.    Well, I have an understanding of what a conductor

13   does.  There's no differential between a yard conductor

14   and a road conductor; they all have seniority.  They

15   can work back and forth and quite often do.

16   Q.    Do you know if Mr. Campbell worked as a road

17   conductor for Amtrak?

18   A.    He was hired to do that.  I don't know, no.

19   Q.    Do you know where he was assigned during the

20   period of his employment?

21   A.    The whole time, no.

22   Q.    Do you have any knowledge of him being assigned to

23   San Francisco?

24   A.    No.

25   Q.    Are you familiar with something called the

PATRICIA CALLAHAN & ASSOCIATES

1    President's Award within Amtrak?

2    A.    Yes.

3    Q.    What is that?

4    A.    An award that's given out yearly to employees that

5    are chosen for, I believe it's five different

6    categories, valor, safety, sustained excellence, and I

7    can't remember the other two.

8    Q.    Do you know if Mr. Campbell was ever nominated for

9    the President's Award?

10   A.    No, I don't.

11   Q.    If an employee under your supervision is nominated

12   for the employee's award, does somebody normally tell

13   you about that?

14   A.    When they are nominated or when they have been

15   selected for the award?

16   Q.    When they are nominated.

17   A.    No.  It's a committee, and I've never been on the

18   committee.

19   Q.    I'm sorry.  You have no information or knowledge

20   of Mr. Campbell being assigned to the San Francisco

21   yard?

22   A.    No.

23   Q.    You have no information or knowledge of

24   Mr. Campbell's functions in the Oakland yard; is that

25   correct?

1   A.    That is correct.

2   Q.    Other than these switching violations that you

3   referenced, correct?

4   A.    Yes.  As I said, when we hire someone as a

5   conductor, we don't hire them specifically as a yard

6   conductor or a road conductor; we just hire them as a

7   conductor.  Where they elect to work is based on their

8   seniority and if they have enough seniority to go on a

9   particular job, be it the road or yard, that's entirely

10  up to them.

11  Q.    You don't recall anyone ever telling you anything

12  about John Campbell's service in the Oakland yard?

13  A.    No.

14  Q.    Do you have any way of keeping track of the

15  assignments of the various employees who work for you?

16  A.    No.  I have 531 employees, and that's not my

17  responsibility, to keep track of their daily

18  assignments.

19  Q.    Whose responsibility is it --

20  A.    Well --

21  Q.    -- if anyone?

22  A.    We have what they call organizational charts.

23  They break down the management hierarchy from, in my

24  case, Joe Deely, the four superintendents under him,

25  then it goes to each manager, who has an accountability

PATRICIA CALLAHAN & ASSOCIATES

70

1   A.    The temporary one?

2   Q.    Yes.

3   A.    I believe it was probably about four to six

4   months.

5   Q.    Who else was there, in addition to Mr. Deely?

6   A.    It was a huge office.  I could not tell you all

7   the people.  There were probably 20 people there or

8   more.

9        MS. PRICE:          Mark the record, please.

10  Q.    Are you familiar with a conductor named

11  Christopher Clipper?

12  A.    I've heard the name.

13  Q.    Do you recall in what context you heard the name?

14  A.    No.

15  Q.    Do you have any information regarding

16  Mr. Clipper's discrimination claim?

17  A.    No.

18  Q.    Are you familiar with Dave West?

19  A.    Yes.

20  Q.    Who is he?

21  A.    He's currently a student engineer.

22  Q.    Did you play any role in his selection to the

23  position of student engineer?

24  A.    No.

25  Q.    Since March 2004, how do you normally communicate

PATRICIA CALLAHAN & ASSOCIATES

1  with Mr. Deely?

2  A.   Every morning at 7:45, we have a morning call to

3  go over the previous day's operations.  It's on the

4  telephone, teleconference.

5  Q.   Do you recall any telephone conference that you

6  had with Mr. Deely since March 2004, where

7  John Campbell's name was brought up?

8  A.   Not on a teleconference, no.

9  Q.   Do you recall any telephone conference with

10  Mr. Deely where there was any discussion of any of the

11  employees assigned to the Oakland yard?

12  A.   No.

13  Q.   In the morning telephone conferences, is there an

14  agenda at all?

15  A.   Yes.

16  Q.   Is it in writing?

17  A.   I could only speak for myself.  Yes, I have forms

18  that I have made for the information, so that it's very

19  succinct, and I provide it for the call.

20  Q.   This is your own form?

21  A.   Yes.

22  Q.   Do you provide that form to anyone else?

23  A.   No.

24  Q.   Do you receive any agenda information from

25  Mr. Deely?

1    A.    No.

2    Q.    What does your form include, what topics,

3    generally?

4    A.    It starts off with if we have any rule violations

5    for the month, if we have any injuries for the month --

6    excuse me, the previous day, if we have any passenger

7    injuries for the previous day.

8         Then I segway into any initial delays on the

9    different train services.  Then I go to the end point

10   delays.  Then I go into the reasons for, if we had end

11   point delays and/or initials, and then I go to the

12   current train status of all the trains that are out

13   there currently running, and any unusual things that

14   may have happened the previous day that I feel Joe

15   needs to be aware of -- generally mechanically-related.

16   Q.    When you say your list includes rule violations,

17   what does that typically include?

18   A.    Amtrak has what they consider major rule

19   violations.  I believe there's eleven categories.  Some

20   examples would be a red signal violation, speeding,

21   improper use of the brakes, an authority issue, damage

22   to equipment, and those are considered major rule

23   violations within the corporation.

24        There's a monthly or weekly log put out that lets

25   every division and every district know where they stand

1    as far as their current rule violations for the fiscal

2    year.  Those are the ones we bring up.

3    Q.    How do you find that information out?  Where do

4    you get the information from to give to him?

5    A.    One of my supervisors.  Any of my supervisors, I

6    should say.

7    Q.    Do you recall any supervisor making you aware of

8    the alleged rule violation by John Campbell in July

9    2004?

10   A.    No.  I don't recall that far back.

11   Q.    Do you write down the rule violations that you are

12   going to alert Mr. Deely to?

13   A.    Yes.  My form has, on the top, "Rules, Safety,"

14   and it would have one rule violation, if that was the

15   case.  So yes, I do write it down.

16   Q.    Would it identify where or when the rule violation

17   took place?

18   A.    It wouldn't be written down.  I would verbally

19   address it.

20   Q.    When you say you would verbally address it, what

21   do you mean by that?

22   A.    I would go into particulars and say it was a red

23   signal violation.  I would say where it occurred, when

24   it occurred, how it occurred, the weather conditions,

25   the crews' status, all -- everything I knew about it at

1    that point.

2    Q.    Where would you get your information from?

3    A.    Generally, from the front-line supervisor, as well

4    as the host railroad.

5    Q.    How would you normally receive the information?

6    A.    Generally, a telephone conversation.

7    Q.    What positions typically participate in that

8    telephone conference?

9    A.    Well, the known participants would be Mr. Deely,

10    the four assistant superintendents, our manager from

11    our operations center.  But quite honestly, sometimes

12    there's more than that on there that I couldn't

13    identify.

14    Q.    What do you mean by that?

15    A.    When the call is over, as people disconnect, a

16    beep comes on the call, and sometimes I hear more beeps

17    than the amount of people that I had communicated with

18    during the call or heard talk.

19    Q.    So there are people on the line sometimes that you

20    don't have any idea who they are or what position they

21    hold?

22    A.    Correct.

23    Q.    Have you ever spoken to Mr. Deely about that?

24    A.    No.

25    Q.    Why not?

1  A.    That they deal with disputes, try to resolve them,

2  and it's all confidential.  They don't share it with

3  me.

4  Q.  Are you aware of any attempt between February

5  and -- say at any time in 2004 -- to resolve the

6  discrimination claims of either John Campbell or

7  Christopher Clipper?

8  A.    No.

9  Q.    Are you aware of any investigation of

10  John Campbell's discrimination claim by Amtrak between

11  February 2004 and June 2004?

12  A.    No, ma'am.

13  Q.    Are you aware of any investigation of

14  Mr. Clipper's discrimination claim within Amtrak

15  between February 2004 and June 2004?

16      MS. MAYLIN:          I need to interpose an

17  objection.  It's not reasonably calculated to lead to

18  the discovery of admissible evidence.

19      Go ahead.

20      THE WITNESS:          No, ma'am.

21      MS. PRICE:          Q.  At any time prior to

22  today, were you aware there were at least two EEO

23  claims of racial discrimination in promotions arising

24  out of your division in 2004?

25  A.    No, ma'am.

81

1  Q.    Do you have someone on your staff that

2  investigates claims of discrimination?

3  A.    No.  It comes through this department.

4  Q.    "This department," being what department?

5  A.    The EEOC or the DRO.

6  Q.    When you say the EEOC, you mean some EEO

7  department within Amtrak?

8  A.    Correct.

9  Q.    Is there any policy or procedure that you are

10  aware of within Amtrak that requires them to contact

11  the business people who are involved in claims of

12  discrimination as part of their investigation?

13      MS. MAYLIN:              Lack of foundation.  Calls

14  for speculation.

15      THE WITNESS:             I'm not aware of that policy.

16      MS. PRICE:               Q.  When people who report to

17  you are accused of discrimination, is there any

18  practice or procedure or policy to notify you of those

19  claims?

20      MS. MAYLIN:              Calls for speculation.

21      THE WITNESS:             No.  I'm not aware.  I would

22  assume -- Actually, I shouldn't say that.  I think the

23  process would be if the claim was validated, then it

24  would come to either myself or possibly Joe to handle

25  the employee.

PATRICIA CALLAHAN & ASSOCIATES

1        MS. PRICE:              Q.   What do you mean,

2    "validated"?

3    A.   If the claim was validated.

4    Q.   I don't know what you mean by that.  Can you

5    explain to us what you mean by "validated"?

6    A.   If they felt, the department that investigated,

7    that there had been some wrongness done, it would

8    probably go to another level within the department the

9    employee works for.

10   Q.   Are you speculating or imagining this, or do you

11   have some personal knowledge of a rule, practice or

12   procedure?

13   A.   No, I have no personal knowledge.

14   Q.   So that's okay.  We don't want to have you telling

15   us maybe it might happen.

16   A.   Okay.

17   Q.   Tell us what you know, okay?

18   A.   I know of no policy.

19   Q.   What about a practice or procedure whereby --

20   A.   I know of no --

21       MS. MAYLIN:              Let her finish, even though

22   you know where she's going.

23       MS. PRICE:              Q.   Yes, I mean, are you

24   aware of any practice or procedure whereby the

25   department whose managers are accused of discrimination

83

1    is advised of those accusations?

2    A.    No.

3    Q.    During the time you have been a manager in the

4    Oakland facility, have you been asked to take any

5    action in response to any allegations of racial

6    discrimination within the Oakland yard?

7    A.    No.

8    Q.    In May of 2004, were you aware of an employee

9    named Lorraine Vanderstreik who worked out of Oakland?

10   A.    I know Lorraine, yes.

11   Q.    How did you know her?

12   A.    She's in the mechanical department, and when we

13   have mechanical issues, I sometimes interact with her.

14   Q.    Who does she report to?

15   A.    Currently, the job is open.  The person that's

16   filling in right now is Chuck Flynn.

17   Q.    In 2004, who did she report to?  I don't need the

18   name, just the position.

19   A.    Superintendent.

20   Q.    Of what?

21   A.    The mechanical department.

22   Q.    In 2004, who was the superintendent of the

23   mechanical department?

24   A.    I'm not positive, but I believe it was

25   Steve Green.

1    Q.    Having reviewed the two letters sent to the EEOC

2    on behalf of Amtrak, do you have any knowledge of where

3    the information that's included in those letters came

4    from?

5    A.    No.

6    Q.    You indicate that you've participated in a morning

7    conference with Mr. Deely since 2004, correct?

8    A.    Yes.

9    Q.    On any morning conference that you have been

10   involved in with Mr. Deely, has there ever been a

11   discussion of any EEO complaints within the company?

12   A.    No.

13   Q.    Do you know why not?

14        MS. MAYLIN:          Argumentative.

15        THE WITNESS:         No.

16        MS. PRICE:           Q.  Is there any particular

17   reason that you all don't discuss EEO matters?

18        MS. MAYLIN:          Asked and answered.

19   Argumentative.

20        MS. PRICE:           Q.  That you know of?

21   A.    The calls are to do with operations, the

22   day-to-day operations of the trains.

23   Q.    Any other reason why the managers who report to

24   Mr. Deely don't discuss EEO matters?

25   A.    The calls are for the operations of the previous

86

1    A.    Not to my recollection.

2    Q.    Did you ever have a discussion about this event

3    for which Mr. Campbell was terminated with Earl Friend?

4    A.    Not to my recollection.

5    Q.    At the time you were reviewing Mr. Campbell's

6    results of Amtrak's hearing and the disciplinary

7    assessment worksheet, did you consider any alternative

8    forms of discipline to termination?

9    A.    No, ma'am.

10   Q.    Why not?

11   A.    As I indicated earlier, the theme seemed to be

12   safety-related switching, which, in our industry, we

13   have a thing called SOFA; it's a safety analysis of

14   fatalities in the industry, and working in the yard is

15   a very dangerous place, and lots of people die each

16   year, and we consider it very serious.

17   Q.    How did you know Mr. Campbell was working in the

18   yard?

19   A.    I read the transcript.

20   Q.    Did you know how long he'd been working in the

21   yard at the time you made the decision to terminate

22   him?

23   A.    No, ma'am.

24   Q.    Any other reason?

25   A.    Could you ask the question again?

1   Q.   Sure.  Any other reason why you did not consider

2   any alternative forms of discipline, alternative to

3   termination, at the time that you decided to fire

4   Mr. Campbell?

5   A.   The reasons were, as I stated, basically they were

6   incidents involving critical safety situations,

7   primarily switching of equipment, and we don't want to

8   have a catastrophe or disaster on the property.

9   Q.   Any other reasons?

10  A.   No.

11  Q.   Let me direct your attention to Exhibit 5.

12       The record should reflect we've had a discussion

13  off the record where Counsel has apparently confirmed

14  that the document we have marked as Exhibit No. 5 is

15  the only document produced by Amtrak or, apparently, in

16  its possession at this time.

17       MS. MAYLIN:            No.  Actually, what I said,

18  Pam, is that our records reflect that this is what we

19  have, and this is what we produced to you.

20       I can tell you that in the short break that we

21  had, I have not had somebody go through the thousands

22  of documents that we produced.  But what we can tell

23  you is that, yes, we did produce this in this form, and

24  as I sit here now, I can't tell you that we produced

25  another form.

1          MS. PRICE:              Well, my assertion was that

2    you have not produced another form, and I asked you to

3    try to find out if you could get the original one.  So

4    I'm sorry if I misstated the results of your inquiry,

5    but for the record right now, this is all we have,

6    which is Exhibit 5, which this witness has testified is

7    incomplete.

8          So I'm forced to examine him on incomplete

9    documents, and I'll move to exclude a lot of stuff,

10   unless I have the actual document and the information

11   that relates to that document prior to trial.

12   Q.    So Mr. Shelton, directing your attention to

13   Exhibit 5 again, under "Discipline History, Previous

14   Discipline," you testified you don't know why that

15   discipline assessment was waived, correct?

16   A.    Correct.

17   Q.    But you believe that the charges in 2000

18   constituted a, quote, "serious violation"; is that your

19   testimony?

20   A.    Correct.

21   Q.    Your declaration in support of Amtrak's Motion for

22   Summary Judgment talks about a major violation.  Do you

23   recall that?

24   A.    I don't recall if it was "major" or "serious."

25   Q.    I'll represent to you it was "major."  I can show

1    THE WITNESS:            Can I make reference to

2  something in here?

3    MS. PRICE:            Q.  It's a true or false

4  question.  I'm not sure what "something in here" is.

5  What are you referring to?

6    MS. MAYLIN:            You can answer as you like,

7  Mr. Shelton.  Go ahead.

8    MS. PRICE:            Q.  Well, if you have to

9  refer to something, you have to identify it for the

10  record.

11    So do you understand the question?

12  A.   Perhaps not.

13    MS. PRICE:            Can you read it back again,

14  please?

15    (Record read by reporter:

16    "Q.  Is it also true that you felt that the

17  decision of the hearing officer that Mr. Campbell had

18  not violated 7.1 in July of 2004 was not significant to

19  this pattern that you felt existed?")

20    THE WITNESS:            True.

21    MS. PRICE:            Q.  One of the rule

22  violations, charge number one -- I want to direct your

23  attention back to the document I handed you.

24    Do you have charge number one there?

25    MS. MAYLIN:            She's talking about this one

94

1      (indicating).

2           THE WITNESS:              Yes, I do.

3           MS. PRICE:                    Q.  Are you familiar with

4      that charge?

5      A.   Yes, I am.

6      Q.   Is that considered a serious violation?

7      A.   Yes, it is.

8      Q.   Is it considered a major violation?

9      A.   It's considered a serious violation.

10     Q.   And are you aware of any action that was taken

11     against the engineer who participated in this event in

12     response to this serious violation?

13     A.   I have no knowledge of that.

14     Q.   Did you inquire as to why the engineer was not

15     charged with this violation, given the seriousness that

16     you believe it had?

17     A.   No, I didn't.

18     Q.   Are you aware of any charges being brought against

19     the assistant conductor who was involved in this

20     incident for the violation of charge number one, the

21     coupling and uncoupling of engines or cars?

22     A.   No, I'm not.

23     Q.   Did you inquire as to whether this charge was also

24     being brought against the assistant conductor?

25     A.   No, I didn't.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.    Was it your understanding in 2004 that this charge

2    number one, this rule applied to all of the crew

3    members or only the conductor?

4    A.    The rules apply to all the employees.

5    Q.    Do you have any explanation as to why only

6    Mr. Campbell was charged with charge number one?

7         MS. MAYLIN:         Lack of foundation.

8         THE WITNESS:        No, I don't.

9         MS. PRICE:          Q.    Were you aware that he

10   was not the only crew member involved in the incident

11   at the time that you made your decision to terminate

12   him?

13   A.    No, I wasn't.

14   Q.    Directing your attention to charge number three,

15   you relied upon this charge, as well, to terminate

16   Mr. Campbell?

17   A.    Yes.

18   Q.    That's not part of the seven series that you

19   described earlier, is it?

20   A.    What the corporation considers major rule

21   violations is this part of the seven that we --

22   Q.    No.

23        Can you read it back, please?

24        (Record read by reporter:

25        "Q.    That's not part of the seven series that you

1    described earlier, is it?")

2        THE WITNESS:        No, it's not.

3        MS. PRICE:            Q.  Was it your understanding

4    at the time that you terminated Mr. Campbell that rule

5    1.47 only applied to conductors?

6    A.   No.

7    Q.   Did you determine whether or not this charge was

8    brought against the other crew members involved in the

9    incident on July 24, 2004?

10   A.   No.

11   Q.   Why not?

12   A.   My part of the process is not to dissect the

13   decision that has been rendered by the hearing officer.

14   My role is to assess discipline.

15   Q.   Did you consider a violation of rule 1.47 to be a

16   serious safety violation?

17   A.   Yes.

18   Q.   Did you consider it to be a major safety

19   violation?

20   A.   No.

21       (Interruption in the deposition.)

22       MS. PRICE:            All right.  Off the record.

23   I believe this is the judge.

24       (Discussion off the record.)

25       (Record read by reporter:

1   person you identified?

2   A.   No.

3   Q.   You say Mr. Barnes was telling the company that.

4   Did he tell you that he had not told the engineer to

5   vacate the train?

6   A.   No.  He told whoever was doing the investigation.

7   Q.   Who was that person?

8   A.   I can't remember.

9   Q.   Was it someone that worked for you?

10  A.   Not directly, no.  It would have been a front-line

11  supervisor, a road foreman, but I don't recall who.

12  There was about a two-year period where we were

13  changing road foremen pretty regularly, and I don't

14  remember who was in charge on that date.

15  Q.   Was this person who said that Mr. Barnes said that

16  someone that you believed to be more credible than

17  Mr. Barnes?

18  A.   I can't answer that.

19  Q.   Why not?

20  A.   Because I can't remember who the individual was.

21  Q.   Mr. Shelton, I'm going to show you what has been

22  submitted to the court as Exhibit A to your Declaration

23  in support of the company's motion for summary

24  judgment.

25       If you could take a look at that.  Let us know

1    when you finish reviewing it.

2    A.    Yes.

3    Q.    This document which you identified as pertaining

4    to discipline and investigation, on the first page,

5    under section b, it talks about a major offense.

6        Do you see that?

7    A.    Yes, I do.

8    Q.    Were any of the charges that Mr. Campbell was

9    charged with considered, quote, "major offenses"?

10   A.    Under the guidelines of Rule 25 of the union

11   contract?

12   Q.    Yeah, Exhibit A.

13   A.    No.

14   Q.    Is there some other section that you are aware

15   of -- Well, let me show you Exhibit B to your

16   declaration.

17       We will mark these 38 and 39.

18       (PLAINTIFF'S EXHIBIT NOS. 38 AND 39 WERE

19       MARKED FOR IDENTIFICATION.)

20       MS. PRICE:           Q.  Do you recognize

21   Exhibit 39, Exhibit B?

22   A.    Yes.

23   Q.    This is an Amtrak disciplinary guideline, correct?

24   A.    Yes.

25   Q.    Does this guideline define what is a serious

1          MS. PRICE:              We can mark it as an exhibit.

2          MS. MAYLIN:             Good.

3          MS. PRICE:              Q.  Do you understand the

4     question, Mr. Shelton?

5     A.    Yes, I do.

6     Q.    Can you answer the question, please?

7     A.    My role is to evaluate the information that has

8     already been gone through, the process of an

9     investigation, a hearing officer, a charging officer,

10    to determine guilt or innocence, and at that point, I

11    assess discipline.

12    Q.    Who investigated Anthony Guillard's role in this

13    incident?

14    A.    I don't know.

15         MS. MAYLIN:             Asked and answered.  Lack of

16    foundation.

17         MS. PRICE:              Q.  Who normally would do

18    that --

19         MS. MAYLIN:             Lack of foundation.

20         MS. PRICE:              Q.   -- if anyone?

21    A.    The front-line supervisor.

22    Q.    Who was that in July 2004?

23    A.    I don't know.

24    Q.    Was it Tim Sheridan?

25    A.    I don't know.

1    specifics of when I did and didn't.

2    Q.    Did you ever talk to anyone in labor relations

3    about why you receive notices of investigation?

4    A.    No.   It's company policy.

5    Q.    Did you ever talk to Joe Deely about why you

6    receive notices of investigation?

7    A.    No.

8    Q.    In the morning meetings, I believe you testified

9    there's no discussion of EEO matters.   Is there any

10   discussion of charges being brought against employees?

11   A.    Yes.

12   Q.    In what context?

13   A.    If there was a rule violation, that would be

14   brought up in the call.   As I told you earlier, the

15   first thing we start with is the rule violations for

16   the month, and if there was a current one just pending

17   investigation, Joe would ask where it's going, who is

18   involved, what is the host railroad's take.   There

19   would be questions like that.

20   Q.    Did you ever communicate with Tim Sheridan

21   regarding notices of investigations that he issued and

22   sent to you?

23   A.    I don't recall.

24   Q.    Now that we know that Tim Sheridan is the one that

25   issued the notice of formal investigation and you have

1    the counseling portion, item one and two, verbal or

2    written warning, the reason they are both in there is

3    because the UTU contract allows for a written warning

4    letter of counseling; the BLET contract does not, and

5    I believe there's other contracts that don't either.

6         Generally, the first session, the counseling,

7    could be either/or.  The second one would be the second

8    rule violation, which would be item three, reprimand or

9    suspension of three days or less, and four would be ten

10   days or less, a more serious violation.

11        MS. PRICE:          Q.  So directing your

12   attention, then, to Exhibit 6 to Mr. Deely's deposition

13   transcript, which is your termination letter to

14   Mr. Campbell, can you tell us why the second offense or

15   the second discipline imposed on Mr. Campbell was not a

16   reprimand or a suspension of three days or less?

17   A.    It was suspension of ten days.

18   Q.    Yeah.  Right.  My question was a little different.

19   I'm not sure if you understood the question.  Let me

20   restate it.

21        Can you tell us why the second offense for

22   Mr. Campbell, as described in your letter, was not --

23   the discipline imposed was not a reprimand or a

24   suspension of less than three days?

25        MS. MAYLIN:          Calls for speculation, and

PATRICIA CALLAHAN & ASSOCIATES

1  also lack of foundation.

2  THE WITNESS:          These are the guidelines.

3  MS. MAYLIN:          No.  No.  Steve, what she's

4  asking -- Look here, she's just asking do you know why

5  that's what was assessed then, that's all.

6  MS. PRICE:          I object to Counsel's

7  coaching and move to strike her coaching of the

8  witness.

9  Q.    Any other reason why, Mr. Shelton, that you know

10  of?

11  A.    Could you reask the question, please?

12  Q.    Sure.

13        Can you tell us, is there any other reason, other

14  than what you have just testified to, why the

15  discipline imposed on Mr. Campbell for the second

16  offense, as described in your letter, was not a

17  reprimand or a suspension of less than three days?

18  MS. MAYLIN:          Calls for speculation.

19  MS. PRICE:          Q.  Any reason other than

20  what you just told us?

21  A.    No.

22  Q.    Is it true, when you say that these are just

23  guidelines, that the management who is responsible for

24  enforcing these guidelines -- as a manager, that you

25  are expected to use some discretion in enforcing the

1  guidelines?

2  A.   Yes.

3  Q.   In your decision to terminate Mr. Campbell in July

4  2004, did you exercise your discretion?

5  A.   Yes.

6  Q.   Did you consider, in the exercise of your

7  discretion, that none of the other crew members had

8  been charged in any way?

9  A.   No.

10  Q.   Did you consider, in exercising your discretion,

11  whether any of the other crew members were at fault in

12  this incident?

13  A.   No, because I was confident that decision had been

14  made early on in the investigation.

15  Q.   By whom?

16  A.   Whomever was doing the investigation.

17  Q.   You had confidence in whomever or in a particular

18  person?

19  A.   Right, a trainmaster or road foreman.

20  Q.   Do you know whether or not the other employees

21  were counseled at all in connection with this incident?

22       MS. MAYLIN:        Asked and answered.  Calls

23  for speculation.

24       THE WITNESS:        No, I don't.

25       MS. PRICE:          Q.   Do you know whether this

PATRICIA CALLAHAN & ASSOCIATES

1  incident was the first time that Mr. Gilliard had had a

2  problem with coupling an engine?

3  A.    No, I don't.

4  Q.    Do you know whether or not this was the first time

5  Mr. Barrows had had a problem with coupling an engine?

6  A.    No, I don't.

7  Q.    Did you, in the evaluation of the discipline to be

8  imposed upon any employee, ever contact the hearing

9  officer to discuss the information that you received in

10  writing?

11  A.    No.

12  Q.    Do you ever contact the charging officer?

13  A.    No.

14  Q.    Have you been able to recall any conversations

15  that you had with Mr. Barnes regarding Mr. Campbell's

16  termination?

17  A.    No.

18  Q.    Have you been able to recall any conversation that

19  you had with Mr. Skinner regarding Mr. Campbell's

20  termination?

21  A.    No.

22  Q.    At the time you terminated Mr. Campbell, did you

23  know that he was being considered for a promotion to an

24  engineer position?

25  A.    No.

1
2
3

## CERTIFICATE

4        I, the undersigned, a Certified Shorthand

5   Reporter, State of California, hereby certify that the

6   witness in the foregoing deposition was by me first

7   duly sworn to testify to the truth, the whole truth,

8   and nothing but the truth in the within-entitled cause;

9   that said deposition was taken at the time and place

10   therein stated; that the testimony of said witness was

11   reported by me, a disinterested person, and was

12   thereafter transcribed under my direction into

13   typewriting; that the foregoing is a full, complete and

14   true record of said testimony; and that the witness was

15   given an opportunity to read and, if necessary, correct

16   said deposition and to subscribe the same.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties in the

19   foregoing deposition and caption named, nor in any way

20   interested in the outcome of the cause named in said

21   caption.

22        Executed this 13th day of April 2007.

23
24
25   _____
     DEBORAH A. PIERSON
     CSR No. 7988