UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C. FAHEEM R. HARDEMAN,

      Plaintiff,

  vs.                         No. C 04-3360 SI

AMTRAK/CALTRAIN RAILROAD,

      Defendants.

_____/

COPY

DEPOSITION OF DONALD BRUCE SHELTON

(Pages 58 through 91

and pages 96 and 97 are confidential)

June 28, 2006

PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
LaRelle M. Fagundes
CSR No. 9762

**EXHIBIT I**

1                DONALD BRUCE SHELTON,

2        Being first duly sworn, testified as follows:

3

4                EXAMINATION BY MS. PRICE

5            MS. PRICE:  Q.  Can you state your name for

6    the record, please.

7    A.         First name is Donald Bruce Shelton.

8    Q.         And what is your current occupation?

9    A.         Conductor Amtrak.

10   Q.         All right.

11              How long have you had that position?

12   A.         Nine years.

13   Q.         Was that your first position with the

14   railroad?

15   A.         Yes.

16              Would you help me out, by the way?  We

17   haven't been introduced.

18   Q.         Sure.  My name is Pamela Price.  I

19   represent Faheem Hardeman.  This is my associate

20   O-Kee Shim.  She also represents Mr. Hardeman.  And

21   we're here to take your deposition and to ask you

22   some questions about things that happened while

23   Mr. Hardeman was employed and a little bit after he

24   was terminated.  Okay?

25              So have you ever had your deposition taken

1    A.    No.

2    Q.    Have you looked at your testimony in the

3    investigatory hearing?

4    A.    No.

5    Q.    Okay.

6          Do you have a memory of your testimony at

7    the investigatory hearing in May of 2003?

8    A.    Vague.

9    Q.    Okay.

10         Do you have a memory of the incident that

11   sort of started all of this where there was a

12   derailment on April 10th, 2003?

13   A.    Fairly clear.

14   Q.    Okay.

15         Why were you on the train that day, April

16   10th, 2003?

17   A.    I was an observer.

18   Q.    What was your purpose in observing?

19   A.    I had broken my back in a job injury and

20   had been out of service for eight months

21   recovering.  And when you're out for that period of

22   time, you need to requalify, become refamiliar with

23   the job, physical characteristics of the railroad.

24   On that day, I had opted to spend some time with

25   the yard crew in San Francisco.

PATRICIA CALLAHAN & ASSOCIATES

1    Q.        Okay.

2              Were you being paid for your time?

3    A.        Yes.

4    Q.        And was this the only day that you were in

5    this observer status?

6    A.        In the San Francisco yard, yes.

7    Q.        Okay.

8              Did you just do one day as an observer in

9    the yard?

10   A.        Yes.

11   Q.        Okay.

12             Were there other locations where you were

13   working but you were in an observer capacity?

14   A.        San Jose yard and on board the trains

15   themselves.

16   Q.        Okay.

17             How many days had you been working in an

18   observer capacity prior to April 10th, if any?

19   A.        Not recalling what day April 10th was, it

20   would have been a week total, about five days.

21   Q.        And after you -- was there a period of time

22   that you were planning to be in observer status?

23   A.        I don't know that there was a definitive

24   time period.  I elected for about five days.  I

25   felt that would be more than sufficient.

```
1    worked a shift in San Jose; is that correct?

2    A.      I had.

3    Q.      Okay.

4            And you had worked a shift somewhere else?

5    A.      I spent some time on the passenger trains.

6    Q.      Okay.  All right.

7            So on the morning of April the 10th, as

8    part of your observation, do you recall what you

9    were doing as the train came into the yard?

10   A.      Well, the train was in the yard.

11   Q.      Okay.  All right.

12           Do you recall that morning if engine -- the

13   engine that derailed, was that the first train you

14   were observing on?

15   A.      Yes.

16   Q.      Okay.

17           Had you been on that particular section of

18   the yard before?

19   A.      Yes.  I was yard conductor qualified in

20   San Francisco.  But having been gone for eight

21   months, this, again, was a

22   familiarization/qualification trip.

23   Q.      Okay.

24           And was it your understanding you were just

25   going to be observing the movement of the trains
```

1    Q.        Okay.

2              Now, had you worked with Paul Soule prior

3    to this day?

4    A.        I have.

5    Q.        Okay.

6              In what capacity?

7    A.        As his conductor on occasion when I was

8    assigned to the yard.

9    Q.        Okay.

10              And have you worked with him since April

11   10th, 2003?

12   A.        To the best of my knowledge, no.

13   Q.        Okay.

14              After the engine derailed, did you and

15   Mr. Soule talk about what had happened?

16   A.        Briefly, but I don't recall the substance

17   of the conversation.

18   Q.        Okay.

19              Did he say to you that Mr. Hardeman had

20   told him that the switches were properly lined?

21   A.        I believe that came up in the conversation,

22   yes.

23   Q.        Okay.

24              Was Mr. Hardeman present at the time of

25   that conversation?

34

1    A.        No.

2    Q.        Okay.

3              Where was Mr. Hardeman?

4    A.        I don't recall.  Immediately after the

5    incident, we were instructed to prepare incident

6    reports.  So Mr. Hardeman was undoubtedly preparing

7    his at some other point on the property.

8    Q.        Okay.

9              Were you and Mr. Soule together at the time

10   that you were preparing your statements?

11   A.        We were within proximity.  We weren't

12   collaborating on the report.

13   Q.        But this conversation that you and he had

14   about the statement by Mr. Hardeman took place

15   while you were in proximity?

16   A.        Yes, before we began doing the incident

17   reports.

18   Q.        Okay.

19             Was anyone else present?

20   A.        Not to my knowledge, no.

21   Q.        Okay.

22             Who asked you to prepare the incident

23   report?

24   A.        It's standard operating procedure, and this

25   would have been on the instructions of management.

1    Q.        Okay.

2             Do you recall who -- what manager asked you

3    to do that?

4    A.        To the best of my recollection, it would

5    have been the trainmaster on duty, and it was

6    Mike Howard.

7    Q.        Okay.

8             Did Mr. Howard talk to you about your

9    statement?

10   A.        No.  He merely solicited the statement, and

11   we completed it, turned it in, and then submitted

12   to a drug and alcohol test.

13   Q.        Okay.

14            And were you off work while you were

15   waiting for the results of your drug and alcohol

16   test?

17   A.        Yes, I was.

18   Q.        How many days?

19   A.        I believe between three and five days.

20   Q.        Were you paid for that time?

21   A.        No.

22   Q.        Did you that morning following the

23   derailment have a conversation with Billy Rogers?

24   A.        Not that morning, no.

25   Q.        Do you know who Billy Rogers is?

1    A.        I do.

2    Q.        Okay.

3              Did you ever have occasion to discuss this

4    derailment with Billy Rogers?

5    A.        I do.

6    Q.        Okay.

7              When?

8    A.        Several days after the incident.

9    Q.        Okay.

10             Where?

11   A.        On the telephone.

12   Q.        Where were you?

13   A.        At home.

14   Q.        Okay.

15             And do you recall the conversation you had

16   with Mr. Rogers?

17   A.        He had called me asking about the alleged

18   conversation that took place in the cab.  And I

19   told him I felt very comfortable about discussing

20   this.  He pressed the matter, so I did tell him

21   that, yes, Paul Soule had asked the engineer if the

22   switch points were lined properly, and that, yes,

23   there was a response from Faheem Hardeman, the

24   engineer, but I couldn't determine what the

25   response was.

1    from the workplace?

2    A.    To the best of my knowledge, yes, because

3    we were both out of service at that point.

4    Q.    Okay.

5          Did you have any conversation with

6    Mr. Soule where your union reps were present?

7    A.    Individually, but not with Paul.

8    Q.    Okay.

9          So you had had contact with your union rep?

10    A.    Yes.

11    Q.    And it was your understanding that he had

12    had contact with his union rep?

13    A.    Without question.

14    Q.    Okay.

15          So tell me what you recall about the first

16    conversation that you and Mr. Soule had after you

17    were taken out of service.

18    A.    The shock at the fact that power derail was

19    actually functioning.

20    Q.    What are you referring to?

21    A.    You're familiar with the derail device?  It

22    directs the cars' wheels off the track to protect

23    equipment that is farther down the track.

24    Q.    Yes, sir.

25    A.    Usually those are manually operated.  This

```
 1    was the only power derail in the San Francisco

 2    yard.  That hadn't been functional in years.

 3    Q.      How do you know that?

 4    A.      From my several years on the railroad and

 5    the time I'd spent working on the yard job.

 6    Q.      At the time of this derailment, in April of

 7    2003, the power derail switch actually directed the

 8    engine into the parking lot; is that correct?

 9    A.      Yes.

10    Q.      Was that the employee parking lot?

11    A.      Yes.

12    Q.      And were you parked in that parking lot?

13    A.      I was.

14            MR. GIVEN:  Is that relevant to anything?

15            MS. PRICE:  Oh, yeah.

16    Q.      Were other employees parked in that parking

17    lot?

18    A.      Yes.

19    Q.      Was it essentially a public parking lot?

20    A.      No.

21    Q.      Okay.

22            But it was open to people who were employed

23    in the yard; is that correct?

24    A.      Employed by Amtrak, yes.

25    Q.      If the engine were to go -- actually derail
```

1    the property before you actually left?

2    A.      I would guess between two and three hours.

3    Q.     Okay.

4           What were you doing during that time?

5    A.      Awaiting the arrival of management,

6    completing an incident report, awaiting somebody

7    from Oakland to administer a drug and alcohol test,

8    and then I stuck around just to watch the rerail

9    procedure.

10    Q.     Okay.

11          And what was the rerail procedure?

12    A.      When they attempt to place the locomotive

13    back on the rails.

14    Q.     Okay.

15          Was that done that morning?

16    A.     It was, yes.

17    Q.     Okay.

18          About how long did that take?

19    A.     I'm guessing.  Between 45 minutes to an

20    hour.

21    Q.     Okay.

22          Was there any damage to the engine that you

23    were aware of?

24    A.     No.  Without wanting to go into a lot of

25    unnecessary detail, when the wheels leave the

1   derail and the time that he left?

2   A.     I'm sure I did.  I cannot honestly tell you

3   what that conversation would have entailed.  I

4   think all three of us expressed extreme surprise

5   that that power derail was, in fact, functioning.

6   Q.     Okay.  Did you express that surprise to

7   anyone in Amtrak management?

8   A.     Yes.

9   Q.     To whom?

10  A.     I don't recall.

11  Q.     Okay.

12  A.     I know I did hear managers, and, again, I

13  can't recall their names, but managers who showed

14  up on the scene, who also expressed surprise that

15  the power derail was, in fact, functioning.

16  Q.     Do you recall if those managers included

17  Mike Howard?

18  A.     I don't recall.

19  Q.     Did you see Billy Rogers that morning

20  before you left?

21  A.     Yes.

22  Q.     Do you recall if he was -- had any surprise

23  or was any way concerned about the power derail

24  being active that morning?

25  A.     If he registered surprise, I wasn't aware

1  Q.      Did Paul indicate to you that he had spoken

2  to Billy Rogers?

3  A.        I don't recall.

4  Q.      Before you went to the investigatory

5  hearing -- withdraw that.

6         At the time of the investigatory hearing,

7  did you have a union rep there?

8  A.      I believe there was a union rep.  I'm

9  sorry.  I should be able to answer that question.

10  It was three years ago.  I'm blanking out.

11  Logically there would be a union rep there to

12  protect the rights of the union members.

13  Q.      Okay.

14         Before the investigatory hearing, had

15  you -- do you recall signing a waiver regarding the

16  discipline for this incident?

17  A.      I didn't sign a waiver because -- initially

18  I received a charge letter charging me with an

19  operating rules violation, the rules being defined

20  by the general code of operating rules.  And I

21  objected to that, because I wasn't a crew member.

22  And I took that up with my rep, and I took it up

23  with the senior manager and told him I'd fight it

24  all the way.  So they agreed that because I was a

25  crew member, but I was present in the cab, that I

PATRICIA CALLAHAN & ASSOCIATES

1    couldn't walk away from this untouched.  So I was

2    charged with a standards of excellence violation.

3    The difference being that after two years, it's

4    purged from your records.  There would be no

5    further violations.

6    Q.      Who was the senior manager that you took it

7    up with?

8    A.      Charlie Barns.

9    Q.      Okay.

10          And did you have -- did you personally

11   speak to Mr. Miller?

12   A.      I did.

13   Q.      Tell me about your conversation with

14   Mr. Miller.

15   A.      I mentioned to him that I was not there in

16   an official capacity.  I was not a crew member.  I

17   was merely observer, that I was in no position to

18   see the movement of the engine based on my position

19   in the cab and that I should not be subjected to an

20   operating rules violation.

21   Q.      Okay.

22          And did he ask you any questions about what

23   had happened?

24   A.      He did.

25   Q.      What did he ask you?

1          MS. PRICE: Yes, sir.

2          THE WITNESS: Possibly. I haven't read my

3     incident report.

4          MS. PRICE: Okay.

5     Q.    Well, when you talked to Mr. Miller, do you

6     recall discussing the conversation with him?

7     A.    I do.

8     Q.    Okay.

9          What did you tell him?

10    A.    I told him that I recalled Paul asking the

11    question of Mr. Hardeman about whether the switch

12    points were properly lined.

13    Q.    Okay.

14         And did you tell him what Mr. Hardeman's

15    response was?

16    A.    I told him that Mr. Hardeman's response was

17    unintelligible.

18    Q.    Did he ask you where you were located when

19    you heard that unintelligible response?

20    A.    I'm sure he did, yes.

21    Q.    Okay.

22         And did you tell -- did he ask you how far

23    you were from Mr. Soule at the time of the

24    conversation?

25    A.    I'm sure he did.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

C. FAHEEM R. HARDEMAN,

      Plaintiff,

    vs.                      No. C 04-3360 SI

AMTRAK/CALTRAIN RAILROAD,

      Defendants.

_____/



DEPOSITION OF DONALD BRUCE SHELTON

(Pages 58 through 91

and pages 96 and 97 are confidential)

June 28, 2006

PATRICIA CALLAHAN & ASSOCIATES, INC.
Certified Shorthand Reporters
Oakland, California  510-835-3993
San Francisco, California  415-788-3993
Castro Valley, California  510-885-2371

Facsimile 510-247-9775
WeReport@aol.com

Reported by:
LaRelle M. Fagundes
CSR No. 9762

1          DONALD BRUCE SHELTON,

2     Being first duly sworn, testified as follows:

3

4          EXAMINATION BY MS. PRICE

5          MS. PRICE:  Q.  Can you state your name for

6     the record, please.

7     A.        First name is Donald Bruce Shelton.

8     Q.        And what is your current occupation?

9     A.        Conductor Amtrak.

10    Q.        All right.

11              How long have you had that position?

12    A.        Nine years.

13    Q.        Was that your first position with the

14    railroad?

15    A.    ·   Yes.

16              Would you help me out, by the way?  We

17    haven't been introduced.

18    Q.        Sure.  My name is Pamela Price.  I

19    represent Faheem Hardeman.  This is my associate

20    O-Kee Shim.  She also represents Mr. Hardeman.  And

21    we're here to take your deposition and to ask you

22    some questions about things that happened while

23    Mr. Hardeman was employed and a little bit after he

24    was terminated.  Okay?

25              So have you ever had your deposition taken

PATRICIA CALLAHAN & ASSOCIATES

1    A.      No.

2    Q.      Have you looked at your testimony in the

3    investigatory hearing?

4    A.      No.

5    Q.      Okay.

6            Do you have a memory of your testimony at

7    the investigatory hearing in May of 2003?

8    A.      Vague.

9    Q.      Okay.

10           Do you have a memory of the incident that

11   sort of started all of this where there was a

12   derailment on April 10th, 2003?

13   A.      Fairly clear.

14   Q.      Okay.

15           Why were you on the train that day, April

16   10th, 2003?

17   A.      I was an observer.

18   Q.      What was your purpose in observing?

19   A.      I had broken my back in a job injury and

20   had been out of service for eight months

21   recovering.  And when you're out for that period of

22   time, you need to requalify, become refamiliar with

23   the job, physical characteristics of the railroad.

24   On that day, I had opted to spend some time with

25   the yard crew in San Francisco.

1    Q.        Okay.

2              Were you being paid for your time?

3    A.        Yes.

4    Q.        And was this the only day that you were in

5    this observer status?

6    A.        In the San Francisco yard, yes.

7    Q.        Okay.

8              Did you just do one day as an observer in

9    the yard?

10   A.        Yes.

11   Q.        Okay.

12             Were there other locations where you were

13   working but you were in an observer capacity?

14   A.        San Jose yard and on board the trains

15   themselves.

16   Q.        Okay.

17             How many days had you been working in an

18   observer capacity prior to April 10th, if any?

19   A.        Not recalling what day April 10th was, it

20   would have been a week total, about five days.

21   Q.        And after you -- was there a period of time

22   that you were planning to be in observer status?

23   A.        I don't know that there was a definitive

24   time period.  I elected for about five days.  I

25   felt that would be more than sufficient.

1    worked a shift in San Jose; is that correct?

2    A.       I had.

3    Q.       Okay.

4             And you had worked a shift somewhere else?

5    A.       I spent some time on the passenger trains.

6    Q.       Okay.  All right.

7             So on the morning of April the 10th, as

8    part of your observation, do you recall what you

9    were doing as the train came into the yard?

10   A.       Well, the train was in the yard.

11   Q.       Okay.  All right.

12            Do you recall that morning if engine -- the

13   engine that derailed, was that the first train you

14   were observing on?

15   A.       Yes.

16   Q.       Okay.

17            Had you been on that particular section of

18   the yard before?

19   A.       Yes.  I was yard conductor qualified in

20   San Francisco.  But having been gone for eight

21   months, this, again, was a

22   familiarization/qualification trip.

23   Q.       Okay.

24            And was it your understanding you were just

25   going to be observing the movement of the trains

PATRICIA CALLAHAN & ASSOCIATES

1    Q.    Okay.

2          Now, had you worked with Paul Soule prior

3    to this day?

4    A.    I have.

5    Q.    Okay.

6          In what capacity?

7    A.    As his conductor on occasion when I was

8    assigned to the yard.

9    Q.    Okay.

10         And have you worked with him since April

11   10th, 2003?

12   A.    To the best of my knowledge, no.

13   Q.    Okay.

14         After the engine derailed, did you and

15   Mr. Soule talk about what had happened?

16   A.    Briefly, but I don't recall the substance

17   of the conversation.

18   Q.    Okay.

19         Did he say to you that Mr. Hardeman had

20   told him that the switches were properly lined?

21   A.    I believe that came up in the conversation,

22   yes.

23   Q.    Okay.

24         Was Mr. Hardeman present at the time of

25   that conversation?

1  A.      No.

2  Q.      Okay.

3          Where was Mr. Hardeman?

4  A.      I don't recall.  Immediately after the

5  incident, we were instructed to prepare incident

6  reports.  So Mr. Hardeman was undoubtedly preparing

7  his at some other point on the property.

8  Q.      Okay.

9          Were you and Mr. Soule together at the time

10 that you were preparing your statements?

11 A.      We were within proximity.  We weren't

12 collaborating on the report.

13 Q.      But this conversation that you and he had

14 about the statement by Mr. Hardeman took place

15 while you were in proximity?

16 A.      Yes, before we began doing the incident

17 reports.

18 Q.      Okay.

19         Was anyone else present?

20 A.      Not to my knowledge, no.

21 Q.      Okay.

22         Who asked you to prepare the incident

23 report?

24 A.      It's standard operating procedure, and this

25 would have been on the instructions of management.

1    Q.       Okay.

2             Do you recall who -- what manager asked you

3    to do that?

4    A.       To the best of my recollection, it would

5    have been the trainmaster on duty, and it was

6    Mike Howard.

7    Q.       Okay.

8             Did Mr. Howard talk to you about your

9    statement?

10   A.       No.  He merely solicited the statement, and

11   we completed it, turned it in, and then submitted

12   to a drug and alcohol test.

13   Q.       Okay.

14            And were you off work while you were

15   waiting for the results of your drug and alcohol

16   test?

17   A.       Yes, I was.

18   Q.       How many days?

19   A.       I believe between three and five days.

20   Q.       Were you paid for that time?

21   A.       No.

22   Q.       Did you that morning following the

23   derailment have a conversation with Billy Rogers?

24   A.       Not that morning, no.

25   Q.       Do you know who Billy Rogers is?

1    A.        I do.

2    Q.        Okay.

3              Did you ever have occasion to discuss this

4    derailment with Billy Rogers?

5    A.        I do.

6    Q.        Okay.

7              When?

8    A.        Several days after the incident.

9    Q.        Okay.

10             Where?

11   A.        On the telephone.

12   Q.        Where were you?

13   A.        At home.

14   Q.        Okay.

15             And do you recall the conversation you had

16   with Mr. Rogers?

17   A.        He had called me asking about the alleged

18   conversation that took place in the cab.  And I

19   told him I felt very comfortable about discussing

20   this.  He pressed the matter, so I did tell him

21   that, yes, Paul Soule had asked the engineer if the

22   switch points were lined properly, and that, yes,

23   there was a response from Faheem Hardeman, the

24   engineer, but I couldn't determine what the

25   response was.

1    from the workplace?

2    A.      To the best of my knowledge, yes, because

3    we were both out of service at that point.

4    Q.      Okay.

5            Did you have any conversation with

6    Mr. Soule where your union reps were present?

7    A.      Individually, but not with Paul.

8    Q.      Okay.

9            So you had had contact with your union rep?

10   A.      Yes.

11   Q.      And it was your understanding that he had

12   had contact with his union rep?

13   A.      Without question.

14   Q.      Okay.

15           So tell me what you recall about the first

16   conversation that you and Mr. Soule had after you

17   were taken out of service.

18   A.      The shock at the fact that power derail was

19   actually functioning.

20   Q.      What are you referring to?

21   A.      You're familiar with the derail device?  It

22   directs the cars' wheels off the track to protect

23   equipment that is farther down the track.

24   Q.      Yes, sir.

25   A.      Usually those are manually operated.  This

1   was the only power derail in the San Francisco

2   yard.  That hadn't been functional in years.

3   Q.      How do you know that?

4   A.      From my several years on the railroad and

5   the time I'd spent working on the yard job.

6   Q.      At the time of this derailment, in April of

7   2003, the power derail switch actually directed the

8   engine into the parking lot; is that correct?

9   A.      Yes.

10  Q.      Was that the employee parking lot?

11  A.      Yes.

12  Q.      And were you parked in that parking lot?

13  A.      I was.

14          MR. GIVEN:  Is that relevant to anything?

15          MS. PRICE:  Oh, yeah.

16  Q.      Were other employees parked in that parking

17  lot?

18  A.      Yes.

19  Q.      Was it essentially a public parking lot?

20  A.      No.

21  Q.      Okay.

22          But it was open to people who were employed

23  in the yard; is that correct?

24  A.      Employed by Amtrak, yes.

25  Q.      If the engine were to go -- actually derail

PATRICIA CALLAHAN & ASSOCIATES

1    the property before you actually left?

2    A.    I would guess between two and three hours.

3    Q.    Okay.

4          What were you doing during that time?

5    A.    Awaiting the arrival of management,

6    completing an incident report, awaiting somebody

7    from Oakland to administer a drug and alcohol test,

8    and then I stuck around just to watch the rerail

9    procedure.

10   Q.    Okay.

11         And what was the rerail procedure?

12   A.    When they attempt to place the locomotive

13   back on the rails.

14   Q.    Okay.

15         Was that done that morning?

16   A.    It was, yes.

17   Q.    Okay.

18         About how long did that take?

19   A.    I'm guessing.  Between 45 minutes to an

20   hour.

21   Q.    Okay.

22         Was there any damage to the engine that you

23   were aware of?

24   A.    No.  Without wanting to go into a lot of

25   unnecessary detail, when the wheels leave the

PATRICIA CALLAHAN & ASSOCIATES

1  derail and the time that he left?

2  A.      I'm sure I did.  I cannot honestly tell you

3  what that conversation would have entailed.  I

4  think all three of us expressed extreme surprise

5  that that power derail was, in fact, functioning.

6  Q.      Okay.  Did you express that surprise to

7  anyone in Amtrak management?

8  A.      Yes.

9  Q.      To whom?

10  A.      I don't recall.

11  Q.      Okay.

12  A.      I know I did hear managers, and, again, I

13  can't recall their names, but managers who showed

14  up on the scene, who also expressed surprise that

15  the power derail was, in fact, functioning.

16  Q.      Do you recall if those managers included

17  Mike Howard?

18  A.      I don't recall.

19  Q.      Did you see Billy Rogers that morning

20  before you left?

21  A.      Yes.

22  Q.      Do you recall if he was -- had any surprise

23  or was any way concerned about the power derail

24  being active that morning?

25  A.      If he registered surprise, I wasn't aware

PATRICIA CALLAHAN & ASSOCIATES

1    Q.      Did Paul indicate to you that he had spoken

2    to Billy Rogers?

3    A.      I don't recall.

4    Q.      Before you went to the investigatory

5    hearing -- withdraw that.

6           At the time of the investigatory hearing,

7    did you have a union rep there?

8    A.      I believe there was a union rep.  I'm

9    sorry.  I should be able to answer that question.

10    It was three years ago.  I'm blanking out.

11    Logically there would be a union rep there to

12    protect the rights of the union members.

13    Q.      Okay.

14           Before the investigatory hearing, had

15    you -- do you recall signing a waiver regarding the

16    discipline for this incident?

17    A.      I didn't sign a waiver because -- initially

18    I received a charge letter charging me with an

19    operating rules violation, the rules being defined

20    by the general code of operating rules.  And I

21    objected to that, because I wasn't a crew member.

22    And I took that up with my rep, and I took it up

23    with the senior manager and told him I'd fight it

24    all the way.  So they agreed that because I was a

25    crew member, but I was present in the cab, that I

1    couldn't walk away from this untouched.  So I was

2    charged with a standards of excellence violation.

3    The difference being that after two years, it's

4    purged from your records.  There would be no

5    further violations.

6    Q.    Who was the senior manager that you took it

7    up with?

8    A.    Charlie Barns.

9    Q.    Okay.

10   And did you have -- did you personally

11   speak to Mr. Miller?

12   A.    I did.

13   Q.    Tell me about your conversation with

14   Mr. Miller.

15   A.    I mentioned to him that I was not there in

16   an official capacity.  I was not a crew member.  I

17   was merely observer, that I was in no position to

18   see the movement of the engine based on my position

19   in the cab and that I should not be subjected to an

20   operating rules violation.

21   Q.    Okay.

22   And did he ask you any questions about what

23   had happened?

24   A.    He did.

25   Q.    What did he ask you?

1          MS. PRICE:  Yes, sir.

2          THE WITNESS:  Possibly.  I haven't read my

3    incident report.

4          MS. PRICE:  Okay.

5    Q.     Well, when you talked to Mr. Miller, do you

6    recall discussing the conversation with him?

7    A.     I do.

8    Q.     Okay.

9          What did you tell him?

10   A.     I told him that I recalled Paul asking the

11   question of Mr. Hardeman about whether the switch

12   points were properly lined.

13   Q.     Okay.

14          And did you tell him what Mr. Hardeman's

15   response was?

16   A.     I told him that Mr. Hardeman's response was

17   unintelligible.

18   Q.     Did he ask you where you were located when

19   you heard that unintelligible response?

20   A.     I'm sure he did, yes.

21   Q.     Okay.

22          And did you tell -- did he ask you how far

23   you were from Mr. Soule at the time of the

24   conversation?

25   A.     I'm sure he did.

1    specific instruction given."

2              Do you see that?

3    A.        I do.

4    Q.        Okay.

5              And was that accurate at the time?

6    A.        Yes.

7    Q.        Okay.

8              Is it normally the conductor's

9    responsibility to tell the engineer to move?

10   A.        Yes.

11   Q.        Okay.

12             You don't recall Mr. Soule telling

13   Mr. Hardeman to move the engine?

14   A.        I don't recall.

15   Q.        Okay.

16             While these events were occurring, you

17   weren't giving Mr. Hardeman any instructions, were

18   you?

19   A.        No.

20   Q.        Okay.

21             And then directing your attention to the

22   top of page 29, you were asked was there any

23   conversation in the cab as to who was to protect

24   the move.

25             Do you see that?

1           What were you looking at other than them?

2    A.     The bulkhead was directly across from me.

3    Q.     Okay.

4           And then you were asked -- the next

5    question from Mr. Rogers was, and was there any

6    conversation in the cab as to who was to protect

7    the move.

8           And do you see that question?

9    A.     I do.

10   Q.     You stated, "I don't recall a specific

11   conversation about it, anybody protecting the

12   point, if that's what you're asking me."

13          Was that your testimony?

14   A.     That's correct.

15   Q.     And is that true?

16   A.     That's correct.

17   Q.     And what did you mean by I don't recall --

18   well, withdraw that.

19          What did you mean by the statement "anybody

20   protecting the point"?

21   A.     Typically in a railroad that would mean you

22   physically leave the cab and proceed to the rear of

23   the movement.  In this case, the rear of the

24   locomotive.  And then using the grab irons on the

25   side of the locomotive, you position yourself there

PATRICIA CALLAHAN & ASSOCIATES

1    for a better vantage point.  And the engineer then

2    proceeds on your instructions.

3    Q.      How frequently is that done in the railroad

4    industry?

5    A.      When you're moving a single engine, not

6    very often.

7    Q.      How frequently is it done -- well, withdraw

8    that?

9            Have you ever done that?

10   A.      Rarely.

11   Q.      Okay.  Then you were asked how did you all

12   know that your route was going to be protected.

13           Do you see that?

14   A.      Yes.

15   Q.      Okay.

16           And your answer -- can you read your answer

17   at the --

18   A.      I'm not certain I understand this response.

19   Well, we had the yard A/C --

20   Q.      No.  No.  No.  I'm sorry.

21           The response found at the bottom half of

22   page 29.

23           If you --

24   A.      Oh, okay.  All right.

25   Q.      So you indicated there that you were kind

1    of guided by the experience of the yard A/C calls.

2           Do you know what that means, or what you

3    meant by -- is that what you said?

4    A.      I think that may have been an error in

5    transcription.  But I was being guided by the

6    experience of the yard assistant conductor, and

7    that would have been Paul Soule.

8    Q.      Okay.

9           And what did you mean by that?

10   A.      It's difficult to argue with 32 years of

11   experience.

12   Q.      Okay.

13          And you indicated that it was your

14   understanding that most of -- or a lot of

15   Mr. Soule's 32 years of experience was working in

16   that San Francisco yard; is that correct?

17   A.      That's correct.

18   Q.      All right.

19          And then you also indicated, as you've

20   testified here, that this was a switch that none of

21   you had ever seen function before; is that correct?

22   A.      That's correct.

23   Q.      Now, you indicated there that several of

24   the managers were talking amongst themselves in the

25   parking lot.  Half of them indicated they thought

1    the switch was spiked and out of service.

2         Do you see that?

3    A.      I do.

4    Q.      And do you recall that that is something

5    that you observed and heard?

6    A.      I do, yes.

7    Q.      Okay.

8         And when you said they thought the switch

9    was spiked and out of service, do you know what

10   that -- what did you mean by that?

11   A.      When they spike a switch, they use a

12   railroad spike to drive a spike in against one of

13   the points so that the switch can't be moved.

14   Q.      Okay.

15   A.      That takes it out of service permanently.

16   Q.      Okay.

17   A.      Or in this case, the derail.  Be the same

18   thing.

19   Q.      All right.

20        And then Mr. Rogers asked you, "So in other

21   words, you're saying nobody was complying with the

22   rule 6.27 and protecting the movement."

23        Do you see that?

24   A.      I do.

25   Q.      Did you -- and your response was, "There

<u>CERTIFICATE</u>

1    I, the undersigned, a Certified Shorthand

2   Reporter, State of California, hereby certify that

3   the witness in the foregoing deposition was by me

4   first duly sworn to testify to the truth, the whole

5   truth, and nothing but the truth in the

6   within-entitled cause; that said deposition was

7   taken at the time and place therein stated; that

8   the testimony of said witness was reported by me, a

9   disinterested person, and was thereafter

10   transcribed under my direction into typewriting;

11   that the foregoing is a full, complete and true

12   record of said testimony; and that the witness was

13   given an opportunity to read and, if necessary,

14   correct said deposition and to subscribe the same.

15    I further certify that I am not of counsel

16   or attorney for either or any of the parties in the

17   foregoing deposition and caption named, nor in any

18   way interested in the outcome of the cause named in

19   said caption.

20    Executed this 5th day of July, 2006.

21

22

23   LARELLE M. FAGUNDES, CSR 9762