1  PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
2  PRICE AND ASSOCIATES
   The Latham Square Building
3  1611 Telegraph Avenue, Suite 1450
   Oakland, CA 94612
4  Telephone: (510) 452-0292
   Facsimile: (510) 452-5625
5
6  Attorneys for Plaintiff
   JOHN EARL CAMPBELL
7
8              UNITED STATES DISTRICT COURT
9
              NORTHERN DISTRICT OF CALIFORNIA
10
11
12 JOHN EARL CAMPBELL,              )    NO. C05-5434 MJJ (EDL)
                                    )
13        Plaintiff,                )
                                    )
14 v.                              )
                                    )
15                                  )
   NATIONAL PASSENGER RAILROAD      )
16 CORPORATION dba AMTRAK, JOE      )
   DEELY, and DOES 1-15, inclusive, )
17                                  )
                                    )
18        Defendants.               )
                                    )
19 _____ )

20         **PLAINTIFF JOHN EARL CAMPBELL'S**
           **MEMORANDUM OF POINTS AND AUTHORITIES IN**
21         **OPPOSITION TO DEFENDANT JOE DEELY'S**
           **MOTION FOR SUMMARY JUDGMENT, OR IN THE**
22         **ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**

23
           **DATE:**          **May 22, 2007**
24         **TIME:**          **9:00 A.M.**
           **CTRM.:**         **11, 19TH FLOOR**
25         **TRIAL DATE:**    **JULY 23, 2007**

26
           HON. MARTIN J. JENKINS
27
28

1143P211PYP

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

        I.    **MR. CAMPBELL CAN ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION AND RETALIATION** . . . . . . . . **9**

        II.   **DIRECT EVIDENCE OF DEFENDANTS' RACIAL BIAS IS ADMISSIBLE TO ESTABLISH DISCRIMINATION AGAINST MR. CAMPBELL** . . . . . . . . . . . . . . . . **10**

        III.  **RETALIATION IS A VIABLE CLAIM UNDER 42 U.S.C. §1981** . . . . **10**

        IV.  **MR. CAMPBELL EXHAUSTED HIS ADMINISTRATIVE REMEDIES AGAINST DEFENDANT DEELY** . . . . . . . . . . . . . . . . . . . **15**

        V.   **AMTRAK'S ALLEGATIONS OF PERFORMANCE DEFICIENCIES ARE A PRETEXT FOR DISCRIMINATION AND RETALIATION** . . . . . . . . . . . . . . . . . . . . . . . **16**

        VI.  **MR. CAMPBELL WAS RETALIATED AGAINST FOR ENGAGING IN ACTIVITY PROTECTED BY 42 U.S.C. 1981 AND FEHA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

        VI.  **DEFENDANT DEELY MAY BE HELD LIABLE FOR PUNITIVE DAMAGES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

1

**SUMMARY OF ARGUMENT**

2        Mr. Campbell opposes Defendant Deely's Motion for Summary Judgment on five (5)

3   principal grounds.[1]  First, Mr. Campbell has shocking and disturbing direct evidence of racial

4   bias toward African-Americans by Defendant Deely which precludes summary judgment as a

5   matter of law.  Second, the evidence clearly reflects that Mr. Campbell's termination was

6   foretold after he complained to the DFEH about the racial discrimination to which AMTRAK

7   subjected him and others.  Third, Mr. Campbell has more than sufficient evidence to establish a

8   causal link between his protected activity in April 2004 and the retaliatory acts which followed in

9   August 2004, in violation of FEHA and 42 U.S.C. Section 1981.  Fourth, Mr. Campbell's

10  complaints for retaliation are timely under Section 1981 and his DFEH Charge filed on

11  August 17, 2005.  Fifth, Section 1981 does provide for a retaliation claim against Defendant

12  Deely.

13        The evidence in the case clearly demonstrates that Mr. Campbell was treated

14  differently from other similarly Caucasian employees in terms of promotional opportunities,

15  disciplinary actions and his eventual termination.  AMTRAK's management under Defendant

16  Deely's leadership has a history, pattern and practice of discrimination against African-

17  Americans on the basis of race.  This is a case that cries out for punitive damages against the

18  Defendants for their ill-fated efforts to cover up their misconduct and sanctions against counsel

19  for participating in the cover-up.

20

**STATEMENT OF FACTS**

21        Mr. Campbell graduated from Oakland High School in 1980.  (See Declaration of

22  John Earl Campbell in Opposition to Defendants Joe Deely and National Passenger Railroad

23

24  _____

[1]        Mr. Campbell does not oppose Defendant Deely's Motion for Summary Adjudication of his
25  common law claims for intentional and/or negligent infliction of emotional distress on the grounds
    that such claims arguably are pre-empted by FELA or as to any claims for retaliation which might
26  have been brought under FEHA based upon the failure to promote him.  Mr. Campbell opposes the
    Motion to the extent it seeks to adjudicate any of his claims under 42 U.S.C. Section 1981 based
27  upon the failure to promote him or based upon the last-filed DFEH Charge.

28

-1-

1   Corporation's Motions for Summary Judgment Or In the Alternative, Partial Summary Judgment

2   (hereinafter "JEC DEN @") at pp. 1:26.)  He attended Merritt College from September 1980 to

3   June 1981.  (JEC DEN @ 1:26-27.)  On May 10, 1984, Mr. Campbell was hired as a Track

4   Laborer by Southern Pacific Railroad.  (JEC DEN @ 2:1.)  In late 1985, Mr. Campbell became a

5   Machine Operator.  (JEC DEN @ 2:2.)  Prior to His promotion to Machine Operator, Mr.

6   Campbell passed the necessary qualification tests and received the appropriate certifications to

7   operate Back hoes, inloaders and tampers.  (JEC DEN @ 2:2-4.)  Mr. Campbell held that

8   position until February 1992 when Mr. Campbell left Southern Pacific.  (JEC DEN @ 2:4.)

9          Mr. Campbell began his career with AMTRAK on September 29, 1998.  (JEC DEN

10  @ 2:5.)  From his date of hire to September 1999, Mr. Campbell worked as an Assistant

11  Conductor at the Oakland Crew Base.  (JEC DEN @ 2:5-6.)  As Assistant Conductor, Mr.

12  Campbell was responsible for the safe operations of his assigned train, helping passengers on and

13  off the train, and taking tickets.  (JEC DEN @ 2:6-8.)

14         For approximately a year, Mr. Campbell worked as an Assistant Yard Conductor at

15  the Oakland Crew Base.  (JEC DEN @ 2:9-10.)  Mr. Campbell bid into that position based on his

16  seniority in the union - this was not a promotion.  (JEC DEN @ 2:10-11.)  Mr. Campbell did not

17  submit any type of application and he was not interviewed for this position.  (JEC DEN @ 2:11.)

18  He did not receive a pay raise and in fact, took a pay cut to work in the Oakland Yard as an

19  Assistant Conductor.  (JEC DEN @ 2:12-13.)  He loved his job and during a period of time when

20  Amtrak was extremely short-staffed, he worked twenty-eight (28) days straight.  (JEC DEN @

21  2:13-14.)

22         From 2000 up until his termination in August 2004, except for a one year stint in San

23  Francisco, Mr. Campbell worked as the Yard Conductor for the Oakland Yard.  (JEC DEN @

24  2:15-16.)  Again, Mr. Campbell bid into that position based on his seniority in the union - this

25  was not a promotion.  (JEC DEN @ 2:16-17.)  Mr. Campbell did not submit any type of

26  application and he was not interviewed for this position.  (JEC DEN @ 2:17-18.)

27         In late 2002, Mr. Campbell bid on and received the position of Work Train Conductor

28

1   to work on a nine-month project called the Baby Bullet Project at the San Francisco Crew Base.

2   (JEC DEN @ 2:20-21.)  It was a $200,000,000 project which involved upgrading the tracks with

3   new ties and new rails in order to bring high speed passenger train service to the Bay Area.  (JEC

4   DEN @ 2:21-23.)  Mr. Campbell was in charge of delivering equipment to the various locations

5   in the Yard.  (JEC DEN @ 2:23-24.)  The project was successfully completed in early 2004.

6   (JEC DEN @ 2:24-25.)  At that time, he returned to the Oakland Crew Base as a Yard

7   Conductor. (JEC DEN @ 2:25-26.)

8          During his tenure in San Francisco working on the Baby Bullet Project, Mr. Campbell

9   received numerous accolades, encouragement and appreciation from the front line supervisors.

10  (JEC DEN @ 2:27-28.)  In late 2003, sometime between October and December, Mr. Campbell

11  was "bumped" by another conductor with more seniority.  (JEC DEN @ 2:28-3:2.)  His

12  supervisors placed him in a "quasi-official" or unofficial supervisor's position in order to keep

13  him working on the project until it was completed.  (JEC DEN @ 3:2-3:3.)

14         As the Yard Conductor, Mr. Campbell acted as the foreman for the crew on duty

15  during his shift.  (JEC DEN @ 3:4-5.)  During any given shift, he supervised a crew of two,

16  including an Assistant Conductor and an Engineer.  (JEC DEN @ 3:5-6.)  The physical area that

17  was subject to his authority included all of the tracks in the Oakland Crew Base, which was made

18  up of nine (9) tracks.  (JEC DEN @ 3:6-7.)  He was in charge of all of the moves involving a

19  train's make-up or break-up that occurred inside the Oakland Crew Base's yard.  (JEC DEN @

20  3:7-8.)  He oversaw the crew to make sure they performed all of the duties on the Mechanical

21  Foreman's switch list, including turning and switching out trains—taking out bad cars and

22  putting in good ones—and all preventative maintenance.  (JEC DEN @ 3:8-12.)

23         During his employment with Amtrak as a Conductor, Mr. Campbell did not receive

24  written performance evaluations or reviews.  (JEC DEN @ 3:13-14.)  Mr. Campbell was

25  subjected to numerous proficiency tests to see if he was in compliance with the rules, knew the

26  rules or was operating safely.  (JEC DEN @ 3:14-15.)  A proficiency test is conducted when

27  supervisors secretly observe your performance.  (JEC DEN @ 3:15-16.)  Mr. Campbell is aware

28

1    of at least two (2) proficiency tests in Oakland, and eleven (11) which were conducted in the San

2    Francisco Yard.  (JEC DEN @ 3:16-17.)  To the best of his knowledge, Mr. Campbell never

3    failed a proficiency test.  (JEC DEN @ 3:18.)

4    　　　　On March 24, 2000, Mr. Campbell was involved in an incident on the Yard where

5    some cables were accidentally pulled apart.  (JEC DEN @ 3:19-20.)  The incident in March 2000

6    did not involve the derailment of a box car.  (JEC DEN @ 3:21-22.)  Mr. Campbell was never

7    told that the recommended decision for this incident was His termination.  (JEC DEN @ 3:28.)

8    Mr. Campbell also does not recall ever actually receiving a Letter of Reprimand.  (JEC DEN @

9    3:28-4:1.)  There is no record that a Letter of Reprimand was in Mr. Campbell's personnel file

10   when he applied for promotion to Engineer eighteen (18) months later in August 2001.

11   　　　　Almost two years later in January 2002, Mr. Campbell was involved in an incident

12   where a boxcar derailed.  (JEC DEN @ 4:4-5.)  In that incident, Bill Birkett was the Engineer.

13   (JEC DEN @ 4:5.)  He ignored Mr. Campbell's instructions and pushed the boxcar off the

14   tracks.  (JEC DEN @ 4:5-6.)  Mr. Birkett was not charged with any type of disciplinary action as

15   a result of the incident.  (JEC DEN @ 4:6-7.)  Two months later, Mr. Birkett derailed two (2)

16   passenger cars with a hard joint   (JEC DEN @ 4:7-8.)  Following that incident, he was banned

17   from the Yard and disqualified as an Engineer Instructor.  (*See also* Confidential Declaration of

18   Pamela Y. Price in Opposition to Defendants Joe Deely and National Passenger Railroad

19   Corporation's Motions for Summary Judgment Or In the Alternative, Partial Summary Judgment

20   (hereinafter "PYP CON-DEN @)"), Ex. H at pp. 76:24-77:1-4; 77:12-78:10; 79:3-11.)

21   　　　　Shortly after this derail, Mr. Campbell had a conversation with Rich Barnes, a union

22   representative acting on his behalf, and His two supervisors, Gregg Baxter and Sid Birkett, about

23   the boxcar derailment incident.  (JEC DEN @ 4:10-12.)  After Mr. Campbell described the

24   events leading up to the derailment, Messrs. Baxter and Birkett agreed that it was the engineer's

25   fault for not stopping the train in time.  (JEC DEN @ 4:12-13.)  During the conversation, Mr.

26   Baxter said that he noticed Mr. Campbell had applied for engine service.  (JEC DEN @ 4:13-14.)

27   He suggested that he would get him in the next engineer's class coming up if Mr. Campbell took

28

1    responsibility for the incident.  (JEC DEN @ 4:14-15.)  Mr. Baxter said, "We'll try to see what

2    we can do in the next class."  (JEC DEN @ 4:15-16.)  Because Mr. Campbell believed Mr.

3    Baxter was going to get him into the next engineer's class, Mr. Campbell agreed to take blame

4    for the incident.  (JEC DEN @ 4:16-17.)

5         Mr. Campbell did not receive a twenty (20) day suspension as a result of the boxcar

6    derailment in January 2002.  (JEC DEN @ 4:18-19.)  The suspension imposed was only for ten

7    (10) days.  (JEC DEN @ 4:19.)  Mr. Campbell served four days, including two days of his

8    regular days off, and was immediately called back to work because they were short-handed.

9    (JEC DEN @ 4:19-21.)  Mr. Campbell did not ever actually serve the remaining six (6) days of

10    the suspension.  (JEC DEN @ 4:21.)  Mr. Campbell also did not have another rules violation

11    charge until July 2004.  (JEC DEN @ 4:21-22.

12         On July 24, 2004, Mr. Campbell was involved in an incident where his assistant

13    conductor and engineer had a mis-communication resulting in a hard coupling.  (JEC DEN @

14    4:25-26.)  On the night of the incident and at all times thereafter, the Assistant Conductor,

15    Anthony Gillard admitted his error as the cause of the incident and accepted responsibility for the

16    event.  (JEC DEN @ 5:10-12; *see also* Declaration of Pamela Y. Price in Opposition to

17    Defendants Joe Deely and National Passenger Railroad Corporation's Motions for Summary

18    Judgment Or In the Alternative, Partial Summary Judgment (hereinafter "PYP DEN @)"), Ex. E

19    at pp. 46:13-48:1.)  He was never charged with any rule violation or disciplined in any way.

20    (PYP DEN, Ex. E @ 24:1-24:16; 48:2-21.)

21         AMTRAK claims that Mr. Campbell's actions in cutting out the air brakes were

22    grounds for his termination.  (JEC DEN @ 4:26-27)  Up to that time, however, cutting out the air

23    brakes are a common practice on the Yard.  (JEC DEN @ 4:27-28; PYP DEN, Ex. D @18:15-

24    21:2; Skinner DEN @ 3:19-23; Barnes DEN @ 3:17-20.)  Other Yard conductors who cut the

25    trucks out on a daily basis included Ray Clarke, Kevin Mayberry, Tim Sheridan, Cynthia

26    Hubbard, and Don Majers.  (JEC DEN @ 4:28-5:12; PYP DEN, Ex. D @ 23:7-24:2.)

27         In the July 2004 incident, there was no damage to any equipment and no injury to any

28

1   personnel. (JEC DEN @ 5:3-4; PYP DEN, Ex. D @ 33:5-33:9; Ex. E @ 20:11-16.) Aside from

2   the disruption in the relationship between the engineer and the Assistant Conductor, their work

3   that night was not impacted. (JEC DEN @ 5:7-8; PYP DEN, Ex. D @ 33:10-21; Ex. E @ 20:17-

4   21:13.) Mr. Campbell was not questioned or made aware in any way that evening that he would

5   be charged with a rule violation for my actions that night. (JEC DEN @ 5:9-10.)

6         During his employment, Mr. Campbell interacted with Defendant Deely in a variety

7   of circumstances. (JEC DEN @ 5:17-18.) At a safety meeting, Lou Bellotti, then the Assistant

8   Superintendent, introduced him and his crew members by name to Defendant Deely. (JEC DEN

9   @ 5:18-19.) Mr. Campbell spoke to Defendant Deely on that occasion. (JEC DEN @ 5:19.)

10  Mr. Campbell was standing in front of Defendant Deely facing him within 5 feet. (JEC DEN @

11  5:20.) After that introduction, while serving as the Yard Conductor, Mr. Campbell called

12  Defendant Deely on the telephone and left messages for him on multiple occasions. (JEC DEN

13  @ 5:21-22.)

14        Since 1998, Mr. Campbell has repeatedly been passed over for promotion to

15  Engineer. (JEC DEN @ 5:23.) During his tenure with AMTRAK, Mr. Campbell watched as

16  people he trained when they were Assistant Conductors under him were selected and promoted to

17  Engineer service. (JEC DEN @ 5:24-25.) They include Josh Kyles, Brian Willson, Ken Powell,

18  Jason Garman, Mike Poirier, Brice Carroll, Mike Yacovetti, Heidi Snyder, and Frank Caron.

19  (JEC DEN @ 5:25-27.)

20        Since October 1998, based upon his review of the seniority roster, Mr. Campbell

21  counted thirty-four (34) individuals whom AMTRAK has hired internally for engineer positions

22  in the Bay Area. (JEC DEN @ 5:28-6:2.) Of those individuals, all of them are Caucasian except

23  for Mr. Brice, who is multi-racial, and Mr. Ly, who is Vietnamese. (JEC DEN @ 6:2-3, Ex. A.)

24        Mr. Campbell has a burning desire to be a Locomotive Engineer. (JEC DEN @ 6:5)

25  In the early years of his quest to become a Locomotive Engineer, Mr. Campbell was only

26  interested in local positions in Oakland because his mother was sick and Mr. Campbell was her

27  primary caretaker. (JEC DEN @ 6:5-7.) His Mom passed away in November 2002. (JEC DEN

28

-6-
PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1 @ 6:7.)  After that time, whenever Mr. Campbell applied to engineer positions, his application

2 was for any position in or around the Bay Area, including San Jose and Sacramento.  (JEC DEN

3 @ 6:8-9.)

4 **PROTECTED ACTIVITY**

5          On April 1, 2004, Mr. Campbell sent an e-mail to Susan Venturelli in AMTRAK's

6 human resources department.  (JEC DEN @ 8:13-14.)  In the e-mail, Mr. Campbell complained

7 about AMTRAK's racially discriminatory hiring practices and AMTRAK's disparate treatment

8 of African-Americans.  (JEC DEN @ 8:14-15.)  Mr. Campbell complained that AMTRAK had

9 passed him over five (5) times for promotion to an AMTRAK engineer position despite his

10 excellent service record because he was African-American.  (JEC DEN @ 8:15-17.)  Mr.

11 Campbell also complained that AMTRAK had not promoted a single African-American to

12 engine service from 1998 to April 2004, the date that he wrote and sent the e-mail.  (JEC DEN @

13 8:17-19, Ex. 10.)

14          Sometime in April 2004, Mr. Campbell received a phone call from Rickie Donofrio,

15 AMTRAK's Dispute Resolution Case Intake Coordinator, concerning the e-mail complaint.

16 (JEC DEN @ 8:21-22.)  Then, on April 10, 2004, Mr. Campbell left a voice mail message for

17 Ms. Donofrio to inform her that he had filed a complaint about AMTRAK's racially

18 discriminatory employment practices with the California Department of Fair Employment &

19 Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC").  (JEC

20 DEN @ 8:25-28.)  In the message, Mr. Campbell also expressed to Ms. Donofrio that he had

21 filed the complaint because he was dissatisfied with AMTRAK's lack of response to his internal

22 complaints.  (JEC DEN @ 8:28-9:2.)

23          On April 21, 2004, AMTRAK sent Mr. Campbell a letter informing him that the

24 Dispute Resolution Office (DRO) of AMTRAK's Business Delivery Department had received a

25 copy of his e-mail complaint about AMTRAK's racially discriminatory employment practices

26 but that it would not be investigating his complaint.  (JEC DEN @ 9:3-6, Ex. 9.)  The letter

27 stated that the "DRO will not be looking into your concerns" because he took his "concerns to

28

-7-

1  the EEOC." (JEC DEN @ 9:6-7.)  Instead of a response to his complaint, Ms. Donofrio sent him

2  a letter of counseling.  (JEC DEN @ 9:10-11, Ex. 9.)

3  **RETALIATORY ACTS**

4          In May 2004, Mr. Campbell again applied for an engineer position.  (JEC DEN @

5  7:19.)  According to AMTRAK procedure, Mr. Campbell faxed and mailed an AMTRAK Job

6  Opportunity Application along with his résumé to AMTRAK's Human Resources department in

7  Los Angeles.  (JEC DEN @ 7:19-21.)  Subsequently, AMTRAK's Human Resources department

8  contacted him to schedule an interview.  (JEC DEN @ 7:21-22.)

9          On July 7, 2004, Mr. Campbell interviewed with Chad Skinner, Larry Follis, and

10  Susan Venturelli.  (JEC DEN @ 7:23-24.)  During the interview, he described his experience as a

11  Machine Operator with Southern Pacific.  (JEC DEN @ 7:24-25.)  Mr. Campbell told Mr. Follis

12  that he had taken and passed the required tests to operate the various machines.  (JEC DEN @

13  7:25-26.)  Mr. Follis did not ask if Mr. Campbell had the certifications (which he does) and did

14  not mention any concerns to him about his duties at Southern Pacific.  (JEC DEN @ 7:26-27.)

15  He also did not share those concerns with Chad Skinner, the union representative who sat in on

16  the engineer interviews.  (Declaration of Chad Skinner (hereinafter "Skinner DEN") @ 2:6-3:2.)

17          Within days after the interview,  Mr. Skinner called him on the radio while he was

18  working in the Yard and said, "You finally made it," in reference to the engineer position.  (JEC

19  DEN @ 7:28-8:1; Skinner DEN @ 2:14-19.)   Approximately two weeks later, Mr. Campbell

20  received a rejection letter from AMTRAK in the mail informing him that he did not get the

21  position.  (JEC DEN @ 8:2-3.)

22          In August 2004, Amtrak promoted Brice Carroll, John Hanson and Patrick Duncan

23  for Engineer training for Oakland.  (JEC DEN @ 8:4-5; PYP DEN, Ex. G @104:1-108:17 & Ex.

24  35.)  Mr. Campbell worked with both Messrs. Carroll and Duncan.  (JEC DEN @ 8:5-6.)  Mr.

25  Campbell trained Brice Carroll for two (2) months to be an Assistant Work Train Conductor.

26  (JEC DEN @ 8:6.)

27          Mr. Campbell also worked with Patrick Duncan for two years, during which time he

28

1    was a mechanical foreman.  (JEC DEN @ 8:9-10.)  Mr. Duncan would make common mistakes

2    in repairing cars such as putting wrong parts on passenger cars.  (JEC DEN @ 8:10-11.)

3            On August 6, 2004, Amtrak charged Mr. Campbell with five separate rules violations.

4    (JEC DEN, Ex. 25B.)  On September 17, 2004, AMTRAK terminated him.  (JEC DEN @ 9:15-

5    16.)  Within a year of his termination, on August 17, 2005, Mr. Campbell filed a Charge of

6    Discrimination with the Department of Fair Employment and Housing for race discrimination

7    and retaliation.  (JEC DEN @ 9:17-19, Ex. 5.)  In his Charge, he identified Defendant Deely as

8    the discriminating official.  (JEC DEN @ 9:19, Ex. 5.)

9    **I.        MR. CAMPBELL CAN ESTABLISH A PRIMA FACIE CASE OF
          DISCRIMINATION AND RETALIATION**

10

11            Mr. Campbell's claims of race discrimination and retaliation both can be analyzed

12    under a disparate treatment model, which applies when "an individual [has been] singled out and

13    treated less favorable than others similarly situated on account of [race]." (*Gay v. Waiters' &

14    Dairy Lunchmen's Union,* 694 F.2d 531, 537 (9th Cir. (1982).)  To prevail in a Title VII disparate

15    treatment case, the plaintiff must first establish a prima facie case of discrimination.  (*McDonnell

16    Douglas Corp. v. Green,* 411 U.S. 792, 807, 93 S.Ct. 1817, 1826-27, 36 L.Ed. 2d 668 (1973).)

17            The burden of establishing a *prima facie* case is not onerous.  (*Texas Dep't of Cmty.

18    Affairs v. Burdine,* 450 U.S. 248, 253, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981).)  At the summary

19    judgment stage, the plaintiff needs only to present "minimal" proof that "does not even need to

20    rise to the level of a preponderance of the evidence." (*Wallis v. J. R. Simplot Co.,* 26 F.3d 885,

21    889 (9th Cir. 1994).)  A plaintiff need only provide evidence **that suggests** that the employer's

22    decision was based on a discriminatory motive that is illegal under the Civil Rights Act.

23    (*International Brotherhood of Teamsters v. U.S.*, (1977) 431 U.S. 324, 358, 97 S.Ct. 1843, 52

24    L.Ed.2d 396; *Hewlett-Packard v. Co.*, 358 F.3d 599, 604 (9th Cir. 2004); *Godwin v. Hunt

25    Wesson Inc.,* 150 F.3d 1217, 1220 (9th Cir. (1998).)

26            As the nonmoving party, Mr. Campbell is not required to produce evidence in a form

27    that would be admissible at trial in order to avoid summary judgment.  (*Fed. Deposit Ins. Corp.

28    v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. (1991).)  At this stage, the test is whether the

1  evidence's contents would be admissible at trial despite the admissibility of the evidence's form.

2  (*Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003).)  Accordingly, hearsay evidence may

3  be considered on summary judgment if there is no indication that the declarant would later be

4  unavailable to present the evidence through direct testimony.  (*J.F. Feeser, Inc. v.*

5  *Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).)

6        "[I]n cases in which the evidence could support a finding that discrimination is one of

7  two or more reasons for the challenged decision, at least one of which may be legitimate, the jury

8  should be instructed to determine first whether the discriminatory reason was 'a motivating

9  factor' in the challenged action.  If the jury's answer to this question is in the affirmative, then the

10  employer has violated Title VII." (*Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1067 (9th

11  Cir. 2003), citing *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 856-57 (9th Cir. 2002), *affirmed,*

12  *Desert Palace, Inc., v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *see also*

13  *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122-1123 (9th Cir. 2004).)[2]

14  **II.    DIRECT EVIDENCE OF DEFENDANTS' RACIAL BIAS IS
         ADMISSIBLE TO ESTABLISH DISCRIMINATION AGAINST**

15  **MR. CAMPBELL**

16        Federal courts admit both direct and circumstantial evidence of discrimination to

17  prove discrimination against a plaintiff on a specific occasion.  (*International Brotherhood of*

18  *Teamsters v. United States*, 431 U.S. *supra* at 358, n. 44; *see also, United States Postal Service*

19  *Board of Governors v. Aikens*, 460 U.S. 711, 714-17 (1983).)[3]  "'Direct evidence' typically

20

_____

21  [2]    Section 703(m) of Title VII provides *inter alia* that:

22              . . . an unlawful employment practice is established when the
                complaining party demonstrates that race, color, religion, sex, or national

23              origin was a motivating factor for any employment practice, even though
                other factors also motivated the practice.

24

25  [3]    In *Mullen v. Princess Anne Volunteer Fire Fighter Co. Inc.*, 853 F.2d 1130, 1134 (4th Cir.
       1988), the Court held that an African-American firefighter denied a position in a firefighting

26  company could introduce evidence of past racial discriminatory statements and evidence of
       customary racist manners of speech by the defendant fire fighter company which were unrelated to

27  the specific disputed action to show racial attitudes in the fire department and to prove the
       Department's specific intent to discriminate.  The *Mullen* Court held that an employer's prior

28

1143P211PYP

-10-

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1  consists of clearly sexist, racist, or similarly discriminatory statements or actions by the

2  employer." (*Dominguez-Curry v. Nevada Transportation Dept.*, 424 F.3d 1027, 1038 (9th Cir.

3  2005), citing *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).)

4         A supervisor's discriminatory remarks are probative of intent even if he directed them

5  towards other people in the protected class.  (*Id.*, see also *Coghlan*, 413 F.3d at 1095, n.6

6  (holding that even if an employer does not target his remarks directly at plaintiff, "when evidence

7  establishes the employer's animus toward the class to which the plaintiff belongs, the inference

8  of fact of discrimination against the plaintiff is sufficiently small that we have treated the

9  evidence as direct.") "Where a decisionmaker makes a discriminatory remark against a member

10 of the plaintiff's class, a reasonable fact finder may conclude that discriminatory animus played a

11 role in the challenged decision."  (*Id.* at 1039; *see also Mondero v. Salt River Project*, 400 F.3d

12 1207, 1213 (9th Cir. 2005) ("An agent's biased remarks against an employee because of his or

13 her gender are admissible to show an employer's discriminatory animus <u>if the agent was involved</u>

14 <u>in the employment decision.</u>) (Emphasis added).)

15         By offering "very little" direct evidence of discriminatory or retaliatory motive, Mr.

16 Campbell rebuts the Defendants' articulation of a non-discriminatory or non-retaliatory motive

17 behind its actions.  (*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (citing

18 and quoting other cases, noting that direct evidence is evidence which, if believed, proves

19 discriminatory animus without inference or presumption).)  In *Godwin*, the Court found that

20 direct evidence included a statement that the defendant did not want to "deal with another

21 female," suggesting bias against the plaintiff as a woman with the necessity of drawing an

22 inference.  (*Godwin*, 150 F.3d *supra* at 1221.)

23         In *Morgan v. Amtrak*, a case tried twice before Judge Illston, the Ninth Circuit held

24 that the Court improperly excluded co-worker testimony regarding racial discrimination,

25

26 discriminatory acts which would otherwise be inadmissible under FRE Rule 404(b) may be

27 introduced to show an employer's **intent**, **motive** *and* **knowledge**.  (*Id.*)  This reasoning and the
   outcome in *Mullen* was cited with approval by the Ninth Circuit in *Heyne v. Caruso*, 69 F.3d at

28 *supra* 1480-1481.

1    including testimony regarding Defendant DEELY's discriminatory practices.[4]  (*Morgan v.*

2    *National Railroad Passenger Corporation*, 232 F.3d 1008, 1017-1018 (9th Cir. 2000), citing

3    *Heyne v. Caruso*, 69 F.3d 1475, 1479 (9th Cir. 1995) and *Spulak v. K Mart Corp.*, 894 F.2d 1150,

4    1156 (10th Cir. 1990); *see also* Exhibits 1 and 6 to Plaintiff's Request for Judicial Notice ("RJN")

5    filed and served concurrently herewith.)

6        The probative value of evidence that AMTRAK management discriminated or

7    retaliated against African-American employees is especially significant in part "because of the

8    inherent difficulty of proving [a defendant's] state of mind," a key issue in disparate treatment

9    and retaliation claims.  (*Heyne*, 69 F.3d *supra* at 1480, *citing Mullen v. Princess Anne Volunteer*

10   *Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988); *see also Hunter v. Allis-Chalmers Corp., Engine*

11   *Div*, 797 F.2d 1417, 1423-24 (7th Cir. 1986) (testimony that defendant Lambert had suspended

12   another black worker for a minor infraction and other evidence "disclosed a strong and persistent

13   pattern of racial hostility that management could hardly have been unaware of and that increased

14   the probability that [the plaintiff's] record-keeping irregularities were merely the pretext for the

15   harsh discipline meted out to him by a management irritated by his complaints about racial

16   harassment").)  Because the evidence went to the issue of the defendant's intent, there was no

17   requirement that the Plaintiff be present or even know about the defendants' harassment of co-

18   workers.  (*Id.*)

19       Thus, evidence of prior acts of discrimination is relevant to demonstrating motive

20   even where the evidence is not extensive enough to establish discriminatory animus by itself.

21   (*Estes v. Dick Smith Ford, Inc.* 856 F.2d 1097, 1102-1104, (8th Cir. 1988) quoted with approval

22   in *Heyne, supra* at 1480; *see also Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 331-332

23   (N.D.Cal. 1992) (Defendant's involvement in two class action sex discrimination suits in the

24

25   [4]    AMTRAK litigated the *Morgan* case through two (2) trials, an appeal to the Ninth
     Circuit  which it lost and a hearing in the United States Supreme Court.  (*See Morgan v. National*
26   *Passenger Railroad Corp.*, 232 F.3d 1008 (9th Cir. 2000), 536 U.S. 101 (2002).  Following the
     jury verdict after the second trial in May 2004, AMTRAK was faced with the costs bill as well as
27   the attorneys' fees under 42 U.S.C. Section 1988 for the entire case.  The case settled in late 2004
     as the parties were preparing to file cross-appeals in the Ninth Circuit.
28

-12-
PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1    early 1980s resulting in consent decrees was relevant to the defendant's notice of discriminatory

2    practices such as those alleged in a suit whose liability period ran from January 1986 to 1992);

3    *Equal Employment Opportunity Commission v. Farmers Brother Company*, 31 F.2d 891, 897

4    (9th Cir 1994); *Detroit Police Officers Association v. Young* (6th Cir. 1979) 608 F.2d 671, 687;

5    *Harvey v. Armour Co.*, 743 F.2d 199, 240  (4th Cir. 1984), *cert. den.* 470 U.S. 1395, 105 S.Ct.

6    1395, 84 L. Ed.2d 784 (1985); *Burns v. McGregor Electronic Industries, Inc.*, 955 F.2d 559, 562

7    (8th Cir. 1992).)

8         Even if the decisionmaker who made discriminatory remarks did not communicate his

9    bias to other decisionmakers who are themselves not biased against the protected class, evidence

10   of the racist remarks "is sufficient to permit a jury to find that animus affected the ultimate"

11   employment decision. (*Dominguez-Curry v. Nevada Transportation Dept.*, 424 F.3d 1027, at

12   1040; *see also Lam v. University of Hawaii*, 40 F.3d 1551, 1560 (9th Cir. 1994) (noting that

13   "among a group of fifteen decisionmakers, 'even a single person's biases may be relatively

14   influential'").

15        If the decisionmakers worked closely together in formulating personnel decisions, a

16   supervisor's bias may be imputed to the subordinate. (*Dominguez-Curry v. Nevada*

17   *Transportation Dept.*, 424 F.3d 1027, at fn. 5, compiling cases, including *Wells v. New Cherokee*

18   *Corp.*, 58 F.3d 233, 237-238 (6th Cir. 1995) (a supervisor's animus imputed to the ultimate

19   decisionmaker, because evidence showed that the two "worked closely together and consulted

20   with each other on personnel decisions" and they "themselves testified that they acted jointly")

21   and *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (the relevant inquiry is whether the

22   person who made the discriminatory remark "had influence or leverage over" the formal

23   decisionmaker).)

24        Mark Carl Schulties testified under oath that Defendant DEELY and his subordinate

25   managers expressed an attitude that African-Americans and women needed to be put or kept in

26   "their place." (PYP DEN. Ex. C @ 44:18-46:2-24; 36:15-40:12; 60:19-64:25; 83:9-86:4;

27   107:20-110:3.)  Defendant DEELY expressed to Mr. Schulties that he would not associate with

28

-13-

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1   the African-American employees at the company's Christmas party.  (PYP DEN, Ex. C @

2   117:24-119:24.)  Defendant DEELY even suggested to Mr. Schulties that he might lose his

3   employment if he pressed his concerns about racism in the workplace.  (PYP DEN, Ex. C @

4   74:4-75:1; 76:14-80:23.)  Mr. Schulties will also testify that Defendant DEELY required that

5   every personnel action be approved by him.  (PYP DEN, Ex. C @ 144:9-16; 189:3-190:23; *see*

6   *also* Ex. F @ 43:3-7; 115:8-19; Declaration of Richard Barnes @ 3:21-25.)

7         Mary Fontaine has also stated under oath that she heard Defendant DEELY use racial

8   epithets to refer to African-Americans.  (Plaintiff's Request for Judicial Notice, Ex. A @ 2:7-13.)

9   She also observed him treat people of color in a derogatory manner, alternating with

10  condescending or aggressive tones of voice.  (Plaintiff's Request for Judicial Notice, Ex. A @

11  2:22-28.)  She observed on multiple occasions that Defendant DEELY had a different, more

12  stringent standard for disciplinary issues when it involved an African-American employee vs. a

13  Caucasian employee.  (Plaintiff's Request for Judicial Notice, Ex. A @ 2:20-4:7.)[5]

14  **III.     RETALIATION IS A VIABLE CLAIM UNDER**
            **42 U.S.C. §1981**

16        Under *Manatt v. Bank of America, NA*, 339 F.3d 792 (9th Cir. 2003), the Ninth Circuit

17  reaffirmed that where a plaintiff charges an employer with racial discrimination in taking

18  retaliatory action, such plaintiff has stated a cause of action under § 1981.  It follows that where

19  an employer retaliates against the employee with a racially discriminatory motive, "then

20  interference with rights protected by § 1981 has occurred and that section must come into play."

    (*Id.* at 800-01.)

21        Other circuits are in accord.  (*See, e.g., Foley v. Univ. of Houston Sys.*, 324 F.3d 310,

22  316 (5th Cir. 2003) (holding that "an employee's claim that he was subjected to retaliation

23  because he complained of race discrimination is a cognizable claim under § 1981(b)"); *Hawkins*

    *v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) ("We remain of the view, in light of

24  the broad sweep of § 1981(b), that a retaliation claim may be brought under § 1981."); *Andrews*

25

26  _____
    [5]       Notably, Defendant DEELY acknowledged that Amtrak received two letters accusing him
27  of racial discrimination, including a letter from Martin Yeager reporting that he overheard a
    conversation where Defendant DEELY used the "N" word.  (Price DEN, Ex. B @ 23:1-19; 25:2-
28  18.)

1  *v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411 (11th Cir. 1998) (noting that the legislative

2  history for the 1991 Civil Rights Act supports the conclusion that Congress intended retaliation

3  claims to be cognizable under § 1981(b)); *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d

4  1248, 1258 (10th Cir. 2001); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir. 1997).)

### IV.    MR. CAMPBELL EXHAUSTED HIS ADMINISTRATIVE REMEDIES AGAINST DEFENDANT DEELY

6      Numerous state and federal courts have held that the DFEH charge does not preclude

7  the naming of certain defendants or acts not mentioned in the administrative complaint, or

8  pursuing additional complaints, if it is likely that the party or the allegation would have been

9  discovered as part of an administrative investigation. *(See e.g., Chavira v. Payless Shoe Source*,

10 140 F.R.D. 441, 444-445 (E.D.Cal. 1991); *Hudson v. Moore Business Forms, Inc.*, 609 F.Supp.

11 467, 471 (D.C.Cal. 1985).)

12      The *Chavira* court held that better rule, and that adopted by the Ninth Circuit, is to

13 allow a suit against individuals not named in the administrative charge if their involvement was

14 likely to be uncovered in the administrative investigation. (*Chavira,* 140 F.R.D. *supra* at 443-

15 444.) The court also pointed out that where the discriminating employer is a company instead of

16 an individual, it is clear to all involved that one or more individuals are responsible for the

17 discriminatory actions. (*Chavira,* 140 F.R.D. *supra* at 445, fn. 3.)

18      Under this rule, as long as the unlawful retaliation and was likely to be uncovered in

19 any administrative investigation, Mr. Campbell is entitled to pursue those claims. His claims

20 against Deely would have been uncovered because they were never "hidden." Defendant Deely's

21 name appears on the face of the Charge of Discrimination itself in two separate places. It is well

22 settled that "[T]he remedial purpose of Title VII and the paucity of legal training among those

23 whom it is designed to protect require charges filed before the EEOC to be construed liberally."

24 (*Stache v. International Union of Bricklayers and Allied Craftsmen*, 852 F.2d 1231, 1233 (9th

25 Cir. 1988); *Wrighten v. Metropolitan Hospital*, 726 F.2d 1346, 1352 (9th Cir. 1984); *Kaplan v.*

26 *International Alliance of Theatrical and Stage Employees*, 525 F.2d 1354, 1359 (9th Cir. 1975).)

27      When an employee brings suit for incidents not listed in his prior EEOC charge, a

28

1    federal court may hear the new Title VII claims if they are 'like or reasonably related to the

2    allegations contained in the EEOC charge.'"(*Sosa v. Hiraoka*, 920 F.2d 1451 (9th Cir. 1990)*;*

3    *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970); *Ong v. Cleveland*, 642 F.2d

4    316, 320 (9th Cir. 1981); *Green, supra* at 1475-76.)  It is clear that the same reasoning and rule

5    applies to FEHA claims.

6            **V.        AMTRAK'S  ALLEGATIONS OF PERFORMANCE**
                       **DEFICIENCIES ARE A PRETEXT FOR**
7                      **DISCRIMINATION AND RETALIATION**

8            A plaintiff is entitled to a trial where a reasonable jury could return a verdict for the

9    non-moving party.  Whether in fact the employer's reasons are inconsistent or unworthy of belief

10   are not determinations appropriate at the summary judgment stage.  There will always be a

11   question for the fact finder once an appellant establishes a prima facie case and raises a genuine

12   issue as to whether the employer's explanation for its action is true.  Such a question cannot be

13   resolved on summary judgment."  (*Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir. 1993).)

14   In this case, Mr. Campbell can establish a *prima facie* case of racial discrimination by showing

15   (1) that he is a member of a protected class (African-American); (2) he was qualified for his

16   position; (3) AMTRAK disciplined and terminated him; and (4) AMTRAK did not discipline or

17   terminate similarly-situated non-African-American employees who violated the same or similar

18   work rules.  (*McDonald v. Santa Fe Trail Transportation*, 427 U.S. 273, 96 S.Ct. 2574, 49

19   L.Ed.2d 493 (1976); *Green v. Armstrong Rubber*, 612 F.2d 967 (5th Cir. 1980); *Turner v. Texas*

20   *Instruments*, 555 F.2d 1251 (5th Cir. 1977); *Garrett v. City & County of San Francisco*, 818 F.2d

21   1515 (9th Cir. 1987).)

22           Irregularities and deviations from protocol support an inference of pretext sufficient to

23   overcome summary judgment. (*Porter v. Cal. Dep't of Corrections,* 383 F.3d 1018, 1031 (9th

24   Cir. 2004).)  Departure from an employer's own rules, policies, practices or procedures, may

25   constitute evidence of pretext and unlawful motive.  (*Gonzales v. Police Dept, City of San Jose*,

26   901 F.2d 758 (9th Cir. 1990).)  Inconsistency in the application of decision-making process is

27   evidence of pretext.  (*See Jauregui v. City of Glendale*, 852 F.2d 1128, 1135 (9th Cir. 1988)

28

                                          -16-

1  (inconsistency in the City's selective application of its asserted basis for denying promotion to

2  Officer Jauregui created an inference of unlawful discrimination).)

3        In appropriate circumstances, the trier of fact may reasonably infer from the falsity of

4  the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an

5  inference is consistent with the general principle of evidence law that the factfinder is entitled to

6  consider a party's dishonesty about a material fact as "affirmative evidence of guilt." (*Wright v.*

7  *West,* 505 U.S. 277, 296, 120 L.Ed.2d 225, 112 S.Ct. 2482 (1992); *see also Wilson v. United*

8  *States,* 162 U.S. 613, 620-621, 40 L.Ed.1090, 16 S.Ct. 895 (1896*);* J. Wigmore, Evidence §

9  278(2), p. 133 (J. Chadbourn Rev. Ed. 1979).)

10        Moreover, once the employer's justification has been eliminated, discrimination may

11  well be the most likely alternative explanation, especially since the employer is in the best

12  position to put forth the actual reason for its decision.  (*Cf. Furnco Constr. Corp. v.  Waters*, 438

13  U.S. 567, 577, 57 L.Ed.2d 957, 98 S.Ct. 2943 (1978) ("When all legitimate reasons for rejecting

14  an applicant have been eliminated as possible reasons for the employer's actions, it is more likely

15  than not the employer, who we generally assume acts with *some* reason, based his decision on an

16  impermissible consideration").  (*Id.* at  2108-2109.)

17        Thus, if a jury rejects an employer's explanations for its decision, it may conclude that

18  unlawful discrimination or retaliation have occurred without further evidence.  From the falsity

19  of the explanation for the adverse action, a rational fact finder may infer that the employer is

20  dissembling to cover up a discriminatory purpose. (*Reeves v. Sanderson Plumbing Products, Inc.*

21   530 U.S. 133, 147 L.Ed.2d 105, 120 S.Ct. 2097, 2109 (2000).)  Proof that an employer's

22  explanation is unworthy of belief may be "quite persuasive" evidence that the employer is

23  "dissembling to cover up a discriminatory purpose".  Such dishonesty about a material fact is

24  "affirmative evidence of guilt." (*Id.* [citations omitted]).

25        In the instant case, Defendants have asserted that they terminated Mr. Campbell's

26  employment based upon a "three-strikes" rule that allows them to terminate an employee who

27  has incurred three "major" rule violations in the course of his employment.  The evidence clearly

28

1  demonstrates, however, that the violation for which Mr. Campbell was terminated was not

2  "major" but quite common on the Yard.  Engineer Richard Barrow, who was present on the night

3  of the event, testified under oath that "cutting the trucks out" was "pretty much common

4  practice."  (PYP DEN, Ex. D @ 18:15-20:6; *see also* Ex. D @ 20:7:-21:2; 23:7-25.)[6]

5          Mr. Barrow's testimony is corroborated by the Declarations of Chad Skinner and

6  Richard Barnes, who also both attest to the fact that "cutting out trucks" was a common practice

7  in the Yard.  (Declaration of Richard Barnes @ 3:17-20; Skinner Declaration @ 3:19-23.)

8  Messrs. Barnes and Skinner met with Steve Shelton following Mr. Campbell's termination and

9  he even admitted to them that "he told them that it was not a terminating offense and that he

10  knew you would get back with pay.  Joe told him just to do as he is told."  (Skinner Declaration

11  @ 4:4-14 and Exhibit 3 thereto; Declaration of Richard Barnes @ 2:23-28; 3:6-10.)

12          Defendants' protestations that Mr. Campbell was "an accident waiting to happen" are

13  also belied by their treatment of other similarly-situated Caucasian employees who have been

14  charged with rule violations and remain employed by Amtrak.  Discovery is continuing so there

15  will undoubtedly be even more examples at trial, however, even with limited information, there

16  are sufficiently egregious examples to withstand summary judgment.

17          Ray Clarke, a Conductor assigned to the Yard who often worked with Mr. Campbell

18  is particularly illustrative of Defendants' pretext.  Mr. Clarke's disciplinary record reflects that he

19  was charged on six separate occasions with rule violations, including derailments, collisions and

20  split switches.  (PYP CON-DEN, Ex. H @ 48:2-24; 54:11-86:5; Ex. 41,  42, 43A, 44, 45, 47, and

21  48.)  As set forth in Exhibit 41, 42 and 44,  Mr. Clark has been blessed with two separate ten (10)

22  day suspensions.  He's received three final warnings since 2004.  For an incident involving a split

23  switch in June 2001, he received a three day suspension held in abeyance for six months.  Less

24  than six months later, in November 2001, he was charged with a series of rule violations for a

25  derailment of two passenger cars, but only received a four day suspension, a Letter of Reprimand

26

27  [6]      According to Mr. Barrows,  "any regular yard conductor that I've worked with over the
          years at some point in time has cut trucks out, not saying that it was a common practice for them to
28      do it.  So do it more than others."  (PYP DEN, Ex. D @ 23:7-25.)

1    and 4 days held in abeyance for 6 months.[7]  According to Mr. Clarke, there was no mention of

2    the previous three day suspension which was "held in abeyance" in June 2001.  (PYP CON-

3    DEN, Ex. H @ 77:1-78:11; 80:8-21.)

4         Amtrak's leniency toward its Caucasian employees is also reflected in its treatment of

5    Donald Bruce Shelton.  On November 10, 1999, Mr. Shelton was charged with failure to stop

6    short of a derail switch in San Jose, causing a derailment.  (PYP CON-DEN, Ex I @ 63:17-20.)

7    Mr. Shelton signed waiver and accepted a three (3) day suspension.  (PYP CON-DEN, Ex. I @

8    71:8.)  On July 21, 2000, Mr. Shelton was charged with splitting a switch.  (PYP CON-DEN, Ex.

9    I @ 69:19.)  He signed a waiver and accepted a one (1) day suspension and ten (10) days held in

10   abeyance.  (PYP CON-DEN, Ex. I @ 74:13.)

11        On July 8, 2002, Mr. Shelton caused a train to depart prior to schedule without

12   receiving authorization from the San Jose control tower.  (PYP CON-DEN, Ex. I @ 74:24.)  He

13   signed a waiver, accepting a reprimand and six (6) months of probation.  (PYP CON-DEN, Ex. I

14   @ 76:13, 77:10, 77:17.)  On July 31, 2002, Mr. Shelton was charged with failing to protect the

15   movement of a train, failing to stop short of an improperly lined switch, causing a split switch.

16   (PYP CON-DEN, Ex. I @ 78:4.)  He signed a waiver, accepting twenty-five (25) days of

17   suspension, of which he served only five (5) days, the remainder being held in abeyance.  (PYP

18   CON-DEN, Ex. I @ 81:20.)

19        On April 10, 2003, Mr. Shelton was involved in a derailment in San Francisco Yard.

20   (RJN, Ex. 3 @ 5:24.)   The train was traveling less than seven miles per hour at the time, and

21   there were no injuries.  (RJN, Ex. 3 @ 7:21.)  C. Faheem Hardeman, one of the very few African-

22   American engineers in the Pacific Division, was responsible for controlling the brakes and gas of

23   the train.  (RJN, Ex. 3 @ 6:1.)  As part of his duties, Mr. Shelton were responsible for directing

24   Mr. Hardeman, ensuring a clear pathway and proper alignment of switches, and providing Mr.

25   Hardeman instructions before and during the actual movement of the train.  (RJN, Ex. 3 @ 6:4-

26

27   [7]     In contrast, Mr. Campbell received a ten day suspension with ten days held in abeyance for

28   a derailment in January 2002.  (JEC DEN @ 4:5-23.)

1    5.)  When the crew came upon Switch No. 39, the engine derailed.  (RJN, Ex. 3 @ 6:20.)

2    Neither AC Soule nor Mr. Shelton had complied with their duties to 'be on the point' or 'protect

3    the movement of the train.'  (RJN, Ex. 3 @ 6:6; PYP CON-DEN, Ex. I @ 101:12-19.)

4         All three (3) crew members were charged with failing to obey the restrictive speed

5    rule.  Mr. Shelton was initially charged with an operating rules violation, but he objected to the

6    charge.  (PYP CON-DEN, Ex. I @ 53:17-54:5.)  He felt it was not fair to be charged with an

7    operating rules violation because he was present in the cab in the capacity of observer on that

8    day, although he was a rules certified Conductor.  (PYP CON-DEN, Ex. I @ 53:17-54:5.)  He

9    took the issue up with senior management, notifying them that he would "fight it all the way."

10   (PYP CON-DEN, Ex. I @ 53:17-54:5.) Mr. Shelton spoke directly with Amtrak manager Charlie

11   Miller about the charged operating rule violation.  (PYP CON-DEN, Ex. I @ 53:17-54:5.)  Mr.

12   Miller reduced the charge to a  Standards of Excellence violation, which meant that after two

13   years, the violation can be purged from the record, whereas an operating rules violation remains

14   on an employee's record forever.[8]  (PYP CON-DEN, Ex. I @ 53:17-54:5.)

15        Mr. Hardeman was terminated on May 30, 2003.  (RJN, Ex. 3 @ 8:20.)

16        Mr. Campbell is prepared to prove at trial that the Amtrak regime led by Defendant

17   Deely in the Bay Area has a history, pattern and practice of disciplining African-American and

18   other non-Caucasian employees more harshly than Caucasian employees in virtually every craft,

19   including Conductors and engineers.  These practices violate 42 U.S.C. Section 1981 at its very

20   core, as well as the analogous state law embodied in FEHA.

21   **V.      MR. CAMPBELL WAS RETALIATED AGAINST FOR
22            ENGAGING IN ACTIVITY PROTECTED BY 42 U.S.C.
              1981 AND FEHA**

23        To prevail in an action for retaliation under FEHA or 42 U.S.C. Section 1981, Mr.

24

25   _____

26   [8]     Notably, this was Mr. Shelton's fifth documented rules violations.  As set forth in the
     Declaration of C. Faheem Hardeman, disparity in the actual decision to charge a violation in the
27   first place was rampant, and he found himself unduly singled out for discipline on matters that are
     glossed over for non-African-American employees.  (RJN, Ex. 3; *see also* Declaration of Richard
28   Barnes @ 3:14-16; 3:26-28; RJN, Ex. 1 @ 3:1-4:15.)

1   Campbell must prove that engaging in protected activity was one of the reasons for the adverse

2   action against him and but for such activity, the adverse action would not have occurred.

3   (*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002); *Bergene v. Salt River*

4   *Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140-41 (9th Cir. 2001); *McAlindin v.*

5   *County of San Diego*, 192 F.3d 1226, 1238 (9th Cir. 2000).)  Asserting one's civil rights in the

6   employment environment is considered protected activity.  (*E.E.O.C. v. Crown Zellerbach Corp.,*

7   720 F.2d 1008, 1013 (9th Cir. 1983).)

8       Furthermore, the U.S. Supreme Court recently upheld *Ray v. Henderson*, 217 F.2d

9   1234, 1245 (9th Cir. 2000), and held that Title VII's anti-retaliation provision covers those

10  employers' actions that are materially averse to a reasonable employee and harmful so that they

11  could dissuade a reasonable worker from testifying in a Title VII proceeding.  (*Burlington*

12  *Northern and Santa Fe Railway Co. v. White*, 548 U.S. ___, 126 S.Ct. 2405 (2006).)  An

13  employer's retaliatory motive can be established by the temporal proximity between the protected

14  activity and the adverse action.  (*Yartzoff v. Thomas*, 809 F.2d 1371, 1375-1376 (9th Cir. 1989).)

15  (*Ray v. Henderson*, 217 F.2d *supra* at 1245; *see also Miller v. Fairchild Ind.*, 885 F.2d 498, 503

16  (9th Cir. 1989).)  *Payne v. Northwest Corp.*, 113 F. 3d 1078, 1080 (9th Cir. 1997).)

17      The third element of the prima facie case, causal link, may be established be inferred

18  from circumstantial evidence, "such as the employer's knowledge that the plaintiff engaged in

19  protected activities and the proximity in time between the protected action and the allegedly

20  retaliatory employment decision.  (*Miller*, 797 F.2d at 731-32; *Yartzoff*, 809 F. 2d at 1376.)

21  Moreover, "[a]t the summary judgment stage, the prima facie case need not be  proved by a

22  preponderance of the evidence."  (*Miller*, 797 F.2d at 731.)

23      Temporal proximity merely provides an evidentiary basis from which an inference of

24  a causal link can be drawn.  The element of causation, which necessarily involves an inquiry into

25  the motives of an employer, is highly context-specific.  When there may be valid reasons why the

26  adverse employment action was not taken immediately, the absence of immediacy between the

27  cause and effect does not disprove causation.  (*Porter v. California Dept. Of Corrections*, 383

28

1   F.3d 1018, 1030 (9th Cir. 2004), *citing Kachmar v. SunGard Data Sys. Inc.*, 109 F. 3d 173, 177-

2   78 (3rd Cir. 1997).)  In *Coszalter v. City of Salem*, 320 F.3d 968, 977-78 (9th Cir. 2003), the Court

3   cautioned that a "specific time period cannot be a mechanically applied criterion.  A rule that any

4   period over a certain time is per se too long (or conversely, a rule that any period under a certain

5   time is per se short enough) would be unrealistically simplistic."

6           While Defendant DEELY and his subordinate, Steve Shelton, outright deny that they

7   had any knowledge of Mr. Campbell's protected activity, their convenient disclaimers must be

8   considered against the duty the law imposes upon them to prevent discrimination and other

9   evidence which shows that their disclaimers are in effect a deliberate attempt on their part to

10  close their eyes to information which was obviously available to them.  (*United States v. Jewell*,

11  532 F.2d 697 (9th Cir. 1976) (*en banc*), *cert. denied*, 426 U.S. 951 (1976).)

12          Indeed, California law imposes an affirmative duty on managers and others

13  responsible for the management of an enterprise to prevent discrimination.  (*See Trujillo v. North*

14  *County Transit District*, 63 Cal.App.4th 280 (1998).) Defendant DEELY and Steve Shelton, as

15  high ranking AMTRAK managers, surely had such an affirmative duty.  They cannot close their

16  eyes to events any reasonable, prudent manager in their place would be expected to be aware of

17  which affected their enterprise or business.

18          The factual premise of Defendants' contention that there is insufficient proximity

19  between Mr. Campbell's protected activity and their retaliatory acts is also flawed.  The evidence

20  is that Mr. Campbell was communicating his concerns to Amtrak's internal EEO department in

21  April 2004, less than four months prior to his termination and his non-selection for the sixth time

22  for an engineer position.  On this record, a reasonable jury could disbelieve Defendants'

23  disclaimers.

24          Furthermore, even, where the facts are not disputed, if reasonable minds could differ

25  on the inferences which may be drawn from the undisputed facts, summary judgment must be

26  denied.  (*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970);

27  *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F. 2d 872, 875 (9th Cir. 1987).)  The

28

1   function of summary judgment is ". . . not to weigh the evidence or determine the truth of the

2   matter, but only to determine whether there is a genuine issue for trial." (*Abdul-Jabbar v.*

3   *General Motors*, 85 F.3d 407, 410 (9th Cir.(1996).)

4       Mark Carl Shulties' testimony also illustrates the perniciousness of Amtrak's

5   promotional practices.  He testified under oath that his efforts to promote Mr. Campbell were

6   thwarted and rebuffed from the very beginning of Mr. Campbell's tenure with Amtrak.  (PYP

7   DEN, Ex. C @ 65:2-69:7; 74:4-28.)  He testified that the so-called one year rule was frequently

8   waived, and identified specific individuals who were promoted with less than one year tenure and

9   a history of rule violations.  (PYP DEN, Ex. C @ 69:20-71:4; 172:12-183:21; 196:11-198:7;

10  199:200:10; 200:25-201:13.)

11      Defendants' claim that Mr. Campbell's disciplinary record "disqualified" him is also

12  belied by Ms. Venturelli's testimony that Mr. Deely decided to waive the rule for one applicant

13  (Than Ly) while refusing to waive it for Debrice Gallo, an African-American female.  (PYP

14  DEN, Ex. G @ 116:10-117:12; 118:4-119:10; 121:4-122:3 and Ex. 32, 35 and 36.)  Exhibit 36 is

15  also particularly telling in that it reflects that the supervisor for one of the applicants chosen over

16  Mr. Campbell reported that the applicant was "below average" in every category of job

17  performance.  (PYP DEN, Ex. G @ 123:7-23.)  Significantly, Ms. Venturelli and Mr. Follis'

18  claims that the panel disqualified Mr. Campbell are contradicted by Mr. Skinner as well as the

19  documentary evidence which reflects that Mr. Campbell had one of the highest scores.  (Skinner

20  Declaration @ 2:6-3:12; PYP DEN, Ex. K & L.)

21      It is well settled that "promotional systems which depend upon the subjective

22  evaluation and favorable recommendation of immediate supervisors provide a ready vehicle for

23  discrimination."  (*Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1054 (5th Cir. 1984); *Rowe v.*

24  *General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972); *Atonio v. Wards Cove Packing Company,*

25  *Inc.*, 810 F.2d 1477, 1481 (9th Cir. 1987); *Jauregui v. City of Glendale*, 852 F.2d 1128, 1135-

26  1136 (9th Cir. 1988).)  While the Ninth Circuit has held that the use of subjective factors to

27  evaluate applicants for promotion is not illegal *per se*, it is understood that "subjective practices

28

1   are particularly susceptible to discriminatory abuse and should be closely scrutinized." (*Atonio v.*

2   *Wards Cove*, 810 F.2d at 1481; *accord*, *Jauregui v. City of Glendale*, 852 F.2d at 1135-1136, and

3   cases cited therein; *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1187 n. 17 (9th Cir. 2002).

4   **VI.    DEFENDANT DEELY MAY BE HELD LIABLE FOR**
        **PUNITIVE DAMAGES**

5   It is a triable issue of fact whether Mr. Campbell is entitled to punitive damages.

6   (*See, e.g., EEOC v. Wal Mart Stores,* 156 F.3d 989 (9th Cir. 1998); *see also Emmel v. Coca-Cola*

7   *Bottling Co. of Chicago*, 95 F.3d 627, 637 (7th Cir. 1996) ("affirming the district court's award of

8   punitive damages where the defendant had terminated the plaintiff's employment for refusing to

9   withdraw her discrimination claim, and gave false reasons for terminating her").) In the instant

10  case, the evidence clearly suggests that Defendants were aware that their reasons for terminating

11  Mr. Campbell were pretextual.

12      In *EEOC v. Wal-Mart*, 156 F.3d at 993, the Ninth Circuit held that Wal-Mart's

13  decision to not hire the plaintiff because she was pregnant and *their subsequent attempt to cover*

14  *up the discrimination* was sufficient evidence that defendant "acted with malice or reckless

15  indifference to the complaining party's federally protected rights." In this case, triable issues of

16  fact exist whether Defendant Deely discriminated against Mr. Campbell because he is African-

17  American, retaliated against him because he complained of the discrimination, and orchestrated

18  his termination. Clearly, the amount of punitive damages necessary, if any, to punish Defendant

19  Deely and deter him from committing the same offenses in the future should be resolved by a

20  jury.

21  **CONCLUSION**

22      Based on the foregoing, Mr. Campbell respectfully requests that the Court deny the

23  Defendants' motion for summary judgment as well as their motion for partial summary judgment

24  except as set forth in footnote 1 *supra*.

25  Dated: May 1, 2007                          PRICE AND ASSOCIATES

26                                              _____/s/___*Pamela Y. Price*_____

27                                              PAMELA Y. PRICE, Attorneys for Plaintiff
                                                JOHN EARL CAMPBELL

28