1  PAMELA Y. PRICE, ESQ. (STATE BAR NO. 107713)
2  PRICE AND ASSOCIATES
   The Latham Square Building
3  1611 Telegraph Avenue, Suite 1450
   Oakland, CA 94612
4  Telephone: (510) 452-0292
   Facsimile: (510) 452-5625
5
6  Attorneys for Plaintiff
   JOHN EARL CAMPBELL
7
8                    UNITED STATES DISTRICT COURT
9
                  NORTHERN DISTRICT OF CALIFORNIA
10
11
12  JOHN EARL CAMPBELL,              )    NO. C05-5434 MJJ (EDL)
                                     )
13           Plaintiff,              )
                                     )
14  v.                               )
                                     )
15                                   )
    NATIONAL PASSENGER RAILROAD      )
16  CORPORATION dba AMTRAK, JOE      )
    DEELY, and DOES 1-15, inclusive, )
17                                   )
                                     )
18           Defendants.             )
                                     )
19  _____)
20          **PLAINTIFF JOHN EARL CAMPBELL'S**
         **MEMORANDUM OF POINTS AND AUTHORITIES IN**
21       **OPPOSITION TO DEFENDANT NATIONAL**
         **RAILROAD PASSENGER CORPORATION'S MOTION**
22       **FOR SUMMARY JUDGMENT, OR IN THE**
         **ALTERNATIVE, PARTIAL SUMMARY JUDGMENT**
23
24              **DATE:**          **May 22, 2007**
                **TIME:**          **9:00 A.M.**
25              **CTRM.:**         **11, 19TH FLOOR**
                **TRIAL DATE:**    **JULY 23, 2007**
26
27              **HON. MARTIN J. JENKINS**
28

1143P201PYP

1

<u>TABLE OF CONTENTS</u>

2

**SUMMARY OF ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

3

**STATEMENT OF FACTS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **1**

4

5          **I.    MR. CAMPBELL CAN ESTABLISH A PRIMA**
**FACIE CASE OF DISCRIMINATION AND RETALIATION** . . . . . . . **10**

6

7          **II.   DIRECT EVIDENCE OF DEFENDANTS' RACIAL**
**BIAS IS ADMISSIBLE TO ESTABLISH**

8
**DISCRIMINATION AGAINST MR. CAMPBELL** . . . . . . . . . . . . . . . . **11**

9

10         **III.  AMTRAK'S  ALLEGATIONS OF PERFORMANCE**
**DEFICIENCIES ARE A PRETEXT FOR**

11         **DISCRIMINATION AND RETALIATION** . . . . . . . . . . . . . . . . . . . . . . . **15**

12

13         **IV.   MR. CAMPBELL WAS TREATED DIFFERENTLY**
**THAN SIMILARLY-SITUATED WHITE EMPLOYEES** . . . . . . . . . . **20**

14

15         **V.    RETALIATION IS A VIABLE CLAIM UNDER 42 U.S.C. §1981** . . . . **22**

16         **VI.   MR. CAMPBELL WAS RETALIATED AGAINST FOR**
**ENGAGING IN ACTIVITY PROTECTED BY**

17         **42 U.S.C. 1981 AND FEHA** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **22**

18

19         **VII.  Mr. CAMPBELL IS ENTITLED TO A JURY TRIAL ON**
**HIS WRONGFUL TERMINATION CLAIM** . . . . . . . . . . . . . . . . . . . . **24**

20

21         **VIII. AMTRAK AND DEFENDANT DEELY MAY BE**
**HELD LIABLE FOR PUNITIVE DAMAGES** . . . . . . . . . . . . . . . . . . . . **24**

22

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **24**

23

24

25

26

27

28

-i-

**SUMMARY OF ARGUMENT**

Mr. Campbell opposes AMTRAK's Motion for Summary Judgment on three (3) principal grounds.[1]  First, Mr. Campbell has shocking and disturbing direct evidence of racial bias toward African-Americans by AMTRAK's managers and its highest regional official, which precludes summary judgment as a matter of law.   Second, the evidence clearly reflects that Mr. Campbell's termination was foretold after he complained to the DFEH about the racial discrimination to which AMTRAK subjected him and others.  Within a short time period, AMTRAK retaliated against him by bringing him up on charges for work practices that were routine in the Yard.  Third, Mr. Campbell has more than sufficient evidence to establish a causal link between his protected activity in April 2004 and the retaliatory acts which followed in August 2004, in violation of FEHA and 42 U.S.C. Section 1981.

The evidence in the case clearly demonstrates that Mr. Campbell was treated differently from other similarly Caucasian employees in terms of promotional opportunities, disciplinary actions and his eventual termination.  AMTRAK's management has a history, pattern and practice of discrimination against African-Americans on the basis of race, and the racism starts at the top.  This is a case that cries out for punitive damages against the Defendants for their ill-fated efforts to cover up their misconduct and sanctions against counsel for participating in the cover-up.

**STATEMENT OF FACTS**

Mr. Campbell graduated from Oakland High School in 1980.  (See Declaration of John Earl Campbell in Opposition to Defendants Joe Deely and National Passenger Railroad Corporation's Motions for Summary Judgment Or In the Alternative, Partial Summary Judgment (hereinafter "JEC DEN @") at pp. 1:26.)  He attended Merritt College from September 1980 to

---

[1]     Mr. Campbell does not oppose Defendant AMTRAK's Motion for Summary Adjudication of his common law claims for intentional and/or negligent infliction of emotional distress on the grounds that such claims arguably are pre-empted by FELA, or as to any claims for retaliation which might have been brought under FEHA based upon the failure to promote him.  Mr. Campbell opposes the Motion to the extent it seeks to adjudicate any of his claims under 42 U.S.C. Section 1981 based upon the failure to promote him or retaliation and discrimination covered by the last-filed DFEH Charge.

June 1981. (JEC DEN @ 1:26-27.) On May 10, 1984, Mr. Campbell was hired as a Track Laborer by Southern Pacific Railroad. (JEC DEN @ 2:1.) In late 1985, Mr. Campbell became a Machine Operator. (JEC DEN @ 2:2.) Prior to His promotion to Machine Operator, Mr. Campbell passed the necessary qualification tests and received the appropriate certifications to operate Back hoes, inloaders and tampers. (JEC DEN @ 2:2-4.) Mr. Campbell held that position until February 1992 when Mr. Campbell left Southern Pacific. (JEC DEN @ 2:4.)

Mr. Campbell began his career with AMTRAK on September 29, 1998. (JEC DEN @ 2:5.) From his date of hire to September 1999, Mr. Campbell worked as an Assistant Conductor at the Oakland Crew Base. (JEC DEN @ 2:5-6.) As Assistant Conductor, Mr. Campbell was responsible for the safe operations of his assigned train, helping passengers on and off the train, and taking tickets. (JEC DEN @ 2:6-8.)

For approximately a year, Mr. Campbell worked as an Assistant Yard Conductor at the Oakland Crew Base. (JEC DEN @ 2:9-10.) Mr. Campbell bid into that position based on his seniority in the union - this was not a promotion. (JEC DEN @ 2:10-11.) Mr. Campbell did not submit any type of application and he was not interviewed for this position. (JEC DEN @ 2:11.) He did not receive a pay raise and in fact, took a pay cut to work in the Oakland Yard as an Assistant Conductor. (JEC DEN @ 2:12-13.) He loved his job and during a period of time when Amtrak was extremely short-staffed, he worked twenty-eight (28) days straight. (JEC DEN @ 2:13-14.)

From 2000 up until his termination in August 2004, except for a one year stint in San Francisco, Mr. Campbell worked as the Yard Conductor for the Oakland Yard. (JEC DEN @ 2:15-16.) Again, Mr. Campbell bid into that position based on his seniority in the union - this was not a promotion. (JEC DEN @ 2:16-17.) Mr. Campbell did not submit any type of application and he was not interviewed for this position. (JEC DEN @ 2:17-18.)

In late 2002, Mr. Campbell bid on and received the position of Work Train Conductor to work on a nine-month project called the Baby Bullet Project at the San Francisco Crew Base. (JEC DEN @ 2:20-21.) It was a $200,000,000 project which involved upgrading the tracks with new ties and new rails in order to bring high speed passenger train service to the Bay Area. (JEC DEN @ 2:21-23.) Mr. Campbell was in charge of delivering equipment to the various locations

in the Yard. (JEC DEN @ 2:23-24.)  The project was successfully completed in early 2004. (JEC DEN @ 2:24-25.)  At that time, he returned to the Oakland Crew Base as a Yard Conductor. (JEC DEN @ 2:25-26.)

During his tenure in San Francisco working on the Baby Bullet Project, Mr. Campbell received numerous accolades, encouragement and appreciation from the front line supervisors. (JEC DEN @ 2:27-28.)  In late 2003, sometime between October and December, Mr. Campbell was "bumped" by another conductor with more seniority.  (JEC DEN @ 2:28-3:2.)  His supervisors placed him in a "quasi-official" or unofficial supervisor's position in order to keep him working on the project until it was completed.  (JEC DEN @ 3:2-3:3.)

As the Yard Conductor, Mr. Campbell acted as the foreman for the crew on duty during his shift. (JEC DEN @ 3:4-5.)  During any given shift, he supervised a crew of two, including an Assistant Conductor and an Engineer.  (JEC DEN @ 3:5-6.)  The physical area that was subject to his authority included all of the tracks in the Oakland Crew Base, which was made up of nine (9) tracks.  (JEC DEN @ 3:6-7.)  He was in charge of all of the moves involving a train's make-up or break-up that occurred inside the Oakland Crew Base's yard.  (JEC DEN @ 3:7-8.)  He oversaw the crew to make sure they performed all of the duties on the Mechanical Foreman's switch list, including turning and switching out trains—taking out bad cars and putting in good ones—and all preventative maintenance.  (JEC DEN @ 3:8-12.)

During his employment with Amtrak as a Conductor, Mr. Campbell did not receive written performance evaluations or reviews.  (JEC DEN @ 3:13-14.)  Mr. Campbell was subjected to numerous proficiency tests to see if he was in compliance with the rules, knew the rules or was operating safely.  (JEC DEN @ 3:14-15.)  A proficiency test is conducted when supervisors secretly observe your performance.  (JEC DEN @ 3:15-16.)  Mr. Campbell is aware of at least two (2) proficiency tests in Oakland, and eleven (11) which were conducted in the San Francisco Yard.  (JEC DEN @ 3:16-17.)  To the best of his knowledge, Mr. Campbell never failed a proficiency test.  (JEC DEN @ 3:18.)

On March 24, 2000, Mr. Campbell was involved in an incident on the Yard where some cables were accidentally pulled apart.  (JEC DEN @ 3:19-20.)  The incident in March 2000 did not involve the derailment of a box car.  (JEC DEN @ 3:21-22.)  Mr. Campbell was never

1   told that the recommended decision for this incident was His termination.  (JEC DEN @ 3:28.)

2   Mr. Campbell also does not recall ever actually receiving a Letter of Reprimand.  (JEC DEN @

3   3:28-4:1.)  There is no record that a Letter of Reprimand was in Mr. Campbell's personnel file

4   when he applied for promotion to Engineer eighteen (18) months later in August 2001.

5       Almost two years later in January 2002, Mr. Campbell was involved in an incident

6   where a boxcar derailed.  (JEC DEN @ 4:4-5.)  In that incident, Bill Birkett was the Engineer.

7   (JEC DEN @ 4:5.)  He ignored Mr. Campbell's instructions and pushed the boxcar off the

8   tracks.  (JEC DEN @ 4:5-6.)  Mr. Birkett was not charged with any type of disciplinary action as

9   a result of the incident.  (JEC DEN @ 4:6-7.)  Two months later, Mr. Birkett derailed two (2)

10  passenger cars with a hard joint   (JEC DEN @ 4:7-8.)  Following that incident, he was banned

11  from the Yard and disqualified as an Engineer Instructor.  (*See also* Confidential Declaration of

12  Pamela Y. Price in Opposition to Defendants Joe Deely and National Passenger Railroad

13  Corporation's Motions for Summary Judgment Or In the Alternative, Partial Summary Judgment

    (hereinafter "PYP CON-DEN @)"), Ex. H at pp. 76:24-77:1-4; 77:12-78:10; 79:3-11.)

14      Shortly after this derail, Mr. Campbell had a conversation with Rich Barnes, a union

15  representative acting on his behalf, and His two supervisors, Gregg Baxter and Sid Birkett, about

16  the boxcar derailment incident.  (JEC DEN @ 4:10-12.)  After Mr. Campbell described the

17  events leading up to the derailment, Messrs. Baxter and Birkett agreed that it was the engineer's

18  fault for not stopping the train in time.  (JEC DEN @ 4:12-13.)  During the conversation, Mr.

19  Baxter said that he noticed Mr. Campbell had applied for engine service.  (JEC DEN @ 4:13-14.)

20  He suggested that he would get him in the next engineer's class coming up if Mr. Campbell took

21  responsibility for the incident.  (JEC DEN @ 4:14-15.)  Mr. Baxter said, "We'll try to see what

22  we can do in the next class."  (JEC DEN @ 4:15-16.)  Because Mr. Campbell believed Mr.

23  Baxter was going to get him into the next engineer's class, Mr. Campbell agreed to take blame

    for the incident.  (JEC DEN @ 4:16-17.)

24      Mr. Campbell did not receive a twenty (20) day suspension as a result of the boxcar

25  derailment in January 2002.  (JEC DEN @ 4:18-19.)  The suspension imposed was only for ten

26  (10) days.  (JEC DEN @ 4:19.)  Mr. Campbell served four days, including two days of his

27  regular days off, and was immediately called back to work because they were short-handed.

28

-4-

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1  (JEC DEN @ 4:19-21.)  Mr. Campbell did not ever actually serve the remaining six (6) days of

2  the suspension.  (JEC DEN @ 4:21.)  Mr. Campbell also did not have another rules violation

3  charge until July 2004.  (JEC DEN @ 4:21-22.

4      In 2002, Mr. Campbell switched his union membership from the United

5  Transportation Union (UTU) to the BLET (Brotherhood of Locomotive Engineers & Trainmen).

6  (JEC DEN @ 4:23-24.)

7      On July 24, 2004, Mr. Campbell was involved in an incident where his assistant

8  conductor and engineer had a mis-communication resulting in a hard coupling.  (JEC DEN @

   4:25-26.)  On the night of the incident and at all times thereafter, the Assistant Conductor,

9  Anthony Gillard admitted his error as the cause of the incident and accepted responsibility for the

10  event.  (JEC DEN @ 5:10-12; *see also* Declaration of Pamela Y. Price in Opposition to

11  Defendants Joe Deely and National Passenger Railroad Corporation's Motions for Summary

12  Judgment Or In the Alternative, Partial Summary Judgment (hereinafter "PYP DEN @)"), Ex. E

13  at pp. 46:13-48:1.)  He was never charged with any rule violation or disciplined in any way.

14  (PYP DEN, Ex. E @ 24:1-24:16; 48:2-21.)

15      AMTRAK claims that Mr. Campbell's actions in cutting out the air brakes were

16  grounds for his termination.  (JEC DEN @ 4:26-27)  Up to that time, however, cutting out the air

17  brakes are a common practice on the Yard.  (JEC DEN @ 4:27-28; PYP DEN, Ex. D @18:15-

18  21:2; Skinner DEN @ 3:19-23; Barnes DEN @ 3:17-20.)  Other Yard conductors who cut the

19  trucks out on a daily basis included Ray Clarke, Kevin Mayberry, Tim Sheridan, Cynthia

20  Hubbard, and Don Majers.  (JEC DEN @ 4:28-5:12; PYP DEN, Ex. D @ 23:7-24:2.)

21      In the July 2004 incident, there was no damage to any equipment and no injury to any

22  personnel.  (JEC DEN @ 5:3-4; PYP DEN, Ex. D @ 33:5-33:9; Ex. E @ 20:11-16.) Aside from

23  the disruption in the relationship between the engineer and the Assistant Conductor, their work

24  that night was not impacted.  (JEC DEN @ 5:7-8; PYP DEN, Ex. D @ 33:10-21; Ex. E @ 20:17-

25  21:13.) Mr. Campbell was not questioned or made aware in any way that evening that he would

   be charged with a rule violation for my actions that night.  (JEC DEN @ 5:9-10.)

26      During his employment, Mr. Campbell interacted with Defendant Deely in a variety

27  of circumstances.  (JEC DEN @ 5:17-18.)  At a safety meeting, Lou Bellotti, then the Assistant

28

1    Superintendent, introduced him and his crew members by name to Defendant Deely. (JEC DEN

2    @ 5:18-19.) Mr. Campbell spoke to Defendant Deely on that occasion. (JEC DEN @ 5:19.)

3    Mr. Campbell was standing in front of Defendant Deely facing him within 5 feet. (JEC DEN @

4    5:20.) After that introduction, while serving as the Yard Conductor, Mr. Campbell called

5    Defendant Deely on the telephone and left messages for him on multiple occasions. (JEC DEN

6    @ 5:21-22.)

7    Since 1998, Mr. Campbell has repeatedly been passed over for promotion to

8    Engineer. (JEC DEN @ 5:23.) During his tenure with AMTRAK, Mr. Campbell watched as

     people he trained when they were Assistant Conductors under him were selected and promoted to

9    Engineer service. (JEC DEN @ 5:24-25.) They include Josh Kyles, Brian Willson, Ken Powell,

10   Jason Garman, Mike Poirier, Brice Carroll, Mike Yacovetti, Heidi Snyder, and Frank Caron.

11   (JEC DEN @ 5:25-27.)

12   Since October 1998, based upon his review of the seniority roster, Mr. Campbell

13   counted thirty-four (34) individuals whom AMTRAK has hired internally for engineer positions

14   in the Bay Area. (JEC DEN @ 5:28-6:2.) Of those individuals, all of them are Caucasian except

15   for Mr. Brice, who is multi-racial, and Mr. Ly, who is Vietnamese. (JEC DEN @ 6:2-3, Ex. A.)

16   Mr. Campbell has a burning desire to be a Locomotive Engineer. (JEC DEN @ 6:5)

17   In the early years of his quest to become a Locomotive Engineer, Mr. Campbell was only

18   interested in local positions in Oakland because his mother was sick and Mr. Campbell was her

19   primary caretaker. (JEC DEN @ 6:5-7.) His Mom passed away in November 2002. (JEC DEN

20   @ 6:7.) After that time, whenever Mr. Campbell applied to engineer positions, his application

21   was for any position in or around the Bay Area, including San Jose and Sacramento. (JEC DEN

22   @ 6:8-9.)

23   In October 1998, Mr. Campbell applied for a train engineer position based on the

24   recommendations of his supervisor, Mark Carl Schulties. (JEC DEN @ 6:10-11; PYP DEN, Ex.

     C @ 69:2-7; 69:20-70:22.) Mr. Campbell filled-out the application and returned it to Mr.

25   Schulties. (JEC DEN @ 6:11-12.) Mr. Schulties later informed him that his boss, Mr. Oughton,

26   tore up the application. (JEC DEN @ 6:12-13.) The reason Mr. Schulties gave him for Mr.

27   Oughton tearing up his application was because Mr. Oughton wanted him to work for AMTRAK

28

for one full year prior to becoming an engineer. (JEC DEN @ 6:13-15; PYP DEN, Ex. C @ 69:20-71:4.) Mr. Campbell applied again in 1999, and his application was rejected again supposedly because of the one year rule. (JEC DEN @ 6:15-16; PYP DEN, Ex. C @ 69:20-71:4.)

In 2000, Mr. Campbell applied for a departmental transfer in response to an AMTRAK job posting in engine services. (JEC DEN @ 6:17-18.) According to AMTRAK procedure, Mr. Campbell mailed and faxed a Transfer of Departments Application to AMTRAK's Human Resources Department in Los Angeles. (JEC DEN @ 6:18-19.) Mr. Campbell received a standard rejection letter in response. (JEC DEN @ 6:19-20) In 2000, five (5) white guys got promoted in the Oakland crew base. (JEC DEN @ 6:20-21.) All of them had less seniority than he. (JEC DEN @ 6:21)

On August 14, 2001, Mr. Campbell applied for four (4) engineer positions that became available in Oakland, including the Locomotive Engineer Trainee position. (JEC DEN @ 6:22-23.) According to AMTRAK procedure, Mr. Campbell mailed and faxed his application to AMTRAK's human resources department in Los Angeles. (JEC DEN @ 6:23-25.) On August 23, 2001, Amtrak sent him a letter confirming receipt of his applications. (JEC DEN @ 6:25-26.) Sometime thereafter, Mr. Campbell interviewed for the Locomotive Engineer Trainee position. (JEC DEN @ 6:26.) On January 25, 2002, Mr. Campbell was informed that He had been passed over for the position. (JEC DEN @ 6:28-7:1.) The positions were all filled with five (5) Caucasian males. (JEC DEN @ 7:1.) Of those who were promoted, Mr. Campbell trained Chad Skinner, Ken Powell and Robert Ward. (JEC DEN @ 7:1-2.)

In 2002, Mr. Campbell applied and was interviewed for an Engineer position. (JEC DEN @ 7:3.) Mr. Campbell interviewed with Richard Barnes, a Caucasian union representative and two Caucasian AMTRAK engineers, Steve Shelton and Richard Edson. (JEC DEN @ 6:27-28.) Of the three final candidates, including Frank Caron, considered for two positions, Mr. Campbell was again the candidate with the most seniority. (JEC DEN @ 7:4-6.)

In April 2003, Mr. Campbell again applied for a train engineer position. (JEC DEN @ 7:7.) According to AMTRAK procedure, Mr. Campbell faxed and mailed an AMTRAK Job Opportunity Application and his résumé to AMTRAK's Human Resources department in Los Angeles. (JEC DEN @ 7:7-9.) Each time Mr. Campbell applied for engine service, he used the

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1   same AMTRAK Job Opportunity Application form and followed the same procedure, i.e., faxing

2   and mailing. (JEC DEN @ 7:9-11.) A sample of his annual submissions is attached as Exhibit

3   D to the Declaration of Paul Ho. (JEC DEN @ 7:11-12.) His 2003 AMTRAK Job Opportunity

    Application clearly stated that Mr. Campbell was a current Amtrak employee. (JEC DEN @
4
    7:12-13.) Only his résumé did not clearly indicate that Mr. Campbell was an Amtrak employee.
5
    (JEC DEN @ 7:13-14.)

6              In May 2004, Mr. Campbell again applied for an engineer position. (JEC DEN @

7   7:19.) According to AMTRAK procedure, Mr. Campbell faxed and mailed an AMTRAK Job

8   Opportunity Application along with his résumé to AMTRAK's Human Resources department in

    Los Angeles. (JEC DEN @ 7:19-21.) Subsequently, AMTRAK's Human Resources department
9
    contacted him to schedule an interview. (JEC DEN @ 7:21-22.)
10
               On July 7, 2004, Mr. Campbell interviewed with Chad Skinner, Larry Follis, and
11
    Susan Venturelli. (JEC DEN @ 7:23-24.) During the interview, he described his experience as a

12  Machine Operator with Southern Pacific. (JEC DEN @ 7:24-25.) Mr. Campbell told Mr. Follis

13  that he had taken and passed the required tests to operate the various machines. (JEC DEN @

    7:25-26.) Mr. Follis did not ask if Mr. Campbell had the certifications (which he does) and did
14
    not mention any concerns to him about his duties at Southern Pacific. (JEC DEN @ 7:26-27.)
15
    He also did not share those concerns with Chad Skinner, the union representative who sat in on

16  the engineer interviews. (Declaration of Chad Skinner (hereinafter "Skinner DEN") @ 2:6-3:2.)

17             Within days after the interview, Mr. Skinner called him on the radio while he was

    working in the Yard and said, "You finally made it," in reference to the engineer position. (JEC
18
    DEN @ 7:28-8:1; Skinner DEN @ 2:14-19.) Approximately two weeks later, Mr. Campbell
19
    received a rejection letter from AMTRAK in the mail informing him that he did not get the

20  position. (JEC DEN @ 8:2-3.)

21             In August 2004, Amtrak promoted Brice Carroll, John Hanson and Patrick Duncan

22  for Engineer training for Oakland. (JEC DEN @ 8:4-5; PYP DEN, Ex. G @104:1-108:17 & Ex.

    35.) Mr. Campbell worked with both Messrs. Carroll and Duncan. (JEC DEN @ 8:5-6.) Mr.
23
    Campbell trained Brice Carroll for two (2) months to be an Assistant Work Train Conductor.
24
    (JEC DEN @ 8:6.)

25             Mr. Campbell also worked with Patrick Duncan for two years, during which time he

26  was a mechanical foreman. (JEC DEN @ 8:9-10.) Mr. Duncan would make common mistakes

    in repairing cars such as putting wrong parts on passenger cars. (JEC DEN @ 8:10-11.)
27
    **PROTECTED ACTIVITY**
28

                                                    -8-
                    PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

On April 1, 2004, Mr. Campbell sent an e-mail to Susan Venturelli in AMTRAK's human resources department. (JEC DEN @ 8:13-14.) In the e-mail, Mr. Campbell complained about AMTRAK's racially discriminatory hiring practices and AMTRAK's disparate treatment of African-Americans. (JEC DEN @ 8:14-15.) Mr. Campbell complained that AMTRAK had passed him over five (5) times for promotion to an AMTRAK engineer position despite his excellent service record because he was African-American. (JEC DEN @ 8:15-17.) Mr. Campbell also complained that AMTRAK had not promoted a single African-American to engine service from 1998 to April 2004, the date that he wrote and sent the e-mail. (JEC DEN @ 8:17-19, Ex. 10.)

Sometime in April 2004, Mr. Campbell received a phone call from Rickie Donofrio, AMTRAK's Dispute Resolution Case Intake Coordinator, concerning the e-mail complaint. (JEC DEN @ 8:21-22.) Then, on April 10, 2004, Mr. Campbell left a voice mail message for Ms. Donofrio to inform her that he had filed a complaint about AMTRAK's racially discriminatory employment practices with the California Department of Fair Employment & Housing ("DFEH") and the U.S. Equal Employment Opportunity Commission ("EEOC"). (JEC DEN @ 8:25-28.) In the message, Mr. Campbell also expressed to Ms. Donofrio that he had filed the complaint because he was dissatisfied with AMTRAK's lack of response to his internal complaints. (JEC DEN @ 8:28-9:2.)

On April 21, 2004, AMTRAK sent Mr. Campbell a letter informing him that the Dispute Resolution Office (DRO) of AMTRAK's Business Delivery Department had received a copy of his e-mail complaint about AMTRAK's racially discriminatory employment practices but that it would not be investigating his complaint. (JEC DEN @ 9:3-6, Ex. 9.) The letter stated that the "DRO will not be looking into your concerns" because he took his "concerns to the EEOC." (JEC DEN @ 9:6-7.) Instead of a response to his complaint, Ms. Donofrio sent him a letter of counseling. (JEC DEN @ 9:10-11, Ex. 9.)

On September 17, 2004, AMTRAK terminated him. (JEC DEN @ 9:15-16.) On November 23, 2005, Mr. Campbell requested a copy of his personnel file from AMTRAK. (JEC DEN @ 9:21.) The documents provided to him by Barbara Hanna of AMTRAK's Human Resources office on December 7, 2005 do not include any Letter of Reprimand. (JEC DEN @

1    9:22-23.)

2        Within a year of his termination, on August 17, 2005, Mr. Campbell filed a Charge of

3    Discrimination with the Department of Fair Employment and Housing for race discrimination

4    and retaliation.  (JEC DEN @ 9:17-19, Ex. 5.)  In his Charge, he identified Defendant Deely as

5    the discriminating official.  (JEC DEN @ 9:19, Ex. 5.)

6    **I.**        **MR. CAMPBELL CAN ESTABLISH A PRIMA FACIE CASE OF DISCRIMINATION AND RETALIATION**

7        Mr. Campbell's claims of race discrimination and retaliation both can be analyzed

8    under a disparate treatment model, which applies when "an individual [has been] singled out and

9    treated less favorable than others similarly  situated on account of [race]." (*Gay v. Waiters' &*

10   *Dairy Lunchmen's Union,* 694 F.2d 531, 537 (9th Cir. (1982).)  To prevail in a Title VII disparate

11   treatment case, the plaintiff must first establish a prima facie case of discrimination.  (*McDonnell*

12   *Douglas Corp. v. Green,* 411 U.S. 792, 807, 93 S.Ct. 1817, 1826-27, 36 L.Ed. 2d 668 (1973).)

13       The burden of establishing a *prima facie* case is not onerous.  (*Texas Dep't of Cmty.*

14   *Affairs v. Burdine,* 450 U.S. 248, 253, 67 L.Ed.2d 207, 101 S.Ct. 1089 (1981).)  At the summary

15   judgment stage, the plaintiff needs only to present "minimal" proof that "does not even need to

16   rise to the level of a preponderance of the evidence." (*Wallis v. J. R. Simplot Co.,* 26 F.3d 885,

17   889 (9th Cir. 1994).)  A plaintiff need only provide evidence **that suggests** that the employer's

18   decision was based on a discriminatory motive that is illegal under the Civil Rights Act.

19   (*International Brotherhood of Teamsters v. U.S.*, (1977) 431 U.S. 324, 358, 97 S.Ct. 1843, 52

20   L.Ed.2d 396; *Hewlett-Packard v. Co.*, 358 F.3d 599, 604 (9th Cir. 2004); *Godwin v. Hunt*

21   *Wesson Inc.,* 150 F.3d 1217, 1220 (9th Cir. (1998).)

22       As the nonmoving party, Mr. Campbell is not required to produce evidence in a form

23   that would be admissible at trial in order to avoid summary judgment.  (*Fed. Deposit Ins. Corp.*

24   *v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. (1991).)  At this stage, the test is whether the

25   evidence's contents would be admissible at trial despite the admissibility of the evidence's form.

26   (*Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. (2003).)  Accordingly, hearsay evidence may

27   be considered on summary judgment if there is no indication that the declarant would later be

28

1  unavailable to present the evidence through direct testimony.  (*J.F. Feeser, Inc. v.*

2  *Serv-A-Portion, Inc.*, 909 F.2d 1524, 1542 (3d Cir. 1990).)

3          "[I]n cases in which the evidence could support a finding that discrimination is one of

4  two or more reasons for the challenged decision, at least one of which may be legitimate, the jury

5  should be instructed to determine first whether the discriminatory reason was 'a motivating

6  factor' in the challenged action.  If the jury's answer to this question is in the affirmative, then the

7  employer has violated Title VII." (*Stegall v. Citadel Broadcasting Co.*, 350 F.3d 1061, 1067 (9[th]

8  Cir. 2003), citing *Costa v. Desert Palace, Inc.,* 299 F.3d 838, 856-57 (9th Cir. 2002), *affirmed,*

9  *Desert Palace, Inc., v. Costa,* 539 U.S. 90, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003); *see also*

10  *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1122-1123 (9th Cir. 2004).)[2]

11  **II.      DIRECT EVIDENCE OF DEFENDANTS' RACIAL BIAS IS
             ADMISSIBLE TO ESTABLISH DISCRIMINATION AGAINST**
12  **MR. CAMPBELL**

13          Federal courts admit both direct and circumstantial evidence of discrimination to

14  prove discrimination against a plaintiff on a specific occasion.  (*International Brotherhood of*

15  *Teamsters v. United States*, 431 U.S. *supra at* 358, n. 44; *see also, United States Postal Service*

16  *Board of Governors v. Aikens*, 460 U.S. 711, 714-17 (1983).)[3] "'Direct evidence' typically

17

18  _____

19  [2]      Section 703(m) of Title VII provides *inter alia* that:

20              . . . an unlawful employment practice is established when the
                complaining party demonstrates that race, color, religion, sex, or national
21              origin was a motivating factor for any employment practice, even though
                other factors also motivated the practice.
22

23  [3]      In *Mullen v. Princess Anne Volunteer Fire Fighter Co. Inc.*, 853 F.2d 1130, 1134 (4th Cir.
     1988), the Court held that an African-American firefighter denied a position in a firefighting
24  company could introduce evidence of past racial discriminatory statements and evidence of
     customary racist manners of speech by the defendant fire fighter company which were unrelated to
25  the specific disputed action to show racial attitudes in the fire department and to prove the
     Department's specific intent to discriminate.  The *Mullen* Court held that an employer's prior
26  discriminatory acts which would otherwise be inadmissible under FRE Rule 404(b) may be
     introduced to show an employer's **intent**, **motive** and **knowledge**.  (*Id.*)  This reasoning and the
27  outcome in *Mullen* was cited with approval by the Ninth Circuit in *Heyne v. Caruso*, 69 F.3d at
     *supra* 1480-1481.
28

1  consists of clearly sexist, racist, or similarly discriminatory statements or actions by the

2  employer." (*Dominguez-Curry v. Nevada Transportation Dept.*, 424 F.3d 1027, 1038 (9th Cir.

3  2005), citing *Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1095 (9th Cir. 2005).)

4      A supervisor's discriminatory remarks are probative of intent even if he directed them

5  towards other people in the protected class.  (*Id.*, see also *Coghlan*, 413 F.3d at 1095, n.6

6  (holding that even if an employer does not target his remarks directly at plaintiff, "when evidence

7  establishes the employer's animus toward the class to which the plaintiff belongs, the inference

8  of fact of discrimination against the plaintiff is sufficiently small that we have treated the

9  evidence as direct.") "Where a decisionmaker makes a discriminatory remark against a member

10  of the plaintiff's class, a reasonable fact finder may conclude that discriminatory animus played a

11  role in the challenged decision."  (*Id.* at 1039; *see also Mondero v. Salt River Project*, 400 F.3d

12  1207, 1213 (9th Cir. 2005) ("An agent's biased remarks against an employee because of his or

13  her gender are admissible to show an employer's discriminatory animus <u>if the agent was involved</u>

14  <u>in the employment decision.</u>) (Emphasis added).)

15      By offering "very little" direct evidence of discriminatory or retaliatory motive, Mr.

16  Campbell rebuts the Defendants' articulation of a non-discriminatory or non-retaliatory motive

17  behind its actions.  (*Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (citing

18  and quoting other cases, noting that direct evidence is evidence which, if believed, proves

19  discriminatory animus without inference or presumption).)  In *Godwin*, the Court found that

20  direct evidence included a statement that the defendant did not want to "deal with another

21  female," suggesting bias against the plaintiff as a woman with the necessity of drawing an

22  inference.  (*Godwin*, 150 F.3d *supra* at 1221.)

23      In *Morgan v. Amtrak*, a case tried twice before Judge Illston, the Ninth Circuit held

24  that the Court improperly excluded co-worker testimony regarding racial discrimination,

25  including testimony regarding Defendant DEELY's discriminatory practices.[4]  (*Morgan v.*

26

27  [4]    AMTRAK litigated the *Morgan* case through two (2) trials, an appeal to the Ninth
Circuit  which it lost and a hearing in the United States Supreme Court. (*See Morgan v. National*
28  *Passenger Railroad Corp.*, 232 F.3d 1008 (9th Cir. 2000), 536 U.S. 101 (2002).  Following the

-12-

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1  *National Railroad Passenger Corporation*, 232 F.3d 1008, 1017-1018 (9th Cir. 2000), citing

2  *Heyne v. Caruso*, 69 F.3d 1475, 1479 (9th Cir. 1995) and *Spulak v. K Mart Corp.*, 894 F.2d 1150,

3  1156 (10th Cir. 1990); *see also* Exhibits 1 and 6 to Plaintiff's Request for Judicial Notice ("RJN")

4  filed and served concurrently herewith.)

5       The probative value of evidence that AMTRAK management discriminated or

6  retaliated against African-American employees is especially significant in part "because of the

7  inherent difficulty of proving [a defendant's] state of mind," a key issue in disparate treatment

8  and retaliation claims.  (*Heyne*, 69 F.3d *supra* at 1480, *citing Mullen v. Princess Anne Volunteer*

9  *Fire Co.*, 853 F.2d 1130, 1133 (4th Cir. 1988); *see also Hunter v. Allis-Chalmers Corp., Engine*

10  *Div*, 797 F.2d 1417, 1423-24 (7th Cir. 1986) (testimony that defendant Lambert had suspended

11  another black worker for a minor infraction and other evidence "disclosed a strong and persistent

12  pattern of racial hostility that management could hardly have been unaware of and that increased

13  the probability that [the plaintiff's] record-keeping irregularities were merely the pretext for the

14  harsh discipline meted out to him by a management irritated by his complaints about racial

15  harassment").)  Because the evidence went to the issue of the defendant's intent, there was no

16  requirement that the Plaintiff be present or even know about the defendants' harassment of co-

17  workers.  (*Id.*)

18       Thus, evidence of prior acts of discrimination is relevant to demonstrating motive

19  even where the evidence is not extensive enough to establish discriminatory animus by itself.

20  (*Estes v. Dick Smith Ford, Inc.* 856 F.2d 1097, 1102-1104, (8th Cir. 1988) quoted with approval

21  in *Heyne, supra* at 1480; *see also Stender v. Lucky Stores, Inc.*, 803 F.Supp. 259, 331-332

22  (N.D.Cal. 1992) (Defendant's involvement in two class action sex discrimination suits in the

23  early 1980s resulting in consent decrees was relevant to the defendant's notice of discriminatory

24  practices such as those alleged in a suit whose liability period ran from January 1986 to 1992);

25  *Equal Employment Opportunity Commission v. Farmers Brother Company*, 31 F.2d 891, 897

26

27  jury verdict after the second trial in May 2004, AMTRAK was faced with the costs bill as well as
the attorneys' fees under 42 U.S.C. Section 1988 for the entire case.  The case settled in late 2004

28  as the parties were preparing to file cross-appeals in the Ninth Circuit.

1  (9th Cir 1994); *Detroit Police Officers Association v. Young* (6th Cir. 1979) 608 F.2d 671, 687;

2  *Harvey v. Armour Co.*, 743 F.2d 199, 240  (4th Cir. 1984), *cert. den.* 470 U.S. 1395, 105 S.Ct.

3  1395, 84 L. Ed.2d 784 (1985); *Burns v. McGregor Electronic Industries, Inc.*, 955 F.2d 559, 562

4  (8th Cir. 1992).)

5          Even if the decisionmaker who made discriminatory remarks did not communicate his

6  bias to other decisionmakers who are themselves not biased against the protected class, evidence

7  of the racist remarks "is sufficient to permit a jury to find that animus affected the ultimate"

8  employment decision. (*Dominguez-Curry v. Nevada Transportation Dept.*, 424 F.3d 1027, at

9  1040; *see also Lam v. University of Hawaii*, 40 F.3d 1551, 1560 (9th Cir. 1994) (noting that

10  "among a group of fifteen decisionmakers, 'even a single person's biases may be relatively

11  influential'").

12          If the decisionmakers worked closely together in formulating personnel decisions, a

13  supervisor's bias may be imputed to the subordinate. (*Dominguez-Curry v. Nevada*

14  *Transportation Dept.*, 424 F.3d 1027, at fn. 5, compiling cases, including *Wells v. New Cherokee*

15  *Corp.*, 58 F.3d 233, 237-238 (6th Cir. 1995) (a supervisor's animus imputed to the ultimate

16  decisionmaker, because evidence showed that the two "worked closely together and consulted

17  with each other on personnel decisions" and they "themselves testified that they acted jointly")

18  and *Laxton v. Gap Inc.*, 333 F.3d 572, 584 (5th Cir. 2003) (the relevant inquiry is whether the

19  person who made the discriminatory remark "had influence or leverage over" the formal

20  decisionmaker).)

21          Mark Carl Schulties testified under oath that Defendant DEELY and his subordinate

22  managers expressed an attitude that African-Americans and women needed to be put or kept in

23  "their place." (PYP DEN. Ex. C @ 44:18-46:2-24; 36:15-40:12; 60:19-64:25; 83:9-86:4;

24  107:20-110:3.)  Defendant DEELY expressed to Mr. Schulties that he would not associate with

25  the African-American employees at the company's Christmas party. (PYP DEN, Ex. C @

26  117:24-119:24.)  Defendant DEELY even suggested to Mr. Schulties that he might lose his

27  employment if he pressed his concerns about racism in the workplace. (PYP DEN, Ex. C @

28  74:4-75:1; 76:14-80:23.)  Mr. Schulties will also testify that Defendant DEELY required that

1  every personnel action be approved by him.  (PYP DEN, Ex. C @ 144:9-16; 189:3-190:23; *see*

2  *also* Ex. F @ 43:3-7; 115:8-19; Declaration of Richard Barnes @ 3:21-25.)

3          Mary Fontaine has also stated under oath that she heard Defendant DEELY use racial

4  epithets to refer to African-Americans.  (Plaintiff's Request for Judicial Notice, Ex. A @ 2:7-13.)

5  She also observed him treat people of color in a derogatory manner, alternating with

6  condescending or aggressive tones of voice.  (Plaintiff's Request for Judicial Notice, Ex. A @

7  2:22-28.)  She observed on multiple occasions that Defendant DEELY had a different, more

8  stringent standard for disciplinary issues when it involved an African-American employee vs. a

9  Caucasian employee.  (Plaintiff's Request for Judicial Notice, Ex. A @ 2:20-4:7.)[5]

10  **III.      AMTRAK'S  ALLEGATIONS OF PERFORMANCE**

11  **DEFICIENCIES ARE A PRETEXT FOR**
     **DISCRIMINATION AND RETALIATION**

12

13          A plaintiff is entitled to a trial where a reasonable jury could return a verdict for the

14  non-moving party.  Whether in fact the employer's reasons are inconsistent or unworthy of belief

15  are not determinations appropriate at the summary judgment stage.  There will always be a

16  question for the fact finder once an appellant establishes a prima facie case and raises a genuine

17  issue as to whether the employer's explanation for its action is true.  Such a question cannot be

18  resolved on summary judgment." (*Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir. 1993).)

19  In this case, Mr. Campbell can establish a *prima facie* case of racial discrimination by showing

20  (1) that he is a member of a protected class (African-American); (2) he was qualified for his

21  position; (3) AMTRAK disciplined and terminated him; and (4) AMTRAK did not discipline or

22  terminate similarly-situated non-African-American employees who violated the same or similar

23  work rules.  (*McDonald v. Santa Fe Trail Transportation*, 427 U.S. 273, 96 S.Ct. 2574, 49

24  L.Ed.2d 493 (1976); *Green v. Armstrong Rubber*, 612 F.2d 967 (5th Cir. 1980); *Turner v. Texas*

25

26  _____

[5]        Notably, Defendant DEELY acknowledged that Amtrak received two letters accusing him

27  of racial discrimination, including a letter from Martin Yeager reporting that he overheard a
     conversation where Defendant DEELY used the "N" word.  (Price DEN, Ex. B @ 23:1-19; 25:2-

28  18.)

                                           -15-

1   *Instruments*, 555 F.2d 1251 (5th Cir. 1977); *Garrett v. City & County of San Francisco*, 818 F.2d

2   1515 (9ᵗʰ Cir. 1987).)

3          Irregularities and deviations from protocol support an inference of pretext sufficient to

4   overcome summary judgment. (*Porter v. Cal. Dep't of Corrections*, 383 F.3d 1018, 1031 (9th

5   Cir. 2004).)  Departure from an employer's own rules, policies, practices or procedures, may

6   constitute evidence of pretext and unlawful motive. (*Gonzales v. Police Dept, City of San Jose*,

7   901 F.2d 758 (9ᵗʰ Cir. 1990).)  Inconsistency in the application of decision-making process is

8   evidence of pretext. (*See Jauregui v. City of Glendale*, 852 F.2d 1128, 1135 (9ᵗʰ Cir. 1988)

9   (inconsistency in the City's selective application of its asserted basis for denying promotion to

10  Officer Jauregui created an inference of unlawful discrimination).)

11         Pretext may also be demonstrated by shifting, conflicting, and retracted justifications

12  for adverse treatment. (*Villiarimo v. Aloha*, 281 F.3d 1054 (9ᵗʰ Cir. 2002) citing *Nidds v.*

13  *Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1997) and *Johnson v. Nordstrom*, Inc., 260

14  F.3d 727, 733-34 (7th Cir. 2001) (Presence of shifting reasons sufficient to defeat summary

15  judgment when those reasons are retracted and incompatible.)  "One who tells the truth need not

16  recite different versions of the supposedly same event." (*Payne v. Norwest Corp.*, 113 F.3d

17  1079, 1080 (9th Cir. 1997).)

18         In appropriate circumstances, the trier of fact may reasonably infer from the falsity of

19  the explanation that the employer is dissembling to cover up a discriminatory purpose.  Such an

20  inference is consistent with the general principle of evidence law that the factfinder is entitled to

21  consider a party's dishonesty about a material fact as "affirmative evidence of guilt." (*Wright v.*

22  *West,* 505 U.S. 277, 296, 120 L.Ed.2d 225, 112 S.Ct. 2482 (1992); *see also Wilson v. United*

23  *States,* 162 U.S. 613, 620-621, 40 L.Ed.1090, 16 S.Ct. 895 (1896*); J.* Wigmore, Evidence §

24  278(2), p. 133 (J. Chadbourn Rev. Ed. 1979).)

25         Moreover, once the employer's justification has been eliminated, discrimination may

26  well be the most likely alternative explanation, especially since the employer is in the best

27  position to put forth the actual reason for its decision. (*Cf. Furnco Constr. Corp. v. Waters*, 438

28  U.S. 567, 577, 57 L.Ed.2d 957, 98 S.Ct. 2943 (1978) ("When all legitimate reasons for rejecting

-16-

1  an applicant have been eliminated as possible reasons for the employer's actions, it is more likely

2  than not the employer, who we generally assume acts with *some* reason, based his decision on an

3  impermissible consideration"). (*Id.* at 2108-2109.)

4        Thus, if a jury rejects an employer's explanations for its decision, it may conclude that

5  unlawful discrimination or retaliation have occurred without further evidence.  From the falsity

6  of the explanation for the adverse action, a rational fact finder may infer that the employer is

7  dissembling to cover up a discriminatory purpose. (*Reeves v. Sanderson Plumbing Products, Inc.*

8  530 U.S. 133, 147 L.Ed.2d 105, 120 S.Ct. 2097, 2109 (2000).)  Proof that an employer's

9  explanation is unworthy of belief may be "quite persuasive" evidence that the employer is

10 "dissembling to cover up a discriminatory purpose".  Such dishonesty about a material fact is

11 "affirmative evidence of guilt." (*Id.* [citations omitted]).

12        In the instant case, Defendants have asserted that they terminated Mr. Campbell's

13 employment based upon a "three-strikes" rule that allows them to terminate an employee who

14 has incurred three "major" rule violations in the course of his employment.  The evidence clearly

15 demonstrates, however, that the violation for which Mr. Campbell was terminated was not

16 "major" but quite common on the Yard.  Engineer Richard Barrow, who was present on the night

17 of the event, testified under oath that "cutting the trucks out" was "pretty much common

18 practice." (PYP DEN, Ex. D @ 18:15-20:6; *see also* Ex. D @ 20:7:-21:2; 23:7-25.)[6]

19        Mr. Barrow's testimony is corroborated by the Declarations of Chad Skinner and

20 Richard Barnes, who also both attest to the fact that "cutting out trucks" was a common practice

21 in the Yard. (Declaration of Richard Barnes @ 3:17-20; Skinner Declaration @ 3:19-23.)

22 Messrs. Barnes and Skinner met with Steve Shelton following Mr. Campbell's termination and

23 he even admitted to them that "he told them that it was not a terminating offense and that he

24 knew you would get back with pay.  Joe told him just to do as he is told." (Skinner Declaration

25 @ 4:4-14 and Exhibit 3 thereto; Declaration of Richard Barnes @ 2:23-28; 3:6-10.)

26 ───────────────

27 [6]   According to Mr. Barrows,  "any regular yard conductor that I've worked with over the
   years at some point in time has cut trucks out, not saying that it was a common practice for them to
28 do it.  So do it more than others." (PYP DEN, Ex. D @ 23:7-25.)

1       Defendants' protestations that Mr. Campbell was "an accident waiting to happen" are

2   also belied by their treatment of other similarly-situated Caucasian employees who have been

3   charged with rule violations and remain employed by Amtrak.  Discovery is continuing so there

4   will undoubtedly be even more examples at trial, however, even with limited information, there

5   are sufficiently egregious examples to withstand summary judgment.

6       Ray Clarke, a Conductor assigned to the Yard who often worked with Mr. Campbell

7   is particularly illustrative of Defendants' pretext.  Mr. Clarke's disciplinary record reflects that he

8   was charged on six separate occasions with rule violations, including derailments, collisions and

9   split switches.  (PYP CON-DEN, Ex. H @ 48:2-24; 54:11-86:5; Ex. 41,  42, 43A, 44, 45, 47, and

10  48.)  As set forth in Exhibit 41, 42 and 44,  Mr. Clark has been blessed with two separate ten (10)

11  day suspensions.  He's received three final warnings since 2004.  For an incident involving a split

12  switch in June 2001, he received a three day suspension held in abeyance for six months.  Less

13  than six months later, in November 2001, he was charged with a series of rule violations for a

14  derailment of two passenger cars, but only received a four day suspension, a Letter of Reprimand

15  and 4 days held in abeyance for 6 months.[7]  According to Mr. Clarke, there was no mention of

16  the previous three day suspension which was "held in abeyance" in June 2001.  (PYP CON-

17  DEN, Ex. H @ 77:1-78:11; 80:8-21.)

18      Amtrak's leniency toward its Caucasian employees is also reflected in its treatment of

19  Donald Bruce Shelton.  On November 10, 1999, Mr. Shelton was charged with failure to stop

20  short of a derail switch in San Jose, causing a derailment.  (PYP CON-DEN, Ex I @ 63:17-20.)

21  Mr. Shelton signed waiver and accepted a three (3) day suspension.  (PYP CON-DEN, Ex. I @

22  71:8.)  On July 21, 2000, Mr. Shelton was charged with splitting a switch.  (PYP CON-DEN, Ex.

23  I @ 69:19.)  He signed a waiver and accepted a one (1) day suspension and ten (10) days held in

24  abeyance.  (PYP CON-DEN, Ex. I @ 74:13.)

25      On July 8, 2002, Mr. Shelton caused a train to depart prior to schedule without

26

27  ───────────────

[7]       In contrast, Mr. Campbell received a ten day suspension with ten days held in abeyance for
28  a derailment in January 2002.  (JEC DEN @ 4:5-23.)

receiving authorization from the San Jose control tower.  (PYP CON-DEN, Ex. I @ 74:24.)  He

signed a waiver, accepting a reprimand and six (6) months of probation.  (PYP CON-DEN, Ex. I

@ 76:13, 77:10, 77:17.)  On July 31, 2002, Mr. Shelton was charged with failing to protect the

movement of a train, failing to stop short of an improperly lined switch, causing a split switch.

(PYP CON-DEN, Ex. I @ 78:4.)  He signed a waiver, accepting twenty-five (25) days of

suspension, of which he served only five (5) days, the remainder being held in abeyance.  (PYP

CON-DEN, Ex. I @ 81:20.)

On April 10, 2003, Mr. Shelton was involved in a derailment in San Francisco Yard.

(RJN, Ex. 3 @ 5:24.)   The train was traveling less than seven miles per hour at the time, and

there were no injuries.  (RJN, Ex. 3 @ 7:21.)  C. Faheem Hardeman, one of the very few African-

American engineers in the Pacific Division, was responsible for controlling the brakes and gas of

the train.  (RJN, Ex. 3 @ 6:1.)  As part of his duties, Mr. Shelton were responsible for directing

Mr. Hardeman, ensuring a clear pathway and proper alignment of switches, and providing Mr.

Hardeman instructions before and during the actual movement of the train.  (RJN, Ex. 3 @ 6:4-

5.)  When the crew came upon Switch No. 39, the engine derailed.  (RJN, Ex. 3 @ 6:20.)

Neither AC Soule nor Mr. Shelton had complied with their duties to 'be on the point' or 'protect

the movement of the train.'  (RJN, Ex. 3 @ 6:6; PYP CON-DEN, Ex. I @ 101:12-19.)

All three (3) crew members were charged with failing to obey the restrictive speed

rule.  Mr. Shelton was initially charged with an operating rules violation, but he objected to the

charge.  (PYP CON-DEN, Ex. I @ 53:17-54:5.)  He felt it was not fair to be charged with an

operating rules violation because he was present in the cab in the capacity of observer on that

day, although he was a rules certified Conductor.  (PYP CON-DEN, Ex. I @ 53:17-54:5.)  He

took the issue up with senior management, notifying them that he would "fight it all the way."

(PYP CON-DEN, Ex. I @ 53:17-54:5.) Mr. Shelton spoke directly with Amtrak manager Charlie

Miller about the charged operating rule violation.  (PYP CON-DEN, Ex. I @ 53:17-54:5.)  Mr.

Miller reduced the charge to a  Standards of Excellence violation, which meant that after two

years, the violation can be purged from the record, whereas an operating rules violation remains

1    on an employee's record forever.[8]  (PYP CON-DEN, Ex. I @ 53:17-54:5.)

2         Mr. Hardeman was terminated on May 30, 2003.  (RJN, Ex. 3 @ 8:20.)

3         Mr. Campbell is prepared to prove at trial that the Amtrak regime led by Defendant

4    Deely in the Bay Area has a history, pattern and practice of disciplining African-American and

5    other non-Caucasian employees more harshly than Caucasian employees in virtually every craft,

6    including Conductors and engineers.  These practices violate 42 U.S.C. Section 1981 at its very

7    core, as well as the analogous state law embodied in FEHA.

8    **IV.    MR. CAMPBELL WAS TREATED DIFFERENTLY THAN**
     **       SIMILARLY-SITUATED WHITE EMPLOYEES**
9

10        It is well settled that "promotional systems which depend upon the subjective

11   evaluation and favorable recommendation of immediate supervisors provide a ready vehicle for

12   discrimination." (*Page v. U.S. Industries, Inc.*, 726 F.2d 1038, 1054 (5th Cir. 1984); *Rowe v.*

13   *General Motors Corp.*, 457 F.2d 348 (5th Cir. 1972); *Atonio v. Wards Cove Packing Company,*

14   *Inc.*, 810 F.2d 1477, 1481 (9th Cir. 1987); *Jauregui v. City of Glendale*, 852 F.2d 1128, 1135-

15   1136 (9th Cir. 1988).)  While the Ninth Circuit has held that the use of subjective factors to

16   evaluate applicants for promotion is not illegal *per se*, it is understood that "subjective practices

17   are particularly susceptible to discriminatory abuse and should be closely scrutinized." (*Atonio v.*

18   *Wards Cove*, 810 F.2d at 1481; *accord*, *Jauregui v. City of Glendale*, 852 F.2d at 1135-1136, and

19   cases cited therein; *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1187 n. 17 (9th Cir. 2002).

20        Defendants claim that they could not promote Mr. Campbell because of his

21   disciplinary history.  There is compelling evidence, however, that Defendants imposed a double

22   standard on Mr. Campbell and treated him far differently than his less experienced colleagues.

23   Frank Caron was promoted to engineer service in 2002.  His promotion is significant for a

24   number of different reasons.  One, Defendants assert that the only promotional opportunity for

25

26   ───────────────
     [8]    Notably, this was Mr. Shelton's fifth documented rules violations.  As set forth in the

27   Declaration of C. Faheem Hardeman, disparity in the actual decision to charge a violation in the
     first place was rampant, and he found himself unduly singled out for discipline on matters that are

28   glossed over for non-African-American employees.  (RJN, Ex. 3; *see also* Declaration of Richard
     Barnes @ 3:14-16; 3:26-28; RJN, Ex. 1 @ 3:1-4:15.)

                                              -20-

1  engine service in 2002 was for a "currently qualified Class I Engineer." (See Susan Venturelli

2  Declaration @ 4:23-26.)  Mr. Caron's employment records reflect that prior to his promotion to

3  Engineer in December 2002, he was an Assistant Conductor.  (PYP CON-DEN, Ex. N.)  Mr.

4  Caron's personnel file also reflects that he was hired in March 1998 with no prior railroad

5  experience.

6      Mr. Caron's promotion is also significant in that he was an Assistant Conductor

7  trained by Mr. Campbell.  Mr. Caron's personnel file reflects that he was promoted from

8  Assistant Conductor to Engineer Trainee on December 10, 2002, less than nine months after his

9  third rule violation on April 21, 2002.  The documents reflect that Defendant Deely approved Mr.

10 Caron's promotion on November 21, 2002, less than eight months after his third rule violation.

11 Mr. Caron was involved in a derailment on April 21, 2002, ran through a switch on July 11,

12 2000, and tore up a luggage bin on December 13, 1999 resulting in extensive damage to the bin.

13 Each of these incidents resulted in multiple charges of rule violations for which he signed

14 waivers admitting guilt.  Not only was he not subject to the "three-strikes" rule, he was promoted

15 less than a year after his third strike.

16      Mark Carl Shulties' testimony also illustrates the perniciousness of Amtrak's

17 promotional practices.  He testified under oath that his efforts to promote Mr. Campbell were

18 thwarted and rebuffed from the very beginning of Mr. Campbell's tenure with Amtrak.  (PYP

19 DEN, Ex. C @ 65:2-69:7; 74:4-28.)  He testified that the so-called one year rule was frequently

20 waived, and identified specific individuals who were promoted with less than one year tenure and

21 a history of rule violations.  (PYP DEN, Ex. C @ 69:20-71:4; 172:12-183:21; 196:11-198:7;

22 199:200:10; 200:25-201:13.)

23      Defendants' claim that Mr. Campbell's disciplinary record "disqualified" him is also

24 belied by Ms. Venturelli's testimony that Mr. Deely decided to waive the rule for one applicant

25 (Than Ly) while refusing to waive it for Debrice Gallo, an African-American female.  (PYP

26 DEN, Ex. G @ 116:10-117:12; 118:4-119:10; 121:4-122:3 and Ex. 32, 35 and 36.)  Exhibit 36 is

27 also particularly telling in that it reflects that the supervisor for one of the applicants chosen over

28 Mr. Campbell reported that the applicant was "below average" in every category of job

-21-

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1   performance. (PYP DEN, Ex. G @ 123:7-23.) Significantly, Ms. Venturelli and Mr. Follis'

2   claims that the panel disqualified Mr. Campbell are contradicted by Mr. Skinner as well as the

3   documentary evidence which reflects that Mr. Campbell had one of the highest scores. (Skinner

4   Declaration @ 2:6-3:12; PYP DEN, Ex. K & L.)

5           **V.      RETALIATION IS A VIABLE CLAIM UNDER**
                     **42 U.S.C. §1981**
6

7           Under *Manatt v. Bank of America, NA*, 339 F.3d 792 (9th Cir. 2003), the Ninth Circuit

8   reaffirmed that where a plaintiff charges an employer with racial discrimination in taking

9   retaliatory action, such plaintiff has stated a cause of action under § 1981. It follows that where

10  an employer retaliates against the employee with a racially discriminatory motive, "then

11  interference with rights protected by § 1981 has occurred and that section must come into play."

12  (*Id.* at 800-01.)

13          Other circuits are in accord. (*See, e.g., Foley v. Univ. of Houston Sys.*, 324 F.3d 310,

14  316 (5th Cir. 2003) (holding that "an employee's claim that he was subjected to retaliation

15  because he complained of race discrimination is a cognizable claim under § 1981(b)"); *Hawkins

16  v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir. 1998) ("We remain of the view, in light of

17  the broad sweep of § 1981(b), that a retaliation claim may be brought under § 1981."); *Andrews

18  v. Lakeshore Rehab. Hosp.*, 140 F.3d 1405, 1411 (11th Cir. 1998) (noting that the legislative

19  history for the 1991 Civil Rights Act supports the conclusion that Congress intended retaliation

20  claims to be cognizable under § 1981(b)); *see also O'Neal v. Ferguson Constr. Co.*, 237 F.3d

21  1248, 1258 (10th Cir. 2001); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1059 (8th Cir. 1997).)

22          **VI.     MR. CAMPBELL WAS RETALIATED AGAINST FOR**
                     **ENGAGING IN ACTIVITY PROTECTED BY 42 U.S.C.**
23                   **1981 AND FEHA**

24          To prevail in an action for retaliation under FEHA or 42 U.S.C. Section 1981, Mr.

25  Campbell must prove that engaging in protected activity was one of the reasons for the adverse

26  action against him and but for such activity, the adverse action would not have occurred.

27  (*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1064 (9th Cir. 2002); *Bergene v. Salt River

28

1  *Project Agric. Improvement & Power Dist.*, 272 F.3d 1136, 1140-41 (9th Cir. 2001); *McAlindin v.*

2  *County of San Diego*, 192 F.3d 1226, 1238 (9th Cir. 2000).)  Asserting one's civil rights in the

3  employment environment is considered protected activity.  (*E.E.O.C. v. Crown Zellerbach Corp.,*

4  720 F.2d 1008, 1013 (9th Cir. 1983).)

5      Furthermore, the U.S. Supreme Court recently upheld *Ray v. Henderson*, 217 F.2d

6  1234, 1245 (9th Cir. 2000), and held that Title VII's anti-retaliation provision covers those

7  employers' actions that are materially averse to a reasonable employee and harmful so that they

8  could dissuade a reasonable worker from testifying in a Title VII proceeding.  (*Burlington*

9  *Northern and Santa Fe Railway Co. v. White*, 548 U.S. ___, 126 S.Ct. 2405 (2006).)  An

10  employer's retaliatory motive can be established by the temporal proximity between the protected

11  activity and the adverse action.  (*Yartzoff v. Thomas*, 809 F.2d 1371, 1375-1376 (9th Cir. 1989).)

12  (*Ray v. Henderson*, 217 F.2d *supra* at 1245; *see also Miller v. Fairchild Ind.*, 885 F.2d 498, 503

13  (9th Cir. 1989).)  *Payne v. Northwest Corp.*, 113 F. 3d 1078, 1080 (9th Cir. 1997).)

14      The third element of the prima facie case, causal link, may be established be inferred

15  from circumstantial evidence, "such as the employer's knowledge that the plaintiff engaged in

16  protected activities and the proximity in time between the protected action and the allegedly

17  retaliatory employment decision.  (*Miller*, 797 F.2d at 731-32; *Yartzoff*, 809 F. 2d at 1376.)

18  Moreover, "[a]t the summary judgment stage, the prima facie case need not be  proved by a

19  preponderance of the evidence."  (*Miller*, 797 F.2d at 731.)

20      While Defendant DEELY and his subordinate, Steve Shelton, outright deny that they

21  had any knowledge of Mr. Campbell's protected activity, their convenient disclaimers must be

22  considered against the duty the law imposes upon them to prevent discrimination and other

23  evidence which shows that their disclaimers are in effect a deliberate attempt on their part to

24  close their eyes to information which was obviously available to them.  (*United States v. Jewell*,

25  532 F.2d 697 (9th Cir. 1976) (*en banc*), *cert. denied*, 426 U.S. 951 (1976).)

26      Indeed, California law imposes an affirmative duty on managers and others

27  responsible for the management of an enterprise to prevent discrimination.  (*See Trujillo v. North*

28

1    *County Transit District*, 63 Cal.App.4th 280 (1998).) Defendant DEELY and Steve Shelton, as

2    high ranking AMTRAK managers, surely had such an affirmative duty.  They cannot close their

3    eyes to events any reasonable, prudent manager in their place would be expected to be aware of

4    which affected their enterprise or business.

5             The factual premise of Defendants' contention that there is insufficient proximity

6    between Mr. Campbell's protected activity and their retaliatory acts is also flawed.  The evidence

7    is that Mr. Campbell was communicating his concerns to Amtrak's internal EEO department in

8    April 2004, less than four months prior to his termination and his non-selection for the sixth time

9    for an engineer position.  On this record, a reasonable jury could disbelieve Defendants'

10   disclaimers.

11            Furthermore, even, where the facts are not disputed, if reasonable minds could differ

12   on the inferences which may be drawn from the undisputed facts, summary judgment must be

13   denied.  (*Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970);

14   *Lake Nacimiento Ranch Co. v. San Luis Obispo County*, 841 F. 2d 872, 875 (9th Cir. 1987).)  The

15   function of summary judgment is ". . . not to weigh the evidence or determine the truth of the

16   matter, but only to determine whether there is a genuine issue for trial."  (*Abdul-Jabbar v.*

17   *General Motors*,  85 F.3d 407, 410 (9th Cir.(1996).)

18   **VII.        Mr. CAMPBELL IS ENTITLED TO A JURY TRIAL ON**

19   **             HIS WRONGFUL TERMINATION CLAIM**

20            As set forth herein, there is an abundance of evidence to establish a triable issue of

21   fact whether Mr. Campbell was terminated in retaliation for his protected activity or because of

22   his race.  To the extent that his discrimination claims survive, he is entitled to a trial on his

23   wrongful termination claim.

24   **VIII.       AMTRAK AND DEFENDANT DEELY MAY BE HELD**

25   **             LIABLE FOR PUNITIVE DAMAGES**

26            It is a triable issue of fact whether Mr. Campbell is entitled to punitive damages.

27   (*See, e.g., EEOC v. Wal Mart Stores,* 156 F.3d 989 (9th Cir. 1998); *see also Emmel v. Coca-Cola*

28   *Bottling Co. of Chicago*, 95 F.3d 627, 637 (7th Cir. 1996).)   In the instant case, the evidence

-24-

PLAINTIFF'S OPPOSITION TO SUMMARY JUDGMENT ( C05-5434 MJJ (EDL))

1  clearly suggests that Defendants were aware that their reasons for terminating Mr. Campbell

2  were pretextual.

3          In *EEOC v. Wal-Mart*, 156 F.3d at 993, the Ninth Circuit held that Wal-Mart's

4  decision to not hire the plaintiff because she was pregnant and *their subsequent attempt to cover*

5  *up the discrimination* was sufficient evidence that defendant "acted with malice or reckless

6  indifference to the complaining party's federally protected rights."  In this case, triable issues of

7  fact exist whether Defendants discriminated against Mr. Campbell because he is African-

8  American, retaliated against him because he complained of the discrimination, denied that they

9  discriminated or retaliated against Mr. Campbell, and attempted to cover up the invidious

10 conduct.

11         Furthermore, to assert a good-faith defense against a claim for punitive damages in an

12 employment discrimination case, "it is insufficient for an employer simply to have in place

13 anti-harassment policies; it must also implement them."  (*Swinton v. Potomac Corp.*, 270 F.3d

14 794, 811 (9th Cir. 2001).)  AMTRAK has had a longstanding practice of subjecting its African-

15 American employees to a racially discriminatory hostile work environment in direct violation of

16 anti-discrimination laws and retaliating against any employee who attempts to make an internal

17 complaint, a fact to which past and current employees are willing to testify.  (*See* Plaintiff's

18 Request for Judicial Notice, Ex. 1 @ 2:10-4:1, Ex. 3 @ 1:24-2:14, Ex. 4:1-6, Ex. 5 @ 2:1-22,

19 Ex. 6 @ 2:9-14, Ex. 7 @ 7:7-25, Ex. 8 @ 8:26-13:22).  Indeed, AMTRAK reprimanded Mr.

20 Campbell in response to his filing an internal complaint of race discrimination.  (*See* JEC DEN,

21 Ex. 9).  Not only is there a lack of good faith effort on AMTRAK's part, but there is evidence of

22 egregious misconduct.  As a result, the  good-faith defense against punitive damages is not

23 available to AMTRAK, and any punitive damages necessary, if any, to punish the Defendants

24 and deter them from committing the same offenses in the future should be resolved by a jury.

25 Dated: May 1, 2007                          PRICE AND ASSOCIATES

26                                             _/s/_  *Pamela Y. Price*

27                                             PAMELA Y. PRICE, Attorneys for Plaintiff
                                              JOHN EARL CAMPBELL

28