Kathleen Maylin (SBN 155371)
Cara Ching-Senaha (SBN 209467)
JACKSON LEWIS LLP
199 Fremont Street, 10th Floor
San Francisco, California 94105
Telephone: (415) 394-9400
Facsimile: (415) 394-9401

Attorneys for Defendants
NATIONAL RAILROAD PASSENGER
CORPORATION dba AMTRAK and JOE DEELY

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN EARL CAMPBELL,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>NATIONAL RAILROAD PASSENGER CORPORATION dba AMTRAK, JOE DEELY, and DOES 1-15, inclusive,<br><br>　　　　Defendants. | Case No. C05-05434 MJJ (EDL)<br><br>**DECLARATION OF CARA CHING-SENAHA IN SUPPORT OF DEFENDANT NATIONAL RAILROAD PASSENGER CORPORATION'S REQUEST FOR LEAVE TO FILE MOTION FOR RECONSIDERATION OF ORDER RE MOTIONS TO COMPEL**<br><br>[CONCURRENTLY FILED HEREWITH: REQUEST FOR LEAVE TO FILE MOTION FOR RECONSIDERATION RE MOTIONS TO COMPEL; REQUEST FOR JUDICIAL NOTICE; PROPOSED ORDER INCLUDING BRIEFING SCHEDULE]<br><br>Complaint Filed: 12/30/05<br>FAC Filed: 2/23/06<br>Trial: 7/23/2007<br><br>Hearing Date: May 1, 2007<br>Hearing Time: 9:00 a.m.<br>Dept.: Courtroom E, 15th Floor<br>Magistrate Judge Elizabeth D. Laporte<br><br>[L.R. 7-9(a), (b)] |

---

1

I, Cara Ching-Senaha, declare on the basis of personal knowledge:

1. I am an attorney with the law firm of Jackson Lewis LLP, counsel of record for Defendants NATIONAL RAILROAD PASSENGER CORPORATION dba AMTRAK and JOE DEELY. I am licensed to practice law in the above-referenced district court. I make the following statements based on personal knowledge.

2. I have read the depositions of Plaintiff John Earl Campbell and Human Resources manager Susan Venturelli, taken in this case.

3. Attached hereto as <u>Exhibit A</u> is a true and correct copy of excerpts from Mr. Campbell's deposition, as referenced in Amtrak's request for leave to file its motion for reconsideration of the court's May 1st discovery ruling.

4. Attached hereto as <u>Exhibit B</u> is a true and correct copy of excerpts from Ms. Venturelli's deposition, as referenced in Amtrak's request for leave to file its motion for reconsideration of the court's May 1st discovery ruling.

Executed this 31st day of May, 2007 in San Francisco, California. I declare under penalty of perjury under the laws of California and the United States of America that the foregoing is true and correct.

_____
CARA CHING-SENAHA

H:\N\National Railroad Passenger Corp (40707)\Campbell (89560)\Pleadings\Motion for Reconsideration\CMC declaration ISO recon req.doc

# EXHIBIT A

**Page 40**

```
1       THE WITNESS:  Oh, why did I leave?
2       MS. MAYLIN:  Yeah.
3       MS. PRICE:  Yes.
4       THE WITNESS:  Oh, I went to work for Amtrak
5  after that.
6       MS. MAYLIN:  Q.  Okay.  Well, it looks like
7  you -- oh, I see what you're saying.  Okay.  All right.
8  Okay.  And then it looks like you had a class at Merritt
9  College.  Did you have any other education beyond that,
10 sir?
11      A.  No.
12      Q.  Did you belong to any other unions, other than
13 the union you were at while you were at Southern Pacific
14 prior to joining Amtrak?
15      A.  No.
16      Q.  Have you testified -- other than your personal
17 injury lawsuit, and right now, have you testified in any
18 legal proceeding before?
19      A.  No.
20      Q.  Okay.  All right.  Sir, how did you first
21 learn about a position at Amtrak?
22      A.  The Internet.
23      Q.  And then did you submit an on-line application
24 or something else?
25      A.  On-line.
```

**Page 41**

```
1       Q.  What position did you apply for?
2       A.  Assistant conductor.
3       Q.  Okay.  And did you eventually interview for
4  the position?
5       A.  Yes.
6       Q.  Okay.  Who did you interview with?
7       A.  Denise Sargeant, Tom Oughton, and Dan Johnson.
8       Q.  And I understand you were hired?
9       A.  Yes.
10      Q.  Okay.  What was your starting salary, sir?
11      A.  Nine thirty an hour.
12      Q.  And did you join the union at that time?
13      A.  After 90 days, yes.
14      Q.  Which union did you join?
15      A.  The UTU.
16      Q.  And what was your -- I'm sorry.  What were
17 your job duties as an assistant conductor?
18      A.  Basically, I help passengers on and off the
19 train, take tickets, make sure of the safe operation of
20 the train I was assigned to.
21      Q.  No hard labor I take it?
22      A.  No.
23      Q.  And, sir, you mentioned safe operation of the
24 trains.  Did you have a -- a handbook or a guideline
25 that you had to follow as far as safety regulations?
```

**Page 42**

```
1       A.  Yes.
2       Q.  Okay.  How many booklets or handbooks did you
3  have, do you recall?
4       A.  Five.
5       Q.  Do you recall the names of those books?
6       A.  I -- ATM (sic) -- AMT, Amtrak Safety Book.
7  Union Pacific Special Instruction.  Union Pacific
8  Timetable.  BNSF Special Instruction.  BNSF Timetable.
9       Q.  Okay.  And it was your job to understand the
10 safety rules in those five books?
11      A.  Correct.
12      Q.  Okay.  All right.  Let's see, here.  So when
13 was it that you were initially hired, sir?
14      A.  September of '98.
15      Q.  Okay.  How long did you remain in the position
16 of assistant conductor?
17      A.  One year.
18      Q.  So to September '99?
19      A.  Yes.
20      Q.  Who was your supervisor at that time?
21      A.  Tom Oughton and Mark Schulthies.
22      Q.  I'm sorry?
23      A.  Mark Schulthies.
24      Q.  What were their positions, if you know?
25      A.  One was road foreman of engines.  I don't know
```

**Page 43**

```
1  what Tom's position was, but he was hired in March.
2       Q.  What shift did you work during that year?
3       A.  The first shift I was extra boards.
4       Q.  What does that mean?
5       A.  I was on call 24/7.
6       Q.  Okay.  So it could be any shift?
7       A.  Correct.
8       Q.  Was there a shift that you typically worked?
9       A.  Extra board, no.
10      Q.  It was all over the place?
11      A.  Yeah.
12      Q.  Okay.  And what site did you work, sir?
13      A.  Out of Oakland.
14      Q.  Do you know the address?
15      A.  Seventh Street is all I can tell you.
16      Q.  Okay.  Did you ever work at another site?
17      A.  No.
18      Q.  Okay.  During your time at Amtrak, did you
19 generally have information about other Amtrak sites,
20 other than the Oakland site?
21      A.  Yes.
22          MS. PRICE:  Objection.  Vague.
23          MS. MAYLIN:  Q.  And how did you gain that
24 information?
25          MS. PRICE:  Same objection.
```

DEPOSITION OF JOHN EARL CAMPBELL

13 (Pages 40 to 43)

**Page 44**

1  THE WITNESS: They post it on the bulletin
2 boards.
3  MS. MAYLIN: Q. Okay. So you would see job
4 opportunities for other sites?
5  A. Correct.
6  Q. What other sites did you see job opportunities
7 for?
8  MS. PRICE: Objection. Overbroad; vague as to
9 time.
10  THE WITNESS: Basically, the whole system.
11 You know, the whole Amtrak system.
12  MS. MAYLIN: Q. Well, throughout California
13 or just California or --
14  A. Every state they served they put the bulletin
15 up, you know.
16  Q. Okay. So as far as you understood -- and by
17 the way, where was this bulletin posted?
18  A. In the crew room.
19  Q. Okay. So there's a bulletin board in the crew
20 room?
21  A. Correct.
22  Q. Okay. And it was your understanding that they
23 would post open positions nationally on that board?
24  A. Correct.
25  Q. And was it your understanding that they would

**Page 45**

1 post all open positions?
2  A. Correct.
3  Q. And did you routinely look at that board?
4  A. Yes.
5  Q. Okay. Were you -- did you -- well, let me ask
6 this: Did you ever apply for a position, Mr. Campbell,
7 outside of the Oakland site?
8  A. No.
9  Q. Is it fair to say that you weren't interested
10 in a position outside of the Oakland site?
11  MS. PRICE: Objection. Vague; overbroad;
12 vague as to time.
13  THE WITNESS: Correct.
14  MS. MAYLIN: Q. And why is that?
15  A. My mom was handicapped, and I needed to stay
16 close to home.
17  Q. Okay. All right. So your -- the -- on the
18 extra boards for approximately a year?
19  A. Yes.
20  Q. Okay. After that time, how did your position
21 change?
22  A. I had enough seniority to basically hold any
23 position I wanted.
24  Q. "Any position" meaning what?
25  A. I -- I could bid on any position out of the

**Page 46**

1 Oakland crew base that basically can hold it
2 seniority-wise.
3  Q. Okay. And when you say "crew base," what does
4 that mean?
5  A. Just a central location that I reported to,
6 Oakland crew base.
7  Q. Well, does that mean that you could bid on any
8 assistant conductor or conductor position?
9  A. Yes.
10  Q. Were there any other positions outside of
11 assistant conductor or conductor that you felt that you
12 could bid on as of September '99?
13  A. Could bid on, no.
14  Q. Okay. All right. And so did you do that?
15  MS. PRICE: Objection. Vague.
16  MS. MAYLIN: Q. Did you bid on another
17 position in September '99?
18  A. I bid on the yard conductor job.
19  Q. Okay. Now, what's the difference in the
20 position between an assistant conductor and a yard
21 conductor?
22  A. The -- the -- the conductor or yard conductor,
23 especially the foreman, the boss. The assistant
24 conductor is basically his helper.
25  Q. So the yard conductor is the boss of the yard

**Page 47**

1 at that site?
2  A. The boss of the crew, not of the yard.
3  Q. Got it. Got it. Okay. All right. And did
4 you get that position, Mr. Campbell?
5  A. The first time, no.
6  Q. Did you have an understanding as to why you
7 didn't get that position?
8  A. Someone with more seniority bidded on it.
9  Q. Okay. So you didn't have a problem with that,
10 did you?
11  A. No. Seniority based, no problem.
12  Q. Okay. All right. And when -- did you
13 continue after that, then, working the extra boards?
14  A. No. I became the assistant yard conductor
15 after that.
16  Q. How did you acquire that job?
17  A. I bidded on it.
18  Q. Okay. Can you give me a month and year?
19  A. Not -- I can't narrow it down to exact -- but
20 it was 1999, thereabouts.
21  Q. Okay. Who was your supervisor then?
22  A. I think it's still Oughton, Schulthies.
23  Q. Okay. What was your shift?
24  A. First part it was the swing shift, which is
25 4 p.m. to 2 a.m.

# EXHIBIT B

4

DECLARATION OF CARA CHING-SENAHA IN SUPPORT OF DFDT. AMTRAK'S REQUEST FOR LEAVE
TO FILE MOTION FOR RECONSIDERATION   Case No. C05-05434 MJJ (EDL)

1  their name is in the system, will their name come up?
2  A.    If it's spelled the same, yes.
3  Q.    If the name comes up, what information will the
4  system give you about that person?
5  A.    The person's current address -- this is a new
6  system -- jobs that person has applied for, location of
7  the jobs the person has applied for, the phone number,
8  the recruiter associated, I believe, with previous
9  vacancies.  That pretty much covers it.
10 Q.    Who manages this SAP system, if anyone?
11 A.    It's managed at the corporate level.
12 Q.    By a person?
13 A.    Well, it's a very complex system, so there are --
14        MS. MAYLIN:          She's not asking about the
15 complexity; she just wants to know about who manages
16 it.
17        THE WITNESS:         I don't know the name of the
18 person that manages it.
19        MS. PRICE:       Q.  Is there a position or a
20 person that manages it?
21 A.    Various IT employees, as well as consultants,
22 various HR personnel.
23 Q.    Is there anyone in your department who has access
24 to this system?
25 A.    Everyone in my department has access to the