**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN EARL CAMPBELL,<br><br>            Plaintiff,<br><br>     v.<br><br>NATIONAL PASSENGER RAILROAD CORPORATION,<br><br>            Defendant.<br>_____/ | No. C 05-5434 CW<br><br>ORDER DENYING DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR A NEW TRIAL, AND GRANTING IN PART PLAINTIFF'S MOTION FOR PRE-JUDGMENT INTEREST AND INJUNCTIVE RELIEF |

On March 3, 2009, a jury returned a verdict in favor of Plaintiff John Campbell on his claims for race discrimination against Defendant National Passenger Railroad Corporation (Amtrak). Amtrak now moves for judgment as a matter of law or, in the alternative, a new trial. Plaintiff opposes this motion and moves for an award of back pay; reinstatement or, in the alternative, front pay; an injunction prohibiting Amtrak from retaliating against him or further discriminating against him; and pre-judgment interest. The matter was heard on June 11, 2009. Having considered oral argument and all of the materials submitted by the parties, the Court denies Amtrak's motion and grants Plaintiff's motion in part.

United States District Court
For the Northern District of California

BACKGROUND

Plaintiff was employed by Amtrak between 1998 and 2004, serving as a yard conductor at all relevant times.  In May, 2004, he applied for a position as an engineer trainee.  In July of that year, Amtrak decided not to select him for one of the open positions.  Plaintiff, who is African-American, asserts that Amtrak's denial of his application was motivated by discriminatory intent.  He notes that he received the highest score of any applicant, yet three white applicants were selected for the positions instead of him.  Although Amtrak claims that it did not select Plaintiff because of his poor safety record, Plaintiff asserts that this explanation is a pretext for discrimination.  In support of this assertion, Plaintiff notes that his safety record was as good or better than that of other applicants who were selected to become engineer trainees.

In September, 2004, Plaintiff was disciplined for disabling the brakes on a locomotive and leaving it unsecured in the course of coupling it to other railroad cars, which caused the locomotive to roll slowly away on its own.  As a consequence, Plaintiff's employment was terminated.  Plaintiff claims that his termination was motivated by discriminatory intent.  He does not deny committing the rule violation, but asserts that other employees who committed rule violations of similar severity were not punished as harshly.

Plaintiff brought this lawsuit under 42 U.S.C. § 1981, challenging the denial of his application for promotion and his subsequent termination as discriminatory on the basis of race. After trial, the jury rendered a verdict for Plaintiff on both of

2

his claims.   The jury awarded Plaintiff $297,716 in back pay,
$259,200 in front pay and $120,000 in non-economic damages.

DISCUSSION

I.    Amtrak's Motion

    A.    Legal Standard

        1.    Judgment as a Matter of Law

A motion for judgment as a matter of law after the verdict
renews the moving party's prior Rule 50(a) motion for judgment as a
matter of law at the close of all the evidence.   Fed. R. Civ.
P. 50(b).   Judgment as a matter of law after the verdict may be
granted only when the evidence and its inferences, construed in the
light most favorable to the non-moving party, permits only one
reasonable conclusion as to the verdict.   Where there is sufficient
conflicting evidence, or if reasonable minds could differ over the
verdict, judgment as a matter of law after the verdict is improper.
See, e.g., Kern v. Levolor Lorentzen, Inc., 899 F.2d 772, 775 (9th
Cir. 1990); Air-Sea Forwarders, Inc. v. Air Asia Co., 880 F.2d 176,
181 (9th Cir. 1989).

        2.    New Trial

A new trial may be granted if the verdict is not supported by
the evidence.   There is no easily articulated formula for ruling on
such motions.   Perhaps the best that can be said is that the motion
should be granted "[i]f, having given full respect to the jury's
findings, the judge on the entire evidence is left with the
definite and firm conviction that a mistake has been committed."
Landes Constr. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365,
1371-72 (9th Cir. 1987) (quoting 11 Wright & Miller, Fed. Prac. &
Proc. § 2806, at 48-49).

3

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1     The Ninth Circuit has found that the existence of substantial

2  evidence in support of the verdict does not prevent the court from

3  granting a new trial if the verdict is against the clear weight of

4  the evidence.  <u>Landes</u>, 833 F.2d at 1371.  "The judge can weigh the

5  evidence and assess the credibility of witnesses, and need not view

6  the evidence from the perspective most favorable to the prevailing

7  party."  <u>Id.</u>  Therefore, the standard for evaluating the

8  sufficiency of the evidence is less stringent than that governing

9  Rule 50(b) motions for judgment as a matter of law after the

10  verdict.

11     B.    Evidence of Discriminatory Intent

12     Amtrak argues that judgment as a matter of law or, in the

13  alternative, a new trial is warranted because there was

14  insufficient evidence to permit the jury to conclude that the

15  adverse actions against Plaintiff were motivated by discriminatory

16  animus.  Specifically, Amtrak argues that two types of evidence

17  were not probative of discriminatory intent: evidence of racial

18  slurs by the Amtrak regional manager, Joseph Deely, and others that

19  pre-dated the events at issue in this case; and evidence of the

20  treatment of other Amtrak employees who were not African-American.

21  Defendant argues that, absent this evidence, the evidence of

22  discriminatory intent was insufficient.  In the alternative, Amtrak

23  argues that this evidence was improperly admitted and more probably

24  than not resulted in the verdict for Plaintiff, and thus a new

25  trial is warranted.

26          1.    Evidence of Racial Slurs

27     Amtrak asserts that evidence of racial slurs by Mr. Deely and

28  others between 1991 and 1999 was not probative of discriminatory

**United States District Court**
For the Northern District of California

motive due to the lack of a direct connection between the comments and the actions challenged in this lawsuit.  On this basis, Amtrak argues both that the evidence was inadmissible and that, even if it was admissible, the evidence was not sufficient to permit the jury to infer that the challenged employment actions were discriminatory.

In particular, Amtrak objects to the testimony of Mary Fontaine, who worked for Amtrak until 1992 and was a union representative for Amtrak conductors until 1994.  Ms. Fontaine testified that the use of racial slurs was common at the Oakland yard, and that she heard Mr. Deely refer to another employee using a common racial slur sometime in 1991.  She also testified that Mr. Deely's interactions with African-American employees were "a little harsher or stricter in nature" than those with white employees.

Amtrak also objects to the testimony of Mary Gotthardt, who, according to Amtrak's recollection,[1] testified that she heard Mr. Deely say in 1995 that he "hates hiring" African-Americans, using a common racial slur, because they leave soon after they are trained. Ms. Gotthardt also testified that, in 1995, another Amtrak manager stated in Mr. Deely's presence that he was going to "give something to those ni--er bitches" to have typed and Mr. Deely did not reprimand him.

Finally, Amtrak objects to the testimony of Mark Schulthies, a manager who worked under Mr. Deely in 1998 and 1999.  Mr. Schulthies testified that Mr. Deely used racial slurs "many times."

---

[1]Neither party has submitted a transcript of Ms. Gotthardt's testimony.  Amtrak's contention is based on its counsel's recollection of the trial testimony.

United States District Court
For the Northern District of California

On one occasion, Mr. Deely told Mr. Schulthies that he chose not to attend Amtrak's 1998 Christmas party because he did not want to associate with African-American employees on his own time after having to "deal with" them all day.  According to Mr. Schulthies, Mr. Deely used a common racial slur to refer to African-American employees during the conversation and expressed a distaste for the type of music and food at the party because it was associated with African-Americans.  Mr. Schulthies also testified that Mr. Deely told him numerous times to keep African-American employees "in their place" and, on more than one occasion, that Plaintiff "didn't know his place" and needed to be "put down."

Under Ninth Circuit law, "[i]t is clear that an employer's conduct tending to demonstrate hostility towards a certain group is both relevant and admissible where the employer's general hostility towards that group is the true reason behind firing an employee who is a member of that group." Heyne v. Caruso, 69 F.3d 1475, 1479 (9th Cir. 1995); see also U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 713-14 n.2 (1983) (evidence of a decision-maker's generalized derogatory remarks about a particular group is relevant and admissible to prove race discrimination); Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1038 (9th Cir. 2005) ("Where a decisionmaker makes a discriminatory remark against a member of the plaintiff's class, a reasonable factfinder may conclude that discriminatory animus played a role in the challenged decision."); Warren v. City of Carlsbad, 58 F.3d 439, 443 (9th Cir. 1995) (holding that a supervisor's general derogatory comment about Hispanics supported an inference of discriminatory motive).  Notwithstanding this general principle, there does not

United States District Court
For the Northern District of California

appear to be any Ninth Circuit law addressing whether conduct probative of racial hostility is relevant to a discrimination claim when the conduct occurred a number of years before the challenged employment actions, as is the case here.

Amtrak cites two Ninth Circuit employment discrimination cases in which the court found that certain remarks by supervisors were insufficient to create an issue of fact adequate to withstand summary judgment.  The first, <u>Merrick v. Farmers Ins. Group</u>, 892 F.2d 1434 (9th Cir. 1990), does not address the timing of the remarks, but rather deals with their nature.  In <u>Merrick</u>, the plaintiff alleged that he had been passed over for a promotion because of his age.  The supervisor responsible for the promotion decision had remarked that the employee who was promoted was "a bright, intelligent, knowledgeable young man."  <u>Id.</u> at 1438.  The court found that this statement was a "stray remark" that, "[w]ithout more," was insufficient to create a triable issue of fact on the issue of discriminatory animus.  <u>Id.</u> at 1438-39.

It is not clear whether Amtrak argues that Mr. Deely's comments were "stray remarks" that are by their very nature incapable of establishing discriminatory animus, but it should go without saying that the "young man" statement is not comparable to the remarks Mr. Deely is alleged to have made.  Three witnesses testified that Mr. Deely used what is probably the most offensive word in the English language to refer to African-Americans.  His remarks are much more probative of bias against African-Americans than the remark in <u>Merrick</u> was probative of bias against older individuals.  In addition, Mr. Deely is alleged to have made multiple remarks over the course of several years, and thus they

7

United States District Court
For the Northern District of California

cannot be characterized as "stray."

The second case cited by Amtrak in which the Ninth Circuit affirmed summary judgment despite evidence of biased remarks is Nesbit v. Pepsico, Inc., 994 F.2d 703 (9th Cir. 1993). In Nesbit, which also involved a claim of age discrimination, the court considered whether the following evidence was sufficient to give rise to an inference of discrimination: 1) statistical evidence that some older workers were laid off while some younger workers were retained and that employees hired after the layoffs were generally younger than those who had been terminated; 2) a comment by the plaintiff's direct superior that "we don't necessarily like grey hair"; and 3) an article in which the defendant's Senior Vice President of Personnel was quoted as saying, "We don't want unpromotable fifty-year olds around." The court found that the statistical evidence did not tend to demonstrate that the layoffs were marked by any pattern of discrimination. Turning to the comments, the court found that the "grey hair" remark, which it characterized as "more than the 'stray remark' involved in Merrick," was "at best weak circumstantial evidence of discriminatory animus" toward the plaintiff because it was "uttered in an ambivalent manner and was not tied directly to [the plaintiff's] termination." Id. at 705. Similarly, the court found that the "unpromotable fifty-year olds" comment was "very general and did not relate in any way, directly or indirectly," to the plaintiff's termination. Id. The court concluded that there was insufficient evidence to create a triable issue of fact on the issue of discriminatory motive.

Amtrak is correct that Mr. Deely's remarks were not directly

United States District Court
For the Northern District of California

connected to Plaintiff's termination.  Nonetheless, they are not "ambivalent" or ambiguous, and are probative of a general hostility to a protected class in a way that the remarks in Nesbit are not. Amtrak has cited no case holding that similar comments that evince racial bias are per se inadmissible or not probative of discriminatory motive simply because they are unrelated to the employment decision in question.  Indeed, requiring racist remarks to relate directly to the employment decision in order to be admissible would eviscerate the broad principle that an employer's conduct tending to demonstrate general hostility towards a certain group is admissible as evidence that the decision was discriminatory.  In addition, the question before the Nesbit court was whether the two remarks, standing alone, were sufficient to defeat summary judgment.  Nesbit did not hold that the remarks were inadmissible.  Here, there was evidence of multiple remarks that are probative of Mr. Deely's racial hostility, as well as other evidence of discriminatory intent, as discussed below.  The Court need not determine whether one or two comments, without more, would permit an inference that the actions taken against Plaintiff were discriminatory.

Amtrak also contrasts two discrimination cases in which the Ninth Circuit reversed the district court's grant of summary judgment in the defendant's favor.  The first, Cordova v. State Farm Ins. Cos., 124 F.3d 1145 (9th Cir. 1997), held that the plaintiff had established a triable issue of fact on her claim for discriminatory failure to promote.  Included in the evidence that supported the plaintiff's position was a statement by the individual in charge of hiring decisions that another employee was

a "dumb Mexican."  Even though the remark referred to an employee other than plaintiff and was made after the hiring decision at issue, the court found that it was "direct evidence of . . . discriminatory animus."  Id. at 1149.  Amtrak notes that, in support of its conclusion, the Cordova court stated that "the timing of [the] alleged remarks is not so far removed from the contested hiring decision so as to render them completely unrelated to that decision."  Id.  However, this statement was not central to the court's discussion and is dictum.  In addition, the court's statement does not compel the conclusion that any racist remark that is removed in time from the hiring decision is necessarily inadmissible or not probative of discriminatory animus.

The second case in which the Ninth Circuit reversed the district court's grant of summary judgment is Lam v. University of Hawaii, 40 F.3d 1551 (9th Cir. 1994).  The Lam court considered the Seventh Circuit's statement in Hunter v. Allis-Chalmers Corp., 797 F.2d 1417, 1423 (7th Cir. 1986), that "acts 'remote in time or place' may be excluded under Fed. R. Evid. 403."  Lam, 40 F.3d at 1562.  The Ninth Circuit stated that, even if Hunter were "read broadly," it would not be helpful to the defendants because the plaintiff "testified not to remote acts but to a consistent pattern of behavior on the part of Professor A. -- a member of the relevant department -- with one manifestation of his alleged discriminatory attitude having occurred only a few months before the directorship search."  Id. at 1563.  The court did not adopt a rule that would absolutely bar evidence of racist conduct occurring a number of years before the challenged employment actions, and thus Lam does not indicate that the evidence of Mr. Deely's past comments was

inadmissible.

Although Amtrak has cited some out-of-circuit cases in support of its position that temporally removed racist statements are not admissible to show discriminatory intent, the Court is not bound to follow these cases. The Court rejects the argument that, simply because Mr. Deely's alleged comments were made a number of years before the employment decisions at issue, they should have been excluded at trial. Although more recent statements may have been more probative of discriminatory animus, the jury was entitled to evaluate the persuasiveness of the evidence for itself. Amtrak's counsel highlighted the age of the statements, and the jury could very well have come to the conclusion that Mr. Deely had changed his opinion of African-Americans between 1999 and 2004. But the probative value of the evidence was substantial, particularly given the nature of the statements at issue. And, even though the statements may have been "inflammatory," to use Amtrak's word, racist statements are by their very nature inflammatory. This does not provide a basis to exclude them as evidence.

The Court concludes that evidence of the racist remarks between 1991 and 1999 was probative of discriminatory intent, was admissible and was sufficient, combined with the other evidence, to permit the jury to conclude that the actions taken against Plaintiff were motivated by discriminatory animus.

     2.   Evidence of Treatment of Similarly Situated Employees

It is undisputed that evidence of disparate treatment of employees who are of a different race than the plaintiff but who are otherwise similarly situated may be introduced as evidence that

**United States District Court**
For the Northern District of California

an adverse employment action was discriminatory.  <u>See, e.g.</u>,

<u>Vasquez v. County of Los Angeles</u>, 349 F.3d 634, 641 (9th Cir.

2003).  At trial, Plaintiff offered evidence that employees with

similar disciplinary backgrounds who were not African-American were

not terminated for committing rule violations similar to the

violation for which Plaintiff was terminated.  Amtrak argues that

this evidence should not have been admitted and, in any event, was

not probative of discriminatory motive because the other employees

were not situated similarly to Plaintiff in two respects: they did

not engage in conduct of comparable seriousness, and they were not

disciplined by the same supervisors.  This argument is directed

exclusively at Plaintiff's termination claim; the relevant portions

of Amtrak's briefs do not discuss employees who were promoted in

lieu of Plaintiff, let alone attempt to show that any such

employees were not situated similarly to Plaintiff.

Amtrak notes that, in order for two employees to be considered

similarly situated, they must "have similar jobs and display

similar conduct."  <u>Id.</u> at 641.  Amtrak asserts that the violation

of the safety rules for which Plaintiff was terminated was more

serious than those of other employees because only Plaintiff

"knowingly and intentionally violated a safety rule by failing to

secure a locomotive prior to coupling," and thus the discipline of

the other employees is not probative of discriminatory intent.  The

"intentional violation" distinction, however, appears to be the

product of <u>post hoc</u> rationalization, as Amtrak has not pointed to

any formal policy that mandates different consequences for

intentional rule violations and what it characterizes as simply

poor judgment calls.  Nor would it make sense to terminate one

United States District Court
For the Northern District of California

employee for engaging in an intentional rule violation the consequence of which was relatively minor, while merely reprimanding someone who made a poor judgment call that resulted in more serious consequences.  As for the seriousness of the safety consequences of the rule violations, while none of the other employees committed exactly the same rule violation as Plaintiff, the other employees engaged in rule violations that caused collisions and derailments.  While the safety risks of collisions and derailments are not precisely the same as the risk of a locomotive rolling down the tracks on its own, they are sufficiently similar to enable the jury to determine whether the fact that the other employees were not terminated suggested a discriminatory intent.

As for Amtrak's argument that the employees who were used as comparators were not similarly situated because they were disciplined by other supervisors, Amtrak has pointed to no Ninth Circuit case that provides that only employees with the same supervisor are similarly situated.  Morever, Plaintiff's theory of the case is that Mr. Deely had the last word on all significant disciplinary decisions, regardless of the supervisor who signed the disciplinary report.  In addition, the fact that some of the disciplinary actions were imposed on other employees between June, 1999 and November, 2002, during which time Mr. Deely was not employed by Amtrak, does not mean that the employees were not similarly situated.  Plaintiff used the example of these employees, all of whom were disciplined after Mr. Deely returned as well, to demonstrate that Amtrak's purported "three strikes" rule was a pretext for discrimination because other employees were not

13

terminated on their third or higher strike when Mr. Deely was in charge.[2]

In short, there may be cases where it is so clear that another employee is not situated similarly to the plaintiff that it is appropriate to decide the issue as a matter of law.  In those cases, it would be appropriate to exclude evidence of the comparator employee's treatment as a means of showing discriminatory intent.  Absent such clarity, however, the issue of is one of fact, which is appropriately left to the jury.  Bowden v. Potter, 308 F. Supp. 2d 1108, 1117 (N.D. Cal. 2004) ("The Court first notes that not only must all inferences be drawn in Mr. Bowden's favor but also that the question of similarly situated is generally an issue of fact.") (citing Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003); Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)); Gifford v. Atchison, Topeka and Santa Fe Ry. Co., 685 F.2d 1149, 1156 (9th Cir. 1982) ("We conclude that Gifford offered sufficient evidence to raise an issue of fact.  The district court erred in deciding as a matter of law that Gifford and the two male employees who were not fired were not similarly situated.").  Here, there was a triable issue of fact as to whether the other employees were situated similarly to Plaintiff.  Amtrak argued to the jury that Plaintiff's infractions were more serious than those of the other employees and were otherwise distinguishable, but the jury apparently rejected this explanation of Plaintiff's treatment, as it was entitled to do.  The issue of

United States District Court
For the Northern District of California

---

[2]Similarly, the fact that Mr. Deely did not work for Amtrak when Plaintiff received his first two disciplinary actions is irrelevant.  Those actions are not being challenged in this lawsuit.

United States District Court
For the Northern District of California

similar situation provides no basis for overturning the jury's verdict or ordering a new trial.

C.   Weight of the Evidence

Amtrak argues that, in the alternative to granting judgment as a matter of law or ordering a new trial for the reasons described above, the Court should order a new trial because the jury's verdict was against the clear weight of the evidence.

First, Amtrak argues that there is "no persuasive evidence" that Mr. Deely or Mr. Shelton knew Plaintiff.  Plaintiff, however, points out that there is evidence that Mr. Shelton was on the panel that interviewed him in connection with a previous application for engineer trainee.  There is also evidence that Mr. Shelton met with another employee to discuss Plaintiff, which implies that Mr. Shelton knew who Plaintiff was.  As for Mr. Deely, there is evidence that he was introduced to Plaintiff when he was introduced to the members of Plaintiff's yard crew.  There is also evidence that Plaintiff left a memorable telephone message for Mr. Deely on one occasion and that, on another occasion, Mr. Deely told Mr. Schulthies to keep Plaintiff "in his place."  There was thus sufficient evidence at trial for the jury to conclude that Mr. Deely and Mr. Shelton knew who Plaintiff was and were aware of his race.  Amtrak argues that Plaintiff's testimony should not be credited because, as discussed further below, he lied at his deposition about whether he had disengaged the locomotive's brakes. Nonetheless, the Court is not the finder of fact, and cannot in its rulings simply "ignore every material word that [Plaintiff] said," as Amtrak requests.  Def.'s Mot. at 15.

Amtrak also argues that there was "no persuasive evidence"

15

that Mr. Deely participated in the decision to terminate Plaintiff.
Although Mr. Deely denied having any involvement in the decision,
there was evidence that he was required to be involved in any
personnel decision of this type.  The jury was entitled to discount
the testimony that Mr. Deely happened not to be involved on this
particular occasion.

Amtrak repeats its argument that the evidence of racial slurs
and similarly situated employees, discussed above, does not support
the inference that the challenged employment decisions were
discriminatory.  As discussed, this evidence was relevant and
supports the jury's verdict.  Amtrak further argues that much of
the testimony about racial slurs was weak.  In particular, Amtrak
argues that, even though Mr. Schulthies testified that Mr. Deely
told him to keep African-American employees "in their place," there
is no evidence that Mr. Deely knew which employees were African-
American.  As explained above, the jury was entitled to conclude
that Mr. Deely knew Plaintiff and, by extension, knew that
Plaintiff was African-American.  Amtrak's argument concerning the
race of other employees is not clear; Mr. Deely's instruction to
keep African-Americans in their place is probative of racial bias,
regardless of whether he knew the race of any given employee at any
given point in time.  Amtrak also argues that Ms. Gotthardt's
testimony about Mr. Deely's racial slurs is weak because Mr.
Deely's office, where the alleged exchanges that Ms. Gotthardt
identified took place, was not in the building that she described.
The jury was presented with this evidence and was entitled to draw
its own conclusions about a discrepancy it could have viewed as
minor.

United States District Court
For the Northern District of California

Amtrak also casts doubt on Mr. Schulthies' testimony about Mr. Deely's expressed reasons for not attending the Christmas party. At trial, Mr. Schulthies testified that, when discussing these reasons, Mr. Deely referred to African-American employees using an offensive racial slur, whereas at his deposition, Mr. Schulthies testified that Mr. Deely had used the phrase "those people" to refer to African-American employees.  When confronted with this inconsistency, Mr. Schulthies explained that at his deposition, he had refrained from using the slur because he was uncomfortable saying the word, and that his omission of this detail at the deposition was "not a material lie."  Amtrak takes the last portion of this explanation to mean that Mr. Schulthies admitted lying about Mr. Deely's use of the slur, but did not consider the lie to be material.  This interpretation is not supportable.  And, in any event, the jury was presented with evidence of the inconsistency and was free to draw its own conclusion about Mr. Schulthies' credibility.

Amtrak further argues that, even if race was a motivating factor for its termination of Plaintiff, the jury was required to conclude that Amtrak would have made the same decision even if race had not been a motivating factor.  Amtrak bases this argument on the fact that the officer at Plaintiff's disciplinary hearing sustained the charges against Plaintiff and that Mr. Shelton testified that he would make the same decision today.  The jury was not required to credit Mr. Shelton's testimony, and there was evidence that other employees with similar disciplinary histories and who had committed similarly serious rule violations were not terminated.

**United States District Court**
For the Northern District of California

1    In sum, the jury's verdict is not clearly contrary to the

2    clear weight of the evidence so as to warrant a new trial.

3    II.   Plaintiff's Motion

4         A.   Back Pay

5         Although the jury awarded Plaintiff $297,716 in back pay, the

6    parties now agree that back pay is an equitable remedy for the

7    Court to decide.   See Lutz v. Glendale Union High Sch., 403 F.3d

8    1061, 1068-69 (9th Cir. 2005).   Amtrak argues that Plaintiff should

9    not be awarded back pay because he lied at his deposition,

10   testifying that he had not disabled the brakes on the locomotive.

11   At trial, Plaintiff admitted that he had disabled the brakes and

12   that he had perjured himself at his deposition.   As Amtrak notes,

13   it is within a court's discretion to deny equitable remedies on the

14   basis that the plaintiff has lied under oath.   See NLRB v.

15   Magnusen, 523 F.2d 643, 645-46 (9th Cir. 1975).

16        Although the Court does not condone Plaintiff's conduct, it

17   will not deny equitable relief because of that conduct.   Plaintiff

18   admitted at trial that he had committed the rule violation that led

19   to his termination, and it was this testimony that the jury

20   considered when it reached its decision that the termination was

21   discriminatory.   Plaintiff was also forthcoming at trial about his

22   past falsehood.

23        The Court will therefore order back pay to compensate

24   Plaintiff for his termination.   The Court will defer to the jury's

25   calculation of back pay.

26        B.   Reinstatement or Front Pay

27        Plaintiff requests that the Court order that Amtrak reinstate

28   him to the position of engineer trainee or, in the alternative,

18

award him front pay. The Ninth Circuit has held that "reinstatement, when it is feasible, is the preferred remedy in a discrimination suit." Gotthardt v. National R.R. Passenger Corp., 191 F.3d 1148, 1156 (9th Cir. 1999) (internal quotation marks omitted). However, "awards of front pay are appropriate when it is impossible to reinstate the plaintiff." Id. (quoting Thorne v. City of El Segundo, 802 F.2d 1131, 1137 (9th Cir. 1986)).

Because reinstatement is feasible here, the Court will order Plaintiff reinstated as an Amtrak employee. However, although the jury concluded that Plaintiff would have been selected as an engineer trainee if it had not been for his race, the Court cannot overlook that, subsequent to being denied the promotion, Plaintiff left a locomotive unsecured during a coupling procedure in clear violation of safety rules. Plaintiff now acknowledges committing the violation, notwithstanding his deposition testimony to the contrary. This rule violation was not on Plaintiff's disciplinary history when he was considered for the engineer trainee position. If it had been, Amtrak may have been justified in denying his application. And while the jury found that the violation did not warrant terminating Plaintiff, the violation was nonetheless serious.

Considering the potentially disastrous consequences that could result from a mistake on the part of a locomotive engineer, the Court cannot in good conscience order Plaintiff promoted to an engineer trainee given the rule violation he committed subsequent to being denied the promotion in the first instance. Accordingly, having considered the equities, the Court concludes that, while it is appropriate to reinstate Plaintiff as a yard conductor, it is

United States District Court
For the Northern District of California

not appropriate to order Amtrak to promote him to the position of engineer trainee.

In order to place Plaintiff in a position similar to that in which he would be had he not been terminated, Amtrak must afford him seniority rights as if he had been an Amtrak employee for the period of time between his termination and the present date. Because the Court is ordering Plaintiff reinstated, his request for an award of front-pay is denied as moot.

C.   Other Injunctive Relief

Plaintiff seeks an injunction prohibiting Amtrak from discriminating against him in the future or retaliating against him for bringing this lawsuit.  "Generally, a person subjected to employment discrimination is entitled to an injunction against future discrimination, unless the employer proves it is unlikely to repeat the practice."  EEOC v. Goodyear Aerospace Corp., 813 F.2d 1539, 1544 (9th Cir. 1987) (citations omitted).  Far from offering assurances that it will not engage in discrimination or retaliation in the future, Amtrak continues to deny that it discriminated against Mr. Campbell to begin with.  Accordingly, an injunction is warranted.

D.   Pre-judgment Interest

Although Plaintiff has not cited any Ninth Circuit case holding that pre-judgment interest should be awarded on back pay in § 1981 cases, the Ninth Circuit has held that pre-judgment interest should be awarded in cases brought under the Fair Labor Standards Act:

> The reason for awarding pre-judgment interest is to make whole those employees who have been deprived of wages unlawfully.  An award of pre-judgment interest also

**United States District Court**
For the Northern District of California

1
2
3
4

> serves to discourage unlawful employment practices by
> denying to employers the interest-free use of money that
> is being delayed by administrative and judicial process.
> For these reasons, we conclude that it is ordinarily an
> abuse of discretion not to include pre-judgment interest
> in back-pay awards under the FLSA.  Affected employees,
> therefore, are entitled to pre-judgment interest.

5 Ford v. Alfaro, 785 F.2d 835, 842 (9th Cir. 1986).  The Ninth

6 Circuit's rationale applies equally to back pay awarded under

7 § 1981.  Accordingly, the Court will order Amtrak to pay pre-

8 judgment interest.

9      "Generally, the interest rate prescribed for post-judgment

10 interest under 28 U.S.C. § 1961 is appropriate for fixing the rate

11 of pre-judgment interest . . . ."  Blankenship v. Liberty Life

12 Assurance Co. of Boston, 486 F.3d 620, 628 (9th Cir. 2007).  This

13 statute provides that interest is calculated "at a rate equal to

14 the weekly average 1-year constant maturity Treasury yield, as

15 published by the Board of Governors of the Federal Reserve System,

16 for the calendar week preceding. [sic] the date of the judgment."

17 In Nelson v. EG & G Energy Measurements Group, Inc., 37 F.3d 1384,

18 1391 (9th Cir. 1994), the court stated:

19
20
21
22
23
24

> EG & G argues that the pre-judgment interest rate should
> have been calculated at the 52-week Treasury bill rate[3]
> as of the time of judgment, which was 3.51 percent.  This
> does not correspond with the approach taken in Western
> Pacific Fisheries[, Inc. v. S.S. President Grant, 730
> F.2d 1280, 1289 (9th Cir. 1984)].  In that case,
> insurance underwriters had paid out funds for which they
> sought reimbursement.  The interest rate utilized for the
> pre-judgment interest was the average 52-week Treasury
> bill rate operative immediately prior to the date of
> payment by the underwriters.  This makes good sense

25

26
27
28

---

[3]At the time Nelson was decided, 28 U.S.C. § 1961(a) provided
that the applicable interest rate was "the coupon issue yield
equivalent (as determined by the Secretary of the Treasury) of the
average accepted auction price for the last auction of fifty-two
week United States Treasury bills settled immediately prior to the
date of the judgment."

United States District Court
For the Northern District of California

because pre-judgment interest is intended to cover the
lost investment potential of funds to which the plaintiff
was entitled, from the time of entitlement to the date of
judgment.  It is the Treasury bill rate during this
interim that is pertinent, not the Treasury bill rate at
the time of judgment.  The Treasury bill rate at the time
of judgment has no bearing on what could have been earned
prior to judgment.

The method of calculating the pre-judgment interest
utilized by the district court reasonably reflected this
approach.  The interest due was calculated as though the
plaintiffs had invested the withheld funds at the 52-week
Treasury bill rate and then reinvested the proceeds
annually at the new rate.  This reasonably reflects the
conservative investment income the plaintiffs would have
been able to have earned had they received the funds on
September 30, 1987.

37 F.3d at 1391-92.

Plaintiff's proposed method of calculating pre-judgment

interest is erroneous because it assumes that Plaintiff would have

been paid his entire amount of back wages -- and begun earning

interest on the sum -- on the date of his termination.  In reality,

he would have been paid only a portion of the back wages at that

time, with additional payments occurring on a periodic basis.

Thus, Plaintiff is due interest equivalent to that which would have

accrued if he had invested his back wages, at the time they would

have been paid, at a rate equal to the weekly average one-year

constant maturity Treasury yield on the date the wages were due to

him, and then reinvested the proceeds annually at a rate equal to

the weekly average one-year constant maturity Treasury yield at the

time of the reinvestment, up to the date on which Amtrak satisfies

the judgment.  In practice, this calculation may be difficult to

perform with precision.  Accordingly, the parties should attempt to

stipulate to a figure for pre-judgment interest that approximates

the result that would obtain under this approach, based on

1    prorating the total back pay award of $297,716 over a set number of

2    intervals between the date of Plaintiff's termination and the

3    present.  If a dispute arises, the parties may seek the Court's

4    intervention.

5                              CONCLUSION

6        For the foregoing reasons, the Court DENIES Amtrak's motion

7    for judgment as a matter of law or a new trial (Docket No. 252),

8    and GRANTS Plaintiff's motion for pre-judgment interest and

9    equitable relief, as modified herein (Docket No. 243).  Amtrak's

10   motion to strike (Docket No. 254) the declaration of Richard

11   Palfin, which contains calculations for an award of front pay, is

12   DENIED; this motion is moot in light of the fact that the Court has

13   not granted an award of front pay.

14       IT IS SO ORDERED.

15

16   Dated: 8/21/09

17                                  CLAUDIA WILKEN
                                    United States District Judge

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California